IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Legacy Foundation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| National Union Fire Insurance Company of | ) | Civil Action No. 07-248 (SLR) |
| Pittsburgh, Pennsylvania, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| The Travelers Indemnity Company of America, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**AMERICAN LEGACY FOUNDATION'S
OPPOSITION TO MOTION OF NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA FOR PARTIAL DISMISSAL**

GILBERT RANDOLPH LLP
Richard Shore
Kami E. Quinn
1100 New York Avenue, NW
Suite 700
Washington, DC 20005
Telephone: (202) 772-2200
and

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Counsel for Plaintiff
American Legacy Foundation

Dated: February 8, 2008

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS .......................... 2

I.      STATEMENT OF FACTS ................................... 4

  A.    The Tobacco Litigation and the Creation of the
      American Legacy Foundation ...................... 4

  B.    The truth® Public Education Campaign .............. 4

  C.    Lorillard's Efforts to Destroy the truth® Campaign . 5

  D.    The Foundation's Litigation with Lorillard ........ 6

  E.    The National Union D&O Policy and National Union's
      Refusal to Provide the Promised Coverage ......... 7

II.     ARGUMENT ........................................... 9

  A.    Summary of Argument .............................. 9

  B.    Standard Governing a Motion to Dismiss ........... 10

  C.    Standard Applicable to National Union's Duty to
      Advance Defense Costs under the D&O Policy ....... 10

III.    CONCLUSION ......................................... 25

## TABLE OF AUTHORITIES

Page

**Cases**

*Aetna Commercial Ins. Co. v Am. Sign Co.,*
  687 So. 2d 834 (Fla. Dist. Ct. App. 1996) ........................................................................ 19

*Am. Continental v. Pooya,*
  666 A.2d 1193 (D.C. 1995) ...................................................................................... 13, 20

*Am. Ins. Group v. Risk Enter. Mgmt., Ltd.,*
  761 A.2d 826 (Del. 2000) ............................................................................................. 12

*Am. Legacy Found. v. Lorillard Tobacco Co.,*
  No. 579,2005 (Del. Feb. 9, 2006) ............................................................................ 18, 19

*Am. Registry of Pathology v. Ohio Cas. Ins. Co.*
  461 F. Supp. 2d 61 (D.D.C. 2006) .................................................................................. 25

*AT&T Corp. v. Clarendon Am. Ins. Co.,*
  931 A.2d 409 (Del. 2007) ............................................................................................. 24

*Bell Atlantic Corp. v. Twombly,*
  127 S. Ct. 1955, 1969 (2007) ........................................................................................ 10

*Brown v. Am. Int'l Group, Inc.,*
  339 F. Supp. 2d 336 (D. Mass. 2004) ............................................................................. 25

*Centaur Partners, IV v. Nat'l Intergroup, Inc.,*
  582 A.2d 923 (Del. 1990) ............................................................................................. 17

*Chase v. State Farm Fire & Cas. Co.,*
  780 A.2d 1123 (D.C. 2001) ...................................................................................... 12, 19

*Cheney v. Canfield,*
  111 P. 92 (Cal. 1910) ................................................................................................... 18

*Continental Cas. Co. v. Alexis I. DuPont Sch. Dist.,*
  317 A.2d 101 (Del. 1974) ............................................................................................. 14

*Continental Ins. Co. v. Burr,*
  706 A.2d 499 (Del. 1998) ............................................................................................. 19

*Delledonne v. State Farm Mut. Auto. Ins. Co.,*
  621 A.2d 350 (Del. Super. Ct. 1992) ............................................................................... 19

*Doe v. Cahill,*
  884 A.2d 451 (Del. 2005) ...................................................................... 22

*E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.,*
  711 A.2d 45 (Del. 1995) ...................................................................... 12

*Emmons v. Hartford Underwriters Ins. Co.,*
  697 A.2d 742 (Del. 1997) .................................................................... 11

*Hurley v. Columbia Cas. Co.,*
  976 F. Supp. 268 (D. Del. 1997) ..................................................... 12, 25

*In re Am. Metrocomm Corp.,*
  274 B.R. 641, 659 (Bankr. D. Del. 2002) .............................................. 11

*In re WorldCom, Inc. Sec. Litig.,*
  354 F. Supp. 2d 455 (S.D.N.Y. 2005) ................................................... 25

*Interstate Fire & Cas. Co. v. 1218 Wisconsin, Inc.,*
  136 F.3d 830, 833 (D.C. Cir. 1998) ...................................................... 14

*Johnston v. Tally Ho, Inc.,*
  303 A.2d 677 (Del. Super. Ct. 1973) ............................................... 14, 22

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,*
  507 U.S. 163 (1993) ............................................................................ 10

*Meade v. Prudential Ins. Co. of Am.,*
  477 A.2d 726 (D.C. 1984) ................................................................... 11

*New Castle County, Delaware v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,*
  243 F.3d 744 (3d Cir. 2001) ...................................................... 12, 13, 20

*NY Times v. Sullivan,*
  376 U.S. 254 (1964) ............................................................................ 23

*Oliver B. Cannon & Son, Inc. v. Dow-Oliver, Inc.,*
  394 A.2d 1160 ..................................................................................... 19

*Penn Mut. Life Ins. Co. v. Oglesby,*
  695 A.2d 1146 (Del. 1997) .................................................................. 11

*Philadelphia Newspapers v. Hepps,* 475 U.S. 767 (1986) ....................... 23

*Sherman v. Ambassador Ins. Co.,*
  670 F.2d 251 (D.C. Cir. 1981) ............................................................. 12

*State Farm Mut. Auto. Ins. Co. v. Johnson,*
  330 A.2d 345 (Del. 1974) ................................................................... 19

*Steigler v. Ins. Co. of N. Am.,*
    384 A.2d 398 (Del. 1978) .................................................................................. 11

*Stevens v. United Gen. Title Ins. Co.,*
    801 A.2d 61 (D.C. 2002) .......................................................................... 14, 22

*Travelers Indem. Co. of Illinois v. United Food Commercial Works Int'l Union,*
    770 A.2d 978 (D.C. 2001) ................................................................ 11, 19, 21

*Twin City Fire Ins. Co. v. Del. Racing Ass'n,*
    840 A.2d 624 (Del. 2003) ................................................................................ 11

*Williams v. Stone,*
    109 F.3d 890 (3d Cir. 1997) ............................................................................ 11

**Statutes**

Fed. R. Civ. P. 12(b) (2008)............................................................................. 23

**Unreported Cases**

8 William Meade Fletcher, *et al.*, Fletcher Cyclopedia of the Law of Private Corporations, §
    4198 (Westlaw 2007)...................................................................................... 18

*Am. Chem. Soc'y v. Leadscope, Inc.,*
    No. 04AP-305, 2005 WL 1220746, at *4-7 (Ohio Ct. App. May 24, 2005) ........................... 25

*Dover Downs, Inc. v. TIG Ins. Co.,*
    No. 04-199-SLR, 2004 WL 1812703, at *5 (D. Del. Aug. 11, 2004) .................................. 13

*Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* No. 89C-SE-35, 1994
    WL 721651, at *5 (Dcl. Super. Ct. March 28, 1994) (citations omitted)................................. 11

*Home Ins. Co. v. Am. Ins. Group,* No. 97C-04-024, 2003 WL 22683008, at *2 (Del. Super. Ct.
    Oct. 30, 2003) ........................................................................................... 24

*Perlegos & Perlegos v. Atmel Corp.,*
    No. 2320-N, 2007 Del. Ch. LEXIS 25, at *105 n.184 (Del. Ch. Feb. 8, 2007)........................ 17

*Salaman v. Nat'l Media Corp.,*
    No. 12365 Del. Ch. LEXIS 4, at * (Del Ch. Jan. 14, 1992) ....................................... 17

## NATURE AND STAGE OF THE PROCEEDINGS

This is an insurance coverage action brought by the American Legacy Foundation (the "Foundation"), a non-profit charitable organization whose mission is "building a world where young people reject tobacco and anyone can quit." The Foundation seeks to recover the approximately seventeen million dollars it spent successfully defending itself against an attack by Lorillard Tobacco Company ("Lorillard") on truth®, the proven-effective and award-winning centerpiece of its youth anti-smoking campaign. The Foundation and truth® were vindicated after five years of hard-fought litigation in Delaware state courts: both the Chancery Court and the Supreme Court (in a unanimous decision) ruled that Lorillard's claims were without merit.

The Foundation purchased insurance coverage to protect itself from claims such as those asserted by Lorillard, including the directors' and officers' ("D&O") liability insurance policy issued by National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union") that is at issue here (the "National Union D&O Policy" or the "D&O Policy"). When Lorillard informed the Foundation that it intended to pursue litigation over the truth® campaign, the Foundation promptly notified National Union. Rather than standing by its insured, however, National Union refused to advance the Foundation's defense costs, as it had promised to do in the D&O Policy. Instead, National Union disclaimed its coverage obligations, leaving the Foundation to fend for itself.

In its Motion, National Union seeks partial dismissal of the Foundation's complaint, arguing that it does not have to pay the Foundation's defense costs under the D&O Policy because the underlying litigation was "largely contractual" and the D&O Policy excludes coverage for contractual liability arising out of an "express contract." It is a fundamental principle of insurance law that in order to avoid its duty to pay defense costs, an insurer must

show that the allegations made in the underlying case fall entirely *outside* the coverage of the policy. Where, as here, the insurer relies on an exclusion to avoid its obligations to pay defense costs, the insurer must show that the allegations made in the underlying case are entirely *within* the exclusion on which it relies. National Union cannot meet this burden.

Lorillard alleged that the Foundation was bound by the contract on which National Union relies not because the Foundation was a party or signatory to that contract, but as a result of the Foundation's conduct. Any alleged contractual liability of the Foundation thus was based not on an "express contract," but rather on an implied-in-fact contract not within the exclusion. Indeed, Lorillard specifically alleged that the Foundation's liability arose out of an implied contract. Moreover, even if the contract were deemed to be an "express contract," the exclusion provides specifically that it does not apply if the alleged liability would attach in the absence of the "express contract," and here, Lorillard's claims also were based on the Foundation's non-contractual governing documents and on allegations that the Foundation published disparaging and defamatory material about Lorillard.

Apparently recognizing that it cannot demonstrate that the allegations made by Lorillard are within the "express contract" exclusion, National Union attempts to bring the entire record of the underlying litigation – a proceeding that lasted five years and generated a record of tens of thousand pages – before the court. This is improper on a motion to dismiss, which with certain limited exceptions must be based exclusively on the allegations in the Foundation's complaint. More important, it is contrary to the fundamental principle of insurance law that an insurer's duty to pay defense costs depends solely on the complaint in the underlying case, not on the entire record of the underlying proceedings. In any event, the underlying record merely confirms that

the Foundation's alleged liability was not within the "express contract" exclusion on which

National Union relies.[1]

## I.  STATEMENT OF FACTS

### A.    The Tobacco Litigation and the Creation of the American Legacy Foundation

In November 1998, Lorillard and the three other major U.S. tobacco companies entered

into a historic settlement agreement with nearly all of the states and U.S. territories known as the

Master Settlement Agreement (the "MSA").  Complaint for Damages ("Compl."). ¶ 9 (Appendix

Exhibit A).  The MSA resolved dozens of claims brought against the tobacco companies by the

states to recover billions of dollars they had spent on their citizens due to the adverse health

effects of tobacco products.  *Id.* ¶ 8-9.  The Foundation did not exist when the aforementioned

parties entered into the MSA, and the Foundation is not a signatory or party to the MSA.  The

parties to the MSA agreed to direct a portion of the states' recovery to create a non-profit

charitable organization dedicated, in significant part, to the reduction of youth smoking.  *Id.* ¶ 10.

Accordingly, in March 1999, the National Association of Attorneys General ("NAAG") created

the Foundation.  The Foundation received the funding earmarked for that purpose under the

MSA.  The MSA provides that the National Public Education Fund, the main source of the

Foundation's funding under the MSA, shall not be used for "vilification" or "personal attack" of

tobacco companies.  *Id.* ¶ 11.  The Foundation's bylaws and articles of incorporation have

provisions to the same effect.  *Id.*

### B.    The truth® Public Education Campaign

---

[1] National Union also asserts that the "property damage" exclusion applies to Lorillard's allegations.  The Foundation does not deny that the D&O Policy excludes property damage claims.  As National Union itself admits, the "property damage" portion of Lorillard's allegations were dismissed for lack of prosecution and accounted for virtually none of the expenses incurred by the Foundation in defending itself.  National Union Motion at 21-22.

Recognizing the deadly toll of tobacco on the United States and the fact that the vast majority of smokers begin smoking before they turn eighteen, the mandate of the Foundation is, among other things, to carry out a nationwide public education program to counter the use by youth of tobacco products. *Id.* ¶ 10. The Foundation's truth® campaign, launched in February 2000, does precisely this. *Id.* ¶ 12. Composed of, among other things, television and radio broadcasts, the truth® campaign discourages youth from smoking by providing straightforward information about the health effects, addictiveness, and social costs related to tobacco products and the marketing practices associated with those products. *Id.* ¶ 13. The spots are blunt, hard-edged, fast-paced, and sometimes humorous, designed to capture and hold the attention of the target teen audience. *Id.* Published, peer-reviewed research establishes that the truth® campaign accounted for 22% of the decline in youth smoking, or 300,000 fewer youth smokers, in its first two years. *See* M. Farrelly, *et al.*, *Evidence of a Dose-Response Relationship Between 'truth' Antismoking Ads and Youth Smoking Prevalence*, 95 Am. J. Pub. Health 425, 429 (March 2005).

