IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| The American Legacy Foundation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| National Union Fire Insurance Company of Pittsburgh, Pennsylvania, | ) Civil Action No. 07-248 (SLR) ) ) ) |
| and | ) ) |
| The Travelers Indemnity Company of America, | ) ) |
| Defendants. | |

**APPENDIX IN SUPPORT OF AMERICAN LEGACY FOUNDATION'S
OPPOSITION TO MOTION OF NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA FOR PARTIAL DISMISSAL**

GILBERT RANDOLPH LLP
Richard Shore
Kami E. Quinn
1100 New York Avenue, NW
Suite 700
Washington, DC  20005
Telephone:  (202) 772-2200

and

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

Counsel for Plaintiff
American Legacy Foundation

Date: February 8, 2008

## TABLE OF CONTENTS

Complaint for Damages ............................. Exhibit A

Answer and Counterclaims
of Defendant Lorillard Tobacco Company ............ Exhibit B

National Union D&O Policy ......................... Exhibit C

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| THE AMERICAN LEGACY FOUNDATION<br>2030 M Street, NW<br>Washington, DC 20036 | ) ) ) ) ) | |
| Plaintiff, | ) ) | CASE NO: 07-248 (SLR) |
| v. | ) ) ) | |
| NATIONAL UNION FIRE INSURANCE<br>COMPANY OF PITTSBURGH, PENNSYLVANIA)<br>175 Water Street<br>18th Floor<br>New York, NY 10038 | ) ) ) ) ) | |
| and | ) ) ) | |
| THE TRAVELERS INDEMNITY COMPANY<br>OF AMERICA<br>One Tower Square<br>Hartford, CT 06183 | ) ) ) ) ) | |
| Defendants. | ) ) | |
| | ) | JURY DEMAND: |

## COMPLAINT FOR DAMAGES

Plaintiff American Legacy Foundation

(the "Foundation") brings this complaint for damages against

Defendants National Union Insurance Company of Pittsburgh,

Pennsylvania ("National Union") and Travelers Indemnity Company

of America ("Travelers").

DOCKET # 1
DATE 05-04-07

## SUMMARY OF THIS ACTION

1.    This is an insurance coverage action brought by the Foundation for damages.  Defendants National Union and Travelers each sold the Foundation comprehensive general liability ("CGL") policies.  National Union additionally sold the Foundation a directors and officers ("D&O") liability policy.  Each of these policies requires National Union or Travelers to defend the Foundation and/or to pay costs incurred by the Foundation in the defense of claims to which this insurance applies or potentially applies.  The Foundation incurred approximately $17 million in reasonable and necessary defense costs successfully defending itself against a claim or claims by Lorillard Tobacco Company ("Lorillard") within the scope of the coverage provided by National Union and Travelers. National Union and Travelers nevertheless wrongfully failed to defend the Foundation or to pay any defense costs incurred by it and have therefore breached their obligations under the policies described above.

## PARTIES

2.    The Foundation is a national non-profit corporation organized under the laws of the State of Delaware that has its principal place of business in the District of Columbia.

2

3.    National Union is a corporation organized under the laws of the State of Pennsylvania that has its principal place of business in the State of New York.

4.    Travelers is a corporation organized under the laws of the State of Pennsylvania that has its principal place of business in the State of Connecticut.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332 based on the parties' diversity of citizenship. The amount in controversy, exclusive of interest and costs, exceeds the sum specified by 28 U.S.C. § 1332.

6.    Defendant National Union is a licensed insurer in the State of Delaware, conducts and solicits business in Delaware, maintains more than minimum contacts in this jurisdiction, and by virtue of its activities in this State is subject to the jurisdiction of this Court.

7.    Defendant Travelers is a licensed insurer in the State of Delaware, conducts and solicits business in Delaware, maintains more than minimum contacts in this jurisdiction, and by virtue of its activities in this State is subject to the jurisdiction of this Court.

3

**BACKGROUND**

A.  **The Formation of the Foundation and
    Its Mission to Reduce Youth Smoking**

8.  In the 1990s, forty-six states and other governmental instrumentalities brought suits against certain tobacco companies seeking to hold them liable for costs tobacco-containing products had imposed on those entities and their citizens (the "Tobacco Litigation").

9.  On November 23, 1998, the parties to the Tobacco Litigation reached an agreement to resolve the pending lawsuits known as the Master Settlement Agreement ("MSA").

10.  The MSA provides for, among other things, the creation of the Foundation.  Under the MSA, the Foundation is "dedicated to significantly reducing the use of Tobacco Products by Youth" and its charge includes, among other things, to "carry[] out a nationwide and sustained advertising and education program to (A) counter the use by Youth of Tobacco Products, and (B) educate consumers about the cause and prevention of diseases associated with the use of Tobacco Products."  The states allocated over $1 billion of their monetary recovery from the settling tobacco companies under the MSA to fund the new Foundation.

11.  The MSA and the Foundation's bylaws require that certain of the Foundation's funds "shall be used only for public

4

education and advertising regarding the addictiveness, health effects, and social costs related to the use of Tobacco Products. . . and shall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively."

12.  In February 2000, in furtherance of its mission to counter the use of tobacco products by youth, the Foundation launched a youth tobacco prevention public education program known as truth®.  Truth® has consisted of numerous television and radio broadcast campaigns, each consisting of various television and/or radio spots.  It has also included print advertisements, internet advertisements, websites and a grass roots component.  More than fifty individual broadcast spots and more than a dozen campaigns were introduced by the Foundation from February 2000 through at least September 2002.

13.  The campaigns included broadcast spots designed to discourage youth smoking by providing straightforward information about the health effects, addictiveness and social costs related to tobacco products and the marketing practices associated with those products.  The spots are blunt, hard-edged, fast-paced and sometimes humorous, designed to capture and hold the attention of teens.

5

B.    **Lorillard's Objections to Certain Broadcast Spots and Claim Against the Foundation**

14.    Lorillard is the fourth largest tobacco company in the United States, the maker of the third most popular brand of cigarettes, Newport, and a signatory of the MSA.

15.    One radio spot created by the Foundation, known as "Dog Walker," was part of the "Infect Truth" campaign launched in June 2001.  In Dog Walker, a telephone caller identifies himself as a professional dog walker to a tobacco company receptionist and offers to collect urine produced by the dogs he walks and sell it to the tobacco company because "dog pee is full of urea, one of the chemicals that [tobacco companies] put in cigarettes."  The receptionist at the tobacco company identifies the company as Lorillard.

16.    Lorillard objected to Dog Walker and threatened to sue the Foundation in connection with that spot in November 2001.  In January 2002, Lorillard expanded its allegations to include other broadcast spots created by the Foundation, and provided notice of its intent to file suit in 30 days.

17.    In response to the notice by Lorillard, on February 13, 2002, the Foundation filed a declaratory judgment action in Delaware Chancery Court captioned *American Legacy Foundation v. Lorillard Tobacco Company*, C.A. No. 19406-NC, Del. Ch. Ct. (Feb. 13, 2002) (the "Delaware Action") seeking a

6

declaration that Lorillard had no basis to sue the Foundation under the MSA or, in the alternative, Lorillard's claims against the Foundation were without merit.

18.   Days later, on February 19, 2002, Lorillard filed its threatened lawsuit in the Wake County Superior Court of North Carolina, *Lorillard Tobacco Company v. American Legacy Foundation*, 02 CvS 02170 (Feb. 19, 2002) (the "North Carolina Action"). The North Carolina Action was stayed during the pendency of the Delaware Action.

19.   On or about September 13, 2002, Lorillard filed various counterclaims in the Delaware Action alleging that, among other things, in breach of the MSA and the Foundation's bylaws, various truth® spots attacked and vilified Lorillard, other tobacco companies and their employees by, among other things, making disparaging statements about their products (the "Counterclaims"). For example, Lorillard alleged that the Dog Walker spot aired by the Foundation "strongly impl[ied] that Lorillard adds dog urine to its cigarettes."

20.   The Counterclaims further alleged that the Foundation maintained a truth® website through which multiple e-mails, allegedly unsolicited and of a harassing nature, were sent to Lorillard and other tobacco companies. Such e-mails were alleged to have interfered with Lorillard's e-mail system

7

and computer network, and to have disrupted Lorillard's
employees' use of their computers.

21. Among other relief, Lorillard sought damages for
the Foundation's alleged conduct set forth in its complaint in
the North Carolina Action and in the Counterclaims.

## C.    The Foundation's Successful Defense of the Claims Against It

22. Granting summary judgment in favor of the
Foundation on August 22, 2005, the Delaware Chancery Court
determined that the Foundation's radio and television broadcasts
did not violate any rights of Lorillard.

23. Lorillard appealed the Chancery Court's decision
to the Supreme Court of the State of Delaware (the "Delaware
Supreme Court").

24. On July 17, 2006, the Delaware Supreme Court
concluded that Lorillard's appeal was "without merit" and
affirmed the Chancery Court's decision.

25. Over the more than four years during which the
North Carolina Action and the Delaware Action (collectively, the
"Lorillard Litigation") were litigated, the Foundation spent
approximately $17 million defending itself against Lorillard's
allegations. Those fees were reasonable and necessary to the
Foundation's successful defense of the claims.

8

D.    **The Insurance Policies Purchased by the Foundation**

26.   From its inception, the Foundation purchased various liability insurance policies to protect itself from the risk of many types of claims against it, including claims such as those at issue in the Lorillard Litigation.

*The Travelers CGL Policies*

27.   The Foundation purchased several primary CGL policies from Travelers including, without limitation, the policies numbered W680479HH8253TIA00 and W680479H8253TIA01 for consecutive annual policy periods from July 22, 2000, through July 22, 2002, and, on information and belief, policy number W680479HH8253TIA99, with a policy period from July 22, 1999 through July 22, 2000 (the "Travelers Policies") (factual statements herein concerning the latter policy are made on information and belief).  These policies provide broad coverage for the Foundation's liabilities to third parties and associated defense costs.

28.   The Travelers Policies also provide that Travelers must defend (and pay the costs of defending) any claim or suit and/or pay the costs of defending any claim or suit against the Foundation to which the Travelers Policies apply or potentially apply.  Costs paid for the defense of the Foundation do not count against, and are therefore paid in addition to, any applicable limits of liability under the Travelers Policies.

9

*The National Union CGL Policies*

29.   National Union issued CGL policies numbered
BE7402566 and BE8716521, for consecutive annual policy periods
from April 24, 2001 through April 24, 2003 (the "National Union
CGL Policies"), under which the Foundation is insured.  These
policies provide broad coverage for the Foundation's liabilities
to third parties and associated defense costs, including
coverage for claims not covered by underlying policies.

30.   The National Union CGL Policies also provide that
National Union must defend (and pay the costs of defending) any
claim or suit against the Foundation to which the National Union
CGL Policies apply or potentially apply, but that is not covered
under the Travelers Policies.  Costs paid for the defense of the
Foundation do not count against, and are therefore paid in
addition to, any applicable limits of liability under the
National Union CGL Policies.

*The National Union D&O Policy*

31.   The Foundation also purchased a directors' and
officers' liability policy numbered 8739971 from National Union,
which provides coverage for the policy period from August 26,
2001 through August 26, 2002  (the "National Union D&O Policy").
The National Union D&O Policy provides broad coverage for the
Foundation's liabilities to third parties for wrongful acts and
associated defense costs.

10

32.   The National Union D&O Policy also requires that National Union "shall advance defense costs" to the Foundation for claims or suits to which the National Union D&O Policy applies or potentially applies.  Costs paid for the defense of the Foundation are paid within, and therefore count against, the $15,000,000 aggregate limit of liability under the National Union D&O Policy.

## COUNT I
(Breach of Contract by Travelers)

33.   Plaintiff Foundation repeats and incorporates by reference the allegations set forth in Paragraphs 1 - 32 above.

34.   Premiums for the Travelers Policies have been paid in full and all other applicable conditions and prerequisites to coverage under the Travelers Policies have been satisfied or waived.

35.   One or more of the Travelers Policies apply or potentially apply to the Lorillard Litigation.  Travelers is therefore required to pay the defense costs incurred by the Foundation in connection with the Lorillard Litigation.

36.   The Foundation sought a defense from Travelers in connection with the Lorillard Litigation, but Travelers has taken the position that the Foundation's defense costs are not covered under the Travelers Policies, and has failed to provide

11

a defense or to pay any of the Foundation's defense costs arising from the Lorillard Litigation.

37.    Travelers has, therefore, breached its obligations under the Travelers Policies by failing to pay, in accordance with its contractual obligations, any of the Foundation's defense costs, which total at least $16,828,946.41.

38.    As a direct and proximate cause of Travelers' breach of its contractual obligations, the Foundation has suffered significant monetary damage.

## COUNT II
(Breach of Contract by National Union)

39.    Plaintiff Foundation repeats and incorporates by reference the allegations set forth in Paragraphs 1 - 38 above.

40.    Premiums for the National Union CGL Policies have been paid in full and all other applicable conditions and prerequisites to coverage under the National Union CGL Policies have been satisfied or waived.

41.    One or more of the National Union CGL Policies apply or potentially apply to the Lorillard Litigation. National Union is, therefore, required to pay the defense costs incurred by the Foundation in connection with the Lorillard Litigation, to the extent that those defense costs are not covered under the Travelers Policies.

12

42.   The Foundation sought a defense from National Union in connection with the Lorillard Litigation, but National Union has failed to provide a defense or to pay any of the Foundation's defense costs arising from the Lorillard Litigation.

43.   National Union has, therefore, breached its obligations under the National Union CGL Policies by failing to pay, in accordance with its contractual obligations, any of the Foundation's fees and costs, which total at least $16,828,946.41.

44.   As a direct and proximate cause of National Union's breach of its contractual obligations, the Foundation has suffered significant monetary damage.

### COUNT III
(Breach of Contract by National Union)

45.   Plaintiff Foundation repeats and incorporates by reference the allegations set forth in Paragraphs 1 - 44 above.

46.   Premiums for the National Union D&O Policy have been paid in full and all other applicable conditions and prerequisites to coverage under the National Union D&O Policy have been satisfied or waived.

47.   The National Union D&O Policy applies or potentially applies to the Lorillard Litigation.  National Union

13

is, therefore, required to pay the defense costs incurred by the
Foundation in connection with the Lorillard Litigation.

48.    The Foundation sought a defense from National
Union in connection with the Lorillard Litigation, but National
Union has failed to provide a defense or to pay any of the
Foundation's defense costs arising from the Lorillard
Litigation.

49.    National Union has breached its obligations under
the National Union D&O Policy by failing to pay, in accordance
with its contractual obligations, any of the Foundation's fees
and costs, which total at least $16,828,946.41.

50.    As a direct and proximate cause of National
Union's breach of its contractual obligations, the Foundation
has suffered significant monetary damage.

### PRAYER FOR RELIEF

WHEREFORE, the Foundation requests judgment as
follows:

1.    Money judgment in the amount of at least
$16,828,946.41;

2.    Prejudgment and any other interest as
appropriate;

3.    An award to Plaintiff Foundation of its costs and
reasonable attorneys' fees associated with this litigation; and

14

4.    Such other and further relief as this Court deems appropriate.

**JURY DEMAND**

The Foundation hereby respectfully requests a trial by jury as to all issues so triable herein.


Dated: May 4, 2007          GILBERT RANDOLPH LLP
                            Richard Shore
                            Kami E. Quinn
                            1100 New York Avenue, NW
                            Suite 700
                            Washington, DC   20005
                            (202) 772-2200

                            and

                            PACHULSKI STANG ZIEHL YOUNG JONES
                            & WEINTRAUB LLP

                            Laura Davis Jones (Bar No. 2436)
                            Timothy P. Cairns (Bar No. 4228)
                            919 North Market Street, 17th Floor
                            P.O. Box 8705
                            Wilmington, DE 19899-8705 (Courier
                            19801)
                            Telephone:  (302) 652-4100
                            Facsimile:  (302) 652-4400
                            Email:  ljones@pszyjw.com
                                    tcairns@pszyjw.com

                            Counsel for Plaintiff
                            American Legacy Foundation

15

# EXHIBIT B

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

AMERICAN LEGACY FOUNDATION, a Delaware )
non-profit corporation )
                            )
               Plaintiff, )
                            )
       v. )    C.A. No. 19406-NC
                            )
LORILLARD TOBACCO COMPANY, a Delaware )
corporation, )
                            )
             Defendant. )

## ANSWER AND COUNTERCLAIMS OF DEFENDANT LORILLARD TOBACCO COMPANY

### FIRST DEFENSE

Responding to the numbered allegations of the Complaint filed by plaintiff American Legacy Foundation ("ALF") in the above-captioned matter, defendant Lorillard Tobacco Company ("Lorillard"), through counsel, alleges and says that:

1.       With respect to the allegations contained in the first sentence of paragraph 1 of the Complaint, it is admitted upon information and belief that ALF is a Delaware non-profit corporation that was created pursuant to the Master Settlement Agreement ("MSA") between forty-six Settling States and the four major tobacco companies and that ALF's mission and permissible functions are set forth in the MSA, a written document that speaks for itself. With respect to the allegations contained in the second sentence of paragraph 1 of the Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to develop and produce its "truth" campaign. By way of further response, it is alleged that the scope of and limitations upon

any of ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, including its "truth" campaign, are set forth in the MSA, a written document that speaks for itself. With respect to the allegations contained in the third sentence of paragraph 1 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 1 of the Complaint are denied.

2.      With respect to the allegations contained in the first sentence of paragraph 2 of the Complaint, the MSA is a written document that speaks for itself. With respect to the allegations contained in the second and third sentences of paragraph 2 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. With respect to the allegations contained in the fourth sentence of paragraph 2 of the Complaint, it is admitted that Lorillard and the other tobacco companies have paid hundreds of millions of dollars under the MSA that have benefitted and funded ALF and its operations. By way of further response, it is alleged that ALF's mission and permissible functions are set forth in the MSA, a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 2 of the Complaint are denied.

3.      With respect to the allegations contained in the first, second, and third sentences of paragraph 3 of the Complaint, the MSA is a written document that speaks for itself. With respect to the allegations contained in the fourth sentence of paragraph 3 of the Complaint, ALF's Certificate of Incorporation and its Bylaws are written documents that speak for themselves. By way of further response, it is admitted that ALF's Certificate of Incorporation and its Bylaws incorporate the terms of the MSA relating to ALF, including the MSA's limitations on ALF's activities. Except as expressly admitted herein, the allegations contained in paragraph 3 of the Complaint are denied.

4.    With respect to the allegations contained in the first and second sentences of paragraph 4 of the Complaint, the MSA and ALF's Bylaws are written documents that speak for themselves. The allegations contained in the third sentence of paragraph 4 of the Complaint are denied. Except as expressly admitted herein, the allegations contained in paragraph 4 of the Complaint are denied.

5.    The allegations contained in the first sentence of paragraph 5 of the Complaint are denied. With respect to the allegations contained in the second sentence of paragraph 5 of the Complaint, it is admitted that ALF had not yet been incorporated when the MSA was executed by the Settling States and certain tobacco companies and that, upon information and belief, ALF has never executed the MSA. By way of further response, it is alleged that ALF has adopted, assumed the obligations of, and otherwise become bound to the MSA through its corporate actions, through its words, and through its conduct. With respect to the allegations contained in the third sentence of paragraph 5 of the Complaint, it is admitted that ALF was not a party to the lawsuits brought by the various Settling States against the tobacco companies. The allegations contained in the fourth sentence of paragraph 5 of the Complaint are denied. With respect to the allegations contained in the fifth sentence of paragraph 5 of the Complaint, the MSA is a written document that speaks for itself. By way of further response, it is alleged that it was not necessary for ALF to execute the MSA in order for ALF to become bound by the MSA. With respect to the allegations contained in the sixth sentence of paragraph 5 of the Complaint, the MSA is a written document that speaks for itself. The allegations contained in the seventh sentence of paragraph 5 are denied. Except as expressly admitted herein, the allegations contained in paragraph 5 of the Complaint are denied.

6.    With respect to the allegations contained in the first sentence of paragraph 6 of the Complaint, it is admitted that on January 18, 2002, Lorillard sent a thirty-day notice letter to ALF's

counsel pursuant to Section VII(c)(2) of the MSA, which letter is a written document that speaks for itself. With respect to the allegations contained in the second and third sentences of paragraph 6 of the Complaint, Lorillard's letter of January 18, 2002, is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 6 of the Complaint are denied.

7.    With respect to the allegations contained in the first sentence of paragraph 7 of the Complaint, it is admitted that Lorillard did not withdraw or change its position as expressed in its letter of January 18, 2002, prior to ALF's filing of the Complaint. With respect to the allegations contained in the second sentence of paragraph 7 of the Complaint, it is admitted that in communications between counsel for Lorillard and counsel for ALF on February 7, 2002, Lorillard did not withdraw or change its position as expressed in its letter of January 18, 2002. With respect to the allegations contained in the third sentence of paragraph 7 of the Complaint, it is admitted that prior to ALF's filing of the Complaint, Lorillard did not identify to ALF the forum in which it intended to bring an enforcement action under the MSA against ALF. Except as expressly admitted herein, the allegations contained in paragraph 7 of the Complaint are denied.

