## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE AMERICAN LEGACY FOUNDATION, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| NATIONAL UNION FIRE INSURANCE | ) Case No. 07-248-SLR |
| COMPANY OF PITTSBURGH, | ) |
| PENNSYLVANIA | ) |
| | ) JURY TRIAL DEMANDED |
| and | ) |
| | ) |
| THE TRAVELERS INDEMNITY | ) |
| COMPANY OF AMERICA, | ) |
| | ) |
| Defendants. | ) |

## NATIONAL UNION'S REPLY BRIEF IN SUPPORT
## OF ITS MOTION FOR PARTIAL DISMISSAL

John A. Parkins, Jr. (#859)
Chad M. Shandler (#3796)
Todd A. Coomes (#4694)
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, Delaware  19899
302-651-7700
Parkins@rlf.com
Shandler@rlf.com
Coomes@rlf.com
Attorneys for Defendant National Union Fire
Insurance Company of Pittsburgh,
Pennsylvania

Dated: February 28, 2008

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

ARGUMENT ..................................................................................................................... 1

INTRODUCTION ............................................................................................................... 1

I.    THE CONSIDERATION OF THE UNDERLYING RECORD FOR
      NATIONAL UNION'S MOTION TO DISMISS IS APPROPRIATE
      UNDER THE APPLICABLE LAW........................................................................... 1

      A.    Consideration Of The Underlying Record Is Appropriate When
            Examining Whether The Duty To Advance Defense Costs Exists After
            The Completion Of The Underlying Litigation. ............................................. 2

      B.    Under The Significant Relationship Test, The State Of Delaware Has
            The Most Significant Contacts With The D&O Policy And Delaware
            Law Should Apply. ....................................................................................... 4

II.   LORILLARD'S CLAIMS ARE EXCLUDED BY THE NATIONAL
      UNION D&O POLICY. ....................................................................................... 6

      A.    There Is No Coverage For Lorillard's Contract Claims. ................................ 6

            1.    The MSA is an Express Contract. ....................................................... 6

            2.    ALF Expressly Adopted the MSA. ...................................................... 8

      B.    There Is No Coverage For Lorillard's Implied Covenant Claims. .................. 9

      C.    There Is No Coverage For Lorillard's Bylaw Claims. ................................... 9

            1.    ALF's Non-Profit Status Does Not Change The Conclusion That
                  Its Bylaws Are A Contract. ............................................................... 9

            2.    ALF's Bylaws Are A Contract Even If It Has No Members Or
                  Stockholders. ................................................................................... 11

            3.    Under Delaware Law, Bylaws and Certificate of Incorporations
                  are  Contracts. ................................................................................. 11

            4.    The Authority Cited by ALF is Unpersuasive. ................................... 12

            5.    ALF Had No Expectation That the D&O Policy Would Cover
                  Claims Based Upon its Bylaws. ........................................................ 12

       6.    Certificate of Incorporations are Contracts under Delaware Law. ..........13

    D.    There Is No Coverage For Lorillard's Trespass To Chattels Claim. ..............14

III.  ALF'S HYPOTHESIZED DEFAMATION CLAIM DOES NOT GIVE
RISE TO COVERAGE..........................................................................................14

        1.    Lorillard's Concessions Precluded Any Defamation Claim....................15

        2.    Lorillard's Counterclaim Does Not Assert A Claim For
Defamation.............................................................................................16

        3.    Assuming Lorillard Asserted A Claim For Defamation, Travelers
-- Not National Union -- Was Obligated To Pay Defense Costs. ............16

CONCLUSION.......................................................................................................................18

RLF1-3256612-4

## TABLE OF AUTHORITIES

### Cases

*AT&T Wireless Servs., Inc. v. Fed. Ins. Co.*,
2007 WL 1849056 (Del. Super. June 25, 2007),
*reargument denied*, 2007 WL 2028070 (Del. Super. June 29, 2007) ...................................5

*Aetna Commercial Ins. Co. v. American Sign Co.*,
687 So. 2d 834 (Fla. Dist. Ct. App. 1996).........................................................................12

*Am. Ins. Group v. Risk Enter. Mgmt., Ltd.*,
761 A.2d 826 (Del. 2000)...............................................................................................2, 3

*Am. Legacy Found. v. Lorillard Tobacco Co.*,
831 A.2d 335 (Del. Ch. 2003) ...........................................................................................8

*Am. Legacy Found. v. Lorillard Tobacco Co.*,
886 A.2d 1 (Del. Ch. 2005) .......................................................................................15, 16

*Am. Legacy Found. v. Lorillard Tobacco Co.*,
2002 Del. Ch. LEXIS 49 (Del. Ch. Apr. 29, 2002) ..........................................................15

*Atchison County Farmers Union Co-op Ass'n v. Turnbull*,
736 P.2d 917 (Kan. 1987)................................................................................................10

*Benihana of Tokyo, Inc. v. Benihana, Inc.*,
906 A.2d 114 (Del. 2006).................................................................................................14

*Centaur Partners, IV v National Intergroup, Inc.*,
582 A.2d 923 (Del. 1990).................................................................................................14

*Cont'l Ins. Co. v. Burr*,
706 A.2d 499 (Del. 1998).................................................................................................13

*Davis v. R.C. Peoples, Inc.*,
2003 WL 21733013 (Del. Super. July 25, 2003) .................................................................8

*DeBonaventura v. Nationwide Mut. Ins. Co.*,
428 A.2d 1151 (Del. 1981)...............................................................................................15

*Delledonne v. State Farm Mut. Auto Ins. Co.*,
621 A.2d 350 (Del. Super. 1992) ......................................................................................13

*Lawrence v. DiBiase*,
2001 WL 1456656 (Del. Super. Feb. 27, 2001) ...................................................................7

iii

*Lorillard Tobacco Co. v. Am. Legacy Found.*,
    903 A.2d 728 (Del. 2006) ............................................................................8, 10, 11, 16

*Mahan v. Avera St. Luke's*,
    621 N.W.2d 150 (S.D. 2001) .........................................................................................10

*Mobilificio San Giacomo S.p.A v. Stoffi*,
    1998 WL 125534 (D. Del. Jan. 29, 1998) ......................................................................4

*Nat'l Bd. of Exam'rs for Osteopathic Physicians & Surgeons, Inc. v. Am. Osteopathic Ass'n*,
    645 N.E.2d 608 (Ind. Ct. App. 1994) ..........................................................................10

*Palmer v. Lodge*,
    109 A. 125 (Del. Super. 1919) .......................................................................................7

*Salaman v. Nat'l Media Corp.*,
    1992 Del. Super. LEXIS 564 (Del. Super. Oct. 8, 1992) ..............................................11

*Seymour Volunteer Fire Dep't. v. Harvey*,
    1987 Tenn. App. LEXIS 2685 (Tenn. Ct. App. May 22, 1987) .....................................10

*Staar Surgical Co. v. Waggoner*,
    588 A.2d 1130 (Del. 1991) ............................................................................................14

*State of New Jersey v. Delgado*,
    742 A.2d 990 (N.J. Super. 2000) ....................................................................................4

*Topolski v. Helena Ass'n of Realtors, Inc.*,
    15 P.3d 414 (Mont. 2000) .............................................................................................10

*Travelers Indem. Co. v. Lake*,
    594 A.2d 38 (Del. 1991) .................................................................................................4

*Trincia v. Testardi*,
    57 A.2d 638 (Del. Ch. 1948) .........................................................................................7

*Weiss v. Northwest Broad. Inc.*,
    140 F. Supp. 2d 336 (D. Del. 2001) ...............................................................................4

## RULES

Del. R. Civ. P. 7.1.3 .................................................................................................................4

iv

## MISCELLANEOUS

1-1 *Corbin on Contracts*, § 1.19 (2007) ........................................................................7

*1 Williston on Contracts*, § 1:5 (4th ed. 2007)..............................................................7

Couch on Ins. § 200:41 ....................................................................................................17

Fletcher Cyc. Corp. § 4198 (Perm. Ed.) ........................................................................12

## ARGUMENT

## INTRODUCTION

The D&O policy at issue excludes coverage for claims alleging, arising out of, based upon or attributable to any contract. In the Delaware courts ALF agreed that "the matter presented is a straightforward contractual issue" and the Delaware courts repeatedly characterized the underlying case as a contract dispute. ALF now tries to persuade this Court that the contract exclusion in the D&O policy is not applicable. In doing so, ALF

- argues that the 147 page MSA with 21 exhibits is not an express contract.

- relies upon an allegation in Lorillard's counterclaim but does not tell this Court that the allegation was stricken in Lorillard's amended counterclaim.

- argues that the counterclaim contained a defamation claim but does not tell this Court that before the underlying case was ever filed Lorillard expressly advised ALF it was abandoning any defamation claim.

As discussed below, none of ALF's arguments can transform the "straightforward contractual issue" in the underlying case into something else.

## I.    THE CONSIDERATION OF THE UNDERLYING RECORD FOR NATIONAL UNION'S MOTION TO DISMISS IS APPROPRIATE UNDER THE APPLICABLE LAW.

Before considering the merits it is necessary to take up two preliminary matters: (1) the scope of the record the Court should consider and (2) the choice of law to apply. In its Answering Brief ALF takes issue with the Delaware Supreme Court's holding in *Risk Enterprise* and argues instead that this Court can only consider Lorillard's counterclaim. ALF's argument is strange, given that ALF's Complaint before this Court expressly references, and in some

instances quotes from, several other portions of the record in the underlying case.[1]   In its

Answering Brief ALF suggests there is an issue over which state law governs the instant claim.

However, ALF does not provide any briefing to the Court on this issue.   It is difficult to

understand why ALF, which chose Delaware as the forum in which to bring the underlying case,

now believes that Delaware law does not govern the insurance claims arising from that case.

### A.     Consideration Of The Underlying Record Is Appropriate When Examining Whether The Duty To Advance Defense Costs Exists After The Completion Of The Underlying Litigation.

National Union made the point that when the underlying case has been resolved, a court

should consider the entire record of the underlying case -- not just the complaint -- in

determining whether there was a duty to advance defense costs. *Am. Ins. Group v. Risk Enter.*

*Mgmt., Ltd.*, 761 A.2d 826 (Del. 2000); (OB at 8-10).   ALF now seeks to distinguish *Risk*

*Enterprise* on the basis that the insured in that case did not notify the carrier until after discovery

in the case was resolved.   This is a distinction without a difference.   *Risk Enterprise* did not turn

on when the carrier was notified.   Rather it turned on the fact that since the underlying case had

already been resolved there was no exigent need to determine coverage and thus no purpose was

served by examining only the underlying complaint:

> The rationale underlying this principle is that the determination of
> whether a party has a duty to defend should be made at the outset
> of the case, both to provide the insured with a defense at the
> beginning of the litigation and to permit the insurer, as the
> defraying entity, to control the defense strategy. . . . Moreover, the
> determination of whether a duty to defend existed is being made
> after the underlying litigation has already been settled.   For these
> reasons, the urgency that often exists at the outset of litigation is
> not present.

---

[1] In addition, ALF cited to portions of the underlying record to support arguments it made in its Answering Brief. (*See* AB at 18).

*Id*. at 829. Thus, ALF's purported distinction of *Rick Enterprise* is meaningless.[2]

ALF's contention that this Court is limited to reviewing Lorillard's counterclaim is inconsistent with the terms of the D&O policy. The instant policy contains a provision that the insured is obligated to repay advancements of defense costs if it is later determined that the insured was not entitled to them.[3] Necessarily, this provision contemplates a determination of the insured's entitlement to defense costs be made *after* those costs have been advanced. Logic (as well as common sense) dictates that this post-payment determination be made, not on the limited basis of the eight corners of the policy and Lorillard's amended counterclaim, but on the basis of the entire record in the underlying case. As the Delaware Supreme Court explained in *Risk Enterprise*, the eight corners rule is applied at the outset of the underlying case when there are exigent circumstances requiring a prompt determination of entitlement to a defense. It would make no sense to apply the same eight corners test at the post-payment determination because such an application would make the second determination a meaningless exercise. The only logical conclusion, therefore, is that the National Union D&O policy contemplates that the post-payment determination must be made on the basis of the entire record of the underlying case.

---

[2] In its Opening Brief National Union also pointed out that this Court was not limited to considering only Lorillard's counterclaim on a motion to dismiss because ALF's Complaint in the instant matter references and relies upon other documents. (OB at 7-8). Nowhere in its Answering Brief does ALF dispute this proposition.

[3] Section 8 of the D&O Policy provides in pertinent part: "Such advanced payments by the Insurer shall be repaid to the Insurer by the Insureds . . . in the event and to the extent that the Insureds shall not be entitled under the terms and conditions of this policy to payment of such Loss." (D&O Policy, § 8).

**B.    Under The Significant Relationship Test, The State Of Delaware Has The Most Significant Contacts With The D&O Policy And Delaware Law Should Apply.**

In a footnote ALF suggests that the law of the District of Columbia, not the law of Delaware, should govern this Court's determination of the "eight corners" issue.[4]  However, it does not supply any argument to the Court why this is the case, and instead merely requests further briefing on this point.[5]  ALF does not explain why it did not brief this issue when it had the chance.  For the reasons stated below, if this Court determines that a choice-of-law analysis is warranted, Delaware law should apply.

"A federal district court sitting in diversity must apply the choice of law rules of the state in which it sits to determine which state's laws governs the controversy before it."  *Weiss v. NW Broad. Inc.*, 140 F. Supp. 2d 336, 342 (D. Del. 2001).  Delaware courts, as articulated by the Delaware Supreme Court, apply the "most significant relationship test" to resolve conflicts issues arising out of the interpretation and validity of contracts, which test is set forth in Section 188 of the Restatement (Second) Conflicts of Law.  *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 41 (Del. 1991).

---

[4] ALF does not assert that any difference exists between the laws of Delaware and the District of Columbia with respect to any of the other issues germane to this motion.

[5] In the last footnote of its brief, ALF requests that this Court order further briefing on the choice of law issue in the event it agrees with National Union's interpretation of *Risk Enterprise*. Pursuant to Local Rule 7.1.3, it is improper to raise or reserve a legal issue in a footnote. *Local Rule of Civil Practice and Procedure of the United States District Court for the District of Delaware*, Rule 7.1.3; *see also State of New Jersey v. Delgado*, 742 A.2d 990, 996 (N.J. Super. 2000) ("[i]t is inappropriate to raise legal issues in a footnote, rather than in proper point headings").  Moreover, there is a strong policy within the District of Delaware of conserving judicial time and effort, which would negate ALF's request for further briefing. *See Mobilificio San Giacomo S.p.A v. Stoffi*, 1998 WL 125534, at *7 (D. Del. Jan. 29, 1998).  While it is clear from ALF's response brief that it researched the District's "eight corners" law and the choice of law issue (*see* AB at 11, fn. 5), ALF waived its right to argue for the application of District of Columbia law by not including a choice of law argument in its brief.

4

While ALF suggests in a footnote that this Court apply the law of the District of Columbia in this dispute, it offers nothing other than its place of business to support this assertion. ALF fails to state where the place of contracting was, where negotiations regarding the D&O policy occurred, and where the parties are incorporated (ALF is incorporated in Delaware).[6] Nor does ALF suggest the place of performance or the location for any subject matter of the policy. ALF's principal place of business alone is not a significant contact with the D&O policy to warrant the application of District of Columbia law to this issue. ALF conducts activities throughout the United States and its board is drawn from throughout the country. Further, it does not appear that the policy was sold or delivered in the District. Instead, the policy shows ALF's insurance agent as being located in Virginia.

In contrast there are considerable ties to Delaware, including:

- ALF is a Delaware corporation.

- ALF chose to bring the underlying suit in Delaware.

- The underlying suit was governed by Delaware law.

- ALF chose to bring this suit in Delaware.

Notably, in an insurance policy dispute arising from an insurer's refusal to pay defense costs, a Delaware court has concluded that the fact that the underlying case was litigated in a particular state is a significant factor in favor of applying the law of that state in the dispute over defense costs. *See AT&T Wireless Servs., Inc. v. Fed. Ins. Co.*, 2007 WL 1849056, at *5 (Del. Super. June 25, 2007) *reargument denied*, 2007 WL 2028070 (Del. Super. June 29, 2007). In addition, Delaware has an inherent interest in applying its law to determine whether claimed defense costs of $17 million are reasonable in an action litigated in its courts.

---

[6] All of these factors that ALF fails to address in its brief are relevant to the choice-of-law analysis under Section 188 of the Restatement (Second) of Conflicts of Law.

5

## II.    LORILLARD'S CLAIMS ARE EXCLUDED BY THE NATIONAL UNION D&O POLICY.

In its Opening Brief National Union discussed each of Lorillard's claims in the order in which they were alleged in Lorillard's amended counterclaim. National Union will repeat that order of discussion here.

### A.    There Is No Coverage For Lorillard's Contract Claims.

The D&O policy excludes coverage for any claim "alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of an Insured under any express contract or agreement; provided, however, that this exclusion shall not apply to liability which would have attached in the absence of such express contract or agreement." (D&O Policy, § 4(k)).

In its Opening Brief National Union demonstrated that the vast majority of Lorillard's claims arose out of the MSA and thus were excluded from coverage. ALF does not dispute that these Lorillard claims in the underlying litigation alleged, arose out of, were based upon or were attributable to the MSA. Indeed, it would be difficult for ALF to argue otherwise as the entire focus of the underlying case was whether ALF's advertisements, paid for by monies made available through the MSA, violated the terms of the MSA. Instead, ALF argues that the MSA -- a 147 page document with 21 exhibits -- is somehow not an "express contract" or that ALF was not expressly bound to it and therefore the exclusion does not apply. (AB at 14-15). ALF's argument lacks merit.

### 1.    The MSA is an Express Contract.

ALF's argument misapprehends the nature of express contracts. Delaware courts have long recognized that an "express contract" is nothing more than a contract manifested by words. "An express contract is one where the terms of the agreement are stated in so many words, and an implied contract is where one party receives benefits from another party, under such

6

circumstances, that the law presumes a promise on the part of the party benefited to pay a reasonable price for the same." *Trincia v. Testardi*, 57 A.2d 638, 642 (Del. Ch. 1948) (internal citations omitted); *Palmer v. Lodge*, 109 A. 125, 127 (Del. Super. 1919) (same); *see also Lawrence v. DiBiase*, 2001 WL 1456656, at *5 (Del. Super. Feb. 27, 2001) ("An express agreement is arrived at by words, while an implied agreement is arrived at by acts.") (citations omitted).  A leading treatise on contract law confirms that an express contract is merely a written contract. *See 1 Williston on Contracts*, § 1:5 (4th ed. 2007) ("An express contract is a contract the terms of which are stated by the parties ....").  Thus, the term "express contract" in the D&O policy's contractual exclusion, if it is to be given any particular meaning,[7] simply refers to a written contract.

Here, there is no dispute that the MSA qualifies as a written contract.  As described in National Union's Opening Brief, virtually every paragraph of Lorillard's amended counterclaim refers to the MSA and its terms and, in specific instances, contains allegations concerning ALF's breaches of the MSA.  Attached hereto at Exhibit A is a chart that references several of Lorillard's allegations concerning the MSA.

The fact that Lorillard's amended counterclaim explicitly refers to "provisions" of the MSA and ALF's breaches of certain of those "provisions" completely negates ALF's argument that the MSA is an implied contract.  As succinctly put by the Delaware Superior Court, "to speak of 'provisions' of an implied contract would be inconsistent with the concept of implied contract.  Since there are no words to comprise the 'provisions' of an implied contract, *ipso*

---

[7] According to one leading treatise:  "[t]here is no difference between an express contract and an implied contract.  All contracts are express contracts, subject to the rules of contract law." 1-1 *Corbin on Contracts*, § 1.19 (2007).

7

*facto*, there are no provisions of an implied contract." *Davis v. R.C. Peoples, Inc.*, 2003 WL 21733013, at *4 (Del. Super. July 25, 2003).

### 2.    ALF Expressly Adopted the MSA.

The Delaware courts found that ALF expressly adopted the MSA and was obligated to comply with its terms. According to the Court of Chancery: "*ALF expressly adopted the MSA through corporate acts and explicit statements.*" *Am. Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335, 351 (Del. Ch. 2003) (emphasis added).[8] In its brief ALF argues that this Court cannot consider the state court opinions because, in ALF's view, this Court is limited to considering only Lorillard's counterclaims. However, Lorillard expressly incorporated the above-cited Court of Chancery's opinion by reference in its amended counterclaim. (Amended Counterclaim ¶ 3). Thus, even if this Court were inclined to accept ALF's view of the scope of the record, it should still consider this opinion. Given that the MSA is indisputably an express contract and that ALF expressly adopted that contract, it necessarily follows that Lorillard's claims alleged, arose out of, were based upon or were attributable to an express contract.

Despite the holding of the Court of Chancery and ALF's admissions that it is bound to the MSA (*See* Amended Counterclaim ¶¶ 55, 66), ALF refers to an isolated paragraph in Lorillard's original pleadings in which Lorillard uses the term "implied agreement." (*See* AB at 15). ALF neglects to mention, however, that this allegation was stricken in Lorillard's amended counterclaim.[9]

---

[8] The Supreme Court agreed that ALF expressly adopted the MSA, concluding that "ALF is required to perform its obligations and can be held liable if found to have breached the MSA." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 745 (Del. 2006).

[9] A blacklined version of Lorillard's amended counterclaim, as filed with the Court of Chancery, is attached hereto at Exhibit B.

8

**B.    There Is No Coverage For Lorillard's Implied Covenant Claims.**

In its Opening Brief National Union demonstrated why Lorillard's implied covenant claims do not give rise to coverage. (OB at 15-17). ALF does not dispute or otherwise respond to this argument.

**C.    There Is No Coverage For Lorillard's Bylaw Claims.**

As noted in National Union's Opening Brief, Lorilland asserted a claim in the underlying action based upon ALF's bylaws and certificate of incorporation. It is well established in Delaware that corporate charters and bylaws are contracts. (OB at 18). Indeed, according to Lorillard's amended counterclaim, ALF's bylaws and certificate of incorporation "were intended to confer direct contractual rights upon Lorillard." (Amended Counterclaim ¶ 74). Consequently, Lorillard's bylaws and certificate of incorporation claims come within the contract exclusion found in the National Union D&O policy. (OB at 17-19). ALF raises several arguments, all of which are without merit, in an attempt to avoid the conclusion that Lorillard's bylaw and certificate of incorporation claims come within the contract exclusion. Each of these arguments are discussed separately below in the order in which they appear in ALF's brief.

**1.    ALF's Non-Profit Status Does Not Change The Conclusion That Its Bylaws Are A Contract.**

ALF argues -- without supporting authority -- that the cases cited by National Union are somehow not applicable to this case because ALF is a non-profit corporation. (AB at 17-18). ALF does not dispute that the bylaws of a for-profit corporation constitute a contract under Delaware law. But it offers no explanation whatsoever why the bylaws of a for-profit corporation constitute a contract whereas the bylaws of a non-profit do not. (AB at 17-18). Indeed, contrary to ALF's position, courts have found no reason to differentiate between for-profit and non-profit corporations when considering the contractual nature of bylaws or

9

certificates of incorporation. As a Tennessee court of appeals put it: "As surely as a corporate charter is a contract between the corporation and its shareholders, the charter of a non-profit corporations would be a contract between the corporation and its members." *Seymour Volunteer Fire Dep't. v. Harvey*, 1987 Tenn. App. LEXIS 2685, at *6 (Tenn. Ct. App. May 22, 1987). Other courts have also found that the bylaws or certificates of incorporation of a non-profit constitute a contract. *E.g., Nat'l Bd. of Exam'rs for Osteopathic Physicians & Surgeons, Inc. v. Am. Osteopathic Ass'n*, 645 N.E.2d 608, 617 (Ind. Ct. App. 1994); *Atchison County Farmers Union Co-op Ass'n v. Turnbull*, 736 P.2d 917, 921 (Kan. 1987); *Topolski v. Helena Ass'n of Realtors, Inc.*, 15 P.3d 414, 417 (Mont. 2000); *Mahan v. Avera St. Luke's*, 621 N.W.2d 150, 153 (S.D. 2001).

The absence of any meaningful distinction between for-profit and non-profit corporation in this regard was underscored by the Delaware Supreme Court in the underlying case. One of the issues raised therein was whether ALF was bound to the MSA by virtue of the doctrine of preincorporation agreements. Attempting to play the non-profit card, as it does here, ALF argued that this doctrine somehow did not apply to ALF because of its non-profit status. The Delaware Supreme Court quickly rejected this argument:

> ALF contends that the doctrine does not apply because this situation is atypical for several reasons, most of which stem from ALF's status as a non-profit entity. The non-profit status of an entity does not affect its contractual duties, and the preincorporation agreement doctrine applies equally to a non-profit entity.

*Lorillard Tobacco Co.*, 903 A.2d at 745. ALF's argument that its bylaws do not constitute a contract simply because it is a non-profit should meet with the same fate.