## C.     Lorillard's Efforts to Destroy the truth® Campaign

Dismayed by the truth® campaign, the Lorillard Tobacco Company began a series of escalating attacks on the Foundation and the campaign. Compl. ¶ 16. Initially, Lorillard focused on one radio broadcast known as "Dog Walker." *Id.* In Dog Walker, an obvious parody, a telephone caller identifies himself to a tobacco company receptionist as a professional dog walker and offers to collect urine produced by the dogs he walks and sell it to the tobacco company because "dog pee is full of urea, one of the chemicals that [tobacco companies] put in cigarettes." *Id.* ¶ 15. The receptionist at the tobacco company identifies the company as Lorillard. *Id.*

In November 2001, Lorillard threatened the Foundation with a defamation action based on Dog Walker. *Id.* ¶ 16. The Foundation provided notice of this threat to National Union. In January

of 2002, Lorillard went further and provided the Foundation with notice of Lorillard's intent to initiate civil litigation challenging virtually the entire truth® campaign, litigation which could have been brought simultaneously in over forty-six different jurisdictions.[2] *Id.*

## D.    The Foundation's Litigation with Lorillard

Lorillard provided the Foundation with 30 days notice before initiating a suit against it. Compl. ¶ 16. The Foundation, not subject to this notice requirement, filed the declaratory judgment action captioned *American Legacy Foundation v. Lorillard Tobacco Company*, C.A. No. 19406-NC, Del. Ch. Ct. (Feb. 13, 2002) (the "Delaware Action") in Delaware Chancery Court, both to avoid the possibility of a nationwide litigation blitz and to avail itself of the Delaware forum.[3] *Id.* ¶ 17. The Foundation sought a declaration that Lorillard had no basis to sue the Foundation and that, in the alternative, the Foundation had engaged in neither "vilification" nor "personal attack" in the truth® campaign. *Id.*

Lorillard filed a counterclaim, seeking damages and other relief from the Foundation. *Id.* ¶ 19. Lorillard alleged, among other things, that, in "broadcasts reaching millions of members of the public," the Foundation had accused tobacco companies of "lying to the public," engaging in the "destruction of evidence" and "add[ing] dog urine to [their] cigarettes." Answer and Counterclaims of Defendant Lorillard Tobacco Company (the "Countercl.") at 24-25 ¶ 31

---

[2] Indeed, after Lorillard's notification and before the Foundation filed suit, a Lorillard spokesperson was quoted in the New York Times as saying that "[i]t is conceivable that Lorillard might have to sue in all of those states, which it has not yet decided to do. . . ." Bernard Stamler, "Lorillard Tobacco Threatens Legal Action Against a Foundation for Its Tough Antismoking Campaign," *N.Y. Times*, Jan. 23, 2002, at C10.

[3] On February 19, 2002, Lorillard filed a lawsuit in the Wake County Superior Court of North Carolina, *Lorillard Tobacco Co. v. American Legacy Foundation*, 02 CvS 02170 (Feb. 19, 2002) (the "North Carolina Action"). The Delaware Chancery Court denied Lorillard's motion to dismiss the Delaware case in favor of the North Carolina case. *Am. Legacy Found. v. Lorillard Tobacco Co.*, No. 19406, 2002 WL 927383 (Del. Ch. Apr. 29, 2002). The North Carolina Action subsequently was stayed during the pendency of the Delaware Action and eventually was dismissed.

(Appendix Exhibit B). It accused the Foundation's President and CEO of "making malicious statements about Lorillard to the public." *Id.* at 27 ¶ 40. Lorillard also asserted that the Foundation created and facilitated through its website "vitriolic, hateful and vulgar personal attacks upon Lorillard's employees," *id.* at 18 ¶ 8, and "in broadcasts reaching millions of members of the public . . . personally attacked and vilified Lorillard, its executives and tobacco companies. . . ." *Id.* at 24 ¶ 31. It went on to allege that these acts violated the Foundation's bylaws, articles of incorporation, and the MSA. *Id.* at 27 ¶ 41. The Foundation provided notice to National Union of each of these developments.

On August 22, 2005, truth® was vindicated in the Delaware Chancery Court, which ruled in the Foundation's favor on cross-motions for summary judgment, finding that Lorillard's attacks on the Foundation's radio and television broadcasts were without merit. *See Am. Legacy Found. v. Lorillard Tobacco Co.*, 886 A.2d 1, 45-46 (Del. Ch. 2005). Lorillard did not stop its crusade against the Foundation there, however. First, it filed a motion for reargument, which was denied by the Chancery Court. *Am. Legacy Found. v. Lorillard Tobacco Co.*, 895 A.2d 874 (Del. Ch. 2005). Then Lorillard appealed the decision to the Delaware Supreme Court. On July 17, 2006, the Delaware Supreme Court unanimously agreed that Lorillard's allegations were without merit and affirmed the Chancery Court's decision. *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 745 (Del. 2006). In all, the Foundation spent more than five years and approximately $17 million dollars in legal fees and expenses defending itself against Lorillard's unfounded allegations. Compl. ¶ 25. The record in the case ultimately totaled tens of thousands of pages.

**E.    The National Union D&O Policy and National Union's Refusal to Provide the Promised Coverage**

The Foundation purchased insurance to protect itself from potential claims, including the types of claims asserted by Lorillard, and to provide or pay for a defense against such claims. *Id.* ¶ 26. This insurance includes the National Union directors' and officers' liability policy at issue here, which covers the period from August 26, 2001 through August 26, 2002.[4] *Id.* ¶ 31. The National Union D&O Policy applies when there is a "Claim first made against the [Foundation] . . . for any actual or alleged Wrongful Act of the [Foundation]" during the policy period. National Union D&O Policy ¶ 1 (Coverage C). "Wrongful Act" is defined to include "any breach of duty . . . error . . . omission or act by or on behalf of the [Foundation]; . . . [and] shall specifically include: . . . libel, slander, [and] defamation." *Id.* ¶ 2(u)(2) and ¶ 2(u)(4)(d) (Appendix Exhibit C). The D&O Policy requires National Union to either defend the Foundation in the event of a Claim or to advance the costs of defending the Claim. Specifically, the D&O Policy states that when National Union "has not assumed the defense of a Claim . . . [it] shall advance nevertheless . . . Defense Costs prior to the final disposition of a Claim," subject to the $15,000,000 limit of the National Union D&O Policy. *Id.* ¶ 8. Notwithstanding its clear obligation to do so, National Union refused to either defend the Foundation or advance defense costs as promised.

National Union argues in its Motion that it is not required to pay defense costs because of Exclusion (k) of the D&O Policy. Exclusion (k) is a limited exclusion applicable to contractual liability under an "express contract or agreement" ("express contract") which states that National Union

> shall not be liable to make any payment for Loss in connection with a Claim made against [the Foundation] . . . alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of [the

---

[4] The Foundation also purchased a series of comprehensive general liability policies from National Union, under which it seeks coverage in this action, but which are not the subject of National Union's Motion.

Foundation] under any express contract or agreement; provided, however, that this exclusion shall not apply to liability which would have attached in the absence of such express contract or agreement.