8.    With respect to the allegations contained in the first sentence of paragraph 8 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. The allegations contained in the second and third sentences of paragraph 8 of the Complaint are denied. Except as expressly admitted herein, the allegations contained in paragraph 8 of the Complaint are denied.

9.    With respect to the allegations contained in the first sentence of paragraph 9 of the Complaint, it is admitted that ALF purports to bring an action against Lorillard pursuant to 10 <u>Del. C.</u> §§ 6501-6513 and 8 <u>Del. C.</u> § 111. With respect to the allegations contained in the second

sentence of paragraph 9 of the Complaint, it is admitted that ALF purports to seek an injunction from the Court. Except as expressly admitted herein, the allegations contained in paragraph 9 of the Complaint are denied.

10.    Admitted, upon information and belief.

11.    With respect to the allegations contained in paragraph 11 of the Complaint, it is admitted that ALF's mission and permissible functions are set forth in the MSA, a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 11 of the Complaint are denied.

12.    With respect to the allegations contained in paragraph 12 of the Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to develop and produce its "truth" campaign. By way of further response, it is alleged that the scope of and limitations upon ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, including its "truth" campaign, are set forth in the MSA, a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 12 of the Complaint are denied.

13.    With respect to the allegations contained in paragraph 13 of the Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to develop and produce its "truth" campaign. By way of further response, it is alleged that the scope of and limitations upon ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, including its "truth" campaign, are set forth in the MSA, a written document that speaks

for itself. Except as expressly admitted herein, the allegations contained in paragraph 13 of the Complaint are denied.

14.    With respect to the allegations contained in paragraph 14 of the Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to undertake other activities. By way of further response, it is alleged that the scope of and limitations upon activities funded in whole or in part by funds disbursed to ALF under the MSA are set forth in the MSA, a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 14 of the Complaint are denied.

15.    With respect to the allegations contained in paragraph 15 of the Complaint, it is admitted that ALF was created pursuant to the MSA and that ALF's mission and permissible functions, as well as the scope of and limitations upon ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, are set forth in the MSA, a written document that speaks for itself. By way of further response, it is admitted that the quoted passage appears in the Supreme Court's opinion in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). Except as expressly admitted herein, the allegations contained in paragraph 15 of the Complaint are denied.

16.    With respect to the allegations contained in paragraph 16 of the Complaint, ALF's Bylaws is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 16 of the Complaint are denied.

17.    Admitted, upon information and belief.

18.    Admitted.

19.    With respect to the allegations contained in paragraph 19 of the Complaint, it is admitted that Lorillard is an original signatory to the MSA, having executed the MSA in 1998.

Except as expressly admitted herein, the allegations contained in paragraph 19 of the Complaint are denied.

20.    With respect to the allegations contained in the first sentence of paragraph 20 of the Complaint, the term "largest" is vague and indefinite and, as a result, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. With respect to the allegations contained in the second sentence of paragraph 20 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 20 of the Complaint are denied.

21.    With respect to the allegations contained in paragraph 21 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 21 of the Complaint are denied.

22.    It is admitted that in the 1990s, a number of states brought suit against the tobacco companies, including Lorillard. With respect to the allegations contained in the second sentence of paragraph 22 of the Complaint, the MSA is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 22 of the Complaint are denied.

23.    With respect to the allegations contained in paragraph 23 of the Complaint, it is admitted that the tobacco companies and the Attorneys General of the States that had brought suit against the tobacco companies entered into settlement negotiations in an effort to resolve the various lawsuits brought by those States. Except as expressly admitted herein, the allegations contained in paragraph 23 of the Complaint are denied.

24.    Admitted.

25.     With respect to the allegations contained in paragraph 25 of the Complaint, the MSA is a written document that speaks for itself.  Except as expressly admitted herein, the allegations contained in paragraph 25 of the Complaint are denied.

26.     The allegations contained in the first sentence of paragraph 26 of the Complaint are admitted upon information and belief.  With respect to the allegations contained in the second sentence of paragraph 26 of the Complaint, it is admitted that ALF was not a party to the lawsuits brought by the various Settling States against the tobacco companies.  Except as expressly admitted herein, the allegations contained in paragraph 26 of the Complaint are denied.

27.     Admitted, upon information and belief.

28.     With respect to the allegations contained in paragraph 28 of the Complaint, it is admitted that ALF had not yet been incorporated when the MSA was executed by the Settling States and certain tobacco companies and that ALF has never executed the MSA.  By way of further response, it is alleged that ALF has adopted, assumed the obligations of, and otherwise become bound to the MSA through its corporate actions, through its words, and through its conduct.  Except as expressly admitted herein, the allegations contained in paragraph 28 of the Complaint are denied.

29.     With respect to the allegations contained in paragraph 29 of the Complaint, such allegations state a legal conclusion as to which no response is required by Lorillard.  By way of further response, it is alleged that ALF is an intended beneficiary of the MSA by virtue of the funds that have been disbursed to it under the MSA.  By way of further response, the MSA is a written document that speaks for itself.  Except as expressly admitted herein, the allegations contained in paragraph 29 of the Complaint are denied.

30.    With respect to the allegations contained in paragraph 30 of the Complaint, the MSA is a written document that speaks for itself.  Except as expressly admitted herein, the allegations contained in paragraph 30 of the Complaint are denied.

31.    With respect to the allegations contained in paragraph 31 of the Complaint, the MSA is a written document that speaks for itself.  Except as expressly admitted herein, the allegations contained in paragraph 31 of the Complaint are denied.

32.    With respect to the allegations contained in the first sentence of paragraph 32 of the Complaint, it is admitted that ALF was created pursuant to the MSA and that ALF's mission and permissible functions, as well as the scope of and limitations upon ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, are set forth in the MSA, a written document that speaks for itself.  With respect to the allegations contained in the second sentence of paragraph 32 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied.  With respect to the allegations contained in the third sentence of paragraph 32 of the Complaint, it is alleged that ALF's mission and permissible functions, as well as the scope of and limitations upon ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, are set forth in the MSA, a written document that speaks for itself.  Except as expressly admitted herein, the allegations contained in paragraph 32 of the Complaint are denied.

33.    With respect to the allegations contained in the first and second sentences of paragraph 33 of the Complaint, the MSA is a written document that speaks for itself.  By way of further response, it is alleged that ALF—through its initial board of directors—adopted ALF's Bylaws.  Except as expressly admitted herein, the allegations contained in paragraph 33 of the Complaint are denied.

34.    The allegations contained in paragraph 34 of the Complaint are denied.  By way of further response, it is alleged that ALF—through its initial board of directors—adopted ALF's Bylaws.  Except as expressly admitted herein, the allegations contained in paragraph 34 of the Complaint are denied.

35.    With respect to the allegations contained in paragraph 35 of the Complaint, the MSA is a written document that speaks for itself.  Except as expressly admitted herein, the allegations contained in paragraph 35 of the Complaint are denied.

36.    With respect to the allegations contained in paragraph 36 of the Complaint, the MSA is a written document that speaks for itself.  By way of further response, it is alleged that the MSA requires that Lorillard and the other tobacco companies, in exchange for promises made by the Settling States—many of which were adopted by ALF—to pay hundreds of millions of dollars that have benefitted and funded ALF and its operations. Except as expressly admitted herein, the allegations contained in paragraph 36 of the Complaint are denied.

37.    With respect to the allegations contained in paragraph 37 of the Complaint, the MSA is a written document that speaks for itself.  By way of further response, it is alleged that the MSA requires that Lorillard and the other tobacco companies, in exchange for promises made by the Settling States—many of which were adopted by ALF—to pay hundreds of millions of dollars that have benefitted and funded ALF and its operations.

38.    With respect to the allegations contained in paragraph 38 of the Complaint, it is admitted that ALF incorporated certain provisions of the MSA into its Bylaws. By way of further response, ALF's Bylaws is a written document that speaks for itself.  Except as expressly admitted herein, the allegations contained in paragraph 38 of the Complaint are denied.

39.    With respect to the allegations contained in paragraph 39 of the Complaint, it is admitted that ALF's Certificate of Incorporation incorporates certain provisions of the MSA. By way of further response, ALF's Certificate of Incorporation is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 39 of the Complaint are denied.

40.    With respect to the allegations contained in paragraph 40 of the Complaint, such allegations state a legal conclusion as to which no response is required by Lorillard.

41.    Denied.

42.    With respect to the allegations contained in paragraph 42 of the Complaint, it is admitted that ALF's mission and permissible functions, as well as the scope of and limitations upon ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, are set forth in the MSA, a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 42 of the Complaint are denied.

43.    With respect to the allegations contained in the first sentence of paragraph 43 of the Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to develop and produce its "truth" campaign. By way of further response, it is alleged that the scope of and limitations upon ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, including its "truth" campaign, are set forth in the MSA, a written document that speaks for itself. With respect to the allegations contained in the second sentence of paragraph 43 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 43 of the Complaint are denied.

44.    With respect to the allegations contained in paragraph 44 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 44 of the Complaint are denied.

45.    With respect to the allegations contained in paragraph 45 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 45 of the Complaint are denied.

46.    With respect to the allegations contained in paragraph 46 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 46 of the Complaint are denied.

47.    With respect to the allegations contained in paragraph 47 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 47 of the Complaint are denied.

48.    With respect to the allegations contained in paragraph 48 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 48 of the Complaint are denied.

49.    With respect to the allegations contained in paragraph 49 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied.

Except as expressly admitted herein, the allegations contained in paragraph 49 of the Complaint are denied.

    50.    Denied.

    51.    With respect to the allegations contained in the first and second sentences of paragraph 51 of the Complaint, it is admitted that on January 18, 2002, Lorillard sent a thirty-day notice letter to ALF's counsel, among others, pursuant to Section VII(c)(2) of the MSA, which letter is a written document that speaks for itself. With respect to the allegations contained in the third sentence of paragraph 51 of the Complaint, it is admitted that Lorillard did not withdraw or change its position as expressed in its letter of January 18, 2002, prior to ALF's filing of the Complaint. Except as expressly admitted herein, the allegations contained in paragraph 51 of the Complaint are denied.

    52.    Denied.

    53.    Lorillard repeats, realleges, and incorporates herein by reference its responses to paragraphs 1 through 52 of the Complaint.

    54.    With respect to the allegations contained in paragraph 54 of the Complaint, it is admitted that ALF purports to seek a declaration that Lorillard has no basis to assert, in any court, any claim or suit against ALF seeking to enforce any term of the MSA or seeking to establish any violation of the MSA. By way of further response, it is alleged that such position lacks merit and is contrary to multiple public statements by ALF acknowledging that it is required to comply with the MSA. Except as expressly admitted herein, the allegations contained in paragraph 54 of the Complaint are denied.

    55.    With respect to the allegations contained in the first sentence of paragraph 55 of the Complaint, it is admitted that Lorillard has pursued and intends to pursue enforcement action against

ALF under the MSA. With respect to the allegations contained in the second sentence of paragraph 55 of the Complaint, it is admitted that ALF has taken the position that Lorillard has no basis for pursing enforcement action against ALF under the MSA. By way of further response, it is alleged that such position lacks merit and is contrary to multiple public statements by ALF acknowledging that it is required to comply with the MSA. With respect to the allegations contained in the third sentence of paragraph 55 of the Complaint, it is admitted that there is an actual controversy between the parties, for which declaratory relief pursuant to 10 Del. C. § 6501 is appropriate. Except as expressly admitted herein, the allegations contained in paragraph 55 of the Complaint are denied.

56.    Denied.

57.    Lorillard repeats, realleges, and incorporates herein by reference its responses to paragraphs 1 through 57 of the Complaint.

58.    With respect to the allegations contained in paragraph 58 of the Complaint, it is admitted that ALF purports to seek a declaration that Lorillard has no standing or basis to assert, in any court, any claim or suit against ALF seeking to enforce ALF's Bylaws or seeking to establish any violation of ALF's Bylaws. Except as expressly admitted herein, the allegations contained in paragraph 58 of the Complaint are denied.

59.    With respect to the allegations contained in paragraph 59 of the Complaint, it is admitted that there is an actual controversy between the parties, for which declaratory relief pursuant to 10 Del. C. § 6501 is appropriate. Except as expressly admitted herein, the allegations contained in paragraph 59 of the Complaint are denied.

60.    With respect to the allegation contained in paragraph 60 of the Complaint, such allegation states a legal conclusion to which no response is required by Lorillard.

61.     Lorillard repeats, realleges, and incorporates herein by reference its responses to paragraphs 1 through 60 of the Complaint.

62.     With respect to the allegations contained in paragraph 62 of the Complaint, it is admitted that ALF purports to seek an injunction barring Lorillard from asserting, in any court, any claim or suit against ALF seeking to enforce any term of the MSA or ALF's Bylaws, or seeking to establish any violation of the MSA or ALF's Bylaws. Except as expressly admitted herein, the allegations contained in paragraph 62 of the Complaint are denied.

63.     With respect to the allegation contained in paragraph 63 of the Complaint, such allegation states a legal conclusion to which no response is required by Lorillard.

64.     Lorillard repeats, realleges, and incorporates herein by reference its responses to paragraphs 1 through 63 of the Complaint.

65.     With respect to the allegations contained in paragraph 65 of the Complaint, it is admitted that ALF purports to seek an alternative declaration that (1) none of the components of ALF's "truth" campaign has constituted a personal attack or vilification under the MSA or ALF's Bylaws and (2) no component of ALF's "truth" campaign has otherwise violated any restriction set forth in the MSA or in ALF's Bylaws. Except as expressly admitted herein, the allegations contained in paragraph 65 of the Complaint are denied.

66.     With respect to the allegations contained in the first sentence of paragraph 66 of the Complaint, it is admitted that Lorillard has pursued and intends to pursue enforcement action against ALF under the MSA. With respect to the allegations contained in the second sentence of paragraph 66 of the Complaint, it is admitted that there is an actual controversy between the parties for which declaratory relief pursuant to 10 Del. C. § 6501 is appropriate, including whether ALF's "truth"

campaign has violated those restrictions on ALF's activities set forth in the MSA and in ALF's

Bylaws.

67.    With respect to the allegation contained in paragraph 67 of the Complaint, such

allegation states a legal conclusion to which no response is required by Lorillard.

## SECOND DEFENSE

ALF fails to state a claim upon which relief can be granted.

## THIRD DEFENSE

ALF's claims against Lorillard are barred by the doctrine of estoppel.

## FOURTH DEFENSE

ALF seeks equitable relief, but has acted inequitably and with unclean hands and,

accordingly, ALF's unclean hands bar it from recovering the relief it seeks in this action.

## FIFTH DEFENSE

ALF's claims against Lorillard are barred by the doctrine of waiver.

## SIXTH DEFENSE and COUNTERCLAIMS

Lorillard, complaining of ALF by way of counterclaims filed pursuant to Rule 13 of the

Delaware Chancery Court Rules, alleges as follows:

## SUMMARY OF CLAIMS

1.    In 1998, defendant-counterclaimant Lorillard Tobacco Company ("Lorillard") signed

a Master Settlement Agreement ("MSA") with other tobacco companies and forty-six states. In the

MSA, Lorillard and the other tobacco company signatories agreed, among other things, to assist in

funding a non-profit entity that would create a public education and advertisement program

concerning the health effects of tobacco use.

2.    To date, plaintiff-counterdefendant American Legacy Foundation ("ALF") has purported to qualify and be eligible to receive such funding as the non-profit entity described in the MSA. ALF has instituted an advertising campaign that is paid for, entirely or primarily, by the National Public Education Fund ("NPEF") described in and created by the MSA. The MSA requires Lorillard and other tobacco companies to fund the NPEF, in exchange for numerous promises made by the other parties to the MSA.

3.    Because it administers and operates the NPEF and because it has accepted and benefitted from disbursement of funds under the MSA, ALF's advertising activities are specifically authorized and circumscribed as follows:

> The National Public Education Fund shall be used only for public education and advertising regarding the addictiveness, health effects, and social costs related to the use of tobacco products and shall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively. The Foundation shall work to ensure that its activities are carried out in a culturally and linguistically appropriate manner.

MSA, § VI(h).

4.    However, since its creation ALF has used the NPEF to publish or broadcast a number of advertisements that do not address the "addictiveness, health effects, or social costs" of tobacco use. In addition, many of ALF's advertisements have included personal attacks on companies and individuals, and the vilification of Lorillard, its employees, and tobacco companies collectively. Such advertisements and attacks constitute breaches of the MSA by ALF. Examples of ALF's radio and television advertisements that violate the MSA are attached as Exhibits A and B, respectively.

5.    In addition to its improper advertisements, ALF has engaged in personal attacks upon Lorillard's employees by sending (and/or assisting others in sending) numerous unsolicited and harassing e-mails. Examples of such e-mails are attached as Exhibit C hereto. Such e-mails

frequently contain vulgar and obscene language, and such e-mails evidence the malice that ALF bears toward Lorillard. Upon information and belief, these e-mails were paid for, entirely or primarily, by the NPEF, and thus they constitute breaches of the MSA by ALF.

6.    In addition to improper use of the NPEF, upon information and belief ALF has improperly used other payments made by Lorillard and the other tobacco companies under the MSA for ALF's benefit.

7.    Lorillard attempted to resolve its concerns about various advertisements and other activities of ALF through informal discussions with ALF and, ultimately, by sending ALF a notice letter informing ALF of Lorillard's intent to pursue enforcement under the MSA, a notice letter required by the MSA. ALF initially responded to Lorillard's notice letter by immediately calling a press conference and making misrepresentations to the public and the media. A copy of the statement issued by ALF's President is attached as Exhibit D. Among other things, ALF stated that Lorillard "is trying to stop the truth campaign" and that Lorillard's efforts to resolve this matter were a "smokescreen to hide Lorillard's real goal, which is to crush the truth campaign because it is working to stop kids from smoking." Such false statements are consistent with ALF's pattern of attacks upon, and vilification of, Lorillard.

8.    Lorillard does not seek to destroy ALF or to prevent ALF from pursuing its mission as set forth in the MSA. Lorillard, in fact, supports the goals of the advertising campaign described in the MSA. Unfortunately, ALF has misused the funds that have been entrusted to it by broadcasting and publishing advertisements that are not authorized by the MSA and by creating and facilitating through its website vitriolic, hateful, and vulgar personal attacks upon Lorillard's employees.

9.    By these counterclaims, Lorillard is seeking, among other relief, a determination that ALF has repeatedly and materially breached the MSA and an order requiring ALF to comply with its obligations under the MSA.

## PARTIES

10.    Lorillard is a corporation organized and existing under the laws of the State of Delaware and has its principal office and place of business in Greensboro, North Carolina.

11.    ALF is a non-profit corporation organized and existing under the laws of the State of Delaware and has its principal office and place of business in Washington, D.C.

## EXECUTION OF MASTER SETTLEMENT AGREEMENT AND THE CREATION OF ALF

12.    As a result of litigation pending in multiple fora, the four major tobacco companies, Plaintiff, Philip Morris Incorporated ("Philip Morris"), Brown & Williamson Tobacco Corporation ("B&W"), and R.J. Reynolds Tobacco Company ("RJR"), on the one hand, and some forty-six states, including Delaware, participated in negotiations designed to reach a resolution of the parties' disputes. The various attorneys general of these states negotiated on the states' behalf.

13.    The parties successfully reached a settlement, and they memorialized the terms in a landmark agreement known as the Master Settlement Agreement ("MSA"). The document was executed in November 1998 by the four tobacco companies, including Lorillard, and the attorneys general of the forty-six states signatories. The state signatories to the MSA hereinafter shall be referred to collectively as the "Settling States," and the four tobacco company signatories hereinafter shall be referred to collectively as the "Participating Manufacturers."

14.    The MSA imposes significant obligations upon the Participating Manufacturers. Among other things, the Participating Manufacturers agreed to fund a non-profit entity charged with the mission of educating the public as to the nature and effect of tobacco products and their use.

15.    Section VI of the MSA carefully describes this non-profit entity's mission, and it lists the entity's permissible functions. This section also describes in a general manner the structure of the organization and the composition of its Board of Directors, as well as certain other organizational requirements the entity must meet once formed.

16.    Section VI of the MSA also sets forth in detail the funding obligations imposed upon the Participating Manufacturers with respect to this non-profit entity. Beginning on March 31, 1999, and extending for a period of nine years thereafter, the Participating Manufacturers have agreed to pay collectively $25,000,000 per year to fund the non-profit entity. These payments are known as base foundation payments. These base foundation payments are disbursed under the MSA and Escrow Agreement to the non-profit entity.