10

### 2.    ALF's Bylaws Are A Contract Even If It Has No Members Or Stockholders.

ALF argues that its bylaws are not a contract because it has no members or stockholders and thus, presumably, there is no one to enforce them. This argument overlooks established law that bylaws constitute a contract between the corporation and its directors, *Salaman v. Nat'l Media Corp.*, 1992 Del. Super. LEXIS 564 at *17 (Del. Super. Oct. 8, 1992), and, therefore, it fails.

ALF's argument has a second flaw -- the notion that ALF's bylaws do not constitute a contract because no one is capable of enforcing them except ALF itself is belied by the position ALF took in the underlying litigation. There ALF told the Delaware courts that the various signatory states under the MSA had standing to enforce its bylaws.[10] It follows that because the various states have standing to enforce its bylaws, those bylaws do not lose their contractual nature.

### 3.    Under Delaware Law, Bylaws and Certificate of Incorporations are Contracts.

For its third argument ALF asserts that bylaws are not a contract. It cites only Fletcher's *Cyclopedia of the Law of Private Corporations,* with an internal citation to only a 1910

---

[10] The Delaware Supreme Court summarized ALF's position this way:

ALF next challenges the determination by the Court of Chancery that Lorillard had standing to sue ALF under the MSA, despite ALF not being a signatory to that agreement. ALF claims that the Court erroneously concluded that ALF could be held liable under the MSA since it was neither a signatory to the contract nor ever adopted it. It contends that the States who created ALF have the sole responsibility to seek a remedy for any vilification or personal attack. Further, the only legal mechanism that the MSA contemplated to prevent vilification or personal attacks by ALF was ALF's own bylaws, not lawsuits by the tobacco company signatories. Therefore, it argues that only the States who established ALF, not the tobacco companies, may enforce ALF's bylaws.

*Lorillard Tobacco Co.*, 903 A.2d at 744.

11

California case. (AB at 18). Whatever may have been the law a century ago in California is immaterial. ALF is a Delaware corporation, and as shown in National Union's Opening Brief and this brief, Delaware courts have repeatedly and unmistakably held that bylaws and certificates of incorporation are contracts. Lest there be any doubt, the same section of Fletcher's cited by ALF recognizes that bylaws "are in the nature and have the force and effect of a contract." *See* Fletcher Cyc. Corp. § 4198 (Perm. Ed.).

### 4. The Case Law Cited by ALF is Unpersuasive.

ALF asserts, citing *Aetna Commercial Ins. Co. v. American Sign Co.*, 687 So.2d 834, 836 (Fla. Dist. Ct. App. 1996), that the bylaws are not a contract for purpose of interpreting an insurance contract. (AB at 19). The opinion is not instructive. Nowhere does the *American Sign* court identify the insured's state of incorporation and thus it is impossible to determine whether bylaws in that state are considered to be contracts. Likewise, the Florida court did not even consider, much less analyze, those cases holding that bylaws are contracts.

### 5. ALF Had No Expectation That the D&O Policy Would Cover Claims Based Upon its Bylaws.

ALF next argues that this Court should ignore Delaware law because it is ostensibly a "hidden trap." (AB at 19). According to ALF it would be denied its unalleged and unspecified "reasonable expectation" if claims under the bylaws were excluded from coverage. To accommodate this purported "expectation," the Court would have to rewrite the law of Delaware and hold that bylaws (and certificates of incorporation) are contracts for all purposes except for purposes of determining insurance coverage questions. There is nothing in the Delaware

12

jurisprudence -- and ALF cites to nothing in Delaware -- which could lead this Court to predict that the Delaware Supreme Court would adopt such a duality.[11]

Further, the notion that ALF somehow expected suits based upon its bylaws to be covered is contradicted by the terms of the policy itself. In most instances claims based upon bylaws are brought by shareholders. But the instant policy excludes coverage for "claims brought by securities holders of the organization in their capacity as such." (D&O Policy, § 4 (m)). It follows that the policy does not cover most claims based upon bylaws, and therefore there is no reason to believe that ALF reasonably thought it was purchasing such coverage when it purchased the policy.[12]

### 6.    Certificate of Incorporations are Contracts under Delaware Law.

Finally, ALF contends that National Union never argued that ALF's certificate of incorporation is a contract. ALF goes so far as to tell this Court that it is aware of no case holding that a certificate of incorporation is a contract. (AB at 20).[13] ALF's contention is curious, to say the least, given that in its Opening Brief National Union quoted language of the

---

[11]    The only Delaware authorities cited by ALF in connection with this argument are *Cont'l Ins. Co. v. Burr*, 706 A.2d 499 (Del. 1998) and *Delledonne v. State Farm Mut. Auto Ins. Co.*, 621 A.2d 350 (Del. Super. 1992). Neither involves a corporate bylaw and thus they provide no basis for predicting that the Delaware Supreme Court would reach this conclusion.

[12]    ALF will undoubtedly argue that it has no shareholders. But the fact remains that the exclusion shows that the policy was not intended to cover most suits based upon bylaws.

[13]    ALF writes in its Answering Brief:

National Union makes no argument that the allegations by Lorillard that the Foundation violated its articles of incorporation are subject to the "express contract" exclusion. It could not, because the articles of incorporation are not a contract, and no case that we are aware of has ever held to contrary.

(AB at 20).

13

Delaware Supreme Court that "corporate charters and bylaws are contracts ...." (OB at 18).[14]

ALF's assertion that it is aware of no cases holding that certificate of incorporation is also

perplexing because such cases are plentiful. *E.g.*, *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906

A.2d 114, 120 (Del. 2006) ("It is settled law that certificates of incorporation are contracts.");

*Staar Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991) ("a corporate charter is both a

contract between the State and the corporation, and the corporation and its shareholders.").

### D.    There Is No Coverage For Lorillard's Trespass To Chattels Claim.

In its Opening Brief National Union demonstrated that Lorillard's trespass to chattels

claim does not give rise to coverage. (OB at 21-23). ALF concedes this point. (AB at 4, n.1).

## III.    ALF'S HYPOTHESIZED DEFAMATION CLAIM DOES NOT GIVE RISE TO COVERAGE.

ALF contends that defamation claims are covered under the D&O policy and argues that

Lorillard's counterclaim can be read as asserting a claim for defamation. Therefore, ALF asserts

that the D&O policy provides coverage for the entire counterclaim. In making this argument,

ALF neglects to tell this Court that Lorillard expressly abandoned any defamation claims *before*

filing its counterclaim and that Lorillard conceded for purposes of the litigation that ALF's

advertisements were true. ALF's argument fails for any of three reasons:    (1) Lorillard's

concession in the underlying litigation precluded any defamation claim, (2) the allegations in the

counterclaim cannot be fairly read to allege a defamation claim and (3) if Lorillard in fact alleged

a defamation claim, Travelers, not National Union, was obligated to advance defense costs.

---

[14] Quoting *Centaur Partners, IV v National Intergroup, Inc.*, 582 A.2d 923, 928 (Del. 1990).

1.    **Lorillard's Concessions Precluded Any Defamation Claim.**

ALF knew when it filed its complaint in the Court of Chancery that Lorillard had already abandoned any claim for defamation. Prior to the filing of any court action Lorillard and ALF attempted to negotiate a resolution of their dispute. During these negotiations Lorillard sent a draft complaint to ALF containing allegations that ALF defamed Lorillard and engaged in deceptive trade practices. But these claims were expressly abandoned by Lorillard before ALF filed its suit in the Court of Chancery. This is what ALF told the Court of Chancery about the matter:

- [I]n November 2001, Lorillard had sent the Foundation a draft complaint asserting entirely different legal theories, which it did not pursue in Court.

- The "different legal theories" which ALF said Lorillard "did not pursue in Court" included a claim for defamation. According to ALF "in January, 2002, Lorillard again changed course entirely, abandoning its defamation [theory] ... in favor of a supposed contractual theory ...."

(ALF Chancery Brief; D.I. 22 at 7, 23 (attached hereto as Exhibit C)). The Court of Chancery observed that on January 18, 2002 -- before ALF filed its Chancery action -- Lorillard's counsel sent a letter to ALF "that it intended to abandon its defamation and unfair and deceptive trade practices claims in favor of contract claims based on the MSA." *Am. Legacy Found. v. Lorillard Tobacco Co.*, 2002 Del. Ch. LEXIS 49, at *7 (Del. Ch. Apr. 29, 2002). Thus, under no stretch of the imagination can Lorillard's counterclaim be read to allege a defamation claim.

There is at least one other aspect in the state court record which negates the existence of a defamation claim. It goes without saying, of course, that truth is an absolute defense to a defamation action. *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1155 (Del. 1981) ("It is hornbook law that truth is an absolute defense to a defamation action."). But Lorillard conceded for purposes of the litigation that ALF's ads were true. *Am. Legacy Found.*

15

*v. Lorillard Tobacco Co.*, 886 A.2d 1, 11 (Del. Ch. 2005). Thus as a matter of law, Lorillard could not have asserted a claim for defamation.

### 2. Lorillard's Counterclaim Does Not Assert A Claim For Defamation.

Not surprisingly, in light of Lorillard's previous abandonment of its defamation claim, its counterclaim does not assert a claim for defamation. The MSA prohibited vilification of or personal attacks on tobacco companies and their employees. The gist of ALF's defamation theory seems to be that in the underlying case the Supreme Court defined "vilification" as a denouncement that is both unfounded and abusive or slanderous. (AB at 23). ALF apparently deduces from this that any allegation that any particular ALF advertisement was a vilification necessarily amounted to an allegation that it was slanderous. This is a *non-sequitur*. Under the Delaware Supreme Court's definition of "vilification" an ad need not be slanderous; it is sufficient if the advertisement is merely "unfounded and abusive." Indeed, throughout the litigation Lorillard disavowed the notion that an advertisement had to be slanderous in order to amount to a vilification. *See Lorillard Tobacco Co.*, 903 A.2d at 741. Thus, Lorillard's allegation that certain advertisements amounted to a vilification does not necessarily mean Lorillard was alleging it was slanderous.

### 3. Assuming Lorillard Asserted A Claim For Defamation, Travelers -- Not National Union -- Was Obligated To Pay Defense Costs.

The National Union D&O policy contains an "Other Insurance" provision which provides that in the event of other insurance the subject policy will provide excess coverage only.[15] In its Complaint, ALF stated that it "purchased several primary GCL policies from Travelers [Indmenity Company of America]," and that these policies provided "broad coverage for

---

[15] The D&O Policy states: "Such insurance as provided by this policy shall apply only as excess over any valid and collectible insurance. This policy shall be specifically excess of any other policy pursuant to which any other insurer has a duty to defend a Claim for which this policy may be obligated to pay a Loss." (D&O Policy, § 14).

16

[ALF's] liabilities to third parties and associated defense costs." (Complaint ¶ 27). Therefore, before the D&O policy's coverage may be implicated, ALF must exhaust its primary coverage with Travelers. *E.g.,* COUCH ON INS. § 200:41 ("it is a fundamental principle that in circumstances where the insured maintains both primary and excess or umbrella policies, the excess or umbrella insurer cannot be obligated to defend until the primary policy limits are exhausted").

ALF has not alleged that it exhausted the Travelers' policies, and, indeed, as a matter of law, it will not be able to make such an allegation. According to ALF, the "[c]osts paid for the defense of [ALF] do not count against, and are therefore paid in addition to, any applicable limits of liability under the Travelers [p]olicies." (Complaint ¶ 28). In other words, when Travelers' duty to defend ALF is triggered, Travelers must defend the claim until the limits of its policies are exhausted by payment of judgments or settlements. But ALF alleges that it was successful in the underlying action and therefore there were no judgments or settlements paid. (Complaint ¶ 22-24). Accordingly, the Travelers policies were not exhausted, and Travelers was obligated to fund the defense of the entire underlying action. It follows from Travelers' obligation to defend that the excess coverage provided by the National Union D&O Policy is not implicated.

In sum, if there is a defamation claim in the amended counterclaim, which National Union vehemently disputes, Travelers was obligated to fund ALF's defense of the entire underlying action and National Union is still entitled to dismissal.

17

## CONCLUSION

For the foregoing reasons, and for the reasons stated in its Opening Brief, Count III of the

Complaint and any allegations asserted in the Complaint referring or relating to National Union's

D&O Policy must be dismissed.

_____

John A. Parkins, Jr. (#859)
Chad M. Shandler (#3796)
Todd A. Coomes (#4694)
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, Delaware  19899
302-651-7700
Parkins@rlf.com
Shandler@rlf.com
Coomes@rlf.com
Attorneys for Defendant National Union Fire
Insurance Company of Pittsburgh,
Pennsylvania

Dated: February 28, 2008

18

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2008, I hand delivered the foregoing document to the following persons and electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Laura Davis Jones
Timothy P. Cairns
Pachulski, Stang, Ziehl, & Jones, LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705

I hereby certify that on February 29, 2008, the foregoing documents will be sent by Federal Express to the following non-registered participants:

Richard Shore
Kami E. Quinn
Gilbert Randolph, LLP
1100 New York Avenue, NW
Suite 700
Washington, DC  20005

Chad M. Shandler (#3796)
shandler@rlf.com

# EXHIBIT A

**EXAMPLES OF ALLEGATIONS IN LORILLARD'S ANSWER AND AMENDED COUNTERCLAIM DEMONSTRATING THAT THE MSA IS AN EXPRESS OR WRITTEN CONTRACT**

| PARAGRAPH | ALLEGATIONS |
|---|---|
| Answer, ¶1 at p. 1 | "ALF's mission and permissible functions are set forth in the MSA, a written document that speaks for itself." |
| Answer, ¶1 at p. 2 | "[T]he scope of and limitations upon any of ALF's activities ... are set forth in the MSA." |
| Answer, ¶2 at p. 2 | "ALF's mission and permissible functions, as well as certain limitations on ALF's conduct and activities and on its use of MSA monies, are set forth in the MSA, a written document that speaks for itself." |
| Answer, ¶12 at p. 6 | "ALF has used funds disbursed to it under the MSA ... to develop, produce and disseminate its 'truth' campaign." |
| Counterclaim, ¶3 at p. 21 | "ALF's public education and advertising program is specifically authorized and circumscribed by the MSA." |
| Counterclaim, ¶3 at p. 21 | "As the Court held in the Opinion of the Court dated January 31, 2003, Section VI(h), together with the other provisions of the MSA relating to ALF, are binding upon ALF and may be enforced by Lorillard." |
| Counterclaim, ¶5 at p. 22 | "[ALF's] e-mails constitute breaches of the MSA by ALF." |
| Counterclaim, ¶6 at p. 22 | "ALF and its attorneys pursued a scheme designed to evade the restrictions placed on ALF's conduct and activities by Section VI of the MSA." |
| Counterclaim, ¶6 at p. 22 | "[T]he [advertising] scheme implemented by ALF itself constitutes a breach of the MSA by ALF." |
| Counterclaim, ¶7 at p. 22 | "ALF ... has repeatedly and materially breached the MSA." |
| Counterclaim, ¶13 at p. 23 | "Section VI of the MSA carefully describes [ALF's] mission, and it lists [ALF's] |

| | |
|---|---|
| | permissible functions." |
| Counterclaim, ¶18 at p. 24 | "Section IV limits significant ways the manner in which [ALF] may use the monies it receives under the MSA." |
| Counterclaim, ¶20 at p. 25 | "Section VI of the MSA therefore imposes significant obligations on [ALF]." |
| Counterclaim, ¶21 at p. 26 | "These promises and contractual obligations concerning the NPEF … and [ALF] generally each constitute material terms of the MSA. " |
| Counterclaim, ¶23 at p. 26 | "The MSA requires that [ALF] … incorporate into its organizational documents those terms of the MSA relating to [ALF]." |
| Counterclaim, ¶36 at p. 30 | "All such advertisements …represent misuse of the NPEF, misuse of NPEF payments and Base Foundation Payments, and breaches of the MSA by ALF." |
| Counterclaim, ¶37 at p. 30 | "ALF purposefully and intentionally developed, produced and disseminated advertisements that violated the MSA." |
| Counterclaim, ¶38 at p. 31 | "ALF's own attorney's warned that the messages they expressed presented moderate or high risk of violating Section VI(h) of the MSA." |
| Counterclaim, ¶41 at p. 32 | "[A]ny personal attach or vilification published or broadcast as part of ALF's public education and advertising program violates the MSA." |
| Counterclaim, ¶55 at p. 36 | "ALF, its board of directors, and its attorneys have repeatedly acknowledged, both publicly and internally, that ALF is bound by the terms of the MSA." |
| Counterclaim, ¶66 at p. 40 | "ALF knew, acknowledged, and admitted that it is bound by and must comply with the terms of the MSA." |

RLF1-3257958-1

# EXHIBIT B

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

**IN AND FOR NEW CASTLE COUNTY**

| | | |
|---|---|---|
| AMERICAN LEGACY FOUNDATION, a Delaware non-profit corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 19406-NC |
| LORILLARD TOBACCO COMPANY, a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) | |

**ANSWER AND COUNTERCLAIMS OF
DEFENDANT LORILLARD TOBACCO COMPANY
TO FIRST AMENDED COMPLAINT**

**FIRST DEFENSE**

Responding to the numbered allegations of the Amended Complaint filed by plaintiff

American Legacy Foundation ("ALF") in the above-captioned matter, defendant Lorillard

Tobacco Company ("Lorillard"), through counsel, alleges and says that:

1.     With respect to the allegations contained in the first sentence of paragraph 1 of the

Amended Complaint, it is admitted upon information and belief that ALF is a Delaware non-

profit corporation that was created pursuant to the Master Settlement Agreement ("MSA")

between forty-six Settling States and the four major tobacco companies and that ALF's mission

and permissible functions are set forth in the MSA, a written document that speaks for itself,

including but not limited to the implied covenant of good faith and fair dealing.  With respect to

the allegations contained in the second sentence of paragraph 1 of the Amended Complaint, it is

admitted upon information and belief that ALF has used funds disbursed to it under the

MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to develop and, produce, and disseminate its "truth" campaign. By way of further response, it is alleged that the scope of and limitations upon any of ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, including its "truth" campaign, are set forth in the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing. With respect to the allegations contained in the third sentence of paragraph 1 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 1 of the Amended Complaint are denied.

2.    With respect to the allegations contained in the first sentence of paragraph 2 of the Amended Complaint, the MSA is a written document that speaks for itself. With respect to the allegations contained in the second and third sentences of paragraph 2 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. With respect to the allegations contained in the fourth sentence of paragraph 2 of the Amended Complaint, it is admitted that Lorillard and the other tobacco companies have paid hundreds of millions of dollars under the MSA that have benefitted benefited and funded ALF and its operations. By way of further response, it is alleged that ALF's mission and permissible functions, as well as certain limitations on ALF's conduct and activities and on its use of MSA monies, are set forth in the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing. Except as expressly admitted herein, the allegations contained in paragraph 2 of the Amended Complaint are denied.

3.    With respect to the allegations contained in the first, second, and third sentences of paragraph 3 of the Amended Complaint, the MSA is a written document that speaks for itself.

2

With respect to the allegations contained in the fourth sentence of paragraph 3 of the Amended

Complaint, ALF's Certificate of Incorporation and its Bylaws are written documents that speak

for themselves. By way of further response, it is admitted that ALF's Certificate of Incorporation

and its Bylaws incorporate the terms of the MSA relating to ALF, including the MSA's

limitations on ALF's activities. Except as expressly admitted herein, the allegations contained in

paragraph 3 of the Amended Complaint are denied.

4.      With respect to the allegations contained in the first and second sentences of

paragraph 4 of the Amended Complaint, the MSA and ALF's Bylaws are written documents that

speak for themselves. By way of further response, it is alleged that the scope of and limitations

upon ALF's conduct and activities and its use of MSA monies, including its "truth" campaign,

are governed by the MSA, a written document that speaks for itself, including but not limited to

the implied covenant of good faith and fair dealing. The allegations contained in the third

sentence of paragraph 4 of the Amended Complaint are denied. By way of further response,

Lorillard refers to the Opinion of the Court dated January 31, 2003. Except as expressly

admitted herein, the allegations contained in paragraph 4 of the Amended Complaint are denied.

5.      The allegations contained in the first sentence of paragraph 5 of the Amended

Complaint are denied. With respect to the allegations contained in the second sentence of

paragraph 5 of the Amended Complaint, it is admitted that ALF had not yet been incorporated

when the MSA was executed by the Settling States and certain tobacco companies and that, upon

information and belief, ALF has never executed the MSA. By way of further response, it is

alleged that ALF has adopted, assumed the obligations of, and otherwise become bound to the

MSA through the actions of its incorporators, through its corporate actions, through its words,

and through its conduct. With respect to the allegations contained in the third sentence of

paragraph 5 of the Amended Complaint, it is admitted that ALF was not a party to the lawsuits brought by the various Settling States against thecertain tobacco companies. The allegations contained in the fourth sentence of paragraph 5 of the Amended Complaint are denied. With respect to the allegations contained in the fifth sentence of paragraph 5 of the Amended Complaint, the MSA is a written document that speaks for itself. By way of further response, it is alleged that it was not necessary for ALF to execute the MSA in order for ALF to become bound by the MSA. With respect to the allegations contained in the sixth sentence of paragraph 5 of the Amended Complaint, the MSA is a written document that speaks for itself. The allegations contained in the seventh sentence of paragraph 5 are denied. Except as expressly admitted herein, the allegations contained in paragraph 5 of the Amended Complaint are denied. By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003.

6.    With respect to the allegations contained in the first sentence of paragraph 6 of the Amended Complaint, it is admitted that on January 18, 2002, Lorillard sent a thirty-day notice letter to ALF's counsel pursuant to Section VII(c)(2) of the MSA, which letter is a written document that speaks for itself. With respect to the allegations contained in the second and third sentences of paragraph 6 of the Amended Complaint, Lorillard's letter of January 18, 2002, is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 6 of the Amended Complaint are denied. By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003.

7.    With respect to the allegations contained in the first sentence of paragraph 7 of the Amended Complaint, it is admitted that Lorillard did not withdraw or change its position as expressed in its letter of January 18, 2002, prior to ALF's filing of theits original Complaint. With respect to the allegations contained in the second sentence of paragraph 7 of the Amended

Complaint, it is admitted that in communications between counsel for Lorillard and counsel for ALF on February 7, 2002, Lorillard did not withdraw or change its position as expressed in its letter of January 18, 2002. With respect to the allegations contained in the third sentence of paragraph 7 of the Amended Complaint, it is admitted that prior to ALF's filing of theits original Complaint, Lorillard did not identify to ALF the forum in which it intended to bring an enforcement action under the MSA against ALF. Except as expressly admitted herein, the allegations contained in paragraph 7 of the Amended Complaint are denied.

8.     With respect to the allegations contained in the first sentenceand second sentences of paragraph 8 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations and they are accordingly deniedthe allegations that ALF holds the views expressed therein; however, Lorillard denies that such views are true. The allegations contained in the second and third, fourth and fifth sentences of paragraph 8 of the Amended Complaint are denied. Except as expressly admitted herein, the allegations contained in paragraph 8 of the Amended Complaint are denied.

9.     With respect to the allegations contained in the first sentence of paragraph 9 of the Amended Complaint, it is admitted that ALF purports to bring an action against Lorillard pursuant to 10 Del. C. §§ 6501-6513 and 8 Del. C. § 111. With respect to the allegations contained in the second sentence of paragraph 9 of the Amended Complaint, it is admitted that ALF purports to seek an injunction from the Court. With respect to the allegations contained in the third sentence of paragraph 9 of the Amended Complaint, it is admitted that ALF purports to seek a declaratory judgment from the Court. Except as expressly admitted herein, the allegations contained in paragraph 9 of the Amended Complaint are denied. By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003.

10.    Admitted, upon information and belief.

11.    With respect to the allegations contained in paragraph 11 of the Amended Complaint, it is admitted that ALF's mission and permissible functions, as well as certain limitations on ALF's conduct and activities and on its use of MSA monies, are set forth in the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing.  Except as expressly admitted herein, the allegations contained in paragraph 11 of the Amended Complaint are denied.

12.    With respect to the allegations contained in paragraph 12 of the Amended Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to develop and, produce, and disseminate its "truth" campaign.  By way of further response, it is alleged that the scope of and limitations upon ALF's conduct and activities funded in whole or in part by funds disbursed to ALF under the MSAand its use of MSA monies, including its "truth" campaign, are set forth ingoverned by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing.  Except as expressly admitted herein, the allegations contained in paragraph 12 of the Amended Complaint are denied.

13.    With respect to the allegations contained in paragraph 13 of the Amended Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to develop and, produce, and disseminate its "truth" campaign, to develop and maintain a website, and to develop and produce events.  By way of further response, it is alleged that the scope of and limitations upon ALF's conduct and activities funded in whole or in-

part by funds disbursed to ALF under the MSA~~and its use of MSA monies~~, including its "truth" campaign, ~~are set forth in~~its website, and its events, are governed by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing. Except as expressly admitted herein, the allegations contained in paragraph 13 of the Amended Complaint are denied.