National Union D&O Policy ¶ 4(k) ("express contract" exclusion).  For the reasons given below, National Union's reliance on Exclusion (k) is misplaced; the exclusion does not negate National Union's obligation to pay the $17 million in defense costs incurred by the Foundation in the underlying litigation.

## II.  ARGUMENT

### A.  Summary of Argument

As set forth in greater detail below, National Union cannot meet its burden to show the applicability of the "express contract" exclusion for at least four reasons:

- First, Lorillard alleged that the MSA was an implied-in-fact contract, not an "express contract" as the exclusion requires.  Countercl. at 28 ¶ 47 and 29 ¶ 51.

- Second, the liability alleged by Lorillard "would have attached in the absence" of the MSA even if the MSA were an "express contract," and thus pursuant to its explicit terms, the "express contract" exclusion does not apply.  *See* National Union Policy ¶ 4(k).  Lorillard's allegations were based not only on the MSA, but also on the Foundation's bylaws and articles of incorporation.  *See id.* at 34-36 ¶¶ 73-80.  Notwithstanding National Union's argument, the bylaws are not a contract, express or otherwise; and National Union does not even attempt to argue that the articles of incorporation are a contract, let alone an "express contract."

- Third, even if the "express contract" exclusion applied to the claims made by Lorillard related to the MSA and the Foundation's articles of incorporation and bylaws, National Union nevertheless should have advanced (and now must pay) the Foundation's defense costs because the exclusion does not apply to *every* claim or theory advanced by Lorillard.  Lorillard's allegations are fundamentally that the Foundation disseminated damaging statements about Lorillard and its executives, and its products to the public.  *Id.* at 24-25 ¶ 31.  These allegations

state a claim (albeit one without merit) for defamation, slander or libel that is not within the "express contract" exclusion and is covered by the D&O Policy.

- Fourth, at best for National Union, the "express contract" exclusion is ambiguous as applied to Lorillard's allegations and must be construed in favor of coverage for the Foundation.

National Union, apparently recognizing that Lorillard's allegations do not, on their face, fall entirely and unambiguously within the "express contract" exclusion, seeks to introduce the entire record in the underlying action – which lasted 5 years – to support its Motion to Dismiss. This is improper. It is a fundamental principle of insurance law that the duty of an insurer to pay defense costs is determined by the allegations in the complaint and not by later developments in the record. In any event, even if considered the record of the underlying case here only supports the proposition that the "express contract" exclusion does not apply.

**B.    Standard Governing a Motion to Dismiss**

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), courts presume the plaintiff's factual allegations to be true, and liberally construe the complaint in the light most favorable to the plaintiff. *E.g., Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). Consequently, "[a] motion to dismiss should not be granted so long as the plaintiff's claim 'may be supported by showing any set of facts consistent with the allegations in the complaint.'" *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007).

**C.    Standard Applicable to National Union's Duty to Advance Defense Costs under the D&O Policy**

**1.    Basic principles of insurance policy construction.**

It is well settled that insurance policies are to be construed in favor of coverage for the insured. *Steigler v. Ins. Co. of N. Am.*, 384 A.2d 398, 400 (Del. 1978); *Meade v. Prudential Ins. Co. of Am.*, 477 A.2d 726, 728 (D.C. 1984).[5] If there is ambiguity in an insurance contract, the contract language is construed strongly against the insurance company that drafted it. *E.g., Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 745 (Del. 1997); *Travelers Indem. Co. of Illinois v. United Food Commercial Works Int'l Union*, 770 A.2d 978, 986 (D.C. 2001). "[I]f the contract . . . is ambiguous, the principle of *contra proferentem* dictates that the contract must be construed against the drafter," and that "[c]onvoluted or confusing terms are the problem of the insurer . . . not the insured." *Penn Mut. Life Ins. Co. v. Oglesby*, 695 A.2d 1146, 1149-1150 (Del. 1997); *see also Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 630 (Del. 2003); *United Food*, 770 A.2d at 986. It also is well settled that "an insurance contract should be read to accord with the reasonable expectations of the [insured]" and that the plain language of the policy controls. *Steigler*, 384 A.2d at 401; *see also United Food*, 770 A.2d at 986. The policy must be interpreted in a common sense manner, so that a reasonable policyholder can understand the scope and limitations of coverage. *Emmons*, 697 A.2d at 745. Moreover, the insurer bears the burden of demonstrating the applicability of policy exclusions, and that they are subject to no reasonable interpretation other than that asserted by the insurer. *Chase v. State*

---

[5] National Union assumes, without discussion, that Delaware law applies to this matter. The Foundation's principal place of business, however, is in Washington, D.C., and the insured's principal place of business has been held to be a significant contact by Delaware courts in determining the applicable law in an insurance dispute. *See Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 89C-SE-35, 1994 WL 721651, at *5 (Del. Super. Ct. March 28, 1994) (citations omitted). Because relevant Delaware and D.C. law do not conflict here, the Court need not determine whether Delaware or D.C. law applies to decide this Motion. *See In re Am. Metrocomm Corp.*, 274 B.R. 641, 659 (Bankr. D. Del. 2002) ("the first step in a choice-of-law analysis is to determine whether a true conflict exists between applicable state laws."); *Williams v. Stone*, 109 F.3d 890, 893 (3d Cir. 1997) (where there is no conflict, this Court should not engage in "an extensive and complex analysis of the thorny choice-of-law questions"). If, however, this Court finds that the law of Delaware and D.C. law conflict in any relevant respect, further briefing may be required on this issue.

*Farm Fire & Cas. Co.*, 780 A.2d 1123, 1127 (D.C. 2001); *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 711 A.2d 45, 53 (Del. 1995); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Rhone-Poulenc Basic Chems. Co.*, No. 87C-SE-11, 1992 WL 22690, at *8 (Del. Super. Ct. Jan. 16, 1992).

Thus where, as here, an insurer relies on an exclusion in order to avoid its duty to pay defense costs, the insurer bears the burden of showing that all of the allegations of the underlying complaint clearly and unambiguously are within the exclusion on which the insurer relies, and that the insurer's interpretation of the exclusion is the only reasonable one.

**2.    An insurer's duty to defend or pay defense costs attaches when any of the allegations made in the underlying case may be within the scope of the policy at issue.**

An insurer's duty to defend or advance defense costs is conceptually distinct from, and broader than, its duty to indemnify.[6]  *Am. Ins. Group v. Risk Enter. Mgmt., Ltd.*, 761 A.2d 826, 830 (Del. 2000) ("*Risk Enterprise*"); *Sherman v. Ambassador Ins. Co.*, 670 F.2d 251, 258-59 (D.C. Cir. 1981).  Insurers must defend any action that arguably or potentially states a claim that is covered under the policy.  *New Castle County, Delaware v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 243 F.3d 744, 749 (3d Cir. 2001); *Sherman*, 670 F.2d at 259 (holding that where the "allegations of a plaintiff's complaint <u>may</u> bring the claim within the coverage of defendant's policy, the insurance company must honor its duty to defend, even if ultimately relieved of any duty to indemnify") (emphasis added).  Courts apply the following interpretive principles to determine whether the underlying allegations may state a claim that is covered under the policy:

---

[6] As discussed in more detail below, courts have consistently held that the duty to advance defense costs is judged by the same standards as the duty to defend. *See, e.g., Hurley v. Columbia Cas. Co.*, 976 F. Supp. 268, 275 (D. Del. 1997) (applying Michigan law) ("there does not exist a significant difference between the duty to defend and the promise to advance defense costs, other than the difference between who will direct the defense").