17.    Section VI also creates the National Public Education Fund ("NPEF"), and the NPEF is to be used by the non-profit entity to fund its public education and advertising program. The Participating Manufacturers have agreed to pay collectively $250,000,000 on March 31, 1999, and $300,000,000 each of the next four years thereafter, for the benefit of the NPEF (and thus also for the benefit of the non-profit entity and its public education and advertising program). These payments are known as NPEF payments. Pursuant to Section IX(e), the Participating Manufacturers have agreed to continue making annual $300,000,000 NPEF payments unless and until their market share falls below 99.05%. These NPEF payments are disbursed under the MSA and Escrow Agreement to the non-profit entity.

18.    Pursuant to and in accordance with the MSA, Lorillard has made base foundation payments in excess of $10,000,000 since 1999, and it has made NPEF payments in excess of $107,000,000 since 1999.

19.    Sections VI and IX(e) limit in significant ways the manner in which the NPEF payments made pursuant to Section VI and IX(e) may be used. These limitations on the use of the NPEF payments are found in limitations directed at the non-profit entity's use of the NPEF. Specifically, Section VI(h) provides that:

> The National Public Education Fund shall be used only for public education and advertising regarding the addictiveness, health effects, and social costs related to the use of tobacco products and shall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively.

Master Settlement Agreement, § VI(h).

20.    Thus, under Section VI of the MSA, there are significant promises and contractual obligations owed to the Participating Manufacturers, including Lorillard, concerning the NPEF, namely that it (1) will be administered and operated by and disbursed to a non-profit entity qualified and eligible to do so and to receive such disbursements and (2) will in fact be used by this non-profit entity in a manner consistent with Sections VI and IX(e) of the MSA. These promises and contractual obligations were consistent with the promises and contractual obligations owed concerning the mission and permissible functions of the non-profit entity.

21.    These promises and contractual obligations concerning the NPEF, its permissible uses, and the Section VI non-profit entity constituted material terms of the MSA. Had they not been present in the MSA, Lorillard and, upon information and belief, the other Participating Manufacturers would not have agreed to make the NPEF payments, would not have agreed to the

formation and funding of the non-profit entity under the MSA and to its use of the NPEF, and would not have executed the MSA itself.

22.    Pursuant to the MSA, on or about March 3, 1999, the National Association of Attorneys General ("NAAG") incorporated a non-profit entity in the State of Delaware. The original name of the entity—the plaintiff and counter-defendant in this action—was "MSA National Foundation," a name that was changed to "American Legacy Foundation" ("ALF") on or about August 2, 1999.

23.    The MSA requires that the non-profit entity described in Section VI incorporate into its organizational documents those terms of the MSA relating to the entity. Consistent with this requirement, the entity's permissible functions as listed in Section VI(f) of the MSA are contained in ALF's Certificate of Incorporation. The MSA's requirements concerning the composition of the entity's board of directors are contained in the Bylaws adopted by ALF's initial board of directors. Section 5.7 of ALF's Bylaws meets the affiliation requirement set forth in Section VI(e) of the MSA, and this provision expressly provides that ALF is bound by and subject to the terms of the MSA. The limitations on the use of the NPEF contained in Section VI(h) of the MSA are set forth in Section 12.2 of ALF's Bylaws, as are the rules set forth in Section VI(g) of the MSA regarding grants made by the non-profit entity from the NPEF. Finally, Article XIII of ALF's Bylaws provides that neither its Bylaws nor its Certificate of Incorporation may be amended so as to create an inconsistency with any provision of the MSA concerning the non-profit entity described in Section VI of the MSA. The entire MSA is attached to ALF's Bylaws as an exhibit.

24.    Upon information and belief, ALF adopted these Bylaws in an attempt to qualify under Section VI of the MSA to administer and operate the NPEF and in an attempt to become eligible to receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow

Agreement. Upon information and belief, ALF adopted these Bylaws for the benefit of the Participating Manufacturers, including Lorillard.

25.    Upon information and belief, after ALF was incorporated and adopted its Bylaws, the Settling States and NAAG considered ALF to be qualified under Section VI of the MSA to administer and operate the NPEF and to be eligible receive disbursements under Sections VI and IX(e) of the MSA, and they considered ALF to be the non-profit entity described in Section VI. Upon information and belief, after ALF was incorporated and adopted its Bylaws, the Setting States and NAAG allowed ALF to administer and operate the NPEF, and they allowed ALF to receive disbursements under Section VI of the MSA and under the Escrow Agreement. Upon information and belief, the Settling States and NAAG took such actions in exchange for ALF's promise and agreement to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA.

26.    Upon information and belief, ALF has received and continues to receive as disbursements all of the base foundation and NPEF payments made by Lorillard and the other Participating Manufacturers to date. Upon information and belief, ALF has administered and operated and continues to administer and operate the NPEF to date. By administering and operating the NPEF and by accepting disbursements under the MSA, ALF has reaped significant, intended benefits under the MSA, and it has done so with knowledge of the terms of the MSA.

## ALF'S MISUSE OF THE NATIONAL PUBLIC EDUCATION FUND

27.    Once formed, ALF launched an advertising campaign that it labels "the truth." The campaign includes an Internet web site maintained by ALF called "THETRUTH.com."

28. Upon information and belief, ALF's advertising campaign called "the truth"—including its Internet web site called "THETRUTH.com"—is funded, entirely or primarily, by the NPEF.

29. Some of ALF's advertisements are appropriate and are authorized by the MSA. Examples of such advertisements, which Lorillard does not challenge, are attached at Exhibits E and F. Such advertisements address "the addictiveness, health effects, and social costs related to the use of tobacco products," and do not attack or vilify any person or group.

30. Unfortunately, shortly after its creation ALF began to run other advertisements—on television, radio, and the Internet—that do not comply with the MSA and that upon information and belief are funded, entirely or primarily, by the NPEF. Such advertisements, and the activities related to such advertisements, represent a misuse of the NPEF and a breach of the MSA by ALF and/or a breach by ALF of the agreement by ALF to abide by the MSA and its restrictions concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA.

31. ALF's improper advertisements do not address "the addictiveness, health effects, and social costs related to the use of tobacco products," as required by the MSA, and/or they constitute personal attacks and vilification, which is prohibited by the MSA. On multiple occasions, in broadcasts reaching millions of members of the public, ALF has personally attacked and vilified Lorillard, its employees, and tobacco companies collectively. For example, ALF has broadcast advertisements that:

      a.    attack tobacco companies collectively, as well as employees of such companies;

      b.    state or strongly imply that Lorillard and other tobacco companies deliberately target their sales efforts at minors; (for example, in a press release on THETRUTH.com, ALF stated "Lorillard has successfully marketed its addictive product to minority youth");

    c.     accuse tobacco companies of shredding documents, thereby implying the intentional and improper destruction of evidence;

    d.     accuse tobacco companies of lying to the public, including one advertisement in which an employee of a tobacco company is asked to take a lie-detector test;

    e.     end with a statement that ALF is attempting to "expose the tobacco industry's deceptions to the light of day"; and

    f.     strongly imply that Lorillard adds dog urine to its cigarettes ("the Dog Urine Ad").

32.     Examples of ALF's improper advertisements are attached as Exhibits A and B. All such advertisements represent misuse of the NPEF and thereby constitute a breach of the MSA by ALF and/or a breach by ALF of the agreement by ALF to abide by the MSA and its restrictions concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA.

33.     In addition to the malicious attitude toward Lorillard and its employees displayed in ALF's advertisements, ALF has engaged in a pattern of sending, facilitating, and/or assisting others in sending multiple unsolicited and harassing e-mails to Lorillard. Such e-mails, some of which are attached as Exhibit C, frequently contain vulgar and obscene language, including the use of such words and phrases as "whores," "fags," "morons," "you monkeys at Lorillard Tobacco Company," "bullshit," "pathetic bitch asses," and "hookers." These multiple unsolicited and harassing e-mails sent to Lorillard interfered with Lorillard's e-mail system and computer network, and they disrupted Lorillard's employees and such employees' use of their computers.

34.     In 2001, Lorillard was forced to install a filter on its computers to attempt to block ALF's vulgar e-mails. However, some of the harassing e-mails from THETRUTH.com website continue to be received by Lorillard. In addition, Lorillard has received multiple harassing e-mails

from third parties. Examples of such additional e-mails are found at Exhibit G. Upon information

and belief, ALF aided in the creation of these e-mails by making form letters and e-mail addresses

available to third parties on THETRUTH.com website.

35.    Such e-mails, and the activities related to such e-mails, were intended by ALF to

harass and annoy (and, upon information and belief, intimidate) Lorillard and its employees. Upon

information and belief, such e-mails were also intended to interfere with Lorillard's e-mail system

and/or computer network and to disrupt Lorillard's employees and such employees' use of their

computers.

36.    These unsolicited and harassing e-mails constitute personal attacks on and vilification

of Lorillard and its employees, which is expressly prohibited by the MSA. Upon information and

belief, ALF used the NPEF to pay for such attacks and thus such e-mails, and the activities related

to such e-mails, constitute breaches of the MSA by ALF and/or breaches by ALF of the agreement

by ALF to abide by the MSA and its restrictions concerning the NPEF, its permissible uses, and the

non-profit entity described in Section VI of the MSA.

37.    Such e-mails, and all activities taken by ALF relating to these e-mails, also constitutes

a violation of North Carolina's Cyberstalking Act and thus a criminal offense. N.C.G.S. § 14-196.3.

## ATTEMPTS BY LORILLARD TO RESOLVE DISPUTE

38    After the Dog Urine Ad was broadcast, Lorillard contacted ALF and expressed its

view that ALF's conduct constituted a material breach of the MSA. Lorillard requested that ALF

issue a retraction of the Ad and agree to comply with the MSA. ALF refused to comply with these

requests.

39.    After these initial informal settlement discussions were unproductive, Lorillard sent

ALF a formal thirty-day notice letter, as required by Section VII(c) of the MSA. Lorillard's hope

was that the parties would re-kindle their discussions and resolve this matter amicably. Instead,

ALF's President, Cheryl Healton, responded by issuing a press statement (Exhibit D) that is rife with

misrepresentations. Ms. Healton stated, *inter alia*:

> I believe this action is a smokescreen to hide Lorillard's real goal, which is to crush
> the truth campaign because it is working to stop kids from smoking.
>
> . . .
>
> The drop-off in youth smoking rates is costing the tobacco industry a great deal of
> revenue, and that's why Lorillard is desperate to stop the truth campaign. And for
> those who disagree with me, let me just ask the question: Would Lorillard be trying
> to stop the truth campaign if it WEREN'T helping to reduce youth smoking and
> tobacco industry revenues?

40.    Ms. Healton's press statement continued ALF's campaign of making malicious

statements about Lorillard to the public. Lorillard does not seek, and has never sought, to stop

ALF's "truth" advertising campaign. Lorillard's goals are for ALF to stop misusing the funds

entrusted to it and for ALF otherwise to comply with its legal, contractual, and ethical obligations.

41.    Lorillard has alerted the Settling States and NAAG as to ALF's misuse of MSA funds

and to its breaches of the MSA and of its Bylaws and Certificate of Incorporation. However, the

Settling States and NAAG have failed to take action to bring ALF's use of the NPEF into

compliance with the MSA and with ALF's Bylaws and Certificate of Incorporation and otherwise

have failed to halt or cure the on-going breaches of the MSA and ALF's Bylaws and Certificate of

Incorporation created and caused by ALF's conduct.

## FIRST CLAIM FOR RELIEF
### Breach of Master Settlement Agreement

42.    The allegations of Paragraphs 1 through 41 are repeated, realleged, and incorporated

herein by reference.

43.    ALF was created under the terms of the MSA.

44.    ALF incorporated the MSA into its Bylaws.

45.    Pursuant to the terms of the MSA, Lorillard has paid tens of millions of dollars for ALF's benefit. ALF has accepted those funds under the terms of the MSA and with full knowledge of the MSA.

46.    The MSA constitutes a pre-incorporation agreement. Specifically:

a.    the MSA sets forth certain obligations of, and restrictions on, ALF;

b.    the MSA was signed by the various Settling States (as defined in the MSA) and their respective attorneys general;

c.    the Settling States and NAAG promoted and incorporated ALF;

d.    ALF has accepted millions of dollars in benefits under the MSA; and

e.    ALF accepted the benefits with full knowledge of the terms of the MSA.

By its conduct, ALF has adopted and ratified the MSA, and is bound to comply with the terms thereof. At no time has ALF attempted to repudiate the benefits received by it under the MSA.

47.    In addition, ALF has expressly and/or implicitly adopted and assumed the obligations set forth in the MSA concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA. This adoption and assumption is evidenced by the fact that ALF has repeatedly acknowledged that it is bound by the terms of the MSA. For example, in her press release (Exhibit D), ALF's President stated that "[a]nyone who has seen truth ads knows that they educate young people about the addictiveness, health effects, and social costs of tobacco, <u>which is exactly what the Master Settlement Agreement says they must do.</u>" (Emphasis added.)

48.    ALF's Bylaws acknowledge that ALF must comply with the MSA. For example, §5.7 provides:

<u>Affiliation</u>. The programs of the Foundation may be affiliated with one or more educational or medical institutions selected by the Board of Directors from time to

time <u>as required by the Master Settlement Agreement attached hereto as Exhibit A</u> ("Master Settlement Agreement").

Exhibit H (emphasis added.)

49.    Other examples of ALF's admissions that it is bound by, and subject to, the MSA are set forth at Exhibit I.

50.    In addition, ALF has succeeded to various obligations of the Settling States and NAAG, including the provisions relating to the types of advertising allowed under the MSA and to the permissible use of the NPEF.

51.    In the alternative, an implied agreement has arisen between Lorillard and ALF pursuant to which ALF agreed to abide by the terms of the MSA in exchange for the payments made by Lorillard for the benefit of ALF.

52.    As described above, ALF has committed multiple material breaches of the MSA, including but not limited to Sections VI(f) and (h), by misusing the funds entrusted to it. Specifically, ALF has used the NPEF for advertisements that do not address the addictiveness, health consequences, or social costs of the use of tobacco products. In addition, ALF has used the NPEF to engage in personal attacks on and the vilification of Lorillard, its employees, and tobacco companies collectively through the advertisements referenced above. Finally, by its own admission in the Complaint, ALF is using base foundation payments for advertising.

53.    In addition to the advertisements that violate the MSA, the e-mails described above constitute personal attacks on and vilification of Lorillard and its employees that further violate the MSA. Upon information and belief, such e-mails were funded, entirely or primarily, by the NPEF.

54.     Pursuant to Section VII(c) of the MSA, this Court has the authority to enforce the terms of the MSA. In addition, this Court has the authority to issue a Declaratory Order (as defined in the MSA).

55.     Lorillard requests that the Court enter a finding that ALF has repeatedly breached the MSA and enter an order requiring ALF to comply with the MSA.

56.     ALF's breaches of the MSA and harassing conduct are likely to recur in the future unless ALF is ordered to cease doing so and to specifically perform its duties and obligations under the MSA, and such breaches and harassing conduct are not compensable by money damages. Accordingly, Lorillard requests preliminary and permanent injunctive relief requiring ALF to cease sending (and assisting others in sending) unsolicited e-mails to Lorillard and/or its employees and to comply with the requirements of the MSA, and Lorillard requests an order requiring ALF to specifically perform its duties and obligations under the MSA.

57.     Lorillard requests as further relief for ALF's breaches of the MSA that the Court enter an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation payments made by the Participating Manufacturers, including Lorillard. In the alternative, Lorillard requests that the Court order an accounting of ALF's use of the NPEF and base foundation payments disbursed to it under Section VI of the MSA and under the Escrow Agreement and, based on the results of such accounting, enter an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation payments made by the

Participating Manufacturers, including Lorillard, that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement.

58.    In the alternative, Lorillard is entitled to at least nominal damages in the amount of $1.00 for ALF's breaches of MSA.

59.    To the extent the Court finds ambiguity in any term or terms of the MSA, Lorillard requests a Declaratory Order under Section VII(c)(1) and (c)(5) of the MSA defining ALF's obligations under the MSA and/or construing such ambiguous term or terms.

## SECOND CLAIM FOR RELIEF
### Breach of the Duty and Covenant of Good Faith and Fair Dealing

60.    The allegations of Paragraphs 1 through 59 are repeated, realleged, and incorporated herein by reference.

61.    Implied in the MSA is a duty and covenant of good faith and fair dealing.

62.    By personally attacking and vilifying Lorillard, its employees, and tobacco companies collectively, and by waging a campaign of harassment through e-mails, ALF has breached its duty and covenant of good faith and fair dealing under the MSA.

63.    Lorillard is entitled to nominal damages in the amount of $1.00 for ALF's breaches of the duty and covenant of good faith and fair dealing.

## THIRD CLAIM FOR RELIEF
### Breach of Contract

64.    The allegations of Paragraphs 1 through 63 are repeated, realleged, and incorporated herein by reference.

65.    Upon information and belief, after ALF was incorporated and adopted its Bylaws, the Settling States and NAAG considered ALF to be qualified under Section VI of the MSA to administer and operate the NPEF and to be eligible to receive disbursements under Sections VI and

IX(e) of the MSA, and they considered ALF to be the non-profit entity described in Section VI. Upon information and belief, after ALF was incorporated and adopted its Bylaws, the Setting States and NAAG allowed ALF to administer and operate the NPEF, and they allowed ALF to receive disbursements under Section VI of the MSA and under the Escrow Agreement, in exchange for ALF's promise and agreement to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA (the "Agreement").

66.      Upon information and belief, Lorillard and the other Participating Manufacturers were intended third-party beneficiaries of ALF's Agreement with the Settling States and/or NAAG to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA. As an intended third-party beneficiary, Lorillard is entitled to enforce such Agreement.

67.      As described above, ALF has committed multiple material breaches of the Agreement by misusing the NPEF and other MSA funds entrusted to it. Specifically, ALF has used the NPEF for advertisements that do not address the addictiveness, health consequences, or social costs of the use of tobacco products. In addition, ALF has used the NPEF to engage in personal attacks on and vilification of Lorillard, its employees, and tobacco companies collectively through the advertisements referenced above. Finally, by its own admission in the Complaint, ALF is using base foundation payments for advertising.

68.      In addition to the advertisements that violate ALF's Agreement to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA, the unsolicited e-mails described above constitute personal attacks on and vilification of Lorillard and its employees that further violate such

Agreement. Upon information and belief, such e-mails were funded, entirely or primarily, by the NPEF.

69.    ALF's breaches of the Agreement are likely to recur in the future unless ALF is ordered to cease doing so and to specifically perform its duties and obligations under the Agreement, and such breaches are not compensable by money damages. Accordingly, Lorillard requests preliminary and permanent injunctions requiring that ALF (a) comply with its Agreement with the Settling States and/or NAAG to abide by the provisions of the MSA relating to the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA and (b) comply with such provisions, and Lorillard requests an order requiring ALF to specifically perform its duties and obligations under the Agreement.

70.    Lorillard requests as further relief for ALF's breaches of the Agreement that the Court enter an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation payments made by the Participating Manufacturers, including Lorillard. In the alternative, Lorillard requests that the Court order an accounting of ALF's use of the NPEF and base foundation payments disbursed to it under Section VI of the MSA and under the Escrow Agreement and, based on the results of such accounting, enter an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation payments made by the Participating Manufacturers, including Lorillard, that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement.

71.    In the alternative, Lorillard is entitled to at least nominal damages in the amount of $1.00 for ALF's breaches of the Agreement.

## FOURTH CLAIM FOR RELIEF
### Violation of Bylaws and Certificate of Incorporation

72.    The allegations of Paragraphs 1 through 71 are repeated, realleged, and incorporated herein by reference.

73.    Upon information and belief, NAAG incorporated those certain provisions of ALF's Certificate of Incorporation concerning the non-profit entity described in Section VI of the MSA in an attempt to qualify ALF under Section VI of the MSA to administer and operate the NPEF and to allow ALF to become eligible to receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow Agreement. Upon information and belief, NAAG incorporated these provisions into ALF's Certificate of Incorporation for the benefit of the Participating Manufacturers, including Lorillard.

74.    Upon information and belief, ALF adopted those Bylaws concerning the NPEF, the NPEF's permissible uses, and the non-profit entity described in Section VI of the MSA, as well as those Bylaws otherwise relating to the MSA, in an attempt to qualify under Section VI to administer and operate the NPEF and to become eligible to receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow Agreement. Upon information and belief, ALF adopted these Bylaws for the benefit of the Participating Manufacturers, including Lorillard.