14.    With respect to the allegations contained in paragraph 14 of the Amended Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to undertake grants and other activities. By way of further response, it is alleged that the scope of and limitations upon ALF's conduct and activities ~~funded in whole or in part by funds disbursed to ALF under the MSA are set forth in~~and its use of MSA monies, including grants and other activities, are governed by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing. Except as expressly admitted herein, the allegations contained in paragraph 14 of the Amended Complaint are denied.

15.    With respect to the allegations contained in paragraph 15 of the Amended Complaint, it is admitted that ALF was created pursuant to the MSA and that ALF's mission and permissible functions, as well as ~~the scope of and~~ certain limitations ~~upon~~on ALF's conduct and activities ~~funded in whole or in part by funds disbursed to ALF under the MSA, are set forth in~~and on its use of MSA monies, are governed by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing. By way of further response, it is admitted that the quoted passage appears in the Supreme Court's opinion in

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). Except as expressly admitted herein, the allegations contained in paragraph 15 of the Amended Complaint are denied.

16.    With respect to the allegations contained in paragraph 16 of the Amended Complaint, ALF's Bylaws is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 16 of the Amended Complaint are denied.

17.    Admitted, upon information and belief.

18.    Admitted.

19.    With respect to the allegations contained in paragraph 19 of the Amended Complaint, it is admitted that Lorillard is an original signatory to the MSA, having executed the MSA in 1998. Except as expressly admitted herein, the allegations contained in paragraph 19 of the Amended Complaint are denied.

20.    With respect to the allegations contained in the first sentence of paragraph 20 of the Amended Complaint, the term "largest" is vague and indefinite and, as a result, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. With respect to the allegations contained in the second sentence of paragraph 20 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 20 of the Amended Complaint are denied.

21.    With respect to the allegations contained in paragraph 21 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 21 of the Amended Complaint are denied.

22.    It is admitted that in the 1990s, a number of states brought suit against ~~the~~certain tobacco companies, including Lorillard. With respect to the allegations contained in the second sentence of paragraph 22 of the Amended Complaint, the MSA is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 22 of the Amended Complaint are denied.

23.    With respect to the allegations contained in paragraph 23 of the Amended Complaint, it is admitted that ~~the~~certain tobacco companies and the Attorneys General of the States that had brought suit against ~~the~~those tobacco companies entered into settlement negotiations in an effort to resolve the various lawsuits brought by those States. Except as expressly admitted herein, the allegations contained in paragraph 23 of the Amended Complaint are denied.

~~24.    Admitted.~~

24.    ~~25.~~ With respect to the allegations contained in paragraph ~~25~~24 of the Amended Complaint, the MSA is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph ~~25~~24 of the Amended Complaint are denied.

25.    With respect to the allegations contained in paragraph 25 of the Amended Complaint, the MSA is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 25 of the Amended Complaint are denied.

26.    The allegations contained in the first sentence of paragraph 26 of the Amended Complaint are admitted upon information and belief. With respect to the allegations contained in the second sentence of paragraph 26 of the Amended Complaint, it is admitted that ALF was not a party to the lawsuits brought by the various Settling States against ~~the~~certain tobacco companies and resolved by the MSA. Except as expressly admitted herein, the allegations

9

contained in paragraph 26 of the Amended Complaint are denied. By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003.

27. Admitted, upon information and belief.

28. With respect to the allegations contained in paragraph 28 of the Amended Complaint, it is admitted that ALF had not yet been incorporated when the MSA was executed by the Settling States and certain tobacco companies and that ALF has never executed the MSA. By way of further response, it is alleged that ALF has adopted, assumed the obligations of, and otherwise become bound to the MSA through the actions of its incorporators, through its corporate actions, through its words, and through its conduct. Except as expressly admitted herein, the allegations contained in paragraph 28 of the Amended Complaint are denied. By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003.

29. With respect to the allegations contained in paragraph 29 of the Amended Complaint, such allegations state a legal conclusion as to which no response is required by Lorillard. By way of further response, it is alleged that ALF is an intended beneficiary of the MSA by virtue of the funds that have been disbursed to it under the MSA. By way of further response, the MSA is a written document that speaks for itself. By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003. Except as expressly admitted herein, the allegations contained in paragraph 29 of the Amended Complaint are denied.

30. With respect to the allegations contained in paragraph 30 of the Amended Complaint, the MSA is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 30 of the Amended Complaint are denied.

10

31.    With respect to the allegations contained in paragraph 31 of the Amended Complaint, the MSA is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 31 of the Amended Complaint are denied.

32.    With respect to the allegations contained in the first sentence of paragraph 32 of the Amended Complaint, it is admitted that ALF was created pursuant to the MSA and that ALF's mission and permissible functions, as well as ~~the scope of and~~ certain limitations ~~upon~~on ALF's conduct and activities ~~funded in whole or in part by funds disbursed to ALF under the MSA, are set forth in~~and on its use of MSA monies, are governed by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing. With respect to the allegations contained in the second sentence of paragraph 32 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. With respect to the allegations contained in the third sentence of paragraph 32 of the Amended Complaint, it is alleged that ALF's mission and permissible functions, as well as ~~the scope of and~~ certain limitations ~~upon~~on ALF's conduct and activities ~~funded in whole or in part by funds disbursed to ALF under the MSA, are set forth in~~and on its use of MSA monies, are governed by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing. Except as expressly admitted herein, the allegations contained in paragraph 32 of the Amended Complaint are denied.

33.    With respect to the allegations contained in the first and second sentences of paragraph 33 of the Amended Complaint, the MSA is a written document that speaks for itself. By way of further response, it is alleged that ALF—through its initial board of directors—adopted ALF's Bylaws. Except as expressly admitted herein, the allegations contained in paragraph 33 of the Amended Complaint are denied.

11

34.    The allegations contained in paragraph 34 of the Amended Complaint are denied. By way of further response, it is alleged that ALF—through its initial board of directors—adopted ALF's Bylaws.    Except as expressly admitted herein, the allegations contained in paragraph 34 of the Amended Complaint are denied.

35.    With respect to the allegations contained in paragraph 35 of the Amended Complaint, the MSA is a written document that speaks for itself.  Except as expressly admitted herein, the allegations contained in paragraph 35 of the Amended Complaint are denied.

~~36.    With respect to the allegations contained in paragraph 36 of the Complaint, the MSA is a written document that speaks for itself.  By way of further response, it is alleged that the MSA requires that Lorillard and the other tobacco companies, in exchange for promises made by the Settling States—many of which were adopted by ALF—to pay hundreds of millions of dollars that have benefitted and funded ALF and its operations.~~

36.    ~~37.~~ With respect to the allegations contained in the first and second sentences contained in paragraph 36 of the Amended Complaint, the MSA is a written document that speaks for itself. With respect to the allegations contained in third, fourth, and fifth sentences of paragraph ~~37~~36 of the Amended Complaint, it is alleged that ALF's mission and permissible functions, as well as ~~the scope of and~~ certain limitations ~~upon~~on ALF's conduct and activities ~~funded in whole or in part by funds disbursed to ALF under the MSA, are set forth in the MSA, a written document that speaks for itself.  By way of further response, it is alleged that the MSA requires that Lorillard and the other tobacco companies, in exchange for promises made by the Settling States—many of which were adopted by ALF—to pay hundreds of millions of dollars that have benefitted and funded ALF and its operations.~~and on its use of MSA monies, are governed by the MSA, a written document that speaks for itself, including but not limited to the

12

implied covenant of good faith and fair dealing.  By way of further response, it is specifically denied that ALF may use Section VI(b) monies for public education or advertising or in a way that violates Section VI(h), including its prohibition against "personal attacks" and "vilification." Except as expressly admitted herein, the allegations contained in paragraph 36 of the Amended Complaint are denied.

37.    With respect to the allegations contained in the first sentence of paragraph 37 of the Amended Complaint, the MSA is a written document that speaks for itself.  By way of further response it is alleged that ALF's mission and permissible functions, as well as certain limitations on ALF's conduct and activities and on its use of MSA monies, are governed by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing.  The allegations of the second sentence of paragraph 37 of the Amended Complaint are denied.    Except as expressly admitted herein, the allegations contained in paragraph 37 of the Amended Complaint are denied.

38.    With respect to the allegations contained in paragraph 38 of the Amended Complaint, it is admitted that ALF incorporated certain provisions of the MSA into its Bylaws. By way of further response, ALF's Bylaws is a written document that speaks for itself.  By way of further response, it is specifically denied that ALF may use Section VI(b) monies for public education or advertising or in a way that violates Section VI(h), including its prohibition against "personal attacks" and "vilification."  Except as expressly admitted herein, the allegations contained in paragraph 38 of the Amended Complaint are denied.

39.    With respect to the allegations contained in paragraph 39 of the Amended Complaint, it is admitted that ALF's Certificate of Incorporation incorporates certain provisions of the MSA.  By way of further response, ALF's Certificate of Incorporation is a written

13

document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 39 of the Amended Complaint are denied.

40.    With respect to the allegations contained in paragraph 40 of the Amended Complaint, such allegations state a legal conclusion as to which no response is required by Lorillard.

41.    Denied.  By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003.

42.    With respect to the allegations contained in paragraph 42 of the Amended Complaint, it is admitted that ALF's mission and permissible functions, as well as ~~the scope of and~~ certain limitations ~~upon~~on ALF's conduct and activities ~~funded in whole or in part by funds disbursed to ALF under the MSA, are set forth in~~and on its use of MSA monies, are governed by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing.  Except as expressly admitted herein, the allegations contained in paragraph 42 of the Amended Complaint are denied.

43.    With respect to the allegations contained in the first sentence of paragraph 43 of the Amended Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to develop ~~and,~~ produce, and disseminate its "truth" campaign. By way of further response, it is alleged that the scope of and limitations upon ALF's conduct and activities ~~funded in whole or in part by funds disbursed to ALF under the MSA~~and its use of MSA monies, including its "truth" campaign, are set forth in the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing.  With respect to the allegations contained in the second sentence of paragraph

14

43 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 43 of the Amended Complaint are denied.

44. ~~With respect to the allegations contained in paragraph 44 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 44 of the Complaint are denied.~~

45. ~~With respect to the allegations contained in paragraph 45 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 45 of the Complaint are denied.~~

46. ~~With respect to the allegations contained in paragraph 46 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 46 of the Complaint are denied.~~

47. ~~With respect to the allegations contained in paragraph 47 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 47 of the Complaint are denied.~~

48. ~~With respect to the allegations contained in paragraph 48 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 48 of the Complaint are denied.~~

15

49.  ~~With respect to the allegations contained in paragraph 49 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 49 of the Complaint are denied.~~

<u>44.</u>  ~~50.~~ Denied.

<u>45.</u>  With respect to the allegations contained in paragraph 45 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 45 of the Amended Complaint are denied.

<u>46.</u>  The allegations contained in the first and third sentences in paragraph 46 of the Amended Complaint are denied. With respect to the allegations contained in the second sentence in paragraph 46 of the Amended Complaint regarding the focus of certain ALF advertisements, it is admitted that certain ALF advertisements focus on the tobacco industry, rather than on tobacco products; the remainder of said sentence is denied. Except as expressly admitted herein, the allegations contained in paragraph 46 of the Amended Complaint are denied.

<u>47.</u>  With respect to the allegations contained in paragraph 47 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 47 of the Amended Complaint are denied.

<u>48.</u>  With respect to the allegations contained in paragraph 48 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 48 of the Amended Complaint are denied.

16

49.   With respect to the allegations contained in paragraph 49 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied.   Except as expressly admitted herein, the allegations contained in paragraph 49 of the Amended Complaint are denied.

50.   Denied.

51.   With respect to the allegations contained in the first and second sentences of paragraph 51 of the Amended Complaint, it is admitted that on January 18, 2002, Lorillard sent a thirty-day notice letter to ALF's counsel, among others, pursuant to Section VII(c)(2) of the MSA, which letter is a written document that speaks for itself.   With respect to the allegations contained in the third sentence of paragraph 51 of the Amended Complaint, it is admitted that Lorillard did not withdraw or change its position as expressed in its letter of January 18, 2002, prior to ALF's filing of ~~the~~its original Complaint.   Except as expressly admitted herein, the allegations contained in paragraph 51 of the Amended Complaint are denied.

52.   ~~Denied.~~The allegations contained in the first sentence of paragraph 52 of the Amended Complaint are denied.   The allegations contained in the second sentence of paragraph 52 of the Amended Complaint are admitted.   With respect to the allegations contained in the third sentence of paragraph 52 of the Amended Complaint, the North Carolina Complaint is a written document that speaks for itself.   Except as expressly admitted herein, the allegations contained in paragraph 52 of the Amended Complaint are denied.

53.   Lorillard repeats, realleges, and incorporates herein by reference its responses to paragraphs 1 through 52 of the Amended Complaint.

54.   With respect to the allegations contained in paragraph 54 of the Amended Complaint, it is admitted that ALF purports to seek a declaration that Lorillard has no basis to

17

assert, in any court, any claim or suit against ALF seeking to enforce any term of the MSA or seeking to establish any violation of the MSA. By way of further response, it is alleged that such position lacks merit, is unsupported by the law and the facts, and is contrary to multiple public and internal statements by ALF and multiple ALF documents, exchanged both internally at ALF and otherwise, acknowledging that itALF is required to comply with the MSA, and is subject to suit for failing to comply with the MSA. By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003. Except as expressly admitted herein, the allegations contained in paragraph 54 of the Amended Complaint are denied.

55.    With respect to the allegations contained in the first sentence of paragraph 55 of the Amended Complaint, it is admitted that Lorillard has pursued and intends to pursue enforcement action against ALF under the MSA. With respect to the allegations contained in the second sentence of paragraph 55 of the Amended Complaint, it is admitted that ALF has taken the position that Lorillard has no basis for pursing enforcement action against ALF under the MSA. By way of further response, it is alleged that such position lacks merit, is unsupported by the law and the facts, and is contrary to multiple public and internal statements by ALF and multiple documents, exchanged both internally at ALF and otherwise, acknowledging that itALF is required to comply with the MSA, and is subject to suit for failing to comply with the MSA. By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003. With respect to the allegations contained in the third sentence of paragraph 55 of the Amended Complaint, it is admitted that there is an actual controversy between the parties, for which declaratory relief pursuant to 10 Del. C. § 6501 is appropriate. Except as expressly admitted herein, the allegations contained in paragraph 55 of the Amended Complaint are denied.

56.    Denied.

18

57.    Lorillard repeats, realleges, and incorporates herein by reference its responses to paragraphs 1 through 57 of the Amended Complaint.

58.    With respect to the allegations contained in paragraph 58 of the Amended Complaint, it is admitted that ALF purports to seek a declaration that Lorillard has no standing or basis to assert, in any court, any claim or suit against ALF seeking to enforce ALF's Bylaws or seeking to establish any violation of ALF's Bylaws. By way of further response, Lorillard denies that ALF is entitled to such declaratory relief. By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003. Except as expressly admitted herein, the allegations contained in paragraph 58 of the Amended Complaint are denied.

59.    With respect to the allegations contained in paragraph 59 of the Amended Complaint, it is admitted that there is an actual controversy between the parties, for which declaratory relief pursuant to 10 Del. C. § 6501 is appropriate. By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003. Except as expressly admitted herein, the allegations contained in paragraph 59 of the Amended Complaint are denied.

60.    With respect to the allegation contained in paragraph 60 of the Complaint, such allegation states a legal conclusion to which no response is required by Lorillard. Denied.

61.    Lorillard repeats, realleges, and incorporates herein by reference its responses to paragraphs 1 through 60 of the Amended Complaint.

62.    With respect to the allegations contained in paragraph 62 of the Amended Complaint, it is admitted that ALF purports to seek an injunction barring Lorillard from asserting, in any court, any claim or suit against ALF seeking to enforce any term of the MSA or ALF's Bylaws, or seeking to establish any violation of the MSA or ALF's Bylaws. By way of further response, Lorillard denies that ALF is entitled to such injunctive relief. By way of further

19

response. Lorillard refers to the Opinion of the Court dated January 31, 2003. Except as expressly admitted herein, the allegations contained in paragraph 62 of the Amended Complaint are denied.

63.    ~~With respect to the allegation contained in paragraph 63 of the Complaint, such allegation states a legal conclusion to which no response is required by Lorillard.~~Denied.

64.    Lorillard repeats, realleges, and incorporates herein by reference its responses to paragraphs 1 through 63 of the Amended Complaint.

65.    With respect to the allegations contained in paragraph 65 of the Amended Complaint, it is admitted that ALF purports to seek an alternative declaration as stated therein that (1) ~~none of the components of~~ ALF's "truth" campaign ~~has constituted a personal attack or vilification under the MSA or ALF's Bylaws and (2) no component of ALF's "truth" campaign has otherwise violated any restriction set forth in the MSA or in ALF's Bylaws~~does not and has not contravened the provisions of Section VI(h) of the MSA and in ALF's Bylaws requiring ALF's public education and advertising to address the addictiveness, health effects, and social costs relating to the use of tobacco product but not to constitute personal attacks or vilification. By way of further response, Lorillard denies that ALF is entitled to such declaratory relief. Except as expressly admitted herein, the allegations contained in paragraph 65 of the Amended Complaint are denied.

66.    With respect to the allegations contained in the first sentence of paragraph 66 of the Amended Complaint, it is admitted that Lorillard has pursued and intends to pursue enforcement action against ALF under the MSA. With respect to the allegations contained in the second sentence of paragraph 66 of the Amended Complaint, it is admitted that there is an actual controversy between the parties for which declaratory relief pursuant to 10 Del. C. § 6501 is

20

appropriate, including whether ~~ALF's "truth" campaign has violated those restrictions on ALF's activities~~certain of ALF's conduct and activities violate, and have violated, the limitations on ALF's conduct and activity and on its use of MSA monies set forth in the MSA and in ALF's Bylaws. By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003.

67.  ~~With respect to the allegation contained in paragraph 67 of the Complaint, such allegation states a legal conclusion to which no response is required by Lorillard.~~Denied.

### SECOND DEFENSE

With respect to Claims I, II, and III of ALF's Amended Complaint, ALF fails to state a claim upon which relief can be granted. By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003.

### THIRD DEFENSE

With respect to Claims I, II, and III of ALF's Amended Complaint, ALF's claims against Lorillard are barred by the doctrine of estoppel. By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003.

### FOURTH DEFENSE

With respect to Claims I, II, and III of ALF's Amended Complaint, ALF seeks equitable relief, but has acted inequitably and with unclean hands and, accordingly, ALF's unclean hands bar it from recovering the relief it seeks in this action. By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003.

### FIFTH DEFENSE

21

With respect to Claims I, II, and III of ALF's Amended Complaint, ALF's claims against Lorillard are barred by the doctrine of waiver. By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003.

## SIXTH DEFENSE

With respect to Claim IV of ALF's Amended Complaint, the implied covenant of good faith and fair dealing in the MSA prevents ALF from using any of the funds disbursed to ALF under the MSA for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively, and especially the tobacco industry, any tobacco company, or any tobacco company personnel.

## SEVENTH DEFENSE

With respect to Claim IV of ALF's Amended Complaint, the implied covenant of good faith and fair dealing in the MSA prevents ALF from taking any action to avoid its obligation to refrain from using any of the funds disbursed to ALF under the MSA for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively, and especially the tobacco industry, any tobacco company, or any tobacco company personnel.

## EIGHTH DEFENSE and COUNTERCLAIMS

Lorillard, complaining of ALF by way of counterclaims filed pursuant to Rule 13 of the Delaware Chancery Court Rules, alleges as follows:

## SUMMARY OF CLAIMS

1.    In   1998,   defendant-counterclaimant   Lorillard   Tobacco   Company ("Lorillard") signed a Master Settlement Agreement ("MSA") with other tobacco companies and forty-six states. In the MSA, Lorillard and the other tobacco company signatories agreed, among

22

other things, to assist in funding a non-profit entity that would ~~create~~operate a public education and ~~advertisement~~advertising program concerning the health effects of tobacco use.

2.    To date, plaintiff-counterdefendant American Legacy Foundation ("ALF") has purported to qualify and be eligible to receive such funding as the non-profit entity described in the MSA.  ALF has ~~instituted an~~in fact operated a public education and advertising ~~campaign that is paid for, entirely or primarily, by~~program, defined as the "National Public Education Fund" ("NPEF") ~~described in~~ and ~~created by the MSA.  The MSA requires Lorillard and other tobacco companies to fund the NPEF, in exchange for numerous promises made~~ the MSA, that is paid for by the ~~other parties~~funding ALF has received pursuant to the MSA.

3.    ~~Because it administers and operates the NPEF and because it has accepted and benefitted from disbursement of funds under the MSA,~~ ALF's public education and advertising ~~activities are~~program is specifically authorized and circumscribed by the MSA as follows:

> The National Public Education Fund shall be used only for public education and advertising regarding the addictiveness, health effects, and social costs related to the use of tobacco products and shall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively.  The Foundation shall work to ensure that its activities are carried out in a culturally and linguistically appropriate manner.

MSA, § VI(h).  As the Court held in the Opinion of the Court dated January 31, 2003, Section VI(h), together with the other provisions of the MSA relating to ALF, are binding upon ALF and may be enforced by Lorillard.

4.    ~~However~~Notwithstanding these important restrictions on its conduct and activities, since its creation ALF has ~~used the NPEF to publish or~~published and broadcast a number of advertisements that do not address the "addictiveness, health effects, or social costs" of tobacco use.  In addition, many of ALF's advertisements have included personal attacks on ~~companies~~

23

and ~~individuals~~, and ~~the~~ vilification of Lorillard, its employees, and tobacco companies collectively. Such advertisements and attacks constitute breaches of the MSA by ALF. ~~Examples of~~ ALF's radio and television advertisements that violate the MSA are ~~attached as Exhibits A and B, respectively~~listed in Exhibit A.

5.    In addition to its improper advertisements, ALF has engaged in personal attacks ~~upon~~on Lorillard's employees by sending (and/or assisting others in sending) numerous unsolicited and harassing e-mails. Examples of such e-mails are attached as Exhibit ~~C~~B hereto. Such e-mails frequently ~~contain~~contained vulgar, threatening, and obscene language, and such e-mails evidence the malice that ALF bears toward Lorillard. ~~Upon information and belief, these e-mails were paid for, entirely or primarily, by the NPEF, and thus they~~These e-mails constitute breaches of the MSA by ALF.

~~6.    In addition to improper use of the NPEF, upon information and belief ALF has improperly used other payments made by Lorillard and the other tobacco companies under the MSA for ALF's benefit.~~

~~7.    Lorillard attempted to resolve its concerns about various advertisements and other activities of ALF through informal discussions with ALF and, ultimately, by sending ALF a notice letter informing ALF of Lorillard's intent to pursue enforcement under the MSA, a notice letter required by the MSA. ALF initially responded to Lorillard's notice letter by immediately calling a press conference and making misrepresentations to the public and the media. A copy of the statement issued by ALF's President is attached as Exhibit D. Among other things, ALF stated that Lorillard "is trying to stop the truth campaign" and that Lorillard's efforts to resolve this matter were a "smokescreen to hide Lorillard's real goal, which is to crush the truth~~

~~campaign because it is working to stop kids from smoking." Such false statements are consistent with ALF's pattern of attacks upon, and vilification of, Lorillard.~~

~~8. Lorillard does not seek to destroy ALF or to prevent ALF from pursuing its mission as set forth in the MSA. Lorillard, in fact, supports the goals of the advertising campaign described in the MSA. Unfortunately, ALF has misused the funds that have been entrusted to it by broadcasting and publishing advertisements that are not authorized by the MSA and by creating and facilitating through its website vitriolic, hateful, and vulgar personal attacks upon Lorillard's employees.~~

6. Moreover, after certain tobacco companies, certain attorneys general, television networks, and others expressed the view to ALF that some of ALF's initial advertisements violated the MSA, ALF and its attorneys pursued a scheme designed to evade the restrictions placed on ALF's conduct and activities by Section VI of the MSA. ALF adopted a practice under which any advertisement or activity deemed by its attorneys to present at least a moderate risk of violating the MSA was designated by ALF to be funded by monies received by ALF pursuant to Section VI(b) of the MSA (the "Base Foundation Payments"), monies ALF wrongly believes may be spent on personal attacks and vilification. Notwithstanding ALF's efforts, it cannot avoid the limitations placed on its conduct and activities as a factual or legal matter and, further, the scheme implemented by ALF itself constitutes a breach of the MSA by ALF, including without limitation a breach of the implied covenant of good faith and fair dealing.

~~9.~~ 7. By these counterclaims, Lorillard is seeking, among other relief, a determination that ALF, by engaging in the conduct alleged herein, has repeatedly and materially breached the MSA and an order requiring ALF to comply with its obligations under the MSA.

**PARTIES**

25

~~10.~~8. Lorillard is a corporation organized and existing under the laws of the State of Delaware and has its principal office and place of business in Greensboro, North Carolina.

~~11.~~9. ALF is a non-profit corporation organized and existing under the laws of the State of Delaware and has its principal office and place of business in Washington, D.C.