(a) where there exists some doubt as to whether the complaint against the insured alleges a risk insured against, that doubt should be resolved in favor of the insured;

(b) any ambiguity in the pleadings should be resolved against the carrier;

(c) if even one count or theory of plaintiff's complaint lies within the coverage of the policy, the duty to defend arises.

*Am. Continental v. Pooya*, 666 A.2d 1193, 1197 (D.C. 1995); *Dover Downs, Inc. v. TIG Ins. Co.*, No. 04-199-SLR, 2004 WL 1812703, at *5 (D. Del. Aug. 11, 2004); *see also New Castle County*, 243 F.3d at 749; *Twin City Fire Ins.*, 840 A.2d at 630. In sum, an insurer is excused from its duty to defend only if it can be determined as a matter of law that there is no possible factual or legal basis upon which the insurer might eventually be obligated to indemnify the insured. *Rhone-Poulenc*, 1992 WL 22690, at *8; *Sherman*, 670 F.2d at 259. The underlying plaintiff need not allege by name, or in a specific count, a particular claim covered by the policy, but rather, "it is appropriate to examine the complaint for all plausible claims encompassed within the complaint." *Am. Continental v. Pooya*, 666 A.2d at 1197; *see also New Castle County*, 243 F.3d at 749. Thus, to avoid its obligations to pay defense costs based on an exclusion in the D&O Policy, National Union must show that all of the "allegations of the underlying complaints are solely and entirely within specific and unambiguous exclusions from coverage." *Rhone-Poulenc*, 1992 WL 22690, at *8.

3. **Under the "eight corners" rule, this Court should consider only the allegations pled by Lorillard, and the D&O Policy, to determine whether National Union is required to pay the Foundation's defense costs.**

In determining whether an insurer has a duty to defend, the "eight corners" rule applies. Courts focus solely on whether the allegations in the underlying complaint (the first four "corners") are potentially within the coverage of the insurance policy (the second four "corners"); the insurer's defense obligation is not "affected by facts ascertained before suit or developed in the process of litigation or by the ultimate outcome of the suit." *United Food*, 770

A.2d at 987; *see also Interstate Fire & Cas. Co. v. 1218 Wisconsin, Inc.*, 136 F.3d 830, 833

(D.C. Cir. 1998); *Continental Cas. Co. v. Alexis I. DuPont Sch. Dist.*, 317 A.2d 101, 103 (Del.

1974); *Stevens v. United Gen. Title Ins. Co.*, 801 A.2d 61, 66 (D.C. 2002); *Johnston v. Tally Ho,

Inc.*, 303 A.2d 677, 679 (Del. Super. Ct. 1973). Thus, to determine whether National Union has

an obligation to advance defense costs to the Foundation with respect to the allegations made by

Lorillard, this Court must compare those allegations to the coverage of the D&O Policy, and if

those allegations are not entirely and unambiguously outside the scope of coverage, National

Union must advance defense costs. Because National Union relies on an exclusion to avoid its

obligation to pay defense costs, in order to prevail National Union must show that Lorillard's

allegations are entirely and unambiguously within the exclusion on which National Union relies.

**D.    National Union Has Not Met Its Burden to Show that the "Express Contract" Exclusion Unambiguously Applies**

As set forth above, to succeed on the Motion, National Union must demonstrate that

Lorillard fails to allege any set of facts that, if proved, would permit the Foundation to prevail.

National Union therefore must show that, taking each of the facts alleged by the Foundation to

be true, and drawing all reasonable inferences in its favor, every claim or theory encompassed by

Lorillard's allegations "aris[es] out of, [is] based upon or attributable to . . . alleged contractual

liability of [the Foundation] under any *express* contract or agreement" and that the alleged

liability would not have "attached in the absence of such express contract or agreement."

National Union D&O Policy ¶ 4(k). National Union cannot do so. Accordingly, this Court

should deny the Motion.

1.    **The "express contract" exclusion does not relieve National Union of its duty to advance defense costs to the Foundation because the MSA is not an "express contract."**

Exclusion (k) permits National Union to avoid liability only if it can prove that the underlying allegations are based on or attributable to an "<u>express</u> contract or agreement." National Union D&O Policy ¶ 4(k) (emphasis added). The D&O Policy does not define the term "express contract or agreement." The term "express" in the exclusion must be given meaning. *In re Integrated Health Servs., Inc.*, 375 B.R. 730, 738 (D. Del. 2007); *Chase*, 780 A.2d at 1132. It is black letter law that an "express contract" (or agreement) requires that the Foundation's assent to be bound to the contract be manifested through an explicit writing or oral agreement to be bound, and *not* by its conduct as alleged by Lorillard. RESTATEMENT (SECOND) OF CONTRACTS, § 4 cmt. a (1979) (stating that where the evidence that a party has accepted a contract is based on the party's conduct, the contract is implied-in-fact and not express); *see also Baltimore & O.R. Co. v. U.S.*, 261 U.S. 592, 597 (U.S. 1923); *Staley v. Taylor*, 994 P.2d 1220, 1224 (Or. Ct. App. 2000).

Here, Lorillard did not allege at any time that the MSA constitutes an "express contract" of the Foundation. To the contrary, Lorillard specifically alleged that there was an "implied" agreement between Lorillard and the Foundation. *See* Countercl. at 29 ¶ 51 ("In the alternative, an implied agreement has arisen between Lorillard and [the Foundation] pursuant to which [the Foundation] agreed to abide by the terms of the MSA in exchange for the payments made by Lorillard."). Moreover, the facts alleged by Lorillard assert that the Foundation was subject to suit under the MSA based on its conduct, not that the MSA was an express contract between Lorillard and the Foundation. For example, Lorillard alleged that, "<u>by its conduct</u>, [the Foundation] has adopted and ratified the MSA, and is bound." *Id.* at 28 ¶ 46 (emphasis added). That alleged conduct included incorporating the MSA into the bylaws and accepting funds paid under the terms of the MSA with full knowledge of the MSA's terms. *See id.* at 28 ¶¶ 44, 45.

In short, Lorillard does not assert that the Foundation's alleged liability arises out of an "express contract or agreement" between Lorillard and the Foundation, and National Union therefore cannot rely on the "express contract" exclusion to avoid its obligations to pay defense costs.[7]

### 2.    The "express contract" exclusion does not apply where, as here, liability would have attached in absence of the contract.