75.    Lorillard enjoys standing to enforce such Bylaws and Certificate of Incorporation provisions because upon information and belief these provisions were intended to confer direct contractual rights upon Lorillard and/or because upon information and belief Lorillard is an intended third-party beneficiary of such provisions

76.    In the alternative, Lorillard enjoys standing to enforce such Bylaws and Certificate of Incorporation provisions because of the special interest Lorillard has in the enforcement of such provisions and/or because the Attorney General of the State of Delaware has failed to enforce such provisions herself.

77.    As described above, ALF has committed multiple material violations of such Bylaws and Certificate of Incorporation provisions by misusing the NPEF and other MSA funds entrusted to it. Specifically, ALF has used the NPEF for advertisements that do not address the addictiveness, health consequences, or social costs of the use of tobacco products. In addition, ALF has used the NPEF to engage in personal attacks on and vilification of Lorillard, its employees, and tobacco companies collectively through the advertisements referenced above. Finally, by its own admission in the Complaint, ALF is using base foundation payments for advertising.

78.    In addition to the advertisements that violate ALF's Bylaws and Certificate of Incorporation provisions concerning the NPEF, the NPEF's permissible uses, and the non-profit entity described in Section VI of the MSA, as well as those provisions otherwise relating to the MSA, the unsolicited e-mails described above constitute personal attacks on and vilification of Lorillard and its employees that further violate such provisions. Upon information and belief, such e-mails were funded, entirely or primarily, by the NPEF.

79.    ALF's misconduct and misuse of MSA funds disbursed and entrusted to it, which misconduct and misuse violates ALF's Bylaws and Certificate of Incorporation provisions concerning the NPEF, the NPEF's permissible uses, and the non-profit entity described in Section VI of the MSA, as well as those provisions otherwise relating to the MSA, are likely to recur in the future unless ALF is ordered to cease doing so and are not compensable by money damages.

Accordingly, Lorillard requests preliminary and permanent injunctive relief requiring ALF to cease its violation of such provisions.

80.    Lorillard requests as further relief for ALF's violation of its Bylaws and Certificate of Incorporation that the Court enter an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation payments made by the Participating Manufacturers, including Lorillard. In the alternative, Lorillard requests that the Court order an accounting of ALF's use of the NPEF and base foundation payments disbursed to it under Section VI of the MSA and under the Escrow Agreement and, based on the results of such accounting, enter an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation payments made by the Participating Manufacturers, including Lorillard, that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement.

## FIFTH CLAIM FOR RELIEF
### Claim for Declaratory Judgment Regarding MSA

81.    The allegations of Paragraphs 1 through 80 are repeated, realleged, and incorporated herein by reference.

82.    Lorillard seeks a declaration that ALF—on account of its conduct, its activities, its use of the NPEF, and otherwise, as alleged herein—does not qualify and is not eligible to administer and operate the NPEF under Sections VI and IX(e) of the MSA and does not qualify and is not eligible to receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow

Agreement. Lorillard requests that the Court issue a declaration to this effect and also declare that ALF no longer may administer and operate the NPEF under Sections VI and IX(e) of the MSA and no longer may receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow Agreement.

83.    Lorillard also seeks a declaration that ALF—on account of its conduct, its activities, its use of the NPEF, and otherwise, as alleged herein—has been disqualified and ineligible to administer and operate the NPEF under Section VI of the MSA and has been disqualified and ineligible to receive disbursements under Section VI of the MSA and under the Escrow Agreement. Lorillard requests that the Court issue a declaration to this effect and also declare that ALF must refund and return to the Escrow Agent all NPEF and base foundation payments disbursed to ALF (or to Lorillard all NPEF and base foundation payments made by Lorillard and disbursed to ALF) while ALF was disqualified and ineligible to administer and operate the NPEF and/or disqualified and ineligible to receive such disbursements.

84.    ALF has demonstrated through its conduct, its activities, its use of the NPEF, and otherwise, as alleged herein, that it does not meet (and has not met) the definition of the non-profit entity described in Sections VI and IX(e) of the MSA and that it does not qualify and is not eligible (and has been disqualified and ineligible) to administer and operate the NPEF under Sections VI and IX(e) of the MSA or to receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow Agreement. However, ALF has suggested that it does qualify and is eligible (and has been qualified and eligible) to administer and operate the NPEF under Sections VI and IX(e) of the MSA and to receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow Agreement. Thus, this claim presents an actual controversy, for which declaratory relief is appropriate under 10 Del. C. § 6501 and Section VII(c) of the MSA.

## SIXTH CLAIM FOR RELIEF
### Alternative Claim for Declaratory Judgment Regarding MSA

85.    The allegations of Paragraphs 1 through 84 are repeated, realleged, and incorporated herein by reference.

86.    In the event that this Court denies the relief sought by Lorillard in Claims I-V, Lorillard seeks an alternative declaration that the Settling States—including Delaware—and/or NAAG (1) may pursue enforcement of the restrictions and provisions in the MSA concerning the NPEF, the base foundation payments, the NPEF's permissible uses, and the non-profit entity described in Section VI of the MSA; (2) may pursue enforcement of ALF's Bylaws and Certificate of Incorporation provisions concerning the NPEF, the base foundation payments, the NPEF's permissible uses, and the non-profit entity described in Section VI of the MSA; and/or (3) may pursue enforcement of ALF's promise and agreement to the Settling States and/or NAAG to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, the base foundation payments, and the non-profit entity described in Section VI of the MSA.

87.    The Settling States—including Delaware—and NAAG have failed to take any action to bring ALF's use of the NPEF into compliance with the MSA and with ALF's Bylaws and Certificate of Incorporation and otherwise have failed to halt or cure the on-going breaches of the MSA, ALF's Bylaws and Certificate of Incorporation, and ALF's promise to abide by certain provisions of the MSA. In the event that the Court denies the relief sought by Lorillard in Claims I-V above, Lorillard will be left to look to the Settling States and/or NAAG to enforce these obligations binding upon ALF. However, ALF has suggested that the Settling States—including Delaware—and/or NAAG lack authority to enforce such obligations. Thus, in the event that the Court denies the relief sought by Lorillard in Claims I-V above, this claim presents an actual

controversy, for which declaratory relief is appropriate under 10 <u>Del. C.</u> § 6501 and Section VII(c) of the MSA.

## SEVENTH CLAIM FOR RELIEF
### Trespass to Chattel

88.    The allegations of Paragraphs 1 through 87 are repeated, realleged, and incorporated herein by reference.

89.    As described above, ALF intentionally intermeddled with Lorillard's e-mail system and computer network by sending, facilitating, and/or assisting others in sending, multiple unsolicited and harassing e-mails to Lorillard and Lorillard's employees. These unsolicited and harassing e-mails interfered with Lorillard's e-mail system and computer network, and they disrupted Lorillard's employees and such employees' use of their computers.

90.    Lorillard was forced to install a filter on its computers to attempt to block such e-mails. However, some of the unsolicited and harassing e-mails from THETRUTH.com website continued to be received by Lorillard. In addition, Lorillard received multiple unsolicited and harassing e-mails from third parties. Upon information and belief, ALF has assisted and is assisting these third parties in sending such e-mails.

91.    ALF's conduct relating to the sending of such unsolicited and harassing e-mails to Lorillard and Lorillard's employees as alleged herein amounts to a trespass to Lorillard's chattel, that is, a trespass to Lorillard's e-mail system and computer network.

92.    As a result of ALF's trespass, Lorillard is entitled to recover from ALF Lorillard's direct and special damages, including the cost of installing the e-mail filter.

93.    ALF's trespass is likely to recur in the future unless ALF is ordered to cease doing so. Accordingly, Lorillard requests preliminary and permanent injunctive relief requiring ALF to

cease sending, facilitating, and/or assisting others in sending unsolicited e-mails to Lorillard and/or Lorillard's employees.

WHEREFORE Defendant-Counterclaimant Lorillard prays that the Court:

1.    Enter judgment in favor of Lorillard and against ALF on ALF's claims against Lorillard and dismiss ALF's complaint against Lorillard in its entirety with prejudice;

2.    Enter judgment in favor of Lorillard and against ALF on Lorillard's claims I-V and VII of Lorillard's Counterclaims and grant Lorillard the relief requested in its Counterclaims;

3.    Grant Lorillard at least $1.00 in nominal damages on claims I, II, and III;

4.    Grant Lorillard its direct and special damages, including the cost of installing the e-mail filter, on claim VII.

5.    Issue a declaration that (1) ALF does not qualify and is not eligible to administer and operate the NPEF under Sections VI and IX(e) of the MSA and does not qualify and is not eligible to receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow Agreement; (2) ALF no longer may administer and operate the NPEF under Sections VI and IX(e) of the MSA and no longer may receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow Agreement; (3) ALF has been disqualified and ineligible to administer and operate the NPEF under Section VI of the MSA and has been disqualified and ineligible to receive disbursements under Section VI of the MSA and under the Escrow Agreement; and (4) ALF must refund and return to the Escrow Agent all NPEF and base foundation payments disbursed to ALF (or to Lorillard all NPEF and base foundation payments made by Lorillard and disbursed to ALF) while ALF was disqualified and ineligible to administer and operate the NPEF and/or to receive such disbursements.

6.    Enter a finding that ALF has repeatedly breached the MSA and enter an order requiring ALF to comply with the MSA;

7.      Enter preliminary and permanent injunctions requiring that ALF comply with its obligations under the MSA, including the proper use of the NPEF and the prohibitions against personal attacks and vilification, and enter an order requiring ALF to specifically perform its duties and obligations under the MSA;

8.      Enter preliminary and permanent injunctions requiring that ALF comply with its Certificate of Incorporation and Bylaws;

9.      Enter preliminary and permanent injunctions requiring that ALF (a) comply with its Agreement with the Settling States—including Delaware—and/or NAAG to abide by the provisions of the MSA relating to the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA and (b) comply with such provisions, and enter an order requiring ALF to specifically perform its duties and obligations under the Agreement;

10.     Enter preliminary and permanent injunctions prohibiting ALF from sending, facilitating, and/or assisting others in sending unsolicited e-mails to Lorillard;

11.     Enter preliminary and permanent injunctions and/or an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation payments made by the Participating Manufacturers, including Lorillard.  In the alternative, enter an order requiring an accounting of ALF's use of the NPEF and base foundation payments disbursed to it under Section VI of the MSA and under the Escrow Agreement and, based on the results of such accounting, requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation payments made by the Participating Manufacturers, including

Lorillard, that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement.

12.     In the alternative to the relief requested in claims I-V of Lorillard's Counterclaims and in the event the Court denies such relief, issue a declaration that the Settling States—including Delaware—and/or NAAG (1) may pursue enforcement of the restrictions and provisions in the MSA concerning the NPEF, the NPEF's permissible uses, and the non-profit entity described in Section VI of the MSA; (2) may pursue enforcement of ALF's Bylaws and Certificate of Incorporation provisions concerning the NPEF, the NPEF's permissible uses, and the non-profit entity described in Section VI of the MSA; and/or (3) may pursue enforcement of ALF's promise and agreement to the Settling States—including Delaware—and/or NAAG to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA.

13.     To the extent necessary and appropriate, enter a Declaratory Order defining ALF's obligations under the MSA or otherwise construing any ambiguous term or terms in the MSA;

14.     Tax the costs of this action, including attorneys' fees, against ALF; and     1   5   .

Grant to Lorillard such other and further relief as the Court deems just and proper.

Stephen E. Herrmann (#691)
Robert W. Whetzel (#2288)
Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
Attorneys for Lorillard Tobacco Company

***Of Counsel:***
Jim W. Phillips, Jr.
Robert J. King III
Charles E. Coble
Brooks, Pierce, McLendon, Humphrey &
 Leonard, L.L.P.
2000 Renaissance Plaza
Greensboro, North Carolina 27401
(336) 373-8850

# EXHIBIT C

**POLICY NUMBER:**
*873-99-71*

 *American International Companies* ® RENEWAL OF:
*473-29-11*

## NOT-FOR-PROFIT INDIVIDUAL AND ORGANIZATION INSURANCE POLICY INCLUDING EMPLOYMENT PRACTICES LIABILITY INSURANCE

## NOT-FOR-PROFIT PROTECTOR sm

☐ AIU Insurance Company
☐ American Home Assurance Company
☐ American International Pacific Insurance Company
☐ American International South Insurance Company
☐ Birmingham Fire Insurance Company of Penns.

☐ Granite State Insurance Company
☐ Illinois National Insurance Company
☒ National Union Fire Insurance Company of Pitts., Pa ®
☐ National Union Fire Insurance Company of Louisiana
☐ New Hampshire Insurance Company

(each of the above being a capital stock company)

**NOTICE:** EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

**NOTICE:** THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

**NOTICE:** THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND. HOWEVER, THE INSUREDS MAY UNDER CERTAIN CONDITIONS TENDER THE DEFENSE OF A CLAIM. IN ALL EVENTS, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.

## DECLARATIONS

ITEM 1.    NAMED ORGANIZATION: *AMERICAN LEGACY FOUNDATION*

MAILING ADDRESS: *1001 G STREET, NW*
*SUITE 800*
*WASHINGTON, DC 20001*
STATE OF INCORPORATION OF THE NAMED ORGANIZATION:
*Delaware*

ITEM 2.    SUBSIDIARY COVERAGE: any past, present or future Subsidiary of the Named Organization

ITEM 3.    POLICY PERIOD:    From: *August 26, 2001*    To: *August 26, 2002*
(12:01 A.M. standard time at the address stated in Item 1.)

ITEM 4.    LIMIT OF LIABILITY:    *$15,000,000*

*7065422*    aggregate for each Policy Year Coverages A, B and C combined (including Defense Costs)

68466 (8/97)

**ITEM 5.    RETENTION:**

    A.    Judgments, Settlements and Defense Costs    None
       (Non-Indemnifiable Loss or Indemnifiable Loss
       incurred solely by Organizations in Financial
       Insolvency)

    B.    Judgments, Settlements and Defense Costs
       (Coverage C and all other Indemnifiable Loss)    *$50,000*

                                   for Loss arising from
                                   Claims alleging the same
                                   Wrongful Act or related
                                   Wrongful Acts (waivable
                                   under Clause 6 in certain
                                   circumstances)

**ITEM 6.    CONTINUITY DATES:**

    A.    Coverages A and B:                  *August 26, 1999*

    B.    Coverage C:                          *August 26, 1999*

**ITEM 7.    A.    PREMIUM:** 1 Year Premium             *$54,450*

                 3 Year Premium Prepaid        *$0*

                 3 Year Premium Installments payable each anniversary

                                 1st   *n/a.*       inception
                                 2nd   *n/a.*
                                 3rd   *n/a.*

    B.    ADDITIONAL PREMIUM FOR PUNITIVE, EXEMPLARY AND MULTIPLIED DAMAGES
                  (included in above) (No punitive damages coverage provided *X* )

**ITEM 8.    NAME AND ADDRESS OF INSURER** (hereinafter "Insurer"):
    (This policy is issued only by the insurance company indicated below.)

*National Union Fire Insurance Company of Pittsburgh, Pa.*

*175 Water Street*

*New York, NY 10038*



                      **Armfield, Harrison & Thomas, Inc.**
                          INSURANCE • BONDS
                    (703) 777-2341   METRO 478-1905
                      20 South King Street
                      LEESBURG, VA 22075

*7065422*

68466 (8/97)

IN WITNESS WHEREOF, the Insurer has caused this policy to be signed on the Declarations page by its President, a Secretary and a duly authorized representative of the Insurer.

_Elizabeth M. Tuck_
SECRETARY

_signature_
PRESIDENT

_signature_
AUTHORIZED REPRESENTATIVE

_____
COUNTERSIGNATURE DATE

_____
COUNTERSIGNED AT

ARMFIELD HARRISON & THOMAS INC
20 S KING ST
LEESBURG, VA 22075

7065422

68466 (8/97)

 **AMERICAN INTERNATIONAL COMPANIES ®**

### NOT–FOR–PROFIT INDIVIDUAL AND ORGANIZATION INSURANCE POLICY INCLUDING EMPLOYMENT PRACTICES LIABILITY INSURANCE

### NOT–FOR–PROFIT PROTECTOR℠

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer by application forming a part hereof and its attachments and the material incorporated therein, the insurance company designated in Item 8 of the Declarations, herein called the "Insurer", agrees as follows:

## 1. INSURING AGREEMENTS

### COVERAGE A: INDIVIDUAL INSURED INSURANCE

This policy shall pay on behalf of each and every Individual Insured Loss arising from a Claim first made against such Individual Insured during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act in his/her respective capacities as an Individual Insured of the Organization, except when and to the extent that the Organization has indemnified the Individual Insured. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

### COVERAGE B: ORGANIZATION INDEMNIFICATION REIMBURSEMENT INSURANCE

This policy shall pay on the behalf of the Organization Loss arising from a Claim first made against an Individual Insured during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act in his/her respective capacities as an Individual Insured of the Organization, but only when and to the extent that the Organization has indemnified such Individual Insured for such Loss pursuant to law, common or statutory, or contract, or the Charter or By–laws of the Organization duly effective under such law which determines and defines such rights of indemnity. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

### COVERAGE C: ORGANIZATION ENTITY COVERAGE

This policy shall pay on behalf of the Organization Loss arising from a Claim first made against the Organization during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act of the Organization. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

### DEFENSE PROVISIONS

The Insurer does not assume any duty to defend; provided, however, the Named Organiza-tion may at its sole option, and in accordance with Clause 8, tender to the Insurer the defense of a Claim for which coverage is provided by this policy. Regardless of whether the defense is so tendered, the Insurer shall advance Defense Costs (excess of the Retention amount) of such Claim prior to its final disposition. Selection of counsel to defend a "Class Action Claim", as defined in Clause 9, shall be made in accordance with Clause 9 of the policy.

## 2. DEFINITIONS

(a) "Affiliate" shall mean any not for profit organization other than a Subsidiary which:

    (1) the Named Organization or any Subsidiary controls or otherwise has the ability to direct the financial or managerial decisions of such entity, whether through the operation of law, contract or agreement, stock ownership or membership, charter, articles of incorporation, or by-law provisions; or

    (2) is granted by contract the right to control the financial or managerial decisions of the Organization or any Subsidiary.

    Provided, however that such coverage as is provided by sections (1) and (2) above shall be limited solely to Wrongful Acts occurring in the course of the exercise of such control of financial or managerial decisions.

(b) "Claim" means:

    (1) a written demand for monetary relief; or

    (2) a civil, criminal, regulatory or administrative proceeding for monetary or non-monetary relief which is commenced by:

        (i) service of a complaint or similar pleading; or

        (ii) return of an indictment (in the case of a criminal proceeding); or

        (iii) receipt or filing of a notice of charges; or

    (3) any request to toll or waive any statute of limitations.

    The term "Claim" shall include an Employment Practices Claim, provided however, that in no event shall the term "Claim" include any labor or grievance proceeding which is subject to a collective bargaining agreement.

(c) "Continuity Date" means the date set forth in:

    (1) Item 6A of the Declarations with respect to all coverages other than Coverage C; or

    (2) Item 6B of the Declarations with respect to Coverage C only.

(d) "Defense Costs" means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a Claim against the Insureds, but excluding salaries of Individual Insureds.

(e) "Employee(s)" means any past, present or future employee of the Organization, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonal and temporary Employee of the Organization in his or her capacity as such.

(f) "Employment Practices Claim" means a Claim alleging an Employment Practices Violation.

(g) "Employment Practices Violation(s)" means any actual or alleged:

    (1) wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied contract;

    (2) harassment (including sexual harassment whether "quid pro quo", hostile work environment or otherwise);

(3) discrimination, (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy, or disability);

(4) Retaliation (including lockouts);

(5) employment-related misrepresentation(s) to an Employee or applicant for employment with the Organization;

(6) employment-related libel, slander, humiliation, defamation or invasion of privacy;

(7) wrongful failure to employ or promote;

(8) wrongful deprivation of career opportunity, wrongful demotion or negligent Employee evaluation, including the giving of negative or defamatory statements in connection with an employee reference;

(9) wrongful discipline;

(10) failure to grant tenure or practice privileges;

(11) failure to provide or enforce adequate or consistent organization policies or procedures relating to any other Employment Practices Violation;

(12) violation of any individual's civil rights relating to any of the above,

but only if the Employment Practices Violation relates to an Individual Insured, or applicant for employment, with the Organization or an Outside Entity, whether direct, indirect, intentional or unintentional.

(h) "Financial Insolvency" means: (1) entering into proceedings in bankruptcy or (2) becoming a debtor in possession; or (3) the taking of control, the supervision of, or the managing or liquidating the financial affairs of such entities by a receiver, conservator, liquidator, trustee, rehabilitator, or similar official.

(i) "Individual Insured(s)" means a past, present or future duly elected or appointed director, officer, trustee, trustee emeritus, executive director, department head, committee member (of a duly constituted committee of the Organization), staff or faculty member (salaried or non-salaried), Employee or volunteer of the Organization. Coverage will automatically apply to all new persons who become Individual Insureds after the inception date of this policy.