## EXECUTION OF THE MASTER SETTLEMENT AGREEMENT ~~AND THE CREATION OF ALF~~

~~12.~~10. As a result of litigation pending in multiple fora, ~~the~~ four ~~major~~ tobacco companies, ~~Plaintiff~~ Lorillard, Philip Morris Incorporated ("Philip Morris"), Brown & Williamson Tobacco Corporation ("B&W"), and R.J. Reynolds Tobacco Company ("RJR"), on the one hand, and some forty-six states, including Delaware, participated in negotiations designed to reach a resolution of the parties' disputes. The various attorneys general of these states negotiated on the states' behalf.

~~13.~~11. The parties successfully reached a settlement, and they memorialized the terms in a landmark agreement known as the ~~Master Settlement Agreement ("MSA")~~ MSA. The document was executed in November 1998 by the four tobacco companies, including Lorillard, and the attorneys general of the forty-six states signatories. The state signatories to the MSA hereinafter shall be referred to collectively as the "Settling States," and the ~~four~~ tobacco company signatories hereinafter shall be referred to collectively as the "Participating Manufacturers."

~~14.~~12. The MSA imposes significant obligations upon the Participating Manufacturers. Among other things, the Participating Manufacturers agreed to fund a non-profit entity charged with the mission of educating the public as to the nature and effect of tobacco products and their use.

26

15.13.    Section VI of the MSA carefully describes this non-profit entity's mission, and it lists the entity's permissible functions. This section also describes in a general manner the structure of the organization and the composition of its Boardboard of Directorsdirectors, as well as certain other organizational requirements the entity must meet once formed.

16.14.    Section VI of the MSA also sets forth in detail the funding obligations imposed upon the Participating Manufacturers with respect to this non-profit entity. BeginningPursuant to Section VI(b), beginning on March 31, 1999, and extending for a period of nine years thereafter, the Participating Manufacturers have agreed to pay collectively $25,000,000 per year to fund the non-profit entity. These payments are known as base foundation payments. These base foundation Base Foundation Payments are disbursed under the MSA and Escrow Agreement to the non-profit entity described in Section VI.

15.    To date, Lorillard has made each of the Base Foundation Payments called for by the MSA, as have the other Participating Manufacturers. Lorillard's proportionate share of the Base Foundation Payments made to date exceeds $10,000,000.

16.    Pursuant to Section VI(c), the Participating Manufacturers agreed to make five substantial payments to fund and for the benefit of the National Public Education Fund ("NPEF"), the public education and advertising program administered by the non-profit entity. The MSA called for these payments to be made on the following dates and in the following amounts: $250,000,000 paid collectively by the Participating Manufacturers on March 31, 1999, and $300,000,000 paid collectively each of the next four years thereafter. These payments are known as "National Public Education Fund Payments" or "NPEF Payments." The NPEF Payments are disbursed under the MSA and Escrow Agreement to the non-profit entity described in Section VI.

17.    ~~Section VI also creates the National Public Education Fund ("NPEF"), and the NPEF is to be used by the non-profit entity to fund its public education and advertising program. The Participating Manufacturers have agreed to pay collectively $250,000,000 on March 31, 1999, and $300,000,000 each of the next four years thereafter, for the benefit of the NPEF (and thus also for the benefit of the non-profit entity and its public education and advertising program). These payments are known as NPEF payments. Pursuant to Section IX(e), the Participating Manufacturers have agreed to continue making annual $300,000,000 NPEF payments unless and until their market share falls below 99.05%. These NPEF payments are disbursed under the MSA and Escrow Agreement to the non-profit entity.~~

17.    To date, Lorillard has made each of the NPEF Payments called for by the MSA, as have the other Participating Manufacturers.  Lorillard's proportionate share of the NPEF Payments made to date exceeds $100,000,000.

18.    ~~Pursuant to and in accordance with the MSA, Lorillard has made base foundation payments in excess of $10,000,000 since 1999, and it has made NPEF payments in excess of $107,000,000 since 1999.~~19.    ~~Sections VI and IX(e) limit~~Section VI limits in significant ways the manner in which the ~~NPEF payments made pursuant to Section VI and IX(e) may be used. These limitations on the use of the NPEF payments are found in limitations directed at the non-profit entity's use of the NPEF. Specifically,~~non-profit entity may use the monies it receives under the MSA. One critical limitation is contained in Section VI(h), ~~which~~ provides that:

> The National Public Education Fund shall be used only for public education and advertising regarding the addictiveness, health effects, and social costs related to the use of tobacco products and shall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively.

28

Master Settlement Agreement, § VI(h). Lorillard and, upon information and belief, the other Participating Manufacturers would not have agreed to make the Base Foundation Payments or the NPEF Payments, would not have agreed to the formation and funding of the non-profit entity under the MSA and to its operation of the NPEF, and would not have executed the MSA itself had the MSA permitted Lorillard's and the Participating Manufacturers' payments to be used for personal attacks on, or vilification of, tobacco companies or their employees, individually or collectively.

19. Pursuant to Section VI(c)(4) of the MSA, the NPEF may be funded only by NPEF Payments and by contributions made to the non-profit entity and specifically designated for the NPEF. Thus, when spent as part of the public education and advertising program called for by the MSA, NPEF Payments may not be used to personally attack or vilify. Lorillard contends that Base Foundation Payments may not be used at all to fund the public education and advertising program. To the extent that Base Foundation Payments are nevertheless able to be used for advertising, however, Section VI(h) and the implied covenant of good faith and fair dealing still require that the advertising concern the addictiveness, health effects, and social costs of the use of tobacco product and not constitute personal attacks or vilification.

20. ~~Thus, under~~ Section VI of the MSA~~, there are~~ therefore imposes significant ~~promises and contractual~~ obligations on the non-profit entity that are owed to the Participating Manufacturers, including Lorillard, ~~concerning the NPEF, namely that it~~ with respect to the NPEF administered and operated by the non-profit entity and the MSA monies disbursed to the non-profit entity, namely that (1) the NPEF will be administered and operated by ~~and disbursed to~~ a non-profit entity qualified and eligible to do so ~~and~~; (2) Base Foundation Payments and NPEF Payments will be disbursed to a non-profit entity qualified and eligible to receive such

29

disbursements; and (2)3) the NPEF, and any MSA monies used to fund it, will in fact be used by this non-profit entity in a manner consistent with SectionsSection VI and IX(e)any other pertinent provisions of the MSA. These promises and contractual obligations wereare consistent with the promises and contractual obligations owed to Lorillard and the Participating Manufacturers concerning the mission and permissible functions of the non-profit entity.

21.    These promises and contractual obligations concerning the NPEF, itsthe Base Foundation Payments and NPEF Payments, the permissible uses of, and restrictions upon, the NPEF, Base Foundation Payments, and NPEF Payments, and the Section VI non-profit entity constitutedgenerally each constitute material terms of the MSA. Had theythese terms not been present in the MSA, Lorillard and, upon information and belief, the other Participating Manufacturers would not have agreed to make the Base Foundation Payments or the NPEF paymentsPayments, would not have agreed to the formation and funding of the non-profit entity under the MSA and to its useoperation of the NPEF, and would not have executed the MSA itself.

22.    Pursuant to the MSA, on or about March 3, 1999, the National Association of Attorneys General ("NAAG") incorporated a non-profit entity in the State of Delaware. The original name of the entity—the plaintiff and counter-defendant in this action—was the "MSA National Foundation," a name that was changed to "American Legacy Foundation" ("ALF") on or about August 2, 1999.

23.    The MSA requires that the non-profit entity described in Section VI incorporate into its organizational documents those terms of the MSA relating to the entity. Consistent with this requirement, the entity's permissible functions as listed in Section VI(f) of the MSA are contained in ALF's Certificate of Incorporation. The MSA's requirements concerning the

composition of the entity's board of directors are contained in the Bylaws adopted by ALF's initial board of directors. Section 5.7 of ALF's Bylaws meets the affiliation requirement set forth in Section VI(e) of the MSA, and this provision expressly provides that ALF is bound by and subject to the terms of the MSA. The ~~limitations on the use of the NPEF~~restrictions contained in Section VI(h) of the MSA are set forth in Section 12.2 of ALF's Bylaws, as are the rules set forth in Section VI(g) of the MSA regarding grants made by the non-profit entity from the NPEF. Finally, Article XIII of ALF's Bylaws provides that neither its Bylaws nor its Certificate of Incorporation may be amended so as to create an inconsistency with any provision of the MSA concerning the non-profit entity described in Section VI of the MSA. The entire MSA is attached to ALF's Bylaws as an exhibit.

24.    Upon information and belief, ALF adopted these Bylaws in an attempt to qualify under Section VI of the MSA to administer and operate the NPEF and in an attempt to become eligible to receive disbursements under Sections VI(b), VI(c), and IX(e) of the MSA and under the Escrow Agreement. Upon information and belief, ALF adopted these Bylaws for the benefit of the Participating Manufacturers, including Lorillard.

25.    Upon information and belief, after ALF was incorporated and adopted its Bylaws, the Settling States and NAAG considered ALF to be qualified under Section VI of the MSA to administer and operate the NPEF and to be eligible receive disbursements under Sections VI(b), VI(c), and IX(e) of the MSA, and they considered ALF to be the non-profit entity described in Section VI. Upon information and belief, after ALF was incorporated and adopted its Bylaws, the Setting States and NAAG allowed ALF to administer and operate the NPEF, and they allowed ALF to receive disbursements under ~~Section~~Sections VI(b) and VI(c) of the MSA and under the Escrow Agreement. ~~Upon information and belief, the Settling States and NAAG took~~

31

~~such actions in exchange for ALF's promise and agreement to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA.~~

26.     ~~Upon information and belief, ALF has received and continues to receive as disbursements all of the base foundation and NPEF payments~~The Escrow Agent has disbursed to ALF each of the Base Foundation Payments made by Lorillard and the ~~other~~ Participating Manufacturers to date.  ~~Upon information and belief, ALF has administered and operated and continues to administer and operate the NPEF to date~~As of July 21, 2004, ALF has received $150,039,584 in Base Foundation Payments, and ALF continues to receive Base Foundation Payments.

27.     The Escrow Agent has disbursed to ALF each of the NPEF Payments made by Lorillard and the Participating Manufacturers to date.  As of July 21, 2004, ALF has received $1,346,029,840 in NPEF Payments, and no additional NPEF Payments are due under the MSA. No payments have been disbursed to ALF pursuant to Section IX(e) of the MSA.

28.     Other than the approximately $50,000,000 in funds ALF has received pursuant to the Smokeless Tobacco Master Settlement Agreement, which contains restrictions identical to those contained in Section VI(h) of the MSA, ALF has no significant assets or sources of revenue other than the Base Foundation Payments and NPEF Payments it has received and the income it has earned on portions of NPEF Payments that have been invested.

29.     ALF has purported to administer and operate the NPEF to date, and ALF continues to do so.

30. By administering and operating the NPEF, and by accepting disbursements of Base Foundation Payments and NPEF Payments under the MSA, ALF has reaped significant, intended benefits under the MSA, and it has done so with knowledge of the terms of the MSA.

## ~~ALF'S MISUSE OF THE NATIONAL PUBLIC EDUCATION FUND~~ALF'S VIOLATIONS OF THE MSA

### A. ALF Publishes and Broadcasts Advertisements that Constitute Personal Attacks and/or Vilification in Violation of Section VI(h) of the MSA

~~27.~~ ~~Once formed, ALF launched an advertising campaign that it labels "the~~ 31. Once formed, in early 2000 ALF launched the public education and advertising program called for by the MSA. This program is comprised of several distinct advertising campaigns, including ALF's primary and most prominent advertising campaign, known as "truth." The "truth" campaign includes an ~~Internet web site~~internet website maintained by ALF called "THETRUTH.com."

~~28.~~ ~~Upon information and belief,~~ 32. ALF's "truth" advertising campaign ~~called "the truth"~~ including its ~~Internet web site~~internet website called "THETRUTH.com"—is funded~~, entirely or primarily,~~ by ~~the~~ NPEF Payments and Base Foundation Payments.

~~29.~~ ~~Some of~~33. Lorillard does not object to those ALF's advertisements ~~are appropriate and~~that are authorized by and consistent with the MSA. ~~Examples of such~~Exhibit A lists radio and television advertisements~~.~~ for which Lorillard ~~does not challenge, are attached at Exhibits E and F. Such~~has no objection. These advertisements properly address "the addictiveness, health effects, and social costs related to the use of tobacco products~~,~~" and do not personally attack or vilify any person or group.

~~30.~~ 34. Unfortunately, shortly after its creation ALF began to run other advertisements—on television, on radio, in print publications, and on the ~~Internet—that do not comply with the MSA and that upon information and belief are funded, entirely or primarily, by~~

the NPEF. Such~~internet~~ ~~that are not authorized by or consistent with the MSA. These~~ ~~advertisements do not address "the addictiveness, health effects, and social costs related to the~~ ~~use of tobacco products" and/or constitute personal attacks on, or vilification of, Lorillard, its~~ ~~employees, or tobacco companies collectively. As a result, such~~ advertisements, and the activities related to such advertisements, represent ~~a misuse of the NPEF and a breach of the~~ ~~MSA by ALF and/or a breach by ALF of the agreement by ALF to abide by the MSA and its~~ ~~restrictions concerning the NPEF, its permissible uses, and the non-profit entity described in~~ ~~Section VI of the MSA.~~misuse of the NPEF, misuse of NPEF Payments and Base Foundation Payments, and breaches of the MSA by ALF.

~~31.~~ ~~ALF's improper advertisements do not address "the addictiveness, health effects,~~ ~~and social costs related to the use of tobacco products," as required by the MSA, and/or they~~ ~~constitute personal attacks and vilification, which is prohibited by the MSA.~~ ~~35.~~ On multiple occasions, in publications or broadcasts reaching millions of members of the public, ALF has personally attacked and vilified Lorillard, its employees, and tobacco companies collectively. For example, ALF has broadcast advertisements that:

    a.    attack tobacco companies collectively, as well as employees of such companies;

    b.    state or strongly imply that Lorillard and other tobacco companies deliberately target their sales efforts at minors; (for example, in a press release on THETRUTH.com, ALF stated "Lorillard has successfully marketed its addictive product to minority youth");

    c.    accuse tobacco companies of shredding documents, thereby implying the intentional and improper destruction of evidence;

    d.    accuse tobacco companies of lying to the public, including one advertisement in which an employee of a tobacco company is asked to take a lie-detector test;

34

e.   end with a statement that ALF is attempting to "expose the tobacco industry's deceptions to the light of day"; and

f.   strongly imply that Lorillard adds dog urine to its cigarettes ("the Dog Urine AdWalker").

~~32.~~36.   Examples of ALF's improper advertisements are ~~attached as Exhibits A and B~~listed in Exhibit A.  All such advertisements (whether they fail to address "the addictiveness, health effects, and social costs related to the use of tobacco products" or constitute personal attacks and/or vilification) represent misuse of the NPEF ~~and thereby constitute a breach of the MSA by ALF and/or a breach by ALF of the agreement by ALF to abide by the MSA and its restrictions concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA~~, misuse of NPEF Payments and Base Foundation Payments, and breaches of the MSA by ALF.

37.   ALF purposefully and intentionally developed, produced, and disseminated advertisements that violated the MSA because ALF and its advertising contractors set out to convey what ALF describes as an "industry manipulation" theme with its public education and advertising program.  In order to convey this theme, ALF and its advertising contractors tested advertisements with focus groups that demonstrated that persons viewed tobacco companies and their employees less favorably after being exposed to ALF's advertising.  In particular, the reports from these focus groups informed ALF before its advertisements were published or broadcast that many of those advertisements caused viewers to see tobacco companies and their employees as, among other things, evil, greedy, deceitful, dishonest, and manipulative.  Such advertisements amount to personal attacks on, and/or vilification of, Lorillard, its employees, and tobacco companies collectively and thus violate the MSA.

35

**B.    ALF Attempts to Evade Section VI(h)'s Restrictions by Manipulating Its Finances**

38.    Among the first of the advertisements ALF developed violate Section VI(h) of the MSA.  These advertisements, including advertisements known as "Body Bags," "Lie Detector," "Hypnosis," and "Shredder", (the "Youth Voice Ads"), were developed for broadcast in early 2000.  When ALF attempted to have these advertisements approved for production by television networks, several networks expressed concern to ALF that these advertisements violated the MSA.   In addition, when tobacco companies learned of these advertisements, they too complained that the advertisements constituted personal attacks and/or vilification.   Finally, members of ALF's own board of directors and certain attorneys general expressed similar concerns to ALF.  In fact, as the Youth Voice Ads were being finalized for production, ALF's own attorneys warned that the messages they expressed presented moderate or high risk of violating Section VI(h) of the MSA.   Notwithstanding the concern expressed from multiple parties as to the propriety of the Youth Voice Ads under the MSA, ALF ultimately broadcast each of these advertisements, either on television or on the internet.

39.    In the wake of the controversy surrounding the Youth Voice Ads, ALF and its attorneys developed a strategy in an attempt to avoid the Section VI(h) restrictions.  Adopting the mistaken view that Base Foundation Payments can be used to pay for advertising and that Base Foundation Payments may be used to personally attack and vilify Lorillard, its employees, and tobacco companies collectively, ALF began in March 2000 designating what ALF describes as "base fund activities" as being paid for by Base Foundation Payments.   Such "base fund activities" included ALF's THETRUTH.com website and any advertisement deemed by ALF's attorneys as exposing ALF to a moderate to high risk of liability for breaching the MSA.  ALF also began allocating certain indirect expenses associated with its public education and

36

advertising program between NPEF Payments and Base Foundation Payments, including the fees paid to advertising contractors, general and administrative expenses, and salaries. This scheme and related actions violate the covenant of good faith and fair dealing in the MSA.

40. Notwithstanding the scheme it devised, ALF has not funded its "base fund activities" exclusively with Base Foundation Payments. This follows for a number of reasons, including without limitation (a) the relationship between ALF and its contractors (b) the fact that ALF commingles NPEF Payments and Base Foundation Payments; (c) the presence of indirect costs associated with ALF's public education and advertising program, some of which are difficult, if not impossible, to allocate accurately between "base fund activities" and non-"base fund activities"; (d) the fact that each discrete "base fund activity" described by ALF cannot be isolated or separated from a larger advertising campaign, and each of ALF's advertising campaigns are funded in part by NPEF Payments; and (e) ALF has simply failed as a factual matter to adhere to its purported distinction between "base fund activities" and non-"base fund activities." Further, the percentages ALF uses to allocate certain indirect expenses among NPEF Payments and Base Foundation Payments upon information and belief are incorrect and unsupported by any factual basis. For these reasons, all of ALF's purported "base fund activities" and all of ALF's advertisements and related activities have been funded, at least in part, by NPEF Payments.

41. Moreover, ALF's use of Base Foundation Payments to fund advertising and other aspects of ALF's public education and advertising program itself constitutes a breach of Section VI of the MSA. Further, any personal attack or vilification published or broadcast as part of ALF's public education and advertising program violates the MSA specifically and through the covenant of good faith and fair dealing, whether or not ALF contends that such personal

attacks or vilification were paid for by Base Foundation Payments. Finally, upon information and belief ALF has improperly spent NPEF Payments so as to make available additional Base Foundation Payments for advertising, which also constitutes a breach of Section VI of the MSA.

## C.    ALF Facilitates and Assists the Sending of Multiple Harassing E-mails to Lorillard Employees

33.42.    In addition to the malicious attitude toward Lorillard~~and~~, its employees, and tobacco companies collectively displayed in ALF's advertisements, ALF has engaged in a pattern of sending, facilitating, and/or assisting others in sending ~~multiple~~thousands of unsolicited and harassing e-mails to Lorillard. ~~Such~~ALF sent, facilitated, and/or assisted others in the dissemination of the harassing e-mails by including features at its THETRUTH.com website known as "mad libs" or "pissed-off libs" and "talk to them" or "letters to big tobacco." These features allowed visitors to ALF's website to compose original messages or to fill in blanks contained in form messages, and then to send the messages to tobacco company executives, whose e-mail addresses were provided by ALF.

43.    These e-mails, some of which are attached as Exhibit ~~C~~B, frequently contain vulgar, threatening, and obscene language, including the use of such words and phrases as "whores," "fags," "morons," "you monkeys at Lorillard Tobacco Company," "bullshit," "pathetic bitch asses," and "hookers." These multiple unsolicited and harassing e-mails sent to Lorillard interfered with Lorillard's e-mail system and computer network, and they disrupted Lorillard's employees and such employees' use of their computers.

34.44.    In 2001, Lorillard was forced to install a filter on its computers to attempt to block ALF's vulgar e-mails. However, some of the harassing e-mails from THETRUTH.com website ~~continue to be~~were nevertheless received by Lorillard thereafter. ~~In addition, Lorillard~~

~~has received multiple harassing e-mails from third parties. Examples of such additional e-mails~~
~~are found at Exhibit G. Upon information and belief, ALF aided in the creation of these e-mails~~
~~by making form letters and e-mail addresses available to third parties on THETRUTH.com~~
~~website.~~

~~35.~~45.    Such e-mails, and the activities related to such e-mails, were intended by ALF to harass and annoy (and, upon information and belief, intimidate) Lorillard and its employees. Upon information and belief, such e-mails were also intended to interfere with Lorillard's e-mail system and/or computer network and to disrupt Lorillard's employees and such employees' use of their computers.

46.    <u>ALF knew that visitors to ALF's website would send and were sending vulgar, profane, and threatening e-mail messages to tobacco company employees with the "mad libs" or "pissed-off libs" and the "talk to them" or "letters to big tobacco" features of ALF's website, yet ALF continued to maintain those features on its website until after this litigation began. ALF also had knowledge that tobacco companies were attempting to block the receipt of ALF's harassing e-mails, yet ALF continued to maintain those features on its website until after this litigation began and, upon information and belief, sought to evade the tobacco companies' attempts to block such e-mails. Finally, ALF knew that visitors would inundate and were inundating tobacco company employees with thousands of such e-mail messages, yet ALF continued to maintain those features on its website until after this litigation began.</u>

~~36.~~47.    These unsolicited and harassing e-mails, <u>including without limitation the vulgar, threatening, and obscene content of such e-mail messages,</u> constitute personal attacks on and vilification of Lorillard and its employees, which is expressly prohibited by the MSA. ~~Upon information and belief, ALF used the NPEF to pay for such attacks and thus such e-mails~~<u>ALF's</u>

THETRUTH.com website is a component of its public education and advertising program and is funded by NPEF Payments and Base Foundation Payments. Thus, the features of ALF's THETRUTH.com website that facilitated the sending of such e-mails, the e-mail messages themselves and their content, and the activities related to such e-mails, ~~constitute~~all constitute misuse of the NPEF, misuse of NPEF Payments and Base Foundation Payments, and breaches of the MSA by ALF ~~and/or breaches by ALF of the agreement by ALF to abide by the MSA and its restrictions concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA.~~.

~~37.    Such e-mails, and all activities taken by ALF relating to these e-mails, also constitutes a violation of North Carolina's Cyberstalking Act and thus a criminal offense. N.C.G.S. § 14-196.3.~~

## ATTEMPTS BY LORILLARD TO RESOLVE DISPUTE

~~38~~48. After ~~the~~ Dog ~~Urine Ad~~Walker was broadcast, Lorillard contacted ALF and expressed its view that ALF's conduct constituted a material breach of the MSA. Lorillard requested that ALF issue a retraction of the ~~Ad~~advertisement and agree to comply with the MSA. ALF refused to comply with these requests.

~~39.~~49. After these initial informal settlement discussions were unproductive, Lorillard sent ALF a formal thirty-day notice letter, as required by Section VII(c) of the MSA. Lorillard's hope was that the parties would re-kindle their discussions and resolve this matter amicably. Instead, ALF's President, Cheryl Healton, responded by issuing a press ~~statement (Exhibit D) that is rife with misrepresentations. Ms. Healton stated, *inter alia*:~~

> ~~I believe this action is a smokescreen to hide Lorillard's real goal, which is to crush the truth campaign because it is working to stop kids from smoking.~~

> ...

~~The drop-off in youth smoking rates is costing the tobacco industry a great deal of revenue, and that's why Lorillard is desperate to stop the truth campaign. And for those who disagree with me, let me just ask the question: Would Lorillard be trying to stop the truth campaign if it WEREN'T helping to reduce youth smoking and tobacco industry revenues?40. Ms. Healton's press statement continued ALF's campaign of making~~release containing malicious statements about Lorillard ~~to the public~~. Lorillard does not seek, and has never sought, to stop ALF's "truth" advertising campaign. Lorillard's goals are for ALF to stop misusing the funds entrusted to it and for ALF otherwise to comply with its legal, contractual, and ethical obligations.

~~41.    Lorillard has alerted the Settling States and NAAG as to ALF's misuse of MSA funds and to its breaches of the MSA and of its Bylaws and Certificate of Incorporation. However, the Settling States and NAAG have failed to take action to bring ALF's use of the NPEF into compliance with the MSA and with ALF's Bylaws and Certificate of Incorporation and otherwise have failed to halt or cure the on-going breaches of the MSA and ALF's Bylaws and Certificate of Incorporation created and caused by ALF's conduct.~~

## FIRST CLAIM FOR RELIEF
### Breach of Master Settlement Agreement

~~42.~~50.    The allegations of Paragraphs 1 through ~~41~~49 are repeated, realleged, and incorporated herein by reference.