Exclusion (k) of the National Union D&O Policy also provides on its face that it does not apply where the alleged liability "would have attached in the absence of such express contract or agreement." Even if the MSA were an express contract between Lorillard and the Foundation, Lorillard also asserted that the Foundation's liability for the alleged "vilification" or "personal attacks" in the truth® campaign was based on violations of the Foundation's articles of incorporation and bylaws, which are not contracts, express or otherwise. *See* Countercl. at 34-36 ¶¶ 73-80. The language of the prohibitions in the MSA, the bylaws, and the articles of incorporation, and the alleged breaches by the Foundation with respect to each, were virtually identical. *Id.* at 17 ¶ 3 and 34 ¶¶ 73-74. Thus, the alleged liability and the costs required to defend against that liability would "attach" even if Lorillard had alleged only that the Foundation breached its bylaws or its articles of incorporation and had never mentioned the MSA. The exclusion therefore does not apply.

---

[7] Even if this Court were to go beyond the "eight corners" as it is urged to do by National Union, the Delaware Courts fully agreed that it was the Foundation's conduct – and not its express agreement, either written or oral – which bound it to the MSA. The Chancery Court confirmed that there is "no doubt that [the Foundation] was not a signatory to the MSA." *Am. Legacy Found.*, 831 A.2d at 343. It further concluded that ". . . to a large extent, the legal conclusion that [the Foundation] has 'adopted' the M.S.A. flows directly from the parties' performance of their obligations under that contract." *Id.* Moreover, the Chancery Court found that, "[a]s both parties admit, no single provision in the M.S.A *expressly* subjects [the Foundation] to enforcement actions by the tobacco companies under the MSA." *Id.* at 344 (emphasis added).

### a.    The Foundation's Bylaws are not an Express Contract which would trigger the Exclusion.

In addition to the allegations regarding the MSA, Lorillard also asserted that the Foundation breached its bylaws. *Id.* at 34 ¶ 74 and 35 ¶ 77. This assertion forms another basis of liability "which would have attached" in the absence of the MSA, thus rendering the exclusion inapplicable. Seeking to avoid this result, National Union attempts to shoehorn Lorillard's bylaws-related allegations into the "express contract" exclusion by arguing that the bylaws themselves are yet another express contract under which the Foundation's alleged liability arises. National Union Motion at 17-18. National Union is simply wrong in its assertion that the "express contract" exclusion applies to the bylaws-based allegations made by Lorillard. Although in some circumstances bylaws are interpreted like contracts, we are aware of no case, and National Union has identified none, holding that bylaws of non-profit organizations such as the Foundation are contracts; and in any event bylaws are not contracts for the purpose of interpreting the terms of an insurance policy.

To support its argument that the bylaws claims are in fact "contract" claims, National Union cites three cases and a brief filed by the Foundation, all of which stand for the irrelevant proposition that, in some circumstances, the bylaws of a for-profit, private corporation can be viewed as contracts among its shareholders or between the corporation and its shareholders. *See Centaur Partners, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 928 (Del. 1990) (finding that by-laws are contracts among the shareholders of a wholesale pharmaceutical distributor traded on the New York Stock Exchange); *see also Salaman v. Nat'l Media Corp.*, No. 12365, 1992 Del. Ch. LEXIS 4, at * (Del Ch. Jan. 14, 1992) (finding that bylaws of National Media "have force of contract" with respect to indemnification for suit by shareholders); *Perlegos & Perlegos v. Atmel Corp.*, No. 2320-N, 2007 Del. Ch. LEXIS 25, at *105 n.184 (Del. Ch. Feb. 8, 2007) (finding that

rules of contract interpretation apply to bylaws of public, stock-issuing company, but that bylaws "also govern the relationship between a corporation and its officers").

The Foundation, however, is a not-for-profit corporation that has no shareholders. National Union notably cites no support for the proposition that the bylaws of a non-profit entity without members or shareholders can be construed as a contract. Such a proposition would be nonsensical; bylaws cannot be an "express contract" where the alleged "contracting parties" (the shareholders) do not exist. The Foundation brief quoted by National Union says this explicitly: "[i]n the case of private, _for-profit_ entities bylaws are sometimes understood as contracts between a corporation and its members . . . ." National Union Motion at 18 (emphasis added). Tellingly, National Union omits the following sentence, which goes on to distinguish the case of nonprofit corporations such as the Foundation. _See_ Answering Brief and Cross-Appeal Opening Brief of Defendant Below, Appellee/Cross-Appellant American Legacy Foundation at 78, _Am. Legacy Found. v. Lorillard Tobacco Co._, No. 579,2005 (Del. Feb. 9, 2006) ("But in the case of nonprofit corporations such as the Foundation, private individuals and entities generally have no enforceable rights in bylaws, and their enforcement lies exclusively with the Attorney General or other state official responsible for supervising the conduct of charitable corporations in a state.").

Moreover, even if the bylaws of a non-profit organization with no shareholder could be understood as a contract, there simply is no basis to assert, and National Union has not asserted, that the bylaws are an unambiguous express contract as required by the exclusion. _See, e.g.,_ 8 William Meade Fletcher, _et al.,_ Fletcher Cyclopedia of the Law of Private Corporations, § 4198 (Westlaw 2007) ("[a] bylaw is not, however, a contract in the strict sense in which the word is sometimes used as designating a formal agreement") _citing Cheney v. Canfield_, 111 P. 92 (Cal. 1910).

Furthermore, courts have found specifically that bylaws are not a contract for the purpose of interpreting the terms of an insurance policy. *Aetna Commercial Ins. Co. v Am. Sign Co.*, 687 So. 2d 834, 836 (Fla. Dist. Ct. App. 1996) (finding that bylaws were not a contract in interpreting an exception to an insurance policy exclusion). *Aetna Commercial* relied on the definition of "bylaws" in Black's Law Dictionary as "[r]egulations, ordinances, rules or laws adopted by an association or corporation or the like for its internal governance." *Id.* Delaware courts also look to dictionary definitions to interpret the plain meaning of undefined terms in a contract, including insurance policies. *Am. Legacy Found.*, 903 A.2d at 738; *Oliver B. Cannon & Son, Inc. v. Dow-Oliver, Inc.*, 394 A.2d 1160, 1163 (Del. 1978) (insurance policies). A Delaware court therefore would similarly find that, in the insurance context, bylaws are not "contracts" within the meaning of the D&O Policy.

Finally, as discussed above, insurance policies must be interpreted consistently with the expectations of a reasonable policyholder. *Chase*, 780 A.2d at 1132; *State Farm Mut. Auto. Ins. Co. v. Johnson*, 330 A.2d 345, 347 (Del. 1974). A reasonable policyholder would not expect that a claim against its organization for a breach of its governing bylaws would fall within a general exclusion for "contractual liability" claims, without a clear and express statement to that effect. Insurance policies are construed to avoid subjecting policyholders to such a "hidden trap or pitfall." *Delledonne v. State Farm Mut. Auto. Ins. Co.*, 621 A.2d 350, 352 (Del. Super. Ct. 1992). Indeed, whatever bylaws' technical character may be as between stockholders with respect to for-profit entities, an ordinary businessperson would not understand the organization's bylaws to be a "contract" in the context of an insurance policy exclusion, let alone an "express contract" to which the "express contract" exclusion applies. *United Food*, 770 A.2d at 986 (internal quotations omitted); *see also Continental Ins. Co. v. Burr*, 706 A.2d 499, 500-01 (Del. 1998) (insurance

policies are interpreted in a manner consistent with the understanding of the ordinary businessperson). If National Union sought to exclude bylaws-based claims, it was obligated to employ clear language revealing its intent to do so. It did not.