(j) "Insured(s)" means the Organization and all Individual Insureds.

(k) "Loss" means damages, (including back pay and front pay), judgments, settlements, pre- and post-judgment interest, the multiple or liquidated damages awards under the Age Discrimination in Employment Act and the Equal Pay Act and Defense Costs; however, Loss shall not include: (1) any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds; (2) employment-related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation; (3) any liability or costs incurred by any Insured to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seinar relating to an Employment Practices Claim; or (4) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

If an additional premium is stated in Item 7B of the Declarations page, then Loss shall specifically include, (subject to the policy's other terms, conditions and exclusions) punitive, exemplary and multiple damages. It is further understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages. If an additional premium is not stated in Item 7B of the Declarations, then Loss shall not include punitive, exemplary damages or the multiplied portion of multiple damages. In all events, coverage shall not be provided to any particular Insured who has been adjudicated to have obtained a profit or advantage or committed a fraudulent or dishonest act or a willful violation of any statute, rule or law.

(l) "No Liability" means: (1) a final judgment of no liability obtained prior to trial, in favor of all Insureds, by reason of a motion to dismiss or a motion for summary judgment, after the exhaustion of all appeals; or (2) a final judgment of no liability obtained after trial, in favor of all Insureds, after the exhaustion of all appeals. In no event shall the term "No Liability" apply to a Claim made against an Insured for which a settlement has occurred.

(m) "Non–Employment Discrimination" means any actual or alleged sexual harassment or unlawful discrimination, as described in paragraphs (2) and (3) of the definition of Employment Practices Violation, or the violation of the civil rights of a person relating to such sexual harassment or discrimination, when such acts are alleged to be committed against anyone other than an Individual Insured, or applicant for employment with the Organization or an Outside Entity, including, but not limited to: students, patients, members, customers and suppliers.

(n) The "Organization" means: (1) the Named Organization designated in Item 1 of the Declarations; (2) any Subsidiary thereof; and (3) and Affiliate thereof listed by endorsement to this policy.

(o) "Outside Entity" means a not–for–profit organization, other than a Subsidiary or listed Affiliate, on which an Individual Insured serves, at the specific written request of the Organization, as a director, trustee, trustee emeritus or governor. Such coverage as is provided by this policy shall be specifically excess of any insurance in force as respects such Outside Entity and any indemnification provided by such Outside Entity.

(p) "Policy Period" means the period of time from the inception date shown in Item 3 of the Declarations to the earlier of the expiration date shown in Item 3 of the Declarations or the effective date of cancellation of this policy.

(q) "Policy Year" means a period of one year, within the Policy Period, commencing each year on the day and hour first named in Item 3. of the Declarations, or if the time between the effective date or anniversary and termination of the Policy is less than one year, then such lesser period.

(r) "Related Wrongful Acts" shall mean Wrongful Acts which are the same, related or continuous, or Wrongful Acts which arise from a common nucleus of facts. Claims can allege Related Wrongful Acts regardless of whether such Claims involve the same or different claimants, Insureds or legal causes of action.

(s) "Retaliation" means a Wrongful Act of an Insured relating to or alleged to be in response to any of the following activities: (1) the disclosure or threat of disclosure by an Employee to a superior or to any governmental agency of any act by an Insured which is alleged to be a violation of any federal, state, local or foreign law, common or statutory, or any rule or regulation promulgated thereunder; (2) the actual or attempted exercise by an Employee of any right that such Employee has under law, including rights under worker's compensation laws, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights; (3) the filing of any claim under the Federal False Claims Act or any other federal, state, local or foreign "whistle–blower" law; or (4) Employee strikes.

68467 (8/97)                                        4

(t)  "Subsidiary" means:

a)  any organization which, on or before the inception of the Policy Period the Organization owns more than fifty percent (50%) of the voting interest, either directly, or indirectly through one or more of its Subsidiaries, or has, on or before the inception of the Policy Period, the right to elect or appoint more than fifty percent (50%) of the voting directors, or trustees, either directly or indirectly through one or more of its Subsidiaries;

b)  automatically any not for profit organization which becomes a Subsidiary during the Policy Period and where the book value of such entity's assets determined in accordance with Generally Accepted Accounting Principles ("GAAP") totals less than 30% of the similarly calculated assets of the Named Organization as of the inception date of the Policy Period; or

c)  any for profit organization which becomes a Subsidiary during the Policy Period and where the book value of such entity's assets determined in accordance with "GAAP" totals less than 20% of the similarly calculated assets of the Named Organization as of the inception date of the Policy Period.

With regard to paragraphs b) and c) above, the Named Organization shall provide the Insurer with full particulars of the Subsidiary before the end of the Policy Period.

Any organization which becomes a Subsidiary during the Policy Period but exceeds the asset limitations stated in b) or c) above, (hereinafter "New Subsidiary") shall be provided coverage under this policy, but only upon the condition that within 90 days after the date of its becoming a Subsidiary, the Named Organization shall have provided the Insurer with full particulars of the New Subsidiary and agreed to any additional premium or amendment of the provisions of this policy required by the Insurer relating to such New Subsidiary. Further, such coverage as shall be afforded to the New Subsidiary is conditioned upon the Named Organization paying when due any additional premium required by the Insurer relating to such New Subsidiary.

An organization becomes a Subsidiary when the Named Organization owns more than fifty percent (50%) of the voting interest, either directly, or indirectly through one or more of its Subsidiaries, or has, on or before the inception of the Policy Period, the right to elect or appoint more than fifty percent (50%) of the voting directors, or trustees, either directly or indirectly through one or more of its Subsidiaries.

In all events, such coverage as is afforded under this policy with respect to a Claim made against any Subsidiary, or any Individual Insured of a Subsidiary, shall only apply for Wrongful Acts committed or allegedly committed after the effective time that such Subsidiary became a Subsidiary and prior to the time that such Subsidiary ceased to be a Subsidiary.

(u)  "Wrongful Act" means:

(1)  with respect to Individual Insureds, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Insureds in his/her respective capacities as such, or any matter claimed against such Individual Insured solely by reason of his/her status as Individual Insureds of the Organization;

(2)  with respect to the Organization under Coverage C, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by or on behalf of the Organization;

(3)  with respect to service on an Outside Entity, any matter claimed against such Individual Insureds arising out of such Insured serving as a director, trustee, trustee emeritus or governor of an Outside Entity in such capacity, but only if such service is at the specific written request or direction of the Organization;

(4) with respect to both the Individual Insureds and the Organization and subject to paragraphs 1, 2 and 3 above, "Wrongful Act" shall specifically include:

    (a) Employment Practices Claims;

    (b) Non–Employment Discrimination;

    (c) violation of the Sherman Antitrust Act or similar federal, state or local statutes or rules;

    (d) libel, slander, defamation or publication or utterance in violation of an individual's right of privacy;

    (e) wrongful entry or eviction or other invasion of the right of occupancy;

    (f) false arrest or wrongful detention;

    (g) plagiarism; and

    (h) infringement of copyright or trademark or unauthorized use of title.

## 3. EXTENSIONS

Subject otherwise to the terms hereof, this policy shall cover Loss arising from any Claims made against the estates, heirs, or legal representatives of deceased Individual Insureds, and the legal representatives of Individual Insureds in the event of an Individual Insured's incompetency, insolvency or bankruptcy, who were Individual Insureds at the time the Wrongful Acts upon which such Claims are based were committed.

Subject otherwise to the terms hereof, this policy shall cover Loss arising from all Claims made against the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) of an Individual Insured for all Claims arising solely out of his or her status as the spouse of an Individual Insured, including a Claim that seeks damages recoverable from marital community property, property jointly held by the Individual Insured and the spouse, or property transferred from the Individual Insured to the spouse; provided, however, that this extension shall not afford coverage for any Claim for any actual or alleged Wrongful Act of the spouse, but shall apply only to Claims arising out of any actual or alleged Wrongful Acts of an Individual Insured, subject to the policy's terms, conditions and exclusions.

## 4. EXCLUSIONS

The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured:

(a) arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an Insured was not legally entitled;

(b) arising out of, based upon or attributable to the committing in fact of any criminal, or deliberate fraudulent act;

    The Wrongful Act of an Insured shall not be imputed to any other Insured for the purpose of determining the applicability of exclusions 4(a) through 4(b).

(c) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or Related Wrongful Act alleged or contained, in any Claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(d) alleging, arising out of, based upon or attributable to as of the Continuity Date, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation; or the alleging of any Wrongful Act which is the same or a Related Wrongful Act to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(e)   alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an Individual Insured serving in any capacitiy, other than with the Organization or as a director, trustee, trustee emeritus, or governor of an Outside Entity;

(f)   which is brought by or on behalf of the Organization against any Individual Insured; provided however, this exclusion shall not apply to any derivative Claim made on behalf of the Organization by a member, an attorney general or any other such representative party if such action is brought and maintained independently of and without the solicitation of or assistance of, or active participation of or intervention of any Individual Insured or the Organization or any Affiliate thereof;

(g)   for any Wrongful Act arising out of an Individual Insured serving as a director, trustee, trustee emeritus or governor of an Outside Entity if such Claim is brought by the Outside Entity or by any director, trustee, trustee emeritus or governor thereof;

(h)   for bodily injury, sickness, disease, death of any person, or damage to or destruction of any tangible property, including the loss of use thereof;

(i)   alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

    (1)   the actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or

    (2)   any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants,

including but not limited to a Claim alleging damage to the Organization or its members.

Pollutants include (but are not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

(j)   for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar provisions of any federal, state or local statutory law or common law; provided, however, that this exclusion shall not apply to Loss arising from a Claim for Retaliation;

(k)   alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of an Insured under any express contract or agreement; provided, however, that this exclusion shall not apply to liability which would have attached in the absence of such express contract or agreement;

(l)   for any civil or criminal fines imposed by law and any taxes (whether imposed by federal, state, local or other governmental authority);

(m)   alleging, arising out of, or in any way relating to any purchase or sale of securities by the Named Organization, Subsidiary or Affiliate or Claims brought by securities holders of the Organization in their capacity as such; provided, however, this exclusion shall not apply to the issuance by the Organization of tax exempt bond debt or Claims brought by tax exempt bond debt holders.

5. **LIMIT OF LIABILITY – (FOR ALL LOSS – INCLUDING DEFENSE COSTS)**

The Limit of Liability stated in Item 4 of the Declarations is the limit of the Insurer's liability for all Loss, under Coverage A, Coverage B and Coverage C combined, arising out of all Claims first made against the Insureds during a Policy Year or the Discovery Period (if applicable); however, the Limit of Liability for the Discovery Period shall be part of, and not in addition to, the Limit of Liability for the Policy Year in which the Discovery Period is elected. Further, any Claim which is made subsequent to the Policy Year or Discovery Period (if applicable) which, pursuant to Clause 7(b) or 7(c), is considered made during the Policy Year or Discovery Period shall also be subject to the one applicable aggregate Limit of Liability stated in Item 4 of the Declarations.

Defense Costs are not payable by the Insurer in addition to the Limit of Liability. Defense Costs are part of Loss and as such are subject to the Limit of Liability for Loss.

This policy provides one aggregate Limit of Liability for each Policy Year. In no event shall the Limit of Liability for any one Policy Year exceed the aggregate Limit of Liability as stated in Item 4 of the Declarations.

6. **RETENTION CLAUSE**

The Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the Retention amount stated in Item 5(B) of the Declarations, such Retention amount to be borne by the Organization and shall remain uninsured, with regard to all Loss for which the Organization has indemnified or is permitted or required to indemnify the Individual Insureds ("Indemnifiable Loss") and Loss under Coverage C. A single Retention amount shall apply to Loss arising from all Claims alleging the same Wrongful Act or Related Wrongful Acts.

Except as hereinafter stated, no Retention shall apply to a Claim in the event of the Financial Insolvency of the Named Organization and all Subsidiaries or Affiliates which are permitted or required to indemnify the Individual Insured with regard to such Claim. Provided, however, the Organization hereby agrees to indemnify the Insureds to the fullest extent permitted by law, taking all steps necessary in furtherance thereto, including the making in good faith of any required application for court approval and the passing of any required corporate resolution or the execution of any contract. The Named Organization and all Subsidiaries and Affiliates will be conclusively deemed to have indemnified the Individual Insureds to the extent that the Organization is permitted or required to indemnify them pursuant to law, common or statutory, or contract, or the charter or by-laws of the Organization.

Further, no Retention shall apply to all coverages for any Claim which is in the form of a civil litigation for monetary relief, and the Insurer shall thereupon reimburse the Defense Costs paid by the Insured, in the event of:

(1) a determination of No Liability of all Insureds; or

(2) a dismissal or a stipulation to dismiss the civil litigation Claim without prejudice and without the payment of any consideration by any Insured;

provided, however, that in the case of (2) above, such reimbursement shall occur one hundred twenty (120) days after the date of dismissal or stipulation as long as the Claim is not re-brought (or any other Claim which is subject to the same single retention by virtue of Clause 6 is not brought) within ninety (90) days from the time of such dismissal or stipulation, and further subject to an undertaking by the Organization in a form acceptable to the Insurer that such reimbursement shall be paid back by the Organization to the Insurer in the event the Claim (or any other Claim which is subject to the same single retention by virtue of Clause 6) is brought after such 90-day period and before the expiration of the statute of limitations for such Claim.

7. **NOTICE/CLAIM REPORTING PROVISIONS**

Notice hereunder shall be given in writing to the Insurer named in Item 8 of the Declarations at the address indicated in Item 8 of the Declarations. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice. A Claim shall be considered to have been first made against an Insured when written notice of such Claim is received by any Insured, by the Named Organization on the behalf of any Insured or by the Insurer, whichever comes first.

(a)  The Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of any Claim made against an Insured as soon as practicable and either:

   (1)  anytime during the Policy Year or during the Discovery Period (if applicable); or

   (2)  within 30 days after the end of the Policy Year or the Discovery Period (if applicable), as long as such Claim is reported no later than 30 days after the date such Claim was first made against an Insured.

(b)  If written notice of a Claim has been given to the Insurer pursuant to Clause 7(a) above, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim for which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, shall be considered made at the time such notice was given.

(c)  If during the Policy Period or during the Discovery Period (if applicable) the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against the Insureds and shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons, and entities involved, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

8. **DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)**

The Insurer does not assume any duty to defend. The Insureds shall defend and contest any Claim made against them.

Notwithstanding the foregoing, the Insureds shall have the right to tender the defense of any Claim to the Insurer, which right shall be exercised in writing by the Named Organization on behalf of all Insureds to the Insurer pursuant to Clause 7 of this policy. This right shall terminate if not exercised within 30 days of the date the Claim is first made against an Insured, pursuant to Clause 7 of the policy. Further, from the date the Claim is first made against the Insureds to the date when the Insurer accepts the tender of the defense of such Claim, the Insureds shall take no action, or fail to take any required action, that prejudices the rights of the Insureds or the Insurer with respect to such Claim. Provided that the Insureds have complied with the foregoing, the Insurer shall be obligated to assume the defense of the Claim, even if such Claim is groundless, false or fraudulent. The assumption of the defense of the Claim shall be effective upon written confirmation thereof sent by the Insurer to the Named Organization. Once the defense has been so tendered, the Insured shall have the right to effectively associate with the Insurer in the defense of such Claim, including, but not limited to, negotiating a settlement, subject to the provisions of this Clause 8. However, the Insurer shall not be obligated to defend such

Claim after the Limit of Liability has been exhausted, or after an Insured's rejection of a Settlement Opportunity as described in this Clause 8.

When the Insurer has not assumed the defense of a Claim pursuant to Clause 8, the Insurer shall advance nevertheless, at the written request of the Insured, Defense Costs prior to the final disposition of a Claim. Such advanced payments by the Insurer shall be repaid to the Insurer by the Insureds, severally according to their respective interests, in the event and to the extent that the Insureds shall not be entitled under the terms and conditions of this policy to payment of such Loss.

The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer, when it has not assumed the defense of a Claim pursuant to this Clause 8, shall be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim, and provided further that in all events the Insurer may withhold consent to any settlement, stipulated judgment or Defense Costs, or any portion thereof, to the extent such Loss is not covered under the terms of this policy.

The Insurer shall have the right to effectively associate with the Insureds in the defense of any Claim that appears reasonably likely to involve the Insurer, including but not limited to negotiating a settlement. The Insureds shall give the Insurer full cooperation and such information as it may reasonably require.

If the Insurer recommends a settlement within the policy's applicable Limit of Liability which is acceptable to the claimant (a "Settlement Opportunity"), and the Insureds consent to such settlement, then the Organization's applicable Retention amount shall be retroactively reduced by ten percent (10%) for such Loss. It shall be a condition to such reduction that the Insureds must consent to such settlement within thirty (30) days of the date the Insureds are first made aware of the Settlement Opportunity, or in the case of a Settlement Opportunity which arises from a settlement offer by the Claimant, then within the time permitted by the claimant to accept such settlement offer, but in all events no later than thirty (30) days after the settlement offer was made.

However, if a Settlement Opportunity arises and the Insureds do not consent to the settlement within the time prescribed above, the Retention amount shall remain the applicable amount set forth in Item 5 of the Declarations even if consent is given to a subsequent Settlement Opportunity.

Furthermore, in the event the Insureds do not consent to the first Settlement Opportunity within the time prescribed, then the Insurer's liability for all Loss on account of such Claim shall not exceed: (1) the amount for which the Insurer could have settled such Claim plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer, ("Settlement Opportunity Amount") plus (2) 50% of covered Loss in excess of such Settlement Opportunity Amount subject to the policy's Limit of Liability. Notwithstanding the foregoing, this paragraph shall not apply until the Settlement Opportunity Amount exceeds the Retention amount stated in Item 5 of the Declarations.

9.  PRE–AUTHORIZED CLASS ACTION DEFENSE ATTORNEYS

This clause applies only to a Claim filed as a class action (hereinafter referred to as a "Class Action Claim").

Affixed as Appendix A hereto and made a part of this policy is a list of Panel Counsel law firms ("Panel Counsel Firms") from which a selection of legal counsel may be made to conduct the defense of any Class Action Claim against an Insured pursuant to the terms set forth below.

In the event the Insurer has assumed the defense pursuant to Clause 8 of this policy, then the Insurer shall be obligated to select a Panel Counsel Firm to defend the Insureds. In the event the Insureds are already defending a Class Action Claim, then the Insureds may at their option select a Panel Counsel firm to defend the Insureds. If the Insured does not select a Panel Counsel firm, such non-Panel Counsel firm selection shall be subject to the Insurer's consent, which consent shall not be unreasonably withheld.

The selection of the Panel Counsel Firm, when done by the Insurer, shall be from the jurisdiction in which the Class Action Claim is brought.

The list of Panel Counsel Firms may be amended from time to time by the Insurer. However, no change shall be made to the specific list attached to this policy during the Policy Period without the consent of the Named Organization.

## 10.  DISCOVERY CLAUSE

Except as indicated below, if the Named Organization shall cancel or the Insurer or the Named Organization shall refuse to renew this policy, the Named Organization, upon payment of the respective "Additional Premium Amount" described below, shall have the right to a period of one, two or three years after the effective date of such cancellation or nonrenewal (herein referred to as the "Discovery Period") in which to give to the Insurer written notice of Claims first made against the Insureds during the selected period for any Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy. The rights contained in this paragraph shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within 30 days of the effective date of cancellation or nonrenewal. The Additional Premium Amount for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

The Additional Premium Amount for: (1) one year shall be 40% of the "full annual premium"; (2) two years shall be 75% of the "full annual premium"; (3) three years shall be 100% of the "full annual premium". As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period.

In the event of a Transaction, as defined in Clause 12, the Named Organization shall have the right, within 30 days before the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction) for a period of no less than six years or for such longer or shorter period as the Named Organization may request. The Insurer shall offer such Discovery Period pursuant to such terms, conditions and premium as the Insurer may reasonably decide. In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

## 11.  CANCELLATION CLAUSE

This policy may be canceled by the Named Organization only by mailing written prior notice to the Insurer or by surrender of this policy to the Insurer or its authorized agent. If this policy is canceled by the Named Organization, the Insurer shall retain the customary short rate proportion of the premium herein. However, if the Policy Period as designated in Item 3. of the Declarations is more than one year, this policy may not be cancelled by the Named Organization.