~~43.~~51.    ALF was created under the terms of the MSA.

~~44.~~52.    ALF incorporated the MSA into its Bylaws.

~~45.~~53.    Pursuant to the terms of the MSA, Lorillard has paid tens of millions of dollars for ALF's benefit. ALF has accepted those funds under the terms of the MSA and with full knowledge of the MSA.

~~46.~~54.    The MSA constitutes a pre-incorporation agreement. Specifically:

    a.    the MSA sets forth certain obligations of, and restrictions on, ALF;

    b.    the MSA was signed by the various Settling States (as defined in the MSA) and their respective attorneys general;

41

    c.     the Settling States and NAAG promoted and incorporated ALF;

    d.     ALF has accepted millions of dollars in benefits under the MSA; and

    e.     ALF accepted the benefits with full knowledge of the terms of the MSA.

By its conduct, ALF has adopted and ratified the MSA, and is bound to comply with the terms

thereof. At no time has ALF attempted to repudiate the benefits received by it under the MSA.

47.55.     In addition, ALF has expressly and/or implicitly adopted and assumed the

obligations set forth in the MSA concerning the NPEF, and its permissible uses, the NPEF

Payments and Base Foundation Payments ALF receives and all restrictions on the use of such

monies, and the non-profit entity described in Section VI of the MSA.  This adoption and

assumption is evidenced by the fact that ALF has, its board of directors, and its attorneys have

repeatedly acknowledged, both publicly and internally, that itALF is bound by the terms of the

MSA.  For example, in her press release (Exhibit D), ALF's President stated that "[a]nyone who

has seen truth ads knows that they educate young people about the addictiveness, health effects,

and social costs of tobacco, which is exactly what the Master Settlement Agreement says they

must do."  (Emphasis added.) and that ALF is subject to suit from the Participating

Manufacturers for breaching the terms of the MSA.

48.56.     ALF's Bylaws acknowledge that ALF must comply with the MSA.  For

example, §5.7 provides:

> Affiliation.  The programs of the Foundation may be affiliated with one or more
> educational or medical institutions selected by the Board of Directors from time to
> time as required by the Master Settlement Agreement attached hereto as Exhibit A
> ("Master Settlement Agreement").

Exhibit H (emphasis added.)

~~49.    Other examples of ALF's admissions that it is bound by, and subject to, the MSA are set forth at Exhibit I.~~

~~50.    In addition, ALF has succeeded to various obligations of the Settling States and NAAG, including the provisions relating to the types of advertising allowed under the MSA and to the permissible use of the NPEF.~~

~~51.    In the alternative, an implied agreement has arisen between Lorillard and ALF pursuant to which ALF agreed to abide by the terms of the MSA in exchange for the payments made by Lorillard for the benefit of ALF.~~ 57.    Thus, as the Court held in the Opinion of the Court dated January 31, 2003, Section VI(h), together with the other provisions of the MSA relating to ALF or the monies ALF receives pursuant to the MSA, are binding upon ALF and may be enforced by Lorillard.

~~52.~~58.    As described above, ALF has committed multiple material breaches of the MSA, including but not limited to Sections VI(f) and (h), by engaging in activities and conduct prohibited by the MSA and by misusing the ~~funds~~monies disbursed and entrusted to it. Specifically, ALF ~~has used the NPEF for advertisements that do not address the addictiveness, health consequences, or social costs of the use of tobacco products. In addition, ALF has used the NPEF to engage in personal attacks on and the vilification of Lorillard, its employees, and tobacco companies collectively through the advertisements referenced above. Finally, by its own admission in the Complaint, ALF is using base foundation payments for advertising.~~ breached the MSA in at least the following ways:

~~53.    In addition to the advertisements that violate the MSA, the e-mails described above constitute personal attacks on and vilification of Lorillard and its employees that further violate~~

43

~~the MSA. Upon information and belief, such e-mails were funded, entirely or primarily, by the~~

~~NPEF.~~

      a.     administering and operating a public education and advertising program that includes advertisements and other activities that fail to address "the addictiveness, health effects, and social costs related to the use of tobacco products;"

      b.     administering and operating a public education and advertising program that includes advertisements and other activities that constitute personal attacks on, and/or vilification of, Lorillard, its employees, and tobacco companies collectively;

      c.     using NPEF Payments to develop, produce, and/or disseminate advertisements that fail to address "the addictiveness, health effects, and social costs related to the use of tobacco products," including certain advertisements identified in Exhibit A;

      d.     using NPEF Payments to develop, produce, and/or disseminate advertisements that constitute personal attacks on, and/or vilification of, Lorillard, its employees, and tobacco companies collectively, including certain advertisements identified in Exhibit A;

      e.     using Base Foundation Payments to develop, produce, and/or disseminate advertisements that fail to address "the addictiveness, health effects, and social costs related to the use of tobacco products," including certain advertisements identified in Exhibit A;

      f.     using Base Foundation Payments to develop, produce, and/or disseminate advertisements that constitute personal attacks on, and/or vilification of, Lorillard, its employees, and tobacco companies collectively, including certain advertisements identified in Exhibit A;

      g.     using NPEF Payments to maintain a website that facilitated and assisted the sending of thousands of unsolicited and harassing e-mail messages to Lorillard employees, which

44

e-mails, and the features of ALF's THETRUTH.com website that facilitated the sending of such e-mails, constitute personal attacks on, and/or vilification of, Lorillard and its employees;

      h.    using Base Foundation Payments to maintain a website that facilitated and assisted the sending of thousands of unsolicited and harassing e-mail messages to Lorillard employees, which e-mails, and the features of ALF's THETRUTH.com website that facilitated the sending of such e-mails, constitute personal attacks on, and/or vilification of, Lorillard and its employees;

      i.    using NPEF Payments for matters other than the functions described in Sections VI(f), VI(g), and VI(h) of the MSA; and

      j.    using Base Foundation Payments for advertising.

54.59.    Pursuant to Section VII(c) of the MSA, this Court has the authority to enforce the terms of the MSA. In addition, this Court has the authority to issue a Declaratory Order (as defined in the MSA).

55.60.    Lorillard requests that the Court enter a finding that ALF has repeatedly breached the MSA and enter an order requiring ALF to comply with the MSA.

56.61.    ALF's breaches of the MSA and harassing conduct are likely to recur in the future unless ALF is ordered to cease doing so and to specifically perform its duties and obligations under the MSA, and such breaches and harassing conduct are not compensable by money damages. Accordingly, Lorillard requests preliminary and permanent injunctive relief requiring ALF to cease sending (and assisting others in sending) unsolicited e-mails to Lorillard and/or its employees and to comply with the requirements of the MSA, including the operation of a public education and advertising program that is consistent with Section VI(h) of the MSA and the expenditure of monies disbursed to ALF under the MSA in a manner consistent with Section

45

VI of the MSA, and Lorillard requests an order requiring ALF to specifically perform its duties and obligations under the MSA.

57.62. Lorillard requests as further relief for ALF's breaches of the MSA that the Court enter an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation paymentsPayments and Base Foundation Payments made by the Participating Manufacturers, including Lorillard. In the alternative, Lorillard requests that the Court order an accounting of ALF's use of the NPEF and base foundation paymentsPayments and Base Foundation Payments disbursed to it under Section VI of the MSA and under the Escrow Agreement and, based on the results of such accounting, enter an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation paymentsPayments and Base Foundation Payments made by the Participating Manufacturers, including Lorillard, that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement.

58. In the alternative, Lorillard is entitled to at least nominal damages in the amount of $1.00 for ALF's breaches of MSA.

59.63. To the extent the Court finds ambiguity in any term or terms of the MSA, Lorillard requests a Declaratory Order under Section VII(c)(1) and (c)(5) of the MSA defining ALF's obligations under the MSA and/or construing such ambiguous term or terms.

## SECOND CLAIM FOR RELIEF
### Breach of the Duty and Covenant of Good Faith and Fair Dealing

60.   The allegations of Paragraphs 1 through 59 are repeated, realleged, and incorporated herein by reference.

61.   Implied in the MSA is a duty and covenant of good faith and fair dealing.

62.   By personally attacking and vilifying Lorillard, its employees, and tobacco companies collectively, and by waging a campaign of harassment through e-mails, ALF has breached its duty and covenant of good faith and fair dealing under the MSA.

63.   Lorillard is entitled to nominal damages in the amount of $1.00 for ALF's breaches of the duty and covenant of good faith and fair dealing.

### THIRD CLAIM FOR RELIEF
### Breach of Contract

64.   The allegations of Paragraphs 1 through 63 are repeated, realleged, and incorporated herein by reference.

65.   Upon information and belief, after ALF was incorporated and adopted its Bylaws, the Settling States and NAAG considered ALF to be qualified under Section VI of the MSA to administer and operate the NPEF and to be eligible to receive disbursements under Sections VI and IX(c) of the MSA, and they considered ALF to be the non-profit entity described in Section VI. Upon information and belief, after ALF was incorporated and adopted its Bylaws, the Setting States and NAAG allowed ALF to administer and operate the NPEF, and they allowed ALF to receive disbursements under Section VI of the MSA and under the Escrow Agreement, in exchange for ALF's promise and agreement to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA (the "Agreement").

47

66.    ~~Upon information and belief, Lorillard and the other Participating Manufacturers were intended third-party beneficiaries of ALF's Agreement with the Settling States and/or NAAG to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA. As an intended third-party beneficiary, Lorillard is entitled to enforce such Agreement.~~

67.    ~~As described above, ALF has committed multiple material breaches of the Agreement by misusing the NPEF and other MSA funds entrusted to it. Specifically, ALF has used the NPEF for advertisements that do not address the addictiveness, health consequences, or social costs of the use of tobacco products. In addition, ALF has used the NPEF to engage in personal attacks on and vilification of Lorillard, its employees, and tobacco companies collectively through the advertisements referenced above. Finally, by its own admission in the Complaint, ALF is using base foundation payments for advertising.~~

68.    ~~In addition to the advertisements that violate ALF's Agreement to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA, the unsolicited e-mails described above constitute personal attacks on and vilification of Lorillard and its employees that further violate such Agreement. Upon information and belief, such e-mails were funded, entirely or primarily, by the NPEF.~~

65.    <u>Implied in the MSA is a duty and covenant of good faith and fair dealing.</u>

66.    <u>ALF knew, acknowledged, and admitted that it is bound by and must comply with the terms of the MSA, including without limitation the prohibitions against personal attacks and vilification contained in Section VI(h) of the MSA. Despite the presence of these limitations on ALF's conduct and activities, ALF undertook to avoid those limitations by manipulating its</u>

48

finances. As alleged herein, ALF sought to designate those advertisements and activities that exposed ALF to significant risk of liability under the MSA as being funded exclusively by Base Foundation Payments, which ALF wrongfully views as not being subject to the MSA's prohibition against personal attacks and vilification.

67.    ALF's purposeful and intentional effort to evade Section VI(h)'s restrictions and to develop, produce, and disseminate advertisements and engage in activities that violate those restrictions amounts to a breach of ALF's duty and covenant of good faith and fair dealing under the MSA.

68.    Accordingly, Lorillard requests that the Court enter a finding that ALF has repeatedly breached the MSA, including without limitation the covenant of good faith and fair dealing, and enter an order requiring ALF to comply with the MSA, including without limitation the covenant of good faith and fair dealing.

69.    ALF's breaches of the AgreementMSA and harassing conduct are likely to recur in the future unless ALF is ordered to cease doing so and to specifically perform its duties and obligations under the AgreementMSA (including without limitation the covenant of good faith and fair dealing), and such breaches and harassing conduct are not compensable by money damages. Accordingly, Lorillard requests preliminary and permanent injunctionsinjunctive relief requiring that ALF (a) comply with its Agreement with the Settling States and/or NAAG to abide by the provisions of the MSA relating to the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA and (b) comply with such provisionsALF to cease sending (and assisting others in sending) unsolicited e-mails to Lorillard and/or its employees and to comply with the requirements of the MSA (including without limitation the covenant of good faith and fair dealing), including the operation of a public education and advertising program that

is consistent with Section VI(h) of the MSA and the expenditure of monies disbursed to ALF under the MSA in a manner consistent with Section VI of the MSA, and Lorillard requests an order requiring ALF to specifically perform its duties and obligations under the ~~Agreement~~MSA, including without limitation the covenant of good faith and fair dealing.

70.    Lorillard requests as further relief for ALF's breaches of the ~~Agreement~~MSA (including without limitation the covenant of good faith and fair dealing) that the Court enter an order requiring ALF ~~(a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard and/or (b)~~ to refund and return to the Escrow Agent all NPEF ~~and base foundation payments~~Payments and Base Foundation Payments made by the Participating Manufacturers, including Lorillard. In the alternative, Lorillard requests that the Court order an accounting of ALF's use of the NPEF ~~and base foundation payments~~Payments and Base Foundation Payments disbursed to it under Section VI of the MSA and under the Escrow Agreement and, based on the results of such accounting, enter an order requiring ALF ~~(a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement and/or (b)~~ to refund and return to the Escrow Agent all NPEF ~~and base foundation payments~~Payments and Base Foundation Payments made by the Participating Manufacturers, including Lorillard, that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement.

~~71.    In the alternative, Lorillard is entitled to at least nominal damages in the amount of $1.00 for ALF's breaches of the Agreement.~~

### ~~FOURTH~~THIRD CLAIM FOR RELIEF
### Violation of Bylaws and Certificate of Incorporation

71. The allegations of Paragraphs 1 through 70 are repeated, realleged, and incorporated herein by reference.

72. The allegations of Paragraphs 1 through 71 are repeated, realleged, and incorporated herein by reference.73. Upon information and belief, NAAG incorporated those certain provisions of ALF's Certificate of Incorporation concerning the non-profit entity described in Section VI of the MSA in an attempt to qualify ALF under Section VI of the MSA to administer and operate the NPEF and to allow ALF to become eligible to receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow Agreement. Upon information and belief, NAAG incorporated these provisions into ALF's Certificate of Incorporation for the benefit of the Participating Manufacturers, including Lorillard.

74.73. Upon information and belief, ALF adopted those Bylaws concerning the NPEF, the NPEF's and its permissible uses, the NPEF Payments and Base Foundation Payments ALF receives and all restrictions on the use of such monies, and the non-profit entity described in Section VI of the MSA, as well as those Bylaws otherwise relating to the MSA, in an attempt to qualify under Section VI to administer and operate the NPEF and to become eligible to receive disbursements under Sections VI(b), VI(c), and IX(e) of the MSA and under the Escrow Agreement. Upon information and belief, ALF adopted these Bylaws for the benefit of the Participating Manufacturers, including Lorillard.

75.74. Lorillard enjoys standing to enforce such Bylaws and Certificate of Incorporation provisions because upon information and belief these provisions were intended to confer direct contractual rights upon Lorillard and/or because upon information and belief Lorillard is an intended third-party beneficiary of such provisions

51

76.75.    In the alternative, Lorillard enjoys standing to enforce such Bylaws and Certificate of Incorporation provisions because of the special interest Lorillard has in the enforcement of such provisions and/or because the Attorney General of the State of Delaware has failed to enforce such provisions herself.

77. 76. As described above, ALF has committed multiple material violations of such Bylaws and Certificate of Incorporation provisions by misusing the NPEF and other MSA funds entrusted to it. Specifically, ALF has used the NPEF by misusing the NPEF Payments and the Base Foundation Payments disbursed to it under the MSA. Specifically and without limitation, ALF's public education and advertising program has included, and the NPEF Payments and Base Foundation Payments disbursed to ALF have been used for, advertisements and activities that do not address the addictiveness, health consequences, or social costs of the use of tobacco products. In addition, ALF has used the NPEF to engage in and/or that constitute personal attacks on and, or vilification of, Lorillard, its employees, and tobacco companies collectively through the advertisements referenced above. Finally, by its own admission in the Complaint, ALF is using base foundation payments for advertising. 78.    In addition to the advertisements that violate ALF's Bylaws and Certificate of Incorporation provisions concerning the NPEF, the NPEF's permissible uses, and the non-profit entity described in Section VI of the MSA, as well as those provisions otherwise relating to the MSA, the unsolicited. In addition, the unsolicited and harassing e-mails described above constitute personal attacksattack on, and vilification of, Lorillard and its employees that further violate such provisions. Upon information and belief, such e-mails were funded, entirely or primarily, by the NPEF.and further violate the MSA. Finally, ALF has also used NPEF Payments and Base Foundation Payments in manners prohibited by the MSA.

52

79. 77. ALF's misconduct and misuse of MSA funds disbursed and entrusted to it, which misconduct and misuse violates ALF's Bylaws and Certificate of Incorporation provisions concerning the NPEF, the NPEF's and its permissible uses, the NPEF Payments and Base Foundation Payments ALF receives and all restrictions on the use of such monies, and the non-profit entity described in Section VI of the MSA, as well as those provisions otherwise relating to the MSA, are likely to recur in the future unless ALF is ordered to cease doing so and are not compensable by money damages. Accordingly, Lorillard requests preliminary and permanent injunctive relief requiring ALF to cease its violation of such provisions.

80. 78. Lorillard requests as further relief for ALF's violation of its Bylaws and Certificate of Incorporation that the Court enter an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation paymentsPayments and Base Foundation Payments made by the Participating Manufacturers, including Lorillard. In the alternative, Lorillard requests that the Court order an accounting of ALF's use of the NPEF and base foundation paymentsPayments and Base Foundation Payments disbursed to it under Section VI of the MSA and under the Escrow Agreement and, based on the results of such accounting, enter an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation paymentsPayments and Base Foundation Payments made by the Participating Manufacturers, including Lorillard, that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement.

## ~~FIFTH~~FOURTH CLAIM FOR RELIEF
## Claim for Declaratory Judgment Regarding MSA

~~81.~~

79. The allegations of Paragraphs 1 through ~~80 are repeated, realleged, and incorporated herein by reference.~~ 78 are repeated, realleged, and incorporated herein by reference.

80. Lorillard seeks a declaration that ALF—on account of its conduct, its activities, the content of the NPEF, its use of NPEF Payments and Base Foundation Payments, and otherwise, as alleged herein—does not qualify and is not eligible to administer and operate the NPEF under Sections VI and IX(e) of the MSA and does not qualify and is not eligible to receive disbursements under Sections VI(b), VI(c), and IX(e) of the MSA and under the Escrow Agreement. Lorillard requests that the Court issue a declaration to this effect and also declare that ALF no longer may administer and operate the NPEF under Sections VI and IX(e) of the MSA and no longer may receive disbursements under Sections VI(b), VI(c), and IX(e) of the MSA and under the Escrow Agreement.

81. Lorillard also seeks a declaration that ALF—on account of its conduct, its activities, the content of the NPEF, its use of NPEF Payments and Base Foundation Payments, and otherwise, as alleged herein—has been disqualified and ineligible to administer and operate the NPEF under Section VI of the MSA and has been disqualified and ineligible to receive disbursements under Section VI(b), VI(c), and IX(e) of the MSA and under the Escrow Agreement. Lorillard requests that the Court issue a declaration to this effect and also declare that ALF must refund and return to the Escrow Agent all NPEF Payments and Base Foundation Payments disbursed to ALF while ALF was disqualified and ineligible to administer and operate the NPEF and/or disqualified and ineligible to receive such disbursements.

54

82. ~~Lorillard seeks a declaration that ALF—on account of its conduct, its activities, its use of the NPEF, and otherwise, as alleged herein—does not qualify and is not eligible to administer and operate the NPEF under Sections VI and IX(e) of the MSA and does not qualify and is not eligible to receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow Agreement. Lorillard requests that the Court issue a declaration to this effect and also declare that ALF no longer may administer and operate the NPEF under Sections VI and IX(e) of the MSA and no longer may receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow Agreement.~~

~~83.~~ ~~Lorillard also seeks a declaration that ALF—on account of its conduct, its activities, its use of the NPEF, and otherwise, as alleged herein—has been disqualified and ineligible to administer and operate the NPEF under Section VI of the MSA and has been disqualified and ineligible to receive disbursements under Section VI of the MSA and under the Escrow Agreement. Lorillard requests that the Court issue a declaration to this effect and also declare that ALF must refund and return to the Escrow Agent all NPEF and base foundation payments disbursed to ALF (or to Lorillard all NPEF and base foundation payments made by Lorillard and disbursed to ALF) while ALF was disqualified and ineligible to administer and operate the NPEF and/or disqualified and ineligible to receive such disbursements.~~84.    ALF has demonstrated through its conduct, its activities, <u>the content of the NPEF,</u> its use of ~~the~~ NPEF<u>_ Payments and Base Foundation Payments,</u> and otherwise, as alleged herein, that it does not meet (and has not met) the definition of the non-profit entity described in Sections VI and IX(e) of the MSA and that it does not qualify and is not eligible (and has been disqualified and ineligible) to administer and operate the NPEF under Sections VI and IX(e) of the MSA or to receive disbursements under Sections VI<u>(b), VI(c),</u> and IX(e) of the MSA and under the Escrow

Agreement.   However, ALF has suggested that it does qualify and is eligible (and has been qualified and eligible) to administer and operate the NPEF under Sections VI and IX(e) of the MSA and to receive disbursements under Sections VI(b), VII(c), and IX(e) of the MSA and under the Escrow Agreement.   Thus, this claim presents an actual controversy, for which declaratory relief is appropriate under 10 Del. C. § 6501 and Section VII(c) of the MSA.

**~~SIXTH~~FIFTH CLAIM FOR RELIEF**
~~Alternative Claim for Declaratory Judgment Regarding MSA~~

~~85.   The allegations of Paragraphs 1 through 84 are repeated, realleged, and incorporated herein by reference.~~

~~86.   In the event that this Court denies the relief sought by Lorillard in Claims I-V, Lorillard seeks an alternative declaration that the Settling States - including Delaware - and/or NAAG (1) may pursue enforcement of the restrictions and provisions in the MSA concerning the NPEF, the base foundation payments, the NPEF's permissible uses, and the non-profit entity described in Section VI of the MSA; (2) may pursue enforcement of ALF's Bylaws and Certificate of Incorporation provisions concerning the NPEF, the base foundation payments, the NPEF's permissible uses, and the non-profit entity described in Section VI of the MSA; and/or (3) may pursue enforcement of ALF's promise and agreement to the Settling States and/or NAAG to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, the base foundation payments, and the non-profit entity described in Section VI of the MSA.~~

~~87.   The Settling States - including Delaware - and NAAG have failed to take any action to bring ALF's use of the NPEF into compliance with the MSA and with ALF's Bylaws and Certificate of Incorporation and otherwise have failed to halt or cure the on-going breaches~~

of the MSA, ALF's Bylaws and Certificate of Incorporation, and ALF's promise to abide by certain provisions of the MSA. In the event that the Court denies the relief sought by Lorillard in Claims I-V above, Lorillard will be left to look to the Settling States and/or NAAG to enforce these obligations binding upon ALF. However, ALF has suggested that the Settling States—including Delaware—and/or NAAG lack authority to enforce such obligations. Thus, in the event that the Court denies the relief sought by Lorillard in Claims I-V above, this claim presents an actual controversy, for which declaratory relief is appropriate under 10 Del. C. § 6501 and Section VII(c) of the MSA.

### SEVENTH CLAIM FOR RELIEF
### Trespass to Chattel

88.83.      The allegations of Paragraphs 1 through 8782 are repeated, realleged, and incorporated herein by reference.

89.84.      As described above, ALF intentionally intermeddled with Lorillard's e-mail system and computer network by sending, facilitating, and/or assisting others in sending, multiplethousands of unsolicited and harassing e-mails to Lorillard and Lorillard's employees. These unsolicited and harassing e-mails interfered with Lorillard's e-mail system and computer network, and they disrupted Lorillard's employees and such employees' use of their computers.

90.      Lorillard was forced to install a filter on its computers to attempt to block such e-mails. However, some of the unsolicited and harassing e-mails from THETRUTH.com website continued to be received by Lorillard. In addition, Lorillard received multiple unsolicited and harassing e-mails from third parties. Upon information and belief, ALF has assisted and is assisting these third parties in sending such e-mails.

57

85.    ALF sent, facilitated, and/or assisted others in the sending of the harassing e-mails by including features at its THETRUTH.com website known as "mad libs" or "pissed off libs" and "talk to them" or "talk to big tobacco."

91.86.    ALF's conduct relating to the sending of such unsolicited and harassing e-mails to Lorillard and Lorillard's employees as alleged herein amounts to a trespass to Lorillard's chattel, that is, a trespass to Lorillard's e-mail system and computer network.

92.87.    As a result of ALF's trespass, Lorillard is entitled to recover from ALF Lorillard's direct and special damages, including the cost of installing the e-mail filter.

93.88.    ALF's trespass is likely to recur in the future unless ALF is ordered to cease doing so. Accordingly, Lorillard requests preliminary and permanent injunctive relief requiring ALF to cease sending, facilitating, and/or assisting others in sending unsolicited e-mails to Lorillard and/or Lorillard's employees.