Thus, National Union cannot demonstrate, as it must to avoid its obligation to pay defense costs under the D&O Policy, that the "express contract" exclusion unambiguously applies to the bylaws-based claims against the Foundation.

### b.    The alleged breach of the Foundation's Articles of Incorporation.

Lorillard alleged in its counterclaims that the same facts that gave rise to its claim under the MSA supported independent claims that the Foundation had violated the "personal attack" and "vilification" provisions included in its articles of incorporation. Countercl. at 34 ¶ 74 and 35 ¶ 77. National Union makes no argument that the allegations by Lorillard that the Foundation violated its articles of incorporation are subject to the "express contract" exclusion. It could not, because the articles of incorporation are not a contract, and no case that we are aware of has ever held to the contrary. Because liability for violation of the articles of incorporation "would have attached in the absence of" the MSA, the exclusion does not apply.[8]

### 3.    The Counterclaims also assert allegations of libel and defamation, wholly unrelated to any alleged contract.

As set forth above, if any plausible or arguable theory alleged by Lorillard falls within the scope of the coverage, National Union is required to defend the claim. *New Castle County*, 243 F.3d at 749; *Pooya*, 666 A.2d at 1197. Here, Lorillard's allegations of disparagement and vilification are tantamount to claims (albeit meritless ones) of slander or defamation, both of which are expressly covered by the D&O Policy. National Union D&O Policy ¶ 1(u)(4) (Wrongful Act includes "any act by or on behalf of the [Foundation] . . . specifically includ[ing] . . . libel, slander,

---

[8] In the Answer and Counterclaims of Defendant Lorillard Tobacco Company to First Amended Complaint, filed on January 14, 2005, Lorillard did not allege that the Foundation violated its articles of incorporation.

defamation . . ."). Thus, even if the "express contract" exclusion were applicable to any of

Lorillard's other claims, National Union could not prove that the exclusion unambiguously applies

to the defamation and slander claims. National Union therefore should have advanced the

Foundation's defense costs and must pay them now.

Whether National Union's duty attaches does not depend on whether Lorillard included

express counts for slander or defamation. "So long as facts are alleged which could form a basis

for recovery within the coverage of the policy, the duty to defend exists." *United Food*, 770

A.2d at 987 (stating also that "in interpreting the allegations of the complaint, which are neither

drafted by the insured nor advanced in contemplation of an insurer's role, excessively literal or

rigid construction is to be avoided.").

When ascertaining the scope of the duty to defend, a court "examine[s] the complaint for

*all plausible claims* encompassed within the complaint." *Id.* (emphasis added); *see also New

Castle County*, 243 F.3d at 749 ("an insurer is required to defend any action which *potentially*

states a claim which is covered under the policy") (emphasis added; internal quotations omitted).

For example, in *United Food*, the D.C. Court of Appeals held that a complaint filed against an

insured and containing a claim for "abuse of process" adequately alleged an action for libel that

was covered under the policy. 770 A.2d at 990 ("[b]ecause [plaintiff's] complaint alleges that

[the insured] intended to damage [plaintiff's] reputation through the knowing and unprivileged

written publication of defamatory material that on its face suggests that [plaintiff] physically and

emotionally injured its employees and, in effect, stole from them as well, it has adequately

alleged a libel"). The complaint need not specifically allege each of the legal elements of a

particular cause of action in a technical way for the complaint to give rise to coverage under the

insurance policy; "libel" and "defamation" must be read to have their common, not technical,

legal meaning. *Johnston v. Tally Ho, Inc.*, 303 A.2d 677, 679 (Del. Super. Ct. 1973); *Stevens v. United Gen. Title Ins. Co.*, 801 A.2d 61, 67 (D.C. 2002).

*The Merriam-Webster Dictionary* defines "libel" as "a spoken or written statement or a representation that conveys an unjustly unfavorable impression of a person or thing."[9] *Merriam-Webster Dictionary* 283 (Merriam-Webster, Inc. ed., 6th ed. 2005). Thus, if the complaint plausibly states a claim within the lay understanding of a libel or defamation claim, National Union is obligated to advance the costs of defending the claim. Lorillard's allegations plausibly state such a claim.[10] Indeed, the close relationship between defamation and the prohibitions against vilification and personal attack is demonstrated by the Delaware Supreme Court's interpretation of the MSA's terms. In particular, it concluded that: ". . . the meaning of 'vilification' according to Lorillard's own dictionary citations is a statement that is *slanderous, defamatory*, or abusive that unjustly denounces its target. The core ordinary meaning of vilification is a denouncement that is both unfounded and abusive or *slanderous*." 903 A. 2d at

---

[9] "Defame" is defined as "to injure or destroy the reputation of by libel or slander" and refers to the definitions for "libel" and "slander," while the definition for "slander" refers to the definition for "defame." *See Merriam-Webster Dictionary* 128, 463.

[10] Even if proof of each element of a libel or defamation claim were required, the elements of such causes of action are within the allegations contained in Lorillard's counterclaims. The elements of such claims under Delaware law include: 1) a defamatory statement; 2) made concerning the plaintiff; 3) that was published; 4) that a third party would understand as defamatory. *Doe v. Cahill*, 884 A.2d 451, 463 (Del. 2005). Lorillard alleges that the Foundation improperly publicly damaged the reputation of Lorillard, its executives and employees, and its product. In particular, Lorillard alleges that the Foundation made "vitriolic, hateful and vulgar" personal attacks on Lorillard's employees. Countercl. at 18 ¶ 8. It further alleged that "in broadcasts reaching millions of members of the public," the Foundation's broadcasts, for example, "accuse tobacco companies of shredding documents, thereby implying the intentional and improper destruction of evidence" and "strongly imply that Lorillard adds dog urine to its cigarettes." Countercl. at 24-25 ¶ 31. These allegations provide more than sufficient notice of a plausible claim under the complaint for defamation or slander.

742 (emphasis added).[11] Thus, Lorillard's allegations of vilification and personal attack are synonymous with slander and defamation, and National Union is obligated to advance defense costs to the Foundation. Accordingly, the Motion should be denied.

### 4.    This Court should ignore National Union's attempt to introduce hundreds of pages of documents from the underlying litigation.