This policy may be canceled by or on the behalf of the Insurer only in the event of nonpayment of premium by the Named Organization. In the event of non-payment of premium by the Named Organization, the Insurer may cancel this policy by delivering to the Named Organization, or by mailing to the Named Organization, by registered, certified, or other first class mail, at the Named Organization's address as shown in Item 1 of the Declarations, written notice stating when, not less than 30 days thereafter, the cancellation

shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The Policy Period terminates at the date and hour specified in such notice, or at the date and time of surrender. The Insurer shall have the right to the premium amount for the portion of the Policy Year during which the policy was in effect.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

## 12.  CHANGE IN CONTROL OF NAMED ORGANIZATION

If during the Policy Period:

a.  the Named Organization shall consolidate with or merge into, or sell all or substantially all of its assets to, any other person or entity, or group of persons or entities acting in concert;

b.  any person or entity or group of persons or entities, acting in concert shall acquire an amount of the voting interest representing more than fifty percent (50%) of the voting power for the election or appointment of directors or trustees of the Named Organization, or acquires the voting rights of such an amount of such interest; or

c.  the Named Organization shall change from not-for-profit to for-profit status;

    (any of the above events herein referred to as the "Transaction")

then, this policy shall continue in full force and effect as to Wrongful Acts occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged Wrongful Act occurring after the effective time of the Transaction. This policy may not be canceled after the effective time of the Transaction and the entire premium for this policy shall be deemed earned as of such time. The Named Organization shall also have the right to an offer by the Insurer of a Discovery Period described in Clause 10 of the policy.

The Named Organization shall give the Insurer written notice of the Transaction as soon as practicable, but not later than thirty (30) days after the effective date of the Transaction.

## 13.  SUBROGATION

In the event of any payment under this policy, the Insurer shall be subrogated to the extent of such payment to all the Insureds' rights of recovery thereof, and the Insureds shall execute all papers required and shall do everything that may be necessary to secure such rights including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of any Insureds. In no event, however, shall the Insurer exercise its rights of subrogation against an Insured under this policy unless such Insured has been convicted of a criminal act, or been determined to have committed a dishonest or fraudulent act, or obtained any profit or advantage to which such Insured was not legally entitled.

## 14.  OTHER INSURANCE AND INDEMNIFICATION

Such insurance as is provided by this policy shall apply only as excess over any valid and collectible insurance. This policy shall be specifically excess of any other policy pursuant to which any other insurer has a duty to defend a Claim for which this policy may be obligated to pay Loss.

In the event of a Claim against a director, trustee, trustees emeritus or governor arising out of his or her serving as a director, trustee, trustees emeritus or governor of an Outside Entity, coverage as is afforded by this policy shall be specifically excess of

indemnification provided by such Outside Entity and any insurance provided to such Outside Entity with respect to its directors, trustees, trustees emeriti or governors.

Further, in the event such other insurance is provided to an Outside Entity by the Insurer or any member company of American International Group, Inc. (AIG) (or would be provided but for the application of the retention amount, exhaustion of the Limit of Liability or failure to submit a notice of a Claim) then the Insurer's maximum aggregate Limit of Liability for all Losses combined in connection with a Claim covered, in part of in whole, by this policy and such other insurance policy issued by AIG shall not exceed the greater of the Limit of Liability of this policy or the limit of liability of such other AIG insurance policy.

### 15. NOTICE AND AUTHORITY

It is agreed that the Named Organization shall act on behalf of the Subsidiaries and all Insureds with respect to the giving of notice of Claim or giving and receiving notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy, the exercising or declining to tender the defense of a Class Action Claim to the Insurer and the exercising or declining of any right to a Discovery Period.

### 16. ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

### 17. ACTION AGAINST INSURER

No action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the Insureds' obligation to pay shall have been finally determined either by judgment against the Insureds after actual trial or by written agreement of the Insureds, the claimant and the Insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Insurer as a party to any action against the Insureds to determine the Insureds' liability, nor shall the Insurer be impleaded by the Insureds or their legal representatives. Bankruptcy or insolvency of the Insureds or of their estates shall not relieve the Insurer of any of its obligations hereunder.

### 18. REPRESENTATIONS AND SEVERABILITY

In granting coverage under this policy, it is agreed that the Insurer has relied upon the statements and representations contained in the application for this policy (including materials submitted thereto and, if this is a renewal application, all such previous policy applications for which this policy is a renewal) as being accurate and complete. All such statements and representations shall be deemed to be material to the risk assumed by the Insurer, are the basis of this policy and are to be considered as incorporated into this policy.

With respect to such statements and representations, no knowledge or information possessed by any Individual Insured shall be imputed to any other Individual Insured. If any person who executed the application knew that such statement or representation was inaccurate or incomplete, such statement shall not be imputed to any trustee, trustee emeritus or governor other than such signator and any other Individual Insureds who knew such statement or representation was inaccurate or incomplete.

19. **HEADINGS**

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

20. **WORLDWIDE TERRITORY**

This policy shall apply to Claims made against an Insured anywhere in the world.

# APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

CLASS ACTIONS–NON EMPLOYMENT,
ANTI–TRUST AND UNFAIR
COMPETITION CLAIMS

### ALASKA

LANE POWELL SPEARS LUBERSKY LLP
420 L Street
Suite 300
Anchorage, AK 99501–1937
Phone: (206) 223–7019
Contact: James B. Stoetzer, Esq.

### ARIZONA

GOODWIN RAUP PC
One Columbus Plaza
Suite 1200
Phoenix, AZ 85012–1942
Phone: (602) 650–2009
Contact: Martin P. Clare, Esq.

### CALIFORNIA

IRELL & MANELLA
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067–4275
Phone: (310) 277–1010
Contact: James F. Elliot, Esq.

LATHAM & WATKINS
505 Montgomery Street
Suite 1900
San Francisco, CA 94111
Phone: (415) 391–0600
Contact: Linda M. Inscoe, Esq.

633 West Fifth Street
Suite 4000
Los Angeles, CA 90071–2007
Phone: (213) 485–1234
Contact: Joel E. Krischer, Esq.

MORRISON & FOERSTER LLP
555 West Fifth St., Suite 3500
Los Angeles, CA 90013–1024
Phone: (213) 892–5200
Contact: B. Scott Silverman, Esq.

425 Market Street
San Francisco, CA 94105–2482
Phone: (415) 268–7000
Contact: Linda E. Shostak, Esq.

O'MELVENY & MYERS LLP
610 Newport Center Drive
Newport Beach, CA 92660
Phone: (714) 760–9600
Contact: Stephen P. Pepe, Esq.

Embarcadero Center West
275 Battery Street
San Francisco, CA 94111–3305
Phone: (415) 984–8700
Contact: Douglas Dexter, Esq.

400 South Hope Street
15th Floor
Los Angeles, CA 90071–2899
Phone: (213) 430–6000
Contact: Gordon E. Krischer, Esq.

### COLORADO

ARNOLD & PORTER
1700 Lincoln Street
Denver, Co 80203–4540
Phone: (303) 863–1000
Contact: James E. Scarboro, Esq.

### DELAWARE

WOLF BLOCK SCHORR AND SOLIS–
COHEN LLP
One Rodney Square
10th & King Streets
Wilmington, DE 19801
Phone: (302) 777–5860
Contact: Barry M. Klayman, Esq.

# APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

**DISTRICT OF COLUMBIA**

GREENBERG TRAURIG
1300 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: (202) 331-3100
Contacts: C. Allen Foster, Esq.; Joe R.
Reeder, Esq., or Eric C. Rowe, Esq.

PATTON BOGGS, LLP
2550 M Street, N.W.
Washington, DC 20037
Tel: (202) 457-6000
Contacts: Douglas B. Mishkin, Esq. or
Sally D. Garr, Esq.

**FLORIDA**

GREENBERG TRAURIG
515 East Las Olas Boulevard
Ft. Lauderdale, FL 33301
Tel: (954) 765-0500
Contact: Frank Scruggs, Esq.

1221 Brickell Avenue
Miami, FL 33131
Tel: (305) 579-0500
Contact: Ron Rosengarten, Esq.

**GEORGIA**

SMITH, GAMBRELL & RUSSELL LLP
3343 Peachtree Road, N.E.
Suite 3200, Promenade II
Atlanta, GA 30326-1010

ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
Phone: (404) 881-7000
Contact: Peter Q. Bassett, Esq. or
Robert P. Riordan, Esq.

**HAWAII**

LOVE YAMAMOTO & MOTOOK
1000 Bishpop Street
Honolulu, HI 9681
Phone: (808) 532-7900
Contact: Chad Love, Esq.

**IDAHO**

QUANE SMITH LLP
US Bank Plaza, Suite 1600
101 South Capital Blvd
Boise, ID 83702
Tel: (208) 345-0960
Contact: Jeremiah A. Quane, Esq.

**ILLINOIS**

JENNER & BLOCK
One IBM Plaza
Chicago, IL 60611
Phone: (312) 222-9350
Contact: David K. Haase, Esq.

SIDLEY & AUSTIN
One First National Plaza
Chicago, IL 60603
Phone: (312) 853-7000
Contact: James S. Whitehead, Esq.,
Julie O. Allen, Esq., Lawrence
Lawrence I. Kipperman, Esq.,
Thomas A. Roberts, Esq.

SONNENSCHEIN NATH & ROSENTHAL
800 Sears Towers
Chicago, IL 60601-1692
Phone: (312) 876-3112
Contact: Roger T. Brice, Esq.

## APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

### INDIANA

KIGHLINGER & GRAY
151 North Delaware
Tel: (317) 638–4521
Contact: Donald L. Dawson, Esq.

### IOWA

NYEMASTER GOODE VOIGTS WEST
HANSELL & O'BRIEN
700 Walnut Street
Des Moines, IA 50309
Tel: (515) 283–3100
Contact: Hayward Draper, Esq.

### KENTUCKY

BOEHL STOPHER & GRAVES
400 West Market Street
Suite 2300
Louisville, KY 40222
Tel: (502) 589–5980
Contact: Ed Stopher, Esq.

### LOUISIANA

ADAMS AND REESE
4500 One Shell Square
New Orleans, LA 70139
Tel: (504) 581–3234
Contact: Janis Van Meerveld, Esq.

### MASSACHUSETTS

NIXON PEABODY LLP
101 Federal Street
Boston, Ma. 02110
Tel: (516) 832–7564
Contact: Joseph J. Ortego, Esq.

ROPES & GRAY
One International Place
Boston, MA 02110–2624
Phone: (617) 951–7000
Contact: John D. Donovan, Jr., Esq.

### NEW YORK

GREENBERG TRAURIG
Met Life Building
200 Park Avenue
New York, NY 10166
Tel: (212) 801–9200
Contact: Joe R. Reeder, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL
919 Third Avenue
New York, NY 10022
Tel: (212) 715–9100
Contact: Gary Naftalis, Esq.

SCHULTE ROTH & ZABEL LLP
900 Third Avenue
New York, NY 10022
Tel: (212) 756–2000
Contact: Irwin J. Sugarman, Esq. or
Daniel J. Kramer, Esq.

WILLKIE FARR & GALLAGHER
787 Seventh Avenue
New York, NY 10019–6099
Phone: (212) 728–8000
Contact: Stephen Greiner, Esq.

NIXON PEABODY LLP
990 Stewart Avenue
Garden City, NY 11530
Tel: (516) 832–7564
Contact: Joseph J. Ortego, Esq

Omni Plaza
300 South Pearl St.
Albany NY 12207
Tel: (518) 427–2650
Contact: Joseph J. Ortego, Esq

437 Madison Avenue
New York NY 10022
Tel: (212) 940–3000
Contact: Joseph J. Ortego, Esq

Clinton Square, PO Box 31051
Rochester, NY 14603
Tel: (716) 263–1000
Contact: Joseph J. Ortego, Esq

# APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

### PENNSYLVANIA

BUCHANAN INGERSOLL, PC
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA 15219-8800
Tel: (412) 562-1880
Contact: John R. Leathers, Esq.

DECHERT PRICE & RHOADS
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793
Tel: (215) 994-4000
Contact: Seymour Kurland, Esq., Jeffrey
G. Weil, Esq., or Frederick G. Herold, Esq.

PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Phone: (215) 981-4000
Contact: Anthony B. Haller, Esq.

WOLF BLOCK SCHORR & SOLIS –
COHEN LLP
1650 Arch Street
Philadelphia, PA 19103-2097
Phone: (215) 977-2588
Contact: Alan Kessler, Esq.

### RHODE ISLAND

ROPES & GRAY
30 Kennedy Plaza
Providence, RI 02903-2328
Phone: (401) 455-4400
Contact: William S. Eggeling, Esq.

NIXON PEABODY LLP
One Citizens Plaza
Providence, RI 02903
Tel: (516) 832-7564
Contact: Joseph J. Ortego, Esq

### TEXAS

BAKER & BOTTS LLP
2001 Ross Avenue
Dallas, TX 75201-2980
Phone: (214) 953-6575
Contact: Dan Hartsfield, Esq.

One Shell Plaza
910 Louisiana
Houston, TX 77002-4995
Phone: (713) 229-1234
Contact: Richard R. Brann, Esq.

FULBRIGHT & JAWORSKI LLP
2200 Ross Avenue
Suite 2800
Dallas, TX 75201
Phone: (214) 855-8188
Contact: Bob Herrell, Esq.
        A.J. Harper, Esq.

1301 McKinney
Suite 5100
Houston, TX 77101-3095
Phone: (713) 651-5442
Contact: Frank Jones, Esq.

PATTON BOGGS LLP
2626 Cole Avenue
Suite 700
Dallas, TX 75204
Phone: (214) 871-2141
Contact: D. Patrick Long, Esq.

**APPENDIX A**
**NOT FOR PROFIT PANEL COUNSEL ADDENDUM**

THOMPSON & K NIGHT LLP
1700 Pacific Avenue
Suite 3300
Dallas, TX 75201-4693
Phone: (214) 969-1700
Contact: Timothy R. McCormick, Esq.
Phone: (214) 969-1751
Contact: Stephen F. Fink, Esq.

**VIRGINIA**

GREENBERG TRAURIG
1750 Tysons Boulevard, 12th Floor
Tysons Corners, VA 22102 Tel: (703)
749-1300 Contacts: C. Allen Foster,
Esq., Joe R. Reeder, Esq. or Harry M.
Glazer, Esq.

MCGUIRE WOODS BATTLE
& BOOTHE LLP
One James Center
901 East Cary Street
Richmond, VA 23219-4030
Tel: (804) 775-4364
Contact: Warren E. Zirkle , Esq.

**WASHINGTON**

LANE POWELL SPEARS LUBERSKY LLP
1420 Fifth Avenue Suite 4100 Seattle
WA 98101-2338 Tel: (206) 223-7019
Contact: James B. Stoetzer, Esq.

**WEST VIRGINIA**

STEPTOE & JOHNSON LLP
Bank One Center
P.O. Box 2190
Clarksburg, WV 26302-2190
Phone: (304) 624-8000
Contact: C. David Morrison, Esq.

# APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

### EMPLOYMENT PRACTICES CLAIMS

#### ALABAMA

LLOYD GRAY & WHITEHEAD
Two Perimeter Park South
Suite 100
Birmingham, AL 35423
Phone: (205) 967–8822
Contact: Steven E. Whitehead, Esq.
*Class Action Approved*

LUTHER OLDENBURG & RAINEY
63 S. Royal Street
Mobile, AL
Phone: (334) 433–8088
Contact: Rudene C. Oldenburg, Esq.

#### ALASKA

LANE POWELL SPEARS LUBERSKY LLP
420 L Street
Suite 300
Anchorage, AK 99501–1937
Phone: (206) 223–7019
Contact: James B. Stoetzer, Esq.
*Class Action Approved*

#### ARIZONA

GOODWIN RAUP PC
One Columbus Plaza
Suite 1200
Phoenix, AZ 85012–1942
Phone: (602) 650–2009
Contact: Calvin Raup, Esq.
*Class Action Approved*

CAMPBELL YOST
234 North Central Avenue
Suite 600
Phoenix, AZ 85004
Phone: (602) 322–1600
Contact: Martin P. Clare, Esq.
*Class Action Approved*

LITTLER MENDELSON
Phoenix Corporate Center
3003 North Central Avenue, Suite 1200
Phoenix, AZ 85012–2907
Tel: (602) 604–2143
Fax: (602) 241–3221
Contact: Mark Ogden, Esq
*Class Action Approved*

#### ARKANSAS

HUCKABAY MUNSON ROWLETT
& TILLEY
1900 West Capital Avenue
Suite 1900
Little Rock, AR 72201
Phone: (501) 374–6535
Contact: Bruce Munson, Esq.
*Class Action Approved*

#### CALIFORNIA

EPSTEIN BECKER & GREEN PC
Two Embarcadero Center
Suite 1650
San Francisco, CA 94111
Phone: (415) 398–3500
Contact: Ron Souza, Esq
*Class Action Approved*

IRELL & MANELLA
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067–4275
Phone: (310) 277–1010
Contact: James F. Elliot, Esq.
*Class Action Approved*

JACKSON LEWIS SCHNITZLER &
KRUPMAN
1888 Century Park East
Suite 1600
Los Angeles, CA 90067
Local Phone: 310–203–0200
Phone: (914) 328–0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved All Locations*

# APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

1215 K Street, Suite 1800
Sacramento, CA 95814
Local Phone: 916–341–0404
Phone: (914) 328–0404
Contact: Steven D. Baderian, Esq.

199 Freemont Street, 10th Floor
San Francisco, CA 94105
Local Phone: 415–394–9400
Phone: (914) 328–0404
Contact: Steven D. Baderian, Esq.

KUTAK ROCK
117 E. Colorado Avenue
Suite 210
Pasadena, CA 91105
Phone: (626) 432–1630
Contact: Gregory Hurley, Esq.

LEWIS D'AMATO BRISBOIS & BISGAARD
LLP
221 N. Figueroa Street, Suite 1200
Los Angeles, CA 90012
Phone: (213) 500–1800
Contact: Robert F. Lewis, Esq. &
        Gary S. Rattet, Esq.

One Sansome Street, Suite 1900
San Francisco, CA 94104
Phone: (415) 362–2580
Contact: Duane C. Musfelt, Esq.

550 West C Street, Suite 800
San Diego, CA 92101
Phone: (619) 233–1006
Contact: R. Gaylord Smith, Esq.

650 Town Center Drive, Suite 1400
Costa Mesa, CA 9 2626
Phone: (714) 545–9200
Contact: Mercedes Cruz, Esq.

Suite 600, 650 East Hospitality Lane
San Bernardino, CA 92408
Phone: (909) 387–1130
Contact: Joseph Arias, Esq.

2500 Venture Oaks Way, Suite 200
Sacramento, CA 95833
Phone: (916) 564–5400
Contact: David L. Cohen, Esq.

LITTLER MENDELSON
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
Phone: (310) 553–0308
Contact: Connie L. Michaels, Esq.
*Class Action Approved All Locations

50 West San Fernando Street
14th Floor
San Jose, CA 95113
Phone: (800) 638–6865
Contact: Dennis M. Brown, Esq. and
        Brian T. McMillan, Esq.

650 California Street, 20th Floor
San Francisco, CA 94108–2693
Tel:  (408) 998–4150
Fax:  (650) 322–4742
Contact: Brian T. McMillan, Esq.
        Dennis M. Brown, Esq.

1690 West Shaw, Suite 201
Fresno, CA 93711–3516
Tel:  (209) 431–8300
Fax:  (209) 431–8329
Contact: Gregory Smith, Esq.

1330 North Dutton Avenue, Suite 200
Santa Rosa CA 95401–4674
Tel:  (800) 638–6865
Fax:  (800) 640–3508
Contact: Brian T. McMillan, Esq.

1111 Broadway, Suite 1510
Oakland, CA 94607–4036
Tel:  (408) 998–4150
Fax:  (408) 288–5686
Contact: Brian T. McMillan, Esq.

2175 North California Blvd., Suite 835
Walnut Creek, CA 94596–3565
Tel:  (800) 638–6865
Fax:  (800) 640–3508
Contact: Brian T . McMillan, Esq.

Revised (5/01)

## APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

400 Capital Mall, 16th Floor
Sacramento, CA 95814
Tel:  (916) 448-7100
Fax:  (916) 448-7741
Contact: Bruce Sarchet, Esq.

701 B Street, 13th Floor
San Diego, CA 92101-8194
Tel:  (619) 232-0441
Fax:  (619) 232-4302
Contact: Jody Landry, Esq

O'MELVENY & MYERS LLP
610 Newport Center Drive
Newport Beach, CA 92660
Tel:  (714) 760-9600
Contact: Stephen P. Pepe, Esq.
*Class Action Approved All Locations

Embarcadero Center West
275 Battery Street
San Francisco, CA 94111-3305
Tel:  (415) 984-8700
Contact: Douglas Dexter, Esq.

400 South Hope Street
15th Floor
Los Angeles, CA 90071-2899
Tel:  (213) 430-6000
Contact: Gordon E. Krischner, Esq.

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER
1055 West Seventh Street
Los Angeles, CA 90017
Phone: (213) 624-3044
Contact: James A. Stankowski, Esq.