WHEREFORE Defendant-Counterclaimant Lorillard prays that the Court:

1.    Enter judgment in favor of Lorillard and against ALF on ALF's claims against Lorillard and dismiss ALF's complaint against Lorillard in its entirety with prejudice;

2.    Enter judgment in favor of Lorillard and against ALF on Lorillard's claims I-V and VII of Lorillard's Counterclaims and grant Lorillard the relief requested in its Counterclaims;

3.    Grant Lorillard at least $1.00 in nominal damages on claims I, II, and III;4. Grant Lorillard its direct and special damages, including the cost of installing the e-mail filter, on claim VII.V;

5. 4. Issue a declaration that (1) ALF does not qualify and is not eligible to administer and operate the NPEF under Sections VI and IX(e) of the MSA and does not qualify and is not eligible to receive disbursements under Sections VI(b), VI(c), and IX(e) of the MSA and under

58

the Escrow Agreement; (2) ALF no longer may administer and operate the NPEF under Sections

VI and IX(e) of the MSA and no longer may receive disbursements under Sections VI(b), VI(c),

and IX(e) of the MSA and under the Escrow Agreement; (3) ALF has been disqualified and

ineligible to administer and operate the NPEF under Section VI of the MSA and has been

disqualified and ineligible to receive disbursements under Section VI(b), VI(c), of the MSA and

under the Escrow Agreement; and (4) ALF must refund and return to the Escrow Agent all NPEF

and base foundation paymentsPayments and Base Foundation Payments disbursed to ALF (or to

Lorillard all NPEF and base foundation payments made by Lorillard and disbursed to ALF) while

ALF was disqualified and ineligible to administer and operate the NPEF and/or to receive such

disbursements.;

    5.    Enter a finding that ALF has repeatedly breached the MSA and enter an order

requiring ALF to comply with the MSA, including without limitation the requirements that ALF

operate a public education and advertising program that is consistent with Section VI(h) of the

MSA and that ALF expend monies disbursed to ALF under the MSA in a manner consistent with

Section VI of the MSA;

    6.    Enter a finding that ALF has repeatedly breached the MSA and enter an order

requiring ALF to comply with the MSA;6. Enter preliminary and permanent injunctions

requiring that ALF comply with its obligations under the MSA, including the content of the

NPEF, the proper use of NPEF Payments and Base Foundation Payments, and the prohibitions

against personal attacks and vilification, and enter an order requiring ALF to specifically perform

its duties and obligations under the MSA, including without limitation the requirements that ALF

operate a public education and advertising program that is consistent with Section VI(h) of the

59

MSA and that ALF expend monies disbursed to ALF under the MSA in a manner consistent with Section VI of the MSA;

7.    ~~Enter preliminary and permanent injunctions requiring that ALF comply with its obligations under the MSA, including the proper use of the NPEF and the prohibitions against personal attacks and vilification, and enter an order requiring ALF to specifically perform its duties and obligations under the MSA;8.~~ Enter preliminary and permanent injunctions requiring that ALF comply with its Certificate of Incorporation and Bylaws;

~~9.    Enter preliminary and permanent injunctions requiring that ALF (a) comply with its Agreement with the Settling States, including Delaware, and/or NAAG to abide by the provisions of the MSA relating to the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA and (b) comply with such provisions, and enter an order requiring ALF to specifically perform its duties and obligations under the Agreement;~~

~~10.8.~~ Enter preliminary and permanent injunctions prohibiting ALF from sending, facilitating, and/or assisting others in sending unsolicited e-mails to Lorillard;

~~11.9.~~ Enter preliminary and permanent injunctions and/or an order requiring ALF ~~(a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard and/or (b)~~ to refund and return to the Escrow Agent all NPEF ~~and base foundation payments~~Payments and Base Foundation Payments made by the Participating Manufacturers, including Lorillard. In the alternative, enter an order requiring an accounting of ALF's use of the NPEF ~~and base foundation payments~~Payments and Base Foundation Payments disbursed to it under Section VI of the MSA and under the Escrow Agreement and, based on the results of such accounting, requiring ALF ~~(a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard that were misspent, misused, and otherwise improperly disbursed to ALF~~

60

under Section VI of the MSA and under the Escrow Agreement and/or (b) to refund and return to the Escrow Agent all NPEF ~~and base foundation payments~~Payments and Base Foundation Payments made by the Participating Manufacturers, including Lorillard, that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement~~.~~;

~~12.    In the alternative to the relief requested in claims I-V of Lorillard's Counterclaims and in the event the Court denies such relief, issue a declaration that the Settling States—including Delaware—and/or NAAG (1) may pursue enforcement of the restrictions and provisions in the MSA concerning the NPEF, the NPEF's permissible uses, and the non-profit entity described in Section VI of the MSA; (2) may pursue enforcement of ALF's Bylaws and Certificate of Incorporation provisions concerning the NPEF, the NPEF's permissible uses, and the non-profit entity described in Section VI of the MSA; and/or (3) may pursue enforcement of ALF's promise and agreement to the Settling States—including Delaware—and/or NAAG to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA.~~

~~13.~~10.      To the extent necessary and appropriate, enter a Declaratory Order defining ALF's obligations under the MSA or otherwise construing any ambiguous term or terms in the MSA;

~~14.~~11.      Tax the costs of this action, including attorneys' fees, against ALF; and

~~15.~~

12.      Grant to Lorillard such other and further relief as the Court deems just and proper.

Stephen E. Herrmann (#691)
Robert W. Whetzel (#2288)
Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware  19899
(302) 651-7700
Attorneys for Lorillard Tobacco Company

*Of Counsel*:
Jim W. Phillips, Jr.
Robert J. King III
Charles E. Coble
Brooks, Pierce, McLendon, Humphrey &
 Leonard, L.L.P.
2000 Renaissance Plaza
Greensboro, North Carolina 27401
(336) 373-8850

62

Document comparison done by DeltaView on Friday, January 14, 2005 12:43:06 PM

| Input: | |
|---|---|
| Document 1 | iManageDeskSite://IM-DMS1/RLF1/2504287/4 |
| Document 2 | iManageDeskSite://IM-DMS1/RLF1/2813061/1 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 537 |
| Deletions | 324 |
| Moved from | 15 |
| Moved to | 15 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 891 |

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

**IN AND FOR NEW CASTLE COUNTY**

| | | |
|---|---|---|
| AMERICAN LEGACY FOUNDATION, a Delaware non-profit corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 19406-NC |
| LORILLARD TOBACCO COMPANY, a Delaware corporation, | ) ) ) | |
| Defendant. | ) | |

## ORDER

This _____ day of _____, 2005, Lorillard having moved the Court for an order pursuant to Rule 15(a) permitting Defendants to amend their Counterclaim ("Motion to Amend"), and which is not approved by Plaintiff and good cause having been shown,

IT IS HEREBY ORDERED that the motion is GRANTED. Defendants shall be permitted to amend their Counterclaim in compliance with Court of Chancery Rule 15(a). The Amended Counterclaim in the form of Exhibit A to the Motion to Amend is deemed filed and served as of the date of this order without any further action required by Defendants.

_____
Vice Chancellor

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of January, 2005, a true and correct copy of the foregoing was caused to be served by electronic service and hand delivery on the following counsel of record:

> David C. McBride
> Christian Douglas Wright
> Young Conaway Stargatt & Taylor
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, Delaware  19899

Stephen E. Herrmann (#691)

# EXHIBIT C

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| AMERICAN LEGACY FOUNDATION,<br>a Delaware non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>LORILLARD TOBACCO COMPANY,<br>a Delaware corporation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)    C.A. No. 19406-NC<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO STAY OR DISMISS

Of Counsel:

Ellen Vargyas
General Counsel
American Legacy Foundation
1001 G Street, N.W., Suite 800
Washington, D.C. 20001
(202) 454-5555

YOUNG CONAWAY STARGATT
  & TAYLOR, LLP
David C. McBride
Richard H. Morse
Martin S. Lessner
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, DE 19801
(302) 571-6600

Thomas P. McGonigle
John L. Reed
DUANE MORRIS, LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801
(302) 657-4900

John Payton
Patrick J. Carome
David W. Ogden
WILMER, CUTLER & PICKERING
2445 M Street, N.W.
Washington, D.C. 20037
(202) 663-6000

*Attorneys for Plaintiff*
*American Legacy Foundation*

Dated: March 18, 2002

WP3:745989.1                                                                                                       59278.1001

# TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................................................... .i

TABLE OF AUTHORITIES .............................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................1

NATURE AND STAGE OF THE PROCEEDINGS .........................................................5

STATEMENT OF FACTS ..............................................................................................13

ARGUMENT...................................................................................................................13

I.    The Comity Doctrine Has No Application Here Because This Matter
Was First-Filed in Delaware and Includes Claims Not Presented in
North Carolina..........................................................................................16

A. This Delaware Action Was First-Filed..........................................16

1. Under Delaware Law, a Declaratory Judgment Action Is
"First-Filed" If It Is Filed in Delaware Before Any Related
Action Is Filed Elsewhere.........................................20

2. Allegations that a Delaware Plaintiff Acted "Inequitably"
in Filing Here Are Irrelevant to the Comity Analysis..............21

3. Lorillard's "Notice Letter" Did Not Constitute Filing in
North Carolina.........................................................24

B. The North Carolina Action Does Not Contain the Same Issues
as This Delaware Action...........................................................26

II.   Lorillard Cannot Demonstrate with Particularity that It Will Suffer
Overwhelming Hardship and Inconvenience If This Action Is Litigated
in Delaware..............................................................................27

CONCLUSION..................................................................................................................34

59278.1001

## TABLE OF AUTHORITIES

### CASES

*ANR Pipeline v. Shell Oil Co.*, Del. Supr., 525 A.2d 991 (1987) ...................................................15

*Acierno v. New Castle County*, Del. Supr., 679 A.2d 455 (1996) ..........................................13, 17

*Assist Stock Management L.L.C. v. Rosheim*, Del. Ch., 753 A.2d 974 (2000) ........................13, 31

*Asten v. Wangner*, Del. Ch., C.A. No. 15617, 1997 WL 634330 (Steele, V.C.)
(Oct. 3, 1997) .......................................................................................................................23

*CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69 (1987) .......................................................30

*Caithness Resources, Inc. v. Ozdemir*, Del. Ch., C.A. No. 18073, 2000 WL
1741941 (Strine, V.C.) (Nov. 22, 2000) ................................................................................27

*Chrysler First Business Credit Corp. v. 1500 Locust Ltd. Partnership*, Del. Supr.,
669 A.2d 104 (1995) ........................................................................................................ *passim*

*Draper v. Paul N. Gardner Defined Plan Trust*, Del. Supr., 625 A.2d 859 (1993) ......................19

*Dura Pharmaceuticals, Inc. v. Scandipharm, Inc.*, Del. Ch., 713 A.2d 925 (1998).....................19

*EEOC v. University of Pennsylvania*, 850 F.2d 969 (3d Cir. 1988) .......................................19, 20

*Elbex Video, Ltd. v. Tecton, Ltd.*, No. 00Civ.0673(LMM), 2000 WL 1708189
(S.D.N.Y. Nov. 15, 2000) ......................................................................................................19

*First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S.
611 (1983) .............................................................................................................................29

*Friedman v. Alcatel Alsthom*, Del. Ch., 752 A.2d 544 (1999) ................................................19, 31

*General Foods Corp. v. Cryo-Maid, Inc.*, Del. Supr., 198 A.2d 681 (1964)..................................15

*Guthy-Renker Fitness, L.L.C. v. Icon Health & Fitness, Inc.*, 179 F.R.D. 264
(C.D. Cal. 1998)....................................................................................................................19

*Household International, Inc. v. Eljer Industries, Inc.*, Del. Ch., C.A. No. 12862,
1993 WL 133065 (Allen, C.) (Apr. 22, 1993) ................................................................ *passim*

*Household, International, Inc. v. Eljer Industries, Inc.*, Del. Ch., C.A. No. 13631, 1995 WL 405741 (Allen, C.) (June 19, 1995) ...........................................................33

*In re Chambers Development Co., Inc., Shareholders Litigation*, Del. Ch., C.A. No. 12508, 1993 WL 179335 (Chandler, V.C.) (May 20, 1993) ...................................28

*In re IBP, Inc. Shareholders Litigation*, Del. Ch., C.A. No. 18373, 2001 WL 406292 (Strine, V.C.) (Apr. 18, 2001) .........................................................13, 19

*In re Westell Technologies, Inc.*, Del. Ch., C.A. No. 18533, 2001 WL 755134 (Chandler, C.) (June 28, 2001) ......................................................................14, 17

*Ison v. E.I. DuPont de Nemours & Co.*, Del. Supr., 729 A.2d 832 (1999) ...........................13, 15

*Joyce v. Cuccia*, Del. Ch., C.A. No. 14953, 1996 WL 422339 (Jacobs, V.C.) (Aug. 6, 1996) ...........................................................................................15

*Macklowe v. Planet Hollywood, Inc.*, Del. Ch., C.A. No. 13689, 1994 WL 586835 (Steele, V.C.) (Oct. 4, 1994) ................................................................27, 31

*Mar-Land Industrial Contractors, Inc. v. Caribbean Petroleum Refining, L.P.*, Del. Supr., 777 A.2d 774 (2001) ...................................................................... *passim*

*McDermott Inc. v. Lewis*, Del. Supr., 531 A.2d 206 (1987) ..........................................30

*McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co.*, Del. Supr., 263 A.2d 281 (1970) ..................................................................... *passim*

*Playtex, Inc. v. Columbia Casualty Co.*, Del. Super., C.A. No. 88C-MR-233, 1989 WL 40913 (Del Pesco, J.) (April 25, 1989) ...........................................18

*QRS 10-12 (TX), Inc. v. Calcomp Technology, Inc.*, Del. Ch., C.A. No. 17133, 1999 WL 350491 (Lamb, V.C.) (May 12, 1999) .........................................16, 17, 24

*Rose v. Lundy*, 455 U.S. 509 (1982) ......................................................................18, 24

*Service Corp., International v. Loewen Group, Inc.*, C.A. No. H-96-3269, 1996 WL 756808 (S.D. Tex. Nov. 29, 1996) ..................................................19

*Taylor v. LSI Logic Corp.*, Del. Supr., 689 A.2d 1196 (1997) ..................................13, 14, 28

*Texas Instruments Inc. v. Cyrix Corp.*, Del. Ch., C.A. No. 13288, 1994 WL 96983 (Jacobs, V.C.) (Mar. 22, 1994) ........................................................19

WP3:745989.1

59278.1001

*UR Acquisition Corp. v. Reid*, Del. Ch., C.A. No. 17090, Hearing Transcript
(Strine, V.C.) (May 5, 1999)................................................................................23

*Ven-Fuel, Inc. v. Department of the Treasury*, 673 F.2d 1194 (11th Cir. 1982) ...........................19

*Warburg, Pincus Ventures, L.P. v. Schrapper*, Del. Supr., 774 A.2d 264 (2001) .........................13

*Welbilt Corp. v. Trane Co.*, Del. Ch., C.A. No. 17876, 2000 WL 1742053
(Lamb, V.C.) (Nov. 17, 2000) ................................................................................17

*Williams Natural Gas Co. v. Amoco Production Co.*, Del. Ch., C.A. No. 11040,
1990 WL 13492 (Jacobs, V.C.) (Feb. 15, 1990)................................................... *passim*

*Williams Natural Gas Co. v. BHP Petroleum Co.*, Del. Supr., 574 A.2d 264
(unpublished table decision) 1990 WL 38329 (Holland, J.) (Mar. 12, 1990)...............................33

*Yoder v. Heinold Commodities, Inc.*, 630 F. Supp. 756 (E.D. Va. 1986) ......................................19

## STATUTES

Del. Code Ann. tit. 8, § 111 ................................................................................30

## OTHER AUTHORITIES

*Press Release*, L.D. Johnston, P.M. O'Malley & J.G. Bachman, *Cigarette Smoking
Among American Teens Declines Sharply in 2001* (Dec. 19, 2001), *available at*
http://www.monitoringthefuture.org/press.html ......................................................6

WP3:745989.1

59278.1001

## PRELIMINARY STATEMENT

Defendant Lorillard Tobacco Company's ("Lorillard") Motion to Stay or Dismiss this action lacks any basis in Delaware law because:

- Plaintiff American Legacy Foundation ("the Foundation") filed and served this Delaware action a full six days (and four business days) before Lorillard filed suit against the Foundation in a North Carolina court;

- Lorillard and the Foundation are both incorporated in Delaware;

- Lorillard now concedes that this case turns in large part on its claimed right to enforce the Foundation's bylaws, which can be resolved only under Delaware law, and which in any event have been placed at issue only in this Delaware action and not in Lorillard's later-filed North Carolina action; and

- Lorillard has not even attempted to show with "particularity" that having to proceed with this action will cause it "overwhelming hardship," as required by Delaware law.

Under well-established Delaware law, Lorillard's request is extraordinary and highly disfavored:

> A plaintiff seeking to litigate in Delaware is afforded the presumption that its choice of forum is proper and a defendant who attempts to obtain a dismissal on grounds of *forum non conveniens* bears a heavy burden. The plaintiff's choice of forum is accorded even more weight where, as here, there are no other previously filed actions pending. Indeed, only in a "rare case" will a complaint filed in Delaware be dismissed on the grounds of *forum non conveniens*. To succeed, the defendant must establish that litigating in Delaware would impose upon it an "overwhelming hardship."

*Mar-Land Indus. Contractors, Inc. v. Caribbean Petroleum Ref., L.P.*, Del. Supr., 777 A.2d 774, 778 (2001) (citations omitted).

Lorillard makes no serious effort to establish that litigating this case in Delaware will impose "overwhelming hardship" on it, because the very suggestion is absurd. It is a

huge company, incorporated here. It concedes that some of the claims it advances against

the Foundation — and which would be litigated if the case proceeds — turn on the

Foundation's Delaware bylaws. It has not even *mentioned* any practical impediments to

proceeding in this Delaware case, much less shown the requisite degree of hardship "with

particularity" as required by the Delaware Supreme Court. *See id.* at 778; *Chrysler First*

*Bus. Credit Corp. v. 1500 Locust Ltd. P'ship,* Del. Supr., 669 A.2d 104, 107 (1995).

Under established Delaware authority, therefore, Lorillard's motion must be denied.

Lorillard's only rejoinders are flatly contradicted by Delaware law. The "comity"

doctrine of *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,* Del. Supr.,

263 A.2d 281, 283 (1970), which lowers the defendant's burden of proof on motions to

dismiss *later* filed Delaware actions, simply has no application where, as here, the

controversy is "*in fact*" submitted first to the courts of Delaware. *Williams Natural Gas*

*Co. v. Amoco Prod. Co.,* Del. Ch., C.A. No. 11040, 1990 WL 13492, at *8 (Jacobs, V.C.)

(Mar. 20, 1990);[1] *see also Chrysler,* Del. Supr., 669 A.2d 104; *Household Int'l, Inc. v.*

*Eljer Indus., Inc.,* Del. Ch., C.A. No. 12862, 1993 WL 133065 (Allen, C.) (Apr. 22,

1993). Contrary to the suggestions in Lorillard's brief, this rule applies with full force to

first-filed Delaware actions for declaratory judgment. *See Chrysler,* Del. Supr., 669 A.2d

104 (first-filed Delaware declaratory judgment action subject to high presumption against

dismissal). Moreover, allegations, like Lorillard's, that the plaintiff engaged in "forum

---

[1]    Copies of the unreported decisions cited herein are contained in the attached
Compendium of Unreported Opinions Cited in Plaintiff's Opposition to Defendant's
Motion to Stay or Dismiss.

2

shopping" or other assertedly "inequitable" conduct when filing first in Delaware do not

excuse the defendant from showing overwhelming hardship, or bring it within the comity

doctrine. *Williams Natural Gas*, Del. Ch., 1990 WL 13492, at *8-*9 (declaratory

judgment action filed first in Delaware entitled to high presumption against dismissal and

not subject to lower presumption of the comity doctrine despite allegations of "forum

shopping"); *Eljer*, Del. Ch., C.A. 12862, 1993 WL 133065, at *1-*2 (same).

Furthermore, even if Lorillard's claims of "inequitable" conduct by the

Foundation were pertinent under Delaware law — and they are not — they are baseless,

and founded on a selective rendition of the history of this matter. The truth is that

Lorillard had asserted a dizzying array of different potential legal claims against the

Foundation over several months, and the Foundation sought protection from this Court

only after Lorillard switched its legal theories and changed its demands to assert a

purported right to control the content of the Foundation's future public education

advertisements designed to dissuade young people from smoking cigarettes. The same

day Lorillard informed the Foundation it was asserting an alleged contractual right to

control the Foundation's future public education efforts, Lorillard sent a "30-day notice"

letter of intent to sue. But that letter created no certainty whatsoever that Lorillard would

file suit at any particular point, or that it would do so in any particular forum or fora. In

fact, in November 2001 Lorillard had sent the Foundation a draft complaint asserting

entirely different legal theories, which it never filed and now apparently has abandoned

entirely.

3

Rather than operate under the continuing threat of tobacco company actions to control its future public education efforts, the Foundation filed suit — not in the District of Columbia where its principal business office is located — in the neutral forum of Delaware, where both entities are incorporated, to get a prompt determination that there is no legal basis for Lorillard's claims. There was nothing "inequitable" about that conduct. Indeed, it is plainly *Lorillard,* not the Foundation, who although incorporated in Delaware seeks to "forum shop" by seeking "home court advantage" in North Carolina with its later filed action.

Nor is there any merit to Lorillard's notion that "comity" to North Carolina is implicated because Lorillard's 30-day notice letter somehow constituted a "filing" there. Lorillard has cited no authority for this startling proposition. A notice letter does not vest any court of a matter, and thus is not a filing in any sense of the word. Moreover, in this case Lorillard's letter did not disclose *where* Lorillard intended to sue, and Lorillard's counsel refused to disclose Lorillard's intentions in this regard when, after receiving the notice, the Foundation's counsel inquired. A notice letter that does not even reference the jurisdiction where the sender intends to file suit obviously cannot suffice to vest another jurisdiction's courts of the matter. Nothing about Lorillard's alleged claims has a special connection to North Carolina. They purportedly arise out of a contract with 46 states and Delaware bylaws, and concern a national foundation and a national public education campaign. Thus, there is no sense in which the letter vested North Carolina courts of the matter. Moreover, a notice letter does not irrevocably commit its sender to file suit at all,

4

nor does it establish *when* it will be filed. And in any case, Lorillard did not even file its North Carolina action on the first business day after expiration of the 30 days.

Finally, Lorillard's claims that this Court should defer to North Carolina as a matter of comity are also defeated by the fact that its North Carolina action includes only some, but not all, of the claims at issue here. *See, e.g., McWane*, Del. Supr., 263 A.2d at 283 (holding that prior action must involve "the same issues" and "the same cause of action"). Lorillard concedes that claims relating to both the Master Settlement Agreement ("MSA") and the Foundation's bylaws are at issue in this case, but its North Carolina complaint asserts only claims under the MSA. Accordingly, there would be no basis for this Court to defer to the North Carolina case even if it had been first-filed. And, even assuming Lorillard was under some obligation to give 30-days notice of its contractual claims, it cannot pretend that it was obligated to wait so much as 30 seconds before filing its specious bylaws allegations — allegations that even to this day it has not asserted in a pleading in any court yet still threatens to file in the future.

For all of these reasons, there is no basis in Delaware law to stay or dismiss this suit, and Lorillard's motion should be denied.

## NATURE AND STAGE OF THE PROCEEDINGS

The Foundation is a non-profit corporation, organized under the laws of Delaware in 1999 at the behest of States that chose to fund it with some of the proceeds from the settlement of their lawsuits against the major tobacco companies. An essential component of the Foundation's mission is to reduce youth smoking through an unprecedented nationwide public education effort targeted to young people. To that end,

5

59278.1001

the Foundation launched an innovative, multi-media grassroots and advertising initiative

called the truth[sm] campaign in early 2000, and in December 2001, the nation's leading

study tracking youth health behavior specifically credited the Foundation with playing an

important role in a striking downturn in youth smoking rates in this country.[2/]  Defendant

Lorillard Tobacco Company manufactures Newport cigarettes, the second-most popular

brand among teenage smokers in this country.

   The Foundation instituted this action against Lorillard on February 13, 2002,

seeking declaratory and injunctive relief.  No action involving the same parties and issues

was at that time pending in any other court.  This action was filed after months of ever-

changing complaints and demands from Lorillard.  Lorillard first threatened to take legal

action against the Foundation in July 2001, its claims centering on whether a particular

radio advertisement called "Dog Walker"[3/] complied with federal and state

communications laws.[4/]  (Affidavit of Ellen Vargyas, Exhibit 1 to Plaintiff's Opening

---

[2/]     *See* Press Release, L.D. Johnston, P.M. O'Malley & J.G. Bachman, *Cigarette Smoking Among American Teens Declines Sharply in 2001* (Dec. 19, 2001), *available at* http://www.monitoringthefuture.org/press.html.