Apparently recognizing that Lorillard's allegations are not unambiguously and entirely within the "express contract" exclusion, National Union engages in a vain attempt to bring before the Court the entire record in the underlying case. National Union Motion at 8-10. Not only would consideration of these documents be inconsistent with both Federal Rule of Civil Procedure 12(b)(6) (which tests the sufficiency of the Foundation's complaint, not the underlying evidence), but, more importantly, it would violate the "eight corners" rule discussed above. *See* Fed. R. Civ. P. 12(b) (2008). Thus, this Court should not consider the record of the Lorillard case in determining National Union's obligation to advance defense costs. (Of course, as discussed above, even were the Court to do so, National Union cannot show that Lorillard's allegations fall entirely within the "express contract" exclusion.)

National Union argues that, under *Risk Enterprise*, the "eight corners" rule does not apply where the insurer's duty to defend is not litigated until the conclusion of the underlying case. *See* 761 A.2d 826. But *Risk Enterprise* is a narrow exception to the "eight corners" rule, and it is plainly inapplicable here. At most, *Risk Enterprise* applies only in the "unusual situation," 761 A.2d at 829, where the policyholder did not notify the insurer of the underlying action until discovery in that action was complete. *See Home Ins. Co. v. Am. Ins. Group*, No. 97C-04-024,

---

[11] The United States Supreme Court also has noted the close relationship between vilification and libel. *Philadelphia Newspapers v. Hepps*, 475 U.S. 767, 782 (1986) ("While deliberate or inadvertent libels vilify private personages, they contribute little to the marketplace of ideas."); *see also NY Times v. Sullivan*, 376 U.S. 254, 271 (1964); *Cantwell v. Connecticut*, 310 U.S. 296, 310 (1940).

2003 WL 22683008, at *2 (Del. Super. Ct. Oct. 30, 2003) ("When the demand for indemnification or defense is made *after* development of a complete discovery record, this Court should not limit its analysis solely to the allegations in the complaint.") (emphasis added). Delaware courts recently have reiterated that the "eight corners" rule is the law of Delaware. *See, e.g., AT&T Corp. v. Clarendon Am. Ins. Co.*, 931 A.2d 409 (Del. 2007) (comparing all allegations of the complaint to the terms of the policy in the context of directors and officers insurance). This is true even where coverage determinations are made after the conclusion of the underlying case. *Dover Downs*, 2004 WL 1812703, at *5.

Here, as set forth above, the Foundation notified National Union of Lorillard's allegations, and demanded coverage, as soon as Lorillard threatened to file the underlying case and again after the lawsuits were filed. Thus, the "unusual situation" that confronted the court in *Risk Enterprise* is not present here.

National Union also argues that the rationale behind the "eight corners" rule has lesser force here in part because the D&O Policy only requires it to "reimburse" the defense costs of the Foundation, and thus, it would not have an immediate obligation to the policyholder in any event. This argument misstates the clear terms of the D&O Policy, which expressly requires that National Union "shall <u>advance</u> . . . Defense Costs <u>prior to the final disposition of a Claim</u>." National Union D&O Policy ¶ 8 (emphasis added). Courts repeatedly have found that this duty

to advance defense costs holds the insurer to the same standard as the duty to defend.[12]  Thus, National Union's obligations are not reduced by virtue of its promise to advance defense costs rather than defend its policyholder.[13]

Accordingly, National Union's reliance on documents and assertions reflecting the conduct of the underlying litigation is misplaced, and the well-established "eight corners" rule must apply to determine National Union's obligation to advance defense costs. This Court should limit its inquiry to Lorillard's allegations and the National Union D&O Policy, and need not – indeed, should not – canvas or consider any of the myriad of documents discovered or created in the Delaware Action, including those relied on in the Motion.

## III.  CONCLUSION

To succeed in its efforts to avoid its obligations to the Foundation under the National Union D&O Policy for which it accepted premiums, National Union must show that the "express contract" exclusion unambiguously applies to every plausible theory or claim asserted by Lorillard.  It has not met that burden, and the Foundation therefore respectfully submits that the Court should deny National Union's Motion.

---

[12] *See, e.g., Hurley*, 976 F. Supp. at 275 ("there does not exist a significant difference between the duty to defend and the promise to advance defense costs, other than the difference between who will direct the defense"); *Am. Chem. Soc'y v. Leadscope, Inc.*, No. 04AP-305, 2005 WL 1220746, at *4-7 (Ohio Ct. App. May 24, 2005) (holding that there is no distinction between "advance defense costs" policies and "duty to defend" policies with respect to the application of the basic principles of the duty to defend); *In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 464 (S.D.N.Y. 2005) (applying the same general principles where insurer's duty was to advance legal costs as the court would to a duty to defend provision); *Brown v. Am. Int'l Group, Inc.*, 339 F. Supp. 2d 336, 346 (D. Mass. 2004) (interpreting policy with duty to advance defense costs and applying the same principles as applied to duty to defend cases).

[13] If this Court agrees with National Union's interpretation of *Risk Enterprise*, then the law of D.C. and Delaware do differ in this respect and a choice of law analysis must be undertaken. *See e.g., Am. Registry of Pathology v. Ohio Cas. Ins. Co.* 461 F. Supp. 2d 61, 66 (D.D.C. 2006) (holding that D.C. follows the "eight corners" rule). The Foundation would respectfully request that this Court order further briefing on the choice of law issue in that event.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| The American Legacy Foundation,  )<br><br>Plaintiff,  )<br><br>v.  )<br><br>National Union Fire Insurance  )<br>Company of Pittsburgh,  )<br>Pennsylvania,  )<br><br>and  )<br><br>The Travelers Indemnity Company )<br>of America,  )<br><br>Defendants.  ) | Civil Action No. 07-248 (SLR) |

## AFFIDAVIT OF SERVICE

Louise L. Tuschak, being duly sworn according to law, deposes and says that she is employed by the law firm of Pachulski Stang Ziehl & Jones LLP, and that on the 8th day of February, 2008 she caused a copy of the following document to be served upon the attached service list in the manner indicated:

**American Legacy Foundation's Opposition to Motion of National Union Fire Insurance Company of Pittsburgh, PA for Partial Dismissal.**

_Louise L. Tuschak_
Louise L. Tuschak

Sworn to and subscribed before
me this 8th day February, 2008

_Mary Corcoran_
Notary Public
My Commission Expires: _11/4/09_

MARY E. CORCORAN
NOTARY PUBLIC
STATE OF DELAWARE
My commission expires Nov. 4, 2009

American Legacy Foundation – Special Service List
Document No. 130442
02 – Hand Delivery
01 –First Class


**Hand Delivery**
Richards Layton & Finger, P.A.
John A. Parkins, Jr.
Chad M. Shandler
Todd A. Coomes
One Rodney Square, P.O. Box 551
Wilmington, DE  19899

**Hand Delivery**
Fox Rothschild, LLP
Neal J. Levitsky, Esquire
919 N. Market Street, Suite 1300
Wilmington, DE  198014

**First Class Mail**
Kramon & Graham, P.A.
Lee H. Ogburn, Esquire
One South Street, Suite 2600
Baltimore, MD  21202-3201