650 California Street
San Francisco, CA 94108
Phone: (415) 433-0990
Contact: Louis H. Castoria, Esq.

### COLORADO

KUTAK ROCK
717 Seventeenth Street
Suite 2800
Denver, CO 80202
Local Phone: (303) 297-2400
Phone: (626) 432-1630
Contact: Gregory Hurley, Esq.

SHERMAN & HOWARD
633 17th Street
Suite 3000
Denver, CO 80202
Phone: (303) 297-2900
Contact: Andrew Bolin, Esq.

PATTON BOGGS
1660 Lincoln Street
Suite 1900
Denver, CO 80264
Phone: (303) 830-1776
Contact: Timothy D. Kraus, Esq.

LITTLER MENDELSON
One Tabor Center
1200 17th Street, Suite 2020
Denver, CO 80202-5835
Tel:  (303) 629-6200
Fax:  (303) 629-0200
Contact: Judith Holmes, Esq
*Class Action Approved

### CONNECTICUT

EPSTEIN BECKER & GREEN PC
One Landmark Plaza
Suite 1800
Stamford, CT 06901-2601
Phone: (212) 351-4500
Contact: Howard Pianko, Esq
*Class Action Approved

# APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

JACKSON LEWIS SCHNITZLER &
KRUPMAN
55 Farmington Avenue
Suite 1200
Hartford, CT 06105
Local Phone: 860-522-0404
Phone: (914) 328-0404
Contact: Steven Badarian, Esq.
*Class Action Approved All Locations

177 Broad Street
Post Office Box 251
Stamford, CT 06904-0251
Local Phone: 203-961-0404
Phone: (914) 328-0404
Contact: Steven D. Baderian, Esq.

### DELAWARE

WOLF BLOCK SCHOOR AND SOLIS -
COHEN LLP
One Rodney Square
10th & King Streets
Wilmington, DE 19801
Phone: (302) 777-5860
Contact: Barry M. Klayman, Esq.
*Class Action Approved

GREENBERG TRAURIG LLP
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Phone: (302) 661-7000
*Class Action Approved

### DISTRICT OF COLUMBIA

DRINKER BIDDLE PITNEY HARDEN
1500 K Street, N.W.
Suite 110
Washington, DC 20005
Phone: (202) 842-8857
Contact: Jennifer Smith, Esq.

PATTON BOGGS LLP
2550 M Street, N.W.
Washington, DC 20037
Phone: (202) 457-6000
Contact: Douglas B. Mishkin, Esq. or
Sally D. Garr, Esq.
*Class Action Approved

JACKSON LEWIS SCHNITZLER &
KRUPMAN
13501 I Street, NW
Suite 510
Washington, DC 20005
Local Phone: 202-347-5200
Phone: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER
1341 G. Street NW
Washington, DC 20005
Phone: (202) 626-7660
Contact: Paul D. Krausse, Esq.
Robert B. Wallace, Esq.

JORDON COYNE & SAVITS, LLP
1100 Connecticut Avenue, NW
Washington, DC 20036
Phone: (202) 496-2810
Contact: Deborah Murrell Whelihan, Esq.
*Class Action Approved

FORD & HARRISON
1300 19th Street NW
Suite 700
Washington, DC 20036
Phone: (202) 719-2012
(202) 719-2000
Contact: David Rosenberg, Esq.

### FLORIDA

AKERMAN SENTERFITT
Suntrust International Center
One Southeast 3rd Ave, 28th FL
Miami, FL 33131-1714
Phone: (305) 982-5543
Contact: Michael Marsh, Esq.
*Class Action Approved

# APPENDIX A
# NOT FOR PROFIT PANEL COUNSEL ADDENDUM

**JACKSON LEWIS SCHNITZLER & KRUPMAN**
First Union Financial Center
200 South Biscayne Boulevard
Suite 2600
Miami, FL 33131
Local Phone: 305–577–7600
Phone: (914) 328–0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved All Locations*

390 North Orange Avenue
Suite 1285
Orlando, FL 32801–1641
Local Phone: 407–246–8440
Phone: (914) 328–0404
Contact: Steven D. Baderian, Esq.

**VERNIS & BOWLING**
517 Northlake Blvd
North Palm Beach, FL 33408
Phone: (561) 845–8781
Contact: G. Jeffrey Vernis, Esq.

**CARLTON FIELDS WARD EMMANUAL SMITH & CUTLER PA**
100 S.E. 2nd Street
Suite 4000
Miami, FL 33131
Phone: (305) 539–7225
Contact: Nancy H. Henry, Esq.

**KUBICKI DRAPER**
25 West Flagler Street Penthouse
Miami, FL 33130
Phone: (305) 374–1212
Contact: Gene Kubicki, Esq.
*Class Action Approved*

**GREENBERG TRAURIG**
515 East Las Olas Boulevard
Ft. Lauderdale, FL 33301
Phone: (954) 765–0500
Contact: Frank Scruggs, Esq.
*Class Action Approved-All Locations*

1221 Brickell Avenue
Miami, Fl 33131
Tel: (305) 579–0500
Contact: Ron Rosengarten, Esq.

**KATZ BARRON SQUITERO FAUST**
2699 So. Bayshore Drive
7th Floor
Miami, FL 33133–5408
Tel: (305) 856–2444
Contact: Todd Boyd, Esq.

## GEORGIA

**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309–3424
Phone: (404) 881–7000
Contact: Peter Q. Bassett, Esq. or
Robert P. Riordan, Esq.
*Class Action Approved*

**FISHER & PHILLIPS LLP**
1500 Resurgens Plaza
945 East Paces Ferry Road
Atlanta, GA 30326
Phone: (404) 240–4235
Contact: D. Albert Brannen, Esq. or
llene W. Berman, Esq.

**JACKSON LEWIS SCHNITZLER & KRUPMAN**
1900 Marquis One Tower
245 Peachtree Center Avenue, NE
Atlanta, GA 30303–1226
Local Phone 404–525–8200
Phone: (202) 328–0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved*

**LONG ALDRIDGE & NORMAN**
One Peachtree Center
5300
Atlanta GA 30308
Phone: (404) 527–8312
Contact: Phillip A. Bradley, Esq.

# APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

LITTLER MENDELSON
1100 Peachtree Street, NE, Suite 2000
Atlanta, GA 30309–4520
Tel: (404) 817–0990
Fax: (404) 817–9898
Contact: Teresa Butler, Esq
*Class Action Approved*

### HAWAII

LOVE YAMAMOTO & MOTOOKA
1000 Bishop Street
Honolulu, HI 96813
Phone: (808) 532–7900
Contact: Chad Love, Esq.
*Class Action Approved*

### IDAHO

QUANE SMITH LLP
US Bank Plaza, Suite 1600
101 South Capital Blvd
Boise, ID 83702
Phone: (208) 345–0960
Contact: Jeremiah A. Quane, Esq.
*Class Action Approved*

### ILLINOIS

CLAUSEN MILLER PC
10 South La Salle Street
Suite 1600
Chicago, IL 60603–1098
Phone: (312) 855–1010
Contact: James S. Barber, Esq. or
        James Nolan, Esq.

FREEBORN & PETERS
311 South Wacker Drive
Suite 3000
Chicago, IL 60606–6677
Phone: (312) 360–6000
Contact: David H. Kistenbroker, Esq. or
        Steven M. Hartmann, Esq.

JACKSON LEWIS SCHNITZLER &
KRUPMAN
320 West Ohio Street
Suite 500
Chicago, IL 60610
Local Phone: 312–787–4949
Phone: (914) 328–0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved*

LITTLER MENDELSON
200 North La Salle Street, Suite 2900
Chicago, IL 60601–1014
Tel: (312) 372–5520
Fax: (312) 372–7880
Contact: Fred Schwartz Esq.
*Class Action Approved*

VEDDER PRICE KAUFMAN &
KAMMHOLZ
222 N. La Salle Street
Chicago, IL 60601–1003
Phone: (312) 609–7745
Contact: Barry Hartstein, Esq.
*Class Action Approved*

### INDIANA

KIGHTLINGER & GRAY
Market Square Center, Suite 660
151 North Delaware
Phone: (317) 638–4521
Contact: Donald L. Dawson, Esq.
*Class Action Approved*

### IOWA

NYEMASTER GOODE VOIGTS WEST
HANSELL & O'BRIEN
700 Walnut Street
Des Moines, IA 50309
Phone: (515) 283–3100
Contact: Hayward Draper, Esq.
*Class Action Approved*

# APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

**KENTUCKY**

BOEHL STOPHER & GRAVES
400 West Market Street
Suite 2300
Louisville, KY 40222
Phone: (502) 589–5980
Contact: Ed Stopher, Esq.
*Class Action Approved

HARLIN, PACKER ALCOTT &
SHOULDOIN
519 East Tenth Street
PO Box 390
Bowling Green, KY 42102–0390
Phone: (270) 842–5611
Contact: William J. Parker, Esq.

**LOUISIANA**

ADAMS AND REESE
4500 One Shell Square
New Orleans, LA 70139
Phone: (504) 581–3234
Contact: Janis Van Meerveld, Esq.
*Class Action Approved

DEUTSCH KERRIGAN & STILES LLP
755 Magazine Street
New Orleans, LA 70130
Phone: (504) 581–5141
Contact: Ellis B. Muorv, Esq.

LOCKE LIDDLE & SAPP LLP
Pan American Life Center
601 Poydras Street, Suite 2400
New Orleans, LA 70130–6036
Phone: (504) 558–5106
Contact: Amelia W. Koch, Esq.

MCGLINCHEY STAFFORD
643 Magazine Street
New Orleans, LA 70130
Phone: (504) 586–1200
Contact: E. Frederick Preis, Jr., Esq.

THE JUNEAU FIRM
The Harding Center
1018 Harding Strret, Suite 202
Lafayette, LA 70503–2412
Tel: (337) 269–0052
Contact: Mike Juneau

**MAINE**

MOON MOSS MCGILL & BACHELDER PA
10 Free Street
PO Box 7250
Portland, ME 04112–7250
Tel: (207) 228–1526
Contact: Richard O. Moon, Esq.

**MARYLAND**

WHITEFORD TAYLOR & PRESTON LLP
Seven St. Paul Street
Baltimore, MD 21202
Phone:
Contact: William Ryan, Jr., Esq.

JORDAN COYNE & SAVITS LLP
33 Wood Lane
Rockville, MD 20850
Tel: (301) 424–4161
Contact: Deborah Murrell Whelihan, Esq.

LITTLER MENDELSON
The World Trade Center
401 East Pratt Street, Suite 1653
Baltimore, MD 21202–3005
Tel: (410) 528–9545
Fax: (410) 528–1908
Contact: Thomas Dowd, Esq.
*Class Action Approved

**MASSACHUSETTS**

FOLEY HOAG & ELIOT LLP
One Post Office Square
Boston, MA 02109
Phone: (617) 832–1000
Contact: Peter M. Rosenblum

## APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

HUTCHINS WHEELER & DITTMAR PC
101 Federal Street
Boston, MA 02110
Phone: (617) 951-6624
Contact: David S. Rosenthal, Esq.
*Class Action Approved

JACKSON LEWIS SCHNITZLER &
KRUPMAN
One Beacon Street
33rd Floor
Boston, MA 02108
Local Phone: 617-367-0025
Phone: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

MINTZ LEVIN COHN FERRIS GLOVSKY
AND POPEO, PC
One Financial Center
Boston, MA 02110
Phone: (617) 542-6000
Contact: Patrick Sharkey, Esq. &
        Robert Gault, Esq.
*Class Action Approved

GETMAN, STACEY, TAMPOSI,
SCHULTESS & STEERE, PA
163 South River Road
Bedford, NH 03110
Phone: (603) 634-4300
Contact: Laurence W. Getman, Esq. or
        Dona Feeney, Esq.
*Western Mass. Only

NIXON PEABODY LLP
101 Federal Street
Boston, Ma. 02110
Tel: (516) 832-7564
Contact: Joseph J. Ortego, Esq.
*Class Action Approved

MURPHY HESSE TOOMEY & LEHANE
300 Crown Colony, Suite 410
Quincy, MA 02269
Phone: (617) 479-6467
Contact: James Toomey, Esq.

PEABODY & ARNOLD
50 Rowes Wharf
Boston, MA 02110
Phone: (617) 951-2100
Contact: William A. Cotter, Esq.

### MICHIGAN

DYKEMA GOSSETT, LLP
1577 N. Woodward Avenue
Bloomfield Hills, MI 48304
Phone: (248) 203-0705
Contact: Robert L. Duty, Esq.

MADDIN HOUSER WARTELL ROTH
28400 Northwestern Highway
PO Box 215
Southfield, MI 48034
Phone: (248) 354-4080
Contact: Harvey Heller, Esq.

MILLER CANFIELD PADDOCK AND
STONE PLC
1200 Campau Square Plaza
99 Monroe Avenue, N W
Grand Rapids, MI 49503
Phone: (616) 454-8656
Contact: Charles S. Mishkind, Esq.
*Class Action Approved-All Locations

150 West Jefferson, Suite 2500
Detroit, MI 48226
Phone: (313) 963-6420
Contact: Charles S. Mishkind, Esq. or
        Carl H. Von Ende, Esq.

PLUNKETT & COONEY
505 N. Woodward Avenue
Suite 3000
Bloomfield Hills, MI 48304
Phone: (248) 901-4005
Contact: Teresa Smith Lloyd, Esq.

BRADY HATHAWAY & BRETZ
1330 Buhl Building
Detroit, MI 48226-3602
Phone: (313) 965-3700
Contact: Dannel Bertz

## APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

**MINNESOTA**

DORSEY & WHITNEY LLP
Philsbury Center South
220 South Sixth Street
Minneapolis, MN 55402
Phone: (612) 340-2600
Contact: Robert R. Reinhart, Esq., or
            Peter S. Hendrickson, Esq.
*Class Action Approved*

JACKSON LEWIS SCHNITZLER &
KRUPMAN
150 Fifth Street Towers
150 South Fifth Street, Suite 2800
Minneapolis, MN 55402
Local Phone: 612-341-8131
Phone: (516) 364-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved*

MEAGHER & GEER LLP
4200 Multifoods Tower
Minneapolis, MN 55402
Phone: (612) 338-0661
Contact: James F. Roegge, Esq.

LITTLER MENDELSON
Multifoods Tower,
33 South 6th Street, Suite 3970
Minneapolis, MN 55402-3720
Tel: (612) 630-1000
Fax: (612) 630-9626
Contact: Kate Wilson, Esq
*Class Action Approved*

**MISSOURI**

ARMSTRONG & TEASDALE LLP
2345 Grand Blvd
Suite 2000
Kansas City, MO 64108
Phone: (816) 221-3420
Contact: Lynn W. Hursh, Esq.
*Class Action Approved*

BROWN & JAMES, PC
705 Olive Street
Suite 1100
St. Louis, MO 63101-2270
Phone: (314) 421-3128
Contact: Charles E. Reis, IV, Esq.

GALLOP JOHNSON & NEUMAN LC
Interco Corporate Tower
101 South Hanley
St. Louis, MO 63105
Phone: (314) 862-1200
Contact: Ron Hack, Esq.

LEWIS RICE & FINGERSH, L.C.
500 N. Broadway, Suite 2000
St. Louis, MO 63102-2147
Tel: (314) 444-7600
Contacts: Robert J. Golterman, Esq. &
Neal F. Perryman, Esq.
*Class Action Approved*

**MISSISSIPPI**

BUTLER SNOW O'MARA STEVENS &
CANNADA PLLC
210 East Capitol Street
Jackson, MS 39201
Phone: (601) 948-5711
Contact: Jeffrey Walker, Esq.
*Class Action Approved*

WATKINS & EAGER PLLC
400 East Capitol Street
Jackson, MS 39201
Phone: (601) 948-6470
Contact: Kenneth E. Milan, Esq.

**MONTANA**

MATOVICH & KELLER PC
225 First Citizens Bank
2812 First Avenue N.
Billings, MT 59101
Phone: (406) 252-5500
Contact: E. Matovich, Esq.

## APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

### NEBRASKA

KUTAK ROCK
1630 Farnam Street
Omaha, NE 68102
Phone: (402) 346-6000
Contact: Gregory Hurley, Esq.

### NEW HAMPSHIRE

GETMAN STACEY TAMPOSI
SCHULTESS & STEERE, PA
163 South River Road
Bedford, NH 03110
Phone: (603) 634-4300
Contact: Laurence W. Getman, Esq. or
          Dona Feeney, Esq.

### NEW JERSEY

EPSTEIN BECKER & GREEN PC
One Riverfront Plaza, 7th Floor
Newark, NJ 07102
Phone: (973) 639-8262
Contact: Howard Pianko, Esq.
*Class Action Approved

HARWOOD LLOYD
130 Main Street
Hackensack, NJ 07601
Phone: (201) 487-1080
Contact: Frank Lloyd, Esq.
          Elizabeth Lorell, Esq.

JACKSON LEWIS SCHNITZLER
& KRUPMAN
60 Washington Street
Morristown, NJ 07960-6844
Local Phone: 973-538-6890
Phone: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

LINDABURY MCCORMICK &
ESTABROOK
53 Cardinal Drive
PO Box 2369
Westfield, NJ 07091
Phone: (908) 233-6800
Contact: Richard Cino, Esq.

LITTLER MENDELSON
89 Headquarters Plaza, North Tower
12th Floor
Morristown, NJ 07960-6834
Tel: (212) 583-9600
Fax: (212) 832-2719
Contact: David Rosen, Esq
*Class Action Approved

SAIBER, SCHLESINGER, SATZ
& GOLDSTEIN
One Gateway Center, 13th Floor
Newark, NJ 07102-5311
Phone: (973) 622-3333
Contact: Jeffrey Lorell, Esq.

THOMPKINS MCGUIRE WACHENFELD
& BARRY
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102-4070
Phone: (973) 622-3000
Contact: William B. McGuire, Esq.

### NEVADA

BARKER BROWN BUSBY CHRISMAN
& THOMAS
300 South Fourth Street
Suite 800
Las Vegas, NV 89101
Phone: (702) 386-1086
Contact: James P. Chrisman, Esq.

LITTLER MENDELSON
350 South Center Street, Suite 530
Reno, NV 89501-2114
Tel: (702) 348-4888
Fax: (702) 786-0127
Contact: Patrick H. Hicks, Esq
*Class Action Approved-All Locations
3930 Howard Hughes Parkway
Suite 150
Las Vegas, NV 89109-0944
Tel: (702) 862-8800
Fax: (702) 862-8811
Contact: Patrick H. Hicks, Esq

# APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

NEW MEXICO

BUTT THORNTON & BAEHR PC
4101 Indian School Road NE
Suite 3005
Albuquerque, NM 87110
Phone: (505) 884-0777
Contact: Agnes Fuentevilla Padilla, Esq.

NEW YORK

D'AMATO & LYNCH
70 Pine Street
New York, NY 10270
Phone: (212) 269-0927
Contact: Luke Lynch Jr., Esq.

EPSTEIN BECKER & GREEN PC
250 Park Avenue
12th Floor
New York, NY 10019
Phone: (212) 351-4500
Contact: Howard Pianko, Esq.
*Class Action Approved

GARBARINI & SCHER PC
1114 Avenue of the Americas
New York, NY 10036
Phone: (212) 764-4000
Contact: James Kachadoorian, Esq.

JACKSON LEWIS SCHNITZLER &
KRUPMAN
101 Park Avenue
37th Floor
New York, NY 10178
Local: (212) 697-8200, (212) 545-4000
Phone: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved-All Locations
1000 Woodbury Road
Suite 402
Woodbury, NY 11797
Local Phone: (516) 364-0404
Phone: (914) 328-0404
Contact: Steven D. Baderian, Esq.

One North Broadway
White Plains, NY 10601-2305
Contact: Steve Baderian, Esq.
Phone: (914) 328-0404

JONES HIRSCH CONNORS BULL
101 East 52nd Street
New York, NY 10022
Phone: (212) 507-1000
Contact: Richard Steer

KAUFMAN BORGEEST & RYAN
747 Third Avenue
New York, NY 10017
Phone: (212) 980-9600
Contact: Julianna Ryan

KRAMER LEVIN NAFTALIS & FRANKEL
919 Third Avenue
New York, NY 10022
Phone: (212) 715-9100
Contact: Kevin LeBlang, Esq.

LITTLER MENDELSON, PC
885 Third Avenue
New York, NY 10022
Phone: (212) 583-9600
Contact: Richard L. Hartz, Esq.
*Class Action Approved

HODGSON, RUSS, ANDREWS, WOODS
& GOODYEAR, LLP
One M&T Plaza, Suite 2000
Buffalo, NY 14203-2391
Tel.: (716) 848-1496
Contact: Patrick J. Tomovic, Esq.