[3/]     The "Dog Walker" advertisement, which aired for six weeks in the summer of 2001 and has not aired since, depicted a telephone call between an actor and two Lorillard employees.  In the advertisement, the young man who plays the "dog walker" makes a clearly satirical offer to sell dog urine to "you tobacco people" because dog urine contains urea, which is "one of the chemicals you guys put into cigarettes."  (Affidavit of Ellen Vargyas, Exhibit 1 to Plaintiff's Opening Brief in Support of Its Motion for Summary Judgment on Claims I-III, ¶ 6.)

[4/]     For example, on October 1, 2001, Lorillard filed a Motion for a Declaratory Ruling with the Federal Communications Commission seeking a declaration that the "Dog Walker" advertisement violated an FCC rule regarding the broadcasting of recorded telephone calls.  The Foundation opposed the Motion, arguing that the FCC's
(Footnote continued on next page)

6

59278.1001

Brief in Support of Its Motion for Summary Judgment on Claims I-III, ¶¶ 6-12 ("Vargyas Aff.").) By November 2001, however, Lorillard had switched strategies, sending the Foundation a draft complaint focused solely on a backward-looking defamation and unfair business practices challenge to the truth of factual assertions in "Dog Walker." (*Id.* at ¶ 16.) In December 2001, counsel for Lorillard and counsel for the Foundation engaged in discussions to explore the possibility of an out-of-court resolution of the issues framed by Lorillard's draft complaint. (*Id.* at ¶ 17.) Because those discussions focused on the accuracy of *past* advertising, the Foundation was prepared to explore an appropriate resolution. (*Id.*)

For whatever reason, in January 2002, Lorillard again changed course entirely, abandoning its defamation and unfair business practices theories relating to a single advertisement in favor of a supposed contractual theory — heretofore mentioned only in passing — attacking the entire truth[sm] campaign. (*Id.* at ¶ 19.) In a previously-scheduled discussion between the parties on January 18, 2002, Lorillard announced for the first time that it intended to advance contract-based claims under the MSA against the Foundation. (*Id.*) The MSA, executed on November 23, 1998, resolved dozens of lawsuits brought by nearly all of the States, as well as other governmental units (collectively, the "Settling

---

rule, by its plain language, extends only to conduct of broadcast licensees and therefore does not apply to the Foundation, which is not a licensee, or its advertisements. The FCC has yet to issue a ruling on the motion. (Vargyas Aff., Ex. 1 to Pl. Summ. Judg. Br., ¶¶ 13-15.)

States")[5/] against Lorillard and the other major tobacco companies seeking relief for injuries inflicted on them and their citizens by the tobacco companies' lethal products. (Affidavit of John Payton, Exhibit 2 to Plaintiff's Opening Brief in Support of Its Motion for Summary Judgment on Claims I-III, at Tab A, MSA.)  In advancing these MSA-based claims, Lorillard attempted to assert control over the content of the Foundation's *future* advertising based on its self-interested vision of what constitutes a "personal attack" on or "vilification" of tobacco companies. (Vargyas Aff., Ex. 1 to Pl. Summ. Judg. Br., ¶¶ 18-21.)

By letter sent to the Foundation on January 18, 2002 — and copied to the Settling States, the National Association of Attorneys General ("NAAG"), and the signatory tobacco companies — Lorillard purported to invoke the enforcement mechanisms of the MSA against the Foundation by providing 30-days notice of its "intent to initiate a proceeding against the American Legacy Foundation [] to enforce the terms of the MSA." (*Id.* at ¶ 20 & Tab A, Jan. 18 Letter.)  Without identifying any particular advertisement sponsored by the Foundation, Lorillard's January 18 letter simply alleged that the Foundation's truth[sm] campaign had engaged in "personal attack" on or "vilification" of Lorillard in violation of the MSA.  (*Id.* at ¶ 21.)  Lorillard's letter gave no indication of the forum in which it intended to sue the Foundation.  Although Lorillard now maintains

---

[5/]      The Settling States include Delaware, 45 other States (excluding Mississippi, Minnesota, Florida, and Texas, all of which settled with the tobacco companies under separate agreements), the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, American Samoa, and the Northern Marianas. (Affidavit of John Payton, Exhibit 2 to Plaintiff's Opening Brief in Support of Its Motion for Summary Judgment on Claims I-III, at Tab A, MSA §§ II(qq) & (rr).)

that it never intended to sue the Foundation anywhere other than North Carolina (*see* Affidavit of Ronald Milstein, attached to Def. Br., ¶ 14 ("Milstein Aff.")), newspaper articles published in the days after the letter reported that a Lorillard spokesman had said that Lorillard had not decided in which forum or in how many fora it would sue.[6] When representatives of the Foundation contacted Lorillard's counsel on February 7, 2002, in response to the January 18 letter, Lorillard reaffirmed its intent to seek enforcement of the MSA against the Foundation. (Vargyas Aff., Ex. 1 to Pl. Summ. Judg. Br., ¶ 22.) Lorillard refused at that time, even in response to a direct question from the Foundation's outside counsel, to say where it would file suit. (*Id.* at ¶ 22.) Lorillard also did not disclose when it would file suit. (*Id.*)

The Foundation was not willing to cede to Lorillard any control over the future content of its public health advertising — which, after all, is intended to stop children from smoking Lorillard's deadly and addictive products — nor was it willing to operate under Lorillard's threats of an unspecified number of baseless "enforcement actions" filed at unspecified times, in unspecified jurisdictions. For that reason, the Foundation

---

[6]    On January 23, 2002, Lorillard spokesperson Steve Watson indicated to the press that Lorillard had made no decision as to where it would file suit and alluded to the possibility of "enforcement actions" against the Foundation in any or all of the 46 state courts with continuing jurisdiction over the MSA and the related consent decrees. (*See* Exhibit 1, Paul Nowell, *Foundation: Lorillard Threat Over Irreverent Ads "Outrageous,"* Associated Press Newswires, Jan. 23, 2002 ("It had not been determined where the suit would be filed, [Watson] said."); Bernard Stamler, *Lorillard Tobacco Threatens Legal Action Against a Foundation for Its Tough Antismoking Campaign, N.Y. Times,* Jan. 23, 2002, Exhibit 3 to Plaintiff's Opening Brief in Support of Its Motion for Summary Judgment on Claims I-III ("It is conceivable that Lorillard might have to sue in all of those states, which it has not yet decided to do, Mr. Watson said.").)

filed suit against Lorillard in Delaware — where both parties are incorporated — to seek expeditious resolution of this dispute in a single forum relevant to both parties.

The Foundation's Complaint contains three principal claims: Claim I seeks a declaration that Lorillard has no basis to sue the Foundation under the MSA; Claim II seeks a declaration that Lorillard has no basis to sue the Foundation under its bylaws; and Claim III seeks corresponding injunctive relief barring Lorillard from bringing any claims against the Foundation under either the MSA or the bylaws.[1/] The Foundation served the summons and complaint on Lorillard's registered agent in Delaware on February 13, 2002, the same day the suit was filed.

Six days later, on February 19, 2002, Lorillard filed a two-count complaint against the Foundation in the Superior Court of Wake County, North Carolina, seeking declaratory and injunctive relief, as well as damages in the amount of one dollar, for alleged breach of contract under the MSA. Lorillard failed to file its lawsuit on the first available day after the expiration of the 30-day notice period it had purported to invoke in its January 18 letter. The 30-day period ended on Sunday, February 17, but Lorillard did not file its complaint until Tuesday, February 19, even though the North Carolina courts were open for business on Monday, February 18. (*See* Affidavit of Jonathan D. Sasser, Exhibit 4 to Plaintiff's Opening Brief in Support of Its Motion for Summary Judgment on

---

[1/]    Claim IV of the Complaint, which is *not* a subject of the Foundation's motion for summary judgment, seeks, in the alternative, a declaration that the Foundation's truth[sm] campaign has been and is in full compliance with the MSA and the bylaws. A ruling in favor of the Foundation on the Foundation's pending motion for summary judgment will render Claim IV moot.

10

Claims I-III, ¶ 3 & Tab A ("Sasser Aff.").)  Lorillard's North Carolina action does not

raise any issues that were not already presented in this Delaware action, nor does it

include any parties not already before this Court.  Lorillard served its complaint by

certified mail on the Foundation's registered agent in Delaware on February 19 (received

on February 21) and by personal service on February 20 at the Foundation's office in

Washington, D.C.

Lorillard's North Carolina complaint failed to mention any issues not already

encompassed by the Foundation's Delaware Complaint and also failed to present a

number of "legal issues" that Lorillard concedes are presented in this Delaware action.

(Compare Def. Br. at 17 n.3 (setting forth eight legal issues in this case including claims

relating to the Foundation's bylaws) with id., Ex. A (Lorillard's North Carolina

complaint) (asserting two claims exclusively under the MSA).)  Specifically, while

Lorillard now states that it intends "to press [the] position" that the Foundation's bylaws

are "enforceable in litigation by Lorillard" (Letter from Stephen E. Herrmann to David C.

McBride, Mar. 14, 2002, Exhibit 5 to Plaintiff's Opening Brief in Support of Its Motion

for Summary Judgment on Claims I-III ("Herrmann Letter")), and while the Foundation's

complaint in this case squarely presents that issue to this Court (Complaint, Claim II),

Lorillard has asserted no such claim in its North Carolina complaint.

The Foundation filed a Motion to Expedite Proceedings in this Court on February

19, 2002, before Lorillard filed its North Carolina action.  After oral argument on that

motion on February 20, this Court entered an order on February 22 granting Plaintiff's

motion and establishing a briefing schedule for two motions — Lorillard's motion to stay

11

or dismiss based on *forum non conveniens* and the Foundation's motion for summary judgment.

Contrary to Lorillard's assertion that discovery in the North Carolina action is "proceeding rapidly" (Def. Br. at 17), on March 7, the Foundation filed a Motion for Protective Order and Stay of Deposition Discovery pending resolution of the *forum non conveniens* motion in this Court. (Sasser Aff., Ex. 4 to Pl. Summ. Judg. Br., ¶ 8.) The Foundation had notified Lorillard's counsel of its intent and preparedness to file such a motion on March 4, but agreed to wait until Lorillard's counsel could confirm that his client would not willingly postpone depositions Lorillard had noticed for March 28 and 29. (*Id.* at ¶¶ 4-6.) Lorillard's counsel did not notify the Foundation until March 7 that Lorillard would not agree to postpone the depositions. (*Id.* at ¶ 7.) At that time, the Foundation promptly filed its Motion for Protective Order, as well as a notice requesting a hearing on that motion for April 29, the earliest available date on the North Carolina court's calendar. (*Id.* at ¶ 8.) In addition, on March 13, the Foundation filed Motions for Extension of Time to respond to Lorillard's other discovery requests and to respond to Lorillard's complaint. The clerk granted 30-day extensions on all requests, according to routine practice in North Carolina.[8/] (*Id.* at ¶¶ 9-13.) As of this time, there are no other pending proceedings or deadlines in the North Carolina action.

---

[8/]    As a result of the extensions granted by the North Carolina court, no discovery responses are due from the Foundation before May 8, and no response is due to Lorillard's complaint until April 22. (Sasser Aff., Ex. 4 to Pl. Summ. Judg. Br., ¶¶ 9-12.)

59278.1001

Lorillard filed a Motion to Stay or Dismiss the Foundation's lawsuit on March 5, and a brief in support of that motion on March 8. Briefing on that motion will conclude on March 22, with oral argument on March 25. The Foundation filed a motion for summary judgment and its brief in support thereof on March 15. Briefing on the Foundation's motion for summary judgment is scheduled to conclude on April 15, and oral argument is scheduled for April 26.

This is Plaintiff's brief in opposition to Defendant's Motion to Stay or Dismiss the Action.

## STATEMENT OF FACTS

The facts relevant to the underlying action are set forth in detail at pages 10-17 of Plaintiff's Opening Brief in Support of Its Motion for Summary Judgment on Claims I-III, filed on March 15, 2002.

## ARGUMENT

Delaware courts have consistently held that a plaintiff's choice of a Delaware forum should be overturned only in a "rare case." *Mar-Land*, Del. Supr., 777 A.2d at 778; *Warburg, Pincus Ventures, L.P. v. Schrapper*, Del. Supr., 774 A.2d 264, 267 (2001); *Ison v. E.I. DuPont de Nemours & Co.*, Del. Supr., 729 A.2d 832, 835 (1999); *Taylor v. LSI Logic Corp.*, Del. Supr., 689 A.2d 1196, 1197 (1997); *Chrysler*, Del. Supr., 669 A.2d at 107; *Acierno v. New Castle County*, Del. Supr., 679 A.2d 455, 458 (1996); *In re IBP, Inc. S'holders Litig.*, Del. Ch., C.A. No. 18373, 2001 WL 406292, at *7 (Strine, V.C.) (Apr. 18, 2001); *Assist Stock Mgmt. L.L.C. v. Rosheim*, Del. Ch., 753 A.2d 974, 983 (2000). When, as here, "there are no other previously filed actions pending," the already

13

strong presumption in favor of a Delaware forum "is accorded even more weight." *Mar-Land*, Del. Supr., 777 A.2d at 778; *see also Taylor*, Del. Supr., 689 A.2d at 1199 ("[J]udicial discretion is to be exercised sparingly where, as here, there is no prior action pending.")  In fact, this presumption is so strong that the Delaware Supreme Court has overturned a lower court's improper dismissal of a first-filed Delaware action several times recently,[9] such that every Delaware Supreme Court case in the last decade involving *forum non conveniens* has resulted in the continuation of the Delaware action.

To overcome this strong presumption in favor of a Delaware forum, a defendant who attempts to obtain a dismissal of a first-filed Delaware action "must establish that litigating in Delaware would impose upon it an 'overwhelming hardship.'" *Mar-Land*, Del. Supr., 777 A.2d at 778; *see also Chrysler*, Del. Supr., 669 A.2d at 108 (holding that a defendant must demonstrate that it will "suffer overwhelming hardship and inconvenience if forced to litigate in Delaware"); *In re Westell Tech., Inc.*, Del. Ch., C.A. No. 18533, 2001 WL 755134, at *1 (Chandler, C.) (June 28, 2001) ("[I]f the Delaware action was first-filed, then defendants may obtain a dismissal only if they meet the exacting burden of demonstrating that the weight of the traditional *forum non conveniens* . . . factors overwhelmingly weigh against the suitability of Delaware as a forum and that defendants therefore face an undue and excessive inconvenience here.") (footnote

---

[9]   *See Mar-Land*, Del. Supr., 777 A.2d 774; *Ison*, Del. Supr., 729 A.2d 832; *Taylor*, Del. Supr., 689 A.2d 1196; *Chrysler*, Del. Supr., 669 A.2d 104.

14

59278.1001

omitted).[10] The defendant must demonstrate such overwhelming hardship and inconvenience by establishing through the factors set forth in *Gen. Foods Corp. v. Cryo-Maid, Inc.*, Del. Supr., 198 A.2d 681 (1964), *overruled in part sub nom. Pepsico, Inc. v. Pepsi-Cola Bottling Co.*, Del. Supr., 261 A.2d 520 (1969), and its progeny that the "drastic relief of dismissal" is warranted. *Ison*, Del. Supr., 729 A.2d at 842; *see also Chrysler*, Del. Supr., 669 A.2d at 108 ("The issue is whether any or all of the *Cryo-Maid* factors establish that defendant will suffer overwhelming hardship and inconvenience if forced to litigate in Delaware. Absent such a showing, plaintiff's choice of forum must be respected."). And the Delaware Supreme Court has recently reiterated that a *forum non conveniens* motion may be granted only if litigating in Delaware imposes overwhelming hardship — and *not* solely if Delaware is less convenient than another forum. *See Mar-Land*, Del. Supr., 777 A.2d at 779.

Before turning to the application of Delaware's "overwhelming hardship" test — which Lorillard has made no real effort to satisfy — we address first Lorillard's principal assertion: that this Court should refuse to hear this case under the "comity" doctrine, because it owes deference to the courts of North Carolina. That assertion is frivolous.

---

[10]    To obtain a stay (as opposed to an outright dismissal), this Court has said that the defendant "must carry the burden of showing that [it] would be subjected to undue hardship and inconvenience if forced to litigate in Delaware." *Joyce v. Cuccia*, Del. Ch., C.A. No. 14953, 1996 WL 422339, at *6 (Jacobs, V.C.) (Aug. 6, 1996) (citing *ANR Pipeline v. Shell Oil Co.*, Del. Supr., 525 A.2d 991, 992 (1987)). As with a motion to dismiss, the question is whether special factors would impose hardship and inconvenience if the first-filed case proceeds in Delaware, *not* whether litigation of the second-filed case would somehow be more convenient. *See ANR Pipeline v. Shell Oil Co.*, Del. Supr., 525 A.2d 991, 992 (1987).

59278.1001

I.   **The Comity Doctrine Has No Application Here Because This Matter Was First-Filed in Delaware and Includes Claims Not Presented in North Carolina.**

A.   **This Delaware Action Was First-Filed.**

As this Court has observed, to establish a right to stay or dismiss a Delaware action under the "comity" doctrine of *McWane*, Del. Supr., 263 A.2d 281, a Delaware defendant must show that "there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues." *QRS 10-12 (TX), Inc. v. Calcomp Tech., Inc.*, Del. Ch., C.A. No. 17133, 1999 WL 350491, at *2 (Lamb, V.C.) (May 12, 1999) (quoting *McWane*, Del. Supr., 263 A.2d at 283). Lorillard plainly cannot satisfy two essential elements of that standard: there is no prior pending action and Lorillard's *later* filed North Carolina action does not include all of the claims at issue here.

The Foundation filed this action at 8:38 A.M. on February 13, 2002. (Docket Entry No. 1.) At 3:50 P.M. that same day, the Foundation effected service of process on Lorillard's registered agent in Delaware. (Docket Entry No. 5.) The Foundation filed a Motion for Expedited Proceedings at 11:35 A.M. on Tuesday, February 19 — the first business day for the Delaware Courts after the three-day President's Day weekend. (Docket Entry No. 14.) The Foundation served that motion on Lorillard's Delaware counsel by hand delivery immediately after filing.

At 11:49 A.M. on February 19, a full *six days* (and four business days) after this Delaware action was filed and served, Lorillard filed suit against the Foundation in Wake County, North Carolina, Superior Court. Lorillard placed a summons and a copy of the

16

complaint in the mail to the Foundation's registered Delaware agent on February 19; the agent received these materials on Thursday, February 21. In the meantime, Lorillard effected personal service on the Foundation in Washington, D.C. on the afternoon of February 20. By that time, this Delaware action had moved forward substantially through the scheduling conference and establishment of an expedited briefing schedule on the morning of February 20.[11]

Not a single case cited in Lorillard's "comity" submission — and so far as we are aware no Delaware case whatsoever — involves application of the *McWane* comity doctrine to a matter, like this one, that was in fact filed first in the Delaware courts. As a doctrinal matter, that follows directly from *McWane*'s requirement — restated in every case discussing the doctrine — that for the doctrine to apply there must be a "*prior* action pending elsewhere." *McWane*, Del. Supr., 263 A.2d at 283 (emphasis added); *see, e.g.*, *Acierno*, Del. Supr., 679 A.2d at 458; *In re Westell Tech.*, Del. Ch., 2001 WL 755134, at *1; *Welbilt Corp. v. Trane Co.*, Del. Ch., C.A. No. 17876, 2000 WL 1742053, at *2 (Lamb, V.C.) (Nov. 17, 2000); *QRS 10-12 (TX)*, Del. Ch., 1999 WL 350491, at *2. As recently as last summer, the Delaware Supreme Court made clear that the "overwhelming hardship" test — and not the *McWane* comity doctrine — applies "where, as here, there are no previously filed actions pending." *Mar-Land*, Del. Supr., 777 A.2d at 778. This Court stated expressly in the context of an argument indistinguishable from Lorillard's

---

[11]    This Court set forth a briefing schedule from the bench that morning (*see* Transcript of Hearing, Scheduling Conference, C.A. No. 19406 (Feb. 20, 2002), at 33-34)), and entered a written order two days later (*see* Order Granting Expedited Proceedings, C.A. No. 19406 (Feb. 22, 2002)).

17

59278.1001

that the *only* question in this regard is whether there was "*in fact*" an action pending in another jurisdiction when the Delaware complaint was filed. *Williams Natural Gas*, Del. Ch., 1990 WL 13492 at *8. If not, then the "overwhelming hardship" test applies.

The reason the comity doctrine cannot apply to actions "in fact" filed first in Delaware is simple. As the United States Supreme Court has explained, the doctrine of comity "teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, *and already cognizant of the litigation*, have had an opportunity to pass upon the matter." *Rose v. Lundy*, 455 U.S. 509, 518 (1982) (quoting *Darr v. Burford*, 339 U.S. 200, 204 (1950)) (emphasis added). Where, as here, the other sovereign is *not* already cognizant of the litigation, there is no reason to defer.

*Playtex, Inc. v. Columbia Cas. Co.*, Del. Super., C.A. No. 88C-MR-233, 1989 WL 40913 (Del Pesco, J.) (Apr. 25, 1989) — the only Delaware case on which Lorillard relies for the proposition that the comity doctrine can apply to first-filed Delaware actions — is not to the contrary. *Playtex* involved a Delaware action filed two weeks *after* a prior filing in Illinois. *Id.* at *2. Thus, the Delaware action there was not in fact filed first. The issue was whether, despite having been filed *second*, the Delaware action should nevertheless proceed. *Playtex* has no relevance whatsoever to a first-filed case like this one. Moreover, even if *Playtex's* reasoning otherwise were relevant — and it is not — the Chancery Court has expressly "decline[d] to follow the analytical approach

18

adopted" in *Playtex*. *Williams Natural Gas*, Del. Ch., 1990 WL 13492, at *9 n.10 (not cited by Lorillard).[12]

The rest of Lorillard's comity cases are, if possible, even less germane, because they involve the entirely irrelevant question of which among two different *federal* courts considering the same issues involving the same parties should proceed with an action.[13] These federal decisions (1) have nothing to do with the law of Delaware, and (2) have nothing to do with "comity" because, as one of the cases cited by Lorillard explains, they involve "cases of *federal* concurrent jurisdiction" and "the subsequent prosecution of

---

[12]    Lorillard also cites to a number of cases that involved a "race to the courthouse" by parties to a breached "standstill agreement." These do not shed light on the instant case for several reasons. First, and most importantly, none involved a decision by a Delaware court to deem a later-filed foreign action first-filed and therefore entitled to the "comity" doctrine of *McWane*. Thus, none supports the use to which Lorillard attempts to put it. Second, those cases establish that even to deem an earlier filed action "contemporaneously filed" — which is the most those cases do — the competing action has to have been hastily filed at the end of a standstill agreement *between the parties*. *See Dura Pharm., Inc. v. Scandipharm, Inc.*, Del. Ch., 713 A.2d 925, 929 (1998). Here, there is no such agreement. Third, these cases all involved filings within a few business *hours* of each other. None is even close to the four full business *days* involved here. *See, e.g., In re IBP*, Del. Ch., 2001 WL 406292, at *7-*8 (five business hours); *Tex. Instruments Inc. v. Cyrix Corp.*, Del. Ch., C.A. No. 13288, 1994 WL 96983, (Jacobs, V.C.) (Mar. 22, 1994) (five business hours); *Draper v. Paul N. Gardner Defined Plan Trust*, Del. Supr., 625 A.2d 859, 869 n.15 (1993) (same business day, but in different time zones); *Friedman v. Alcatel Alsthom*, Del. Ch., 752 A.2d 544, 548, 551-52 (1999) (three hours).

[13]    *EEOC v. Univ. of Pa.*, 850 F.2d 969 (3d Cir.), *cert. granted in part*, 488 U.S. 992 (1988); *Ven-Fuel, Inc. v. Dep't of the Treasury*, 673 F.2d 1194 (11th Cir. 1982); *Elbex Video, Ltd. v. Tecton, Ltd.*, No. 00Civ.0673(LMM), 2000 WL 1708189 (S.D.N.Y. Nov. 15, 2000); *Guthy-Renker Fitness, L.L.C. v. Icon Health & Fitness, Inc.*, 179 F.R.D. 264 (C.D. Cal. 1998); *Serv. Corp., Int'l v. Loewen Group, Inc.*, C.A. No. H-96-3269, 1996 WL 756808 (S.D. Tex. Nov. 29, 1996); *Yoder v. Heinold Commodities, Inc.*, 630 F. Supp. 756 (E.D. Va. 1986).

similar cases . . . *in different federal district courts.*" *EEOC v. Univ. of Pa.*, 850 F.2d 969, 971 (3d Circ. 1988) (emphasis added).  How a sovereign such as the United States chooses to handle duplicative litigation arising within its own court system says nothing at all about how principles of comity should apply between different sovereigns.