NIXON PEABODY LLP
990 Stewart Avenue
Garden City, NY 11530
Tel: (516) 832-7564
Contact: Joseph J. Ortego, Esq.
*Class Action Approved-All Locations
Omni Plaza
300 South Pearl St.
Albany NY 12207
Tel: (518) 427-2650
Contact: Joseph J. Ortego, Esq

## APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

437 Madison Avenue
New York NY 10022
Tel: (212) 940-3000
Contact: Joseph J. Ortego, Esq

Clinton Square, PO Box 31051
Rochester, NY 14603
Tel: (716) 263-1000
Contact: Joseph J. Ortego, Esq

### NORTH CAROLINA

COZEN & O'CONNOR
2100 One First Union Center
301 South College St. Suite 2100
Charlotte, NC 28202
Phone: (704) 376-3400
Contact: Jay Goldstein, Esq.

PARKER POE ADAMS & BERNSTEIN
401 S. Tyon Street, Suite 3000
Charlotte, NC 28202
Phone: (704) 372-9000
Contact: Jonathan M. Crotty

### OHIO

DINSMORE SHOAL
175 South 3rd Street
10th Floor
Columbus, OH 43215
Phone: (614) 628-6220

GALLAGHER SHARP FULTON &
NORMAN
Seventh Floor Bulkley Building
1501 Euclid Avenue
Cleveland, OH 44115
Phone: (216) 241-5310
Contact: Alton Stephens, Esq.
*Class Action Approved
JANIK & DORMAN
Building Two
8223 Brecksville Road
Cleveland, OH 44141
Phone: (440) 838-7600
Contact: Steven G. Janik, Esq.
*Class Action Approved

LITTLER MENDELSON, PC
Fifth Third Center
21 E. State Street
Suite 1600
Columbus, OH 43215
Phone: (614) 463-4201
Contact: James Ferber, Esq.
*Class Action Approved

### OKLAHOMA

RHODES HIERONYMUS JONES TUCKER &
GABLE PLLC
PO Box 21100
Tulsa, OK 74121-1100
Tel: (918) 582-1173
Contact: Chris L. Rhodes, Esq.

### OREGON

BULLIVANT HOUSER BAILEY
300 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204-2089
Phone: (503) 228-6351
Contact: Chrys A. Martin, Esq.

LANE POWELL SPEARS LUBERSKY LLP
601 SW Second Avenue
Suite 2100
Portland, OR 97204
Phone: (206) 223-7019
Contact: James B. Stoetzer, Esq.
*Class Action Approved

LINDSAY HART NEIL & WEIGLER LLP
1300 West Fifth Avenue
Suite 3400
Portland, OR 97201-5696
Phone: (503) 226-7677
Contact: Lisa F. Rackner, Esq.
      Jerard S. Weigler, Esq.

# APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

### PENNSYLVANIA

COZEN AND O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Phone: (215) 665-2000
Contact: Jeffrey Pasek, Esq.

JACKSON LEWIS SCHNITZLER &
KRUPMAN
One PPG Place
29th Floor
Pittsburgh, PA 15222-5414
Local Phone: 412-232-0404
Phone: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

LITTLER MENDELSON
Domain Tower
625 Liberty Avenue, Suite 2000
Office 2810
Pittsburgh, PA 15222
Tel: (412) 255-3730
Contact: John M. Cerilli, Esq.
*Class Action Approved

MARSHALL DENNEHY
1845 Walnut Street
Philadelphia, PA 19103
Phone: (215) 573-2600
Contact: Phil Torin, Esq.
         Jay Rothman, Esq.

WILSON ELSER MOSKOWITZ EDELMAN &
DICKER LLP
The Curtis Center
Suite 1130 East
Philadelphia, PA 19106
Phone: (215) 627-6900
Contact: Lou Isaacsohn, Esq.
*Class Action Approved

HAMBURG & GOLDEN
1601 Market Street, Suite 565
Philadelphia, PA 19103-1443
Phone: (215) 255-8590
Contact: Neil Hamburg, Esq.

### RHODE ISLAND

ROPES & GRAY
30 Kennedy Plaza
Providence, RI 02903-2328
Phone: (401) 455-4400
Contact: William S. Eggeling, Esq.
*Class Action Approved

NIXON PEABODY LLP
One Citizens Plaza
Providence, RI 02903
Tel:  (516) 832-7564
Contact: Joseph J. Ortego, Esq
*Class Action Approved

### SOUTH CAROLINA

JACKSON LEWIS SCHNITZLER &
KRUPMAN
2100 Daniel Building
301 S. Main Street
Greenville, SC 29601
Phone: (914) 328-0404
Contact: Steve Baderian, Esq.
Phone: (914) 328-0404
*Class Action Approved

YOUNG CLEMENT RIVERS & TISDALE
LLP
P.O. Box 993
28 Boad Street
Charleston, SC 29402
Phone: (864) 557-4000
Contact: Shawn D. Wallace, Esq.

### SOUTH DAKOTA

COSTELLO PORTER HILL HEISTERKAMP
BUSHNELL & CARPENTER LLP 200
Security Building
P.O. Box 290
Rapid City, SD 57709
Phone: (605) 343-2410
Contact: Robert L. Lewis, Esq.

# APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

DAVENPORT EVANS HURWITZ
& SMITH LLP
P.O. Box 1030
513 South Main Avenue
Sioux Falls, SD 57101-1030
Phone: (605) 336-2880
Contact: Susan Brunick Simons, Esq.
            Jean H. Bender, Esq.

### TENNESSEE

LEITNER WILLIAMS DOOLEY
& NAPOLITAN PLLC
Pioneer Building
3rd Floor
Chattanooga, TN 37402
Phone: (423) 265-0214
Contact: Paul R. Leitner, Esq.

WEINTRAUB, STOCK BENNETT
GRISHAM & UNDERWOOD
One Commerce Square
Suite 2560
Memphis, TN 38103
Phone: (901) 526-0431
Contact: James H. Stock, Esq.

### TEXAS

CLARK WEST KELLER BUTLER
& ELLIS LLP
4800 Renaissance Tower
1201 Elm Street
Dallas, TX 75270-2146
Phone: (214) 741-1001
Contact: Mark Shank, Esq.

FULBRIGHT & JAWORSKI LLP
2200 Ross Avenue
Suite 2800
Dallas, TX 75201
Phone: (214) 855-8188
Contact: Bob Herrell, Esq.
            A.J. Harper, Esq.
*Class Action Approved-All Locations

1301 McKinney
Suite 5100
Houston, TX 77101-3095
Phone: (713) 651-5442
Contact: Frank Jones, Esq.

JACKSON LEWIS SCHNITZLER
& KRUPMAN
3811 Turtle Creek Boulevard
Suite 500
Dallas, TX 75219
Local Phone: 214-520-2400
Phone: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

LOCKE LIDDELL & SAPP LLP
2200 Ross Avenue
Suite 2200
Dallas, TX 75201-6776
Phone: (214) 740-8000
Contact: John McElhaney, Esq.

LITTLER MENDELSON
The Chevron Tower
1301 McKinney Street, Suite 3300
Houston, TX 77010-3031
Tel: (713) 951-9400
Fax: (713) 951-9212
Contact: Timothy McInturf
*Class Action Approved-All Locations

2001 Ross Avenue, Suite 2600 Lock Box
116
Dallas, TX 75201
Tel: (214) 880-8100
Fax: (214) 880-0181
Contact: Scott M. McDonald, Esq

MILLS SHIRLEY ECKEL & BASSETT, LLP
400 Washington Building
2228 Mechanic, P.O. Box 1943
Galveston, TX 77553
Phone: (409) 763-2341
Contact: Carla Cotropia, Esq.

# APPENDIX A
## NOT FOR PROFIT PANEL COUNSEL ADDENDUM

**UTAH**

CHRISTENSON & JENSEN PC
50 South Main Street
Suite 1500
Salt Lake City, UT 84101
Phone: (801) 355-3431
Contact: Phillip S. Ferguson, Esq.

**VERMONT**

CLEARY SHAHI ASSOCIATES
110 Merchants Row
P.O. Box 6740
Rutland, VT 05702
Phone: (802) 775-8800
Contact: David L. Cleary, Esq.

**VIRGINIA**

GENTRY LOCKE RAKES & MOORE
P.O. Box 40013
Roanoke, VA 24022-0013
Phone: (540) 983-9300
Contact: W. David Paxton, Esq.

JORDAN COYNE & SAVITS, LLP
33 Wood Lane
Rockville, MD 20850
Phone: (301) 424-4161
Contact: Deborah Murrell Whelihan
*Class Action Approved-All Locations

305 Harrison Street, SE
LeeBurg, VA 20175
Tel: (202) 496-2810
Debra M. Whelihan, Esq.

MCGUIRE WOODS BATTLE & BOOTHE
LLP
901 East Cary Street
Richmond, VA 23219
Phone: (804) 775-4378
Contact: Stephen D. Busch, Esq.

**WASHINGTON**

COZEN AND O'CONNOR
1201 Third Avenue
Suite 5200
Seattle, WA 98101
Phone: (206) 340-1000
Contact: Thomas M. Jones, Esq.

JACKSON LEWIS SCHNITZLER &
KRUPMAN
1420 Fifth Avenue, Suite 2000
Seattle, WA 98101
Local Phone: 206-405-0404
Phone: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

LANE POWELL SPEARS LUBERSKY LLP
1420 Fifth Avenue
Suite 4100
Seattle, WA 98101-2338
Phone: (206) 223-7019
Contact: James B. Stoetzer, Esq.
*Class Action Approved

LITTLER MENDELSON
First Interstate Center
999 3rd Avenue, Suite 3800
Seattle, WA 98104-4023
Tel: (206) 623-3300
Fax: (206) 447-6965
Contact: Daniel Thieme, Esq.
*Class Action Approved

**WEST VIRGINIA**

STEPTOE & JOHNSON LLP
Bank One Center
P.O. Box 2190
Clarksburg, WV 26302-2190
Phone: (304) 624-8000
Contact: C. David Morrison, Esq.
*Class Action Approved

**APPENDIX A**
**NOT FOR PROFIT PANEL COUNSEL ADDENDUM**

**WISCONSIN**

MELLI WALKER PEASE & RUHLY SC
19 Martin Luther King Blvd
Madison, WI 53701
Phone: (608) 257–4812
Contact: Jack D. Walker, Esq.

**WYOMING**

HIRST & APPLEGATE
1720 Carey Avenue
Suite 200
Cheyenne, WY 82001
Phone: (307) 632–0541
Contact: Thomas A. Nicholas, Esq.

**ENDORSEMENT# 1**

This endorsement, effective *12:01 a.m.    August 26, 2001*            forms a part of
policy number   *873-99-71*
issued to *AMERICAN LEGACY FOUNDATION*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

**OUTSIDE ENTITY ENDORSEMENT**

In consideration of the premium   charged, it is hereby understood and agreed that the
following entities shall be deemed an "Outside Entity" with respect to its corresponding
Continuity Date below:

**OUTSIDE ENTITY**                                    **CONTINUITY DATE**

1)    any not-for-profit organization;                 *August 26, 1999*

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
'AUTHORIZED REPRESENTATIVE

*END 001*

QE0119

ENDORSEMENT# 2

This endorsement, effective *12:01 a.m.*    *August 26, 2001*        forms a part of
policy number   *873-99-71*
issued to *AMERICAN LEGACY FOUNDATION*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

Wherever used in this endorsement: 1) "we", "us", "our", and "insurer" mean the insurance company which issued this policy; and 2) "you", "your", "named insured", "First Named Insured", and "insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

## WASHINGTON, D.C.
## CANCELLATION/NONRENEWAL ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that the cancellation/nonrenewal provisions of this policy are amended to read as follows:

A)    Cancellation

If this policy has been in effect for thirty (30) days or more, the Insurer may cancel this policy only if one or more of the following reasons apply:

1)    Insured has refused or failed to pay a premium due under the terms of the policy;

2)    Insured or Other Insured(s) have made a material and willful misstatement or omission of fact to the Insurer or its employees, agents or brokers in connection with any application to, or claim against the Insurer; or

3)    Property or other interest of the Insured shall have been transferred to a person other than the Insured or beneficiary, unless the transfer is permissible under the terms of the policy, or unless the property, interest or use thereof shall have materially changed with respect to its insurability.

The Insurer will mail or deliver to the named Insured notice of cancellation at least thirty (30) days prior to the date of cancellation. For cancellation as described under 2) and 3) above, the Insurer will mail or deliver a copy of the notice to the Superintendent of Insurance at least thirty (30) days before the date of cancellation.

B)    Nonrenewal

If the Insurer decides not to renew this policy the Insurer will mail or deliver to the named Insured the Insurer's notice of nonrenewal at least thirty (30) days before the end of the policy period.

The Insurer will mail or deliver notice of cancellation or nonrenewal to the agent or broker at least five (5) days prior to the Insurer's mailing of notice to the named Insured.

*END 002*

52136 (8/95)                 – 1 –

**ENDORSEMENT# 2**    (continued)

The Notice of cancellation or nonrenewal will be mailed or delivered to Insured's last known address and will include the reason(s) for cancellation or nonrenewal. The envelope containing the notice shall be labeled "Important Insurance Notice" in at least 18 point type or larger.

All other terms, conditions and exclusions shall remain the same.

_____

**AUTHORIZED REPRESENTATIVE**

*END 002*

ENDORSEMENT# 3

This endorsement, effective *12:01 a.m.    August 26, 2001*        forms a part of
policy number   *873-99-71*
issued to *AMERICAN LEGACY FOUNDATION*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (BROAD FORM)

In consideration of the premium charged, it is hereby understood and agreed that this policy does not apply to any Claim(s):

A.    alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly the hazardous properties of nuclear material, including but not limited to:

    (1)    nuclear material located at any nuclear facility owned by, or operated by or on behalf of, the Organization, or discharged or dispersed therefrom; or

    (2)    nuclear fuel contained in spent fuel or waste which was or is at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the Organization; or

    (3)    the furnishing by an insured or the Organization of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility; or

    (4)    claims for damages to the Organization or its members which alleges, arises from, is based upon, is attributed to or in any way involves, directly or indirectly, the hazardous properties of nuclear material.

B.    (1)    which is insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for its termination upon exhaustion of its Limit of Liability; or,

    (2)    with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Organization or any insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into the United States of America, or any agency thereof, with any person or organization.

As used in this endorsement:

    "hazardous properties" include radioactive, toxic or explosive properties;

    "nuclear material" means source material, special nuclear material or byproduct material;

    "source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in law amendatory thereof;

*END 003*

51681 (4/91)                    – 1 –

## ENDORSEMENT# 3    (continued)

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means –

(a)    any nuclear reactor,

(b)    any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all-premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self- supporting chain reaction or to contain a critical mass of fissionable material.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

**AUTHORIZED REPRESENTATIVE**

*END 003*

**ENDORSEMENT# 4**

This endorsement, effective *12:01 a.m.*     *August 26, 2001*        forms a part of
policy number     *873-99-71*
issued to *AMERICAN LEGACY FOUNDATION*


by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

**CAPTIVE INSURANCE COMPANY EXCLUSION**

In consideration of the premium charged, it is hereby understood and agreed that the
Insurer shall not be liable to make any payments for Loss in connection with any Claim(s)
made against any Insured alleging, arising out of, based upon, or attributable to the
ownership, management, maintenance and/or control by the Organization of any captive
insurance company or entity, including but not limited to any Claim(s) alleging the
insolvency or bankruptcy of the Organization as a result of such ownership, operation,
management and control.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____
**AUTHORIZED REPRESENTATIVE**


*END 004*

**ENDORSEMENT# 5**

This endorsement, effective *12:01 a.m.    August 26, 2001*        forms a part of
policy number    *873-99-71*
issued to *AMERICAN LEGACY FOUNDATION*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### COMMISSIONS EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the
Insurer shall not be liable to make any payment for Loss in connection with any Claim(s)
made against any Insured alleging, arising out of, based upon, or attributable to:

(i)    payments, commissions, gratuities, benefits or any other favors to or for the
benefit of any full or part-time domestic or foreign governmental or armed
services officials, agents, representatives, employees or any members of their
family or any entity with which they are affiliated; or

(ii)    payments, commissions, gratuities, benefits or any other favors to or for the
benefit of any full or part-time officials, directors, agents, partners, represent-
atives, members, principal shareholders, owners or employees, or affiliates (as
that term is defined in the Securities Exchange Act of 1934, including any of
their officers, directors, agents, owners, partners, representatives, principal
shareholders or employees) or any customers of the Organization or any
members of their family or any entity with which they are affiliated; or

(iii)    political contributions, whether domestic or foreign.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*END 005*

## ENDORSEMENT# 6

This endorsement, effective 12:01 a.m.    August 26, 2001        forms a part of
policy number    873-99-71
issued to AMERICAN LEGACY FOUNDATION

by    National Union Fire Insurance Company of Pittsburgh, Pa.

### EXCESS BENEFIT PENALTY COVERAGE

In consideration of the premium charged, Clause 2. Definition (k) Loss is amended to include any 10% "Excess Benefits" penalty assessed by the Internal Revenue Service against any Individual Insured(s) for management involvement in the award of an "Excess Benefit".

It is further understood and agreed that no coverage shall be provided by this policy or endorsement for any Individual Insured(s) subject to the 25% "Excess Benefit" penalty assessed by the Internal Revenue Service against any such Insured as a "disqualified person"; provided however, that Defense Cost coverage shall be provided to such Insured.

IT IS FURTHER UNDERSTOOD AND AGREED THAT UNDER NO CIRCUMSTANCES SHALL THE INSURER BE LIABLE FOR PAYMENT OF LOSS ATTRIBUTABLE TO ANY 200% PENALTY ASSESSED BY THE INTERNAL REVENUE SERVICE FOR FAILURE TO CORRECT THE AWARD OF AN EXCESS BENEFIT.

For purposes of this endorsement, the terms "Excess Benefits" and "disqualified person" shall be defined as those terms are defined in the "Taxpayer Bill of Rights 2", (H.R. 2337, P.L. 104-168), 26 USC 4958.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

**END 006**

**ENDORSEMENT# 7**

This endorsement, effective  *12:01 a.m.    August 26, 2001*    forms a part of
policy number  *873-99-71*
issued to  *AMERICAN LEGACY FOUNDATION*

by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

### RELIANCE ENDORSEMENT–NOT–FOR–PROFIT ORGANIZATIONS
### (STANDARD FORM)

In consideration of the premium charged, it is hereby understood and agreed that this policy is issued in reliance upon the accuracy of the statements made and materials furnished to the Insurer by the Named Organization in connection with all Not–For–Profit Organization and/or Directors and Officers and/or Trustees Insurance applications or requests furnished to the Insurer including all prior insurance applications or requests, and all statements made and materials incorporated in the following specific documents issued or filed by the Named Organization whether furnished directly to the Insurer or indirectly to the Insurer from public resources available to the Insurer at the time of such request(s):

1.  The Organization's audited annual report(s) or audited financial statements;

2.  The Organization's interim financial statements;

3.  The Organization's indemnification provisions (and contracts, if any).

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*END 007*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

The American Legacy Foundation,   )
                                  )
            Plaintiff,            )
                                  )
    v.                            )
                                  )
National Union Fire Insurance     )
Company of Pittsburgh,            )   Civil Action No. 07-248 (SLR)
Pennsylvania,                     )
                                  )
        and                       )
                                  )
The Travelers Indemnity Company   )
of America,                       )
                                  )
            Defendants.           )

### AFFIDAVIT OF SERVICE

Louise L. Tuschak, being duly sworn according to law,
deposes and says that she is employed by the law firm of
Pachulski Stang Ziehl & Jones LLP, and that on the 8th day of
February, 2008 she caused a copy of the following document to be
served upon the attached service list in the manner indicated:

**Appendix in Support of American Legacy Foundation's
Opposition to Motion of National Union Fire Insurance Company of
Pittsburgh, PA for Partial Dismissal.**

_____
Louise L. Tuschak

Sworn to and subscribed before
me this 8th day February, 2008

_____
Notary Public
My Commission Expires: ___11/4/09___

MARY E. CORCORAN
NOTARY PUBLIC
STATE OF DELAWARE
My commission expires Nov. 4, 2009

03691-001\DOCS_DE:130511.7

American Legacy Foundation - Special Service List
Document No. 130442
02 - Hand Delivery
01 -First Class

**Hand Delivery**
Richards Layton & Finger, P.A.
John A. Parkins, Jr.
Chad M. Shandler
Todd A. Coomes
One Rodney Square, P.O. Box 551
Wilmington, DE  19899

**Hand Delivery**
Fox Rothschild, LLP
Neal J. Levitsky, Esquire
919 N. Market Street, Suite 1300
Wilmington, DE  198014

**First Class Mail**
Kramon & Graham, P.A.
Lee H. Ogburn, Esquire
One South Street, Suite 2600
Baltimore, MD  21202-3201