In the end, without any precedential support, Lorillard's claim to "first-filed" status for its later-filed North Carolina complaint boils down to three propositions: (1) that first-filed declaratory judgment actions are not entitled to first-filed status; (2) that "inequitable conduct" in the form of "forum shopping" disentitles a first-filed declaratory judgment action to "first-filed" status; and (3) that Lorillard's 30-day notice letter to the Foundation should be considered a "filing" in a North Carolina court.  Each assertion is demonstrably incorrect.

### 1.    Under Delaware Law, a Declaratory Judgment Action Is "First-Filed" If It Is Filed in Delaware Before Any Related Action Is Filed Elsewhere.

Lorillard's suggestion (Def. Br. at 12) that declaratory judgment actions should not be considered first-filed is foreclosed by the Delaware Supreme Court's decision in *Chrysler*, Del. Supr., 669 A.2d 104.  In *Chrysler*, the plaintiff filed a declaratory judgment action in Delaware and the Delaware defendant subsequently sued in Pennsylvania on the same claims at issue in the Delaware case. *Id.* at 108.  Observing that the Delaware declaratory judgment action was first-filed, the Delaware Supreme Court reversed the Court of Chancery's dismissal of the action because the defendant had failed to show that the Delaware case imposed "overwhelming hardship and inconvenience." *Id.* at 108.  The Court did not even hint that the rule requiring such a

20

showing should somehow be different when the first-filed Delaware action seeks a declaratory judgment.

Consistent with the Delaware Supreme Court's approach, this Court has at least twice rejected suggestions like Lorillard's and denied motions to stay or dismiss first-filed Delaware declaratory judgment actions under the traditional *forum non conveniens* framework. *See Eljer*, Del. Ch., 1993 WL 133065; *Williams Natural Gas*, Del. Ch., 1990 WL 13492.

2.    **Allegations that a Delaware Plaintiff Acted "Inequitably" in Filing Here Are Irrelevant to the Comity Analysis.**

Nor do Lorillard's allegations of "forum shopping" or other "inequitable" conduct (*see, e.g.,* Def. Br. at 12) somehow change the analysis. In *Williams Natural Gas* and *Eljer* alike, this Court flatly rejected the suggestion that such accusations relieve a defendant from demonstrating "overwhelming hardship." In *Williams Natural Gas*, the court expressly stated that equitable considerations may be advanced only as *part* of the hardship test, not at the outset to relieve the defendant of demonstrating the requisite degree of hardship. *See Williams Natural Gas*, Del. Ch., 1990 WL 13492 at *8. As the *Williams Natural Gas* court said, "if the plaintiff has behaved inequitably in choosing the Delaware forum, those inequities are taken into account in determining whether the moving party has met its burden of showing the requisite inconvenience and hardship." *Id.*

Moreover, in both *Williams Natural Gas* and *Eljer* this court rejected the notion that so-called "forum shopping" could weigh against a declaratory judgment plaintiff at all. In *Williams Natural Gas*, the court explained that an "accusation [of] 'forum

21

shopping' may have rhetorical value, but it does little to advance the analysis. It is a fact

of life that a party's choice of forum will more likely than not be motivated by strategic

considerations. What is pivotal is not the litigant's subjective motivation but the

objective impact of its actions." *Id.* at \*9. Similarly in *Eljer*, which was, like *Williams*

*Natural Gas* and this case, a first-filed Delaware declaratory judgment action, this Court

stated that "[d]efendants complain that plaintiff filed its declaratory judgment action

simply as a way to defeat defendants' choice of forum when they were on the verge of

filing their own case. This may be the case, but, if it is, it does not disentitle plaintiff

from the use of this forum, where justice may be had without hardship to any party."

*Eljer*, Del. Ch., 1993 WL 133065, at \*1. As the *Williams Natural Gas* court observed,

"[i]f such behavior were considered inequitable, a stay would become virtually automatic

in most litigations involving large economic stakes." *Williams Natural Gas*, Del. Ch.,

1990 WL 13492 at \*9.

Furthermore, there was nothing inequitable about the Foundation's decision to file

suit in Delaware. As discussed above (*see* pp. 5-13, *supra*), Lorillard spent the latter half

of 2001 asserting backward-looking claims about whether one particular advertisement

was defamatory or violated unfair business practices or communications laws. (Vargyas

Aff., Ex. 1 to Pl. Summ. Judg. Br., ¶¶ 5-17.) The Foundation sought protection from this

Court only after Lorillard suddenly switched its legal theories and changed its demands to

assert a purported right to control the content of the Foundation's future public education

advertisements. (*Id.* at ¶¶ 19-21.) Lorillard's "30-day notice" letter arrived the very day

Lorillard informed the Foundation that it was advancing this attempt to control the

22

59278.1001

Foundation's future public education efforts. (*Id.* at ¶¶ 19-20 & Tab A.) That letter created no certainty whatsoever that Lorillard would file suit at any particular time, or that it would do so in any particular forum or fora. In fact, in November 2001, Lorillard had sent the Foundation a draft complaint asserting entirely different legal theories, which it did not pursue in court. (*Id.* at ¶ 16.) Further, Lorillard's spokesman was quoted in the press as suggesting that multiple enforcement actions in many different jurisdictions had not been ruled out. *See* Bernard Stamler, *Lorillard Tobacco Threatens Legal Action Against a Foundation for Its Tough Antismoking Campaign*, *N.Y. Times*, Jan. 23, 2002, Exhibit 3 to Plaintiff's Opening Brief in Support of Its Motion for Summary Judgment on Claims I-III. Rather than operate under the continuing threat of an unspecified number of tobacco company actions filed at unspecified times designed to control the Foundation's future public education efforts, the Foundation filed suit.

It is significant to note that the Foundation did *not* sue in the District of Columbia, where its principal business office is located. Instead, it chose the *neutral* forum of Delaware, where both it and Lorillard are incorporated. There was nothing "inequitable" about that conduct. Indeed, it is at best highly ironic for Lorillard to make such charges when *it* seeks to avoid litigation in its own state of incorporation in favor of a later filed case in North Carolina, its "home court." *See Asten v. Wangner*, Del. Ch., C.A. No. 15617, 1997 WL 634330, at *1, (Steele, V.C.) (Oct. 3, 1997) ("No Delaware corporation can, absent unusual circumstances, claim surprise or inconvenience of litigating against another Delaware corporation in the state of incorporation of both parties."); *UR Acquisition Corp. v. Reid*, Del. Ch., C.A. No. 17090, hearing transcript, at 94 (Strine,

V.C.) (May 5, 1999) ("This is a case where the primary players are all Delaware citizens, and they will all get a fair shake.").[14]

### 3. Lorillard's "Notice Letter" Did Not Constitute Filing in North Carolina.

For Lorillard now to contend that the North Carolina action was *filed* on January 18, the date of the 30-day notification letter, defies common sense. (*See* Def. Br. at 16.) There was no action pending in North Carolina (or anywhere else) on January 18. Thus, the very purpose of the comity doctrine — demonstrating respect for a foreign jurisdiction already cognizant of a matter — is simply not implicated. *See Rose v. Lundy*, 455 U.S. at 518; *QRS 10-12 (TX)*, Del. Ch., 1999 WL 350491, at *2 (comity is a question of the relationship "between the two *courts* involved") (emphasis added).

Moreover, it was not even clear from Lorillard's letter or its other contemporaneous statements that an action *would* be filed in North Carolina. (*See* Exhibit 1, Paul Nowell, *Foundation: Lorillard Threat Over Irreverent Ads "Outrageous,"* Associated Press Newswires, Jan. 23, 2002 (stating that Lorillard spokesman Steve Watson said that "[i]t had not been determined where the suit would be filed").) At all times after the January 18 letter until Lorillard actually filed suit on

---

[14]    Lorillard's complaint that the Foundation informed the press and public about its notice letter (Def. Br. at 11), even if it stated some kind of equitable claim, is as irrelevant as its forum-shopping claims. As *Williams Natural Gas* makes clear, as described in the text, such equitable assertions must be considered only under the "hardship" standard. Lorillard obviously cannot contend that the Foundation's press statements created any barrier to proceeding with this litigation in Delaware. Moreover, the Foundation has every right under the First Amendment to tell the public about Lorillard's threats and its efforts to control the content of the Foundation's public education campaign.

February 19, Lorillard consistently refused to identify the forum or fora in which it would sue. On February 7, the Foundation's counsel specifically asked Lorillard where it intended to file suit — and Lorillard refused to name a forum or fora. (Vargyas Aff., Ex. 1 to Pl. Summ. Judg. Br., ¶ 22.) Furthermore, Lorillard's public statements immediately after the January 18 letter belie its claim that it never threatened to sue the Foundation in multiple jurisdictions. *Compare* Stamler, *N.Y. Times*, Jan. 23, 2002, Ex. 3 to Pl. Summ. Judg. Br. ("It is conceivable that Lorillard might have to sue in all of those states, which it has not yet decided to do, Mr. Watson [Lorillard's spokesman] said.") *with* Milstein Aff. ¶ 10. Thus, even had the North Carolina courts been paying attention to press reports, they would have had no basis, prior to the filing of this Delaware action, to believe that they would in the future have cognizance of this matter.

Finally, even if Lorillard had somehow given the North Carolina courts some relationship to this matter before it sued there — which it did not — there is no equitable force whatever to Lorillard's invocation of the 30-day notice period of the MSA as somehow entitling it to an earlier "deemed" filing. Lorillard's claim that the *Foundation* somehow "*required* Lorillard to operate under the 30 day waiting period" (Def. Br. at 13 (emphasis added)) is patently false. The 30-day period is contained in a contract — the MSA — to which Lorillard *is* a party but the Foundation is *not*. That Lorillard considered it prudent to comply with a provision of its own contract with MSA parties before suing a non-party under that contract can hardly be converted into inequitable conduct by the non-party. Moreover, the bylaws claims that Lorillard now asserts (*see* Def. Br. at 17 n.3; Hermann Letter, Ex. 5 to Pl. Summ. Judg. Br.) were not even arguably

25

59278.1001

subject to a 30-day notice period. And in any event, Lorillard dallied even after the 30

days expired, filing only on the *second* business day thereafter.[15/] Presumably, on

Lorillard's theory, it would have been entitled to first-filed status based on its notice letter

whenever it ultimately got around to filing suit.

Thus, this Delaware court was clearly first vested of this controversy, and the

*McWane* comity analysis is inapplicable.

> **B.    The North Carolina Action Does Not Contain the Same Issues as This
> Delaware Action.**

Moreover, for the *McWane* comity analysis to apply, the prior pending foreign

action must involve the "same issues" as the Delaware action. *McWane*, 263 A.2d at

283. *McWane* explains that this requires that the Delaware matter involve "the same

cause of action." *Id.* Here, the claims concerning the Foundation's bylaws set forth in

the Foundation's Delaware Complaint and "press[ed]" by Lorillard here (*see* Herrmann

Letter, Ex. 5 to Pl. Summ. Judg. Br.) are simply not at issue in the North Carolina case.

(*See* North Carolina Complaint, Ex. A to Def. Br.) Whether Lorillard can enforce *the

Foundation's bylaws* against the Foundation plainly is a different issue and a different

---

[15/]    The thirtieth day after Lorillard's January 18 letter was Sunday, February 17,
2002. (*See* Milstein Affidavit ¶ 17.) The next day — the first day that Lorillard could
have filed suit, according to its theory — was President's Day. But the North Carolina
courts were open for business. (*See* Sasser Affidavit, Ex. 4 to Pl. Summ. Judg. Br., ¶ 3 &
Tab A.) Lorillard's self-serving contentions that "Lorillard was closed" that day, and that
"[it] wanted to avoid any controversy as to whether the thirty-day notice period had run"
(Milstein Aff. ¶17), are non-sequiturs and are directly contrary to Lorillard's
representations to this Court on February 20. At the scheduling conference, Lorillard's
counsel specifically represented that the North Carolina action was filed on "the first
business day after the 30-day period expired." (Transcript of Hearing, Scheduling
Conference, C.A. No. 19406 (Feb. 20, 2002), at 6 (Statement of Steve Herrmann).)

26

cause of action from whether Lorillard can enforce *the MSA* against the Foundation. The claims involve entirely different alleged "contracts." In addition, because different "contracts" are at issue, significant aspects of this action arise from distinct "operative fact[s]" from the more limited claims at issue in North Carolina. *Macklowe v. Planet Hollywood, Inc.*, Del. Ch., C.A. No. 13689, 1994 WL 586835, at *3 (Steele, V.C.) (Oct. 4, 1994). In sum, the claims and issues in the North Carolina action form only a subset of those in this Delaware action. Accordingly, for this entirely independent reason, Lorillard cannot state a basis for dismissal or delay of this case under the *McWane* comity doctrine.

II.    **Lorillard Cannot Demonstrate with Particularity that It Will Suffer Overwhelming Hardship and Inconvenience If This Action Is Litigated in Delaware.**

Because the Delaware action was first-filed (or, alternatively, because it does not contain the same claims as the North Carolina action), Lorillard's Motion to Stay or Dismiss must be decided under the doctrine of *forum non conveniens. See Caithness Resources, Inc. v. Ozdemir*, Del. Ch., C.A. No. 18073, 2000 WL 1741941, at *3 (Strine, V.C.) (Nov. 22, 2000); *Eljer*, Del. Ch., 1993 WL 133065, at *1. As discussed above, although every Delaware plaintiff is accorded a presumption that its choice of forum is proper, "[t]he plaintiff's choice of forum is accorded even more weight where, as here, there are no other previously filed actions pending." *Mar-Land*, Del. Supr., 777 A.2d at 778. To defeat this strong presumption, Lorillard must show that this action is the "rare case" in which dismissal of a first-filed Delaware action is warranted. *Id.*

27

To obtain a *forum non conveniens* dismissal, Lorillard must establish — through the so-called *Cryo-Maid* factors — that it will "suffer overwhelming hardship and inconvenience if forced to litigate in Delaware." *Chrysler*, Del. Supr., 669 A.2d at 108.

The *Cryo-Maid* factors are well-established:

1.   the applicability of Delaware law;

2.   the ease of access to proof;

3.   the availability of compulsory process for witnesses;

4.   the pendency or nonpendency of a similar action or actions in another jurisdiction;

5.   the possibility of a need to view the premises;

6.   all other practical considerations.

*In re Chambers Dev. Co., Inc., S'holders Litig.*, Del. Ch., C.A. No. 12508, 1993 WL 179335, at *2 (Chandler, V.C.) (May 20, 1993). Lorillard "must show '*with particularity*' that one or more of these factors" actually imposes an overwhelming hardship. *Mar-Land*, Del. Supr., 777 A.2d at 778 (quoting *Ison*, Del. Supr., 729 A.2d at 838) (emphasis added); *see also Taylor*, Del. Supr., 689 A.2d at 1199 (holding that a defendant may not rely upon "bare allegations of inconvenience without a particularized showing of the hardships relied upon").

Here, like the defendant whose motion to stay or dismiss was rejected by the Delaware Supreme Court in *Mar-Land*, Lorillard has utterly failed to show severe hardship under these factors with particularity. As the Delaware Supreme Court held in *Mar-Land*, to show "overwhelming hardship" the defendant must "detail[] the grounds of any potential defenses it may raise . . . or the grounds of any counterclaims it may assert,"

28

identify any specific evidence needed that would be unavailable for production in Delaware, and identify impediments to obtaining specific witnesses to be called at trial. *Mar-Land*, Del. Supr., 777 A.2d at 770-81. Lorillard's single, cryptic footnote listing the eight claims it contends are at issue is apparently the best it can do, and clearly does not meet this standard. (*See* Def. Br. at 17 n.3.) Moreover, as set forth below, Lorillard has failed to show with particularity that *any* of the *Cryo-Maid* factors would subject it to overwhelming hardship and inconvenience such that dismissal or stay of this first-filed action is warranted.[16]

   **Application of Delaware law.** Contrary to representations it made to this Court on February 20, 2002,[17] Lorillard has now admitted that interpretation — and possible enforcement — of the Foundation's bylaws is an issue in this case. (*See* Def. Br. at 17 n.3; Herrmann Letter, Ex. 5 to Pl. Summ. Judg. Br.) There can be no doubt that the issue of interpretation and enforcement of the bylaws of the Foundation, a Delaware non-profit corporation, is a matter of Delaware law. *See, e.g., First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983) ("As a general matter, the law

---

[16]    For the same reasons, Lorillard has not established that proceeding with this first-filed action would subject it to "undue hardship and inconvenience" (*see* n.10, *supra*), and thus there is no basis for a stay of this case in favor of the later-filed North Carolina action.

[17]    *See* Transcript of Hearing, Scheduling Conference, Civil Action No. 19406 (Feb. 20, 2002) at 20 ("We have not brought an action seeking to enforce their bylaws . . ."); *but see* Herrmann Letter, Ex. 5 to Pl. Summ. Judg. Br. (stating that "[a]s I mentioned to you and to Vice Chancellor Lamb at the office conference on February 20, 2002, at the time that the Delaware litigation was filed, the [Foundation] had good reason to believe that Lorillard would make claims that the [Foundation's] By-law Section 12.2 was enforceable in litigation by Lorillard").

59278.1001

of the state of incorporation normally determines issues relating to the *internal* affairs of a corporation."). According to the internal affairs doctrine, Delaware law "should determine issues relating to internal corporate affairs." *McDermott Inc. v. Lewis*, Del. Supr., 531 A.2d 206, 215 (1987); *see also CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 90 (1987) ("[A] corporation — except in the rarest situations — is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of its incorporation."). Interpretation and enforcement of the bylaws of a Delaware non-profit corporation is a matter of quintessential interest to the Delaware courts and public, and a matter of corporate governance committed by statute to the jurisdiction of the Court of Chancery. Del. Code Ann. tit. 8, § 111 ("Any action to interpret, apply, or enforce the provisions of the certificate of incorporation or the bylaws of a corporation may be brought in the Court of Chancery.").

**Ease of access to proof.** Lorillard's burden is not merely to show, as it appears to believe, "which court has easier access to proof." (Def. Br. at 19.) As the Delaware Supreme Court said in *Mar-Land*: "It is insufficient 'that all of the *Cryo-Maid* factors may favor defendant' or that 'another court would be a "more appropriate forum."'" *Mar-Land*, Del. Supr., 777 A.2d at 778 (citations omitted). To the contrary, to establish the requisite degree of hardship, Lorillard must "identif[y] . . . specific pieces of evidence necessary to its defense that it will not be able to produce in Delaware" or that "requiring [Lorillard] to move forward in Delaware would impede its access to the testimony of witnesses." *Id.* at 781. Lorillard makes no effort to meet this burden, and concedes that the Delaware courts are no less able to compel the testimony of witnesses than the North

30

Carolina courts. (Def. Br. at 19.) As in *Mar-Land*, the fact that a defendant's corporate

headquarters is outside Delaware does not establish hardship. *Mar-Land*, Del. Supr., 777

A.2d at 780-81; *see also Macklowe*, Del. Ch., 1994 WL 586835, at *4 (requiring a

Delaware corporation with headquarters out of state to produce documents in Delaware is

not a "substantial inconvenience"). Nor is the presence of a single Foundation director in

North Carolina pertinent to the issue.[18] Finally, when a defendant "possess[es]

substantial resources," as Lorillard does, the burden of providing witnesses and evidence

from other jurisdictions is "'substantially attenuated.'" *Friedman*, Del. Ch., 752 A.2d at

553 (quoting *Monsanto Co. v. Aetna Cas. & Sur. Co.*, Del. Super., 559 A.2d 1301, 1307

(1988)). Thus, Lorillard can show no inconvenience at all with regard to ease of access

to proof.

 **Availability of compulsory process for witnesses.** Lorillard concedes that "this

criterion is equal between the two jurisdictions" (Def. Br. at 19) and thus this factor

cannot support a claim of hardship.

 **Pendency or nonpendency of a similar action in another jurisdiction.** As

described above in Section I, this Delaware action is first-filed. This weighs heavily

against Lorillard. *See Assist Stock*, Del. Ch., 753 A.2d at 983 ("The fact that no first-filed

suit involving the same parties is pending in another jurisdiction weighs heavily against

---

[18] Consistent with a provision of its bylaws that requires that its board of directors
be "nationally geographically diverse" (Vargyas Aff., Ex. 1 to Pl. Summ. Judg. Br., at
Tab B, Bylaws 3.2(c)), the members of the Foundation's directors reside in locations
throughout the country. United States Senator Thomas R. Carper served as one of the
Foundation's founding directors during his tenure as Governor of Delaware. (*See id.* at ¶
24.)

defendant."). The only reason there is a hardship of a similar lawsuit in another

jurisdiction is because Lorillard has decided to pursue a subset of the same claims in a

later-filed action in North Carolina rather than litigating in its home state of

incorporation. Any hardship is therefore of Lorillard's own creation. *See Chrysler*, Del.

Supr., 669 A.2d at 107-08 ("The parties face wasteful duplication of effort and risk

inconsistent adjudications only because the [defendant] is pursuing its later-filed . . .

action."). If Lorillard were to dismiss or stay the later-filed North Carolina action, this

purported hardship would disappear. *See id.*

Further, it is not the case that "significant discovery" has meaningfully "begun" in

the North Carolina action. (Milstein Aff. ¶¶ 23-25; Def. Br. at 4, 20.) Lorillard fails to

bring to the Court's attention the fact that, the day before Lorillard filed its brief in this

Court, the Foundation had filed a Motion for Protective Order regarding discovery in

North Carolina.[19] (*See* Sasser Aff., Ex. 4 to Pl. Summ. Judg. Br., ¶ 8 & Tabs B, C, D.)

As Lorillard is well aware, the earliest this motion will be heard is April 29 (*see id.* at ¶¶

7-8 & Tab C) — more than a month after argument on the instant motion and three days

after argument on the Foundation's summary judgment motion.[20] Likewise, the North

---

[19]    The fact that the Motion for Protective Order was filed on March 7 rather than
March 4 was due solely to the Foundation's attempts to resolve this dispute with
Lorillard's counsel, without need of a motion. (Sasser Aff., Ex. 4 to Pl. Summ. Judg. Br.,
¶¶ 4-8.)

[20]    Since the time that Lorillard filed its brief, the Foundation has secured automatic,
30-day extensions of time to answer and to respond to specific discovery requests.
(Sasser Aff., Ex. 4 to Pl. Summ. Judg. Br., ¶¶ 9-12 & Tabs E, F, G, H.) These automatic,
administrative extensions are the normal practice in North Carolina. (*Id.* at ¶ 13.)

Carolina court has put off all discovery deadlines until May 8 or later, and has postponed

the time for the Foundation to answer or otherwise respond to Lorillard's complaint until

April 22. (*Id.* at ¶¶ 9-12 & Tabs E, F, G, H.) In contrast, the Delaware proceedings are

advancing on an expedited schedule.

**Possibility of a Need to View the Premises.** Lorillard states that there is no need

for a view of the premises of either the Foundation or Lorillard (*see* Def. Br. at 18 n.4),

and therefore this factor cannot support a claim of overwhelming hardship.

**Other Practical Considerations.** Lorillard offers no special practical

considerations that would impose extraordinary hardship on it if this case proceeds in

Delaware, apart from suggesting that proceeding here will result in duplication of

discovery efforts with those in North Carolina. (*See* Def. Br. at 20.) As noted, Delaware

courts take the view that the later-filed foreign case — not the first-filed Delaware case

— should be dropped or stayed to avoid such duplication of effort. *See Williams Natural*

*Gas Co. v. BHP Petroleum Co.*, Del. Supr., 574 A.2d 264 (unpublished table decision),

1990 WL 38329, at *2 (Holland, J.) (Mar. 12, 1990) (holding that the Court of Chancery

should have proceeded with first-filed Delaware action and enjoined the parties from

prosecuting the second-filed foreign action when the foreign court refused to stay its

proceedings); *Household, Int'l, Inc. v. Eljer Indus., Inc.,* Del. Ch., C.A. No. 13631, 1995

WL 405741, at *3 (Allen, C.) (June 19, 1995) (enjoining prosecution of second-filed

foreign action). In the end, neither this nor anything else in Lorillard's brief

"demonstrate[s] that this 'is one of the rare cases where . . . the burden of litigating in this

33

forum is so severe as to result in manifest hardship to the defendant.'" *Mar-Land*, 777

A.2d at 778 (quoting *Ison*, Del. Supr., 729 A.2d at 842).

## CONCLUSION

For all of the foregoing reasons, Defendant Lorillard's Motion to Stay or Dismiss

this action should be denied.

34

Respectfully submitted,

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Of Counsel:

Ellen Vargyas
General Counsel
American Legacy Foundation
1001 G Street, N.W., Suite 800
Washington, D.C. 20001
(202) 454-5555

David C. McBride
Richard H. Morse
Martin S. Lessner
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, DE 19801
(302) 571-6600

Thomas P. McGonigle
John L. Reed
DUANE MORRIS, LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801
(302) 657-4900

John Payton
Patrick J. Carome
David W. Ogden
WILMER, CUTLER & PICKERING
2445 M Street, N.W.
Washington, D.C. 20037
(202) 663-6000

*Attorneys for Plaintiff*
*American Legacy Foundation*

Dated:  March 18, 2002