IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Legacy Foundation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| National Union Fire Insurance Company of | ) | |
| Pittsburgh, Pennsylvania, | ) Civil Action No. 07-248 (SLR) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**APPENDIX TO THE FOUNDATION'S BRIEF
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**VOLUME I OF III**

GILBERT RANDOLPH LLP
Richard Shore
Kami E. Quinn
1100 New York Avenue, NW
Suite 700
Washington, DC 20005
Telephone: (202) 772-2200

and

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Counsel for Plaintiff
American Legacy Foundation

Date: March 12, 2008

# TABLE OF CONTENTS

**Description**          **Page**

Affidavit of Ellen Vargyas, General Counsel and
Corporate Secretary for the American Legacy Foundation ...................................................... A1

Exhibit A:
November 13, 2001 Letter from Jim Phillips to John Payton.................................................... A5

Exhibit B:
January 18, 2002 Letter from Ronald Milstein to Patrick Carone [sic]..................................... A8

Exhibit C:
Complaint Filed by American Legacy Foundation in Delaware Chancery Court,
C.A. 19406-NC ...................................................................................................................... A10

Exhibit D:
Complaint filed by Lorillard Tobacco Company in Wake County General Court
of Justice, Superior Court Division North Carolina, 02 CvS 02170...................................... A33

Exhibit E:
Answer and Counterclaims filed by Lorillard Tobacco Company in the
Delaware Chancery Court, C.A. 19406-NC .......................................................................... A47

Exhibit F:
December 6, 2002 Letter from Wayne Borgeest to Jane Greenburg....................................... A90

Exhibit G:
April 10, 2003 Letter from John Haller to Anna Spriggs ..................................................... A101

Exhibit H:
Decision of the Delaware Chancery Court, C.A. 19406-NC in *Am. Legacy
Found. v. Lorillard Tobacco Co.*, 886 A.2d 1 (Del. Ch. 2005) ............................................ A115

Exhibit I:
Decision of the Supreme Court of Delaware, No. 579, 2005 in *Lorillard
Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728 (Del. 2006)........................................... A162

Exhibit J:
Answer and Counterclaims of Defendant Lorillard Tobacco Company to First
Amended Complaint in the Delaware Chancery Court, C.A. 19406-NC .............................. A181

Exhibit K:
National Union CGL Policies (Numbers BE 7402566 and BE 8716521)............................. A230

Exhibit L:
National Union D&O Policy Number 873-99-71 .................................................................... A398

Exhibit M:
Travelers CGL Policies (Numbers W-680-479H825-3-99, W-680-479H825-
3-00, and W-680-479H825-3-01) ....................................................................................... A445

Exhibit N:
Transcripts of Broadcasts........................................................................................................ A747

## AFFIDAVIT OF ELLEN VARGYAS

WASHINGTON                    )
                              )      SS. :
DISTRICT OF COLUMBIA          )

I, Ellen Vargyas, being duly sworn, do hereby depose and state as follows:

1.    I currently am General Counsel and Corporate Secretary for the American

Legacy Foundation (the "Foundation"), located at 1724 Massachusetts Avenue, NW,

Washington, D.C. 20036.  I make this affidavit based upon my personal knowledge.

2.    The Foundation's business includes encouraging young people to reject tobacco

through, among other things, public education.

3.    In November 2001, Lorillard Tobacco Company ("Lorillard") threatened to sue

the Foundation for defamation based on a truth® radio broadcast spot known as "Dog

Walker." A true and correct copy of the letter, dated November 13, 2001 is attached as

Exhibit A.

4.    In Dog Walker, a telephone caller identifies himself to a tobacco company

receptionist as a professional dog walker and offers to collect urine produced by the dogs he

walks and sell it to the tobacco company because "dog pee is full of urea, one of the

chemicals that [tobacco companies] put in cigarettes."

5.    In January 2002, Lorillard sent a further letter providing notice of its intent to

file suit against the Foundation in 30 days to enforce asserted prohibitions against vilification

and personal attack, allegedly violated by truth® broadcast spots.  A true and correct copy of

the letter, dated January 18, 2002 is attached as Exhibit B.

A1

6.    On February 13, 2002, seeking to avoid the possibility of a nationwide litigation blitz and to avail itself of a Delaware forum, the Foundation filed a declaratory judgment action in the Delaware Chancery Court, captioned *American Legacy Foundation v. Lorillard Tobacco Co.*, C.A. No. 19406-NC, Del. Ch. (Feb. 13, 2002) (the "Delaware Action"). A true and correct copy of the Foundation's complaint filed in the Delaware Action on February 13, 2002 is attached as Exhibit C.

7.    Several days later, Lorillard filed its threatened suit against the Foundation in North Carolina, in the Wake County Superior Court, captioned *Lorillard Tobacco Co. v. American Legacy Foundation*, No. 02 CvS 02170 (Feb. 19, 2002) (the "North Carolina Action"). A true and correct copy of the complaint filed on February 19, 2002 in the North Carolina Action is attached as Exhibit D. The North Carolina Action was later stayed to allow the Delaware Action to proceed.

8.    Lorillard also asserted various counterclaims in the Delaware Action, seeking damages and other relief (the "Counterclaims"). A true and correct copy of Lorillard's Counterclaims, filed on September 13, 2002, is attached as Exhibit E.

9.    Lorillard's allegations in both the North Carolina Action, which was stayed to allow the Delaware Action to proceed, and its Amended Counterclaims filed in the Delaware Action on January 1, 2005, are in material respects the same as the Counterclaims in the Delaware Action. A true and correct copy of Lorillard's Amended Counterclaims is attached as Exhibit J.

10. The Foundation provided prompt notice to National Union of the November 13, 2001 letter from Lorillard, the January 18, 2002 letter from Lorillard, the

A2

Delaware Action, the North Carolina Action, and the Counterclaims asserted by Lorillard. A true and correct copy of letters acknowledging such notice are attached as Exhibits F and G.

11. National Union flatly denied its obligation to defend the Foundation under the CGL policies or to advance defense costs under the D&O Policy, leaving the Foundation to fend for itself. *See* Exhibits F and G.

12. The Foundation successfully defended itself against Lorillard's allegations in both the Delaware Chancery Court and the Delaware Supreme Court against Lorillard's, and in so doing incurred approximately $17 million in legal fees and expenses. A true and correct copy of the courts' opinions, *Am. Legacy Found. v. Lorillard Tobacco Co.*, 886 A.2d 1 (Del. Ch. 2005) and *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728 (Del. 2006) are attached as Exhibits H and I hereto.

13. To this day, National Union has not paid a single penny of the Foundation's legal fees and expenses.

14. The Foundation purchased umbrella CGL policies from National Union for consecutive annual policy periods from April 24, 2001 through April 24, 2003 (the "National Union CGL Policies"). True and correct copies of the National Union CGL Policies are attached as Exhibit K hereto.

15. In addition to the CGL policies, the Foundation also purchased a D&O liability policy from National Union, which covers the period from August 26, 2001 through August 26, 2002 (the "National Union D&O Policy"). A true and correct copy of the National Union D&O Policy is attached as Exhibit L hereto.

16. The Travelers Indemnity Company of America ("Travelers") also was named as a defendant in this action; the Foundation has dismissed Travelers with prejudice from the

A3

litigation.  True and correct copies of the Travelers policies identified in the Foundation's

complaint in this action are attached as Exhibit M hereto.

17.  In defending itself in the Lorillard litigation described above, the Foundation

incurred nearly $17 million dollars in legal fees and costs.

18.  In the Lorillard litigation, Lorillard challenged several television and radio truth®

broadcasts that were initially aired between April 24, 2001 and April 24, 2003.

19.  Lorillard attached electronic copies of certain challenged truth® broadcast spots

to its Counterclaims in the Delaware Action.  True and correct transcripts of those broadcast

spots are attached hereto as Exhibit N.

20.  I declare under penalty of perjury that the foregoing is true and correct to the best

of my knowledge, information and belief.


FURTHER AFFIANT SAYETH NOT.




_Ellen Vargyas_
Ellen Vargyas



**SUBSCRIBED AND SWORN**
to before me this 11th day
of March, 2008.

_Virginia Cornell_
Notary Public

My Commission Expires: 5/14/2012

VIRGINIA CORNELL
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires May 14, 2012


A4

# EXHIBIT A

BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P.

RALEIGH OFFICE

1600 FIRST UNION CAPITOL CENTER
150 FAYETTEVILLE STREET MALL (27601)
POST OFFICE BOX 1800 (27602)
RALEIGH, NORTH CAROLINA
(919) 839-0300
FACSIMILE (919) 839-0304

ATTORNEYS AND COUNSELLORS AT LAW

FOUNDED 1897

2000 RENAISSANCE PLAZA

230 NORTH ELM STREET

POST OFFICE BOX 26000

GREENSBORO, NORTH CAROLINA 27420

TELEPHONE: (336) 373-8850

FACSIMILE: (336) 378-1001

WRITER'S DIRECT DIAL

(336) 271-3131

November 13, 2001

## FOR SETTLEMENT PURPOSES ONLY

## VIA FACSIMILE 202-663-6363 AND OVERNIGHT MAIL

John A. Payton, Esq.
Wilmer, Cutler & Pickering
2445 M Street, N.W.
Washington, DC 20037-1420

Dear Mr. Payton:

We represent Lorillard Tobacco Company, ("Lorillard"). Lorillard previously has written to the American Legacy Foundation (the "Foundation") and to Arnold Worldwide concerning the dog urine radio advertisement which your client broadcast on more than 100 radio stations nationwide during the spring and summer of this year.

The dog urine advertisement states directly or implies that Lorillard adds urea to its cigarette products, that urea is unhealthy and unsanitary like dog urine and that Lorillard adds dog urine or a component derived from dog urine to its cigarette products. As we have stated before, none of these statements are true.

So that we can be crystal clear about this, we will respond to the questions raised in your July 20, 2001 letter to Steven Watson:

(1)    *Is the presence of urea on the list of composite ingredients related solely to products of manufacturers other than Lorillard?* Answer: Yes.

(2)    *Is it in fact true that the only urea that exists in Lorillard's cigarettes is that which "naturally occurs in the tobacco leaf" from which those cigarettes were produced?* Answer: Yes.

(3)    *Has Lorillard ever added urea to any of its cigarettes?* ... Answer: No.

(4)    *Does Lorillard reintroduce urea into its cigarettes that may be lost in the manufacturing process?* Answer: No.

(5)    *Does urea occur in different levels in different types of tobacco? If so, does*

A5

John A. Payton, Esq.
November 13, 2001
Page 2

> *Lorillard alter the tobacco blend in its cigarettes to affect urea levels?* Answer:
> Lorillard does not measure the levels of urea in tobacco and does not alter its
> tobacco blend for any reason having to do with urea.

 (6) *Does Lorillard add other compounds that contain urea?* Answer: No.

  The fact that the Foundation would ask these questions only after the fact — after the dog
urine ad was broadcast and the harm was done -- confirms to us that your client had no basis for
making the false and disparaging statements in the ad and, in fact, knew that the statements were
false when the ad was created and before it was broadcast. These statements constitute
defamation and unfair business practices for which Lorillard is entitled to a remedy.

  Despite the existence of these claims and Lorillard's willingness to assert them in court,
we are willing to resolve these matters short of litigation if the Foundation is willing to
acknowledge the inaccuracies in the dog urine ad. Put plainly, in your letter to Mr. Watson, you
stated that the Foundation is dedicated to conveying the truth to the public. Lorillard will provide
the Foundation one last chance to do just that.

  Lorillard will agree to forego legal action if the Foundation acknowledges in writing, that:

 (1) The dog urine ad was false in its statement that Lorillard Tobacco Company adds
   urea to its cigarette products.

 (2) The implication in the ad that Lorillard adds dog urine or a derivative of dog urine
   to its cigarette products is false.

 (3) The Foundation regrets the false statements contained in its advertisement,
   retracts the advertisement and will not broadcast or publish, or arrange for
   broadcasting or publication, the advertisement in the future, whether on radio,
   Internet, or otherwise.

  Finally, Lorillard's agreement to forego legal action is conditioned on agreement by the
Foundation and its advertising agencies not to make and record or transcribe any further
telephone calls to company employees for advertising purposes or for broadcast or other
publication.

  We hope that in this instance the Foundation will honor its commitment to publish the
truth. However, if we do not receive a positive response to this correspondence by the end of the
business day on Monday, November 26, 2001, Lorillard will move forward with the filing of a
complaint which will include at least the claims set forth in the enclosed draft and possibly
others, including claims for breach of the Master Settlement Agreement's "vilification" provision.

A6

John A. Payton, Esq.
November 13, 2001
Page 3


Sincerely,

Jim W. Phillips, Jr.

JWP:jw
Enclosure
cc:    Ronald S. Milstein, Esq.

A7

# **EXHIBIT B**



Ronald S. Milstein
Vice President,
General Counsel and Secretary

January 18, 2002

(336) 335-7718
Fax (336) 335-7707
E-Mail: rmilstein@lortobco.com

<u>**VIA FACSIMILE 202-663-6363 AND OVERNIGHT MAIL**</u>

Patrick Carone, Esq.
Wilmer, Cutler & Pickering
2445 M Street, N.W.
Washington, DC  20037-1420

      **Re:**    **Notice of Intent to Initiate Enforcement Proceeding under MSA**

Dear Mr. Carone:

      This letter gives notice, pursuant to Section VII(c)(2) of the Master Settlement Agreement ("MSA"), of Lorillard Tobacco Company's ("Lorillard's") intent to initiate a proceeding against the American Legacy Foundation ("ALF") to enforce the terms of the MSA. Unless ALF's violations of the provisions of the MSA that govern its actions, including Section VI(h), are addressed to Lorillard's satisfaction within thirty (30) days of the date of this notice, Lorillard intends to avail itself of the remedial provisions set forth in the MSA.

      As you know, Lorillard agreed in the MSA to participate in the funding of a campaign with twin aims: (1) educating the American public as to the health effects of smoking and as to the nature of tobacco products generally and (2) counteracting the use of tobacco products by youth in America. Lorillard's agreement to participate in this effort represents a significant commitment on its part to support an important public policy component of the MSA. Under Section VI of the MSA, millions of dollars paid by Lorillard and the other participating manufacturers have been earmarked for the National Public Education Fund ("Fund"). This fund is administered by ALF—which itself is established by Section VI of the MSA—and has been the genesis of ALF's "truth" campaign. However, it has become abundantly clear that ALF's "truth" campaign is not about conveying the truth about tobacco products to the American public, so much as vilifying and personally attacking tobacco companies and their employees.

      This fact comes as a matter of great disappointment to Lorillard, as the MSA sets forth in detail ALF's permissible functions and the manner in which ALF may use Fund money. Even more importantly, the MSA expressly provides that the Fund may not be used "for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental

Corporate Office:
714 Green Valley Road
Greensboro, NC 27408

Mail to:
P.O. Box 10529
Greensboro, NC 27404-0529

A8

Patrick Carone, Esq.
November 13, 2001
Page 2

agency, whether individually or collectively. [ALF] shall work to ensure that its activities are carried out in a culturally and linguistically appropriate manner." The MSA requires that ALF incorporate these limitations on its own actions into its organizational documents, and its Articles and Bylaws in fact do so.

Despite the presence of the limitations on ALF's activities, the message of the "truth" campaign has consistently strayed far afield from the facts concerning tobacco products and their effect on users. Rather than focus on the products themselves, in large part the message of the "truth" campaign is that the participating manufacturers and their executives are dishonest, deceitful, callous, malicious, or otherwise unscrupulous. This is precisely what is forbidden by the MSA provisions governing the establishment and activities of ALF and the creation and use of the Fund. The cessation of ALF's current pattern of conduct is of the utmost importance not just simply because it has failed to meet its obligations under the MSA, but even more fundamentally because it dishonors the good faith negotiations and negotiators who laboriously struggled to, and succeeded in, consummating the most significant public health agreement in our country's history.

Lorillard first alerted ALF to its concerns with the "truth" campaign in July of 2001. Lorillard made further overtures to ALF in the fall and winter of 2001, again seeking to resolve its concerns with ALF's conduct through informal channels, but these efforts proved to be fruitless. Because of the seriousness with which Lorillard regards ALF's activities and the use of Fund money, Lorillard believes it is now left with no alternative but to pursue enforcement under Section VII(c) of the MSA. Nevertheless, Lorillard remains committed to resolving the matters raised in this notice informally and is available to meet or to discuss these matters with ALF, the Settling States, and the other participating manufacturers in an effort to do so, as is required by Section VII(c)(5) of the MSA. Lorillard hopes that in the end ALF's actions will affirm an earnest commitment on its part to honor its obligations under the MSA and in fact to stand as purveyors of the truth.

Sincerely,

Ronald S. Milstein

# EXHIBIT C

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

|  |  |
|---|---|
| AMERICAN LEGACY FOUNDATION,<br>a Delaware non-profit corporation, | ) )<br>) |
| Plaintiff, | ) )<br>)  C.A. No. 19406-NC |
| v. | ) )<br>) |
| LORILLARD TOBACCO COMPANY,<br>a Delaware corporation, | ) )<br>) ) |
| Defendant. | ) ) ) |

### COMPLAINT

Plaintiff American Legacy Foundation ("the Foundation"), by its undersigned attorneys, as and for its Complaint for declaratory and injunctive relief against Defendant Lorillard Tobacco Company ("Lorillard"), alleges as follows:

### NATURE OF THE ACTION

1.      The American Legacy Foundation is a national foundation, organized as a Delaware non-profit corporation, dedicated to one of the most critical public health missions facing this country -- reducing youth smoking and preventing smoking-related diseases. One of the Foundation's major initiatives in support of this public health mission is its development and sponsorship of the truth[sm] campaign -- an award-winning, nationwide grassroots and advertising campaign designed to discourage youth smoking by providing straightforward information about tobacco products, presented in a format that connects with teens. The Foundation's novel and successful countermarketing efforts have been credited publicly as part of the reason for the recent, sharp decline in cigarette smoking rates among children in the United States.

2.      Establishment of the Foundation was one of the core remedial features of the Master Settlement Agreement ("MSA"), the landmark agreement reached in 1998 to resolve lawsuits filed by nearly all the States and certain other government instrumentalities (collectively, the "Settling States") against the nation's largest tobacco companies, including Lorillard. (A copy of the MSA is attached hereto as Exhibit A.) The Settling States brought those lawsuits to seek far-reaching monetary and injunctive relief against the tobacco companies for the enormous injuries inflicted on the States and their citizens by the companies' deadly and addictive products. One of the Settling States' principal objectives in bringing the lawsuits, and in entering into the MSA, was to create mechanisms and programs to prevent America's children from becoming addicted to tobacco products and suffering the attendant consequences to their health. The Foundation, which is funded in part by hundreds of millions of dollars in settlement payments "made at the direction and on behalf of Settling States," (Ex. A, MSA § VI(h)), is the centerpiece of this effort.

3.      The MSA included terms that (a) described public health missions and activities to be undertaken by the Foundation, (b) provided for the Foundation's initial funding at the direction and on behalf of the Settling States, and (c) specified the composition of, and method of selecting, the Foundation's Board of Directors. The MSA provided that the Settling States, acting through the National Association of Attorneys General ("NAAG"), would perform the tasks necessary to form the Foundation and would cause the organizational documents of the Foundation to incorporate the terms of the MSA relating to the Foundation. (See Ex. A, MSA § VI.) The Settling States, through NAAG, in fact fulfilled these obligations, and the Foundation was established in

1999. As the MSA contemplates, the organizational documents of the Foundation --

specifically, its bylaws and certificate of incorporation -- incorporate the terms of the

MSA relating to the Foundation. (A copy of the Foundation's bylaws is attached hereto

as Exhibit B, and a copy of the Foundation's certificate of incorporation is attached

hereto as Exhibit C.)

    4.    As contemplated by the MSA and as specified in the Foundation's bylaws,

the Foundation is governed by a Board of Directors, a majority of whom are elected State

officials selected by NAAG, the National Governors' Association, and the National

Conference of State Legislators. (*See* Ex. B, Bylaws § 3.2.) Those elected State officials

select the remaining members of the Foundation's Board. (*See id.*) None of the tobacco

companies was given any role in the governance of the Foundation, either through the

appointment or selection of its directors or otherwise, because of the obvious and direct

conflict between the Foundation's public health mission and the tobacco companies'

economic self-interest.

    5.    The MSA provides no mechanism by which any tobacco company,

including Lorillard, may seek to enforce any term of the MSA against the Foundation.

The Foundation is not a party to the MSA and, in fact, did not even exist when the MSA

was signed. Likewise, the Foundation was not a party to any of the lawsuits that were

settled by the MSA, and therefore it is not subject to any of the 46 state court consent

decrees that were entered in accordance with the terms of the MSA. Indeed, the MSA

makes clear that *only* the Settling States, the tobacco companies, and certain other

specified persons and entities related to or associated with the tobacco companies -- and

not the Foundation -- are to be considered beneficiaries of the MSA. (*See* Ex. A, MSA

3

§ XVIII(p).)  In entering into the MSA, the tobacco companies did not obtain any

provision requiring that the Foundation join the MSA or become subject to any of the

consent decrees.  Instead, the MSA provides only that the MSA's provisions relating to

the Foundation be incorporated into the Foundation's organizational documents.  (*See id.*

at § VI(d).)  As a result, the restrictions on the Foundation's activities that are

contemplated in the MSA, while having the full force and legal effect that flows from

their presence in the Foundation's bylaws and certificate of incorporation, are not

enforceable through any claim or suit brought by a tobacco company against the

Foundation for an alleged breach of the MSA.

  6. Notwithstanding the fact that Lorillard, as a matter of law, has no basis to

assert any claim or suit against the Foundation for an alleged breach of the MSA,

Lorillard has recently issued a formal written threat to do exactly that.  Specifically, on

January 18, 2002, Lorillard sent the Foundation's counsel a letter purporting to invoke

the MSA's enforcement mechanisms against the Foundation and providing thirty-days'

notice of Lorillard's "intent to initiate a proceeding against the American Legacy

Foundation to enforce the terms of the MSA."  (A copy of Lorillard's letter is attached

hereto as Exhibit D.)  This letter asserted in a general and conclusory fashion that the

Foundation's national advertising campaign has failed to comply with a provision of the

MSA stating that a particular fund from which the Foundation derives most of its

financial support (namely, the "National Public Education Fund") shall not be used to

commit any "personal attack" on or "vilification" of any person or company.

  7. Lorillard has not taken any action to withdraw its threat to commence an

MSA enforcement action against the Foundation.  To the contrary, in a subsequent

communication between representatives of the Foundation and Lorillard on February 7,

2002, Lorillard reaffirmed its intent to bring such an action. Lorillard's representatives

have to date refused to identify the forum or fora in which Lorillard intends to proceed

against the Foundation, leaving the Foundation exposed to the possibility that Lorillard is

about to sue it in any or all of the 46 state courts that have continuing jurisdiction with

respect to the MSA and the related consent decrees.

      8.      Although the Foundation is confident that all of its activities have been in

full compliance with its bylaws and certificate of incorporation, including in particular its

bylaw that incorporates verbatim the MSA provision banning use of the National Public

Education Fund for "personal attacks" or "vilification" (Ex. B, Bylaws § 12.2), the

Foundation does not wish to -- and should not have to -- operate under the specter that

Lorillard or any other tobacco company may commence putative enforcement actions

against the Foundation in a multiplicity of judicial fora every time any one of them

reaches the self-interested determination that the Foundation's advertising is having a

detrimental effect upon their business and allegedly is "vilifying" them. Unless the

Foundation obtains a judicial declaration that it is not subject to such putative

enforcement actions, the continuing threat of such actions will have substantial and

deleterious effects on the Foundation's day-to-day operations, including its future

decisions regarding the content of the anti-smoking advertisements it creates and

disseminates and its future decisions regarding which of its funds it will use to pay for

those advertisements. A judicial declaration also is necessary to minimize the prospects

that: (1) Lorillard and other tobacco companies, whose economic self-interests are in

direct conflict with the basic public health mission of the Foundation, will be able to

subject the Foundation to vexatious, harassing, burdensome, and expensive litigation throughout the country; and (2) the Foundation will be subject to multiple and conflicting court rulings regarding its basic legal rights and obligations.

9.    For the foregoing reasons, the Foundation seeks a declaratory judgment, pursuant to 10 *Del. C.* §§ 6501 - 6513, and 8 *Del. C.* § 111, that (1) Lorillard has no basis to assert, in any court, any claim or suit against the Foundation seeking to enforce any term of the MSA or seeking to establish any violation of the MSA, and (2) Lorillard has no standing or basis to assert, in any court, any claim or suit against the Foundation seeking to enforce any of the Foundation's bylaws. The Foundation also seeks an injunction barring Lorillard from asserting any such claims under the MSA or the Foundation's bylaws.

### PARTIES

10.    Plaintiff American Legacy Foundation is a non-profit corporation organized under the laws of the State of Delaware, with its principal place of business in the District of Columbia.

11.    The Foundation is a national non-profit organization with a public health mandate to create and implement a wide-ranging public education and research effort devoted to reducing youth smoking and preventing diseases associated with smoking.

12.    To further its mission, the Foundation has developed the first-ever, nationwide, sustained public health campaign to educate the public, with a particular emphasis on youth, about the addictiveness, health effects, and social costs associated with tobacco products.

13.    The Foundation's efforts to deter and decrease youth tobacco use include
its hallmark truth[sm] campaign, which encompasses an award-winning, multi-media
advertising campaign, grassroots promotional events across the nation, and an interactive
website, providing teens with facts about the health and social consequences and
addictiveness of tobacco use.

14.    The Foundation's work in support of youth tobacco prevention also
includes grant awards to states to foster statewide, youth-led efforts against tobacco use, a
biannual, national, school-based survey on teen tobacco use, and a variety of other
innovative research and education initiatives.

15.    Because "tobacco use, particularly among children and adolescents, poses
perhaps the single most significant threat to public health in the United States," *FDA v.
Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000), the Settling States'
creation of the Foundation is one of the most significant public health achievements
flowing from the MSA.

16.    The Foundation is governed, according to its bylaws, by a distinguished
Board of Directors. The 11 Directors include two State Attorneys General, selected by
NAAG, two State Legislators selected by the National Conference of State Legislators,
and two Governors selected by the National Governors' Association. These six Directors
select five additional Directors, one of whom must have public health expertise, and four
of whom must have expertise in medical, child psychology, or public health disciplines.
(*See* Ex. B, Bylaws § 3.2.)

17.    The current members of the Foundation's Board of Directors are:

Christine Gregoire, Attorney General, Washington (*Chair*); Steven A. Schroeder, M.D., President, The Robert Wood Johnson Foundation (*Vice-Chair*); Alma S. Adams, Ph.D., North Carolina State Representative (*Treasurer*); Parris N. Glendening, Governor, Maryland; Ellen R. Gritz, Ph.D., Frank T. McGraw Memorial Chair in the Study of Cancer, University of Texas M.D. Anderson Cancer Center; Elmer E. Huerta, M.D., M.P.H., The Washington Cancer Institute; Michael O. Leavitt, Governor, Utah; Jenny H. Lee, Student, University of Miami; John J.H. Schwarz, M.D., Michigan State Senator; Carla J. Stovall, Attorney General, Kansas; Kenneth E. Warner, Ph.D., Avedis Donabedian Distinguished University Professor of Public Health, University of Michigan.

18.    Defendant Lorillard is a corporation organized under the laws of the State of Delaware, with a registered agent at: The Prentice Hall Corporation System, Inc., 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. Lorillard's principal place of business is in Greensboro, North Carolina.

19.    To settle the dozens of lawsuits brought against it by States seeking relief for the huge physical, social, and financial costs of its lethal products, Lorillard agreed to become one of the original signatories to the MSA in 1998.

20.    Lorillard is the fourth largest manufacturer of tobacco products in the United States. In 1999, Lorillard was the only one of the major tobacco companies to increase the amount of product it shipped in the United States. *See* Doug Campbell, *Lorillard Gains as RJR Sees Decline*, THE BUSINESS JOURNAL OF THE GREATER TRIAD AREA (April 3, 2000), at www.bizjournals.com/triad/stories/2000/04/03/story2.html.

21.    Lorillard's top-selling cigarette brand, Newport, is the second-most

popular brand among American teen smokers. A national survey of eighth-, tenth-, and

twelfth-grade students in the United States in 2000 showed that 18.7% of all smoking

teens said that they usually smoked Newport. Indeed, Newport was the brand of choice

for 23.4% of eighth-grade smokers. *See* Research Triangle Institute Analysis of L.D.

Johnston, P.M. O'Malley & J.G. Bachman, *Monitoring the Future National Survey*

*Results on Drug Use, 1975-2000, Vol. 1: Secondary School Students* (NIH Pub. No. 01-

4924), Bethesda, MD: National Institute on Drug Abuse (2001), available at

<http://www.monitoringthefuture.org>. Lorillard's Newport brand has even greater

popularity among African-American youth. Indeed, 70% of all African-American high

school smokers selected Newport as their brand of choice in 2000. *See* M.C. Farrelly, M.

Vilsaint, D. Lindsey, K.Y. Thomas, P. Messeri, Legacy First Look Report 7, *Cigarette*

*Smoking Among Youth: Results from the 2000 National Youth Tobacco Survey* (August

2001).

### GENERAL ALLEGATIONS

#### Resolution of the States' Lawsuits Against Tobacco Companies:
#### Formation of the MSA

22.    In the 1990s, more than 40 States and other government instrumentalities

commenced lawsuits seeking to hold tobacco companies liable for the enormous costs

their deadly products impose on the States and their citizens -- smokers and non-smokers

alike. The States brought claims for equitable relief and damages under state laws "in

order to further the Settling States' policies regarding public health, including policies

adopted to achieve a significant reduction smoking by Youth." (Ex. A, MSA § I.)

23.    With this avalanche of lawsuits, the tobacco companies faced the threat of multi-billion dollar judgments and potential bankruptcy. To avoid these devastating results and the burden, expense, and uncertainty of protracted litigation, the tobacco companies entered into lengthy negotiations with State Attorneys General to try to reach a settlement.

24.    After nearly a year of intense discussions, the negotiations culminated in the MSA, which was signed by the four largest tobacco companies (including Lorillard) and 46 States (including Delaware), the District of Columbia, the Commonwealth of Puerto Rico, and four U.S. territories.

25.    The nearly 150-page MSA is a complex, highly-negotiated agreement between sophisticated, experienced parties.

26.    Courts in each of the Settling States entered consent decrees to resolve the lawsuits pending against the tobacco companies. The Foundation was not a party to any of these lawsuits, was not present before any of the courts upon entry of any of the consent decrees, and is not bound by any of these consent decrees.

27.    The MSA was presented to and approved by the court that entered the consent decree in each Settling State.

28.    The Foundation is not a party to the MSA. Indeed, the Foundation did not even exist when the signatories entered into the MSA on November 23, 1998.

29.    The Foundation is not a third-party beneficiary of the MSA, which specifically provides that "[n]o portion of this Agreement shall provide any rights to, or be enforceable by, any person or entity" other than the Settling States, the tobacco

companies, and specified persons and entities related to or associated with the tobacco companies. (Ex. A, MSA § XVIII (p).)

30.    One of the principal public health aims of the MSA is reducing youth smoking. The MSA was designed to "achieve for the Settling States and their citizens significant funding for the advancement of public health, the implementation of important tobacco-related public health measures, including the enforcement of the mandates and restrictions related to such measures, as well as *funding for a national Foundation dedicated to significantly reducing the use of Tobacco Products by Youth.*" (Ex. A, MSA § I (emphasis added).) The Attorneys General of the Settling States specifically expressed their belief that "entry into this Agreement and uniform consent decrees with the tobacco industry is necessary in order to further the Settling States' policies designed *to reduce Youth smoking*, to promote the public health and to secure monetary payments to the Settling States." (*Id.* (emphasis added).)

31.    To that end, the tobacco companies, including Lorillard, agreed to limit their advertising and promotional activities, particularly with respect to marketing directed at youth. For example, tobacco companies that joined the MSA may not "take any action, directly or indirectly, to target Youth within any Settling State in the advertising, promotion or marketing of Tobacco Products, or take any action the primary purpose of which is to initiate, maintain or increase the incidence of Youth smoking within any Settling State." (Ex. A, MSA § III(a).) Likewise, the tobacco companies agreed to a ban on the use of cartoons in cigarette advertising, significant limitations on brand name sponsorship, and bans on free samples to youth. (*See id.* at §§ III(b), (c) & (g).)

### Combating the Public Health Crisis of Youth Smoking:
### Creation of the American Legacy Foundation

32.     The creation of the Foundation was the keystone of the MSA's goal of preventing the tobacco companies from creating a new generation of addicted smokers among America's children.  In fact, the Settling States believed that the creation of a national foundation to develop and implement "a comprehensive, coordinated program of public education and study" was an essential element of this effort. (*See* Ex. A, MSA § VI(a).)  The Foundation was intended "to support (1) the study of and programs to reduce Youth Tobacco Product usage and Youth substance abuse in the States, and (2) the study of and educational programs to prevent diseases associated with the use of Tobacco Products in the States." (*Id.*; Ex. C, Certificate of Incorporation, Art. III(A).)

33.     Under the MSA, the Settling States, acting through NAAG, were responsible for providing for the creation of the Foundation.  The MSA further provided that the Foundation's "organizational documents . . . shall specifically incorporate the provisions of this Agreement relating to the Foundation . . ." (Ex. A, MSA § VI(d).)

34.     The Settling States, acting through NAAG, fulfilled their responsibility under the MSA by providing for the creation of the American Legacy Foundation and by causing the Foundation's organizational documents -- its bylaws and its certificate of incorporation -- to specifically incorporate the provisions of the MSA relating to the Foundation. (*See* Exs. B & C.)

35.     The MSA provides that "as part of the settlement of claims" the four original signatory tobacco companies are obligated to make payments to an escrow account, from which funds are disbursed to fund the Foundation.  (Ex. A, MSA § VI(a).)  The MSA explicitly provides that the payment of these funds to the Foundation is "made

12

at the direction and on behalf of Settling States." (*Id.* at § VI(h).) The MSA also
provides that "[b]y making such payments in such manner, the [tobacco companies] do
not undertake and expressly disclaim any responsibility with respect to the creation,
operation, liabilities, or tax status" of the Foundation. (*Id.*)

     36.    The MSA provides for two sets of these payments made at the direction
and on behalf of the Settling States as initial funding for the Foundation. The smaller set
of payments -- $250 million over ten years -- are known as Base Foundation payments.
(*See* Ex. A, MSA § VI(b).)

     37.    The larger set of payments made at the direction and on behalf of the
Settling States -- more than $1.4 billion over five years -- is directed to the National
Public Education Fund, which may also be funded through specially designated donations
from third parties made directly to the Foundation. (*See id.* at § VI(c).)

     38.    The Foundation's bylaws incorporates verbatim a provision from the MSA
that pertains to the Foundation's use of the National Public Education Fund. That Fund --
unlike the Base Fund -- "shall be used only for public education and advertising
regarding the addictiveness, health effects, and social costs related to the use of Tobacco
Products, as defined in the Master Settlement Agreement, and shall not be used for any
personal attack on, or vilification of, any person (whether by name or business
affiliation), company, or governmental agency, whether individually or collectively."
(Ex. B, Bylaws § 12.2.)

     39.    The Foundation's Certificate of Incorporation incorporates verbatim a
provision of the MSA, stating: "The Foundation shall not engage in, nor shall any of the
Foundation's money be used to engage in, any political activities or lobbying, including,

but not limited to, support of or opposition to candidates, ballot initiatives, referenda or other similar activities. The Foundation shall work to ensure that its activities are carried out in a culturally and linguistically appropriate manner. The Foundation's activities shall be carried out solely within the States." (Ex. C, Certificate of Incorporation, Art. III(C).)

40.    Provisions of the MSA that have been incorporated into the Foundation's organizing documents have the full force and legal effect that ordinarily are accorded to the bylaws and certificate of incorporation of any Delaware non-profit corporation.

41.    The MSA does not provide the tobacco companies who were parties to the MSA with any basis to assert any claim or suit against the Foundation for an alleged breach of the MSA. If the parties to the MSA had intended such a result, they easily could have provided for a mechanism to permit the tobacco companies to seek enforcement of the MSA directly against the Foundation. For example, the parties could have provided that the Foundation execute an instrument containing an agreement to assume contractual obligations under the MSA. The parties' choice not to provide for such a mechanism was deliberate, and it accords with the MSA's intent to permit the Foundation to pursue its mission free from the threat of harassing and vexatious lawsuits by entities whose economic self-interest is inextricably opposed to the Foundation's mission.

<u>The Foundation's Acclaimed National Anti-Smoking Initiative:<br>the truth<sup>sm</sup> campaign</u>

42.    One of the Foundation's mandated functions is to "carry[] out a nationwide sustained advertising and education program to (A) counter the use by Youth of Tobacco Products, and (B) educate consumers about the cause and prevention of

14

diseases associated with the use of Tobacco Products." (Ex. C, Certificate of Incorporation, Art. IV(1) (incorporating MSA §§ VI(a), VI(f)(1)).)

43.    To that end, the Foundation has developed, produced, and sponsored a national, multi-media advertising campaign called the truth[sm], designed to provide candid, straightforward information to teens about tobacco products.  Launched in February 2000, the truth[sm] campaign's primary target audience consists of 12-to-17-year-olds who are most likely to smoke -- an identifiable subset of teens defined in the professional literature as "sensation seeking."

44.    In fiscal year 2001, the Foundation spent over $100 million on the truth[sm] campaign.  Since the Foundation's inception in 1999, some aspects of the campaign, including some of the ads, have been funded entirely out of the Base Fund, which is not subject to the bylaws' restriction on "personal attack" or "vilification."

45.    A core premise of the truth[sm] campaign is that children start smoking because they believe smoking expresses independence, risk-taking, and rebelliousness. In light of this, truth[sm] ads frequently feature teens who are learning the facts about smoking and using their rebelliousness in a positive way to reject the tobacco industry's marketing efforts and to spread the anti-smoking message to their peers and others.

46.    In order to maximize its effectiveness in connecting with youth, the Foundation has developed and honed a signature style, which includes cutting-edge presentation of facts and hard-hitting messages that speak to teens in their own voice. As part of the educational mission of the truth[sm] campaign, the ads sometimes focus on tobacco industry actions and marketing practices -- a proven strategy for reaching the young people who are most likely to smoke and for changing their attitudes and behavior

15

related to smoking. The Foundation's truth[sm] ads are edgy and use unconventional, irreverent humor because that is the best way to capture and hold the attention of the teens the Foundation is trying to reach.

47.     The Foundation's strategies have achieved concrete and critical success. The "Monitoring the Future" survey, sponsored by the National Institute on Drug Abuse of the U.S. Department of Health and Human Services and conducted by the University of Michigan, recently concluded, based on responses by some 44,000 eighth-, tenth-, and twelfth-grade students across the nation, that teen smoking has declined sharply. This rapid reduction is particularly significant, according to the forthcoming report's authors, in contrast to the dramatic increases in smoking rates in the early 1990s. The authors of the study, which is the nation's leading study tracking youth behavior relating to health, specifically cited the Foundation's countermarketing efforts as one of the reasons for this important public health achievement. *See* Press Release, L.D. Johnston, P.M. O'Malley & J.G. Bachman, *Cigarette Smoking Among American Teens Declines Sharply in 2001*, (December 19, 2001), available at <http://www.monitoringthefuture.org/press.html>. In addition, the Foundation's own evaluation data show that the truth[sm] campaign is highly effective. The campaign has produced statistically significant reductions in intention to smoke among teens who are nonsmokers.

48.     The advertising community also has recognized the truth[sm] campaign as a strategic breakthrough in social marketing, bestowing on the campaign major industry awards including four Clio awards, the "Best Public Service Award" from *Ad Age Magazine*, the "Campaign of the Year," from *Ad Week*, and the top Public Service Campaign at the London International Advertising Awards. The truth[sm] campaign has

been hailed as one of the most effective anti-tobacco campaigns ever created, and as the most recognizable anti-tobacco campaign among youth, reaching 77% confirmed youth awareness.

49.    The Foundation has achieved this unprecedented success despite the fact that it must counteract the messages of the tobacco industry in a market saturated with tobacco advertising. The tobacco industry spends approximately $8.24 billion each year to advertise and market its products. Although the MSA prohibits tobacco companies from directly or indirectly targeting youth in their advertising, the New England Journal of Medicine reported that "The Master Settlement Agreement with the tobacco industry appears to have had little effect on cigarette advertising in magazines and on the exposure of young people to these advertisements." C. King & M. Siegel, "The Master Settlement Agreement with the Tobacco Industry and Cigarette Advertising in Magazines," *New England Journal of Medicine* 345(7): 504-511, Aug. 16, 2001. In fact, the Journal reported that Lorillard had not "substantially changed its level of advertising in youth-oriented magazines during the first two years after the settlement." *Id.*

50.    The tobacco companies, including Lorillard, have a clear economic self-interest in diminishing the effectiveness of the Foundation's anti-smoking campaign. It is an indisputable economic reality that tobacco companies depend on enticing and addicting new customers to replace the many customers their products kill. The estimated tobacco industry revenue from teen smoking in 2001 was approximately $1.2 billion. It is particularly important to the tobacco companies to attract smokers as early as possible because individual smoking patterns are established before adulthood: nearly 90% of all adult smokers in the United States began smoking before the age of 18. *See*

17

U.S. Department of Health and Human Services, Centers for Disease Control and

Prevention, *Preventing Tobacco Use Among Young People: A Report of the Surgeon

General*, at 65 tbl.7 (1994). Accordingly, like other tobacco companies, Lorillard has a

direct financial interest in thwarting the Foundation's efforts to inoculate America's

youth against the tobacco industry's concentrated efforts to addict new smokers.

Lorillard's Threat to Commence an Enforcement Action<br>Against the Foundation Under the MSA.

51.    In a letter dated January 18, 2002, directed to the Foundation's outside

counsel, Lorillard formally stated its "intent to initiate a proceeding against the American

Legacy Foundation to enforce the terms of the MSA." (Ex. D.) This letter accused the

Foundation of violating provisions of the MSA, including the prohibition on using the

National Public Education Fund for personal attacks or vilification. Lorillard's

representatives have since reiterated Lorillard's intent to bring an MSA enforcement

action against the Foundation but have refused to identify the forum or fora in which

Lorillard intends to proceed, leaving the Foundation exposed to the possibility that

Lorillard is about to sue it in any or all of the 46 state courts (including this Court) that

have continuing jurisdiction with respect to the MSA and the related consent decrees.

52.    Although the Foundation is confident that all of its activities have been in

full compliance with its bylaws and certificate of incorporation -- including in particular

its bylaw incorporating the MSA's restriction on using the National Public Education

Fund for "personal attacks" or "vilification"-- the Foundation has a credible fear that

Lorillard will attempt to bring an illegitimate and baseless action seeking to enforce the

terms of the MSA against the Foundation and that this threat will negatively effect the

Foundation's operations.

18

## CLAIM I
### (Declaratory Judgment Regarding MSA)

53.     Plaintiff hereby realleges and incorporates herein by reference Paragraphs 1-52 of this Complaint.

54.     Plaintiff seeks a declaration that Lorillard has no basis to assert, in any court, any claim or suit against the Foundation seeking to enforce any term of the MSA or seeking to establish any violation of the MSA.

55.     Lorillard has recently advised the Foundation that it intends to bring an enforcement action against the Foundation under the MSA. The Foundation takes the position that Lorillard has no basis on which to do so. Thus, this claim presents an actual controversy, for which declaratory relief pursuant to 10 *Del. C.* § 6501 is appropriate.

56.     Plaintiff has no adequate remedy at law.

## CLAIM II
### (Declaratory Judgment Regarding the Foundation's Bylaws)

57.     Plaintiff hereby realleges and incorporates herein by reference Paragraphs 1-56 of this Complaint.

58.     Plaintiff seeks a declaration that Lorillard has no standing or basis to assert, in any court, any claim or suit against the Foundation seeking to enforce any of the Foundation's bylaws or seeking to establish any violation of the bylaws.

59.     This claim presents an actual controversy, for which declaratory relief pursuant to 10 *Del. C.* § 6501 and 8 *Del. C.* § 111 is appropriate.

60.     Plaintiff has no adequate remedy at law.

A28

## CLAIM III
### (Injunctive Relief)

61.    Plaintiff hereby realleges and incorporates herein by reference Paragraphs 1-60 of this Complaint.

62.    Plaintiff seeks an injunction barring Lorillard from asserting, in any court, any claim or suit against the Foundation seeking to enforce any term of the MSA or any of the Foundation's bylaws, or seeking to establish any violation of the MSA or bylaws.

63.    Plaintiff seeks equitable relief and has no adequate remedy at law.

## CLAIM IV
### (Alternative Claim for Declaratory Relief)

64.    Plaintiff hereby realleges and incorporates herein by reference Paragraphs 1-63 of this Complaint.

65.    If (and only if) this Court denies the relief sought under Claims I and II, then Plaintiff seeks, in the alternative, a declaration that (1) none of the components of the Foundation's truth[sm] campaign that the Foundation has funded out of the National Public Education Fund has constituted a "personal attack" or "vilification" within the meaning of the MSA and the Foundation's bylaws, and (2) no component of the Foundation's truth[sm] campaign otherwise has violated any restriction applicable to the Foundation under either the MSA or the Foundation's bylaws.

66.    Lorillard has recently advised the Foundation that it intends to bring an enforcement action against the Foundation under the MSA based on allegations that the Foundation has violated the provisions of the MSA that restrict the use of the National Public Education Fund.  Thus, if (and only if) this Court denies the relief sought under

Claims I and II, this claim presents an actual controversy, for which declaratory relief pursuant to 10 *Del. C.* § 6501 is appropriate.

67.     Plaintiff has no adequate remedy at law.

### PRAYER FOR RELIEF

68.     WHEREFORE, Plaintiff American Legacy Foundation respectfully requests that this Court enter judgment against Defendant Lorillard Tobacco Company as follows:

        A.     Declaring and decreeing that Lorillard has no basis to assert, in any court, any claim or suit against the Foundation seeking to enforce any term of the MSA, or seeking to establish any violation of the MSA;

        B.     Declaring and decreeing that Lorillard has no standing or basis to assert, in any court, any claim or suit against the Foundation seeking to enforce any term of the Foundation's bylaws, or seeking to establish any violation of the bylaws;

        C.     Enjoining Lorillard from asserting, in any court, any claim or suit against the Foundation seeking to enforce any term of the MSA or the Foundation's bylaws, or seeking to establish any violation of the MSA or the bylaws;

        D.     Declaring and decreeing -- in the alternative to the declarations sought in Claims I and II -- that (1) none of the components of the Foundation's truth[sm] campaign that the Foundation has funded out of the National Public Education Fund has constituted a "personal attack" or "vilification" within the meaning of the MSA and the Foundation's bylaws, and (2) no component of the Foundation's truth[sm] campaign otherwise has violated any restriction applicable to the Foundation under either the MSA or the Foundation's bylaws;

21

A30

        E.      Enjoining Lorillard from initiating or prosecuting any lawsuit in any other forum or fora involving the same or similar issues or operative facts as the instant claims;

        F.      Awarding Plaintiff its costs and reasonable attorneys' fees associated with this litigation;

        G.     Granting Plaintiff such other and further relief as the Court may deem just and proper.

WP3:733581.1

99999.1001

A31

Dated: Wilmington, Delaware
        February 13, 2002

                                              YOUNG CONAWAY STARGATT
                                                & TAYLOR, LLP

Of Counsel:                                   David C. McBride
                                              Richard H. Morse
Ellen Vargyas                                 Martin S. Lessner
General Counsel                               The Brandywine Building, 17th Floor
American Legacy Foundation                    1000 West Street
1001 G Street, N.W., Suite 800                P.O. Box 391
Washington, D.C. 20001                        Wilmington, DE 19801
(202) 454-5555                                (302) 571-6600

                                              Thomas P. McGonigle
                                              John L. Reed
                                              DUANE MORRIS, LLP
                                              1100 North Market Street, Suite 1200
                                              Wilmington, DE 19801
                                              (302) 657-4900

                                              John Payton
                                              Patrick J. Carome
                                              David W. Ogden
                                              WILMER, CUTLER & PICKERING
                                              2445 M Street, N.W.
                                              Washington, D.C. 20037
                                              (202) 663-6000

                                              *Attorneys for Plaintiff*
                                              *American Legacy Foundation*

WP3:733581.1                                                          99999.1001

A32

# EXHIBIT D

NORTH CAROLINA                    FILED IN THE GENERAL COURT OF JUSTICE
                                        SUPERIOR COURT DIVISION
WAKE COUNTY             2002 FEB 19 AM 11: 49    01 CvS 02176
                           WAKE COUNTY, C.S.C.    02

LORILLARD TOBACCO COMPANY,    )
                              )
            Plaintiff,        )
                              )
    vs.                       )            **COMPLAINT**
                              )
AMERICAN LEGACY FOUNDATION,   )
                              )
            Defendant.        )

Plaintiff Lorillard Tobacco Company ("Lorillard" or "Plaintiff"), complaining of Defendant

American Legacy Foundation ("American Legacy" or "Defendant"), alleges as follows:

## SUMMARY OF CLAIMS

1.      In 1998, Lorillard signed a Master Settlement Agreement ("MSA") with other tobacco

companies and forty-six states. A copy of the MSA, without exhibits, is attached as Exhibit A.

Pursuant to the MSA, Plaintiff agreed to assist in funding a non-profit organization (Defendant

American Legacy Foundation) that would create a public education and advertisement program.

2.      Defendant's advertising under the MSA is paid for, entirely or primarily, through the

National Public Education Fund ("NPEF"), which is funded by Plaintiff and other tobacco

companies.

3.      Under the MSA, Defendant's advertising activities are specifically authorized and

circumscribed as follows:

> The National Public Education Fund shall be used only for public education and
> advertising regarding the addictiveness, health effects, and social costs related to the
> use of tobacco products and shall not be used for any personal attack on, or
> vilification of, any person (whether by name or business affiliation), company, or

299779.11

A33

governmental agency, whether individually or collectively. The [American Legacy] Foundation shall work to ensure that its activities are carried out in a culturally and linguistically appropriate manner.

Master Settlement Agreement ¶ VI(h).

4.      Since its creation, Defendant has used the NPEF to publish or broadcast a number of advertisements that do not address the "addictiveness, health effects, or social costs" of tobacco use. In addition, many of Defendant's advertisements have included personal attacks on companies and individuals, and the vilification of Plaintiff, its employees, and tobacco companies collectively. Such advertisements and attacks constitute breaches of the MSA. Examples of Defendant's radio and television advertisements which violate the MSA are attached as Exhibits C and D, respectively.

5.      In addition to its improper advertisements, Defendant ALF has engaged in personal attacks upon Plaintiff's employees by sending (and/or assisting others in sending) numerous harassing e-mails. Examples of such e-mails are attached as Exhibit B hereto. Such e-mails frequently contain vulgar and obscene language, and such e-mails evidence the malice that Defendant bears toward Plaintiff.

6.      Many of Defendant's harassing and vulgar e-mails constitute criminal acts that violate North Carolina's Cyberstalking Act, N.C.G.S. §14-196.3.

7.      Plaintiff has attempted to resolve its concerns about various advertisements through informal discussions with Defendant and by sending Defendant a thirty day notice letter as required by the MSA (Exhibit G). Defendant initially responded to Plaintiff's notice letter by immediately calling a press conference and making misrepresentations to the public and the media. A copy of the statement issued by Defendant's President is attached as Exhibit H. Among other things, Defendant stated that Plaintiff "is trying to stop the truth campaign" and that Lorillard's efforts to

299779.11                                          -2-

resolve this matter were a "smokescreen to hide Lorillard's real goal, which is to crush the truth campaign because it is working to stop kids from smoking." Such false statements are consistent with Defendant's pattern of attacks upon, and vilification of, Plaintiff.

8.    Defendant took advantage of the thirty-day notice letter to file a "declaratory judgment" suit against Lorillard in Delaware state court. In the Delaware suit, Defendant seeks, inter alia, an injunction to prevent Lorillard from enforcing its legal rights under the MSA. The complaint in the Delaware suit contains numerous gratuitous attacks on Lorillard, which is consistent with Defendant's prior actions and public statements.

9.    Plaintiff does not seek to destroy American Legacy or to prevent Defendant from pursuing its mission as set forth in the MSA. Lorillard, in fact, supports the goals of the advertising campaign described in the MSA. Unfortunately, American Legacy has misused the funds that have been entrusted to it by broadcasting and publishing advertisements that are not authorized by the MSA and by creating and facilitating through its website vitriolic, hateful, and vulgar personal attacks upon Lorillard's employees.

10.    By this action, Plaintiff is seeking a determination that Defendant has repeatedly and materially breached the MSA; Lorillard is also seeking an order requiring American Legacy to comply with its obligations under the MSA. This action is brought only as a result of Defendant's conduct in consistently ignoring its legal, contractual, and ethical obligations.

**PARTIES**

11.    Lorillard is a corporation organized and existing under the laws of the State of Delaware and has its principal office and place of business in Greensboro, Guilford County, North Carolina.

12.    American Legacy is a nonprofit corporation organized and existing under the laws of the State of Delaware and has its principal office and place of business in Washington, D.C. Defendant's Articles of Incorporation are attached as Exhibit I.

13.    American Legacy has had substantial contacts with the State of North Carolina and is subject to the jurisdiction of this Court.

14.    Venue is proper in this County pursuant to Section VII(a) of the MSA, as well as N.C. Gen. Stat. §§ 1-79 and 1-80.

## EXECUTION OF MASTER SETTLEMENT AGREEMENT

15.    American Legacy was established and funded pursuant to the 1998 Master Settlement Agreement between tobacco manufacturers and various states.

16.    Lorillard is a signatory of and party to the Master Settlement Agreement.

17.    Defendant's By-laws (Exhibit J) incorporate the MSA and acknowledge that Defendant is subject to the terms of the MSA.

18.    Pursuant to and in accordance with the Master Settlement Agreement, Lorillard has made payments for the benefit of American Legacy in excess of $80,000,000 since 1999.

## DEFENDANT'S MISUSE OF THE NATIONAL PUBLIC EDUCATION FUND

19.    American Legacy has funded and is funding, through payments made by Lorillard, among others, an advertising campaign that it labels "the truth." The campaign includes an Internet website maintained by American Legacy called "THETRUTH.com."

20.    Upon information and belief, Defendant's advertising campaign called "the truth" is funded, entirely or primarily, by the NPEF.

21.    Some of Defendant's advertisements are appropriate and are authorized by the MSA. Examples of such advertisements, which Lorillard supports, are attached at Exhibits E and F. Such advertisements address "the addictiveness, health effects, and social costs related to the use of tobacco products," and do not attack or vilify any person or group.

22.    Unfortunately, beginning shortly after its creation, Defendant began to run other advertisements – on television, radio, and the Internet – which do not comply with the MSA. Many of Defendant's advertisements do not address "the addictiveness, health effects, and social costs related to the use of tobacco products," as required by the MSA. Such activities represent a misuse of the National Public Education Fund and a breach of the MSA by Defendant.

23.    Many of Defendant's advertisements also violate the MSA's prohibition against personal attacks and vilification. On multiple occasions, in broadcasts and other advertisements reaching millions of members of the public, Defendant has personally attacked and vilified Lorillard, its employees, and tobacco companies collectively. Such attacks frequently are highly offensive, and culturally and linguistically inappropriate. For example, Defendant has broadcast advertisements that:

a.    attack tobacco companies collectively, as well as employees of such companies;

b.    state or strongly imply that Plaintiff and other tobacco companies deliberately target their sales efforts at minors; (for example, in a recent press release on THETRUTH.com, American Legacy stated "Lorillard has successfully marketed its addictive product to minority youth");

c.    accuse tobacco companies of shredding documents, thereby implying the intentional and improper destruction of evidence;

299779.11

-5-

d.    accuse tobacco companies of lying to the public, including one advertisement in which an employee of a tobacco company is asked to take a lie-detector test;

e.    end with a statement that Defendant is attempting to "expose the tobacco industry's deceptions to the light of day"; and

f.    strongly imply that Plaintiff adds dog urine to its cigarettes ("the Dog Urine Ad").

Examples of Defendant's improper advertisements are attached as Exhibits C and D. All such advertisements are clear, material violations of the MSA.

## HARASSING E-MAILS AND VIOLATIONS OF CYBERSTALKING CRIMINAL STATUTE

24.    In addition to the malicious attitude toward Plaintiff and its employees displayed in Defendant's advertisements, Defendant has engaged in a pattern of sending multiple harassing e-mails to Defendant. Such e-mails, some of which are attached as Exhibit B, frequently contain vulgar and obscene language, including the use of such words and phrases as "whores," "fags," "morons," "you monkeys at Lorillard Tobacco Company," "bullshit," "pathetic bitch asses," and "hookers."

25.    In 2001, Lorillard was forced to install a filter on its computers to attempt to block Defendant's vulgar e-mails. However, some of the harassing e-mails from THETRUTH.com website continued to be received by Lorillard. In addition, Lorillard received multiple harassing e-mails from third parties. Examples of such additional e-mails are found at Exhibit K. Upon information and belief, Defendant aided in the creation of these e-mails by making form letters and e-mail addresses available to third parties on THETRUTH.com website.

26.   Such e-mails were intended by Defendant to harass and annoy (and, upon information and belief, intimidate) Plaintiff and its employees.

27.   North Carolina Cyberstalking Act, N.C.G.S. §14-196.3, provides that:

   (b)   It is unlawful for a person to:

            . . .

      (2)   Electronically mail or electronically communicate to another repeatedly, whether or not conversation ensues, for the purpose of abusing, annoying, threatening, terrifying, harassing, or embarrassing any person.

28.   The attached harassing e-mails constitute personal attacks on Plaintiff's employees, which is expressly prohibited by the MSA. Upon information and belief, Defendant used the NPEF to pay for such attacks.

29.   The e-mails that were transmitted by Defendant after the effective date of North Carolina's Cyberstalking Act constitute criminal cyberstalking, which is punishable by up to thirty days imprisonment and a fine of up to one thousand dollars.

## ATTEMPTS BY LORILLARD TO RESOLVE DISPUTE

30.   After the Dog Urine Ad was broadcast, Plaintiff contacted Defendant and expressed its view that Defendant's conduct constituted a material breach of the MSA. Plaintiff requested that Defendant issue a retraction of the Ad and agree to comply with the MSA. Defendant refused to comply with these requests.

31.   After these initial informal settlement discussions were unproductive, Plaintiff sent Defendant a formal 30-day notice letter, as required by Section VII(c) of the MSA. Plaintiff's hope was that the parties would re-kindle their discussions and resolve this matter amicably. Instead,

Defendant's President, Cheryl Healton, responded by issuing a press statement (Exhibit H) that is rife with misrepresentations. Ms. Healton stated, *inter alia*:

> I believe this action is a smokescreen to hide Lorillard's real goal, which is to crush the truth campaign because it is working to stop kids from smoking.
>
> . . .
>
> The drop-off in youth smoking rates is costing the tobacco industry a great deal of revenue, and that's why Lorillard is desperate to stop the truth campaign. And for those who disagree with me, let me just ask the question: Would Lorillard be trying to stop the truth campaign if it WEREN'T helping to reduce youth smoking and tobacco industry revenues?

32.    Ms. Healton's press statement continued Defendant's campaign of making malicious statements about Plaintiff to the public. Lorillard does not seek, and has never sought, to stop Defendant's "truth" advertising campaign. Plaintiff's goals are for Defendant to stop misusing the funds entrusted to it and for Defendant to otherwise comply with its legal, contractual, and ethical obligations.

### DELAWARE "DECLARATORY JUDGMENT" SUIT

33.    As noted above, Lorillard gave American Legacy thirty days' notice prior to filing this action. In addition to being required by the MSA, Lorillard hoped that such notice would lead to discussions and, ultimately, to Defendant's agreement to comply with its legal obligations.

34.    Rather than comply with its legal obligations, American Legacy instead filed a "declaratory judgment" suit against Lorillard in Delaware state court. In the Delaware complaint, American Legacy asked the court to enter an injunction prohibiting Lorillard from enforcing its rights under the MSA.

35.    In the complaint in the Delaware suit, Defendant asserted that it was not bound to comply with the MSA, despite having received hundreds of millions of dollars under the MSA, and despite repeated public statements acknowledging that American Legacy is required to comply with the MSA.

36.    The complaint in the Delaware suit also contains numerous gratuitous attacks on Lorillard, claiming that Lorillard has threatened to subject Defendant to "vexatious, harassing, burdensome, and expensive litigation throughout the country" and that "[i]t is an indisputable economic reality that tobacco companies depend on enticing and addicting new customers to replace the many customers their products kill." Such statements represent a continuation of Defendant's practice of making malicious attacks on Plaintiff.

37.    Shortly after filing the Delaware strike suit, American Legacy issued a "fact sheet" (Exhibit L) that contained additional malicious attacks on Lorillard.

### FIRST CLAIM FOR RELIEF
### Breach of Master Settlement Agreement

38.    The allegations of Paragraphs 1 through 37 are incorporated by reference.

39.    Defendant was created under the terms of the MSA. Specifically, Defendant was incorporated by the Settling States (as defined in the MSA) and the Executive Director and General Counsel of the National Association of Attorneys General ("NAAG"). NAAG is a national organization of state attorneys general. Forty-six of such attorneys general are signators to the MSA.

40.    Defendant incorporated the MSA into its By-laws.

41.    Pursuant to the terms of the MSA, Plaintiff has paid tens of millions of dollars for Defendant's benefit. Defendant has accepted those funds under the terms of the MSA.

299779.11

-9-

42.    The MSA constitutes a pre-incorporation agreement. Specifically:

    a.    the MSA sets forth certain obligations of, and restrictions on, Defendant;

    b.    the MSA was signed by the various Settling States (as defined in the MSA) and their respective attorneys general;

    c.    the Settling States and NAAG promoted and incorporated Defendant;

    d.    Defendant has accepted millions of dollars in benefits under the MSA; and

    e.    Defendant accepted the benefits with full knowledge of the terms of the MSA.

By its conduct, Defendant has adopted and ratified the MSA, and is bound to comply with the terms thereof. At no time has Defendant attempted to repudiate the benefits received by it under the MSA.

43.    In addition, Defendant has succeeded to various obligations of the Settling States and NAAG, including the provisions relating to the types of advertising allowed under the MSA.

44.    In the alternative, an implied agreement has arisen between Plaintiff and Defendant pursuant to which Defendant agreed to abide by the terms of the MSA in exchange for the payments made by Plaintiff for the benefit of Defendant.

45.    Defendant has repeatedly acknowledged that it is bound by the terms of the MSA. For example, in her press release (Exhibit H), Defendant's President stated that "[a]nyone who has seen truth ads knows that they educate young people about the addictiveness, health effects, and social costs of tobacco, which is exactly what the Master Settlement Agreement says they must do." (Emphasis added.)

46.    American Legacy's by-laws acknowledge that Defendant must comply with the MSA. For example, §5.7 provides:

<u>Affiliation</u>. The programs of the Foundation may be affiliated with one or more educational or medical institutions selected by the Board of Directors from time to time <u>as required by the Master Settlement Agreement attached hereto as Exhibit A</u> ("Master Settlement Agreement").

Exhibit J (emphasis added.)

47.    Other examples of Defendant's admissions that it is bound by, and subject to, the MSA are set forth at Exhibit M.

48.    As described above, Defendant has committed multiple material breaches of the MSA, including but not limited to Sections VI(f) and (h), by misusing the funds entrusted to it. Specifically, Defendant has used the NPEF for advertisements that do not address the addictiveness, health consequences, or social costs of the use of tobacco products. By its own admission in the Delaware complaint, Defendant is using the Base Fund for advertising. In addition, Defendant has used the NPEF to engage in personal attacks on and the vilification of Plaintiff, its employees, and tobacco companies collectively through the advertisements referenced above.

49.    In addition to the advertisements that violate the MSA, the e-mails described above constitute personal attacks and vilification that further violate the MSA.

50.    The above-described e-mails that were sent to Plaintiff on and after December 1, 2000 constitute cyberstalking under North Carolina's criminal Cyberstalking Act, N.C.G.S. §14-196.3. Such activities constitute a Class 2 misdemeanor, which is punishable by up to thirty days imprisonment and a fine of up to one thousand dollars.

51.    Pursuant to Section VII(c) of the MSA, this Court has the authority to enforce the terms of the MSA. In addition, this Court has the authority to issue a Declaratory Order (as defined in the MSA).

52.      Plaintiff requests that the Court enter an order requiring Defendant to comply with the MSA.

53.      Defendant's harassing conduct is likely to recur in the future unless Defendant is ordered to obey the laws of this State. Such misconduct is not compensable with monetary damages. Accordingly, Plaintiff requests preliminary and permanent injunctive relief requiring Defendant to cease sending (and assisting others in sending) harassing e-mails.

54.      To the extent that there is found to be any ambiguity as to the terms of the MSA, Plaintiff requests a Declaratory Order defining Defendant's obligations under the MSA.

55.      Plaintiff further requests an award of $1.00 for Defendant's breaches of the MSA.

## SECOND CLAIM FOR RELIEF
### Breach of the Duty and Covenant of Good Faith and Fair Dealing

56.      The allegations of Paragraphs 1 through 55 are incorporated by reference.

57.      Implied in the MSA is a duty and covenant of good faith and fair dealing.

58.      By personally attacking and vilifying Plaintiff, its employees, and tobacco companies collectively, and by waging a campaign of harassment through e-mails, Defendant has breached its duty and covenant of good faith and fair dealing.

59.      Plaintiff is entitled to damages in the amount of $1.00 for Defendant's breach of the duty and covenant of good faith and fair dealing.

WHEREFORE Plaintiff Lorillard Tobacco Company prays that the Court:

1.    Enter judgment finding that Defendant has repeatedly breached the MSA;

2.    Enter judgment for Plaintiff Lorillard Tobacco Company and against Defendant for damages in the amount of $1.00;

3.    Enter preliminary and permanent injunctions requiring that Defendant comply with its obligations under the MSA, including the proper use of the National Public Education Fund and the prohibitions on personal attacks and vilification;

4.    Enter preliminary and permanent injunctions prohibiting Defendant from sending (and assisting others in sending) harassing and vulgar e-mails to Plaintiff;

5.    To the extent necessary and appropriate, enter a Declaratory Order defining Defendant's obligations under the MSA;

6.    Tax the costs of this action against Defendant; and

7.    Grant to Plaintiff such other and further relief as the Court deems just and proper.

PLAINTIFF DEMANDS TRIAL BY JURY.

This the __19th__ day of February, 2002.

Jim W. Phillips, Jr.
  N.C. State Bar No. 12516
Robert J. King III
  N.C. State Bar No. 15946
Charles E. Coble
  N.C. State Bar No. 25342

*Attorneys for Plaintiff Lorillard
Tobacco Company*

Of Counsel:

BROOKS, PIERCE, McLENDON,
  HUMPHREY & LEONARD, LLP
Post Office Box 26000
Greensboro, NC 27420
Telephone: (336) 373-8850
Telefax:  (336) 378-1001

A46

# EXHIBIT E

ORIGINAL

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

### IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| AMERICAN LEGACY FOUNDATION, a Delaware non-profit corporation | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 19406-NC |
| LORILLARD TOBACCO COMPANY, a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) | |

### ANSWER AND COUNTERCLAIMS OF DEFENDANT LORILLARD TOBACCO COMPANY

### FIRST DEFENSE

Responding to the numbered allegations of the Complaint filed by plaintiff American Legacy Foundation ("ALF") in the above-captioned matter, defendant Lorillard Tobacco Company ("Lorillard"), through counsel, alleges and says that:

1.    With respect to the allegations contained in the first sentence of paragraph 1 of the Complaint, it is admitted upon information and belief that ALF is a Delaware non-profit corporation that was created pursuant to the Master Settlement Agreement ("MSA") between forty-six Settling States and the four major tobacco companies and that ALF's mission and permissible functions are set forth in the MSA, a written document that speaks for itself.  With respect to the allegations contained in the second sentence of paragraph 1 of the Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to develop and produce its "truth" campaign.  By way of further response, it is alleged that the scope of and limitations upon

any of ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, including its "truth" campaign, are set forth in the MSA, a written document that speaks for itself. With respect to the allegations contained in the third sentence of paragraph 1 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 1 of the Complaint are denied.

2.     With respect to the allegations contained in the first sentence of paragraph 2 of the Complaint, the MSA is a written document that speaks for itself. With respect to the allegations contained in the second and third sentences of paragraph 2 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. With respect to the allegations contained in the fourth sentence of paragraph 2 of the Complaint, it is admitted that Lorillard and the other tobacco companies have paid hundreds of millions of dollars under the MSA that have benefitted and funded ALF and its operations. By way of further response, it is alleged that ALF's mission and permissible functions are set forth in the MSA, a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 2 of the Complaint are denied.

3.     With respect to the allegations contained in the first, second, and third sentences of paragraph 3 of the Complaint, the MSA is a written document that speaks for itself. With respect to the allegations contained in the fourth sentence of paragraph 3 of the Complaint, ALF's Certificate of Incorporation and its Bylaws are written documents that speak for themselves. By way of further response, it is admitted that ALF's Certificate of Incorporation and its Bylaws incorporate the terms of the MSA relating to ALF, including the MSA's limitations on ALF's activities. Except as expressly admitted herein, the allegations contained in paragraph 3 of the Complaint are denied.

A48

4.    With respect to the allegations contained in the first and second sentences of paragraph 4 of the Complaint, the MSA and ALF's Bylaws are written documents that speak for themselves. The allegations contained in the third sentence of paragraph 4 of the Complaint are denied. Except as expressly admitted herein, the allegations contained in paragraph 4 of the Complaint are denied.

5.    The allegations contained in the first sentence of paragraph 5 of the Complaint are denied. With respect to the allegations contained in the second sentence of paragraph 5 of the Complaint, it is admitted that ALF had not yet been incorporated when the MSA was executed by the Settling States and certain tobacco companies and that, upon information and belief, ALF has never executed the MSA. By way of further response, it is alleged that ALF has adopted, assumed the obligations of, and otherwise become bound to the MSA through its corporate actions, through its words, and through its conduct. With respect to the allegations contained in the third sentence of paragraph 5 of the Complaint, it is admitted that ALF was not a party to the lawsuits brought by the various Settling States against the tobacco companies. The allegations contained in the fourth sentence of paragraph 5 of the Complaint are denied. With respect to the allegations contained in the fifth sentence of paragraph 5 of the Complaint, the MSA is a written document that speaks for itself. By way of further response, it is alleged that it was not necessary for ALF to execute the MSA in order for ALF to become bound by the MSA. With respect to the allegations contained in the sixth sentence of paragraph 5 of the Complaint, the MSA is a written document that speaks for itself. The allegations contained in the seventh sentence of paragraph 5 are denied. Except as expressly admitted herein, the allegations contained in paragraph 5 of the Complaint are denied.

6.    With respect to the allegations contained in the first sentence of paragraph 6 of the Complaint, it is admitted that on January 18, 2002, Lorillard sent a thirty-day notice letter to ALF's

A49

counsel pursuant to Section VII(c)(2) of the MSA, which letter is a written document that speaks for itself. With respect to the allegations contained in the second and third sentences of paragraph 6 of the Complaint, Lorillard's letter of January 18, 2002, is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 6 of the Complaint are denied.

7.      With respect to the allegations contained in the first sentence of paragraph 7 of the Complaint, it is admitted that Lorillard did not withdraw or change its position as expressed in its letter of January 18, 2002, prior to ALF's filing of the Complaint. With respect to the allegations contained in the second sentence of paragraph 7 of the Complaint, it is admitted that in communications between counsel for Lorillard and counsel for ALF on February 7, 2002, Lorillard did not withdraw or change its position as expressed in its letter of January 18, 2002. With respect to the allegations contained in the third sentence of paragraph 7 of the Complaint, it is admitted that prior to ALF's filing of the Complaint, Lorillard did not identify to ALF the forum in which it intended to bring an enforcement action under the MSA against ALF. Except as expressly admitted herein, the allegations contained in paragraph 7 of the Complaint are denied.

8.      With respect to the allegations contained in the first sentence of paragraph 8 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. The allegations contained in the second and third sentences of paragraph 8 of the Complaint are denied. Except as expressly admitted herein, the allegations contained in paragraph 8 of the Complaint are denied.

9.      With respect to the allegations contained in the first sentence of paragraph 9 of the Complaint, it is admitted that ALF purports to bring an action against Lorillard pursuant to 10 Del. C. §§ 6501-6513 and 8 Del. C. § 111. With respect to the allegations contained in the second

A50

sentence of paragraph 9 of the Complaint, it is admitted that ALF purports to seek an injunction from the Court. Except as expressly admitted herein, the allegations contained in paragraph 9 of the Complaint are denied.

      10.    Admitted, upon information and belief.

      11.    With respect to the allegations contained in paragraph 11 of the Complaint, it is admitted that ALF's mission and permissible functions are set forth in the MSA, a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 11 of the Complaint are denied.

      12.    With respect to the allegations contained in paragraph 12 of the Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to develop and produce its "truth" campaign. By way of further response, it is alleged that the scope of and limitations upon ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, including its "truth" campaign, are set forth in the MSA, a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 12 of the Complaint are denied.

      13.    With respect to the allegations contained in paragraph 13 of the Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to develop and produce its "truth" campaign. By way of further response, it is alleged that the scope of and limitations upon ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, including its "truth" campaign, are set forth in the MSA, a written document that speaks

A51

for itself. Except as expressly admitted herein, the allegations contained in paragraph 13 of the Complaint are denied.

14.    With respect to the allegations contained in paragraph 14 of the Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to undertake other activities. By way of further response, it is alleged that the scope of and limitations upon activities funded in whole or in part by funds disbursed to ALF under the MSA are set forth in the MSA, a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 14 of the Complaint are denied.

15.    With respect to the allegations contained in paragraph 15 of the Complaint, it is admitted that ALF was created pursuant to the MSA and that ALF's mission and permissible functions, as well as the scope of and limitations upon ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, are set forth in the MSA, a written document that speaks for itself. By way of further response, it is admitted that the quoted passage appears in the Supreme Court's opinion in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). Except as expressly admitted herein, the allegations contained in paragraph 15 of the Complaint are denied.

16.    With respect to the allegations contained in paragraph 16 of the Complaint, ALF's Bylaws is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 16 of the Complaint are denied.

17.    Admitted, upon information and belief.

18.    Admitted.

19.    With respect to the allegations contained in paragraph 19 of the Complaint, it is admitted that Lorillard is an original signatory to the MSA, having executed the MSA in 1998.

A52

Except as expressly admitted herein, the allegations contained in paragraph 19 of the Complaint are denied.

20.    With respect to the allegations contained in the first sentence of paragraph 20 of the Complaint, the term "largest" is vague and indefinite and, as a result, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. With respect to the allegations contained in the second sentence of paragraph 20 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 20 of the Complaint are denied.

21.    With respect to the allegations contained in paragraph 21 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 21 of the Complaint are denied.

22.    It is admitted that in the 1990s, a number of states brought suit against the tobacco companies, including Lorillard. With respect to the allegations contained in the second sentence of paragraph 22 of the Complaint, the MSA is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 22 of the Complaint are denied.

23.    With respect to the allegations contained in paragraph 23 of the Complaint, it is admitted that the tobacco companies and the Attorneys General of the States that had brought suit against the tobacco companies entered into settlement negotiations in an effort to resolve the various lawsuits brought by those States. Except as expressly admitted herein, the allegations contained in paragraph 23 of the Complaint are denied.

24.    Admitted.

A53

25.    With respect to the allegations contained in paragraph 25 of the Complaint, the MSA is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 25 of the Complaint are denied.

26.    The allegations contained in the first sentence of paragraph 26 of the Complaint are admitted upon information and belief. With respect to the allegations contained in the second sentence of paragraph 26 of the Complaint, it is admitted that ALF was not a party to the lawsuits brought by the various Settling States against the tobacco companies. Except as expressly admitted herein, the allegations contained in paragraph 26 of the Complaint are denied.

27.    Admitted, upon information and belief.

28.    With respect to the allegations contained in paragraph 28 of the Complaint, it is admitted that ALF had not yet been incorporated when the MSA was executed by the Settling States and certain tobacco companies and that ALF has never executed the MSA. By way of further response, it is alleged that ALF has adopted, assumed the obligations of, and otherwise become bound to the MSA through its corporate actions, through its words, and through its conduct. Except as expressly admitted herein, the allegations contained in paragraph 28 of the Complaint are denied.

29.    With respect to the allegations contained in paragraph 29 of the Complaint, such allegations state a legal conclusion as to which no response is required by Lorillard. By way of further response, it is alleged that ALF is an intended beneficiary of the MSA by virtue of the funds that have been disbursed to it under the MSA. By way of further response, the MSA is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 29 of the Complaint are denied.

30.     With respect to the allegations contained in paragraph 30 of the Complaint, the MSA is a written document that speaks for itself.  Except as expressly admitted herein, the allegations contained in paragraph 30 of the Complaint are denied.

31.     With respect to the allegations contained in paragraph 31 of the Complaint, the MSA is a written document that speaks for itself.  Except as expressly admitted herein, the allegations contained in paragraph 31 of the Complaint are denied.

32.     With respect to the allegations contained in the first sentence of paragraph 32 of the Complaint, it is admitted that ALF was created pursuant to the MSA and that ALF's mission and permissible functions, as well as the scope of and limitations upon ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, are set forth in the MSA, a written document that speaks for itself.  With respect to the allegations contained in the second sentence of paragraph 32 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied.  With respect to the allegations contained in the third sentence of paragraph 32 of the Complaint, it is alleged that ALF's mission and permissible functions, as well as the scope of and limitations upon ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, are set forth in the MSA, a written document that speaks for itself.  Except as expressly admitted herein, the allegations contained in paragraph 32 of the Complaint are denied.

33.     With respect to the allegations contained in the first and second sentences of paragraph 33 of the Complaint, the MSA is a written document that speaks for itself.  By way of further response, it is alleged that ALF—through its initial board of directors—adopted ALF's Bylaws.  Except as expressly admitted herein, the allegations contained in paragraph 33 of the Complaint are denied.

34. The allegations contained in paragraph 34 of the Complaint are denied. By way of further response, it is alleged that ALF—through its initial board of directors—adopted ALF's Bylaws. Except as expressly admitted herein, the allegations contained in paragraph 34 of the Complaint are denied.

35. With respect to the allegations contained in paragraph 35 of the Complaint, the MSA is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 35 of the Complaint are denied.

36. With respect to the allegations contained in paragraph 36 of the Complaint, the MSA is a written document that speaks for itself. By way of further response, it is alleged that the MSA requires that Lorillard and the other tobacco companies, in exchange for promises made by the Settling States—many of which were adopted by ALF—to pay hundreds of millions of dollars that have benefitted and funded ALF and its operations. Except as expressly admitted herein, the allegations contained in paragraph 36 of the Complaint are denied.

37. With respect to the allegations contained in paragraph 37 of the Complaint, the MSA is a written document that speaks for itself. By way of further response, it is alleged that the MSA requires that Lorillard and the other tobacco companies, in exchange for promises made by the Settling States—many of which were adopted by ALF—to pay hundreds of millions of dollars that have benefitted and funded ALF and its operations.

38. With respect to the allegations contained in paragraph 38 of the Complaint, it is admitted that ALF incorporated certain provisions of the MSA into its Bylaws. By way of further response, ALF's Bylaws is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 38 of the Complaint are denied.

A56

39.    With respect to the allegations contained in paragraph 39 of the Complaint, it is admitted that ALF's Certificate of Incorporation incorporates certain provisions of the MSA. By way of further response, ALF's Certificate of Incorporation is a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 39 of the Complaint are denied.

40.    With respect to the allegations contained in paragraph 40 of the Complaint, such allegations state a legal conclusion as to which no response is required by Lorillard.

41.    Denied.

42.    With respect to the allegations contained in paragraph 42 of the Complaint, it is admitted that ALF's mission and permissible functions, as well as the scope of and limitations upon ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, are set forth in the MSA, a written document that speaks for itself. Except as expressly admitted herein, the allegations contained in paragraph 42 of the Complaint are denied.

43.    With respect to the allegations contained in the first sentence of paragraph 43 of the Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to develop and produce its "truth" campaign. By way of further response, it is alleged that the scope of and limitations upon ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, including its "truth" campaign, are set forth in the MSA, a written document that speaks for itself. With respect to the allegations contained in the second sentence of paragraph 43 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 43 of the Complaint are denied.

44.    With respect to the allegations contained in paragraph 44 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 44 of the Complaint are denied.

45.    With respect to the allegations contained in paragraph 45 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 45 of the Complaint are denied.

46.    With respect to the allegations contained in paragraph 46 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 46 of the Complaint are denied.

47.    With respect to the allegations contained in paragraph 47 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 47 of the Complaint are denied.

48.    With respect to the allegations contained in paragraph 48 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied. Except as expressly admitted herein, the allegations contained in paragraph 48 of the Complaint are denied.

49.    With respect to the allegations contained in paragraph 49 of the Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied.

Except as expressly admitted herein, the allegations contained in paragraph 49 of the Complaint are denied.

50.    Denied.

51.    With respect to the allegations contained in the first and second sentences of paragraph 51 of the Complaint, it is admitted that on January 18, 2002, Lorillard sent a thirty-day notice letter to ALF's counsel, among others, pursuant to Section VII(c)(2) of the MSA, which letter is a written document that speaks for itself. With respect to the allegations contained in the third sentence of paragraph 51 of the Complaint, it is admitted that Lorillard did not withdraw or change its position as expressed in its letter of January 18, 2002, prior to ALF's filing of the Complaint. Except as expressly admitted herein, the allegations contained in paragraph 51 of the Complaint are denied.

52.    Denied.

53.    Lorillard repeats, realleges, and incorporates herein by reference its responses to paragraphs 1 through 52 of the Complaint.

54.    With respect to the allegations contained in paragraph 54 of the Complaint, it is admitted that ALF purports to seek a declaration that Lorillard has no basis to assert, in any court, any claim or suit against ALF seeking to enforce any term of the MSA or seeking to establish any violation of the MSA. By way of further response, it is alleged that such position lacks merit and is contrary to multiple public statements by ALF acknowledging that it is required to comply with the MSA. Except as expressly admitted herein, the allegations contained in paragraph 54 of the Complaint are denied.

55.    With respect to the allegations contained in the first sentence of paragraph 55 of the Complaint, it is admitted that Lorillard has pursued and intends to pursue enforcement action against

ALF under the MSA. With respect to the allegations contained in the second sentence of paragraph 55 of the Complaint, it is admitted that ALF has taken the position that Lorillard has no basis for pursing enforcement action against ALF under the MSA. By way of further response, it is alleged that such position lacks merit and is contrary to multiple public statements by ALF acknowledging that it is required to comply with the MSA. With respect to the allegations contained in the third sentence of paragraph 55 of the Complaint, it is admitted that there is an actual controversy between the parties, for which declaratory relief pursuant to 10 <u>Del. C.</u> § 6501 is appropriate.  Except as expressly admitted herein, the allegations contained in paragraph 55 of the Complaint are denied.

56.    Denied.

57.    Lorillard repeats, realleges, and incorporates herein by reference its responses to paragraphs 1 through 57 of the Complaint.

58.    With respect to the allegations contained in paragraph 58 of the Complaint, it is admitted that ALF purports to seek a declaration that Lorillard has no standing or basis to assert, in any court, any claim or suit against ALF seeking to enforce ALF's Bylaws or seeking to establish any violation of ALF's Bylaws.  Except as expressly admitted herein, the allegations contained in paragraph 58 of the Complaint are denied.

59.    With respect to the allegations contained in paragraph 59 of the Complaint, it is admitted that there is an actual controversy between the parties, for which declaratory relief pursuant to 10 <u>Del. C.</u> § 6501 is appropriate.  Except as expressly admitted herein, the allegations contained in paragraph 59 of the Complaint are denied.

60.    With respect to the allegation contained in paragraph 60 of the Complaint, such allegation states a legal conclusion to which no response is required by Lorillard.

61.    Lorillard repeats, realleges, and incorporates herein by reference its responses to paragraphs 1 through 60 of the Complaint.

62.    With respect to the allegations contained in paragraph 62 of the Complaint, it is admitted that ALF purports to seek an injunction barring Lorillard from asserting, in any court, any claim or suit against ALF seeking to enforce any term of the MSA or ALF's Bylaws, or seeking to establish any violation of the MSA or ALF's Bylaws.  Except as expressly admitted herein, the allegations contained in paragraph 62 of the Complaint are denied.

63.    With respect to the allegation contained in paragraph 63 of the Complaint, such allegation states a legal conclusion to which no response is required by Lorillard.

64.    Lorillard repeats, realleges, and incorporates herein by reference its responses to paragraphs 1 through 63 of the Complaint.

65.    With respect to the allegations contained in paragraph 65 of the Complaint, it is admitted that ALF purports to seek an alternative declaration that (1) none of the components of ALF's "truth" campaign has constituted a personal attack or vilification under the MSA or ALF's Bylaws and (2) no component of ALF's "truth" campaign has otherwise violated any restriction set forth in the MSA or in ALF's Bylaws.  Except as expressly admitted herein, the allegations contained in paragraph 65 of the Complaint are denied.

66.    With respect to the allegations contained in the first sentence of paragraph 66 of the Complaint, it is admitted that Lorillard has pursued and intends to pursue enforcement action against ALF under the MSA.  With respect to the allegations contained in the second sentence of paragraph 66 of the Complaint, it is admitted that there is an actual controversy between the parties for which declaratory relief pursuant to 10 <u>Del. C.</u> § 6501 is appropriate, including whether ALF's "truth"

campaign has violated those restrictions on ALF's activities set forth in the MSA and in ALF's

Bylaws.

67.    With respect to the allegation contained in paragraph 67 of the Complaint, such

allegation states a legal conclusion to which no response is required by Lorillard.

## SECOND DEFENSE

ALF fails to state a claim upon which relief can be granted.

## THIRD DEFENSE

ALF's claims against Lorillard are barred by the doctrine of estoppel.

## FOURTH DEFENSE

ALF seeks equitable relief, but has acted inequitably and with unclean hands and,

accordingly, ALF's unclean hands bar it from recovering the relief it seeks in this action.

## FIFTH DEFENSE

ALF's claims against Lorillard are barred by the doctrine of waiver.

## SIXTH DEFENSE and COUNTERCLAIMS

Lorillard, complaining of ALF by way of counterclaims filed pursuant to Rule 13 of the

Delaware Chancery Court Rules, alleges as follows:

## SUMMARY OF CLAIMS

1.    In 1998, defendant-counterclaimant Lorillard Tobacco Company ("Lorillard") signed

a Master Settlement Agreement ("MSA") with other tobacco companies and forty-six states. In the

MSA, Lorillard and the other tobacco company signatories agreed, among other things, to assist in

funding a non-profit entity that would create a public education and advertisement program

concerning the health effects of tobacco use.

2.    To date, plaintiff-counterdefendant American Legacy Foundation ("ALF") has purported to qualify and be eligible to receive such funding as the non-profit entity described in the MSA. ALF has instituted an advertising campaign that is paid for, entirely or primarily, by the National Public Education Fund ("NPEF") described in and created by the MSA. The MSA requires Lorillard and other tobacco companies to fund the NPEF, in exchange for numerous promises made by the other parties to the MSA.

3.    Because it administers and operates the NPEF and because it has accepted and benefitted from disbursement of funds under the MSA, ALF's advertising activities are specifically authorized and circumscribed as follows:

> The National Public Education Fund shall be used only for public education and advertising regarding the addictiveness, health effects, and social costs related to the use of tobacco products and shall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively. The Foundation shall work to ensure that its activities are carried out in a culturally and linguistically appropriate manner.

MSA, § VI(h).

4.    However, since its creation ALF has used the NPEF to publish or broadcast a number of advertisements that do not address the "addictiveness, health effects, or social costs" of tobacco use. In addition, many of ALF's advertisements have included personal attacks on companies and individuals, and the vilification of Lorillard, its employees, and tobacco companies collectively. Such advertisements and attacks constitute breaches of the MSA by ALF. Examples of ALF's radio and television advertisements that violate the MSA are attached as Exhibits A and B, respectively.

5.    In addition to its improper advertisements, ALF has engaged in personal attacks upon Lorillard's employees by sending (and/or assisting others in sending) numerous unsolicited and harassing e-mails. Examples of such e-mails are attached as Exhibit C hereto. Such e-mails

frequently contain vulgar and obscene language, and such e-mails evidence the malice that ALF bears toward Lorillard. Upon information and belief, these e-mails were paid for, entirely or primarily, by the NPEF, and thus they constitute breaches of the MSA by ALF.

6.    In addition to improper use of the NPEF, upon information and belief ALF has improperly used other payments made by Lorillard and the other tobacco companies under the MSA for ALF's benefit.

7.    Lorillard attempted to resolve its concerns about various advertisements and other activities of ALF through informal discussions with ALF and, ultimately, by sending ALF a notice letter informing ALF of Lorillard's intent to pursue enforcement under the MSA, a notice letter required by the MSA. ALF initially responded to Lorillard's notice letter by immediately calling a press conference and making misrepresentations to the public and the media. A copy of the statement issued by ALF's President is attached as Exhibit D. Among other things, ALF stated that Lorillard "is trying to stop the truth campaign" and that Lorillard's efforts to resolve this matter were a "smokescreen to hide Lorillard's real goal, which is to crush the truth campaign because it is working to stop kids from smoking." Such false statements are consistent with ALF's pattern of attacks upon, and vilification of, Lorillard.

8.    Lorillard does not seek to destroy ALF or to prevent ALF from pursuing its mission as set forth in the MSA. Lorillard, in fact, supports the goals of the advertising campaign described in the MSA. Unfortunately, ALF has misused the funds that have been entrusted to it by broadcasting and publishing advertisements that are not authorized by the MSA and by creating and facilitating through its website vitriolic, hateful, and vulgar personal attacks upon Lorillard's employees.

9.    By these counterclaims, Lorillard is seeking, among other relief, a determination that ALF has repeatedly and materially breached the MSA and an order requiring ALF to comply with its obligations under the MSA.

## PARTIES

10.    Lorillard is a corporation organized and existing under the laws of the State of Delaware and has its principal office and place of business in Greensboro, North Carolina.

11.    ALF is a non-profit corporation organized and existing under the laws of the State of Delaware and has its principal office and place of business in Washington, D.C.

## EXECUTION OF MASTER SETTLEMENT AGREEMENT AND THE CREATION OF ALF

12.    As a result of litigation pending in multiple fora, the four major tobacco companies, Plaintiff, Philip Morris Incorporated ("Philip Morris"), Brown & Williamson Tobacco Corporation ("B&W"), and R.J. Reynolds Tobacco Company ("RJR"), on the one hand, and some forty-six states, including Delaware, participated in negotiations designed to reach a resolution of the parties' disputes. The various attorneys general of these states negotiated on the states' behalf.

13.    The parties successfully reached a settlement, and they memorialized the terms in a landmark agreement known as the Master Settlement Agreement ("MSA"). The document was executed in November 1998 by the four tobacco companies, including Lorillard, and the attorneys general of the forty-six states signatories. The state signatories to the MSA hereinafter shall be referred to collectively as the "Settling States," and the four tobacco company signatories hereinafter shall be referred to collectively as the "Participating Manufacturers."

14.    The MSA imposes significant obligations upon the Participating Manufacturers. Among other things, the Participating Manufacturers agreed to fund a non-profit entity charged with the mission of educating the public as to the nature and effect of tobacco products and their use.

15.    Section VI of the MSA carefully describes this non-profit entity's mission, and it lists the entity's permissible functions. This section also describes in a general manner the structure of the organization and the composition of its Board of Directors, as well as certain other organizational requirements the entity must meet once formed.

16.    Section VI of the MSA also sets forth in detail the funding obligations imposed upon the Participating Manufacturers with respect to this non-profit entity. Beginning on March 31, 1999, and extending for a period of nine years thereafter, the Participating Manufacturers have agreed to pay collectively $25,000,000 per year to fund the non-profit entity. These payments are known as base foundation payments. These base foundation payments are disbursed under the MSA and Escrow Agreement to the non-profit entity.

17.    Section VI also creates the National Public Education Fund ("NPEF"), and the NPEF is to be used by the non-profit entity to fund its public education and advertising program. The Participating Manufacturers have agreed to pay collectively $250,000,000 on March 31, 1999, and $300,000,000 each of the next four years thereafter, for the benefit of the NPEF (and thus also for the benefit of the non-profit entity and its public education and advertising program). These payments are known as NPEF payments. Pursuant to Section IX(e), the Participating Manufacturers have agreed to continue making annual $300,000,000 NPEF payments unless and until their market share falls below 99.05%. These NPEF payments are disbursed under the MSA and Escrow Agreement to the non-profit entity.

18.    Pursuant to and in accordance with the MSA, Lorillard has made base foundation payments in excess of $10,000,000 since 1999, and it has made NPEF payments in excess of $107,000,000 since 1999.

19.    Sections VI and IX(e) limit in significant ways the manner in which the NPEF payments made pursuant to Section VI and IX(e) may be used. These limitations on the use of the NPEF payments are found in limitations directed at the non-profit entity's use of the NPEF. Specifically, Section VI(h) provides that:

> The National Public Education Fund shall be used only for public education and advertising regarding the addictiveness, health effects, and social costs related to the use of tobacco products and shall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively.

Master Settlement Agreement, § VI(h).

20.    Thus, under Section VI of the MSA, there are significant promises and contractual obligations owed to the Participating Manufacturers, including Lorillard, concerning the NPEF, namely that it (1) will be administered and operated by and disbursed to a non-profit entity qualified and eligible to do so and to receive such disbursements and (2) will in fact be used by this non-profit entity in a manner consistent with Sections VI and IX(e) of the MSA. These promises and contractual obligations were consistent with the promises and contractual obligations owed concerning the mission and permissible functions of the non-profit entity.

21.    These promises and contractual obligations concerning the NPEF, its permissible uses, and the Section VI non-profit entity constituted material terms of the MSA. Had they not been present in the MSA, Lorillard and, upon information and belief, the other Participating Manufacturers would not have agreed to make the NPEF payments, would not have agreed to the

A67

formation and funding of the non-profit entity under the MSA and to its use of the NPEF, and would

not have executed the MSA itself.

22.     Pursuant to the MSA, on or about March 3, 1999, the National Association of

Attorneys General ("NAAG") incorporated a non-profit entity in the State of Delaware. The original

name of the entity—the plaintiff and counter-defendant in this action—was "MSA National

Foundation," a name that was changed to "American Legacy Foundation" ("ALF") on or about

August 2, 1999.

23.     The MSA requires that the non-profit entity described in Section VI incorporate into

its organizational documents those terms of the MSA relating to the entity. Consistent with this

requirement, the entity's permissible functions as listed in Section VI(f) of the MSA are contained

in ALF's Certificate of Incorporation. The MSA's requirements concerning the composition of the

entity's board of directors are contained in the Bylaws adopted by ALF's initial board of directors.

Section 5.7 of ALF's Bylaws meets the affiliation requirement set forth in Section VI(e) of the MSA,

and this provision expressly provides that ALF is bound by and subject to the terms of the MSA.

The limitations on the use of the NPEF contained in Section VI(h) of the MSA are set forth in

Section 12.2 of ALF's Bylaws, as are the rules set forth in Section VI(g) of the MSA regarding

grants made by the non-profit entity from the NPEF. Finally, Article XIII of ALF's Bylaws provides

that neither its Bylaws nor its Certificate of Incorporation may be amended so as to create an

inconsistency with any provision of the MSA concerning the non-profit entity described in Section

VI of the MSA. The entire MSA is attached to ALF's Bylaws as an exhibit.

24.     Upon information and belief, ALF adopted these Bylaws in an attempt to qualify

under Section VI of the MSA to administer and operate the NPEF and in an attempt to become

eligible to receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow

Agreement. Upon information and belief, ALF adopted these Bylaws for the benefit of the Participating Manufacturers, including Lorillard.

25.    Upon information and belief, after ALF was incorporated and adopted its Bylaws, the Settling States and NAAG considered ALF to be qualified under Section VI of the MSA to administer and operate the NPEF and to be eligible receive disbursements under Sections VI and IX(e) of the MSA, and they considered ALF to be the non-profit entity described in Section VI. Upon information and belief, after ALF was incorporated and adopted its Bylaws, the Setting States and NAAG allowed ALF to administer and operate the NPEF, and they allowed ALF to receive disbursements under Section VI of the MSA and under the Escrow Agreement. Upon information and belief, the Settling States and NAAG took such actions in exchange for ALF's promise and agreement to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA.

26.    Upon information and belief, ALF has received and continues to receive as disbursements all of the base foundation and NPEF payments made by Lorillard and the other Participating Manufacturers to date. Upon information and belief, ALF has administered and operated and continues to administer and operate the NPEF to date. By administering and operating the NPEF and by accepting disbursements under the MSA, ALF has reaped significant, intended benefits under the MSA, and it has done so with knowledge of the terms of the MSA.

### ALF'S MISUSE OF THE NATIONAL PUBLIC EDUCATION FUND

27.    Once formed, ALF launched an advertising campaign that it labels "the truth." The campaign includes an Internet web site maintained by ALF called "THETRUTH.com."

28.     Upon information and belief, ALF's advertising campaign called "the truth"—including its Internet web site called "THETRUTH.com"—is funded, entirely or primarily, by the NPEF.

29.     Some of ALF's advertisements are appropriate and are authorized by the MSA. Examples of such advertisements, which Lorillard does not challenge, are attached at Exhibits E and F. Such advertisements address "the addictiveness, health effects, and social costs related to the use of tobacco products," and do not attack or vilify any person or group.

30.     Unfortunately, shortly after its creation ALF began to run other advertisements—on television, radio, and the Internet—that do not comply with the MSA and that upon information and belief are funded, entirely or primarily, by the NPEF. Such advertisements, and the activities related to such advertisements, represent a misuse of the NPEF and a breach of the MSA by ALF and/or a breach by ALF of the agreement by ALF to abide by the MSA and its restrictions concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA.

31.     ALF's improper advertisements do not address "the addictiveness, health effects, and social costs related to the use of tobacco products," as required by the MSA, and/or they constitute personal attacks and vilification, which is prohibited by the MSA. On multiple occasions, in broadcasts reaching millions of members of the public, ALF has personally attacked and vilified Lorillard, its employees, and tobacco companies collectively. For example, ALF has broadcast advertisements that:

   a. attack tobacco companies collectively, as well as employees of such companies;

   b. state or strongly imply that Lorillard and other tobacco companies deliberately target their sales efforts at minors; (for example, in a press release on THETRUTH.com, ALF stated "Lorillard has successfully marketed its addictive product to minority youth");

c.    accuse tobacco companies of shredding documents, thereby implying the intentional and improper destruction of evidence;

d.    accuse tobacco companies of lying to the public, including one advertisement in which an employee of a tobacco company is asked to take a lie-detector test;

e.    end with a statement that ALF is attempting to "expose the tobacco industry's deceptions to the light of day"; and

f.    strongly imply that Lorillard adds dog urine to its cigarettes ("the Dog Urine Ad").

32.    Examples of ALF's improper advertisements are attached as Exhibits A and B. All such advertisements represent misuse of the NPEF and thereby constitute a breach of the MSA by ALF and/or a breach by ALF of the agreement by ALF to abide by the MSA and its restrictions concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA.

33.    In addition to the malicious attitude toward Lorillard and its employees displayed in ALF's advertisements, ALF has engaged in a pattern of sending, facilitating, and/or assisting others in sending multiple unsolicited and harassing e-mails to Lorillard. Such e-mails, some of which are attached as Exhibit C, frequently contain vulgar and obscene language, including the use of such words and phrases as "whores," "fags," "morons," "you monkeys at Lorillard Tobacco Company," "bullshit," "pathetic bitch asses," and "hookers." These multiple unsolicited and harassing e-mails sent to Lorillard interfered with Lorillard's e-mail system and computer network, and they disrupted Lorillard's employees and such employees' use of their computers.

34.    In 2001, Lorillard was forced to install a filter on its computers to attempt to block ALF's vulgar e-mails. However, some of the harassing e-mails from THETRUTH.com website continue to be received by Lorillard. In addition, Lorillard has received multiple harassing e-mails

from third parties. Examples of such additional e-mails are found at Exhibit G. Upon information and belief, ALF aided in the creation of these e-mails by making form letters and e-mail addresses available to third parties on THETRUTH.com website.

35.    Such e-mails, and the activities related to such e-mails, were intended by ALF to harass and annoy (and, upon information and belief, intimidate) Lorillard and its employees. Upon information and belief, such e-mails were also intended to interfere with Lorillard's e-mail system and/or computer network and to disrupt Lorillard's employees and such employees' use of their computers.

36.    These unsolicited and harassing e-mails constitute personal attacks on and vilification of Lorillard and its employees, which is expressly prohibited by the MSA. Upon information and belief, ALF used the NPEF to pay for such attacks and thus such e-mails, and the activities related to such e-mails, constitute breaches of the MSA by ALF and/or breaches by ALF of the agreement by ALF to abide by the MSA and its restrictions concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA.

37.    Such e-mails, and all activities taken by ALF relating to these e-mails, also constitutes a violation of North Carolina's Cyberstalking Act and thus a criminal offense. N.C.G.S. § 14-196.3.

### ATTEMPTS BY LORILLARD TO RESOLVE DISPUTE

38    After the Dog Urine Ad was broadcast, Lorillard contacted ALF and expressed its view that ALF's conduct constituted a material breach of the MSA. Lorillard requested that ALF issue a retraction of the Ad and agree to comply with the MSA. ALF refused to comply with these requests.

39.    After these initial informal settlement discussions were unproductive, Lorillard sent ALF a formal thirty-day notice letter, as required by Section VII(c) of the MSA. Lorillard's hope

was that the parties would re-kindle their discussions and resolve this matter amicably. Instead,

ALF's President, Cheryl Healton, responded by issuing a press statement (Exhibit D) that is rife with

misrepresentations. Ms. Healton stated, *inter alia*:

> I believe this action is a smokescreen to hide Lorillard's real goal, which is to crush
> the truth campaign because it is working to stop kids from smoking.

. . .

> The drop-off in youth smoking rates is costing the tobacco industry a great deal of
> revenue, and that's why Lorillard is desperate to stop the truth campaign. And for
> those who disagree with me, let me just ask the question: Would Lorillard be trying
> to stop the truth campaign if it WEREN'T helping to reduce youth smoking and
> tobacco industry revenues?

40.    Ms. Healton's press statement continued ALF's campaign of making malicious

statements about Lorillard to the public. Lorillard does not seek, and has never sought, to stop

ALF's "truth" advertising campaign. Lorillard's goals are for ALF to stop misusing the funds

entrusted to it and for ALF otherwise to comply with its legal, contractual, and ethical obligations.

41.    Lorillard has alerted the Settling States and NAAG as to ALF's misuse of MSA funds

and to its breaches of the MSA and of its Bylaws and Certificate of Incorporation. However, the

Settling States and NAAG have failed to take action to bring ALF's use of the NPEF into

compliance with the MSA and with ALF's Bylaws and Certificate of Incorporation and otherwise

have failed to halt or cure the on-going breaches of the MSA and ALF's Bylaws and Certificate of

Incorporation created and caused by ALF's conduct.

## FIRST CLAIM FOR RELIEF
### Breach of Master Settlement Agreement

42.    The allegations of Paragraphs 1 through 41 are repeated, realleged, and incorporated

herein by reference.

43.    ALF was created under the terms of the MSA.

A73

44.    ALF incorporated the MSA into its Bylaws.

45.    Pursuant to the terms of the MSA, Lorillard has paid tens of millions of dollars for ALF's benefit. ALF has accepted those funds under the terms of the MSA and with full knowledge of the MSA.

46.    The MSA constitutes a pre-incorporation agreement. Specifically:

    a.    the MSA sets forth certain obligations of, and restrictions on, ALF;

    b.    the MSA was signed by the various Settling States (as defined in the MSA) and their respective attorneys general;

    c.    the Settling States and NAAG promoted and incorporated ALF;

    d.    ALF has accepted millions of dollars in benefits under the MSA; and

    e.    ALF accepted the benefits with full knowledge of the terms of the MSA.

By its conduct, ALF has adopted and ratified the MSA, and is bound to comply with the terms thereof. At no time has ALF attempted to repudiate the benefits received by it under the MSA.

47.    In addition, ALF has expressly and/or implicitly adopted and assumed the obligations set forth in the MSA concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA. This adoption and assumption is evidenced by the fact that ALF has repeatedly acknowledged that it is bound by the terms of the MSA. For example, in her press release (Exhibit D), ALF's President stated that "[a]nyone who has seen truth ads knows that they educate young people about the addictiveness, health effects, and social costs of tobacco, which is exactly what the Master Settlement Agreement says they must do." (Emphasis added.)

48.    ALF's Bylaws acknowledge that ALF must comply with the MSA. For example, §5.7 provides:

Affiliation. The programs of the Foundation may be affiliated with one or more educational or medical institutions selected by the Board of Directors from time to

time <u>as required by the Master Settlement Agreement attached hereto as Exhibit A</u> ("Master Settlement Agreement").

Exhibit H (emphasis added.)

49.    Other examples of ALF's admissions that it is bound by, and subject to, the MSA are set forth at Exhibit I.

50.    In addition, ALF has succeeded to various obligations of the Settling States and NAAG, including the provisions relating to the types of advertising allowed under the MSA and to the permissible use of the NPEF.

51.    In the alternative, an implied agreement has arisen between Lorillard and ALF pursuant to which ALF agreed to abide by the terms of the MSA in exchange for the payments made by Lorillard for the benefit of ALF.

52.    As described above, ALF has committed multiple material breaches of the MSA, including but not limited to Sections VI(f) and (h), by misusing the funds entrusted to it. Specifically, ALF has used the NPEF for advertisements that do not address the addictiveness, health consequences, or social costs of the use of tobacco products. In addition, ALF has used the NPEF to engage in personal attacks on and the vilification of Lorillard, its employees, and tobacco companies collectively through the advertisements referenced above. Finally, by its own admission in the Complaint, ALF is using base foundation payments for advertising.

53.    In addition to the advertisements that violate the MSA, the e-mails described above constitute personal attacks on and vilification of Lorillard and its employees that further violate the MSA. Upon information and belief, such e-mails were funded, entirely or primarily, by the NPEF.

54.    Pursuant to Section VII(c) of the MSA, this Court has the authority to enforce the terms of the MSA. In addition, this Court has the authority to issue a Declaratory Order (as defined in the MSA).

55.    Lorillard requests that the Court enter a finding that ALF has repeatedly breached the MSA and enter an order requiring ALF to comply with the MSA.

56.    ALF's breaches of the MSA and harassing conduct are likely to recur in the future unless ALF is ordered to cease doing so and to specifically perform its duties and obligations under the MSA, and such breaches and harassing conduct are not compensable by money damages. Accordingly, Lorillard requests preliminary and permanent injunctive relief requiring ALF to cease sending (and assisting others in sending) unsolicited e-mails to Lorillard and/or its employees and to comply with the requirements of the MSA, and Lorillard requests an order requiring ALF to specifically perform its duties and obligations under the MSA.

57.    Lorillard requests as further relief for ALF's breaches of the MSA that the Court enter an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation payments made by the Participating Manufacturers, including Lorillard. In the alternative, Lorillard requests that the Court order an accounting of ALF's use of the NPEF and base foundation payments disbursed to it under Section VI of the MSA and under the Escrow Agreement and, based on the results of such accounting, enter an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation payments made by the

Participating Manufacturers, including Lorillard, that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement.

58.    In the alternative, Lorillard is entitled to at least nominal damages in the amount of $1.00 for ALF's breaches of MSA.

59.    To the extent the Court finds ambiguity in any term or terms of the MSA, Lorillard requests a Declaratory Order under Section VII(c)(1) and (c)(5) of the MSA defining ALF's obligations under the MSA and/or construing such ambiguous term or terms.

## SECOND CLAIM FOR RELIEF
### Breach of the Duty and Covenant of Good Faith and Fair Dealing

60.    The allegations of Paragraphs 1 through 59 are repeated, realleged, and incorporated herein by reference.

61.    Implied in the MSA is a duty and covenant of good faith and fair dealing.

62.    By personally attacking and vilifying Lorillard, its employees, and tobacco companies collectively, and by waging a campaign of harassment through e-mails, ALF has breached its duty and covenant of good faith and fair dealing under the MSA.

63.    Lorillard is entitled to nominal damages in the amount of $1.00 for ALF's breaches of the duty and covenant of good faith and fair dealing.

## THIRD CLAIM FOR RELIEF
### Breach of Contract

64.    The allegations of Paragraphs 1 through 63 are repeated, realleged, and incorporated herein by reference.

65.    Upon information and belief, after ALF was incorporated and adopted its Bylaws, the Settling States and NAAG considered ALF to be qualified under Section VI of the MSA to administer and operate the NPEF and to be eligible to receive disbursements under Sections VI and

IX(e) of the MSA, and they considered ALF to be the non-profit entity described in Section VI. Upon information and belief, after ALF was incorporated and adopted its Bylaws, the Setting States and NAAG allowed ALF to administer and operate the NPEF, and they allowed ALF to receive disbursements under Section VI of the MSA and under the Escrow Agreement, in exchange for ALF's promise and agreement to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA (the "Agreement").

66.     Upon information and belief, Lorillard and the other Participating Manufacturers were intended third-party beneficiaries of ALF's Agreement with the Settling States and/or NAAG to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA. As an intended third-party beneficiary, Lorillard is entitled to enforce such Agreement.

67.     As described above, ALF has committed multiple material breaches of the Agreement by misusing the NPEF and other MSA funds entrusted to it. Specifically, ALF has used the NPEF for advertisements that do not address the addictiveness, health consequences, or social costs of the use of tobacco products. In addition, ALF has used the NPEF to engage in personal attacks on and vilification of Lorillard, its employees, and tobacco companies collectively through the advertisements referenced above. Finally, by its own admission in the Complaint, ALF is using base foundation payments for advertising.

68.     In addition to the advertisements that violate ALF's Agreement to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA, the unsolicited e-mails described above constitute personal attacks on and vilification of Lorillard and its employees that further violate such

Agreement. Upon information and belief, such e-mails were funded, entirely or primarily, by the NPEF.

69.    ALF's breaches of the Agreement are likely to recur in the future unless ALF is ordered to cease doing so and to specifically perform its duties and obligations under the Agreement, and such breaches are not compensable by money damages. Accordingly, Lorillard requests preliminary and permanent injunctions requiring that ALF (a) comply with its Agreement with the Settling States and/or NAAG to abide by the provisions of the MSA relating to the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA and (b) comply with such provisions, and Lorillard requests an order requiring ALF to specifically perform its duties and obligations under the Agreement.

70.    Lorillard requests as further relief for ALF's breaches of the Agreement that the Court enter an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation payments made by the Participating Manufacturers, including Lorillard. In the alternative, Lorillard requests that the Court order an accounting of ALF's use of the NPEF and base foundation payments disbursed to it under Section VI of the MSA and under the Escrow Agreement and, based on the results of such accounting, enter an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation payments made by the Participating Manufacturers, including Lorillard, that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement.

71.    In the alternative, Lorillard is entitled to at least nominal damages in the amount of

$1.00 for ALF's breaches of the Agreement.

### FOURTH CLAIM FOR RELIEF
### Violation of Bylaws and Certificate of Incorporation

72.    The allegations of Paragraphs 1 through 71 are repeated, realleged, and incorporated

herein by reference.

73.    Upon information and belief, NAAG incorporated those certain provisions of ALF's

Certificate of Incorporation concerning the non-profit entity described in Section VI of the MSA in

an attempt to qualify ALF under Section VI of the MSA to administer and operate the NPEF and to

allow ALF to become eligible to receive disbursements under Sections VI and IX(e) of the MSA and

under the Escrow Agreement.  Upon information and belief, NAAG incorporated these provisions

into ALF's Certificate of Incorporation for the benefit of the Participating Manufacturers, including

Lorillard.

74.    Upon information and belief, ALF adopted those Bylaws concerning the NPEF, the

NPEF's permissible uses, and the non-profit entity described in Section VI of the MSA, as well as

those Bylaws otherwise relating to the MSA, in an attempt to qualify under Section VI to administer

and operate the NPEF and to become eligible to receive disbursements under Sections VI and IX(e)

of the MSA and under the Escrow Agreement.  Upon information and belief, ALF adopted these

Bylaws for the benefit of the Participating Manufacturers, including Lorillard.

75.    Lorillard enjoys standing to enforce such Bylaws and Certificate of Incorporation

provisions because upon information and belief these provisions were intended to confer direct

contractual rights upon Lorillard and/or because upon information and belief Lorillard is an intended

third-party beneficiary of such provisions

A80

76.    In the alternative, Lorillard enjoys standing to enforce such Bylaws and Certificate

of Incorporation provisions because of the special interest Lorillard has in the enforcement of such

provisions and/or because the Attorney General of the State of Delaware has failed to enforce such

provisions herself.

77.    As described above, ALF has committed multiple material violations of such Bylaws

and Certificate of Incorporation provisions by misusing the NPEF and other MSA funds entrusted

to it. Specifically, ALF has used the NPEF for advertisements that do not address the addictiveness,

health consequences, or social costs of the use of tobacco products. In addition, ALF has used the

NPEF to engage in personal attacks on and vilification of Lorillard, its employees, and tobacco

companies collectively through the advertisements referenced above. Finally, by its own admission

in the Complaint, ALF is using base foundation payments for advertising.

78.    In addition to the advertisements that violate ALF's Bylaws and Certificate of

Incorporation provisions concerning the NPEF, the NPEF's permissible uses, and the non-profit

entity described in Section VI of the MSA, as well as those provisions otherwise relating to the

MSA, the unsolicited e-mails described above constitute personal attacks on and vilification of

Lorillard and its employees that further violate such provisions. Upon information and belief, such

e-mails were funded, entirely or primarily, by the NPEF.

79.    ALF's misconduct and misuse of MSA funds disbursed and entrusted to it, which

misconduct and misuse violates ALF's Bylaws and Certificate of Incorporation provisions

concerning the NPEF, the NPEF's permissible uses, and the non-profit entity described in Section

VI of the MSA, as well as those provisions otherwise relating to the MSA, are likely to recur in the

future unless ALF is ordered to cease doing so and are not compensable by money damages.

Accordingly, Lorillard requests preliminary and permanent injunctive relief requiring ALF to cease its violation of such provisions.

80.    Lorillard requests as further relief for ALF's violation of its Bylaws and Certificate of Incorporation that the Court enter an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation payments made by the Participating Manufacturers, including Lorillard. In the alternative, Lorillard requests that the Court order an accounting of ALF's use of the NPEF and base foundation payments disbursed to it under Section VI of the MSA and under the Escrow Agreement and, based on the results of such accounting, enter an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation payments made by the Participating Manufacturers, including Lorillard, that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement.

**FIFTH CLAIM FOR RELIEF**
**Claim for Declaratory Judgment Regarding MSA**

81.    The allegations of Paragraphs 1 through 80 are repeated, realleged, and incorporated herein by reference.

82.    Lorillard seeks a declaration that ALF—on account of its conduct, its activities, its use of the NPEF, and otherwise, as alleged herein—does not qualify and is not eligible to administer and operate the NPEF under Sections VI and IX(e) of the MSA and does not qualify and is not eligible to receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow

Agreement. Lorillard requests that the Court issue a declaration to this effect and also declare that ALF no longer may administer and operate the NPEF under Sections VI and IX(e) of the MSA and no longer may receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow Agreement.

83.     Lorillard also seeks a declaration that ALF—on account of its conduct, its activities, its use of the NPEF, and otherwise, as alleged herein—has been disqualified and ineligible to administer and operate the NPEF under Section VI of the MSA and has been disqualified and ineligible to receive disbursements under Section VI of the MSA and under the Escrow Agreement. Lorillard requests that the Court issue a declaration to this effect and also declare that ALF must refund and return to the Escrow Agent all NPEF and base foundation payments disbursed to ALF (or to Lorillard all NPEF and base foundation payments made by Lorillard and disbursed to ALF) while ALF was disqualified and ineligible to administer and operate the NPEF and/or disqualified and ineligible to receive such disbursements.

84.     ALF has demonstrated through its conduct, its activities, its use of the NPEF, and otherwise, as alleged herein, that it does not meet (and has not met) the definition of the non-profit entity described in Sections VI and IX(e) of the MSA and that it does not qualify and is not eligible (and has been disqualified and ineligible) to administer and operate the NPEF under Sections VI and IX(e) of the MSA or to receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow Agreement. However, ALF has suggested that it does qualify and is eligible (and has been qualified and eligible) to administer and operate the NPEF under Sections VI and IX(e) of the MSA and to receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow Agreement. Thus, this claim presents an actual controversy, for which declaratory relief is appropriate under 10 Del. C. § 6501 and Section VII(c) of the MSA.

## SIXTH CLAIM FOR RELIEF
### Alternative Claim for Declaratory Judgment Regarding MSA

85.    The allegations of Paragraphs 1 through 84 are repeated, realleged, and incorporated herein by reference.

86.    In the event that this Court denies the relief sought by Lorillard in Claims I-V, Lorillard seeks an alternative declaration that the Settling States—including Delaware—and/or NAAG (1) may pursue enforcement of the restrictions and provisions in the MSA concerning the NPEF, the base foundation payments, the NPEF's permissible uses, and the non-profit entity described in Section VI of the MSA; (2) may pursue enforcement of ALF's Bylaws and Certificate of Incorporation provisions concerning the NPEF, the base foundation payments, the NPEF's permissible uses, and the non-profit entity described in Section VI of the MSA; and/or (3) may pursue enforcement of ALF's promise and agreement to the Settling States and/or NAAG to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, the base foundation payments, and the non-profit entity described in Section VI of the MSA.

87.    The Settling States—including Delaware—and NAAG have failed to take any action to bring ALF's use of the NPEF into compliance with the MSA and with ALF's Bylaws and Certificate of Incorporation and otherwise have failed to halt or cure the on-going breaches of the MSA, ALF's Bylaws and Certificate of Incorporation, and ALF's promise to abide by certain provisions of the MSA. In the event that the Court denies the relief sought by Lorillard in Claims I-V above, Lorillard will be left to look to the Settling States and/or NAAG to enforce these obligations binding upon ALF. However, ALF has suggested that the Settling States—including Delaware—and/or NAAG lack authority to enforce such obligations. Thus, in the event that the Court denies the relief sought by Lorillard in Claims I-V above, this claim presents an actual

A84

controversy, for which declaratory relief is appropriate under 10 <u>Del. C.</u> § 6501 and Section VII(c)

of the MSA.

## SEVENTH CLAIM FOR RELIEF
### <u>Trespass to Chattel</u>

88.    The allegations of Paragraphs 1 through 87 are repeated, realleged, and incorporated

herein by reference.

89.    As described above, ALF intentionally intermeddled with Lorillard's e-mail system

and computer network by sending, facilitating, and/or assisting others in sending, multiple

unsolicited and harassing e-mails to Lorillard and Lorillard's employees. These unsolicited and

harassing e-mails interfered with Lorillard's e-mail system and computer network, and they disrupted

Lorillard's employees and such employees' use of their computers.

90.    Lorillard was forced to install a filter on its computers to attempt to block such e-

mails. However, some of the unsolicited and harassing e-mails from THETRUTH.com website

continued to be received by Lorillard. In addition, Lorillard received multiple unsolicited and

harassing e-mails from third parties. Upon information and belief, ALF has assisted and is assisting

these third parties in sending such e-mails.

91.    ALF's conduct relating to the sending of such unsolicited and harassing e-mails to

Lorillard and Lorillard's employees as alleged herein amounts to a trespass to Lorillard's chattel, that

is, a trespass to Lorillard's e-mail system and computer network.

92.    As a result of ALF's trespass, Lorillard is entitled to recover from ALF Lorillard's

direct and special damages, including the cost of installing the e-mail filter.

93.    ALF's trespass is likely to recur in the future unless ALF is ordered to cease doing

so. Accordingly, Lorillard requests preliminary and permanent injunctive relief requiring ALF to

cease sending, facilitating, and/or assisting others in sending unsolicited e-mails to Lorillard and/or Lorillard's employees.

WHEREFORE Defendant-Counterclaimant Lorillard prays that the Court:

1.      Enter judgment in favor of Lorillard and against ALF on ALF's claims against Lorillard and dismiss ALF's complaint against Lorillard in its entirety with prejudice;

2.      Enter judgment in favor of Lorillard and against ALF on Lorillard's claims I-V and VII of Lorillard's Counterclaims and grant Lorillard the relief requested in its Counterclaims;

3.      Grant Lorillard at least $1.00 in nominal damages on claims I, II, and III;

4.      Grant Lorillard its direct and special damages, including the cost of installing the e-mail filter, on claim VII.

5.      Issue a declaration that (1) ALF does not qualify and is not eligible to administer and operate the NPEF under Sections VI and IX(e) of the MSA and does not qualify and is not eligible to receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow Agreement; (2) ALF no longer may administer and operate the NPEF under Sections VI and IX(e) of the MSA and no longer may receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow Agreement; (3) ALF has been disqualified and ineligible to administer and operate the NPEF under Section VI of the MSA and has been disqualified and ineligible to receive disbursements under Section VI of the MSA and under the Escrow Agreement; and (4) ALF must refund and return to the Escrow Agent all NPEF and base foundation payments disbursed to ALF (or to Lorillard all NPEF and base foundation payments made by Lorillard and disbursed to ALF) while ALF was disqualified and ineligible to administer and operate the NPEF and/or to receive such disbursements.

6.      Enter a finding that ALF has repeatedly breached the MSA and enter an order requiring ALF to comply with the MSA;

7.    Enter preliminary and permanent injunctions requiring that ALF comply with its obligations under the MSA, including the proper use of the NPEF and the prohibitions against personal attacks and vilification, and enter an order requiring ALF to specifically perform its duties and obligations under the MSA;

8.    Enter preliminary and permanent injunctions requiring that ALF comply with its Certificate of Incorporation and Bylaws;

9.    Enter preliminary and permanent injunctions requiring that ALF (a) comply with its Agreement with the Settling States—including Delaware—and/or NAAG to abide by the provisions of the MSA relating to the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA and (b) comply with such provisions, and enter an order requiring ALF to specifically perform its duties and obligations under the Agreement;

10.    Enter preliminary and permanent injunctions prohibiting ALF from sending, facilitating, and/or assisting others in sending unsolicited e-mails to Lorillard;

11.    Enter preliminary and permanent injunctions and/or an order requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation payments made by the Participating Manufacturers, including Lorillard. In the alternative, enter an order requiring an accounting of ALF's use of the NPEF and base foundation payments disbursed to it under Section VI of the MSA and under the Escrow Agreement and, based on the results of such accounting, requiring ALF (a) to refund and return to Lorillard the NPEF and base foundation payments made by Lorillard that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement and/or (b) to refund and return to the Escrow Agent all NPEF and base foundation payments made by the Participating Manufacturers, including

Lorillard, that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement.

12.     In the alternative to the relief requested in claims I-V of Lorillard's Counterclaims and in the event the Court denies such relief, issue a declaration that the Settling States—including Delaware—and/or NAAG (1) may pursue enforcement of the restrictions and provisions in the MSA concerning the NPEF, the NPEF's permissible uses, and the non-profit entity described in Section VI of the MSA; (2) may pursue enforcement of ALF's Bylaws and Certificate of Incorporation provisions concerning the NPEF, the NPEF's permissible uses, and the non-profit entity described in Section VI of the MSA; and/or (3) may pursue enforcement of ALF's promise and agreement to the Settling States—including Delaware—and/or NAAG to abide by the restrictions and provisions in the MSA concerning the NPEF, its permissible uses, and the non-profit entity described in Section VI of the MSA.

13.     To the extent necessary and appropriate, enter a Declaratory Order defining ALF's obligations under the MSA or otherwise construing any ambiguous term or terms in the MSA;

14.     Tax the costs of this action, including attorneys' fees, against ALF; and    1  5  . Grant to Lorillard such other and further relief as the Court deems just and proper.

Stephen E. Herrmann (#691)
Robert W. Whetzel (#2288)
Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
Attorneys for Lorillard Tobacco Company

***Of Counsel*:**
Jim W. Phillips, Jr.
Robert J. King III
Charles E. Coble
Brooks, Pierce, McLendon, Humphrey &
 Leonard, L.L.P.
2000 Renaissance Plaza
Greensboro, North Carolina 27401
(336) 373-8850

# **EXHIBIT F**

# KAUFMAN, BORGEEST & RYAN

ATTORNEYS AT LAW

99 PARK AVENUE
NEW YORK, NEW YORK 10016

TELEPHONE: 212-980-9600
FACSIMILE: 212-980-9291
www.kbrlaw.com

WESTCHESTER OFFICE
200 SUMMIT LAKE DR.
VALHALLA, NEW YORK 10595
TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025

LONG ISLAND OFFICE
900 MERCHANTS CONCOURSE
WESTBURY, NEW YORK 11590
TELEPHONE: 516-794-2907
FACSIMILE: 516-794-2908

NEW JERSEY OFFICE
27 NORTH BROAD STREET
RIDGEWOOD, NEW JERSEY 07450
TELEPHONE: 201-612-9960
FACSIMILE: 201-612-9980

ANDREW S. KAUFMAN†
WAYNE E. BORGEEST
JULIANNA RYAN
LEE E. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE††
JONATHAN D. RUBIN‡
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL P. MEZZACAPPA*‡
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER

ELYSA T. BRANDT*
CHRISTOPHER E. DiGIACINTO*
JONATHAN R. HAMMERMAN*
THOMAS GIBBONS
ROCCO J. SICONOLFI
HEATHER LASCHEWER*
CAROL S. DOTY†‡

ADEOLA I. ADELE
AINE V. MADDEN
BARBARA-ANN M. COSTELLO
MELINDA B. MARGOLIES*
JONATHAN B. BRUNO*
JEFFREY S. WHITTINGTON
ROCCO P. MATRA◊
ELIZABETH O'BRIEN TOTTEN
ANN MARIE COLLINS*†‡
RICHARD A. PRETTI
PAUL J. COLUCCI
SARAH E. GREITZER
CALVIN K. WOO†‡
NATALIA M. BARTELS†‡
REBECCA KILDUFF
CHRISTINA M. ROGERS
JENNY COOLEY*
KRISTOPHER M. DENNIS*
JACQUELINE MANDELL*

CHRISTINE HEENAN
ELENA CARTER
MARK H. PEIKIN*
BELINDA DODDS-MARSHALL
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER
FRANK K. STAIANO
JACQUELINE B. TOMASSO
ROBERT PARISER
BRIAN YOMTOV

OF COUNSEL:
SCOTT A. SCHECHTER*
MARIBETH SLEVIN

† ALSO ADMITTED IN PA
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN DC
††ALSO ADMITTED IN CT
* ALSO ADMITTED IN MA
◊ ALSO ADMITTED IN TX
* APPELLATE COUNSEL

December 6, 2002

**PRIVILEGED & CONFIDENTIAL**

Jane Greenburg
Armfield, Harrison, & Thomas, Inc.
20 South King Street
Leesburg, VA 20175

RE:   Insured : American Legacy Foundation
      Claimant: Lorillard Tobacco Company
      Claim Nos.: 371-018857 & 434-002836
      Policy No.: 873-9971
      Our File No.: 707.183

Dear Ms. Greenburg:

We have been retained to advise and assist National Union Fire Insurance Company of Pittsburgh, PA ("National Union") in connection with above matter, submitted for coverage under the above-captioned Policy, a National Union Not-for-Profit Individual and Organization Insurance Policy.

We have now had an opportunity to review the Claim in conjunction with the terms and conditions of the Policy and have conferred with National Union. This letter conveys National Union's position with regard to coverage for the Claim.

Please note that the coverage position described below is based upon the information presently available to us. Should further pertinent information come to light, National Union

A90

Re:  Lorillard Tobacco Company
v. American Legacy Foundation
Page 2 of 6

will revise its coverage position accordingly and reserves the right to do so.  If this letter should
be addressed to persons other than you, please forward this letter to the appropriate person
immediately and advise us of the party to whom we should also direct our correspondence.

It is our understanding that the Insured, American Legacy Foundation ("ALF"), is a
national, independent public health foundation located in Washington, D.C.  ALF collaborates
with national, state, and local organizations through grant awards, research initiatives, marketing
efforts and training programs in an effort to reduce tobacco use in the United States.  ALF's
National Tobacco Youth Prevention and Education effort is known as the "Truth" campaign.
The "Truth" campaign consists of advertising, grass roots, promotional events and an interactive
website to educate regarding tobacco use and tobacco marketing.  The "Truth" campaign was
established on March 19, 1999 following the Master Settlement Agreement ("MSA") entered
into between a coalition of attorneys general in 46 states and 5 U.S. territories and the tobacco
industry.  ALF is primarily funded by the payments designated by the settlement.

It is also our understanding that the MSA resolved lawsuits filed by the attorneys general
against the tobacco industry and provided individual States funding intended for tobacco
prevention and control.  The agreement required tobacco companies to take down all billboard
advertising and advertising in sports arenas, to stop using cartoon characters to sell cigarettes and
to make many of their internal documents available to the public.  The tobacco companies also
agreed to not market or promote their products to young people.  Claimant, Lorillard Tobacco
Company ("Lorillard"), is one of the tobacco companies involved in this settlement.

On November 13, 2001, counsel for Lorillard issued a letter to counsel for ALF in
response to ALF's recent commercial advertisements implying that Lorillard adds urea, which
can be derived from dog urine, to its cigarettes/tobacco products.  The actual ad involved a
person calling the tobacco company and inquiring into whether the tobacco company wanted to
purchase dog urine for its urea.  It appears this letter was also in response to a July 20, 2001 letter
that counsel for ALF had sent to Steve Watson of Lorillard regarding questions pertaining the
presence and/or addition of urea to Lorillard cigarettes/tobacco products.  Lorillard advised that
it would forgo legal action if ALF acknowledged in writing that the "dog urine ads" were false in
implying that Lorillard added urea (from dog urine or in general) to its cigarette products, and
that ALF issue statements regretting the false statements contained in its advertisement and
retract the advertisement(s).  Additionally, Lorillard requested that ALF cease making and
recording telephone calls to company employees of Lorillard for broadcast or other publication.
Attached to the November 13th letter was a draft Complaint which contained causes of action for
slander, libel and violations of the North Carolina Unfair Trade Practice Act.  The letter also
threatened to add a claim for violation of the Master Settlement Agreement's "vilification"
provision.

On November 30, 2001, counsel for ALF forwarded the November 13th letter and draft
complaint to ALF's insurance broker, Armfield, Harrison & Thomas, Inc. ("A,H&T").  It was
advised that the purpose of the letter was to request formally on ALF's behalf that all ALF
insurance companies immediately be put on notice of this matter and that a demand for defense

KAUFMAN, BORGEEST & RYAN

150813-1

Re: Lorillard Tobacco Company
v. American Legacy Foundation
Page 3 of 6

and indemnity was being made to all insurers.    On December 3, 2001 a Notice of
Occurrence/Claim was submitted by A,H&T to AIG.

On January 18, 2002, another letter was issued from Lorillard to counsel for ALF. This
letter gave notice that, pursuant to section 8 (c)(2) of the Master Settlement Agreement,
Lorillard intended to initiate a proceeding against ALF to enforce the terms of the MSA. The
letter also cited the provisions of the MSA that pertained to the "Truth" campaign that ALF was
allegedly violating.    Additionally it was alleged that ALF was violating the "vilification
provisions" of the MSA. The letter also noted the prior overtures made by Lorillard in the fall
and winter of 2001 (i.e. November 13th letter and draft Complaint) seeking resolution of
Lorillard's concerns with ALF's conduct. On January 31, 2002, counsel for ALF forwarded this
letter to A,H&T, also referring to the prior threat made in November 2001 to sue ALF for
slander, libel and unfair deceptive trade practices. Once again, the Insurers were requested to be
notified and a demand for defense and indemnity was asserted.

On February 19, 2002, a lawsuit was filed by Lorillard against ALF in the State of North
Carolina, Wake County, the General Court of Justice, Superior Court Division. The Complaint
alleged that ALF was violating the provisions of the Master Settlement Agreement through its
"Truth Campaign" advertising.    The Complaint contains two causes of action.    The first is
Breach of the Master Settlement Agreement and, the second is Breach of the Duty and
Covenant of Good Faith and Fair Dealing that were implied in the Master Settlement
Agreement.    This Complaint also makes reference to a criminal statute, the North Carolina
Cyber-Stalking Act, N.G.S. Section 14-196.3[1], but does not contain a cause of action for it (nor
does a private civil right of action appear to exist under the statute).    We recognize that the
allegations set forth in the Complaint may be without substance and nothing contained in this
letter is intended to suggest that they have any legal or factual merit.

On February 25, 2002, counsel for ALF issued a letter to A,H&T advising of the above
referenced lawsuit. Once again, requesting that all of ALF's insurers be immediately contacted
and notified them of the lawsuit with a demand for defense and indemnity being made.

Since the Notice of Occurrence/Claim, the November 13th and January 18th letters (with
attachments) and the North Carolina complaint were forwarded to AIGTS on separate occasions
and to different departments, two separate Claims had been opened for this matter. The first
Claim, number 371-018857, was opened in response to the December 3, 2001 Notice of
Occurrence/Claim. The second Claim, number 434-002836 (forwarded to a different department
within AIGTS), was opened in response to the February 25, 2002 letter referencing the filed and
served lawsuit captioned Lorillard Tobacco Company v. American Legacy Foundation, General
Court of Justice, Superior Court Division, North Carolina, Wake County, 02-CVS-02170. We
have been advised by defense counsel that the litigation in North Carolina State Court ("North

---

[1] The Complaint also advises that after Lorillard gave ALF 30 days notice prior to filing the lawsuit, as required by
the MSA, ALF filed a "declaratory judgment" suit in Delaware State Court against Lorillard. In the Delaware
Complaint, ALF requested the court to enter an injunction prohibiting Lorillard from enforcing its alleged rights
under the MSA.

KAUFMAN, BORGEEST & RYAN
150813-1

Re: Lorillard Tobacco Company
v. American Legacy Foundation
Page 4 of 6

Carolina Action") has been stayed pending resolution of the declaratory action that was filed by
ALF against Lorillard in the Delaware State Court. We were also advised that there were no
counter-claims filed by Lorillard in the Delaware action.[2]

National Union issued Not-for-Profit Individual and Organization Insurance Policy
Including Employment Practices Liability Insurance for the period of August 26, 2001 to August
26, 2002. The Policy provides for a Limit of Liability of $15 million for all Loss subject to a
$50,000 Retention for Claims alleging the same Wrongful Acts or Related Wrongful Acts. The
Policy does not provide for a duty to defend.

A Claim is defined to include a written demand for monetary relief; or a civil proceeding
for monetary or non-monetary relief which is commenced by a service of a Complaint or similar
pleading. Please be advised that a Claim was first made in this matter upon the service of the
Complaint filed in North Carolina. A Claim was not made at the time of either the November
13, 2001 letter or the January 18, 2002 letter because no monetary relief was requested[3]. Please
note that the allegations contained in the above-referenced letters and the filed Complaint all
pertain to alleged violations of the conditions, restrictions and/or compliance with the Master
Settlement Agreement and its provisions, and therefore qualify as one Claim.

As an initial matter, ALF is currently prosecuting a declaratory action against Lorillard in
Delaware State Court ("Delaware Action") seeking a declaration/injunction regarding its rights
under the MSA. The North Carolina Action has been stayed pending resolution of the Delaware
Action. Please be advised that the affirmative prosecution of a lawsuit is not a Claim under the
Policy. (In other words, a matter must be defense related to be a Claim under the Policy.)
Therefore, please be advised that the Delaware Action is not a Claim under the Policy and no
Loss, including litigation costs, from it will be subject to reimbursement.

In the event the Delaware action does not resolve this matter and the North Carolina
action is allowed to proceed, we would direct your attention to exclusion (k) of the Policy.
Exclusion (k) provides that the Insurers will not be liable to make payment for Loss in
connection with a Claim made against an Insured alleging, arising out of, based upon or
attributable to any actual or alleged contractual liability of an Insured under any express contract
or agreement; provided however, that this exclusion shall not apply to liability which would have
attached in the absence of such express contract or agreement. Based upon the allegations
contained in the Complaint, that ALF is in breach of the MSA and the alleged implied duties that
arise out of it, coverage appears to be excluded under this exclusion of the Policy. National

---

[2] It appears depending on how the Delaware action is resolved, the North Carolina action may become moot.
[3] Both letters would have been considered notice of circumstances of a potential Claim. Additionally, the draft
Complaint that had contained allegations of libel, slander and unfair trade practices that was attached to the
November 13, 2001 letter is also not a Claim because it was not "served" on the Insured. Additionally, if this
Complaint is subsequently filed and served (which appears unlikely), it would be deemed a Related Wrongful Act
under the Policy because it pertains to the same facts and claims of the filed lawsuit. The Policy defines Related
Wrongful Act as the same, Related or Continuous or Wrongful Acts which arise from a common nucleus of facts.
Claims can allege Related Wrongful Acts regardless of whether such claims involved the same or different
claimants, Insureds or legal causes of action.

KAUFMAN, BORGEEST & RYAN
150813-1

A93

Re: Lorillard Tobacco Company
v. American Legacy Foundation
Page 5 of 6


Union, therefore, reserves the right to deny or limit coverage for this matter based upon this exclusion.

In addition to the above, we would also direct your attention to the Loss Definition of the Policy. It provides that Loss shall not include any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds, or matters which may be deemed uninsurable under the law pursuant to which this Policy shall be construed. National Union reserves its rights to deny or limit coverage under the Loss definition.

In addition, exclusion (a) of the Policy, provides that there is no coverage for any gaining "in fact" of any profit or advantage the Insured is not legally entitled. Also, exclusion (b) of the Policy provides that there is no coverage for any in fact finding that a criminal act has occurred. In addition, under exclusion (l) of the Policy, there would be no coverage for any criminal fines imposed by law. National Union additionally reserves its rights to deny or limit coverage under these exclusions.

The Other Insurance clause reflected in the Policy states that this Policy shall apply excess over any valid and collectible insurance. It is therefore requested, if you have not already done so, that you contact the Insured's CGL, umbrella carrier, errors and omissions carrier, or any other insurance carrier where coverage may be applicable. Further, we request that the coverage communications and policies of all carriers placed on notice of this matter be forwarded to our office at your earliest opportunity.

Lastly, we would like to point out that the allegations contained in the November 13, 2002 letter indicate that in June or July of 2001 the Claimant appears to have advised the Insured that the "Truth Campaign" was violating the Master Settlement Agreement. As you know, the Policy was issued August 26, 2001. To the extent the Policy's renewal application inquired into whether there were any acts, facts or circumstances that could give rise to a future Claim and this was answered in the negative or the requested information was not provided, National Union reserves its rights to deny or limit coverage pursuant to any omissions/misrepresentations contained in the renewal insurance application.

There may also be other Policy terms, conditions and exclusions that might be applicable and this letter is not intended to be an exhaustive recitation of all applicable terms, conditions and exclusion.

Nothing in this letter is intended to, or does, waive any of National Union's rights, privileges or defenses under the Policy, at law, or in equity. If you have any questions or comments, please do not hesitate to contact me, or my associate, Richard Pretti, at the above number.


KAUFMAN, BORGEEST & RYAN
150813-1

A94

Re: Lorillard Tobacco Company
v. American Legacy Foundation
Page 6 of 6

Very truly yours,

Wayne E. Borgeest

WEB/sjb

cc:    Sylvia Toyos
       AIG Technical Services, Inc.
       175 Water Street
       New York, NY  10038

       Kimberly Parker, Esq.
       Wilmer, Culter & Pickering
       2445 M Street N.W.
       Washington, D.C.  20037-1420

KAUFMAN, BORGEEST & RYAN
150813-1

# KAUFMAN BORGEEST & RYAN LLP

### ATTORNEYS AT LAW

ANDREW S. KAUFMAN†‡
WAYNE E. BORGEEST
JULIANNA RYAN
LEE E. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE††
JONATHAN D. RUBIN‡
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL P. MEZZACAPPA*‡
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER*
CHRISTOPHER E. DiGIACINTO*

OF COUNSEL:
MARIBETH SLEVIN
SHERRI M. FELDMAN◊

ELYSA T. BRANDT*
JONATHAN R. HAMMERMAN*
THOMAS GIBBONS
ROCCO J. SICONOLFI
HEATHER LASCHEVER*
CAROL S. DOTY††‡
ADEOLA I. ADELE
BARBARA-ANN M. COSTELLO
MELINDA B. MARGOLIES*
JONATHAN B. BRUNO*
JEFFREY S. WHITTINGTON
ROCCO P. MATRA◊
ELIZABETH O'BRIEN TOTTEN
ANN MARIE COLLINS*††
RICHARD A. PRETTI
PAUL J. COLUCCI
NATALIA M. BARTELS††
REBECCA KILDUFF
CHRISTINA M. ROGERS

KRISTOPHER M. DENNIS*
JACQUELINE MANDELL*
CHRISTINE HEENAN
ELENA CARTER§A
BELINDA DODDS-MARSHALL*‡
JULIE A. KEEGAN
STEPHANIE R. GITNIK
JEFFREY W. KLEINER*
FRANK K. STAIANO††
JACQUELINE B. TOMASSO
ROBERT PARISER*
JENNIFER PILZ
GINA R MICHALS*
MICHAEL R. JANES
YAEL J. ERDHEIM*
JESSE E. GUTIERREZ
DENNIS B. MCGOLDRICK††
R. EVON HOWARD*
JONATHAN D. BEEKMAN*

LEONARD B. COOPER††
MICHAEL WALDER
KATHRYN E. WHITE*
JULIE ANN LEVINSOHN*¤
MATTHEW M. D'AMICO

† ALSO ADMITTED IN PA
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN DC
††ALSO ADMITTED IN CT
* ALSO ADMITTED IN MA
§ ALSO ADMITTED IN MO
A ALSO ADMITTED IN MI
◊ ALSO ADMITTED IN TX
¤ ADMITTED IN CA ONLY
¤ ADMITTED IN NJ & MA ONLY
* ADMITTED IN CA, VA, DC ONLY
☆ BARRISTER AT LAW
   ADMITTED IN ENGLAND & WALES
* APPELLATE COUNSEL

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

August 13, 2003

**PRIVILEGED & CONFIDENTIAL**

Jane Greenburg
Armfield, Harrison, & Thomas, Inc.
20 South King Street
Leesburg, VA 20175

RE:       Insured   :   American Legacy Foundation
          Claimant:     Lorillard Tobacco Company
          Claim No.:    371-018857
          Policy No.:   873-9971
          Our File No.: 707.183

Dear Ms. Greenburg:

As you know, we have been retained to advise and assist National Union Fire Insurance Company of Pittsburgh, PA ("National Union") in connection with above matter, submitted for coverage under the above-captioned Policy, a National Union Not-for-Profit Individual and Organization Insurance Policy. Please allow this letter to supplant National Union's reservation of rights letter issued December 6, 2002. This letter is in response to the Insured's counsel's request for any defense and indemnity coverage available with regard to the counter-claims filed against the Insured in its Delaware state court action, filed February 13, 2002 in the Court of Chancery of Delaware captioned, <u>American Legacy Foundation v. Lorillard Tobacco Company</u>, Civ. No. 19406 ("Delaware Action").

As you know, National Union issued Not-for-Profit Individual and Organization Insurance Policy Including Employment Practices Liability Insurance for the period of August 26, 2001 to August 26, 2002. The Policy provides for a Limit of Liability of $15 million for all Loss subject to a $50,000 Retention for Claims alleging the same Wrongful Acts or Related Wrongful Acts. The Policy does not provide for a duty to defend.

NEW YORK OFFICE
99 PARK AVENUE
NEW YORK, NEW YORK 10016
TELEPHONE: 212-980-9600
FACSIMILE: 212-980-9291

LONG ISLAND OFFICE
1305 FRANKLIN AVENUE
GARDEN CITY, NEW YORK 11530
TELEPHONE: 516-248-6000
FACSIMILE: 516-248-0677

CALIFORNIA OFFICE
CORPORATE CENTER AT MALIBU CANYON
26635 WEST AGOURA ROAD
CALABASAS, CALIFORNIA 91302
TELEPHONE: 818-880-0992
FACSIMILE: 818-880-0993

NEW JERSEY OFFICE
27 NORTH BROAD STREET
RIDGEWOOD, NEW JERSEY 07450
TELEPHONE: 201-612-9960
FACSIMILE: 201-612-9980

A96

Re: Lorillard Tobacco Company
v. American Legacy Foundation
Page 2 of 5

On February 19, 2002, an action was filed by Lorillard Tobacco Company ("Lorillard") against American Legacy Foundation ("ALF") in the State of North Carolina, Wake County, the General Court of Justice, Superior Court Division ("North Carolina Action"). As noted above, ALF brought the Delaware Action against Lorillard seeking a declaration/injunction regarding its rights under the MSA on or about February 13, 2002. We have been advised the North Carolina Action has been stayed pending resolution of the Delaware Action.

As noted above, we have also been advised by defense counsel of the following: Lorillard filed seven counter-claims in the Delaware state court action[1] on September 13, 2002, but the court issued a stay/extension to answer the counter-claims until the court issued a ruling on ALF's summary judgment motion which had been pending since April 2002. The Court denied summary judgment for ALF (and in fact granted judgment in favor of Lorillard with respect to Lorillard's ability to sue ALF under a contract theory based on the Master Settlement Agreement), and is now allowing Lorillard's counter-claims to proceed. Also, Lorillard moved to stay or dismiss the Delaware Action in favor of their North Carolina suit and the Delaware court denied this motion.

By letter dated January 7, 2002, the Insured demanded defense and indemnity with regard to Lorillard's counter-claims against ALF[2]. As you know, on December 6, 2002, National Union issued a reservation of rights letter regarding Lorillard's North Carolina suit against ALF. National Union's rights were reserved on the following: exclusion (k) – contractual liability exclusion; exclusion (a) – no coverage for any gaining in fact of any profit or advantage the Insured is not legally entitled; exclusion (b) – no coverage for any in fact finding that a criminal act has occurred; exclusion (l) – no coverage for any criminal fines imposed by law; and the Loss definition. Additionally, the Insured was advised coverage is not available for prosecuting a declaratory action against Lorillard in the Delaware action as it is not a Claim under the Policy (i.e., it is not defense related). As noted above, the Insured is now seeking coverage for the seven counter-claims filed against the Insured in the Delaware action. We have now had an opportunity to review the allegations contained in the seven counter-claims and supplant National Union's coverage position accordingly.

As an initial matter, a Claim is defined to include a written demand for monetary relief, or a civil proceeding for monetary or non-monetary relief which is commenced by a service of a Complaint or similar pleading. As previously advised, a Claim was first made in this matter upon the service of the Complaint filed in North Carolina, and not by the affirmative prosecution of the Delaware lawsuit. (In other words, a matter must be defense related to be a Claim under

---

[1] The following seven counter-claims were filed by Lorillard against ALF: breach of settlement agreement; breach of the duty and covenant of good faith and fair dealing; breach of contract; violation bylaws and certificate of incorporation; claim for declaratory judgment regarding the MSA; alternative claim for declaratory judgment regarding the MSA; and trespass to chattel.
[2] As advised in our letter dated June 3, 2003, we first received the Insured's counsel's request for defense and indemnity for the counter-claims filed against the Insured in the Delaware Action on May 22, 2003.

Re: Lorillard Tobacco Company
v. American Legacy Foundation
Page 3 of 5

the Policy.) The Delaware Action itself, therefore, is not a Claim under the Policy and no Loss, including litigation costs, from it will be subject to reimbursement. The counter-claims against the Insured would be considered a Claim against the Insured, however, the North Carolina Complaint and the Delaware Action counter-claims pertain to alleged violations of the conditions, restrictions and/or compliance with the Master Settlement Agreement and its provisions, and therefore qualify as one interrelated Claim.

We would direct your attention to exclusion (k) of the Policy. Exclusion (k) provides that the Insurers will not be liable to make payment for Loss in connection with a Claim made against an Insured alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of an Insured under any express contract or agreement; provided however, that this exclusion shall not apply to liability which would have attached in the absence of such express contract or agreement. Based upon the allegations contained in the complaint of the (stayed) North Carolina action and the seven counter-claims in the Delaware Action, that ALF is in breach of the MSA and the alleged duties that arise out of it, coverage is excluded under this exclusion of the Policy. National Union, therefore, advises there is no coverage for the North Carolina Action and the seven counter-claims against the Insured in the Delaware Action.

Additionally, with regard to the seventh counter-claim, trespass to chattel, the allegations are that ALF intentionally interfered with Lorillard's e-mail system and computer network by sending unsolicited multiple harassing e-mails to Lorillard employees. Lorillard alleges the e-mails disrupted its computer system, and employees, and forced Lorillard to install a "filter" to block the e-mails. Lorillard seeks injunctive relief (cease and direct order) and special damages, including the cost of the "filter". We direct your attention to exclusion (h) of the Policy, which excludes coverage for damage to or destruction of any tangible property, including its loss of use. National Union further denies coverage under exclusion (h) as to the seventh counter-claim, trespass to chattel.

We also note that exclusion (d) excludes coverage for this matter. Exclusion (d) provides there is no coverage for a Claim alleging, arising out of, based upon or attributable to, as of the continuity date, any prior litigation. The Policy's Continuity Date is August 26, 1999. The underlying litigation in this matter involved suits by the various state attorney generals against the tobacco companies, including Lorillard. The litigations were settled by the MSA, which was entered into November of 1998. As noted, the MSA resulted in the creation and funding of ALF. The current litigations, and counter-claims, arise out the MSA and ALF's actions as established, funded and regulated by MSA. National Union, therefore, denies coverage for this Claim based exclusion (d).

In addition to the above, we would also direct your attention to the Loss Definition of the Policy. It provides that Loss shall not include any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds, or matters which may be deemed uninsurable under the law pursuant to which this Policy shall be construed. National Union further reserves its rights to deny or limit coverage under the Loss definition.

KAUFMAN BORGEEST & RYAN LLP

208616-1

A98

Re: Lorillard Tobacco Company
v. American Legacy Foundation
Page 4 of 5

In addition, exclusion (a) of the Policy, provides that there is no coverage for any gaining "in fact" of any profit or advantage the Insured is not legally entitled. Also, exclusion (b) of the Policy provides that there is no coverage for any in fact finding that a criminal act has occurred. In addition, under exclusion (l) of the Policy, there would be no coverage for any criminal fines imposed by law. National Union continues to additionally reserves its rights to deny or limit coverage under these exclusions.

The Other Insurance clause reflected in the Policy states that this Policy shall apply excess over any valid and collectible insurance. It is therefore requested, if you have not already done so, that you contact the Insured's CGL, umbrella carrier, errors and omissions carrier, or any other insurance carrier where coverage may be applicable. In particular, based upon the allegations contained in the trespass to chattel counter-claim, we request ALF notify its general liability carrier of this Claim[3]. Further, we request that the coverage communications and policies of all carriers placed on notice of this matter be forwarded to our office at your earliest opportunity.

Lastly, we have learned Lorillard sent two letters (dated July 18 and 24, 2001) to the Insured regarding the "Truth Campaign" and the Insured's alleged violations of the Master Settlement Agreement. As you know, the Policy was issued August 26, 2001. To the extent the Policy's renewal application inquired into whether there were any acts, facts or circumstances that could give rise to a future Claim and this was answered in the negative or the requested information was not provided, National Union reserves all of its rights, including the right to deny or limit coverage, pursuant to any omissions/misrepresentations contained in the renewal insurance application.

There may also be other Policy terms, conditions and exclusions that might be applicable and this letter is not intended to be an exhaustive recitation of all applicable terms, conditions and exclusion.

Nothing in this letter is intended to, or does, waive any of National Union's rights, privileges or defenses under the Policy, at law, or in equity. If you have any questions or comments, please do not hesitate to contact me, or my associate, Richard Pretti, at the above number.

Very truly yours,

Wayne E. Borgeest

WEB/sjb

---

[3] We additional note any claim for defamation, libel and/or slander would also be matters for the general liability policy to respond to.

KAUFMAN BORGEEST & RYAN LLP

208616-1

Re: Lorillard Tobacco Company
v. American Legacy Foundation
Page 5 of 5


cc:     Sylvia Toyos
        AIG Technical Services, Inc.
        175 Water Street
        New York, NY  10038

        Kimberly Parker, Esq.
        Wilmer, Cutler & Pickering
        2445 M Street N.W.
        Washington, D.C.  20037-1420

# **EXHIBIT G**



**AIG Technical Services, Inc.**

EXCESS CASUALTY CLAIMS DEPARTMENT

175 Water Street, 22nd Floor

New York, NY 10038

(212) 458-5690            Fax: 212- 458-5679

(E-mail: John.Haller@AIG.com)

April 10, 2003

**Via Registered Mail**

Ms. Anna Spriggs
The American Legacy Foundation
1001 G Street, N.W., Suite 800
Washington DC 20001

RE:    **Insured:        Health and Education Liability Program, Inc.**
       **Claimant:       Lorillard Tobacco Company**
       **Policy No.'s    BE 740-25-66 & BE 871-65-21**
       **Our File No.:   169-117957**

Dear Ms. Spriggs:

AIG Technical Services, Inc. ("AIGTS") is the claims administrator for National Union Fire
Insurance Company of Pittsburg, PA ("National Union") with respect to Policy No.'s BE 740-
25-66 and BE 871-65-21 issued to Health and Education Liability Program, Inc. ("HELP"). The
purpose of this letter is to advise HELP of National Union's coverage position and, in particular,
as to why National Union currently owes no obligation to HELP under National Union Policy
no.'s BE 740-25-66 and BE 871-65-21 with respect to *American Legacy Foundation v. Lorillard
Tobacco Company* filed in the Court of Chancery of the State of Delaware, in and For New
Castle County, case no. C.A. No. 19406 and *Lorillard Tobacco Company v. American Legacy
Foundation* filed in the General Court of Justice, Superior Court Division, Wake County North
Carolina, case no. 02 CVS 02170 (hereinafter referred to as "the Underlying Suits"). In addition,
this letter reserves National Union's rights, including but not limited to the right to decline
coverage at a later time, if appropriate, under National Union Policy no.'s BE 740-25-66 and BE
871-65-21.

Prior to discussing the relevant policy provisions and coverage issues, we summarize below the
allegations of the Underlying Suits. Our summary of the allegations in no way implies that
National Union believes that the allegations asserted by the claimants are true or deserve merit.

Ms. Ann Marie Celeste
April 10, 2003
Page 2

Lorillard Tobacco Company ("Lorillard") alleges that it is a signatory to a Master Settlement Agreement ("MSA") with other tobacco companies and 46 states. Pursuant to the MSA, Lorillard agreed to assist in funding a non-profit organization, American Legacy Foundation ("ALF"), that would create a public education and advertisement program regarding the addictiveness, health effects and social costs related to the use of tobacco products. Lorillard alleges that ALF's advertising under the MSA is paid for, entirely or primarily, through the National Public Education Fund ("NPEF"), which is funded by Lorillard and other tobacco companies. Under the MSA, the NPEF is not to be used for any personal attack on, or vilification of, any person, company or governmental agency, whether individually or collectively. Furthermore, the activities conducted using the NPEF are to be carried out in a "culturally and linguistically appropriate manner."

Lorillard alleges that, since its creation, ALF has used the NPEF to publish or broadcast a number of advertisements that do not address the "addictiveness, health affects, or social costs" of tobacco use, but instead include personal attacks on and the vilification of Lorillard, its employees and the tobacco companies collectively. Lorillard alleges that such advertisements constitute breaches of the MSA. Examples of advertisements that Lorillard alleges have personally attacked and vilified it, its employees and tobacco companies collectively are advertisements that attack tobacco companies and tobacco company employees, state or imply that Lorillard deliberately targets its sales efforts at minors, implicitly accuses tobacco companies of the intentional and improper destruction of evidence, accuses tobacco companies of lying to the public and strongly imply that Lorillard adds dog urine to its cigarettes.

Lorillard alleges that ALF has also engaged in personal attacks upon Lorillard's employees by sending and/or assisting others in sending numerous harassing emails to Lorillard's employees. Lorillard alleges that many of ALF's harassing and vulgar emails constitute criminal acts that violate North Carolina's Cyber Stalking Act, N.C.G.S. §14-196.3. Lorillard further alleges that in 2001, it was forced to install a filter on its computer system to attempt to block vulgar and harassing emails sent by ALF and/or with its assistance.

In the suit filed by Lorillard in the Superior Court of Wake County, North Carolina, Lorillard's first claim for relief is for ALF's breach of the MSA. Lorillard's second claim for relief is for ALF's breach of its duty and covenant of good faith and fair dealing with regard to the MSA. In the North Carolina action, Lorillard seeks judgment in its favor finding that ALF has repeatedly breached the MSA and for nominal damages in the amount of $1.00. Lorillard also seeks preliminary and permanent injunctions requiring ALF to comply with its obligations under the MSA and prohibiting ALF from sending and assisting others in sending harassing and vulgar emails to Lorillard and its employees. Lorillard also seeks a declaratory order defining ALF's obligations under the MSA, as well as Lorillard's costs in bringing the action against ALF.



A Member Company of
American International Group, Inc.

Ms. Ann Marie Celeste
April 10, 2003
Page 3


In the action originally filed by ALF against Lorillard in the Court of Chancery for New Castle County, Delaware, Lorillard has filed counterclaims against ALF. For its counterclaims, Lorillard sets forth seven claims for relief: breach of the MSA; breach of the duty and covenant of good faith and fair dealing; breach of contract; violation of bylaws and certificate of incorporation; declaratory judgment regarding MSA; alternative claim for declaratory judgment regarding MSA; and trespass to chattel. In its claim for relief based upon trespass to chattel, Lorillard alleges that ALF intentionally intermeddled with Lorillard's email system and computer network by sending, facilitating and/or assisting others in sending multiple unsolicited and harassing emails to Lorillard and its employees. Lorillard alleges that these emails interfered with its email system and computer network and disrupted Lorillard's employees and the use of their computers. Lorillard alleges that such conduct amounts to a trespass upon Lorillard's email system and computer network.

With regard to its first, second, and third claims for relief in the Delaware action (breach of the MSA, breach of the duty and covenant of good faith and fair dealing, and breach of contract), Lorillard seeks "at least" $1.00 in nominal damages. On its seventh claim for relief (trespass to Chattel), Lorillard seeks direct and special damages, including the costs of installing an email filter on its computer network. In addition, Lorillard seeks various declarations as to the rights and allegations of Lorillard and ALF with regard to the MSA. Among the declarations that Lorillard seeks is a declaration that ALF must refund and return some or all of the funds that it has received either directly or indirectly from Lorillard and other tobacco companies pursuant to the MSA.

National Union issued Commercial Umbrella Policy No.'s BE 740-25-66 and BE 871-65-21 to HELP for the periods August 21, 2000 to August 21, 2001 and August 21, 2001 to August 21, 2002, respectively ("the National Union policies"). The National Union policies have limits of liability of $20 million each occurrence and in the aggregate in excess of the underlying limits and/or SIR per annual period.

Please note the following policy language with respect to the National Union Policies:

AIG    A Member Company of
American International Group, Inc.

Ms. Ann Marie Celeste
April 10, 2003
Page 4

I.      **INSURANCE AGREEMENT – COVERAGE A:    EXCESS
        FOLLOW FORM INSURANCE**

        A.      We will pay on behalf of the **Insured** those sums in excess
                of the total applicable limits of **Scheduled Underlying
                Insurance** that the **Insured** becomes legally obligated to
                pay as damages provided the damages would be covered by
                **Scheduled Underlying Insurance,** except for exhaustion
                of the total applicable limits of **Scheduled Underlying
                Insurance** by the payment of **Loss.**

        B.      Coverage A shall follow the terms, definitions, conditions
                and exclusions of **Scheduled Underlying Insurance,**
                subject to the **Policy Period,** Limits of Insurance, premium
                and all other terms, definitions, conditions and exclusions
                of this policy.  If any provisions of **Scheduled Underlying
                Insurance** conflict with any provisions of this policy, the
                provisions of this policy will apply.

        C.      Coverage A of this policy will not, in any event, provide
                broader coverage than that provided by **Scheduled
                Underlying Insurance.**

        D.      If we are prevented by law or statute from paying damages
                on behalf of the **Insured,** then we will indemnify the
                **Insured** for those sums in excess of the total applicable
                limits of **Scheduled Underlying Insurance.**

        E.      The amount we will pay for damages is limited as
                described in Section IV. Limits of Insurance.

II.     **INSURING AGREEMENT – COVERAGE B:  UMBRELLA
        LIABILITY INSURANCE**

        A.      We will pay on behalf of the **Insured** those sums in excess
                of the **Self-Insured Retention** that the **Insured** becomes
                legally obligated to pay as damages by reason of liability
                imposed by law or assumed by the **Insured** under an
                **Insured Contract** because of **Bodily Injury, Property
                Damage, Personal Injury** or **Advertising Injury** not



A Member Company of
American International Group, Inc.

A104

Ms. Ann Marie Celeste
April 10, 2003
Page 5

covered by **Scheduled Underlying Insurance**, provided that:

1.  the **Bodily Injury** or **Property Damage** is caused by an **Occurrence** happening anywhere, and the **Bodily Injury** or **Property Damage** occurs during the **Policy Period**.

2.  the **Personal Injury** or **Advertising Injury** is caused by an **Occurrence** happening anywhere, and the **Occurrence** takes place during the **Policy Period**.

B.  Coverage B will not apply to damages that would have been covered by **Scheduled Underlying Insurance** even if the total applicable limits of **Scheduled Underlying Insurance** have been exhausted by the payment of **Loss**.

C.  If we are prevented by law or statute from paying damages on behalf of the **Insured**, then we will indemnify the **Insured** for those sums in excess of the **Self-Insured Retention**.

D.  The amount we will pay for damages is limited as described in Section IV. Limits of Insurance.

III.  **DEFENSE PROVISIONS**

A.  We shall the right and duty to defend any **Suit** against the **Insured** that seeks damages covered by this policy:

1.  under Coverage A, when the total applicable limits of **Scheduled Underlying Insurance** have been exhausted by payment of **Loss**.

AIG    A Member Company of
American International Group, Inc.

A105

Ms. Ann Marie Celeste
April 10, 2003
Page 6

2.    under Coverage B, when the damages sought because of **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** would not be covered by **Scheduled Underlying Insurance**.

We shall have the right and duty to defend any **Suit** against the **Insured** that seeks damages covered by this policy, even if the **Suit** is groundless, false or fraudulent.

If we are prevented by law or statute from assuming the obligations specified under this provision, we will pay any expenses incurred with our consent.

§ § § § §

IV.    **LIMITS OF INSURANCE**

§ § § § §

E.    Coverage A applies only in excess of the total applicable limits of **Scheduled Underlying Insurance**. If, however, a policy shown in the Schedule of Underlying Insurance forming a part of this policy has a limit of insurance:

1.    greater than the amount shown in such schedule, this policy will apply in excess of the greater amount; or

2.    less than the amount shown in such schedule, this policy will apply in excess of the amount shown in the Schedule of Underlying Insurance forming a part of this policy.

§ § § § §

AIG    A Member Company of
American International Group, Inc.

Ms. Ann Marie Celeste
April 10, 2003
Page 7

## V.    DEFINITIONS

A.    **Advertisement** under Coverage B means a paid broadcast, publication or telecast to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.

B.    **Advertising Injury** under Coverage B means injury, other than **Bodily Injury** or **Personal Injury**, arising solely out of your **Advertisement** as a result of one or more of the following offenses:

    1.    slander or libel of a person or organization, or disparagement of a person's or organization's goods, products or services in your **Advertisement**;

    2.    violation of a person's right of privacy in your **Advertisement**;

    3.    misappropriation of another's advertising idea in your **Advertisement**; or

    4.    infringement upon another's copyright, trademark or slogan in your **Advertisement**.

§ § § § §

D.    **Bodily Injury** under Coverage B and under any exclusion in this policy applicable to Coverage A means bodily injury, sickness, disability or disease, including death resulting from any of these at any time.  **Bodily Injury** shall also mean mental injury, mental anguish, humiliation, shock or death if directly resulting from bodily injury, sickness, disability or disease.

§ § § § §



A Member Company of
American International Group, Inc.

Ms. Ann Marie Celeste
April 10, 2003
Page 8

J.    **Loss** under Coverages A and B means those sums actually
paid as judgments and settlements and, under Coverage A
if provided by **Scheduled Underlying Insurance**,
expenses incurred to defend any **Suit** or to investigate any
claim.

*§ § § §*

N.    **Occurrence** under Coverage A means the definition given
to that term or the equivalent thereof in **Scheduled
Underlying Insurance**.

O.    **Occurrence** under Coverage B means:

1.    as respects **Bodily Injury** or **Property Damage**, an
accident, including continuous or repeated exposure
to substantially the same general harmful
conditions. All such exposure to substantially the
same general harmful conditions shall be deemed to
arise out of one **Occurrence**.

2.    as respects **Personal Injury** or **Advertising Injury**,
an offense arising out of your business that causes
**Personal Injury** or **Advertising Injury**. All
damages that arise from the same or related
injurious material or act shall be deemed to arise out
of one **Occurrence**, regardless of the frequency or
repetition thereof, the number and kind of media
used and the number of claimants.

*§ § § §*

Q.    **Personal Injury** under Coverage B means injury arising
out of your business, other than **Bodily Injury** or
**Advertising Injury**, caused by one or more of the
following offenses:

AIG    A Member Company of
American International Group, Inc.

A108

Ms. Ann Marie Celeste
April 10, 2003
Page 9

    **1.**     false arrest, detention or imprisonment;

    **2.**     malicious prosecution;

    **3.**     the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

    **4.**     oral, written or electronic publication of material that slanders or libels a person or organization, or disparages a person's or organization's goods, products or services;

    **5.**     oral, written or electronic publication of materials that violates a person's right of privacy; or

    **6.**     discrimination or humiliation that results in injury to the feelings or reputation of a natural person, but only if such discrimination or humiliation is:

        **a.**     not done intentionally by or at the direction of any **Insured**; and

        **b.**     not directly or indirectly related to the employment, prospective employment or termination of employment of any person or persons by any **Insured**.

§ § § §

**U.**    **Property Damage** under Coverage B and under any exclusion in this policy applicable to Coverage A means:

    **1.**     physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or



A Member Company of
American International Group, Inc.

Ms. Ann Marie Celeste
April 10, 2003
Page 10

> 2. loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **Occurrence** that caused it.

§ § § § §

Please note the following exclusions contained in the National Union policies:

## VI. Exclusions

### N. Willful Violation, Falsity, Prior Publication, Criminal, Assumed Liability

Under Coverage B, this insurance does not apply to **Personal Injury** or **Advertising Injury**:

> 1. caused by or at the direction of any **Insured** with the knowledge that the act would violate the rights of another and would inflict **Personal Injury** or **Advertising Injury**;

> 2. arising out of oral, written or electronic publication of material if done by or at the direction of any **Insured** with knowledge of its falsity;

> 3. arising out of oral, written or electronic publication of material whose first publication took place before the beginning of the **Policy Period**;

> 4. arising out of a criminal act committed by or at the direction of any **Insured**; or

> 5. for which the **Insured** has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the **Insured** would have in the absence of the contract or agreement.

AIG  A Member Company of
American International Group, Inc.

Ms. Ann Marie Celeste
April 10, 2003
Page 11

**O.    Various Advertising**

Under Coverage B, this insurance does not apply to **Advertising Injury**:

1.    arising out of a breach of contract, except an implied contract to use another's advertising idea;

2.    arising out of the failure of goods, products or services to conform with any statement of quality or performance made;

3.    arising out of the wrong description of the price of goods, products or services; or

4.    committed by an **Insured** whose business is advertising, broadcasting, publishing or telecasting.

§ § § §

**R.    Expected or Intended**

Under Coverage B, this insurance does not apply to **Bodily Injury** or **Property Damage** expected or intended from the standpoint of the **Insured.** However, this exclusion does not apply to:

1.    **Bodily Injury** or **Property Damage** resulting from the use of reasonable force to protect persons or property; or

2.    liability of the **Named Insured** for damages as the result of an act committed by the **Named Insured's** employee(s) which results in **Bodily Injury** or **Property Damage** expected or intended from the standpoint of the **Names Insured's** employee(s), provided such act was not committed at the direction of the **Named Insured.**

AIG

A Member Company of
American International Group, Inc.

Ms. Ann Marie Celeste
April 10, 2003
Page 12

As an initial matter, we note that the National Union policies name Health and Education Liability Program, Inc. as the named insured.  Please provide any relevant information demonstrating that American Legacy Foundation is a participating member of HELP.  In the interim, National Union reserves it rights to deny coverage to HELP to the extent that ALF is not an Insured under the National Union policies.

As a further matter, the National Union Policies are commercial umbrella liability policies, which provide excess follow form insurance under Coverage A and umbrella liability coverage under Coverage B.  The National Union Policies potentially apply under Coverage A only to the extent that the claims against ALF are covered under the Scheduled Underlying Insurance and such insurance is exhausted.  The National Union Policies potentially apply under Coverage B only if not covered by the Scheduled Underlying Insurance and upon exhaustion of the Self-Insured Retention of the National Union Policies.

With respect to Coverage A of the National Union policies, National Union takes this opportunity to advise HELP of potential coverage issues and to reserve National Union's rights and defenses, including the right to deny coverage with respect to Coverage A, in the event that the Scheduled Underlying Insurance does cover these claims.

Coverage Section A of the National Union policies follows form to the terms, definitions, conditions, and exclusions set forth in the Scheduled Underlying Insurance, subject to the policy period, limits of insurance, premium and all other terms, definitions, conditions and exclusions of the National Union policies.  Thus, Coverage A applies only to the extent that these claims are covered under the Scheduled Underlying Insurance.  We currently have no information regarding the Scheduled Underlying Insurance, including whether such insurance covers these claims, or information regarding the exhaustion of such insurance.  Accordingly, National Union reserves its rights to deny coverage under Coverage A at a later time based upon all the terms, exclusions, and conditions contained in the Schedule Underlying Policies and the National Union policies. If you have information evidencing that the Scheduled Underlying Insurance covers these claims and has been exhausted, please provide this information to us immediately.  In addition, please provide to us copies of the Scheduled Underlying Insurance and any correspondence from Schedule Underlying Insurance and/or its representatives explaining its coverage position with respect to the Complaints.

National Union also takes this opportunity to advise you of potential coverage issues and to reserve all of National Union's rights, including the right to deny coverage under Coverage B should the Schedule Underlying Insurance not apply to the Complaints and the self-insured retention is exhausted.  Coverage B of the National Union Policies provides umbrella coverage. Coverage B applies only to the extent that the underlying Scheduled Underlying Insurance does not apply to the claims and the Self-Insured Retention has been exhausted.



A Member Company of
American International Group, Inc.

Ms. Ann Marie Celeste
April 10, 2003
Page 13

For coverage to potentially apply under Coverage B of the National Union policies, a claim must seek damages because of **Bodily Injury**, **Property Damage**, **Personal Injury**, or **Advertising Injury**. Based upon our review of the Underlying Suits, it does not appear that the suits seek damages because of **Bodily Injury** arising out of an **Occurrence**, as that term is defined in the National Union policies. Accordingly, National Union reserves its rights, including the right to decline coverage, under the National Union policies on the foregoing grounds.

To the extent that the Underlying Suits do not allege damages because of "physical injury to tangible property" or "loss of use of tangible property that is not physically injured," the Underlying Suits do not implicate **Property Damage** coverage under the National Union policies. We note that even if any allegations fall within the definition of **Property Damage**, any resulting damage must arise out of an **Occurrence** and take place during the applicable policy period. To the extent that the allegations involve **Property Damage** arising out of an **Occurrence** taking place during the policy period, please note that Exclusion R may exclude certain or all such damages asserted by Lorillard with respect to these claims. Accordingly, National Union reserves its rights, including the right to decline coverage, under the National Union Policies on the foregoing grounds.

Additionally, to the extent that the Underlying Suits do not seek damages for claims that fall within any of the enumerated offenses provided within the **Personal Injury** definition contained in the National Union policies, as set forth above, the Underlying Suits would not implicate **Personal Injury** coverage. Even if any allegations implicate **Personal Injury** coverage under the National Union policies, Exclusion N may exclude any **Personal Injury** coverage with respect to these claims under the National Union policies. Accordingly, National Union reserves its rights, including the right to decline coverage under the National Union policies on the foregoing grounds.

Further, to the extent that the Underlying Suits do not seek damages for claims that arise solely out of one or more of the specifically enumerated offenses as listed in the **Advertising Injury** definition of the National Union policies and/or claims that involve **Advertisement**, as that term is defined under the National Union policies, the claims do not implicate **Advertising Injury** coverage under the National Union policies. We note that even if any allegations in the Underlying Suits were to implicate **Advertising Injury** coverage under the National Union Policies, Exclusions N and O may exclude any **Advertising Injury** coverage with respect to these claims. Accordingly, National Union reserves its rights, including the right to decline coverage, under the National Union policies on the foregoing grounds.

The Complaints seek, in part, equitable relief. The National Union policies do not afford coverage for equitable relief such as requested.

 AIG  A Member Company of
American International Group, Inc.

A113

Ms. Ann Marie Celeste
April 10, 2003
Page 14


In sum, we find that National Union has no current obligations with respect to Coverages A or B in the National Union policies. Thus, National Union's obligations have not been triggered as no information evidences that the Scheduled Underlying Insurance covers this claim and is exhausted or that such insurance does not cover these claims and that the self-insured retention is exhausted. Accordingly, National Union accepts notice of the Underlying Suits under a complete and full reservation of rights, including but not limited to the right to deny coverage at a subsequent time.

Please be advised that our investigation into this matter should not be taken as an indication that National Union has waived any of its rights or defenses in connection with this matter. National Union reserves the right to supplement and/or amend this coverage position letter at any time in the future and to assert any defenses, whether or not specifically enumerated herein, which may now or later be applicable.

If you have any questions concerning this matter, please feel free to contact me.

Very truly yours,

John D. Haller
Complex Coverage Director
Excess Casualty Claims


cc:
Ms. Ann Marie Celeste
Claims Administration Corporation
1065 Avenue of the Americas
New York, NY 10018

Ms. Jane Greenburg
Armfield, Harrison & Thomas, Inc.
20 South King Street
Leesburg, VA 20175

Ms. Kimberly A. Parker, Esq.
Wilmer, Cutler & Pickering
2445 M Street, N.W.
Washington, DC 20037-1420

 A Member Company of
American International Group, Inc.

# EXHIBIT H

Westlaw.

886 A.2d 1                                                                                          Page 1
886 A.2d 1
**(Cite as: 886 A.2d 1)**

**H**

American Legacy Foundation v. Lorillard Tobacco
Co.
Del.Ch.,2005.

Court of Chancery of Delaware,New Castle
County.
AMERICAN LEGACY FOUNDATION, a
Delaware non-profit corporation, Plaintiff,
v.
LORILLARD TOBACCO COMPANY, a Delaware
corporation, Defendant.
**C.A. No. 19406.**

Submitted: May 20, 2005.
Decided: Aug. 22, 2005.

**Background:** Non-profit foundation formed
with proceeds from master settlement of lawsuits
against tobacco companies sought declaratory judg-
ment to effect that certain of its advertising con-
formed to requirements of settlement agreement, as
well as injunctive relief against tobacco company.
Tobacco company counterclaimed, alleging viola-
tion of settlement agreement.

**Holdings:** On cross-motions for summary
judgment, the Court of Chancery, New Castle
County, Lamb, Vice Chancellor. held that:

(1) cross-motions for summary judgment were
equivalent of stipulation for decision on the merits
on record submitted;

(2) challenged advertisements did not amount
to vilification in violation of settlement agreement;

(3) challenged advertisements did not amount
to personal attacks in violation of settlement agree-
ment;

(4) e-mail generated from non-profit organiza-
tion's internet site amounted to "personal attack" in
violation of settlement agreement;

(5) such violation was de minimis; and

(6) challenged advertisements addressed
"addictiveness, health effects, and social costs re-
lated to the use of tobacco products" as required by
settlement agreement.

Plaintiff's motion for summary judgment granted.

West Headnotes

**[1] Judgment 228 ⟀183**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k183 k. In General. Most Cited Cases
Cross-motions for summary judgment in action for
declaratory judgment were equivalent of stipulation
for decision on the merits on record submitted,
where neither party argued existence of any dis-
puted material issue of fact. Chancery Court Rule
56(h).

**[2] Judgment 228 ⟀183**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k183 k. In General. Most Cited Cases

**Judgment 228 ⟀185(2)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185 Evidence in General
                228k185(2) k. Presumptions and Bur-
den of Proof. Most Cited Cases
Standard of drawing inferences in favor of nonmov-
ing party did not apply to cross-motions for sum-
mary judgment in action for declaratory judgment,
where motions were equivalent of stipulation for
decision on the merits on record submitted. Chan-

A115

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cery Court Rule 56(h).

**[3] States 360 ☜127**

360 States
    360IV Fiscal Management, Public Debt, and Se-
curities
        360k127 k. Special Funds. Most Cited Cases
Trial court was not required to rely on dictionary
definitions of terms employed in master settlement
agreement in tobacco litigation in determining
whether particular advertising violated terms of
such settlement agreement prohibiting advertisers
bound thereby from engaging in "vilification" or
"personal attack[,]" where terms at issue, although
not legal terms of art, had sufficient usage in legal
opinions to inform the court.

**[4] States 360 ☜127**

360 States
    360IV Fiscal Management, Public Debt, and Se-
curities
        360k127 k. Special Funds. Most Cited Cases
Trial court was required, in construing terms of
master settlement agreement in tobacco litigation,
to confine its analysis to express language of the
contract, where settlement agreement expressly
prohibited reliance on negotiations among drafters
thereof to determine parties' intent.

**[5] States 360 ☜127**

360 States
    360IV Fiscal Management, Public Debt, and Se-
curities
        360k127 k. Special Funds. Most Cited Cases
For purposes of determining whether particular ad-
vertisements disseminated by non-profit organiza-
tion violated clause of master settlement agreement
in tobacco litigation prohibiting expenditure of set-
tlement monies on advertising which engaged in
vilification of any person or company, Delaware
courts regarded "vilification" as stronger, that is,
more contemptuous or malicious, than disparaging
someone.

**[6] States 360 ☜127**

360 States
    360IV Fiscal Management, Public Debt, and Se-
curities
        360k127 k. Special Funds. Most Cited Cases
For purposes of determining whether particular ad-
vertisements disseminated by non-profit organiza-
tion violated clause of master settlement agreement
in tobacco litigation prohibiting expenditure of set-
tlement monies on advertising which engaged in
vilification of any person or company,
"vilification" was based, at least in part, on target
of the words, akin to victim of defamation.

**[7] States 360 ☜127**

360 States
    360IV Fiscal Management, Public Debt, and Se-
curities
        360k127 k. Special Funds. Most Cited Cases
For purposes of determining whether particular ad-
vertisements disseminated by non-profit organiza-
tion violated clause of master settlement agreement
in tobacco litigation prohibiting expenditure of set-
tlement monies on advertising which engaged in
vilification of any person or company, truthfulness
of advertisements at issue was relevant factor to be
considered, even though truthfulness was not com-
plete defense to claim of violation of settlement
agreement.

**[8] States 360 ☜127**

360 States
    360IV Fiscal Management, Public Debt, and Se-
curities
        360k127 k. Special Funds. Most Cited Cases
For purposes of determining whether particular ad-
vertisements disseminated by non-profit organiza-
tion violated clause of master settlement agreement
in tobacco litigation prohibiting expenditure of set-
tlement monies on advertising which engaged in
vilification of any person or company, tone of each
advertisement was relevant, although not determin-
ative, factor to be considered in determining wheth-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

er such advertisement constituted "vilification."

**[9] States 360 ⚖127**

360 States
    360IV Fiscal Management, Public Debt, and Securities
        360k127 k. Special Funds. Most Cited Cases
Advertisement disseminated by non-profit organization formed with proceeds from master settlement of lawsuits against tobacco companies, in which narrators referred to tobacco industry reports targeting potential teenagers as consumers as "embarrassing," did not amount to "vilification" of tobacco industry, in violation of settlement agreement, where advertisement accurately represented contents of referenced reports; advertisement did not lessen standing of tobacco companies any more than mere existence of referenced reports, and simply made public aware of existence of reports and expressed characterization or opinion with respect thereto.

**[10] States 360 ⚖127**

360 States
    360IV Fiscal Management, Public Debt, and Securities
        360k127 k. Special Funds. Most Cited Cases
Advertisement disseminated by non-profit organization formed with proceeds from master settlement of lawsuits against tobacco companies, characterizing tobacco company executives in general as "greedy," did not amount to "vilification" of tobacco company executives or employees, in violation of settlement agreement; negative implication that tobacco company executives were bad people was too far removed from direct, confrontational attack to be considered vilification, and negative implications were toned down by use of humor in advertisement at issue.

**[11] States 360 ⚖127**

360 States
    360IV Fiscal Management, Public Debt, and Se-

curities
        360k127 k. Special Funds. Most Cited Cases
Advertisement disseminated by non-profit organization formed with proceeds from master settlement of lawsuits against tobacco companies, in which actor purporting to be tobacco company executive announced recall of all cigarettes, acknowledged health hazards of smoking, and stated that cigarettes would stay off market until industry could, with clear conscience, offer safe product, followed by voiceover proclaiming "April fools," did not amount to "vilification" of tobacco industry, in violation of settlement agreement; tobacco company conceded that truth of any factual claims could be presumed for purposes of litigation, and implication that tobacco industry executives did not have clear consciences was at most a mild rebuke.

**[12] States 360 ⚖127**

360 States
    360IV Fiscal Management, Public Debt, and Securities
        360k127 k. Special Funds. Most Cited Cases
Advertisement disseminated by non-profit organization formed with proceeds from master settlement of lawsuits against tobacco companies, in which telephone caller asked tobacco company employee if company was interested in buying dog urine to add to its supply of urea for manufacture of cigarettes, did not amount to "vilification" of tobacco company executives or employees, in violation of settlement agreement, where urea was in fact common to both dog urine and cigarettes and negative implications were toned down by use of humor in advertisement at issue.

**[13] States 360 ⚖127**

360 States
    360IV Fiscal Management, Public Debt, and Securities
        360k127 k. Special Funds. Most Cited Cases
Advertisement disseminated by non-profit organization formed with proceeds from master settlement of lawsuits against tobacco companies, in which

A117

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

Page 4

actor stated that tobacco marketing plan targeting homosexuals and homeless people was known by acronym "SCUM," did not amount to "vilification" of tobacco industry or any of its employees, in violation of settlement agreement, where tobacco company conceded that truth of any factual claims could be presumed for purposes of litigation, and advertisement did not identify any tobacco industry employees as homosexual or claim that tobacco industry employees should have any particular sexual orientation.

**[14] States 360 ☞127**

360 States
   360IV Fiscal Management, Public Debt, and Securities
      360k127 k. Special Funds. Most Cited Cases
Advertisements disseminated by non-profit organization formed with proceeds from master settlement of lawsuits against tobacco companies, portraying tobacco and tobacco industry in negative light, did not rise to level of "vilification" in violation of settlement agreement, where underlying messages of advertisements, namely, that tobacco companies target young consumers, tobacco companies manipulate chemical composition of cigarettes to increase addictiveness of nicotine, and that smoking kills, did not violate anti-vilification clause of settlement agreement and were based on publicly available facts.

**[15] States 360 ☞127**

360 States
   360IV Fiscal Management, Public Debt, and Securities
      360k127 k. Special Funds. Most Cited Cases
Advertisements disseminated by non-profit organization formed with proceeds from master settlement of lawsuits against tobacco companies, involving tobacco industry employees and describing them, explicitly or implicitly, as liars, greedy executives, or authors of embarrassing documents, did not rise to level of "vilification" in violation of settlement agreement, where advertisements did not subject

employees to contemptuous language, scurrilous or vitriolic attacks, cruel slander, social ostracism, public ridicule, traduction, or calumny, and were for the most part humorous, silly, or absurd in tone.

**[16] States 360 ☞127**

360 States
   360IV Fiscal Management, Public Debt, and Securities
      360k127 k. Special Funds. Most Cited Cases
For purposes of determining whether particular advertisements disseminated by non-profit organization violated clause of master settlement agreement in tobacco litigation prohibiting expenditure of settlement monies on advertising which engaged in "personal attack," both nature of language alleged to constitute "attack" and whether such alleged attack was "personal" were relevant factors to be considered.

**[17] States 360 ☞127**

360 States
   360IV Fiscal Management, Public Debt, and Securities
      360k127 k. Special Funds. Most Cited Cases
For purposes of determining whether particular advertisements disseminated by non-profit organization violated clause of master settlement agreement in tobacco litigation prohibiting expenditure of settlement monies on advertising which engaged in personal attack, Delaware courts regarded term "personal attack" as going beyond simple criticism, and including, inter alia, allegations of fraud, tax evasion, and corporate mismanagement.

**[18] States 360 ☞127**

360 States
   360IV Fiscal Management, Public Debt, and Securities
      360k127 k. Special Funds. Most Cited Cases
For purposes of determining whether particular advertisements disseminated by non-profit organization violated clause of master settlement agreement

A118

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in tobacco litigation prohibiting expenditure of settlement monies on advertising which engaged in personal attack, mere allegation that particular individual was lying, or a liar, while both personal, in that it went to character, and attack, in that it went beyond mere criticism, did not rise to level of "personal attack" prohibited by settlement agreement, in absence of other language creating more serious context and amplifying allegation with other surrounding facts.

**[19] States 360 ⟢127**

360 States
  360IV Fiscal Management, Public Debt, and Securities
    360k127 k. Special Funds. Most Cited Cases
For purposes of determining whether particular advertisements disseminated by non-profit organization violated clause of master settlement agreement in tobacco litigation prohibiting expenditure of settlement monies on advertising which engaged in personal attack, "personal attack" was one concerning subject matter separate from target's commercial aspect, whether target's business or employment, and target was required to be either specific individual or specific company.

**[20] States 360 ⟢127**

360 States
  360IV Fiscal Management, Public Debt, and Securities
    360k127 k. Special Funds. Most Cited Cases
For purposes of determining whether particular advertisements disseminated by non-profit organization violated clause of master settlement agreement in tobacco litigation prohibiting expenditure of settlement monies on advertising which engaged in personal attack, personal attacks included those on specifically identified companies, especially where relevant provision of settlement agreement included companies and governmental agencies in list of entities against which personal attacks were forbidden.

**[21] States 360 ⟢127**

360 States
  360IV Fiscal Management, Public Debt, and Securities
    360k127 k. Special Funds. Most Cited Cases
Clause of master settlement agreement in tobacco litigation prohibiting expenditure of settlement monies on advertising which engaged in "personal attack" did not preclude advertising attacking group of unnamed tobacco companies, even if such companies were collectively referred to as "Big Tobacco" or "the tobacco industry"; requirement that prohibited attacks be "personal" required that attacks be made against particular and identified companies.

**[22] States 360 ⟢127**

360 States
  360IV Fiscal Management, Public Debt, and Securities
    360k127 k. Special Funds. Most Cited Cases
For purposes of determining whether particular advertisements disseminated by non-profit organization violated clause of master settlement agreement in tobacco litigation prohibiting expenditure of settlement monies on advertising which engaged in personal attack, term personal consisted of two parts, with first part concerning target's private characteristics, such as, for an individual, amorality, and second part concerning specific identification of target.

**[23] States 360 ⟢127**

360 States
  360IV Fiscal Management, Public Debt, and Securities
    360k127 k. Special Funds. Most Cited Cases
For purposes of determining whether particular advertisements disseminated by non-profit organization violated clause of master settlement agreement in tobacco litigation prohibiting expenditure of settlement monies on advertising which engaged in personal attack, term personal, as applied to to-

A119

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bacco companies, applied only to attacks on specifically identified companies.

**[24] States 360 ⟶127**

360 States
    360IV Fiscal Management, Public Debt, and Securities
        360k127 k. Special Funds. Most Cited Cases
Advertisement disseminated by non-profit organization formed with proceeds from master settlement of lawsuits against tobacco companies, in which tobacco company employees were exposed on camera as narrators used messages to amplify messages directed at them, did not amount to "personal attack" on such employees, in violation of settlement agreement, where faces of all employees depicted were electronically obscured and building in which filming occurred was not identified as headquarters of particular tobacco company.

**[25] States 360 ⟶127**

360 States
    360IV Fiscal Management, Public Debt, and Securities
        360k127 k. Special Funds. Most Cited Cases
Advertisement disseminated by non-profit organization formed with proceeds from master settlement of lawsuits against tobacco companies, in which actors drove around neighborhood in which tobacco company executives allegedly lived, playing hypnotic recordings implying that executives were greedy and were bad people, did not amount to "personal attack" on tobacco company executives, in violation of settlement agreement, despite fact that words employed went beyond simple criticism and allegations involved targets' private characteristics, where neighborhood depicted was generic and no target was specifically identified.

**[26] States 360 ⟶127**

360 States
    360IV Fiscal Management, Public Debt, and Securities

        360k127 k. Special Funds. Most Cited Cases
Advertisement disseminated by non-profit organization formed with proceeds from master settlement of lawsuits against tobacco companies, in which actor purporting to be tobacco company executive announced recall of all cigarettes, acknowledged health hazards of smoking, and stated that cigarettes would stay off market until industry could, with clear conscience, offer safe product, followed by voiceover proclaiming "April fools," did not amount to "personal attack" in violation of settlement agreement, where no specific target was identified and issues raised were not "personal" in nature.

**[27] States 360 ⟶127**

360 States
    360IV Fiscal Management, Public Debt, and Securities
        360k127 k. Special Funds. Most Cited Cases
Trial court would not find that advertisement disseminated by non-profit organization formed with proceeds from master settlement of lawsuits against tobacco companies, in which telephone caller asked employee of specifically identified tobacco company if company was interested in buying dog urine to add to its supply of urea for manufacture of cigarettes, amounted to "personal attack" in violation of settlement agreement, where counsel for named tobacco company specifically argued that advertisement would only be a "problem" if it identified "Big Tobacco," rather than specific company, and that named company was not contending that advertisement was personal attack upon it.

**[28] States 360 ⟶127**

360 States
    360IV Fiscal Management, Public Debt, and Securities
        360k127 k. Special Funds. Most Cited Cases
Advertisement disseminated by non-profit organization formed with proceeds from master settlement of lawsuits against tobacco companies, in which actor stated that tobacco marketing plan targeting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

homosexuals and homeless people was known by acronym "SCUM," did not amount to "personal attack" in violation of settlement agreement, where no tobacco company or tobacco company employee was specifically identified and actor was stating fact not denied by tobacco company.

**[29] States 360 ⬅127**

360 States
    360IV Fiscal Management, Public Debt, and Securities
        360k127 k. Special Funds. Most Cited Cases
Advertisements disseminated by non-profit organization formed with proceeds from master settlement of lawsuits against tobacco companies, portraying tobacco and tobacco industry in negative light, did not specifically identify targets of alleged attacks and thus did not violate provision of settlement agreement prohibiting personal attacks.

**[30] States 360 ⬅127**

360 States
    360IV Fiscal Management, Public Debt, and Securities
        360k127 k. Special Funds. Most Cited Cases
Text supplied on internet site maintained by non-profit organization formed with proceeds from master settlement of lawsuits against tobacco companies, into which site users inserted random grammatically appropriate words, after which completed text was e-mailed to specific tobacco company executives, amounted to "personal attack" in violation of settlement agreement, where such text explicitly accused e-mail recipients of, inter alia, having covered up cigarettes' link to cancer and having made money from selling product with known harmful effects.

**[31] States 360 ⬅127**

360 States
    360IV Fiscal Management, Public Debt, and Securities
        360k127 k. Special Funds. Most Cited Cases

For purpose of determining whether e-mails generated on internet site maintained by non-profit organization formed with proceeds from master settlement of lawsuits against tobacco companies, and subsequently sent to tobacco company executives, which e-mails contained both content generated by non-profit organization and content supplied by visitors to site, amounted to "personal attack" in violation of settlement agreement, non-profit organization was responsible for entire content of e-mails thus generated, where non-profit organization created site, designed its format, and provided users with mechanism to send e-mail directly to tobacco company executives.

**[32] States 360 ⬅127**

360 States
    360IV Fiscal Management, Public Debt, and Securities
        360k127 k. Special Funds. Most Cited Cases
For purpose of determining whether e-mails generated on internet site maintained by non-profit organization formed with proceeds from master settlement of lawsuits against tobacco companies, and subsequently sent to tobacco company executives, which e-mails contained both content generated by non-profit organization and content supplied by visitors to site, amounted to personal attack in violation of settlement agreement, e-mails thus generated were personal within scope of settlement agreement, where internet site provided users with list of specific tobacco company executives to whom e-mails could be sent.

**[33] States 360 ⬅127**

360 States
    360IV Fiscal Management, Public Debt, and Securities
        360k127 k. Special Funds. Most Cited Cases
Non-profit organization's violation of clause of master settlement agreement in tobacco litigation prohibiting settlement monies from being used to mount personal attacks, occasioned by its maintenance of internet site used to send e-mails constitut-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ing personal attacks to tobacco company executives, was de minimis, and entitled tobacco company to no relief, whether monetary or injunctive, where shortly after first e-mails arrived, tobacco company installed effective blocking software at cost of less than $1,000, and offending function of non-profit organization's internet site was removed in course of litigation.

[34] States 360 ⚖=127

360 States
   360IV Fiscal Management, Public Debt, and Securities
      360k127 k. Special Funds. Most Cited Cases
Advertisements disseminated by non-profit organization formed with proceeds from master settlement of lawsuits against tobacco companies addressed "addictiveness, health effects, and social costs related to the use of tobacco products[,]" as required by settlement agreement; advertisements at issue focused on social costs of marketing cigarettes to certain target groups, including children and teenagers, on negative health effects of smoking, including second-hand smoke, smoking-related diseases and death, or on addictiveness of nicotine and other chemicals found in cigarettes.

*6 David C. McBride, Esquire, Martin S. Lessner, Esquire, *7Christian Douglas Wright, Esquire, Karen E. Keller, Esquire, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware; John Payton, Esquire, David W. Ogden, Esquire, Stuart F. Delery, Esquire, Wilmer, Cutler, Pickering, Hale and Dorr LLP, Washington, D.C.; Ellen Vargyas, Esquire, American Legacy Foundation, Washington, D.C., Attorneys for American Legacy Foundation.
Stephen E. Herrmann, Esquire, Steven J. Fineman, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; Jim W. Phillips, Jr., Esquire, Robert J. King, III, Esquire, Charles E. Coble, Esquire, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Greensboro, North Carolina, Attorneys for Lorillard Tobacco Company.
Don A. Beskrone, Esquire, Ashby & Geddes, P.A.,

Wilmington, Delaware; Michael C. Hefter, Esquire, Dewey Ballantine LLP, New York, New York, Attorneys for Amicus Curiae, The Citizens' Commission To Protect The Truth.
Joel Friedlander, Esquire, Bouchard, Margules & Friedlander, P.A., Wilmington, Delaware; Attorneys for Amici Curiae Alaska, Arizona, Arkansas, Colorado, Connecticut, Georgia, Hawaii, Idaho, Illinois, Iowa, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Missouri, Montana, Nevada, New Jersey, New Mexico, New York, North Dakota, Northern Mariana Islands, Oklahoma, Oregon, Puerto Rico, South Carolina, South Dakota, Tennessee, Utah, Vermont, Washington, West Virginia, and Wisconsin.
Thomas G. Macauley, Esquire, Elizabeth D. Power, Esquire, Zuckerman Spaeder LLP, Wilmington, Delaware; William B. Schultz, Esquire, Alexandra W. Miller, Esquire, Zuckerman Spaeder LLP, Washington, D.C., Attorneys for Amici Curiae Campaign for Tobacco-Free Kids, Action on Smoking and Health, American Cancer Society, American College of Occupational and Environmental Medicine, American College of Preventative Medicine, American Dental Hygienists' Association, American Heart Association, American Lung Association, American Public Health Association, American School Health Association, American Society of Addiction Medicine, Association of State and Territorial Health Officials, American Thoracic Society, Community Anti-Drug Coalitions of America, Lung Cancer Alliance, National African American Tobacco Prevention Network, National Association of County and City Health Officials, National Association of Local Boards of Health, and National Latino Council on Alcohol and Tobacco Prevention.

*OPINION*

LAMB, Vice Chancellor.

**I.**

   This litigation arises out of the historic 1998 tobacco settlement between the nation's largest to-

A122

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

bacco companies and 46 of the states' attorneys general. In the settlement, the tobacco companies agreed to fund a foundation charged with creating programs to reduce youth tobacco product usage in the United States. As part of its mission, the foundation created a series of television and radio ads under the brand "the truth."[FN1]

> FN1. "The truth" is a registered trademark. For ease of reading, the court will omit the mark when referring to the ad campaign.

The settlement agreement imposes certain limits on the content of the foundation's activities, including a requirement that its advertising not constitute a "personal*8 attack on, or vilification of" any person or company. After the airing of one of the foundation's radio ads in 2001, a tobacco company threatened to take legal action against the foundation. Several months later, with the issue still unresolved and facing the threat of suit in multiple jurisdictions, the foundation filed an action in this court, seeking a declaration that none of its ads violate the settlement agreement. The tobacco company counterclaimed that the ads do violate the settlement agreement.

Both parties move for summary judgment, arguing that there is no genuine issue of material fact. They both agree that the matter presented is a straightforward contractual issue that turns on the legal interpretation of the words of the settlement agreement.

The restrictive terms used in the settlement agreement do not have well defined legal meanings. Nevertheless, drawing upon numerous sources, including case law, law review articles, and dictionaries, the court is able to ascertain the meaning of those terms and, then, to analyze the disputed advertisements in light of those meanings. As a result of this analysis, and for the reasons discussed below, the foundation's motion for summary judgment is granted and the tobacco company's motion for summary judgment is denied.

## II.

### A. Background

The defendant is Lorillard Tobacco Company, the oldest tobacco company in the United States and a Delaware corporation. The plaintiff is American Legacy Foundation ("ALF"), a Delaware non-profit corporation formed pursuant to the terms of the Master Settlement Agreement (the "MSA"), a 1998 agreement whereby the nation's largest tobacco companies settled lawsuits brought against them by the attorneys general of 46 states. The MSA requires that the tobacco signatories make collective Base Fund Payments of $25,000,000 per year for nine years. The MSA also requires the tobacco signatories to make collective payments in the amount of $250,000,000 in 1999 and $300,000,000 per year for the next four years for ALF's National Public Education Fund ("NPEF"). These funds have been used by ALF to produce its ad campaigns.

ALF's mission, as originally stated in the MSA and later incorporated into ALF's bylaws, is to educate America's youth about the dangers of tobacco products and to reduce the usage of tobacco products by young people. To fulfill its mission, ALF launched an advertising campaign universally known as "the truth" campaign. This campaign involved various television and radio ads aimed at young people that portray the negative side of tobacco products. To make sure that its ads were effective in reaching young people, ALF purposefully made them edgier and more confrontational than regular television and radio ads. Many ads could be described as "in your face" and "eye-catching."

The funding provided to ALF pursuant to the MSA did not come without restrictions. A majority of ALF's funding was earmarked for the public's education (i.e.advertising), and the content of that advertising is made subject to both requirements and prohibitions. The MSA required that the advertising concern only the "addictiveness, health ef-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fects, and social costs related to the use of tobacco products."[FN2] The MSA also prohibited the advertising from being a personal attack *9 or a vilification of tobacco company employees or tobacco companies.[FN3]

FN2. Section VI(h).

FN3. *Id.*

The relationship between ALF and the tobacco companies got off to a rocky start. In July 2001, Lorillard threatened litigation against ALF because of a radio ad that mentions Lorillard by name and implies that cigarettes contain dog urine. Lorillard initially threatened claims of defamation and unfair business practices against ALF, but later changed its position to assert that ALF's ads were a breach of the MSA.

In a January 18, 2002 letter, Lorillard notified ALF that it intended to bring suit for a breach of the MSA. Lorillard could not, however, bring suit at that time due to a 30-day notice provision of the MSA. ALF, as a non-signatory to the MSA, was not similarly bound. Thus, after a Lorillard spokesman indicated that Lorillard might sue ALF in 46 different states, ALF sued first, filing this action in Delaware on February 13, 2002.

In its complaint, ALF seeks a declaratory judgment that its advertisements do not violate Section VI(h) of the MSA. ALF also seeks injunctive relief on the theory that the continuing threat of litigation from Lorillard, especially the possibility that it may need to defend itself in multiple jurisdictions, threatened irreparable harm to its ability to continue its day-to-day operations.

Lorillard counterclaims that ALF's advertisements violate Section VI(h) of the MSA.

B. *Procedure*

This opinion is the fourth in a series of opinions concerning the litigation between these

[FN4] In *Lorillard I,* the court held that ALF's claims would be litigated in Delaware.[FN5] In *Lorillard II,* the court granted partial summary judgment in favor of Lorillard, finding that the MSA could be enforced against ALF even though it did not sign the agreement. In *Lorillard III,* the court granted a motion to compel certain documents, and denied a motion to compel other documents, all of which related to the contested advertisements.

FN4. *See Am. Legacy Found. v. Lorillard Tobacco Co.,* 2004 Del. Ch. LEXIS 157 (Del. Ch. Nov. 3, 2004) ("*Lorillard III* "); *Am. Legacy Found. v. Lorillard Tobacco Co.,* 831 A.2d 335 (Del.Ch.2003) ("*Lorillard II* "); *Am. Legacy Found. v. Lorillard Tobacco Co.,* 2002 WL 927383, 2002 Del. Ch. LEXIS 49 (Del. Ch. Apr. 29, 2002) ("*Lorillard I* ").

FN5. The parties have apparently never argued about which state's law governs the MSA. Pursuant to the MSA, it is "governed by the laws of the relevant Settling State, without regard to the conflict of law rules of such Settling State." MSA at 135. Both parties cite to Delaware case law not only for the procedural rules of summary judgment but also for the substantive law of contract construction and interpretation. Moreover, ALF is a Delaware entity and the section of the MSA at issue has been incorporated into ALF's bylaws. *Lorillard I,* 2002 WL 927383, at *5, 2002 Del. Ch. LEXIS 49, at *15 ("Because both Lorillard and the Foundation are Delaware entities and the interpretation and enforcement of the Foundation's bylaws is an issue in this case, Delaware law is clearly applicable to at least some of the claims."). Therefore, the court will apply the law of Delaware to the MSA.

Now, after years of litigation and several months before trial, both parties move for summary judgment, neither party contending that there is a

A124

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

material issue of fact. This opinion addresses those motions.

## C. The Dispute

Section VI(h) of the MSA is at the center of the dispute between Lorillard and *10 ALF. That section, titled "Foundation Activities," states, in relevant part, as follows:

The Foundation shall not engage in, nor shall any of the Foundation's money be used to engage in, any political activities of lobbying, including, but not limited to, support of or opposition to candidates, ballot initiatives, referenda or other similar activities. The National Public Education Fund shall be used only for public education and advertising regarding the addictiveness, health effects, and social costs related to the use of tobacco products and shall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively.

The parties argue about three separate clauses in this provision: (1) the anti-vilification and personal attack clause; (2) the restriction of ALF to addressing the "addictiveness, health effects, and social costs related to the use of tobacco products" (the "three criteria clause"); and (3) the funding of ALF's advertisements. Each will be addressed in turn.

### 1. Vilification And Personal Attack

The fundamental argument between the parties is the meaning of the word "vilification" and the phrase "personal attack." [FN6] ALF defines vilification as "advertising that strikes out at tobacco companies or their employees with extreme intensity and contains untruthful information." [FN7] ALF defines a personal attack as "advertising that is hostile or aggressive in tone and addresses subjects that are strictly private-individual characteristics unrelated to the person's public role." [FN8] Applying these definitions to its advertisements, ALF contends that it has not violated the Section VI(h) of the MSA.

FN6. Indeed, in a table depicting which ads violate (i) vilification, (ii) personal attack, or (iii) the three criteria clause, the great majority of ads with which Lorillard takes exception are due to vilification and personal attack, not violation of the three criteria clause. See Pl.'s Ex. 43. Moreover, most of the ads that Lorillard indicates are in violation of the MSA are assertedly violative of both the vilification *and* personal attack prohibition. Lorillard does not argue that any ad vilifies without also personally attacking. And only in rare instances does Lorillard urge that an ad is personally attacking without urging that it also vilifies.

FN7. Pl.'s Opening Br. at 42.

FN8. *Id.*

In contrast, Lorillard defines "vilification" and "personal attack" with less forceful terminology. Lorillard defines vilification as "the use of words or visuals that have the tendency to degrade, disparage, or lessen the standing of another." [FN9] Lorillard defines personal attack as "a negative depiction or hostile criticism of another." [FN10] Lorillard argues that under these definitions, ALF has violated Section VI(h) of the MSA.

FN9. Def.'s Opening Br. at 2.

FN10. *Id.*

### 2. The Addictiveness, Health Effects, And Social Costs Related To The Use Of Tobacco Products

ALF argues that all of the ads in question address the addictiveness, health effects, and social costs related to the use of tobacco products. ALF also maintains that Lorillard has challenged whether some of the ads meet this standard. [FN11] Although Lorillard appears to concede the issue, FN12 the court will address the three *11 criteria

A125

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

clause and determine whether any of the ads violate it.

> FN11. Pl.'s Opening Br. at 2.

> FN12. Def.'s Opening Br. at 59 ("Within [the second sentence of Section VI(h) of the MSA], the only words that are apparently in dispute are 'personal attack' and 'vilification.' ").

3. *The Funding Of ALF's Ads*

ALF argues that Section VI(h) treats the two sources of funds differently. It maintains that the first sentence relates to its Base Fund and that the second sentence relates to the NPEF. ALF claims that "the Base Fund, unlike the NPEF, is not subject to the constraints of either the three-criteria clause or the vilification/personal attack clause." FN13 Thus, according to ALF, "as a matter of law, advertisements funded out of the Base Fund cannot violate those clauses." FN14

> FN13. Pl.'s Opening Br. at 81.

> FN14. *Id.* ALF contends that it funded six of the 20 contested ads from the Base Fund: *Body Bags, Congress, Hypnosis, Lie Detector, Product Recall,* and *Shredder.*

Lorillard disagrees with ALF's interpretation of the funding restrictions of Section VI(h). Lorillard argues that ALF is not permitted to use the Base Fund for any advertising or public education. Thus, Lorillard contends that if any ad received any of the Base Fund, either directly or indirectly, then ALF has violated Section VI(h). Lorillard asserts that ALF cannot prove that any ad was funded exclusively from the NPEF because of improper record-keeping and inaccurate allocation of money received pursuant to the MSA.

D. *The Ads*

For purposes of this motion, the parties stipu-

late that a determination of whether ALF has violated Section VI(h) of the MSA is confined to a select group of 20 ads. The parties chose this group of ads nearly a year ago, each side designating 10 ads. For the past year, the parties have conducted extensive discovery about those ads.

During the discovery process, ALF sought information from Lorillard that would prove or disprove the truth of the ads. Lorillard refused to provide the information, claiming that the truthfulness of the ads was not relevant to the court's analysis of the MSA as a contractual agreement. Indeed, Lorillard has not pointed to one fact in ALF's ads which has not been publicly admitted by either Lorillard or one of the other signatories to the MSA. For the purposes of this motion, if the court determines that truthfulness is relevant, Lorillard concedes that the court can assume all of the contested ads are true. FN15 ALF maintains now that truth matters, although there is evidence of a memo written by its CEO that truth is not a defense to vilification. FN16

> FN15. Def.'s Answering Br. at 18.

> FN16. *Id.* at 16.

The ads are as follows, categorized by campaign: FN17

> FN17. Each ad has different versions. For simplicity, the court cites to only one version of each ad that reflects the content of the ad as it is understood by both parties. Additionally, all ads are television ads unless otherwise noted.

1. *Youth Voices Campaign*

a. *Shredder* FN18

> FN18. Pl.'s Ex. 7.

In *Shredder,* two youths stand outside of an urban corporate building with a large machine de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

scribed as the "Shredder 2000," which appears to be a large wood chipper. The building is identified only as a major tobacco company, although in reality it is *12 Philip Morris's headquarters.[FN19] The youths use megaphones to address employees[FN20] in the building, asking them if there are "a lot of embarrassing reports lying around the office." One of the youths then tells the employees that they "need" the Shredder 2000 to handle reports from the tobacco industry that say "today's teenager is tomorrow's potential regular customer." He then runs to the back of Shredder 2000 and throws what appears to be a report into the chipper. The report is instantly shredded. The youths also point out that the reports do not even need to be removed from where they are, shredding a file cabinet, a briefcase, and a computer. The ad concludes with a voice over that says "Shredder 2000-now available in regular and king-size."

> FN19. This building is not identified by name in the ad. Def.'s Opening Br. at 68.

> FN20. The employees are not identifiable because their faces are electronically obscured.

b. *Hypnosis*[FN21]

> FN21. Pl.'s Ex. 7.

In *Hypnosis,* three youths driving a truck "somewhere in tobacco suburbia" ask various passers-by where tobacco company executives live. Eventually, they find their way to a suburban housing development. The setting is at night and the houses have their interior lights on. Inside the van, the youths marvel at the size of the large homes, saying that working in an industry that kills over a thousand people a day pays "pretty well." Then they cue a pre-recorded tape linked to a public address system on top of the truck. On the tape, a woman's voice speaks in hypnotic monotone. The following are examples of what the voice says: "I am a good person;" "Selling a product that kills people makes me uncomfortable;""I realize that cigarettes

are addictive;" and "Tomorrow I will look for a new job." The ad ends with a youth announcing that they are "just trying to help."

c. *Body Bags*[FN22]

> FN22. *Id.*

In *Body Bags,* an unmarked truck pulls up "outside a major tobacco company." A group of youths rush to the back of the truck, where the door opens. They begin to pull large bags out of the truck. The bags are marked in large block lettering "BODY BAGS." The youths stack the bags on the sidewalk next to the tobacco company building while employees[FN23] inside watch. The bags line two sides outside of the building. Then, using a megaphone, a youth asks the employees inside if they know how many people tobacco kills everyday. The answer is 1,200 people, according to the ad. The body bags represent each person killed everyday (i.e. 1,200 body bags). The ad ends with youths posting signs on poles that read: "Every day 1200 people die from tobacco."

> FN23. *See* note 20.

d. *Lie Detector*[FN24]

> FN24. *Id.*

In *Lie Detector,* several youths enter the building of "a major tobacco company" carrying a lie detector. They ask to see the vice president of marketing because they want to drop off a lie detector. The security guards in the lobby of the building do not let them in. The security guards then ask them to leave, at which point one of the youths points out that the tobacco company has switched its position from claiming that nicotine is not addictive to admitting that it is addictive.

*13 2. *Orange Curtain Campaign*

a. *SCUM*[FN25]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

FN25. *Id.*

*SCUM* features what appears to be a homeless person reading a message directly to the viewer. He states that in the mid-1990s tobacco company executives created a marketing program that specifically targeted "gays and homeless people." The name of the program, he continues, was Project Sub-Culture Urban Marketing, "also known as Project SCUM." FN26The ad ends with the actor saying, sarcastically, "But I am sure they meant that in a good way." FN27

FN26. *Id.*

FN27. Pl.'s Ex. 7.

b. *Congress* FN28

FN28. *Id.*

In *Congress*, a young woman stands in front of the Capitol building with a memo in her hand. She states that in 1994, the top executive of a huge U.S. tobacco company testified before Congress that he did not believe that nicotine was addictive. Then she points to the memo, which she says is an internal memo from the same company that says that nicotine is addictive. She follows up by saying that the memo is from 1963. The ad ends with the woman saying that maybe the executive did not get the memo.

c. *Unclear* FN29

FN29. *Id.*

*Unclear* opens with a young man talking to the viewer about the testimony of a tobacco company executive, who said that he was unclear if anyone dies from cigarette smoking related diseases. As the young man continues in a voiceover, the ad shows him spray-painting a wall mural. When the mural is complete, the viewer can see it is a memorial to someone who lived from 1954 to 2002. The youth then says that it is his dad. The youth also says that

his dad died from throat cancer due to smoking. He then asks the viewer if that is clear enough.

3. *Bags Over America Campaign*

a. *Western* FN30

FN30. *Id.*

*Western* opens with a bird's eye view of a corral of horses in what appears to be western America. Three youths pull body bags out of a truck and throw them over the horses' backs as if they were saddles. The youths then turn the horses loose. As the horses gallop away, a youth holds a sign that says "what if cigarette ads told the truth?" At the end of the ad, another of the youths says "Let's see them put that in a magazine."

b. *Night Club* FN31

FN31. *Id.*

In *Night Club*, a group of youths are dancing and enjoying themselves in what appears to be a pulsating night club. A narrator describes the scene positively and then states, "looks like a cigarette ad to me." The ad cuts to the narrator, who is a youth, standing next to a body bag and another youth. The youths carry the body bag through the crowd and up to the bar, where they tell it that a woman dancing on the dance floor is "checking [it] out." The dancers then part on the dance floor, revealing a person holding a sign that says "What if cigarette ads told the truth?"

4. *Infect Truth Campaign*

*14 a. *Dog Walker* FN32

FN32. *Id.*

*Dog Walker,* a radio ad, begins with the ringing of a telephone. A woman answers "Good afternoon,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
**(Cite as: 886 A.2d 1)**

Page 15

Lorillard." [FN33] The caller asks to speak to someone about a "business idea." The caller announces that he is a professional dog walker and has noticed the waste of quality dog urine when dogs pee on fire hydrants and flowerbeds. He offers to collect the dog urine and sell it to the tobacco companies because, as he says, "dog pee is full of urea, one of the chemicals that [tobacco companies] put in cigarettes." He offers the woman samples from a Chihuahua, a Golden Retriever, and even, as he describes it, "high-test" pee from a Rottweiler. She then transfers the caller to someone else, who hangs up on him at the mention of a "pee proposal." [FN34]

> FN33. When asked at the summary judgment hearing about the reference to Lorillard, counsel stated that the reference did not violate the MSA. Tr. at 108.

> FN34. This is only one of two radio ads in the list of 20 disputed ads. Due to the nature of the medium, it is technologically possible to splice various phone calls together and make it appear as if it were one seamless conversation. Apparently, *Dog Walker* is the result of such a splice. ALF admits that the ad consisted of audio from more than one phone call. Pl.'s Answering Br. at 32.

b. *Flavor Gendek* [FN35]

> FN35. Pl.'s Ex. 7.

*Flavor Gendek,* a radio ad, also begins with the ringing of a telephone. A person answers, "Hello?" The caller identifies himself as "Jeff" and says that he is taking a survey about a well known product. "Jeff" then asks the person to rate flavors on a scale of one to ten. The first three flavors are cocoa, licorice, and peppermint, all of which the person rates in the mid-range of the scale. Then "Jeff" asks about ammonia, which receives a zero. "Jeff" next asks about another chemical, which also receives a zero. Finally, when "Jeff" asks about a third chem-

ical, the person asks, "What kind of stupid questions are these?" "Jeff" then informs the person that some tobacco companies add the chemicals to cigarettes.

c. *Ammonia Soul Train* [FN36]

> FN36. *Id.*

In *Ammonia Soul Train,* a group of youths are dancing in what appears to be a game show backdrop. One of the youths has a microphone and is presumably a game show host. He introduces two other youths as "contestants." There is a "scrambleboard" in the background that contains several jumbled letters that do not spell a word. The host asks the contestants to unscramble letters and make a word that is a chemical used to clean floors and that tobacco companies add to cigarettes to increase the impact of nicotine. The contestants successfully rearrange the letters to spell "ammonia."

d. *Raspa* [FN37]

> FN37. Pl.'s Ex. 7. *Raspa* is in Spanish, but ALF has provided an English translation in their opening brief. Pl.'s Opening Br. at 75-76 n. 23.

In *Raspa,* two youths are selling water ice from a vending cart. Customers appear and the youths ask them if they want to try a new flavor, ammonia. When the customer questions using ammonia as a flavor, the youths tell him that tobacco companies put ammonia in cigarettes for flavor "[w]hen in reality ammonia increases the impact of nicotine." The customer then asks if ammonia is risky or if anything bad can happen. In the end, he declines to eat the ammonia water ice.

***15** 5. *Death And Disease Campaign*

a. *Baby Invasion* [FN38]

A129

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

FN38. Pl.'s Ex. 7.

In *Baby Invasion,* a group of mechanical baby dolls crawls around an urban landscape. Each doll is wearing a diaper and an orange T-shirt. Their presence is overwhelming and soon passers-by are picking up the dolls and reading their T-shirts, which presumably are identical. The ad shows a close-up of a T-shirt, which has two sentences printed on it. The first sentence is a question, which asks "How do infants avoid secondhand smoke?" The second sentence, attributed to a tobacco executive, answers "At some point they begin to crawl."

b. *Body Bags Memorial* [FN39]

FN39. *Id.*

*Body Bags Memorial* opens with a group of youths in Washington, D.C. One of the youths acts as the narrator, welcoming fellow Americans to a new memorial in the nation's capitol. The youths set about to create a new memorial for people who have died, namely tobacco customers. This "tobacco memorial" consists of a gigantic pile of body bags dumped in a vacant lot. Initially, the youths pile them up by hand, but eventually, there are so many bags that a conveyor belt must be used to continue stacking them higher. The memorial symbolizes tobacco's "loyal customers" who die every day. The ad also announces that the memorial is "so that everyone in America can see what Big Tobacco is really up to." When a passer-by asks what the bags are, a youth answers that "they're just mothers, fathers, sisters, brothers, friends." The ad ends with the line "if anyone finds this offensive, so do we."

c. *Product Recall* [FN40]

FN40. *Id.*

In *Product Recall,* an actor portraying the "Tobacco Industry Chairman" gives a speech in which he says that tobacco companies are recalling all cigarettes. The date on the video is April 1, 2001. The actor says that there is "mounting evidence linking cigarettes to cancer, addiction, emphysema, heart disease, and premature death." He states that the tobacco industry takes responsibility for its products. Until the tobacco companies can, with a clear conscience, offer a cigarette that poses no health risk, the actor asserts, all cigarettes will be recalled. His reasoning for the recall is clear: the tobacco industry cares about consumers' health and consumers' trust. The ad then fades to black and the screen shows only the words "April fools" while a voiceover reads the words "April fools."

d. *Choice* [FN41]

FN41. *Id.*

In *Choice,* the ad presents a close-up of a woman looking directly at the camera and not talking. She does not move during the entire ad, except for involuntary human movements like blinking. In a voiceover, a female narrator, presumably the woman on screen, says the following:
  My name is Linda. I smoked for 21 years and I am dying of emphysema. The tobacco companies say smoking is an adult choice. Today I am dying because of a choice I made when I was sixteen. * * * I am not going to get better. I am going to die.

As the narrator says "I am going to die," the woman's face fades away and the viewer is left looking at a blank white screen.

**\*16** 6. *Tobacco Advertising*

a. *Bodega* [FN42]

FN42. *Id.*

In *Bodega,* a group of youths enter a convenience store in a barrio. They repeatedly ask the store clerk why the cigarette ads are so low to the ground. For example, they point to ads for Camel and Marlboro cigarettes, which are clearly within a

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

few feet of the floor, at or lower than a small child's line of sight. The ads are directly in front of the counter, so presumably every customer must face them before paying for any products. The ad ends with a close-up of the Marlboro ad.

b. *Peer Pressure* [FN43]

> FN43. *Id.*

In *Peer Pressure,* two youths stand outside with an electronic sign that flashes different numbers. In the background is a jumble of children's voices. Various phrases flash on the screen. When put together, the phrases make the following sentence: "Tobacco advertising-it's like peer pressure with a $15,000,000 a day budget."The electronic sign provides the "15,000,000" number to complete the sentence.

c. *Rip It Out* [FN44]

> FN44. *Id.*

In *Rip It Out,* the ad alternates between a young man on a couch in his apartment reading a magazine and a board room full of tobacco company executives listening to a report about the company's "phenomenal" rate of growth. As the young man reads the magazine, he rips out tobacco advertisements. Each time he rips out the ad, the executive giving the presentation in the boardroom hesitates and appears to lose his voice momentarily. Eventually, the executive can no longer speak. At the end of the ad, a voiceover implores viewers to "silence Big Tobacco's voice" by ripping out their ads from magazines. [FN45]

> FN45. In order to protect ALF legally, the ad warns viewers to rip out ads only from those magazines that they own.

E. *The Creation Of "The Truth" Campaign*

ALF's ad campaign was modeled on an earlier campaign in Florida that successfully reduced to-bacco usage among young people. The campaigns were alike in that they marketed their ads under the brand "the truth." Indeed, the first employee hired by ALF was the director of Florida's campaign, Chuck Wolfe, who was hired as Executive Vice President and Chief Operating Officer. Under Wolfe's direction, ALF retained Crispin, Porter & Bogusky, the primary advertising agency for the Florida truth campaign. As Wolfe testified in his deposition, he went to work for ALF in order to expand Florida's successful campaign to a national scale. [FN46]

> FN46. Wolfe Dep. at 27.

The key difference between the Florida campaign and ALF's campaign for the purposes of this litigation is that ALF is subject to the contractual provisions in the MSA. In an effort to ensure compliance with the MSA, ALF hired the law firm of Wilmer, Cutler & Pickering, now Wilmer Cutler Pickering Hale and Dorr ("Wilmer Cutler"), to review its advertisements.

As part of the review process, Wilmer Cutler devised a multi-factor test to evaluate whether an ALF ad, i.e. a draft ad not yet broadcast, violated the MSA. Some of the factors are as follows: (i) the qualitative nature of the ad's content, i.e. allegations of greed and untruthfulness; (ii) the *17 tone of the ad; (iii) whether the ad singles out individuals or specific tobacco companies; and (iv) the quantity of the criticism within the ad. Although there is some dispute about the derivation of the test, how many factors were included, and whether ALF formally adopted it, Wilmer Cutler did create a test to evaluate the ads and their possible violation of the MSA.

Using the test, Wilmer Cutler assigned each draft ad a risk rating as to whether the ad would potentially expose ALF to liability under the MSA. A low risk rating meant that the ad had a 1 in 10 chance of violating the MSA. A moderate risk rating meant that the ad had between a 1 in 10 chance and a 1 in 3 chance of violating the MSA. A high risk rating meant that the ad had a 1 in 3 chance of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

violating the MSA. Initially, ALF planned to require full board approval of any ad that received a moderate or high risk rating. ALF later changed its position, creating an Advertising Approval Committee for ads with a moderate risk rating.

The overall effect of Wilmer Cutler's involvement was to tone down or abandon ads that were found to have a high risk of liability. For example, an ad called *Kills 1/3,* which is not challenged in this motion, originally stated that the tobacco **industry** kills one third of the customers who use their product.[FN47] The ad was later changed to state that tobacco **products** kill one third of the customers. This minor change shifted the focus of killing customers from the industry to the product. Other examples of the effect of Wilmer Cutler's involvement include the ads *Conscience Patch, Tobacco Company, Interview (Version 3),* and *Uncle Ray Ray,* all of which were abandoned due to their high risk rating.[FN48]

FN47. *Id.* at 40-41; Ex. 103.

FN48. Pl.'s Answering Br. at 46-47.

Wilmer Cutler's review process also led to the alteration of at least one ad that is disputed in this litigation, *Shredder.*[FN49] In the original draft ad, the script indicated that the documents to be shredded were incriminating evidence. As assessed by Wilmer Cutler, the draft ad was given a high risk rating, partly because of the implication that the documents were "incriminating." The final version calls the documents merely "embarrassing."

FN49. *Compare* Def.'s Opening Br. Ex 141 *to* Def.'s Opening Br. Ex. 144.

ALF argues that its two-step review process ensures that its ads are in compliance with the MSA. The first review is performed by Wilmer Cutler and the second review is performed by the Advertising Approval Committee. Through these reviews, ALF argues, draft ads are either approved as is or altered to conform to the MSA.

ALF implemented the two-step review process in response to the tobacco signatories' concerns about of the Florida truth campaign. As ALF knew, *Demon Awards,* a Florida truth campaign ad, was the reason that the tobacco companies sought a prohibition against vilification and personal attack in the MSA.[FN50] In *Demon Awards,* tobacco wins the award for Most Deaths in a Single Year, beating out other contestants like murder, suicide, and illegal drugs. *Demon Awards* is a parody of such glamorous award ceremonies as the Oscars and the Emmys and it features tobacco industry executives applauding when tobacco is nominated for its gruesome award. The audience also includes Hitler and Stalin, who join in the applause.

FN50. Pl.'s Opening Br. at 19 n. 7

Although these Florida ads laid the groundwork for ALF's ads, ALF did not **\*18** copy them. Instead, ALF expanded the general concept of Florida's campaign but implemented the two-step review process to make sure that its ads do not violate the MSA. In this manner, ALF attempts to produce ads that retain their effectiveness in convincing young people not to smoke, yet remain within the parameters spelled out in the MSA.

### III.

Summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[FN51] When evaluating a motion for summary judgment, a court must view the facts in the light most favorable to the nonmoving party and the moving party has the burden of demonstrating that there is no material question of fact.[FN52]

FN51. CH. CT. R. 56(c); *see also Williams v. Geier,* 671 A.2d 1368, 1375 (Del.1996).

FN52. *Tanzer v. Int'l Gen. Indus., Inc.,* 402 A.2d 382, 385 (Del.Ch.1979) (citing *Judah v. Delaware Trust Co.,* 378 A.2d 624, 632 (Del.1977)).

A132

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

"A party opposing summary judgment, however, may not merely deny the factual allegations adduced by the movant." [FN53] "If the movant puts in the record facts which, if undenied, entitle him to summary judgment, the burden shifts to the defending party to dispute the facts by affidavit or proof of similar weight." [FN54]

> FN53. *Tanzer,* 402 A.2d at 385.

> FN54. *Id.*

Since ALF seeks a declaratory judgment, this court notes that "[t]here is a split of authority as to whether a plaintiff seeking a declaratory judgment bears the burden of persuasion or whether the burden of persuasion rests with the party who would have borne that burden had it been brought as a conventional action, i.e., the declaratory defendant." [FN55] In Delaware, "[t]he better view is that a plaintiff in a declaratory judgment action should always have the burden of going forward." [FN56]

> FN55. *Rhone-Poulenc v. GAF Chemicals,* 1993 WL 125512, at *3, 1993 Del. Ch. LEXIS 59, at *7 (Del. Ch. Apr. 6, 1993).

> FN56. *Id.*

[1][2] Additionally, under Court of Chancery Rule 56(h), since neither party argues that there is a disputed material issue of fact, the court deems the cross-motions to be the equivalent of a stipulation for decision on the merits on the record submitted.FN57 Thus, the usual standard of drawing inferences in favor of the nonmoving party does not apply.

> FN57. CH. CT. R. 56(h) ("Where the parties have filed cross motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions.").

IV.

*A. Contract Drafting*

"The principles of contract interpretation in Delaware are well settled." [FN58] "In construing the meaning of written contracts, the court's first obligation to the parties is to determine the nature and scope of the contractual rights and obligations they created and to enforce those rights and obligations in accordance with law." [FN59] "The court's ultimate guide in determining *19 those legal entitlements is to attempt to fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted." [FN60]

> FN58. *Interactivecorp v. Vivendi Universal,* 2004 WL 1516149, *9, 2004 Del. Ch. LEXIS 90, at *30 (Del. Ch. June 30, 2004).

> FN59. *U.S. WEST, Inc. v. Time Warner Inc.,* 1996 WL 307445, at *9, 1996 Del. Ch. LEXIS 55, at *28 (Del. Ch. June 6, 1996).

> FN60. *Id.* 1996 WL 307445, at *9, 1996 Del.Ch. LEXIS 55, at *28-*29.

When a highly sophisticated company like Lorillard and a group of 46 of the nation's attorneys general sign a contract that includes two critical phrases, "personal attack" and "vilification," that have no accepted blackletter legal definition, the court presumes that there was an implicit agreement by the parties to avoid the use of legal terms of art.FN61 For example, the parties could have easily replaced "vilification" with a well defined legal term that approximates its meaning taken from the torts of libel, slander, or defamation.FN62 Each of those torts has a settled legal definition that would have allowed the parties to brief an extensive list of cases in support of their argument.FN63 Instead, the parties are left with legally undefined terms that they attempt to define by resort to meanings found in various dictionaries. Each party cites no less than

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

three dictionaries in support of its definition of "vilification." The same is true of personal attack.

> FN61. As the court noted at the hearing, the choice of words almost raises a question as to whether the parties intended a dispute about Section VI(h) of the MSA to be justiciable. Tr. at 19. As this court said in *Lorillard II,* "the court notes that the parties to the MSA are sophisticated persons who can be expected to have considered the interaction of provisions across the MSA (and accompanying agreements) and the implications of including or excluding various terms and language in the MSA." *Lorillard II* at 346 n. 42.

> FN62. The tie between vilification and the torts of libel, slander, and defamation is made clear in *Spence,* which cited back to *Rice,* "the seminal case" from 140 years before *Spence,* in its discussion of libel. *Spence v. Funk,* 396 A.2d 967, 971 (Del.1978) (referring to *Rice v. Simmons,* 2 Del. 417 (Del. Ct. of Errors and Appeals 1838)). As *Spence* declared, "*Rice v. Simmons* has more than age to commend it." *Spence,* 396 A.2d at 972. "[*Rice* ] embodies long settled law in this State, reaffirmed by [the Delaware Supreme Court in *Klein v. Sunbeam Corp.,* 47 Del. 526, 533, 94 A.2d 385 (Del.1952),] and its reasoning remains sound." *Id.* Despite this direct link to *Rice,* neither *Spence* nor *Klein* mentions the term "vilification."

> FN63. For an extended discussion of libel, slander, and defamation, see *Spence,* 396 A.2d at 967. As *Spence* states, "defamation is ... that which tends to injure reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him." *Id.* at 969. "[L]ibel is written defamation and slander is oral

defamation." *Id.* at 970.

[3] While dictionary definitions are helpful and instructive, they are not precedent and this court need not rely on them, especially when, as in this case, there are sufficient usages in legal opinions to inform the court as to whether the advertisements in question violate the MSA. Moreover, a significant problem with the parties' dictionary arguments is that they are, at least in part, identical. That is, both parties rely on *exactly* the same dictionary definition, at times, to support divergent interpretations of the MSA. Yet neither party offers a suggestion as to how this court should rule when the "competing" dictionary definitions are actually the same definition.

"The primary rule of construction is [that] where the parties have created an unambiguous integrated written *[contract],* ... the language of that contract ... will control." [FN64] "Contract language is not ambiguous simply because the parties **\*20** disagree on its meaning." [FN65] "Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." [FN66] "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." [FN67]

> FN64. *U.S. WEST,* 1996 WL 307445, at *9, 1996 Del.Ch. LEXIS 55, at *29-*30.

> FN65. *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.,* 693 A.2d 1059, 1061 (Del.1997).

> FN66. *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del.1992).

> FN67. *Id.*

[4] Another difficulty in this case is that the MSA prohibits the court from relying on any negotiation between the drafters of the agreement to de-

A134

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
**(Cite as: 886 A.2d 1)**

termine the meaning of the words.[FN68] In other contract interpretation cases, the court is able to look to parol evidence to determine the parties' intent.[FN69] But here, given the MSA's prohibition against discovering into the drafters' negotiations, the court must confine itself to the express language of the contract.

> FN68. Tr. at 35, 72-73.

> FN69. *See, e.g., Rago v. Judge,* 1989 WL 25802, at *6, 1989 Del. Ch. LEXIS 29, *15-*17 (Del.Ch. Mar. 16, 1989).

**B. *Defining Vilification*** [FN70]

> FN70. Vilification is often improperly spelled "villification." The court has considered precedent including either spelling.

*1. Case Law*

a. *Delaware*

The word "vilify" first appears in Delaware case law over 150 years ago. In 1837, the Delaware Court of General Sessions [FN71] described blasphemy as "the open, public vilification of the religion of the country ... [a] licentiousness endangering the public peace ... tending to corrupt society, [] considered as a breach of the peace, and punishable by indictment." [FN72] The next year, the highest court in Delaware [FN73] described "to vilify" as to bring one "into hatred, contempt and ridicule." FN74 Several years later, the Superior Court again used the term "to vilify," this time as part of a test to determine whether a publication is "libellous." FN75 The "libellous" test was subsequently repeated in 1880 in **\*21** two cases involving a set of newspaper publications. Both cases defined a publication as "libellous ... if it tends to vilify, defame and injure the plaintiff." [FN76] Thereafter, there is a large time gap in the case law before the term "vilify" was described again, this time in 2001, in which vilifying referred to "assail[ing] people and institutions." FN77

FN71. "The [Court of General Sessions] was abolished in 1951 and its responsibilities given to the newly reorganized Superior Court." http:// www.state.de.us/sos/dpa/collections/aghist /2805.shtml

FN72. *State v. Chandler,* 2 Del. 553, 577-78 (Del. Ct. of General Sessions 1837) (quoting Pennsylvania law).

FN73. "The Delaware Supreme Court is Delaware's highest court." http:// www.state.de.us/sos/dpa/collections/aghist /1205.shtml "Established in colonial times as the highest appellate court, it lost much of its power after the 1792 constitution reorganized the judicial system." *Id.* From 1831 to 1897, the highest court in Delaware was the Court of Errors and Appeals. *See* http:// www.state.de.us/sos/dpa/collections/aghist /1210.shtml. "The current Supreme Court was reestablished under the 1897 constitution, to assume the duties and functions of the former Court of Errors and Appeals." http://www.state. de.us/sos/dpa/collections/aghist/1205.shtml

FN74. *Rice,* 2 Del. at 428 ("Sir James Mansfield, in delivering the opinion of the court said 'there is no doubt that this was a libel for which the plaintiff in error might have been indicted and punished; because, though the words impute no punishable crimes, they contain that sort of imputation which is calculated to vilify a man, and bring him, as the books say, into hatred, contempt and ridicule.'") (quoting British law).

FN75. *Layton v. Harris,* 3 Del. 406, 407 (Del.Super.1842) ("If the attending circumstances prove nothing one way or the other about the intent, then the intent must be gathered from the paper itself, and if

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
**(Cite as: 886 A.2d 1)**

886 A.2d 1                                                                              Page 22

that is libellous-if it tends to vilify, defame and injure the plaintiff-the inference of law as well as of common sense is, that such was the intention, and the publication is, therefore, taken to be malicious.").

FN76. *Croasdale v. Bright,* 11 Del. 52, 59 (Del.Super.1880); *Delaware State Fire & Marine Ins. Co. v. Croasdale,* 11 Del. 181, 195 (Del.Super.1880).

FN77. *Capano v. State,* 781 A.2d 556, 668 (Del.2001) (stating how the defendant vilified others).

While the preceding recitation of Delaware case law does not conclusively demonstrate a blackletter law definition of "vilification," it does offer a basic understanding of the term as it has been used historically. In the first instance, a court used "vilification" in a discussion about blasphemy. Then another court linked vilification to hatred, contempt and ridicule. Then, in the 1880 newspaper cases, the court used the term "vilify" in its discussion of publications in which the author called a company "a rotten and worthless fraud" "run by swindlers" who are "a pair of rascals, who ought to be in jail." FN78 This handful of cases, which represents a comprehensive survey of Delaware law on the meaning of "vilification," FN79 will form the backdrop for the court's understanding of "vilification" as it is used in other jurisdictions as well as in the MSA.

FN78. *Delaware State Fire & Marine,* 11 Del. at 181.

FN79. A few other cases refer to the term "vilify" or "vilification," but they offer absolutely no information about the meaning of the contested terms. *See Lorillard I* (explaining the MSA); *Lorillard II* (explaining the MSA); *Piasecki Aircraft Corp. v. Int'l Union, United Auto., etc.,* 129 A.2d 663, 666 (Del.Ch.1957) ("While it is obvious that the claimed termination

of the Bellanca-Union contract was followed promptly by vilification of those workers, supervisory personnel and suppliers, who passed defendants' picket line, it appears that picketing by Local 840 in recent weeks has been regulated and controlled by its own officials and that a labor force equivalent in size to that employed prior to November 23, 1956, is entering and leaving plaintiff's plant more or less on schedule.").

b. *The United States Supreme Court*

The United States Supreme Court has frequently used the term "vilify" in its opinions, often in First Amendment cases. The most recent use was in a discussion about libel in *Phila. Newspapers v. Hepps.*FN80 In that discussion, the Court stated that "[w]hile deliberate or inadvertent libels vilify private personages, they contribute little to the marketplace of ideas."FN81 The Court made this statement in the context of a First Amendment discussion involving the famous *New York Times* case,FN82 which itself quoted a passage from another United States Supreme Court case, *Cantwell v. Connecticut.*FN83 *22 *Cantwell* appears to be the origin for many of the United States Supreme Court cases that use the terms "vilify" or "vilification." The oft-cited passage from *Cantwell* is as follows:

FN80. 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986).

FN81. *Id.* at 782, 106 S.Ct. 1558.

FN82. *New York Times Co. v. Sullivan,* 376 U.S. 254, 271, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

FN83. 310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (holding unconstitutional a Connecticut statute under which the defendants were convicted of promoting their religious beliefs).

A136

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
**(Cite as: 886 A.2d 1)**

In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.[FN84]

> FN84. 310 U.S. at 310, 60 S.Ct. 900.

A review of state and federal case law shows that at least 30 opinions have quoted the sentence from *Cantwell* that contains the word "vilification," including six United States Supreme Court opinions.[FN85] Those half-dozen opinions include well known First Amendment cases such as *Feiner v. New York,*[FN86] *New York Times v. Sullivan,*[FN87] and *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council.*[FN88]

> FN85. One of the federal cases that cites the *Cantwell* discussion about vilification is a Third Circuit case about a Wilmington police department directive. *Gibson v. Mayor & Council of Wilmington,* 355 F.3d 215, 227 (3d Cir.2004).

> FN86. 340 U.S. 315, 329, 71 S.Ct. 303, 95 L.Ed. 295 (1951) (Black, J., dissenting) (discussing whether a public speaker incited a crowd of onlookers with racially charged comments).

> FN87. 376 U.S. at 271, 84 S.Ct. 710 (deciding whether a public official can recover for defamatory falsehoods relating to the public official's official conduct).

> FN88. 425 U.S. 748, 780, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (Stewart, J., con-

curring) (discussing the free flow of information concerning the price of prescription drugs).

In addition to *Cantwell* and its progeny, other United States Supreme Court cases also refer to vilification. In each of these cases, the Court used the term "vilification" to mean something stronger than mere disparagement.[FN89] In addition, many of the United States Supreme Court cases appear in contexts that have serious social implications. Such contexts, like race-based threats,[FN90] blasphemy,[FN91] and pro-German communications during World War II,[FN92] are beyond the commercial advertising complained about here by Lorillard.

> FN89. *See, e.g., Mayberry v. Pennsylvania,* 400 U.S. 455, 465, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971) (equating "vilified" with "cruelly slandered"); *Old Dominion Branch No. 496 v. Austin,* 418 U.S. 264, 294, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (Powell, J., dissenting) (discussing union officials subjecting letter carrier scabs to "public ridicule and vilification"); *Linn v. United Plant Guard Workers,* 383 U.S. 53, 67-68, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) (Black, J., dissenting) (including "vilification" in a list with "invective" and "exaggeration").

> FN90. *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 894, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (analyzing a Mississippi Supreme Court's judgment that "many black citizens were intimidated by threats of social ostracism, vilification, and traduction").

> FN91. *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 539, 72 S.Ct. 777, 96 L.Ed. 1098 (1952) (citing a dictionary definition of blasphemy that defined blasphemy as "the denying or vilifying of the Deity, by speech or writing").

A137

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN92. *Hartzel v. United States,* 322 U.S. 680, 692, 64 S.Ct. 1233, 88 L.Ed. 1534 (1944) (Reed, J., dissenting) (describing pro-German pamphlets, which contained "scurrilous and vitriolic attacks," as vilifying Jews during World War II).

**\*23 c.** *Other Legal Sources*

An analysis of state and federal case law demonstrates that those jurisdictions use the term "vilification" in a manner that is consistent with both Delaware and the United States Supreme Court.

First, state and federal case law shows that courts often use the term "vilification" to describe statements that are stronger than disparagement. For example, racial slurs, insults and epithets have been described as vilification.[FN93] In another case, a court described an allegation of rape committed in the presence of the victim's sister as vilification.[FN94] Also, in a heavily cited case from New Jersey, a court used the term "vilification" to describe allegations that a nursery school teacher had sexually abused her students.[FN95] These statements indicate that courts treat the term "vilification" much more seriously than mere disparagement.

FN93. *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 182 (4th Cir.2001).

FN94. *United States v. Burke,* 80 F.3d 314, 317 (8th Cir.1996).

FN95. *State v. Michaels,* 136 N.J. 299, 642 A.2d 1372 (1994).

Second, courts often use the term "vilification" in contexts that implicate serious social issues not found in commercial marketing. The term "vilification" is frequently found in case law involving racially charged issues.[FN96] "Vilification" is also found in case law dealing with sexual orientation.[FN97]

FN96. *See, e.g., Good News/Good Sports Club v. School Dist.,* 28 F.3d 1501, 1517 (8th Cir.1994) (labeling a black speaker's words vilification when he labeled Jews "bloodsuckers of the black nation"); *Snell v. Suffolk County,* 782 F.2d 1094, 1098 (2d Cir.1986) (including in its list of vilifications " 'study guides' for minority officers comprised of puzzles commonly found in children's books, as well as a questionnaire for black officers containing virtually every conceivable racially offensive cliché").

FN97. *See, e.g., Centola v. Potter,* 183 F.Supp.2d 403, 410 (D.Mass.2002) (classifying as vilification assertions by co-workers that an assumed homosexual should be more "manly").

Additionally, a survey of leading law reviews and journals supports the use of "vilification" in the case law. More than 20 years ago, the Yale Law Journal included a definition of the word "vilifies" in an article on group vilification.[FN98] As the article states, " '[v]ilifying' speech has been defined as any utterance that, directly or by innuendo, holds up the target of the utterance to 'public contempt, hatred, shame, disgrace, or obloquy,' or that causes the target or its members to be 'shunned, avoided, or injured' in business, profession or occupation." FN99 The article used this definition in a discussion about the Nazi Party of America's attempt to march in Skokie, Illinois, an event made infamous in a 1977 First Amendment case.[FN100] The Yale Law Journal article states that "the public dissemination of speech [by the Nazi Party] vilifies large and identifiable racial, ethnic, or religious groups." FN101 According to the same article, vilification is not restricted to racial, ethnic, or religious slurs. Vilification may also take the form of accusations of "sexual **\*24** crimes and deviations." [FN102]

FN98. Note, *Group Vilification Reconsidered,* 89 YALE L.J. 308, 308 (1979).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN99. *Id.* at 308 n. 2 (quoting, in part, Note, *Statutory Prohibition of Group Defamation,* 47 COLUM. L.REV.. 595, 609 (1947)).

FN100. *Village of Skokie v. Nat'l Socialist Party of Am.,* 51 Ill.App.3d 279, 9 Ill.Dec. 90, 366 N.E.2d 347 (1977), *aff'd in part and rev'd in part,*69 Ill.2d 605, 14 Ill.Dec. 890, 373 N.E.2d 21 (1978).

FN101. *Group Vilification Reconsidered,* 89 YALE L.J. at 308.

FN102. *Id.* at 310 n. 9 (citing *Neiman-Marcus v. Lait,* 13 F.R.D. 311, 312 (S.D.N.Y.1952)).

Other law reviews and journals also contain articles that use the terms "vilify" or "vilification." Most of these references to vilification are addressed to specific subject matters, such as race relations,[FN103] politics,[FN104] gender relations,[FN105] and religion.[FN106] Each of these subject areas is more serious than the commercial ads complained about by Lorillard.

FN103. *See, e.g.,* J.M. Balkin & Sanford Levinson, *The Canons of Constitutional Law,* 111 HARV. L.REV.. 963, 976 (1998) ("Few constitutional scholars believe that the principles or the holding of *Dred Scott* [*v. Sandford,* 60 U.S. 393, 19 How. 393, 15 L.Ed. 691 (1857),] are important for modern constitutional theory (except perhaps as a symbol continually to be vilified)."); Robert A. Sedler, *The Unconstitutionality of Campus Bans on "Racist Speech:" The View From Without and Within,* 53 U. PITT. L.REV.. 631, 661 (1992)("*UWM Post*[v. *Board of Regents of the Univ. of Wis. Sys.,* 774 F.Supp. 1163 (E.D.Wis.1991)] makes it clear then that narrow bans on racist speech, such as those that are limited to 'direct, face-to-face racial insults' and 'targeted vilification,' as

proposed by Professor Charles Lawrence, also violate the First Amendment."); Michael J. Klarman, *Bush v. Gore Through the Lens of Constitutional History,* 89 CAL. L.REV. 1721, 1756 (2001) ("Thus, a Court decision that is initially popular or that generates a mixed response can later become so universally criticized as to subject the Court to popular vilification. *Dred Scott* and *Plessy* surely illustrate this phenomenon, and *Korematsu* may as well.").

FN104. *See, e.g.,* Richard J. Baker, Note, *Constitutional Law: State Campaign Contribution Limits: Nixon v. Shrink Missouri Government PAC: An Abridgment of Freedom in the Name of Democracy,* 54 OKLA. L.REV. 373, 390 (2001) ("Therefore, neither [the view of the civic republican nor the view of the populist] should be vilified as democracy-destroying corruption for the purpose of absconding First Amendment rights."); Stewart Jay, *Origins of Federal Common Law: Part One,* 133 U. PA. L.REV. 1003, 1037 (1985) ( "Throughout the entire episode the character of Jay was thoroughly vilified, and Republicans repeatedly portrayed him as aristocratic and biased toward England.").

FN105. *See, e.g.,* Katherine M. Franke, *The Domesticated Liberty of Lawrence v. Texas,* 104 COLUM. L.REV.. 1399, 1418-19 (2004) ("Might there be something politically valuable in resisting the transformation of the gay political subject from pervert to domesticated couple? What political projects are foreclosed by the vilification of the notion of perversion in the gay community?"); Richard F. Duncan, *Who Wants to Stop the Church: Homosexual Rights Legislation, Public Policy, and Religious Freedom,* 69 NOTRE DAME L.REV. 393, 415 (1994)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

("Of course, proponents of the homosexual agenda have every right to wage a propaganda campaign to promote social acceptance of the gay lifestyle and even to vilify traditional religion."); Jeffrey G. Sherman, *Love Speech: The Social Utility of Pornography,* 47 STAN. L.REV.. 661, 664 (1995) ("And unfortunately, the anticensorship forces likewise have taken up this dubious weapon of personal disparagement upon occasion, insinuating that antipornography feminists are simply bitter, ill-favored women who cannot find husbands and therefore inveigh against conspicuous images of women more alluring than they. This kind of vilification, whether employed by the pro-or the anticensorship forces, has no place in a reasoned discussion of the issue.").

> FN106. *See, e.g.,* Leonard Pertnoy & Daniel Gordon, *Would Alan Dershowitz Be Hired to Teach Law at a Catholic Law School? Catholicizing, Neo-Brandeising, and an American Constitutional Policy Response,* 23 SEATTLE UNIV. L.REV. 355, 377 ("As early as St. Augustine, the Catholic Church vilified Jews, reinforcing images of Jews as rejected people."); Michal R. Belknap, *God and the Warren Court: The Quest for "A Wholesome Neutrality,"* 9 SETON HALL CONST. L.J.. 401, 410 (1999) ("In its most famous defense of the rights of this often vilified sect, the Court held in *West Virginia Board of Education v. Barnette* that Jehovah's Witness children attending public schools could not be required to salute the American flag.").

In summary, the state and federal case law, as well as law reviews, support a view of vilification that is consistent with Delaware law. First, on a textual level, the words of vilification are stronger than disparagement.***25** Second, on a contextual level, the term "vilification" is most often used to de-

scribe situations that implicate serious social issues, such as race or gender relations.

While the overwhelming majority of legal sources show a consistent use of "vilification" that is stronger than mere disparagement and frequently "vilification" is used in serious social contexts, there are a small minority of cases that appear to use "vilify" in a watered-down manner. For example, Lorillard cites cases that appear to use "vilify" to mean disparage or lower in standing.FN107 These cases are few and far between and will not be relied on by this court.

> FN107. Def.'s Supplemental Br. at 5 (citing, among others, *West v. State,* 793 So.2d 870, 883 (Ala.Crim.App.2000); *Allied Aviation Serv. Co.,* 248 N.L.R.B. 229, 230 (N.L.R.B.1980)).

**2. *Dictionaries***

Both parties rely heavily in their briefing on dictionary definitions of "vilification." They both argue that "vilification" is not a legal term of art and has not been defined in any relevant case law.FN108 Thus, the parties request that the court confine its analysis to the "usual and ordinary meaning" (i.e. dictionary definition) of "vilification" in order to interpret the MSA properly.FN109 Although the parties may agree that an analysis of leading dictionaries provides the proper method of interpretation, they do not agree on the meaning of the dictionary definitions of "vilification."

> FN108. Pl.'s Supplemental Br. at 1 n. 1 ("Neither party in this case has ever suggested that the pertinent terms are legal terms of art or have a settled legal definition."); Def.'s Answering Br. at 1 ("Neither party contends that personal attack or vilification are terms of art or are somehow used in the MSA in a sense other than their usual and ordinary ones."). But in its supplemental briefing, Lorillard cites *Vanasco*

A140

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

*v. Schwartz,* which states that "[t]o vilify can mean to make 'less valuable or important,' and 'lower in estimation.' " 401 F.Supp. 87, 96 n. 18 (E.D.N.Y.1975), *aff'd,*423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (Unabridged) 2552 (1966)). Def.'s Supplemental Br. at 3. Notably, the *Vanasco* court says *can* mean, not *does* mean.

FN109. Pl.'s Supplemental Br. at 1 n. 1 ("The parties agree, therefore, that the usual and ordinary meanings of the terms are the proper starting points here."). After the summary judgment hearing on May 10, 2005, the court requested that both parties provide supplemental briefs on the legal meanings of "vilification" and "personal attack" since most of the pre-hearing briefing focused on non-legal dictionary definitions.

ALF claims that dictionaries describe vilification as "false, abusive, and ... communicated with extreme intensity." FN110 ALF looks first to the *American Heritage Dictionary,* which defines "vilify" as "[t]o make vicious and defamatory statements about." FN111 ALF then quotes the *Oxford English Dictionary,* which defines "vilify" as "to depreciate with abusive or slanderous language; to defame or traduce; to speak evil of." FN112 Finally, ALF quotes the *Random House Dictionary,* which defines "vilify" as "to speak ill of; defame; slander." FN113 ALF argues that these definitions*26 provide the proper meaning of the word "vilification" in the MSA.

FN110. Pl.'s Opening Br. at 44. In its supplemental brief, ALF describes vilification as "speech acts that are abusive in tone and that contain false statements or express unfair condemnation." Pl.'s Supplemental Br. at 1.

FN111. *Id.* at 44 (quoting AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1919 (4th ed.2000)).

FN112. *Id.* at 44 (quoting OXFORD ENGLISH DICTIONARY 630 (2d ed.1989)).

FN113. *Id.* at 44 (quoting RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 2122 (2d ed.1987)).

Lorillard cites to dictionaries, some of which are the same as those relied on by ALF. For example, Lorillard quotes from the *American Heritage Dictionary* which defines "vilify" as "[t]o make vicious and defamatory statements about." FN114 Although Lorillard quotes an older version of the *American Heritage Dictionary,* it uses the *exact same language* relied on by ALF for its definition of "vilification." Lorillard also cites to the *Oxford English Dictionary,* another source used by ALF, to demonstrate that "vilify" is "derived from the Latin vilificare and vilis, which means cheap or base." FN115 In addition to these two dictionaries, Lorillard cites the following three dictionaries:

FN114. Def.'s Opening Br. at 62 (quoting AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (3d ed.1992)).

FN115. *Id.* at 62 (citing OXFORD ENGLISH DICTIONARY (2d ed.1989)).

• *Webster's Third New International Dictionary of the English Language* (Unabridged) (3d ed.1993) (defining "vilify" as "To make less valuable or important: lower in estimation. To make morally despicable or abhorrent: degrade.")
• *Webster's Ninth New Collegiate Dictionary* (1987) (defining "vilify" as "To lower in estimation or importance. To utter slanderous and abusive statements against: Defame.").
• *The New Oxford American Dictionary* (2001) (defining "vilify" as "Speak or write about in an ab-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

usively disparaging manner: he has been vilified in the press.").

The "clear" result of these definitions, according to Lorillard, is "that the touchstone of vilification is the use of words that have a tendency to lower in standing or debase the target of the vilifying statement." FN116

> FN116. Def.'s Opening Br. at 62.

### 3. What Is Vilification?

As the foregoing review of case law, law reviews, and dictionaries demonstrates there is no blackletter law definition of vilification. What is clear is that there is a range of meanings for vilification, both in the legal and nonlegal contexts.

[5] In order to determine the meaning of the word "vilification" for the purposes of the MSA, the court begins with the use of vilification in Delaware case law. As summarized above, Delaware courts have used "vilification" in conjunction with words like blasphemy, licentiousness, hatred, contempt, and ridicule. "Vilification" has also been used in two related cases that concerned an alleged fraud by swindlers who perhaps should have been put in jail. From these sources, it is clear that Delaware law regards vilification as stronger (i.e. more contemptuous or malicious) than disparaging someone.

Looking to other jurisdictions, the court notes that a few cases appear to treat the term "vilification" no differently than criticism. But these cases are the minority and inconsistent with Delaware's jurisprudence. As *Spence* declared, the seminal libel case of *Rice v. Simmons* has "more than age to commend it." FN117 While *Rice* does not define vilification, it links vilification to "hatred, contempt, and ridicule" FN118 and provides a starting point for any analysis of vilification in this state.

> FN117. *Spence,* 396 A.2d at 972 ("[*Rice* ] embodies long settled law in this State ...

and its reasoning remains sound.").

> FN118. *Rice,* 2 Del. at 428.

**\*27** More generally, the United States Supreme Court, federal case law, and state case law are consistent with the stronger meaning of vilification found in Delaware law. An overwhelming percentage of references to vilify or vilification are stronger than, if not much stronger than, disparage. A survey of the relevant case law shows that vilification is often found in cases that deal with racial slurs, allegations of sexual impropriety (including abuse), and denigrating religions. These subject matters are not mere disparagement. They are much more hateful, much more personal, and much more disturbing than the usual meaning of disparage.

Similarly, although of less importance, the great majority of law review articles that use the term "vilification" do so in the context of serious social and political debate. The issues of racism, political power, gender and sexual equality, and freedom of religion are galvanizing issues for everyone. The arguments that surround these issues are often highly emotionally charged and full of strong language that goes far beyond mere disparagement. Differing viewpoints on these issues are much more intense and personal than in the commercial setting, where competitors routinely argue about the superiority of their products. For example, no one can reasonably compare a statement that a cigarette is the "best" cigarette to the statement that one religion is the "best" religion. This is not to say that there are no examples of "vilification" in the commercial setting, because there are. FN119 But even commercial examples of vilification are mostly confined to social settings with highly emotionally charged debate, such as Third World access to HIV/AIDS drugs. Nowhere does a company that simply makes a bad product seem to be "vilified."

> FN119. *See, e.g.,* Barbara Cochrane Alexander, Note, *Lack of Access to HIV/AIDS Drugs in Developing Countries: Is There a*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Violation of the International Human Right to Health?*, 8 HUM. RTS. BR.. 12, 14 (2001) ( "Pharmaceutical corporations feel vilified by criticisms that they value patents more than human lives, but perhaps they fail to realize that limited price reductions of drug treatments are not sufficient to address the scope of the HIV/AIDS epidemic."); Dmitry N. Feofanov, *Luna Law: The Libertarian Vision in Heinlein's The Moon Is a Harsh Mistress*, 63 TENN. L.REV. 71, 98 (1995) ("It is easier to vilify 'big, evil corporations,' than widows and orphans who might be the actual corporate owners."); Dan Hunter, *Culture War*, 83 TEX. L.REV. 1105, 1116 (2005) ("American pharmaceutical manufacturers were widely vilified-they were even caricatured on The West Wing-because they refused to provide drug therapies for HIV/AIDS in Africa for anything less than their patent-monopoly controlled price.").

The court recognizes that examples can be found indicating that vilification is commonplace.FN120 Nonetheless, the overwhelming majority of references to vilification are directed at much more serious topics, such as violations of human dignity. Moreover, as one law review notes, "the United States allows all forms of rudeness ... ensuring that few opinions are suppressed in the marketplace of ideas."FN121

FN120. *See, e.g.*, Robert F. Nagel, *Privacy and Celebrity: An Essay on the Nationalization of Intimacy*, 33 U. RICH. L.REV.. 1121, 1124-25 (2000) ( "Profanity, fighting words, group vilification, and other forms of speech that were once suppressed are now as routine as bumper stickers.").

FN121. *See, e.g.*, Winfried Brugger, *Ban On or Protection of Hate Speech? Some Observations Based on German and American Law*, 17 TUL. EUR. & CIV. L.F. . 1, 10-11 (2002) (in a discussion about vilific-

ation, comparing "the drawing of the state prime minister of Bavaria as a copulating pig" in a German case with the famous *Hustler* case involving the Reverend Jerry Falwell purportedly having sex with his mother in an outhouse").

[6] Another point about vilification is that it appears to be based, at least in *28 part, on the target of the words, akin to the victim of defamation. Obviously racial epithets vilify people only of the targeted race. Similarly, masculine slurs vilify men and feminine slurs vilify women. Here, the company claiming vilification is a tobacco company. Lorillard is a member of an industry that has been under attack since the 1960s, when the first warnings from the Surgeon General were published.FN122 In order to conform to federal law, Lorillard has for years printed warnings about the adverse health effects of smoking on its own cigarette packaging. Effectively, Lorillard has for years been running an ad campaign on cigarette packaging that disparages, at least implicitly, smoking, the tobacco industry, and Lorillard.

FN122. ht-tp://www.cdc.gov/tobacco/sgr/sgr_2000/fa ctsheets/ factsheet_ labels.htm ("The Federal Cigarette Labeling and Advertising Act of 1965 (Public Law 89-92) required that the warning 'Caution: Cigarette Smoking May Be Hazardous to Your Health' be placed in small print on one of the side panels of each cigarette package. The act prohibited additional labeling requirements at the federal, state, or local levels.").

[7] The court notes that the truthfulness of the ads, while not a complete defense to Lorillard's claims, is pertinent to the issues here. ALF has maintained from the beginning of this litigation that all of the facts in the ads are true. And, in a procedural maneuver, Lorillard has decided not to contest ALF's position for purposes of this motion. Lorillard's position that the truthfulness of the ad does

not factor into the court's decision is incorrect. For example, if someone were to call someone else a thief, the court should look at the record evidence of whether the person had been arrested or convicted of being a thief before determining whether the accusation might be vilifying.

Lorillard's status as a tobacco company does not preclude it from being vilified, but any alleged violation of the anti-vilification clause of the MSA should be analyzed in context. For example, if ALF's ad campaigns contained only the federally-mandated warning that cigarette smoking is dangerous to your health, would Lorillard seriously claim that the ads violate the anti-vilification clause of the MSA? How would Lorillard argue that such an ad campaign lessened its standing in society when millions of people see that warning label everyday? More to the point, how could ALF carry out its mission of educating the public about the "health effects[] and social costs related to the use of tobacco products"[FN123] without mentioning the increased risk of disease and death due to tobacco use? Clearly, the public is aware, in general, of the dangers of smoking.[FN124]

FN123. MSA § VI(h).

FN124. "CDC: Smoking deaths cost $92 billion,"*at* http://www.cnn.com/2005/HEALTH/conditions/06/30/smoking.deaths.ap/index.html (last visited July 14, 2005).

Although it refuses to admit as much, ALF's actions indicate that it agrees that Lorillard can be vilified. For example, ALF's retention of Wilmer Cutler to review its ads for compliance with the MSA demonstrates an understanding, at least implicitly, that ads can cross the line and violate Section VI(h). A good example of such an ad is the *Demon Awards* from the Florida truth campaign. In *Demon Awards,* tobacco products are equated with suicide, murder, and illegal drugs. This ad is an extreme example of getting an anti-tobacco message across to the viewer and would be a violation of the MSA if

ALF had produced it. Indeed, ALF acknowledges that *Demon Awards*\*29 was the single reason why the tobacco companies negotiated Section VI(h)'s anti-vilification clause.

That being said, the court notes one final item about the tone of the ads. The parties take wildly divergent positions as to whether tone should be part of this court's analysis. ALF maintains that tone is a critical part of the analysis, citing the key adjective modifiers in its definitions, such as *abusive* language, *vicious* statements, *hostile* comments, and *bitter* words.[FN125] Without the modifying adjectives, ALF contends, the nouns themselves cannot be vilification. Thus, ALF argues against an analysis of the words themselves devoid of the surrounding context. ALF's position appears to carve out a safe harbor for all ads that are humorous, light-hearted, or comical.

FN125. Pl.'s Reply Br. at 2-3.

At the other end of the spectrum, Lorillard takes the position that tone does not matter, only the words do.[FN126] Lorillard contends that "the definitions of vilification go to the content of the communications, not its manner of delivery." FN127 Furthermore, Lorillard points out that there is nothing in the MSA that discusses tone.

FN126. Def.'s Answering Br. at 6-7 ("There is nothing whatsoever in the language of Section VI(h) to support the notion that the manner in which a message is communicated-as opposed to the content of the message itself-determines whether an act constitutes a personal attack or vilification.").

FN127. *Id.* at 8.

[8] The court finds that the proper analysis of whether an ad violates Section VI(h) must incorporate some consideration of tone. As ALF points out, a joke is completely different than a serious accusation. But Lorillard also makes a valid point that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ALF has conveniently found humor, irreverence, or satire in every one of its ads. There must be some middle ground for a proper understanding of the ads. Here, both parties have taken polar opposite positions. Neither is correct.

Therefore, in its analysis of the ads, the court will take into account tone. However, tone will not necessarily provide an ad with a safe harbor. For example, *Demon Awards* is a parody of an awards show and a parody does have an element of humor. But the element of humor can be lost in the socially offensive comparison to murder and suicide. If, on the other hand, an ad is substantially humorous, but does mention that tobacco kills 1,200 people per day, that ad is most likely not a violation of the anti-vilification clause.

*4. Did ALF Violate The Anti-Vilification Clause Of The MSA?*

The court now reviews each of the 20 ads to determine if any of them contravene the anti-vilification clause of the MSA.[FN128]

> FN128. In its briefing, Lorillard concentrates its efforts on five ads: *Shredder, Hypnosis, Product Recall, Dog Walker,* and *SCUM.*For these ads, Lorillard provides detailed analysis.

*a. Shredder*

[9] The youths in *Shredder* refer to tobacco industry reports targeting potential teenager consumers, calling the reports "embarrassing." Lorillard contends that the discussion of the reports focuses on the employees' behavior and not on tobacco products. Lorillard claims that *Shredder* has "the tendency to disparage and lessen the standing ... of tobacco companies generally."[FN129] While *Shredder* may be critical of tobacco companies and their employees, it does not rise to the level of vilification. Nothing in the ad lessens the standing of the tobacco companies**30** any more than the existence of the reports themselves. Simply making the

public aware of the reports and expressing a characterization or opinion does not constitute a violation of the MSA.

> FN129. Def.'s Opening Br. at 68.

Additionally, the criticism implied by the youths' statements is offset by the humor involved in shredding various ridiculously oversized objects, like a briefcase and a file cabinet. Indeed, the "shredder" in the ad is clearly a wood chipper and not a shredder. These facts all point to the inescapable conclusion that *Shredder* is a humorous ad accentuated by the absurdity of shredding unshreddable objects.

*b. Hypnosis*

[10] In *Hypnosis,* youths drive a truck around late at night, apparently attempting to hypnotize tobacco company executives by playing recordings such as "I am a good person." Lorillard argues that *Hypnosis* sends the message that "tobacco executives are greedy and are bad people."[FN130] They argue that *Hypnosis*"crosses well into the realm of negative depiction, negative criticism, and disparagement of tobacco company employees."[FN131] Even though *Hypnosis* may be negative and may be critical, it is not vilifying. Calling someone greedy is not equivalent to calling someone a racist or a sexual abuser of children or a rapist. The negative implication that the sleeping executives are bad people is too far removed from a direct, confrontational attack to be considered vilification.

> FN130. *Id.* at 70.
>
> FN131. *Id.*

The message in *Hypnosis* is also toned down by the use of humor. For example, the youths go through a drive-thru window of a fast food restaurant and, instead of ordering food, they asked whether tobacco executives live in the area. Clearly, if the youths were intent on actually hypnotizing tobacco company executives, they would have researched

A145

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

Page 32

where they live and driven straight there. Asking a fast food worker where tobacco company executives live is merely a comical diversion intended to grab a television viewer's attention.

Thus, *Hypnosis* does not violate the anti-vilification clause of the MSA.

### c. *Product Recall*

[11] In *Product Recall,* an actor purporting to be a tobacco company executive claims to be recalling all cigarettes and states that all cigarettes will stay off the market until the industry can, with a clear conscience, offer a safe product. At the end of the ad, a voiceover says "April fools." Lorillard claims *Product Recall* "mocks and ridicules tobacco company employees and negatively depicts them as callous, uncaring, and without a conscience." As with the other ads, *Product Recall* may be negative and may be critical, but it is not vilifying. Tobacco is certainly not a safe product; indeed, Lorillard does not contradict the claim that the use of tobacco kills 1,200 people each day. The ad's implication that the tobacco industry and, by extension, tobacco company executives, do not have a clear conscience about the safety of tobacco products is, at most, a mild rebuke-not vilification.

Moreover, *Product Recall* does interject humor into its message. Most obvious is the use of the tag line "April fools" which has historically been an indication of a joke being played on someone. Here, the tag line may be viewed as sarcastic, but, even so, the ad does not present a straightforward indictment of the tobacco industry or a particular tobacco company executive. Indeed, Lorillard offers no proof that the *31 actor actually did resemble a particular tobacco company executive.

Therefore, *Product Recall* does not violate the anti-vilification clause of the MSA.

### d. *Dog Walker*

[12] In *Dog Walker,* a telephone caller asks a tobacco employee if the company is interested in buying dog urine to add to its supply of urea for the manufacture of cigarettes. Lorillard contends that *Dog Walker* "ridicules Lorillard's employees and casts them in a negative light." [FN132] Lorillard's entire argument about this ad is focused on the use of the term "dog urine." Lorillard concedes that another ALF advertisement which states that cigarettes contain urea is not vilifying. What Lorillard does take issue with in *Dog Walker* is the implication that cigarettes contain dog urine. This is a minor point, especially because the ad does not expressly state that cigarettes contain dog urine. The caller merely gives the impression that a tobacco company could extract urea from dog urine and put it into cigarettes. Apparently, urea is common to both dog urine and cigarettes. The fact that the ad illustrates this point does not make the ad vilifying.

FN132. Def.'s Opening Br. at 73.

In addition, the tone of the ad is irreverent, especially when the caller offers Lorillard different breeds of urine. Just the fact that the caller offers high-test Rottweiler pee shows the comical side of the ad. If urea is present in dog urine, why would it matter if the urine were high-test or from a specific breed? The caller's offer is clearly meant as a joke that could not be taken seriously by any reasonable listener.

Thus, *Dog Walker* does not violate the anti-vilification clause of the MSA.

### e. *SCUM*

[13] In *SCUM,* an actor states that a tobacco marketing plan targeting homosexuals and homeless people was known by the acronym "SCUM." Lorillard contends that *SCUM's* intended message was that "tobacco companies and their employees are callous, uncaring people who hold their customers or potential customers in contempt." [FN133] While *SCUM* does deal with at least one issue fre-

A146

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

quently mentioned in vilification cases, homosexuality, the ad does not vilify Lorillard. *SCUM* is easily distinguished from the facts of other cases in which demeaning talk about homosexuality is considered vilification. Here, ALF does not contend that any tobacco company employees are homosexuals or that they should act more "manly." *SCUM* only portrays the tobacco industry's view of potential consumers with a specific sexual orientation. *SCUM* does not state that tobacco company employees have a specific sexual orientation or should have a specific sexual orientation. The ad only illustrates a marketing plan by tobacco companies. Thus, *SCUM* does not violate the anti-vilification clause of the MSA.

> FN133. *Id.* at 74.

f. *The Remaining Ads* [FN134]

> FN134. Lorillard does not brief the vilification aspect of the remaining ads, choosing instead to rely on the five detailed ads above.

[14] After a review of the remaining 15 ads at issue, the court finds that none of them violate the anti-vilification clause of the MSA. Each of them portrays tobacco and the tobacco industry in a negative light, but those portrayals, without more, do not rise to the level of vilification. For example, in *Body Bag Memorial,* youths create a memorial in Washington, D.C. out *32 of body bags, each of which represents a person who dies every day from tobacco products. The implication is that smoking kills. The same implication is clear in *Choice,* a serious ad in which a smoker with a terminal illness states that she is going to die.

ALF's ad campaign consists of a group of cohesive messages: tobacco companies target young consumers to begin smoking, tobacco companies manipulate the chemical composition of cigarettes to increase the addictiveness of the nicotine, and smoking kills. None of these messages violate the anti-vilification clause of the MSA. The messages are based on well known public facts. Anyone can view the Centers for Disease Control and Prevention's website, which states that "[t]obacco use is the leading preventable cause of death in the United States" [FN135] and that "[m]ore deaths are caused each year by tobacco use than by all deaths from human immunodeficiency virus (HIV), illegal drug use, alcohol use, motor vehicle injuries, suicides, and murders combined." [FN136] And people have known for years that cigarette companies marketed to children, [FN137] especially through cartoons [FN138] and candy-flavored cigarette look-a-likes. [FN139]

> FN135. http://www.cdc.gov/tobacco/factsheets/Tobacco_ Related_ Mortality_ factsheet.htm

> FN136. *Id.*

> FN137. http://releases. usnewswire.com/ printing.asp?id =41016 ("After two years of denying responsibility for its actions, RJ Reynolds Tobacco Company has finally agreed to settle a lawsuit filed against the company by the state of California. Originally convicted in 2002 of violating the 1998 Tobacco Settlement by marketing to kids in California, RJR has now agreed to limit its tobacco advertising in magazines with large youth readership and avoid publications with at least 15 percent teen readership.").

> FN138. http://www.usatoday.com/news/smoke /smoke50.htm (reporting in 1997 that "R.J. Reynolds Tobacco Co. has agreed to pay California communities $10 million to settle a lawsuit accusing it of targeting children with Joe Camel."). Obviously, the tobacco companies conceded this point when they signed the MSA. *See also* MSA § III(b) at 19 ("No [tobacco company] may use or cause to be used any Cartoon in any advertising, promoting, packaging, or labeling of To-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bacco Products.").

FN139.   http://www.mass.   gov/
dph/media/20          04/pr0520.htm
("Massachusetts Department of Public
Health Commissioner Christy Ferguson
today called on the major tobacco manu-
facturers to put a stop to marketing and
sale of candy flavored cigarettes in the
Commonwealth because the cigarettes may
make it easier for teenagers to take up
smoking.").

[15] Even the ads that involve tobacco industry
employees do not constitute vilification. None of
the ads subject the employees to the type of con-
temptuous language contained in other case law
discussing vilification. There are no scurrilous and
vitriolic attacks. There is no cruel slander. There is
no social ostracism. There is no public ridicule, tra-
duction, or calumny. Although the employees may
be described, either explicitly or implicitly, as liars,
greedy executives, or authors of embarrassing doc-
uments, the ads do not vilify them.

Furthermore, many of ALF's ads do not have a
serious tone. The ads frequently employ humor to
grab viewer attention. Some examples of the silli-
ness or absurdity contained in the ads are water ice
flavored with ammonia, a night club in which a wo-
man is making a sexual overture to a body bag, and
a game show in which young people are challenged
by the spelling of ammonia. These ads clearly use
preposterous situations as an attention-getting
mechanism to contrast historical misrepresentations
from the tobacco industry with current knowledge
about the dangers of tobacco products.

**\*33** Therefore, the court finds that none of the
ads violate the anti-vilification clause of the MSA.

## C. Legal Definitions Of Personal Attack [FN140]

FN140. Courts use the phrase "personal at-
tack" in three distinct legal contexts. First,
courts use "personal attack" to refer to

physical violence. *See, e.g., Lowell v.
Commissioner,* 26 T.C.M. (CCH) 366
(1967) ("Petitioner's testimony indicates
that most or all of these claimed expenses
were made necessary by an unwarranted
personal attack on him in April 1964 when
at four o'clock on a Saturday afternoon pe-
titioner was lying on a couch in his home
and a man by the name of Chester Napi-
erkowski walked in and hit him in the
eye."). Second, courts use "personal at-
tack" to refer to courtroom behavior. *See,
e.g., In re Hillis,* 858 A.2d 317, 323
(Del.2004) ("Professional civility is con-
duct that shows respect not only for the
courts and colleagues, but also for all
people encountered in practice. Respect re-
quires promptness in meeting appoint-
ments, consideration of the schedules and
commitments of others, adherence to com-
mitments whether made orally or in writ-
ing, promptness in returning telephone
calls and responding to communications,
and avoidance of verbal intemperance and
personal attacks.") (quoting PRINCIPLES
OF    PROFESSIONALISM    FOR
DELAWARE LAWYERS No. 4); *In re
Shearin,* 765 A.2d 930, 938 (Del.2000)
(stating that "members of the Delaware
Bar are subject to disciplinary sanctions
for speech consisting of intemperate and
reckless personal attacks on the integrity of
judicial officers."); *Mayberry,* 400 U.S. at
457, 458, 460, 91 S.Ct. 499 (describing as
personal attacks statements such as calling
the judge a "tyrannical dog," stating that
the judge needed "some kind of psychiatric
treatment," and telling the judge to keep
his mouth shut). Both of the first two con-
texts are inapplicable to the facts of this
case. Obviously this case is not about
physical violence. This case is also not
about courtroom behavior. As the
Delaware Supreme Court and the United
States Supreme Court have made clear, ci-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

vility in the courtroom is a matter of special interest in the law. Therefore, this court will confine its analysis of personal attack to the third legal context, in which courts discuss communications that occur outside of the courtroom.

1. *Case Law*

There are many fewer relevant instances of "personal attack" than "vilification" in the case law. For example, in Delaware, there appears to be only one case with a factual situation that could shed light on the meaning of "personal attack" in the context of the MSA. In *Skouras v. Admiralty Enterprises, Inc.,* the Delaware Supreme Court labeled as a personal attack letters from the plaintiff to various governmental and business entities that threatened charges of wrongdoing by the defendant's directors and officers.[FN141] The letters appear to be sent in connection with allegations of fraud, tax evasion, and corporate mismanagement.[FN142]

FN141. 386 A.2d 674, 679 (Del.Ch.1978).

FN142. *Id.* at 679.

The United States Supreme Court has a similar lack of "personal attack" case law that would be relevant to this case. In one relevant case, however, the Court found that "[the high school principal] could reasonably have concluded that the students who had written and edited these articles had not sufficiently mastered those portions of the Journalism II curriculum that pertained to the treatment of controversial issues and personal attacks, the need to protect the privacy of individuals whose most intimate concerns are to be revealed in the newspaper, and 'the legal, moral, and ethical restrictions imposed upon journalists within [a] school community' that includes adolescent subjects and readers."[FN143]

FN143. *Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260, 276, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988).

[16] The *Hazelwood* case also highlights another important issue here. Not *34 only should this court be concerned with what constitutes "attack," it should also be concerned with what constitutes "personal." In *Hazelwood,* the court linked the concept of personal attack to the concept of individual privacy. The idea that the analysis of what constitutes a personal attack depends on context is explored more fully in *Monitor Patriot Co. v. Roy,* where the Court made clear that if an individual exposes his private life to the public, he loses the ability to call his private life a purely private concern.[FN144]

FN144. 401 U.S. 265, 273-74, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971).

In addition, the United States Supreme Court has used the phrase "personal attack" in a line of cases concerning the Federal Communications Commission ("FCC"). The FCC cases are based on the FCC's personal attack rule, pursuant to which broadcasters must "notify victims of on-air personal attacks and [] provide victims with opportunity to respond over the air."[FN145] Lorillard does, however, note that this rule has since been repealed.[FN146]

FN145. *Turner Broad. Sys. v. FCC,* 512 U.S. 622, 650 n. 7, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (citing 47 C.F.R. § 73.1920 (1993)). *See also Buckley v. Valeo,* 424 U.S. 1, 49, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("In *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the Court upheld the political-editorial and personal-attack portions of the Federal Communications Commission's fairness doctrine."); *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 114, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) ("The 'personal attack' rule provides that 'when, during the presentation of views on a controversial issue of public importance, an attack is made upon the honesty, character,

A149

integrity or like personal qualities of an identified person,' the licensee must notify the person attacked and give him an opportunity to respond.").

FN146. Def.'s Opening Br. at 61.

Turning to the federal case law, the court finds that there are many more cases concerning the phrase "personal attack." FN147 The majority of these cases concern statements that are much stronger than criticism. In one case, for example, *35 instead of criticizing the politics of a group of individuals, a person called them "political flunkies." In another example, members at a union meeting were compared to cancer. A more recent example in the corporate context is a case in which directors were called scoundrels and their executive compensation plan was referred to as a bribe. As these cases show, the federal courts do not equate personal attack with criticism. Instead, the federal courts use the phrase "personal attack" when categorizing statements that include comparing people to terminal illnesses or alleging that they are criminals.

FN147. *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.,* 278 F.3d 693, 695-96 (7th Cir.2002) (describing as personal attacks the accusations that "School Board members [were] 'living high on the hog' and [that] School Board members [were] spending taxpayer money on business trips."); *Kopp v. Samaritan Health Sys.,* 13 F.3d 264, 268 (8th Cir.1993) (listing the incredibly derogatory remarks about female co-workers, called "personal attacks," including comments about their weight and specific references to female anatomy); *Smith v. Cleburne County Hospital,* 870 F.2d 1375, 1382 (8th Cir.1989) (labeling as caustic personal attacks statements that individuals were "political flunkies who ... held contempt toward concerned citizens"); *Hesse v. Bd. of Educ.,* 848 F.2d 748, 750 (7th Cir.1988)

(describing memoranda written to school officials that were "often sarcastic, unprofessional and insulting in nature" as personal attacks); *Falwell v. Flynt,* 805 F.2d 484, 484 (4th Cir.1986) (Wilkinson, J., Phillips, J., Sprouse, J., Ervin, J., Winter, J., dissenting), *rev'd sub nom, Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (describing as a personal attack the famous ad parody by *Hustler* magazine that implies an incestuous rendezvous between the Reverend Jerry Falwell and his mother in an outhouse); *Weinman v. Local 40 of Int'l Asso. of Bridge, Structural etc.,* 1974 WL 1123, at *6, 1974 U.S. Dist. LEXIS 7553, at *16 (S.D.N.Y.1974) (describing as a personal attack comments at a union meeting that likened the plaintiffs to cancer that should be cut out); *United States v. Barlow,* 56 F.Supp. 795, 797 (D.Utah 1944) (calling these descriptions personal attacks: "a mental and physical bastard, a black hearted coward, a liar, perjurer, and slanderer, who would sell a mother's honor with less hesitancy and for much less silver than Judas betrayed the Saviour.") (citing *Swearingen v. United States,* 161 U.S. 446, 446, 16 S.Ct. 562, 40 L.Ed. 765 (1896)); *In re First City Bancorporation,* 282 F.3d 864, 866 (5th Cir.2002) (calling directors scoundrels and labeling an executive compensation plan a bribe).

Few federal cases have addressed the "personal" aspect of personal attack. Perhaps the most relevant case is *Evans,* in which the court explored in detail the difference between personal and nonpersonal attack. The *Evans* court analyzed the difference as follows:

After careful consideration and analysis of the problem, this court holds that people who, by assuming their leadership role, may be classified as organization figures, have decreased their right to privacy and freedom from defamation. These rights,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1                                                                                    Page 37
886 A.2d 1
**(Cite as: 886 A.2d 1)**

however, have been decreased only with respect to the other members of or people who have a direct, substantial, and significant interest in the same organization. Following *New York Times* and *Butts,* the Constitutional limitation of the protection afforded by the laws of defamation extends only to comments, criticism, and dissent with respect to this particular individual's capacity and function within the organization. Only criticism of an individual in his official capacity will be privileged. Personal attacks will not be tolerated by the courts. Thus, comments and criticism of an organization's top leaders, by members of the same organization or by outside individuals whose relationship to the organization is direct, substantial, and significant, to other members of the same organization or people having a direct, substantial, and significant interest in this organization which concern actions, decisions, policy and other related matters taken, done, or acted upon by these people in their official capacity will be protected and privileged.[FN148]

> FN148. *Evans v. Lawson,* 351 F.Supp. 279, 286 (D.Va.1972).

Turning to state case law, the court finds that there are few cases in which the courts use the phrase "personal attack" to refer to statements.[FN149] In these cases, the statements are, like in the federal cases, much stronger than criticism. For example, alleging that a person is trying to disown his child. Another example is challenging the character or fitness of a police officer as a man.

> FN149. *Ptaszek v. Michalik,* 238 Ill.App.3d 72, 179 Ill.Dec. 283, 606 N.E.2d 115, 122 (1992) (Jiganti, J., dissenting) (characterizing as a personal attack labeling the plaintiff "as a person who is trying to disown his child"); *Sparks v. Boone,* 560 S.W.2d 236, 239 (Ky.Ct.App.1977) (describing as a personal attack challenging a police officer's "fitness and character as a man").

State courts also address the "personal" aspect of personal attack.[FN150] In fact, the **\*36** state courts have more fully developed case law with regard to the difference between public and private concerns. Most of the case law is found in discussions about libel and slander, quoting extensively from a treatise on the subject.[FN151] The operative phrase in most of these cases is "personal attack on private character."

> FN150. *Miami Herald Publ'g Co. v. Brautigam,* 127 So.2d 718, 722 (Fla.Dist.Ct.App.1961) (describing personal attacks as "on private character") (citing NEWELL ON SLANDER AND LIBEL 516 (4th ed.)); *Hills v. Press Co.,* 122 Misc. 212, 202 N.Y.S. 678, 681 (N.Y.Sup.1924) (describing personal attacks as "upon private character"); *Woodell v. Ormet Primary Aluminum,* 156 Ohio App.3d 602, 808 N.E.2d 402, 410 (2004) (describing as "scandalous and offensive personal attacks" graffiti that makes outrageous, sexually-explicit comments about individuals); *Sherman v. Int'l Publ'ns, Inc.,* 214 A.D. 437, 445, 212 N.Y.S. 478 (1925) (describing personal attacks as "on private character") (citing NEWELL ON SLANDER AND LIBEL 516 (4th ed.)); *Hall v. Binghamton Press Co.,* 29 N.Y.S.2d 760, 768 (N.Y.Sup.1941), *rev'd,*263 A.D. 403, 33 N.Y.S.2d 840 (N.Y.App.Div.1942), *aff'd,*296 N.Y. 714, 70 N.E.2d 537 (N.Y.1946) (describing personal attacks as "on the private character"); *Wood v. Boyle,* 177 Pa. 620, 35 A. 853, 853 (1896) (describing a publication as a "personal attack upon the plaintiff in his private, individual and personal capacity"); *Black v. State Co.,* 93 S.C. 467, 77 S.E. 51, 57 (1913) (describing personal attacks as "on private character").

> FN151. The oft-quoted treatise is

A151

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

NEWELL ON SLANDER AND LIBEL (4th ed.).

## 2. *Law Reviews*

Turning to law reviews, the court finds that articles which use the term "personal attack" are consistent with the case law listed above.[FN152]

> FN152. Erica Hepp, Note, *Barking Up The Wrong Channel: An Analysis of Communication Law Problems Through The Lens Of Media Concentration Rules,* 85 B.U.L.REV. 553, 573 (2005) (labeling as a personal attack the statement that FCC Chairman Michael Powell would have made a "great minister of information" for Saddam Hussein); Captain John A. Carr, USAF, *Free Speech in the Military Community: Striking a Balance Between Personal Rights and Military Necessity,* 45 A.F.L.REV. 303, 336-37 (1998) (describing as a personal attack an Air Force Major's comments that "President Clinton [is] a 'dope-smoking,' 'skirt-chasing,' 'draft-dodging' Commander-in-Chief"); Henry T. King, Jr., *Robert Jackson's Transcendent Influence Over Today's World Name,* 68 ALB. L.REV.. 23, 28 (2004) (characterizing as a personal attack on the Nüremburg prosecutor the description of the Nüremburg Trials a high-grade lynching party).

## 3. *Dictionaries*

As with vilification, both parties rely heavily on dictionary definitions in their briefing on the meaning of "personal attack." They both argue that "personal attack" is not a legal term of art and has not been defined in any relevant case law.[FN153] Thus, the parties request that the court confine its analysis to the "usual and ordinary meaning" (i.e. dictionary definition) of "personal attack" in order to interpret the MSA properly.[FN154] Although the parties may agree that an analysis of leading dic-

tionaries provides the proper method of interpretation, they do not agree on the actual meaning of "personal attack."

> FN153. Pl.'s Supplemental Brief at 1 n. 1 ("Neither party in this case has ever suggested that the pertinent terms are legal terms of art or have a settled legal definition."); Def.'s Answering Br. at 1 ("Neither party contends that personal attack or vilification are terms of art or are somehow used in the MSA in sense other than their usual and ordinary ones.").

> FN154. *See* note 109.

ALF claims that dictionaries describe personal attacks as "hostile in tone or manner"[FN155] and "take their reason from private or intimate matters unrelated to the targeted individual's public role."[FN156] ALF turns first to the definition of "attack" before addressing the definition of "personal."

> FN155. Pl.'s Opening Br. at 45.

> FN156. *Id.* at 45. ALF describes personal attack as "a bitter, fierce, or hostile statement relating to private or intimate aspects of an individual's life." Pl.'s Supplemental Br. at 1.

For "attack," ALF begins with definitions from the *American Heritage Dictionary,* which defines "attack" as "1. The act or an instance of attacking; an assault. 2. An expression of strong criticism; hostile **\*37** comment."[FN157] ALF also quotes the *Oxford English Dictionary,* which defines "attack" as "3. An assault with hostile or bitter words, or action intended to overthrow, injure, or defame."[FN158] In addition, ALF quotes the *Random House Dictionary,* which defines "attack" as "the act of attacking; onslaught; assault" or "3. to blame or abuse violently or bitterly. 4. to direct unfavorable criticism against; criticize severely; argue with strongly, 5. to try to destroy, esp. with verbal abuse."[FN159] Nowhere does ALF explain why it of-

A152

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fers only some of the definitions under "attack," instead of all.

> FN157. *Id.* at 45 (quoting AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 115 (4th ed.2000)).

> FN158. *Id.* at 45 (quoting OXFORD ENGLISH DICTIONARY 760 (2d ed.1989)).

> FN159. *Id.* at 45 (quoting RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 133 (2d ed.1987)).

ALF then moves on to define "personal" using the same dictionaries. The *American Heritage Dictionary* defines "personal" as "2b. Done to ... a particular person" and "3. Concerning a particular person and his or her private business, interests, or activities; intimate. 4a. Aimed pointedly at the most intimate aspects of a person, especially in a critical or hostile manner; an uncalled-for, highly personal remark." [FN160] The *Oxford English Dictionary* defines "personal" as "[h]aving an individual person as object; relating to a person in his individual capacity; directed to, aimed at, or referring to some particular person or to oneself personally, spec. in a disparaging or offensive sense or manner." [FN161]

> FN160. *Id.* at 47 (quoting AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1311 (4th ed.2000)).

> FN161. *Id.* at 46-47 (quoting OXFORD ENGLISH DICTIONARY 599 (2d ed.1989)).

ALF stitches all of these definitions together to make one complete definition of "personal attack." Under its definition, "in the context of the MSA, a 'personal' attack could conceivably be a hostile or aggressive verbal act directed to some particular individual as opposed to another target or one that aims at purely private issues, as opposed to public ones." [FN162]

> FN162. *Id.* at 47.

To support its definition of "personal attack," Lorillard cites to the same dictionaries that it did for "vilification," one of which is the same one cited by ALF. Lorillard, like ALF, splits its analysis into two parts, one for "attack" and one for "personal."

Lorillard quotes from the *American Heritage Dictionary* to define "attack" as "[a]n expression of strong criticism; hostile comment; vicious attacks in all the newspapers." [FN163] Although Lorillard quotes an older version of the *American Heritage Dictionary,* it uses the *exact same language* relied on by ALF for its definition of "attack," at least partially. [FN164] In addition to the *American Heritage Dictionary,* Lorillard cites the following three dictionaries:

> FN163. Def.'s Opening Br. at 60 (quoting AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (3d ed.1992)).

> FN164. Both parties cite to the second definition of "attack" (i.e. an "expression of strong criticism; hostile comment"), but they do not cite the remaining sections of the definition in the same manner.

• *Webster's Third New International Dictionary of the English Language* (Unabridged) (3d ed.1993) (defining "attack" as "[a]n assault with unfriendly or bitter words.")
**\*38** • *Webster's Ninth New Collegiate Dictionary* (1987) (defining "attack" as "[a] belligerent or antagonistic action.").
• *The New Oxford American Dictionary* (2001) (defining "attack" as "[c]riticize or oppose fiercely and publicly.").

Lorillard relies on just one dictionary for its definition of "personal." It argues that *The New Oxford American Dictionary* defines "personal" as "of or relating to a particular person; private." [FN165]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

Lorillard further argues, without either legal or dictionary support, that the word "personal" is expressly expanded by Section VI(h) of the MSA "to include attacks against entities and collective attacks." FN166

> FN165. *Id.* at 60 (quoting THE NEW OXFORD AMERICAN DICTIONARY 1351 (2001) ) )).

> FN166. *Id.* at 60.

The combined result of Lorillard's dictionary analyses is that "a 'personal attack' under the MSA captures accusations that someone (or some group of persons or some entity) is greedy, immoral, callous, uncaring, unsympathetic, cold, untrustworthy, and so on." FN167 Lorillard goes on to argue that its interpretation of "personal attack" is consistent with the FCC's meaning under the fairness doctrine. "Under the FCC's rules, [now repealed,] a 'personal attack' was defined as 'an attack made upon the honesty, character, integrity or like personal qualities of an identified person or group.' " FN168

> FN167. *Id.* at 61.

> FN168. Def.'s Opening Br. at 61.

*4. What Is The Meaning Of "Personal Attack"?*

A comprehensive review of case law, law reviews, and dictionaries demonstrates that there is no blackletter law definition of "personal attack." What is clear is that there is a range of meanings for "personal attack," both in the legal and nonlegal contexts.

[17] The court starts with interpreting the phrase "personal attack" in Delaware case law. Delaware courts, while not defining "personal attack," have used the term in at least one discussion applicable here that concerned fraud, tax evasion, and corporate mismanagement. Clearly, the term goes beyond simple criticism.

A review of federal and state case law supports

this court's interpretation of "personal attack." The vast majority of federal and state cases that discuss "personal attack" include modifiers or complete discussions that increase the intensity of a personal attack well beyond any simple criticism. For example, telling a judge that he needs psychiatric treatment or calling someone a crook go far beyond criticism. Additionally, these statements are not related to the job or official duties of the target of the speech and are therefore clearly personal.

Law reviews also support the court's interpretation that "personal attack" goes beyond simple criticism. The articles quoted above use "personal attack" in conjunction with invective such as calling the President a "dope-smoking, skirt-chasing, draft-dodging Commander-in-Chief," or linking the FCC Chairman to Saddam Hussein. Not only are these uses much stronger than simple criticism, they plainly go beyond the job or official capacity of the target.

[18] Lorillard could rely on certain cases that term "liar" a personal attack. First, the accusation of lying is personal because it goes to an individual's character. Second, it is an attack because it goes *39 beyond mere criticism. But after reviewing the case law, the court finds that, in the majority of cases that include lying or the accusation of being a liar, the context is much more serious and lying is amplified by other surrounding facts. For example, in *Barlow,* an individual is accused not only of being a liar, but a "willful, malicious and cowardly liar." FN169 The naked accusation that someone is a liar therefore does not appear to rise to the level of personal attack.

> FN169. *Barlow,* 56 F.Supp. at 797 (quoting *Swearingen:* "a black hearted coward, a liar, perjurer, and slanderer, who would sell a mother's honor with less hesitancy and for much less silver than Judas betrayed the Saviour. Time and again has he been proven a willful, malicious and cowardly liar.").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

There are, of course, some less strongly worded definitions of the phrase "personal attack." But those definitions are selectively chosen by Lorillard to make a point. After an extensive review of legal precedent, it is clear that a personal attack is not just criticism.[FN170]

> FN170. *See Pilkington v. Bevilacqua,* 439 F.Supp. 465, 477 (D.R.I.1977), *aff'd,*590 F.2d 386 (1st Cir.1979) ("The plaintiff's statements ... were principled criticisms not personal attacks."); *Donovan v. Wilson Sporting Goods Co.,* 285 F.2d 714, 718 n. 6 (1st Cir.1961) (listing as personal attacks, "irresponsible statements, insidious assertions, and [guileful] allegations").

Just as they did with "vilification," both parties cite heavily to dictionaries, often the same dictionary and the same words to define "attack."[FN171] They both quote the *American Heritage Dictionary* to define "attack" as "an expression of strong criticism; hostile comment." If the court were to rely on dictionary definitions in this case, the court suspects that the litigation would devolve into an argument about the meaning of the words used in the definition itself. If both parties agree that "hostile comment" is an accurate definition of "personal attack" but disagree about its meaning, how can the court look to the dictionary to differentiate the arguments? The answer is that it cannot. Thus, the court will look primarily to case law as the appropriate starting point. Although not clearly defined, "personal attack" appears in a variety of cases that give context to this court's understanding of the meaning of Section VI(h) of the MSA.

> FN171. The court does, however, discount the cases cited by ALF to support its dictionary definitions of personal attack since the cases do not deal with competing dictionary definitions. In *Cisneros v. U.D. Registry, Inc.,* the court cited the *American Heritage Dictionary* in defining the word "personal." 39 Cal.App.4th 548, 46 Cal.Rptr.2d 233, 247 (1995). It relied on

the same definition "personal" that is offered here, "of or pertaining to a particular person, private, and concerning a particular individual and his intimate affairs." *Id.* (quoting the *American Heritage Dictionary* ). But the *Cisneros* court does not appear to have been presented with competing dictionary definitions.

[19] The court also notes that even if an ad were an attack, it must be personal as well in order to violate the MSA. By "personal," the court means that the ad must concern subject matter that is separate from the target's commercial aspect, whether it is the target's business or employment. Additionally, the target of the attack must be a specific individual or specific company.

[20] Although ALF argues that "personal" relates only to individuals, entities can also be subject to personal attack. In *First City,* the court implied that the assertion that one law firm was the stooge of another law firm as a personal attack.[FN172] In *Smith Property,* the court called the allegations that the government was engaging*40 in litigation to deplete the other party's resources a personal attack on the government.[FN173] In *Ultracashmere,* the court found that the vexatious litigation practices of a representative of one company amount to a personal attack on the other company.[FN174] Moreover, the express language of Section VI(h) foresees the possibility of personal attacks on companies.[FN175]

> FN172. *In re First City Bancorporation,* 282 F.3d at 866.

> FN173. *Smith Prop. Holdings, 4411 Conn. L.L.C. v. United States,* 311 F.Supp.2d 69, 76 n. 8 (D.D.C.2004).

> FN174. *Ultracashmere House, Ltd. v. Nordstrom, Inc.,* 123 F.R.D. 435, 437 (D.N.Y.1988).

> FN175. Section VI(h) ("[S]hall not be used

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively.").

Finally, the court addresses the word "collectively" as it is used in Section VI(h). Plainly, the clause "whether individually or collectively" modifies all three of the potential targets of the attack (i.e. person, company, or governmental agency). Thus, the MSA facially proscribes a personal attack on a group of individuals or on a group of companies or on a group of governmental agencies. But this insight does not explain what constitutes a "personal attack" on a group of individuals or, in this case, companies.

While a personal attack generally targets an individual (i.e. a person), there is some case law that expands the concept to encompass entities such as companies. The case law reviewed by the court, however, refers only to personal attacks against particular and identified companies. Thus, for example, naming Lorillard in *Dog Walker* would satisfy this element of specific identification. By contrast, in *Lie Detector,* the reference to Rita, Vice President of Marketing of an unnamed tobacco company is not specific enough to satisfy this element.

[21] Lorillard is unable to cite any case law for the proposition that a personal attack can be made against a group of unnamed companies, even a group that is described collectively by affiliation, such as "Big Tobacco." As used in the MSA in the context of personal attack, "collectively" is most easily and appropriately understood to refer to a group of persons or companies specifically identified by name or other means of identification. Lorillard's argument that the word "collectively" prohibits attacks on "the tobacco industry" or "Big Tobacco" because the affiliation references would make the attacks personal reads restrictive language in the contract too broadly. If the court were to adopt Lorillard's position, the term "personal" would

effectively be written out of Section VI(h) of the MSA. Every ad would fulfill the "personal" prong just by mentioning the word "tobacco." Obviously, this cannot be the proper interpretation of the MSA.

[22][23] The court concludes that the term "personal" in the MSA's "personal attack" consists of two parts. The first part concerns the target's private characteristics, such as, for an individual, amorality. The second part concerns the specific identification of the target. Case law clearly supports the interpretation that the target must be identified. The court finds that such identification must be specific to a particular person or company. Calling the tobacco companies "the tobacco industry" or "Big Tobacco" does not identify the signatories to the MSA in a specific enough manner to be violative of Section VI(h) of the MSA. Lorillard could have, but did not, achieve a broader prohibition in the MSA by referring to "Big Tobacco" or the tobacco industry specifically. It did not, and there is no reason to suppose that the 46 attorneys general would ever have agreed to such language. **\*41**

*5. Did ALF Violate The Personal Attack Clause Of The MSA?*

The court now reviews each of the 20 ads to determine if any of them violated the personal attack prohibition of Section VI(h) of the MSA.FN176The descriptions of Lorillard's arguments may overlap with the analysis of "vilification" because Lorillard addresses its "personal attack" and "vilification" arguments simultaneously.

> FN176. In its briefing, Lorillard concentrates its efforts on five ads: *Shredder, Hypnosis, Product Recall, Dog Walker,* and *SCUM.*For theses ads, Lorillard provides detailed analysis.

*a. Shredder*

[24] The youths in *Shredder* use a megaphone to amplify their message to tobacco company em-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ployees inside a tobacco company building. Lorillard argues that the focus of the ad is on the employees and not on tobacco products, thus constituting a personal attack. While *Shredder* may expose tobacco company employees on camera, their faces are electronically obscured. No viewer would be able to identify any specific employee. Additionally, although the building in the ad is Philip Morris's headquarters, it is not identified as such. Therefore, since no person or company, is specifically identified, *Shredder* does not violate the personal attack clause of the MSA.

b. *Hypnosis*

[25] In *Hypnosis,* youths drive a truck through a neighborhood where tobacco company executives allegedly live, playing hypnotic recordings such as "I am a good person." Lorillard argues that *Hypnosis* enters the personal realm of tobacco company executives. Instead of discussing tobacco products or tobacco companies, Lorillard argues, *Hypnosis* instead focuses on the greed of tobacco company employees and whether tobacco company employees are bad people. The court finds that this ad comes closest to violating the personal attack restriction of Section VI(h). The words in this ad are definitely stronger than simple criticism. And the van is purportedly driving around tobacco company employees' homes, making allegations about their private characteristics.

While *Hypnosis* comes close to violating Section VI(h), the court finds that it does not. Where a tobacco executive lives is not related to his or her job and is purely a personal matter. But *Hypnosis* is not personal under the MSA because it does not specifically attack any one person. Even Lorillard's dictionary definition states that personal means "relating to a particular person." The neighborhood in *Hypnosis* is a generic neighborhood. There is no evidence that any tobacco company employees actually live there.[FN177] Also, there is no specific tobacco employee against whom the ad is targeted. For this reason, *Hypnosis* does not violate the personal attack clause of the MSA.

FN177. In addition, there is snow on the ground, an unusual circumstance where most tobacco companies are located.

c. *Product Recall*

[26] In *Product Recall,* an actor portraying a tobacco executive claims to be recalling all cigarettes. The ad ends with a voiceover that says "April fools." Lorillard claims *Product Recall*"mocks and ridicules tobacco company employees and negatively depicts them as callous, uncaring, and without a conscience."[FN178] As discussed above, unless a particular person or ***42** particular entity is specifically identified, Lorillard cannot fulfill the "personal" prong of personal attack. Here, there is one person in the ad. While Lorillard argues that the actor was cast to "resemble an actual tobacco company CEO," it does not name which one.[FN179] Without a specific identification, Lorillard cannot support its claim of personal attack.

FN178. Def.'s Opening Br. at 71.

FN179. Def.'s Opening Br. at 71.

Moreover, Lorillard's argument disproves its claim. As Lorillard argues, *"Product Recall...* mocks and ridicules tobacco company employees." FN180 Nowhere in the transcript of *Product Recall* is there any reference to employees or any particular employer or group of employees. All references are to the tobacco industry. While the court agrees with Lorillard that a company can be personally attacked, such an attack would necessarily be outside of the company's public role. But the ad is plainly focused on the health risk of cigarettes and does not address any issues that would be considered "personal" for either Lorillard or the industry in general.

FN180. *Id.*

Therefore, *Product Recall* does not violate the personal attack clause of the MSA.

A157

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

d. *Dog Walker*

[27] In *Dog Walker,* a person phones a tobacco company and a tobacco company employee answers the phone "[g]ood afternoon, Lorillard." The caller then asks the employee if the company is interested in buying dog urine to get more urea. Lorillard maintains that *Dog Walker* "ridicules Lorillard's employees and casts them in a negative light." [FN181]

FN181. *Id.* at 73.

If Lorillard had contended that the *Dog Walker* ad was a personal attack because of the mention of Lorillard's name, this court most likely would have agreed. But at the summary judgment hearing, Lorillard eschewed that argument. [FN182] Instead, Lorillard's counsel argued that *Dog Walker* would be a "problem" if it said "Big Tobacco" because "people know who those [companies] are." [FN183] The court is at a loss to explain this reasoning. It is difficult to understand how identifying a group of companies as "Big Tobacco" would somehow be more "personal" than the specific identification of one company, namely Lorillard. Indeed, to the best of this court's knowledge, this entire litigation grew out of the *Dog Walker* ad and its specific reference to Lorillard. [FN184] But counsel conceded the point in the hearing and this court cannot make Lorillard's argument for it. [FN185] Thus, *Dog Walker* does not violate the personal attack clause of the MSA.

FN182. Tr. at 107:
THE COURT: ... Is the problem with the Dog Walker one that it identifies Lorillard?
MR. PHILLIPS: Your Honor, I don't really think so.
* * *
MR. PHILLIPS: ... as far as a violation of the MSA, I think not.

FN183. *Id.*

FN184. *Lorillard I,* 2002 WL 927383, at *2, 2002 Del. Ch. LEXIS 49, at *4 ("In re-

sponse to [the *Dog Walker* ] ad, in July 2001 Lorillard threatened to take legal action against [ALF].").

FN185. Section VI(h) ("[S]hall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively.").

e. *SCUM*

[28] In *SCUM,* an actor describes a tobacco marketing plan that targets homosexuals and homeless people. He states that the plan was known by the acronym "SCUM." Lorillard argues that *SCUM's* **43** intended message was that "tobacco companies and their employees are callous, uncaring people who hold their customers or potential customers in contempt." [FN186] *SCUM* does not meet either the "personal" or "attack" prongs of personal attack. The actor in *SCUM* is only describing a fact, a fact that Lorillard does not deny. Additionally, *SCUM* does not target any particular person or company. Thus, *SCUM* does not violate the personal attack clause of the MSA.

FN186. Def.'s Opening Br. at 74.

f. *The Remaining Ads*

Lorillard does not brief the personal attack aspect of the remaining ads, choosing instead to rely on the five detailed ads above. The court pauses here to address these ads before turning to the issue of ALF's website.

[29] After a review of the remaining 15 ads at issue, the court finds that none of them violate the personal attack clause of the MSA. Each of them portrays tobacco companies and tobacco company employees in a negative light, but none of the ads specifically identify a target of an alleged attack.

ALF's ad campaign carefully does not mention any company or any employee by name nor does it

A158

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

886 A.2d 1

Page 45

refer to any identifiable group such as the CEOs by name or description.[FN187] Thus, their ads are in compliance with Section VI(h) of the MSA.

> FN187. The one exception is the *Dog Walker* ad, as discussed above.

#### 6. ALF's thetruth.com Website

The court next turns to ALF's website, which allows users to send "pissed off" libs.[FN188] Unlike the children's game in which kids innocently insert wrong words, creating ridiculous stories, the pissed off libs of ALF's website appear designed to create negative messages for tobacco company executives. For example, one pissed off lib contained the statement "It's bad enough that you ____ at Lorillard...." The same pissed off lib ended with the statement "May the lord have mercy on your pathetic ____."These emails were then sent to specific executives of tobacco companies.[FN189]

> FN188. "Pissed off" libs is a reference to the game "Mad Libs." *See* Def.'s Opening Br. at 49, Ex. 101 (offering a "customized 'I'm not mad, I'm pissed off' lib letter"). In Mad Libs, children fill in a group of grammatically correct words (plural noun, adjective, verb, etc.). The words are then inserted in a pre-formatted story. The resulting completed story is often humorous and frequently absurd.

> FN189. *See, e.g.,* Def.'s Ex. 111 (listing example emails).

Lorillard argues that the pissed off libs functioned to provide web surfers with an easy and convenient way to send vulgar, profane, and vilifying emails to tobacco company executives. As proof, it cites many emails received by tobacco company employees that contain all manner of expletives and gross anatomy in the blank spaces listed above.FN190 ALF maintained during the summary judgment hearing that it was not responsible for the filled-in content of the emails, arguing that it was

protected by the Communications Decency Act.

> FN190. *See, e.g.,* Def.'s Ex. 111.

[30] The court finds that the emails generated by thetruth.com website constitute "personal attack" as it is used in Section VI(h) of the MSA. They are attacks because they go far beyond simple criticism. One of the example sentences of the boilerplate form provided by ALF states "It's bad enough that you ... knew that smoking cigarettes caused cancer, and **44 kept selling them anyway, but to be deceptive about what you knew and ... try to cover it up is just plain ____." Even without any of the filled-in vulgarities from the numerous examples provided by Lorillard, this sentence is an attack on the recipient of the email. The sentence explicitly refers to covering up cigarettes' link to cancer, as well as making money from selling a product with known harmful effects. This content is not criticism. It is a scathing indictment of a person and a person's employment.

[31] Moreover, the court finds that ALF is also responsible for the entire content of the emails, including any filled-in expletives, scatological references, and criminal insinuations. ALF created the website, designed its format, and provided web surfers with an easy method of ranting at tobacco company executives. All the web surfers had to do was fill in some dirty words and click the send button. The court rejects ALF's claim that it is not responsible for what web surfers entered into the emails. ALF's structure of the website and the email form was highly suggestive and makes it virtually impossible for anyone to fill out the email in a positive manner. Indeed, the evidence shows that web surfers filled in the foulest language possible. Any argument about the Communications Decency Act is irrelevant in this context, in which ALF is contractually bound not to utter certain communications that would violate the MSA.[FN191]

> FN191. At the hearing, ALF argued that this court should look to *Schneider v. Amazon.com, Inc.,* 108 Wash.App. 454, 31

A159

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

P.3d 37, 39 (2001), to find that "[u]nder the Communications Decency Act of 1996(CDA), interactive computer service providers are immune from publisher liability." Even if that case were to apply here, ALF failed to inform the court about Amazon.com's restriction against "profanity, obscenities, or spiteful remarks." *Id.* at 38. Indeed, ALF's website appears to encourage such remarks. For that reason, ALF would be hard pressed to succeed in an argument that its actions related to the pissed off libs would come under "the 'good samaritan' blocking and screening of offensive material" section of the CDA discussed in *Schneider. Id.* at 39.Moreover, ALF argues that CDA immunity extends to breach of contract, but the cases it cites deal with the contract between the provider and the user, not between the provider and a third party, as is the case here. *See Batzel v. Smith,* 333 F.3d 1018, 1030 n. 14 (9th Cir.2003) (discussing the CDA provision that "insulates service providers from claims premised on the taking down of a customer's posting such as breach of contract or unfair business practices."). Here, ALF is bound to the MSA and is contractually prevented from personally attacking Lorillard or tobacco company executives. Thus, the CDA does not apply.

[32] Furthermore, the court finds that the emails were also "personal" in regard to the "personal attack" prohibition of Section VI(h). ALF provided web surfers with a list of specific tobacco company executives to whom to send the emails. Thus, the emails were targeted on a very personal level, unlike the television ads that do not mention executives by name and are broadcast nationwide.

[33] Although the website violates Section VI(h) of the MSA, the court declines to award Lorillard any relief because the violation was de min-

imis. Very soon after the emails were received by its employees, Lorillard put in place technology that effectively blocked further communications from ALF's website. The evidence reflects that Lorillard expended less than $1,000 to block the emails. Additionally, the pissed off libs function of the website has since been removed, so no more emails are being sent. For these reasons, the court will not award damages or injunctive relief connected to ALF's violation of Section VI(h) of the MSA.

D. *Funding ALF's Ad Campaign*

Lorillard also argues that ALF cannot escape the vilification and personal attack **\*45** prohibition by using the Base Fund to fund its ads. ALF, on the other hand, argues that the Base Fund is separate from the NPEF and therefore not subject to the vilification and personal attack clause. ALF maintains that ads paid for by the Base Fund are immune from contractual liability under Section VI(h).

The court need not resolve the issue of funding the ads at this time. As discussed above, none of the contested ads violate Section VI(h), so the issue of what effect the method of funding has on the court's analysis is moot.

Nevertheless, it would appear as if ALF's position might constitute a violation of the implied covenant of good faith and fair dealing that inheres in every contract.[FN192] Although ALF may be technically correct that the prohibitions on the substance of the ads applies only to the NPEF, the MSA clearly reflects an understanding that the NPEF pays for ads and the Base Fund pays for ALF's administrative costs. Thus, ALF's gambit of using payment out of the Base Fund as a defense for Lorillard's claim that certain ads violate Section VI(h) would seem to deprive Lorillard of the bargain reflected in the structure of the MSA.

FN192. *Montgomery Cellular Holding Co. v. Dobler,* 880 A.2d 206, 223 (Del.Supr.2005).

886 A.2d 1
886 A.2d 1
(Cite as: 886 A.2d 1)

E. *The Three Criteria Clause*

While ALF maintains that the three criteria clause remains part of this litigation, Lorillard appears to concede the issue.[FN193] Lorillard does not brief its position on the three criteria clause, most likely because it cannot seriously argue that the ads do not address the "addictiveness, health effects, and social costs related to the use of tobacco products." Nonetheless, the court will analyze the ads to see if they comport with the three criteria clause.

> FN193. Def.'s Opening Br. at 59 ("Within [the second sentence of Section VI(h) of the MSA], the only words that are apparently in dispute are 'personal attack' and 'vilification.' ").

[34] *Shredder* deals with social costs because it talks about enticing today's teenager to be tomorrow's customer. Similarly, *Bodega* and *Peer Pressure* focus on marketing to children, another social cost of tobacco. *Rip It Out* also touches on the social costs of tobacco smoking by referring to the phenomenal rate of growth of a hypothetical tobacco company. *SCUM* is also a social cost commercial because it talks about targeting the "sub-culture" people in society.

*Hypnosis* concerns the health effects of tobacco products because it mentions how many people die from tobacco-related illnesses. The same logic applies to *Body Bags* and *Body Bag Memorial*. Likewise, *Unclear* and *Choice* contain individual messages about smokers and the negative health effects of smoking. *Western* and *Night Club* touch on the health effects of tobacco products by using the imagery of body bags in the ads. *Baby Invasion* concerns the health effects of tobacco products by discussing secondhand smoke. *Product Recall* is also a health effect ad because it discusses various tobacco-related illnesses, such as emphysema and heart disease.

*Lie Detector* and *Congress* refer to the addict-

iveness of nicotine. *Ammonia Soul Train* and *Raspa* indirectly refer to the addictiveness of nicotine by the "impact" of nicotine. *Flavor Gendek* and *Dog Walker* also indirectly address the addictiveness of nicotine by referring to chemicals that are found in cigarettes.

After evaluating each of the contested ads individually, the court holds that none *46 of them violate the three criteria clause of Section VI(h) of the MSA.

### V.

For the foregoing reasons, ALF's motion for summary judgment is GRANTED and Lorillard's motion for summary judgment is DENIED. Counsel are directed to submit a form of Final Judgment, on notice, within 7 days of the date hereof. IT IS SO ORDERED.

Del.Ch.,2005.
American Legacy Foundation v. Lorillard Tobacco Co.
886 A.2d 1

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT I

Westlaw.

903 A.2d 728
903 A.2d 728
(Cite as: 903 A.2d 728)

Page 1

**H**

Lorillard Tobacco Co. v. American Legacy Foundation
Del.Supr.,2006.

Supreme Court of Delaware.
LORILLARD TOBACCO COMPANY, a Delaware
corporation, Defendant Below, Appellant/
Cross-Appellee,
v.
AMERICAN LEGACY FOUNDATION, a
Delaware non-profit corporation, Plaintiff Below,
Appellee/Cross-Appellant.
**No. 579, 2005.**

Submitted: April 26, 2006.
Decided: July 17, 2006.

**Background:** Non-profit foundation funded
with proceeds from Master Settlement Agreement
(MSA) between various states and tobacco compan-
ies sought declaratory judgment to effect that cer-
tain of its advertising conformed to requirements of
MSA, as well as injunctive relief against tobacco
company. Tobacco company counterclaimed, al-
leging violation of MSA. On cross-motions for
summary judgment, the Court of Chancery, New
Castle County, Lamb, Vice Chancellor, entered de-
claratory judgment for foundation. Tobacco com-
pany appealed.

**Holdings:** The Supreme Court, en banc,
Ridgely, J., held that:

(1) abandonment of dictionary definitions of
"personal attack" and "vilification" was harmless
error;

(2) "personal attack" means a verbal assault
conducted in an invidious, disparaging, belligerent,
offensive, and fiercely or severely critical manner;

(3) "vilification" means a denouncement that is
both unfounded and abusive or slanderous;

(4) advertisements were not personal attacks or
vilification of tobacco company or its employees;

(5) refusal to award declaratory relief was not
an abuse of discretion; and

(6) foundation was bound by terms of MSA.

Affirmed.

West Headnotes

**[1] States 360 ☞127**

360 States
360IV Fiscal Management, Public Debt, and Se-
curities
360k127 k. Special Funds. Most Cited Cases
Chancery court's error, if any, in abandoning dic-
tionary definitions of "personal attack" and
"vilification" as used in Master Settlement Agree-
ment (MSA) between various states and tobacco
companies, in favor of definitions provided by legal
writers and case law was harmless, for purposes of
determining whether anti-tobacco advertisements
disseminated by non-profit foundation funded pur-
suant to MSA violated the no personal attack and
anti-vilification provisions of the MSA, given that
chancery court's ruling that advertisements were not
personal attacks or vilification of tobacco compan-
ies or its employees was warranted under the dic-
tionary definition of those terms.

**[2] Appeal and Error 30 ☞893(2)**

30 Appeal and Error
30XVI Review
30XVI(F) Trial De Novo
30k892 Trial De Novo
30k893 Cases Triable in Appellate
Court
30k893(2) k. Equitable Proceed-
ings. Most Cited Cases
A court of chancery's grant of summary judgment is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A162

903 A.2d 728
903 A.2d 728
**(Cite as: 903 A.2d 728)**

reviewed de novo.

**[3] Contracts 95 &#8594;152**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k151 Language of Instrument
            95k152 k. In General. Most Cited
Cases
State courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract.

**[4] Contracts 95 &#8594;147(1)**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k147 Intention of Parties
            95k147(1) k. In General. Most Cited
Cases
When interpreting a contract, the role of a court is to effectuate the parties' intent.

**[5] Contracts 95 &#8594;152**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k151 Language of Instrument
            95k152 k. In General. Most Cited
Cases
In construing a contract, the court is constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended.

**[6] Contracts 95 &#8594;152**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction

         95k151 Language of Instrument
            95k152 k. In General. Most Cited
Cases
When a contract term's definition is not altered or has no "gloss" in the relevant industry, it should be construed in accordance with its ordinary dictionary meaning.

**[7] Contracts 95 &#8594;143(1)**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k143 Application to Contracts in General
            95k143(1) k. In General. Most Cited
Cases

**Contracts 95 &#8594;169**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k169 k. Extrinsic Circumstances. Most
Cited Cases
A court must accept and apply the plain meaning of an unambiguous term in the context of the contract language and circumstances, insofar as the parties themselves would have agreed ex ante.

**[8] Contracts 95 &#8594;147(2)**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k147 Intention of Parties
            95k147(2) k. Language of Contract.
Most Cited Cases

**Contracts 95 &#8594;154**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k151 Language of Instrument
            95k154 k. Reasonableness of Construction. Most Cited Cases

A163

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

903 A.2d 728
903 A.2d 728
(Cite as: 903 A.2d 728)

The true test in construing a term in a contract is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.

**[9] States 360 ☞127**

360 States
    360IV Fiscal Management, Public Debt, and Securities
        360k127 k. Special Funds. Most Cited Cases
For purposes of Master Settlement Agreement (MSA) between tobacco companies and various states, a "personal attack," prohibited in educational advertising under the MSA, means a verbal assault conducted in an invidious, disparaging, belligerent, offensive, and fiercely or severely critical manner.

**[10] States 360 ☞127**

360 States
    360IV Fiscal Management, Public Debt, and Securities
        360k127 k. Special Funds. Most Cited Cases
For purposes of Master Settlement Agreement (MSA) between tobacco companies and various states, "vilification," prohibited in educational advertising under the MSA, means a denouncement that is both unfounded and abusive or slanderous.

**[11] States 360 ☞127**

360 States
    360IV Fiscal Management, Public Debt, and Securities
        360k127 k. Special Funds. Most Cited Cases
Anti-tobacco advertisements disseminated by non-profit foundation formed pursuant to Master Settlement Agreement (MSA) between various states and tobacco companies were not "personal attacks" or vilification of tobacco company or its employees in violation of MSA; advertisements disseminated unpleasant facts about the tobacco companies and smoking, statements by youths in the advertisements were not belligerent or fiercely or severely critical of tobacco company or its employees but

were friendly and helpful, and advertisements drew attention to past conduct of tobacco companies through innocuous or even helpful sounding offers.

**[12] Declaratory Judgment 118A ☞143.1**

118A Declaratory Judgment
    118AII Subjects of Declaratory Relief
        118AII(G) Written Instruments and Contracts
            118AII(G)1 In General
                118Ak143 Particular Contracts
                    118Ak143.1 k. In General. Most Cited Cases
Chancery court acted within its discretion in refusing to award declaratory relief to tobacco company against non-profit foundation that maintained website that permitted consumers to send negative e-mails to tobacco company employees, in violation of tobacco litigation Master Settlement Agreement (MSA) that prohibited personal attacks or vilification by foundation that was funded by the tobacco companies pursuant to the MSA, given that tobacco company's direct claim for monetary damages was dismissed for failure to prosecute, injunctive relief was unjustified after foundation removed website e-mail function, and declaratory relief would not terminate the controversy. 10 Del.C. § 6506.

**[13] Declaratory Judgment 118A ☞394**

118A Declaratory Judgment
    118AIII Proceedings
        118AIII(H) Appeal and Error
            118Ak392 Appeal and Error
                118Ak394 k. Discretion of Lower Court. Most Cited Cases
A trial court's decision to award declaratory relief is reviewed for abuse of discretion.

**[14] Corporations 101 ☞448(2)**

101 Corporations
    101XI Corporate Powers and Liabilities
        101XI(D) Contracts and Indebtedness
            101k448 Contracts Before Incorporation or Organization

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

903 A.2d 728
903 A.2d 728
(Cite as: 903 A.2d 728)

Page 4

101k448(2) k. Adoption or Ratification. Most Cited Cases
Non-profit anti-smoking educational foundation, formed pursuant to Master Settlement Agreement (MSA) between various states and tobacco companies, was bound by anti-vilification and "no personal attacks" provisions of MSA regarding foundation's anti-tobacco advertisements, giving tobacco company standing to sue foundation for alleged violations of those provisions, even though foundation was not a signatory of MSA and had not adopted the MSA, where state attorneys general who signed MSA anticipated formation of foundation and MSA was essentially a preincorporation agreement that benefited foundation by providing funding.

**[15] Corporations 101 ☞448(1)**

101 Corporations
   101XI Corporate Powers and Liabilities
      101XI(D) Contracts and Indebtedness
         101k448 Contracts Before Incorporation or Organization
            101k448(1) k. Liability for Contracts of Promoters or Incorporators in General. Most Cited Cases
Under Delaware law the doctrine of preincorporation agreements allows a promoter who is establishing a corporation to enter into agreements that bind the nascent corporation.

**[16] Corporations 101 ☞448(1)**

101 Corporations
   101XI Corporate Powers and Liabilities
      101XI(D) Contracts and Indebtedness
         101k448 Contracts Before Incorporation or Organization
            101k448(1) k. Liability for Contracts of Promoters or Incorporators in General. Most Cited Cases
The non-profit status of an entity does not affect its contractual duties, and the preincorporation agreement doctrine applies equally to a non-profit entity as it does a for-profit entity.

**[17] Corporations 101 ☞448(2)**

101 Corporations
   101XI Corporate Powers and Liabilities
      101XI(D) Contracts and Indebtedness
         101k448 Contracts Before Incorporation or Organization
            101k448(2) k. Adoption or Ratification. Most Cited Cases
If a subsequently formed corporation expressly adopts the preincorporation agreement or implicitly adopts it by accepting its benefits with knowledge of its terms, the corporation is bound by it.

**\*730** Court Below: Court of Chancery of the State of Delaware in and for New Castle County, C.A. No. 19406.
Upon appeal from the Court of Chancery. **AFFIRMED.**
Stephen E. Herrmann, John A. Parkins, Jr. (argued), and Steven J. Fineman, Esquires, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Of Counsel: Jim W. Phillips, Jr., Robert J. King, III, and Charles E. Coble, Esquires of Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., Greensboro, NC; for Appellant/Cross-Appellee.
David C. McBride, Martin S. Lessner, and Christian Douglas Wright, Esquires, of Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware; Of Counsel: John Payton, David W. Ogden, (argued) Stuart F. Delery, Paul R.Q. Wolfson, Pavnett**\*731** Singh, and Carey Bollinger, Esquires, of Wilmer Cutler Pickering Hale and Dorr, LLP, Washington, DC; and Ellen Vargyas, Esquire, General Counsel, Washington, DC, for Appellee/Cross-Appellant.
Don A. Beskrone, Esquire, of Ashby & Geddes, P.A., Wilmington, Delaware and Michael C. Hefter, Matthew L. DiRisio, Kristien M. Kahn, Esquires, of Dewey Ballantine, LLP, New York, NY, for Citizens' Commission to Protect the Truth, for amici curiae.
John Friedlander, Esquire of Bouchard Margules & Friedlander, P.A., Wilmington, Delaware, and Olha N.M. Rybakoff, Esquire, Nashville, TN, for Alaska, American Samoa, Arizona, Arkansas, California,

A165

903 A.2d 728                                                                    Page 5
903 A.2d 728
**(Cite as: 903 A.2d 728)**

Colorado, Connecticut, Georgia, Hawaii, Idaho, Illinois, Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Missouri, Montana, Nevada, New Mexico, New York, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Washington, West Virginia, Wyoming and Wisconsin, for amici curiae.

Thomas G. Maculey and Elizabeth D. Power, Esquires, of Zuckerman Spaeder, LLP, Wilmington, Delaware and William B. Schultz and Alexandra W. Miller, Esquires, of Zuckerman Spaeder, LLP, Washington, DC, for Tobacco-Free Kids, American Cancer Society, American College of Occupational and Environmental Medicine, American Dental Hygienists' Association, American Heart Association, American Public Health Association, American School Health Association, American Society of Addiction Medicine, Association of Schools of Public Health, Community Anti-Drug Coalitions of America, Lung Cancer Alliance, Medical Society of Delaware, National African American Tobacco Prevention Network, National Association of County and City Health Officials, National Association of Local Boards of Health, National Latino Council on Alcohol and Tobacco Prevention, Society for Research on Nicotine and Tobacco, and Tobacco Control Legal Consortium, for amici curiae.

Before    HOLLAND,    BERGER,    JACOBS, RIDGELY, Justices and GRAVES, Judge,[FN*] constituting the Court en Banc.

> FN* Sitting by designation pursuant to Art. IV, § 12 of the Delaware Constitution and Supreme Court Rules 2 & 4.

RIDGELY, Justice.

Defendant-Appellant Lorillard Tobacco Company appeals the declaratory judgment of the Court of Chancery in favor of the American Legacy Foundation ("ALF") arising from a contract dispute under a Master Settlement Agreement ("MSA") between the nation's largest tobacco companies and forty-six states' attorneys general. Consistent with the terms of the MSA, ALF was created to reduce tobacco usage among youth. ALF sought to do so through advertising which Lorillard contends violates the prohibition in the settlement agreement against "vilification" or "personal attacks" against tobacco companies or their executives. The Vice Chancellor granted ALF's motion for summary judgment and denied Lorillard's cross-motion for summary judgment, holding that all of the advertisements in issue comply with the MSA as a matter of law.

The primary question on appeal is whether any of ALF's advertisements in their "truth®" campaign violate the contractual language of the MSA prohibiting "vilification" or "personal attacks." The truth® campaign informs its audience of reasons to stop smoking and includes references to the conduct of tobacco *732 companies or their executives. ALF has designed the ads to inform its target audience of manipulative marketing techniques because published research has demonstrated that these types of messages are the most effective ones for discouraging the rebellious, anti-authoritarian segment of young people who otherwise are the most likely segment of the population to begin smoking.FN1 Lorillard alleges the campaign vilifies and personally attacks it, tobacco companies generally, and their executives. We agree with Lorillard that the ads do refer to tobacco companies or their executives and in one instance specifically to Lorillard. However, we conclude that Lorillard's appeal is without merit because the campaign's advertisements do not satisfy the plain meaning of "vilification" or "personal attacks." We also conclude that the Vice Chancellor did not abuse his discretion, based on the record before him, when declining to award relief on Lorillard's claim that ALF managed an email server to facilitate personal attacks on Lorillard employees.

> FN1. Lisa K. Goldman & Stanton A. Glantz, *Evaluation of Antismoking Advertising Campaigns,* 279 J. AM. MED. ASS'N. 772, 774 (March 11, 1998).

ALF has filed a cross appeal, raising the issue

A166

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

903 A.2d 728                                                     Page 6
903 A.2d 728
(Cite as: 903 A.2d 728)

of whether it may be sued for alleged breaches of the MSA. The Vice Chancellor held that the tobacco companies may sue ALF for the alleged breaches of the MSA. We agree. Under the preincorporation agreement doctrine, the states who agreed to establish ALF bound the nascent corporation to the terms of the MSA. Since ALF was bound to the terms of the agreement by its incorporators, Lorillard has standing to sue ALF for any breach by ALF of those terms.

Accordingly, we affirm the judgment of the Court of Chancery.

## I. Background

### A. Background of the American Legacy Foundation ("ALF")

We reiterate the background of this litigation as stated by the Vice Chancellor.[FN2]

> FN2. *Am. Legacy Found. v. Lorillard Tobacco Co.,* 886 A.2d 1, 7-8 (Del.Ch.2005).

This litigation arises out of the historic 1998 tobacco settlement between the nation's largest tobacco companies and 46 of the states' attorneys general. In the settlement, the tobacco companies agreed to fund a foundation charged with creating programs to reduce youth tobacco product usage in the United States. As part of its mission, the foundation created a series of television and radio ads under the brand "the truth."

The settlement agreement imposes certain limits on the content of the foundation's activities, including a requirement that its advertising not constitute a "personal attack on, or vilification of" any person or company.

* * *

The defendant is Lorillard Tobacco Company, the oldest tobacco company in the United States and a Delaware corporation. The plaintiff is American Legacy Foundation ("ALF"), a Delaware non-

profit corporation formed pursuant to the terms of the Master Settlement Agreement (the "MSA"), a 1998 agreement whereby the nation's largest tobacco companies settled lawsuits brought against them by the attorneys general of 46 states. The MSA requires that the tobacco signatories make collective Base Fund Payments of $25,000,000 per year for nine years. The MSA also requires the tobacco signatories to make collective payments in the amount of $250,000,000 in 1999 and $300,000,000 *733 per year for the next four years for ALF's National Public Education Fund ("NPEF"). These funds have been used by ALF to produce its ad campaigns.

ALF's mission, as originally stated in the MSA and later incorporated into ALF's bylaws, is to educate America's youth about the dangers of tobacco products and to reduce the usage of tobacco products by young people. To fulfill its mission, ALF launched an advertising campaign universally known as "the truth" campaign. This campaign involved various television and radio ads aimed at young people that portray the negative side of tobacco products. To make sure that its ads were effective in reaching young people [specifically those young people who are most likely to smoke, *i.e.,* those who challenge authority], ALF purposefully made them edgier and more confrontational than regular television and radio ads. Many ads could be described as "in your face" and "eye-catching."

The funding provided to ALF pursuant to the MSA did not come without restrictions. A majority of ALF's funding was earmarked for the public's education (*i.e.* advertising), and the content of that advertising is made subject to both requirements and prohibitions. The MSA required that the advertising concern only the "addictiveness, health effects, and social costs related to the use of tobacco products." The MSA also prohibited the advertising from being a personal attack or a vilification of tobacco company employees or tobacco companies.

Section VI of the MSA entitled "Establishment of a National Foundation" is at issue in this appeal. Subsection VI(h) establishes the prohibition that the

A167

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

903 A.2d 728
903 A.2d 728
(Cite as: 903 A.2d 728)

Page 7

advertising "shall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively." The MSA does not define the terms "personal attack" or "vilify."

## B. The ALF advertisements

Lorillard claims the advertisements of the truth® campaign violate Subsection VI(h) of the MSA and focuses on four examples of ads titled: "Shredder," "Hypnosis," "Lie Detector," and "Dog Walker." We have carefully considered these examples and the other ads in the record before us and find no merit to Lorillard's claims that ALF has breached the MSA.

Our analysis begins with a summary of the examples Lorillard has cited. In "Shredder," a cargo truck with the "truth®" logo tows a large machine labeled "Shredder 2000" and stops in front of an office building on a city street. The words "Outside a major tobacco company." appear at the bottom of the television screen. Although the building is Philip Morris's New York City headquarters, the advertisement does not directly disclose its identity or even the city where the ad takes place. Even so, it is conceivable that at least some New Yorkers would recognize the building as the headquarters of Phillip Morris. At various times in the advertisement, people are visible inside the building, but their faces have been pixilated to protect their identity. Two youths stand beside the towed machine, a large wood chipper. The youths use megaphones to address employees in the building. The first announces, "Attention tobacco manufacturers! Do you have a lot of embarrassing reports lying around the office? You can't just leave that job to any paper shredder, you need Shredder 2000!" The other youth agrees, "That is right, folks. You need Shredder 2000 to use on documents like this research report from 1981 that says 'Today's teenager is tomorrow's potential regular customer.' " He **734 then runs to the mouth of the shredder with a paper

report and throws it into the teeth, shredding it. The first youth then asks "Or this report where you actually gauge smoking patterns of sixth graders?" He proceeds to shred the report while the second youth asks another question, "And you know what folks? With the Shredder 2000, you don't even have to take those highly confidential files out of the cabinets." Two more people carry a four-drawer file cabinet to the mouth of the shredder. "You can just throw the whole darned thing in." They shred the entire filing cabinet. "The whole filing cabinet!" exclaims the second youth. The first youth then exclaims, "Heck yeah, and even your briefcase! Shredder 2000 shreds it all!" A man in a hard hat feeds a briefcase into the shredder. The first youth continues, "More effectively, quicker, better than any shredder in this building. Am I right?" The second youth replies, "You are right!" The first youth continues, "I guarantee it!" The second youth asks, "And you know those top secret files you had on your computer? Just throw the whole computer in. It's gone." A computer monitor is shredded. The first youth confirms, "Completely gone. You need Shredder 2000!" While the two youths dance behind the shredder, the ad concludes with a voice that says "Shredder 2000-now available in regular and king-size."

In "Hypnosis," three youths are driving a truck at night. The words "Somewhere in tobacco suburbia." appear at the bottom of the television screen. One youth says, "I'm feeling the vibe, Man. We're going to find these tobacco guys." They stop the van at a convenience store. They ask a passing pedestrian, "Hey, Man. Do you know if there are any tobacco executives around here?" They stop the van at a fast-food, drive-through window. Through the ordering microphone, they ask the employee, "Do you know if any tobacco executives live around here?" There is no reply. Another pedestrian gives directions, "Go three blocks down, make a left. You'll see some big houses." The youths attempt to confirm the directions, then unfold a map. They drive the van past very large, well-lit houses with large yards. One youth exclaims in awe, "Look at

A168

903 A.2d 728
903 A.2d 728
(Cite as: 903 A.2d 728)

the size of the houses." Another youth replies, "I guess working for an industry that kills over a thousand people a day, ah, pays pretty well." One youth says, "We gotta help these people, Man. Turn on the tape." The youth driving the van agrees, "Yeah. Yeah. Cue the tape." There is a reel-to-reel tape player mounted inside the van. Loudspeakers fixed to the top of the van issue a woman's loud but soothing voice. "I am a good person. Selling a product that kills people makes me uncomfortable. I realize cigarettes are addictive." One youth comments, "It looks like money is addictive, too." The voice continues over the van's loudspeakers, "...kill over four hundred and thirty thousand people each year. Tomorrow I will look for a new job. And I will be less concerned with covering my butt and more concerned with doing the right thing." The ad ends with a youth announcing that they are "just trying to help." The voice begins to repeat as the van continues driving through the upscale neighborhood. There is no indication of the city where the ad was filmed.

In "Lie Detector," several youths enter a large, corporate building. The words "Inside a major tobacco company." appear at the bottom of the television screen. The building is the headquarters of Phillip Morris, but as in "Shredder," the advertisement does not directly disclose its identity or location. The name of the building is pixilated to mask it. Again, it is conceivable that at least some New Yorkers would recognize the building as the headquarters of Phillip Morris. One youth announces to the guard at the front desk that **\*735** "we have a delivery for the marketing department." The faces of the guards and everyone but the youths are pixilated to hide their identity. The guard asks, "Who are you here to see?" Another youth clarifies, "the VP of marketing." The first youth continues, "You can just tell her we're dropping off a lie detector." They place a large case labeled "lie detector" on the guard's desk. The camera cuts to a woman dressed much as the guards are dressed; her face is pixilated. One of the youths asks, "Hi, are you Rita?" She replies, "No." The youth continues,

"We just thought you'd know if Rita was in." The woman says, "I already answered that. Alright? You can have a seat, or you can leave." The youths sit in the lobby and wait. A man appears in a light suit; his face is also pixilated. One youth says, "Hey, look at this guy." The first youth says, "You're not Rita." He shakes the youth's hand, "OK. Can I help you?" The youth explains, "We have a lie detector to clear up the confusion.... Your company has said that nicotine isn't addictive, and then you say that it is." The man asks, "Do you have an appointment with anyone in particular?" The youth replies, "We were told to come to see Rita."The man interrupts, "Leave her a voice mail." The youth cheerfully agrees, "OK. Great." She calls from the front desk and says into the phone, "Hi, Rita.... I just wanted to drop off a lie detector." She looks away from the phone, "She hung up on me.... Maybe it was the wrong Rita."The security guards ask them to leave. While walking backwards to the front door, the youth explains, "OK. We're leaving, but your company has said that nicotine isn't addictive, and then you say that it is, and we're just trying to get at the truth."

"Dog Walker" is a radio ad and begins with the ringing of a telephone. A woman answers, "Good afternoon, Lorillard." The caller says, "Hello, Ma'am. My name is John, and I was hoping I could talk to someone about a business idea." The woman asks, "What is the nature of this business, though?" The caller announces that, "I'm a professional dog walker by trade, and my dogs, they pee a lot, usually on-like-fire hydrants and people's flower beds. I thought, why not collect it and sell it to you tobacco people? Well, see, dog pee is full of urea, and that's one of the chemicals you guys put into cigarettes, and I was just hoping to make a little extra spending cash.... I can send you some samples. I got Chihuahua, Golden Retriever, some high-test Rottweiler pee. It's all good stuff." She then transfers the caller to someone else, who answers the phone with his full name, heard clearly in the ad and not edited or omitted from it. The person hangs up on him at the mention of his "pee proposal." An

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

903 A.2d 728
903 A.2d 728
(Cite as: 903 A.2d 728)

Page 9

announcer concludes the commercial, stating, "You've been infected with a powerful contagion. Truth exposes the tobacco industry's deceptions to the light of day. And it spreads. The truth outbreak tour is here. Check out the truth dot com. Infect truth." FN3

> FN3. *Lorillard Tobacco Co.,* 886 A.2d at 11-12, 14 (footnotes omitted).

## C. The ALF website

ALF maintained a website with an email server where visitors could complete a pre-formatted email to actual tobacco company employees by adding adjectives, verbs, and nouns. For example, one form email read:

Dear Mr. Big Tobacco Executive,

I just wanted to say that I think the way your _____ cigarette company has deceived the world really _____, and I don't understand how you can _____ with yourself selling a _____ product like cigarettes.

It's bad enough that you _____ at _____ knew that smoking *736 your cigarettes caused cancer, and kept selling them anyways, but then to be deceptive about what you knew and _____ try to cover it up is just plain _____.

I also wanted to know-was it worth it? How many _____ have you been able to buy with all the money you've made addicting people to nicotine? How could all your _____ ever make up for the _____ of suffering you've caused smokers and their families as you got _____ rich hooking them on a deadly product?

Just remember, in the end we _____ what we _____.

May the lord have mercy on your pathetic _____.

ALF placed a warning of the website against the use of profane or harassing messages. Employees at Lorillard and other companies received these emails, sometimes containing profanity despite ALF's warning. Many emails sent to and read by tobacco company employees were malevolent. At a cost of less than $1,000 Lorillard quickly installed a filter that shielded its employees from emails sent by visitors to the website. ALF then removed this e-mail feature from its website.

## D. The Court of Chancery's Declaration

The Court of Chancery held that the advertisements did not violate Subsection VI(h)'s ban on personal attacks. The court further held that the advertisements did not vilify any person or company, either individually or collectively.

To define "vilify" in the context of the MSA, the Court of Chancery did not use any dictionary. While the court referenced the parties' own usage of dictionary definitions as one of the means to define "vilify," it expressly declined to do so in this case.FN4 The court explained, that although "dictionary definitions are helpful and instructive, they are not precedent and this court need not rely on them, especially when, as in this case, there are sufficient usages in legal opinions to inform the court as to whether the advertisements in question violate the MSA." FN5

> FN4. *Id.* at 19.

> FN5. *Id.* The Vice Chancellor also stated that "[i]f the court were to rely on dictionary definitions in this case, the court suspects that the litigation would devolve into an argument about the meaning of the words in the definition itself." *Id* at 39.

The Vice Chancellor then looked to a variety of sources including Delaware court decisions,FN6 United States Supreme Court decisions,FN7 federal court decisions,FN8 and other legal sources.FN9 After reviewing *737 a wide range of legal sources, the Vice Chancellor distilled a definition of "vilify" from the uses of the words by the particular authors of these writings. He concluded that:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A170

903 A.2d 728                                                                                                                              Page 10
903 A.2d 728
**(Cite as: 903 A.2d 728)**

FN6. *Id.* at 21 citing *State v. Chandler,* 2 Del. 553, 577-78, 2 Harr. 553 (Del. Ct. of General Sessions 1837); *Rice v. Simmons,* 2 Del. 417, 428, 2 Harr. 417 (1838); *Layton v. Harris,* 3 Del. 406, 407, 3 Harr. 406 (Del.Super.Ct.1842); *Croasdale v. Bright,* 11 Del. 52, 59, 6 Houst. 52 (Del.Super.Ct.1880); *Del. State Fire & Marine Ins. Co.v. Croasdale,* 11 Del. 181, 195, 6 Houst. 181 (1880); *Capano v. State,* 781 A.2d 556, 668 (Del.2001)*aff'd in part and rev'd in part on other grounds,*889 A.2d 968 (Del.2006).

FN7. *See id.* at 22 (citing, *inter alia, Phila. Newspapers v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *NY Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)).

FN8. *See id.*(citing *Gibson v. Mayor & Council of Wilmington,* 355 F.3d 215, 227 (3d Cir.2004); *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 182 (4th Cir.2001); *United States v. Burke,* 80 F.3d 314, 317 (8th Cir.1996); *State v. Michaels,* 136 N.J. 299, 642 A.2d 1372 (N.J.1994)).

FN9. *See id.* at 24 (citing foreign state court decisions, law review articles, and other secondary sources such as Note, *Group Vilification Reconsidered,* 89 YALE L.J. 271, 308 (1979); Note, *Statutory Prohibition of Group Defamation,* 47 COLUM. L.Rev. 595, 609 (1947); *Village of Skokie v. Nat'l Socialist Party of Am.,* 51 Ill.App.3d 279, 366 N.E.2d 347, 9 Ill.Dec. 90 (Ill.App.1977), *aff'd in part and rev'd in part,*69 Ill.2d 605, 373 N.E.2d 21, 14 Ill.Dec. 890 (Ill.1978); *Neiman-Marcus v. Lait,* 13 F.R.D. 311, 312 (S.D.N.Y.1952)).

the state and federal case law, as well as law reviews, support a view of vilification that is con-

sistent with Delaware law. First, on a textual level, the words of vilification are stronger than disparagement. Second, on a contextual level, the term "vilification" is most often used to describe situations that implicate serious social issues, such as race or gender relations.

While the overwhelming majority of legal sources show a consistent use of "vilification" that is stronger than mere disparagement and frequently "vilification" is used in serious social contexts, there are a small minority of cases that appear to use "vilify" in a watered-down manner....[FN10]

FN10. *Id.* at 25.

The Vice Chancellor placed primary reliance on Delaware court decisions using the word "vilification" concluding that:

Delaware courts have used "vilification" in conjunction with words like blasphemy, licentiousness, hatred, contempt, and ridicule. "Vilification" has also been used in two related cases that concerned an alleged fraud by swindlers who perhaps should have been put in jail. From these sources, it is clear that Delaware law regards vilification as stronger (*i.e.* more contemptuous or malicious) than disparaging someone.[FN11]

FN11. *Id.* at 26. The court did, of course, rely on the aforementioned references as well.

He then incorporated factors into this high threshold that included the truthfulness of the advertisements and their tone and concluded that the advertisements at issue did not violate Subsection VI(h)'s ban on vilifying persons or companies.

To define "personal attack" the Vice Chancellor again looked to uses of this term by authors in sources other than dictionaries as he did with his analysis of "vilify." He noted that some courts have used "personal attack" in three distinct legal contexts: referring to 1) physical violence; 2) courtroom behavior; and 3) "communications that

A171

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

903 A.2d 728
903 A.2d 728
**(Cite as: 903 A.2d 728)**

occur outside of the courtroom." [FN12] He adopted the third category of "personal attack," for his analysis in this case.

> FN12. *Id.* at 33-36, n. 140, n. 152 (citations omitted).

After recognizing the scarcity of "personal attack" cases in both Delaware and United States Supreme Court jurisprudence,[FN13] the Vice Chancellor noted that "federal courts use the phrase 'personal attack' when categorizing statements that include comparing people to terminal illnesses or alleging that they are criminals." [FN14] In other words, the authors of both federal and state case decisions use *738 "personal attack" to mean more than mere criticism. The Vice Chancellor concluded:

> FN13. *Id.* The court cited *Skouras v. Admiralty Enter., Inc.,* 386 A.2d 674, 679 (Del.1978) as "label[ing] as a personal attack letters from the plaintiff to various governmental and business entities that threatened charges of wrongdoing by the defendant's directors and officers. The letters appear to be sent in connection with allegations of fraud, tax evasion, and corporate mismanagement." Additionally, the court cited to the United States Supreme Court decision in *Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260, 276, 108 S.Ct. 562, 98 L.Ed.2d 592, (1988).

> FN14. *Lorillard Tobacco Co.,* 886 A.2d at 35 (citations omitted).

[T]he term "personal" in the MSA's "personal attack" consists of two parts. The first part concerns the target's private characteristics, such as, for an individual, amorality. The second part concerns the specific identification of the target. Case law clearly supports the interpretation that the target must be identified. The court finds that such identification must be specific to a particular person or company. Calling the tobacco companies "the to-

bacco industry" or "Big Tobacco" does not identify the signatories to the MSA in a specific enough manner to be violative of Section VI(h) of the MSA. Lorillard could have, but did not, achieve a broader prohibition in the MSA by referring to "Big Tobacco" or the tobacco industry specifically. It did not, and there is no reason to suppose that the 46 attorneys general would ever have agreed to such language.[FN15]

> FN15. *Id.* at 40-41.

Applying this definition of "personal attack," he stated that Lorillard had the burden of demonstrating that there was an attack and that the attack was personal on it specifically. The Vice Chancellor found that advertisements did not violate the personal attack provision of Subsection VI(h). With respect to the email-generating server managed by ALF, he found that the emails did constitute "personal attacks" but declined to award any damages or injunctive relief because the violation was *de minimis.*[FN16]

> FN16. *Id.* at 44 (citations and footnotes omitted).

**II. The MSA does not prohibit the truth® campaign advertisements.**

[1][2][3] We review the Court of Chancery's grant of summary judgment *de novo.*[FN17] Lorillard's primary claim on appeal is that the Court of Chancery legally erred in the procedure it used to define the terms "personal attack" and "vilify" and, in so doing, erroneously granted summary judgment in favor of ALF. Lorillard insists that the Vice Chancellor should have used the dictionary definitions of "vilification" and "personal attack" to determine the plain meaning of these terms. We agree that the Vice Chancellor's abandonment of all dictionaries and his innovative review of how legal writers have used ordinary words in their texts to ascertain the plain meaning of the words are not supported by precedent. Under well-settled case law, Delaware courts look to dictionaries for assist-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

903 A.2d 728
903 A.2d 728
(Cite as: 903 A.2d 728)

ance in determining the plain meaning of terms which are not defined in a contract.[FN18] This is because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract. Dictionary definitions change over time, provide the contemporary meaning of ordinary words, and note when a particular definition of a term has become obsolete.[FN19] Assuming, *739 without deciding, that the Vice Chancellor erred in not using dictionaries in this case, we find that this error was of no moment, *i.e.* harmless, because the plain meaning of the terms "personal attack" and "vilification" shown by dictionary definitions still requires the entry of summary judgment in favor of ALF.

> FN17. *See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992) (citing *Aetna Cas. and Sur. Co. v. Kenner,* 570 A.2d 1172, 1174 (Del.1990)).

> FN18. *See, e.g., Northwestern National Ins. Co. v. Esmark, Inc.,* 672 A.2d 41, 44 (Del.1996) (using AMERICAN HERITAGE DICTIONARY (1969) to define "under" as "within the group or classification of" without further comment); *Hibbert v. Hollywood Park, Inc.,* 457 A.2d 339, 343 n. 3 (Del.1983) (using Webster's New International Dictionary (2d ed. unabr.1951) to define "party" without further comment); *The Cove on Herring Creek Homeowners' Ass'n v. Riggs,*Del. Ch., C.A. No. 02024-S, 2005 WL 1252399, Noble, V.C., 2005 Del. Ch. LEXIS 71, *5 (May 19, 2005) (applying definition from WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993) to unambiguous, but disputed, language in a contract).

> FN19. Courts have recognized that definitions can become obsolete. *See, e.g., Kelly v. Estate of Johnson,* 788 N.E.2d 933, 935

(Ind.Ct.App.2003) (after each party cited numerous sources, including dictionaries, case law, and the opinion of an auctioneer/ appraiser, to support his or her version of the meaning of "furniture," the court recognized that "there is in fact a wide divergence in the meaning given to 'furniture' across sources. Interestingly, it appears that the definition of the term has, to some extent, changed over time. Older sources tend to interpret furniture as all the items in a room, including china, lamps, paintings, and candlesticks.... Newer sources tend to interpret furniture to mean only large movable items, such as chairs, couches, desks, cabinets, and tables."); *Marriott Corp. v. Combined Properties Ltd. Partnership,* 239 Va. 506, 391 S.E.2d 313 (Va.1990) (The trial court determined that the phrase "drive-in food establishment" in 1967 referred to a food establishment that permitted customers to eat food in their cars while parked in the establishment's lot. However, a possible 1990 definition of "drive-in" restaurant might be an establishment with a drive-through window where customers could order food to go. Ultimately, the Court applied the definition as contemplated by the parties in 1967 and affirmed.).

[4][5] When interpreting a contract, the role of a court is to effectuate the parties' intent. In doing so, we are constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended.[FN20] In *Rhone-Poulenc,* this Court explained the paramount importance of determining what a reasonable person in the position of the parties would have thought the language of a contract means.

> FN20. *See Northwestern National Ins. Co. v. Esmark, Inc.,* 672 A.2d 41, 43 (Del.1996) (citing *E.I. duPont de Nemours and Co., Inc. v. Shell Oil Co.,* 498 A.2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

903 A.2d 728
903 A.2d 728
**(Cite as: 903 A.2d 728)**

1108, 1113 (Del.1985)).

Clear and unambiguous language ... should be given its ordinary and usual meaning. Absent some ambiguity, Delaware courts will not destroy or twist policy language under the guise of construing it. When the language of a ... contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented....

A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. Ambiguity does not exist where a court can determine the meaning of a contract without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends. Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty. The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.[FN21]

> FN21. *Rhone-Poulenc,* 616 A.2d at 1195-96 (quotations and citations omitted).

**A. The advertisements do refer to persons by business affiliations, to tobacco companies collectively, or to Lorillard.**

Subsection VI(h) of the MSA refers to a personal attack on or vilification of a person, company or governmental agency. If *740 the ad does not refer to a person, company, or governmental agency, the prohibition cannot apply. Here, the ads do refer to a person or company, *either individually or collectively.* We disagree with the Vice Chancellor's conclusion that they do not.

In the Shredder and Lie Detector ads, the settings were expressly "outside" and "inside a major tobacco company." In Hypnosis, one of the youths refers to "these tobacco guys" in a setting "somewhere in tobacco suburbia." In Lie Detector, the youths repeatedly ask for an individual employee by what sounds like her first name, audible in the ad. In Dog Walker, a woman answers "Good afternoon, Lorillard," and the caller explains to the Lorillard employee that "you tobacco people" put urea, a chemical found in dog urine, into cigarettes; the announcer concludes saying, "Truth exposes the tobacco industry's deceptions...."

We agree with Lorillard that ALF's advertisements expressly and impliedly referred to specific companies, the collective tobacco companies, and in one case, to a specific employee by name. The headquarters of Phillip Morris appears in two of the ads. When the evidence is viewed in a light most favorable to the non-moving party as is required on summary judgment, we conclude that advertisements of the truth® campaign did refer to a person (whether by name or business affiliation), tobacco companies collectively, and in one instance to Lorillard. Since they did, we must determine if the ads are "personal attacks" or "vilification" in violation of the MSA. If they are not, we must affirm the Vice Chancellor's ultimate conclusion that the ads do not violate Subsection VI(h) of the MSA.

**B. The advertisements are not "personal attacks" or "vilification."**

**1. The plain meaning of the terms**

[6][7][8] When a term's definition is not altered or has "no 'gloss' in the [relevant] industry it should be construed in accordance with its ordinary dictionary meaning."[FN22] There may be more than one dictionary definition, and parties may disagree on the meaning of the definition as applied to their case, but "if merely applying a definition in the dictionary suffices to create ambiguity, no term would be unambiguous."[FN23] A court must accept and

A174

apply the plain meaning of an unambiguous term in
the context of the contract language and circum-
stances, insofar as the parties themselves would
have agreed *ex ante.*[FN24] As we have stated be-
fore, the "true test is not what the parties to the con-
tract intended it to mean, but what a reasonable per-
son in the position of the parties would have
thought it meant."[FN25]

> FN22. *USA Cable v. World Wrestling
> Fed'n. Entm't, Inc.,* 766 A.2d 462, 474
> (Del.2000) (using RANDOM HOUSE UN-
> ABRIDGED DICTIONARY (2d ed.1993);
> MERRIAM WEBSTER'S COLLEGIATE
> DICTIONARY (10th ed.1997) to define
> "regularly").

> FN23. *Monsanto Co. v. Aetna Casualty &
> Sur. Co.,* Del.Super. Ct., No. 88C-JA-118,
> 1994 WL 146005, Ridgely, P.J., 1994
> Del.Super. LEXIS 172, *11 n. 5 (quoting
> *Fireman's Fund Ins. Cos. v. Ex-Cell-O
> Corp.,* 702 F.Supp. 1317, 1324
> (E.D.Mich.1988)). *See E.I. du Pont de
> Nemours & Co. v. Admiral Ins. Co.,* 711
> A.2d 45, 59 (Del.Super.Ct.1995) ("If the
> mere existence of different dictionary
> definitions constitutes an ambiguity, draft-
> ing unambiguous contractual language
> would be impossible without defining al-
> most every word. Standing alone, multiple
> dictionary definitions do not prove all dif-
> fering definitions are reasonable.")
> (citations omitted).

> FN24. *See Duncan v. TheraTx, Inc.,* 775
> A.2d 1019, 1021 (Del.2001) (courts should
> apply the rules that "generally reflect the
> contract term that most parties would have
> bargained for at the time of the agree-
> ment") (citations omitted); *Rhone-Poulenc,
> infra.*

> FN25. *Rhone-Poulenc Co.,* 616 A.2d at
> 1196 (citing *Steigler v. Insurance Com-
> pany of North America,* 384 A.2d 398, 401

(Del.1978)).

*741 Lorillard would have us define "personal
attack" as "negative criticism and negative portray-
al of the characteristics, traits, ethics or conduct of
tobacco companies or their employees," and
"vilification" as "expressions that disparage, depre-
ciate or lower the standing of tobacco companies or
their employees."[FN26] Lorillard cites several dic-
tionaries to define "personal"[FN27] and "attack,"
[FN28] and to define "vilification."[FN29] Lorillard
further contends that "vilification" does not require
defamation and is not determined by tone. Finally,
Lorillard cites two cases from other jurisdictions
defining "vilification."[FN30] However, both of
these cases involved political speech and the First
Amendment. We do not find them persuasive in
resolving the issue of contract interpretation which
is before us.

> FN26. Appellant's opening brief, p. 18-19.

> FN27. Appellant's opening brief, p. 29. *See*
> ENCARTA WORLD ENGLISH DIC-
> TIONARY, 1346 (1999) ("*That personal
> remark was definitely uncalled for.*")
> (emphasis added); WEBSTER'S THIRD
> NEW INTERNATIONAL DICTIONARY
> OF THE ENGLISH LANGUAGE, 1686
> (1993) ("*relating to an individual,* his
> character, conduct, motives, or private af-
> fairs esp. *in an invidious and offensive
> manner.*") (emphasis added); THE RAN-
> DOM HOUSE DICTIONARY OF THE
> ENGLISH LANGUAGE, 1445 (2d
> ed.1987) ("referring or *directed to a par-
> ticular person* in a *disparaging or offens-
> ive* sense or manner, usually involving
> character, behavior, appearance etc.")
> (emphasis added).

> FN28. Appellant's opening brief, p. 28. *See*
> WEBSTER'S THIRD NEW INTERNA-
> TIONAL DICTIONARY OF THE ENG-
> LISH LANGUAGE, 140 (1993) ("An as-
> sault with *unfriendly or bitter* words")

A175

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

903 A.2d 728
903 A.2d 728
**(Cite as: 903 A.2d 728)**

(emphasis added); MERRIAM-WEB-STER'S COLLEGIATE DICTIONARY, 74 (10th ed. 1995) ("Assault. A *belligerent or antagonistic* action.") (emphasis added); THE AMERICAN HERITAGE DICTION-ARY OF THE ENGLISH LANGUAGE, 118 (3d ed. 1992) ("An expression of *strong criticism; hostile* comment") (emphasis added); THE NEW OXFORD AMERICAN DICTIONARY, 102 (2001) ("*Criticize* or oppose *fiercely and publicly.*") (emphasis added); THE RAN-DOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, 133 (2d ed.1987) ("*criticize severely;* argue with strongly") (emphasis added).

FN29. Appellant's opening brief, p. 33. *See* WEBSTER'S THIRD NEW INTERNA-TIONAL DICTIONARY OF THE ENG-LISH LANGUAGE, 2552 (1993) ("To make less valuable or important: lower in estimation.... To utter *slanderous and abusive* statements against: *denounce unjustly* or abuse as hateful or vile") (emphasis added). MERRIAM-WEBSTER'S COL-LEGIATE DICTIONARY, 1317 (10th ed. 1995) ("To lower in estimation or import-ance. To utter *slanderous and abusive* statements against") (emphasis added); XIX OXFORD ENGLISH DICTIONARY, 630 ("To depreciate with *abusive or slan-derous* language; to defame or traduce; to speak evil of") (emphasis added); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, 1992 (3d ed. 1992) ("To make *vicious and de-famatory* statements about") (emphasis ad-ded); THE NEW OXFORD AMERICAN DICTIONARY, 1884 (2001) ("Speak or write about in an abusively disparaging manner"); THE RANDOM HOUSE DIC-TIONARY OF THE ENGLISH LAN-GUAGE, 2122 (2d ed. 1987) ("To speak ill of; *defame; slander* ") (emphasis added).

FN30. *Vanasco v. Schwartz,* 401 F.Supp. 87 (E.D.N.Y.1975), *aff'd,*423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976); *Giet-zen v. Feleciano,* 25 Kan.App.2d 487, 964 P.2d 699 (1998).

ALF contends that "vilification" refers to an "abusive statement about the target that is false or unfair." ALF would define "personal attack" as "a bitter or hostile verbal assault on a person identified by name or business affiliation relating to an indi-vidual's private life." In other words, ALF contends that the modifier "personal" requires an expressly named target, but neglects to explain why Subsec-tion VI(h) contains an additional modifier "whether individually or collectively." We construe this addi-tional language to mean that no express target is re-quired if the target is collectively identified.

**\*742** [9][10] It is apparent from the dictionary citations provided by Lorillard that a "personal at-tack" in the context of Section VI is a verbal assault conducted in an invidious, disparaging, belligerent, offensive, and fiercely or severely critical manner.FN31 Likewise, the meaning of "vilification," according to Lorillard's own diction-ary citations, is a statement that is slanderous, de-famatory, or abusive that unjustly denounces its tar-get.FN32 The core ordinary meaning of vilification is a denouncement that is both unfounded and abus-ive or slanderous.

FN31. *See* n. 27-28 *supra.*

FN32. *See* n. 29 *supra.*

### 2. Application of the MSA to the advertisements

[11] With the boundaries established by Sec-tion VI of the MSA in mind, we turn to whether the advertisements before us violate that provision. They do not. The advertisements are not invidious, disparaging, offensive, belligerent, nor fiercely or severely critical. Nor are they denouncements that are both unfounded and abusive or slanderous. The tone of the youth in the advertisements is usually

903 A.2d 728                                                                                              Page 16
903 A.2d 728
**(Cite as: 903 A.2d 728)**

expressly friendly or helpful, even if implicitly drawing attention to unflattering facts about past actions of tobacco companies or their employees. The youth's messages, and thus the advertisements themselves, do not qualify as personal attacks or vilifications. To illustrate the basis for our conclusions, we will use the same four advertisements that Lorillard has presented as examples of breaches of contract by ALF.

In "Shredder," the youths are salesman expressly offering help to an unnamed tobacco company. They are seeking to sell a tobacco company a machine that it could use based on its history and possible need of shredding many documents. At no point do the youths expressly criticize the company for the contents of the documents or the possibility of shredding them. They reveal no disparaging behavior, belligerence, or fierce criticism. Throughout the advertisement, the youths refer to only two publications. The first report contains the phrase, "Today's teenager is tomorrow's potential regular customer." The second report "gauges smoking patterns of sixth graders." Lorillard does not dispute that these reports exist. The youths do not expressly criticize the company for the reports, nor do they unjustly denounce the company for having them. They merely call the reports "embarrassing." They attempt only to sell their shredder to the company because they appear to assume that the company would want to shred the reports. The advertisement may be effective at disseminating an unpleasant fact about an unnamed tobacco company, but it does not amount to a personal attack or vilification.

"Hypnosis" also portrays the youths as helpful. There are several statements that, while critical of the effects of tobacco, are not belligerent, or fiercely or severely critical of the tobacco companies or employees. For instance, one youth observes that "working for an industry that kills over a thousand people a day, ah, pays pretty well." Lorillard does not contend that tobacco-related disease does not kill over a thousand people a day, nor does it contend that its executives are not well paid. The

youth's statement is immediately followed by insistence that the youths "help these people," reiterated at the end of the commercial. The closest statement to a personal attack or vilification is the implication that a tobacco executive needs to be "less concerned with covering [their] butt[s] and more concerned with doing the right thing." However, the message again is not slanderous or defamatory, abusive, **\*743** offensive, belligerent, or fiercely or severely critical. As with "Shredder," the "Hypnosis" advertisement may be effective at stating unpleasant facts such as tobacco "kill[ing] over four hundred and thirty thousand people each year," but it does not amount to a personal attack or vilification.

"Lie Detector" shows the attempts of several youth to deliver a lie detector to "a major tobacco company." The entire message of the advertisement is crystallized when a youth explains, "We have a lie detector to clear up the confusion. Your company has said that nicotine isn't addictive, and then you say that it is." This statement simply asserts that tobacco companies have made contradictory statements. The assertion is not presented in a disparaging, offensive, or belligerent manner. It is not fiercely or severely critical. Lorillard does not deny that a tobacco company at one time stated that nicotine is not addictive and then later stated that it is. The contention is not a denouncement that is either unfounded or slanderous. The youths are not abusive, but are merely pleading to see a certain employee. When asked to leave, they leave. We conclude that this advertisement also fails to meet the definition of personal attack or vilification.

The caller in "Dog Walker" maintains an expressly helpful tone throughout the advertisement. His tone is not belligerent, critical, argumentative, disparaging, or offensive. Even though "Dog Walker" involves a bizarre offer to sell dog urine and begins by identifying the company called as Lorillard, the caller simply makes a factually accurate assertion that cigarettes often include a chemical that is also found in dog urine. The caller does not accuse

903 A.2d 728                                                              Page 17
903 A.2d 728
(Cite as: 903 A.2d 728)

the company of adding dog urine to cigarettes. Although the Lorillard employee hangs up on the caller, there is no personal attack or vilification of Lorillard or its employees.

While the MSA creates real restrictions on ALF's advertisements, we conclude that the advertisements presented to us from ALF's truth® campaign fall within the MSA's restrictions, and do not exceed them. Merely drawing attention to the past conduct of tobacco companies through innocuous and even helpful-sounding offers such as those heard in "Shredder," "Hypnosis," "Lie Detector," and "Dog walker," is not a personal attack or vilification prohibited by the MSA.

**C. The Court of Chancery acted within its discretion when it declined to award relief for ALF's website.**

[12][13] We review a trial court's decision on whether to award declaratory relief for abuse of discretion.[FN33] The Court of Chancery accepted as true that ALF at one time managed an email server that facilitated receipt by Lorillard employees of emails with expletives and that Lorillard quickly and effectively erected a filter blocking the emails for under $1,000. The Court then stated that these emails were personal attacks on individual employees in violation of Subsection VI(h).[FN34] Lorillard had a direct claim for requested monetary damages for its cost of blocking the emails was contained within Count V of its amended counterclaims ("Trespass to Chattel") but this claim was dismissed by the Vice Chancellor for failure to prosecute.[FN35] The Vice Chancellor did not award injunctive relief because the web site function allowing the emails to be sent had been removed.

FN33. *Stabler v. Ramsay,* 88 A.2d 546, 552 (Del.1952).

FN34. 886 A.2d at 40.

FN35. Final Judgement Order dated November 1, 2005. Lorillard has not ap-

pealed that dismissal.

**\*744** Under the Declaratory Judgment Act, "[t]he court may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, will not terminate the uncertainty or controversy giving rise to the proceeding."[FN36] No tobacco company employee who received the emails participated in this case. We conclude that on the record presented, the Court of Chancery acted well within its discretion when it declined to award declaratory, injunctive or monetary relief to Lorillard for the defunct ALF website activities which were directed to tobacco company employees.

FN36. 10 Del. C. § 6506. Discretionary relief.

**III. Lorillard has standing to sue for ALF's breach of the MSA.**

ALF has filed a cross-appeal in this case. First, ALF claims that its activities are not subject to the "vilification" and "personal attack" restriction of the MSA Subsection VI(h). Second, it claims that Lorillard may not enforce either the MSA or ALF's own bylaws against it.

ALF claims that the MSA imposes the vilification and personal attack restriction only on the funds in the National Public Education Fund, and not on funds derived from Base Foundation Payments. ALF contends that it has no liability for ads funded by Base Foundation Payments whether or not they vilify or personally attack. We need not address this claim because in this decision we have held that the advertisements are not vilifications or personal attacks.

[14] ALF next challenges the determination by the Court of Chancery that Lorillard had standing to sue ALF under the MSA, despite ALF not being a signatory to that agreement. ALF claims that the Court erroneously concluded that ALF could be held liable under the MSA since it was neither a

A178

signatory to the contract nor ever adopted it. It contends that the States who created ALF have the sole responsibility to seek a remedy for any vilification or personal attack. Further, the only legal mechanism that the MSA contemplated to prevent vilification or personal attacks by ALF was ALF's own bylaws, not lawsuits by the tobacco company signatories. Therefore, it argues that only the States who established ALF, not the tobacco companies, may enforce ALF's bylaws.

[15] The Court of Chancery held that ALF's formation was like that of a nascent corporation and applied the doctrine of preincorporation agreements:

American courts generally hold that promoters' contracts made on the corporation's behalf may be adopted, accepted or ratified by the corporation when organized, and that the corporation is then liable both at law and in equity, on the contract itself, and not merely for the benefits which it has received. Accordingly, if the corporation accepts the contract's benefits, the corporation will be required to perform its obligations.[FN37]

> FN37. Carol A. Jones and Britta M. Larsen, 1A FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 207 (perm.ed., rev.vol.2002).

Thus, under Delaware law the doctrine of preincorporation agreements allows a promoter who is establishing a corporation to enter into agreements that bind the nascent corporation.[FN38]

> FN38. See Spering v. Sullivan, 361 F.Supp. 282, 286 (D.Del.1973); Stringer v. Elec. Supply Corp., 2 A.2d 78, 79 (Del.Ch.1938); see also 18 AM. JUR. 2D CORPORATIONS, § 123 (1985); 12 WILLISTON, § 35:71; RESTATEMENT (SECOND) OF AGENCY, § 104 (1957).

[16] The doctrine applies here because the state attorneys general establishment of ALF meets the elements of a promoter's formation of a corporation, albeit a *745 non-profit one. The MSA's payment provisions show the parties intended that ALF be bound by the MSA provisions. ALF contends that the doctrine does not apply because this situation is atypical for several reasons, most of which stem from ALF's status as a non-profit entity. The non-profit status of an entity does not affect its contractual duties, and the preincorporation agreement doctrine applies equally to a non-profit entity.

The Vice Chancellor found that "the MSA in fact contemplates that ALF will adopt [it]."[FN39] We agree. The Vice Chancellor explained:

> FN39. Am. Legacy Found. v. Lorillard Tobacco Co., 831 A.2d 335, 344 (Del.Ch.2003).

One could almost conclude that the MSA expressly contemplates ALF's adoption because it provides for ALF's creation and funding, it requires ALF's board to be comprised of a predetermined group of people, and it places significant restrictions on ALF's activities. The Settling States (through NAAG) then obligated ALF, through provisions in ALF's bylaws and Certificate of Incorporation, to comply with the MSA, and the tobacco companies performed their part by providing the required funds.[FN40]

> FN40. Id. at 345.

The Vice Chancellor then enumerated "several express provisions of the MSA that manifest the MSA's signatories' expectation that ALF would ultimately adopt it."[FN41] We conclude, as did the Vice Chancellor, that "the MSA should be viewed, as a matter of law, as expressly contemplating ALF's adoption."[FN42]

> FN41. Id. For instance, Section IX of the MSA provides ALF shall fund public education "in the manner described in and subject to the provision of subsections VI(g) and VI(h)." (emphasis added). Sub-

A179

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

section VI(h) of the MSA, instructs that
ALF "shall not engage" in certain activit-
ies. Subsection VI(e) of the MSA provides
that ALF "shall be formally affiliated with
an educational or medical institution." *Id.*
at 345-46.

FN42. *Id.* at 346.

[17] "Under Delaware law, if the subsequently
formed corporation expressly adopts the preincor-
poration agreement or implicitly adopts it by ac-
cepting its benefits with knowledge of its terms, the
corporation is bound by it."[FN43] ALF is required
to perform its obligations and can be held liable if
found to have breached the MSA. The cross-appeal
of ALF is without merit.

FN43. *Lorillard Tobacco Co.,* 831 A.2d at
350 (citing *Spering,* 361 F.Supp. at 286;
*Stringer,* 2 A.2d at 79).

### IV. Conclusion

The judgment of the Court of Chancery is AF-
FIRMED on appeal and cross-appeal.

Del.Supr.,2006.
Lorillard Tobacco Co. v. American Legacy Founda-
tion
903 A.2d 728

END OF DOCUMENT

A180

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **EXHIBIT J**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| AMERICAN LEGACY FOUNDATION, a Delaware non-profit corporation,<br><br>                Plaintiff,<br><br>      v<br><br>LORILLARD TOBACCO COMPANY, a Delaware corporation,<br><br>               Defendant | )<br>)<br>)<br>)<br>)<br>)   C A No 19406-NC<br>)<br>)<br>)<br>)<br>) |

## ANSWER AND COUNTERCLAIMS OF DEFENDANT LORILLARD TOBACCO COMPANY TO FIRST AMENDED COMPLAINT

### FIRST DEFENSE

Responding to the numbered allegations of the Amended Complaint filed by plaintiff American Legacy Foundation ("ALF") in the above-captioned matter, defendant Lorillard Tobacco Company ("Lorillard"), through counsel, alleges and says that:

1    With respect to the allegations contained in the first sentence of paragraph 1 of the Amended Complaint, it is admitted upon information and belief that ALF is a Delaware non-profit corporation that was created pursuant to the Master Settlement Agreement ("MSA") between forty-six Settling States and the four major tobacco companies and that ALF's mission and permissible functions are set forth in the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing  With respect to the allegations contained in the second sentence of paragraph 1 of the Amended Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA— funds totaling hundreds of millions of dollars paid by the tobacco companies, including

Lorillard—to develop, produce, and disseminate its "truth" campaign  By way of further response, it is alleged that the scope of and limitations upon any of ALF's activities funded in whole or in part by funds disbursed to ALF under the MSA, including its "truth" campaign, are set forth in the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing  With respect to the allegations contained in the third sentence of paragraph 1 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied  Except as expressly admitted herein, the allegations contained in paragraph 1 of the Amended Complaint are denied

2.    With respect to the allegations contained in the first sentence of paragraph 2 of the Amended Complaint, the MSA is a written document that speaks for itself  With respect to the allegations contained in the second and third sentences of paragraph 2 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied  With respect to the allegations contained in the fourth sentence of paragraph 2 of the Amended Complaint, it is admitted that Lorillard and the other tobacco companies have paid hundreds of millions of dollars under the MSA that have benefited and funded ALF and its operations  By way of further response, it is alleged that ALF's mission and permissible functions, as well as certain limitations on ALF's conduct and activities and on its use of MSA monies, are set forth in the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing  Except as expressly admitted herein, the allegations contained in paragraph 2 of the Amended Complaint are denied

3    With respect to the allegations contained in the first, second, and third sentences of paragraph 3 of the Amended Complaint, the MSA is a written document that speaks for itself  With respect to the allegations contained in the fourth sentence of paragraph 3 of the Amended

Complaint, ALF's Certificate of Incorporation and its Bylaws are written documents that speak for themselves   By way of further response, it is admitted that ALF's Certificate of Incorporation and its Bylaws incorporate the terms of the MSA relating to ALF, including the MSA's limitations on ALF's activities   Except as expressly admitted herein, the allegations contained in paragraph 3 of the Amended Complaint are denied

4      With respect to the allegations contained in the first and second sentences of paragraph 4 of the Amended Complaint, the MSA and ALF's Bylaws are written documents that speak for themselves   By way of further response, it is alleged that the scope of and limitations upon ALF's conduct and activities and its use of MSA monies, including its "truth" campaign, are governed by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing   The allegations contained in the third sentence of paragraph 4 of the Amended Complaint are denied   By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003   Except as expressly admitted herein, the allegations contained in paragraph 4 of the Amended Complaint are denied

5      The allegations contained in the first sentence of paragraph 5 of the Amended Complaint are denied   With respect to the allegations contained in the second sentence of paragraph 5 of the Amended Complaint, it is admitted that ALF had not yet been incorporated when the MSA was executed by the Settling States and certain tobacco companies and that, upon information and belief, ALF has never executed the MSA   By way of further response, it is alleged that ALF has adopted, assumed the obligations of, and otherwise become bound to the MSA through the actions of its incorporators, through its corporate actions, through its words, and through its conduct   With respect to the allegations contained in the third sentence of paragraph 5 of the Amended Complaint, it is admitted that ALF was not a party to the lawsuits

3

brought by the various Settling States against certain tobacco companies    The allegations contained in the fourth sentence of paragraph 5 of the Amended Complaint are denied    With respect to the allegations contained in the fifth sentence of paragraph 5 of the Amended Complaint, the MSA is a written document that speaks for itself    By way of further response, it is alleged that it was not necessary for ALF to execute the MSA in order for ALF to become bound by the MSA    With respect to the allegations contained in the sixth sentence of paragraph 5 of the Amended Complaint, the MSA is a written document that speaks for itself.    The allegations contained in the seventh sentence of paragraph 5 are denied    Except as expressly admitted herein, the allegations contained in paragraph 5 of the Amended Complaint are denied    By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003

6    With respect to the allegations contained in the first sentence of paragraph 6 of the Amended Complaint, it is admitted that on January 18, 2002, Lorillard sent a thirty-day notice letter to ALF's counsel pursuant to Section VII(c)(2) of the MSA, which letter is a written document that speaks for itself    With respect to the allegations contained in the second and third sentences of paragraph 6 of the Amended Complaint, Lorillard's letter of January 18, 2002, is a written document that speaks for itself    Except as expressly admitted herein, the allegations contained in paragraph 6 of the Amended Complaint are denied    By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003

7.    With respect to the allegations contained in the first sentence of paragraph 7 of the Amended Complaint, it is admitted that Lorillard did not withdraw or change its position as expressed in its letter of January 18, 2002, prior to ALF's filing of its original Complaint    With respect to the allegations contained in the second sentence of paragraph 7 of the Amended Complaint, it is admitted that in communications between counsel for Lorillard and counsel for

4

ALF on February 7, 2002, Lorillard did not withdraw or change its position as expressed in its letter of January 18, 2002  With respect to the allegations contained in the third sentence of paragraph 7 of the Amended Complaint, it is admitted that prior to ALF's filing of its original Complaint, Lorillard did not identify to ALF the forum in which it intended to bring an enforcement action under the MSA against ALF  Except as expressly admitted herein, the allegations contained in paragraph 7 of the Amended Complaint are denied

8      With respect to the allegations contained in the first and second sentences of paragraph 8 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny the allegations that ALF holds the views expressed therein; however, Lorillard denies that such views are true  The allegations contained in the third, fourth and fifth sentences of paragraph 8 of the Amended Complaint are denied  Except as expressly admitted herein, the allegations contained in paragraph 8 of the Amended Complaint are denied

9      With respect to the allegations contained in the first sentence of paragraph 9 of the Amended Complaint, it is admitted that ALF purports to bring an action against Lorillard pursuant to 10 Del. C. §§ 6501-6513 and 8 Del. C. § 111  With respect to the allegations contained in the second sentence of paragraph 9 of the Amended Complaint, it is admitted that ALF purports to seek an injunction from the Court  With respect to the allegations contained in the third sentence of paragraph 9 of the Amended Complaint, it is admitted that ALF purports to seek a declaratory judgment from the Court  Except as expressly admitted herein, the allegations contained in paragraph 9 of the Amended Complaint are denied  By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003

10      Admitted, upon information and belief.

11    With respect to the allegations contained in paragraph 11 of the Amended Complaint, it is admitted that ALF's mission and permissible functions, as well as certain limitations on ALF's conduct and activities and on its use of MSA monies, are set forth in the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing  Except as expressly admitted herein, the allegations contained in paragraph 11 of the Amended Complaint are denied.

12    With respect to the allegations contained in paragraph 12 of the Amended Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to develop, produce, and disseminate its "truth" campaign  By way of further response, it is alleged that the scope of and limitations upon ALF's conduct and activities and its use of MSA monies, including its "truth" campaign, are governed by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing  Except as expressly admitted herein, the allegations contained in paragraph 12 of the Amended Complaint are denied

13    With respect to the allegations contained in paragraph 13 of the Amended Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to develop, produce, and disseminate its "truth" campaign, to develop and maintain a website, and to develop and produce events  By way of further response, it is alleged that the scope of and limitations upon ALF's conduct and activities and its use of MSA monies, including its "truth" campaign, its website, and its events, are governed by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith

6

and fair dealing  Except as expressly admitted herein, the allegations contained in paragraph 13 of the Amended Complaint are denied

      14    With respect to the allegations contained in paragraph 14 of the Amended Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to undertake grants and other activities  By way of further response, it is alleged that the scope of and limitations upon ALF's conduct and activities and its use of MSA monies, including grants and other activities, are governed by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing  Except as expressly admitted herein, the allegations contained in paragraph 14 of the Amended Complaint are denied

      15    With respect to the allegations contained in paragraph 15 of the Amended Complaint, it is admitted that ALF was created pursuant to the MSA and that ALF's mission and permissible functions, as well as certain limitations on ALF's conduct and activities and on its use of MSA monies, are governed by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing  By way of further response, it is admitted that the quoted passage appears in the Supreme Court's opinion in *FDA v Brown & Williamson Tobacco Corp*, 529 U S 120, 161 (2000)  Except as expressly admitted herein, the allegations contained in paragraph 15 of the Amended Complaint are denied

      16    With respect to the allegations contained in paragraph 16 of the Amended Complaint, ALF's Bylaws is a written document that speaks for itself  Except as expressly

admitted herein, the allegations contained in paragraph 16 of the Amended Complaint are denied

     17     Admitted, upon information and belief

     18     Admitted

     19     With respect to the allegations contained in paragraph 19 of the Amended Complaint, it is admitted that Lorillard is an original signatory to the MSA, having executed the MSA in 1998  Except as expressly admitted herein, the allegations contained in paragraph 19 of the Amended Complaint are denied

     20     With respect to the allegations contained in the first sentence of paragraph 20 of the Amended Complaint, the term "largest" is vague and indefinite and, as a result, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied  With respect to the allegations contained in the second sentence of paragraph 20 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied.   Except as expressly admitted herein, the allegations contained in paragraph 20 of the Amended Complaint are denied

     21     With respect to the allegations contained in paragraph 21 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied   Except as expressly admitted herein, the allegations contained in paragraph 21 of the Amended Complaint are denied

     22     It is admitted that in the 1990s, a number of states brought suit against certain tobacco companies, including Lorillard   With respect to the allegations contained in the second sentence of paragraph 22 of the Amended Complaint, the MSA is a written document that speaks

for itself  Except as expressly admitted herein, the allegations contained in paragraph 22 of the Amended Complaint are denied

23      With respect to the allegations contained in paragraph 23 of the Amended Complaint, it is admitted that certain tobacco companies and the Attorneys General of the States that had brought suit against those tobacco companies entered into settlement negotiations in an effort to resolve the various lawsuits brought by those States  Except as expressly admitted herein, the allegations contained in paragraph 23 of the Amended Complaint are denied

24      With respect to the allegations contained in paragraph 24 of the Amended Complaint, the MSA is a written document that speaks for itself  Except as expressly admitted herein, the allegations contained in paragraph 24 of the Amended Complaint are denied

25      With respect to the allegations contained in paragraph 25 of the Amended Complaint, the MSA is a written document that speaks for itself  Except as expressly admitted herein, the allegations contained in paragraph 25 of the Amended Complaint are denied

26      The allegations contained in the first sentence of paragraph 26 of the Amended Complaint are admitted upon information and belief  With respect to the allegations contained in the second sentence of paragraph 26 of the Amended Complaint, it is admitted that ALF was not a party to the lawsuits brought by the various Settling States against certain tobacco companies and resolved by the MSA  Except as expressly admitted herein, the allegations contained in paragraph 26 of the Amended Complaint are denied   By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003

27      Admitted, upon information and belief

28      With respect to the allegations contained in paragraph 28 of the Amended Complaint, it is admitted that ALF had not yet been incorporated when the MSA was executed

9

A189

by the Settling States and certain tobacco companies and that ALF has never executed the MSA By way of further response, it is alleged that ALF has adopted, assumed the obligations of, and otherwise become bound to the MSA through the actions of its incorporators, through its corporate actions, through its words, and through its conduct  Except as expressly admitted herein, the allegations contained in paragraph 28 of the Amended Complaint are denied. By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003

29    With respect to the allegations contained in paragraph 29 of the Amended Complaint, such allegations state a legal conclusion as to which no response is required by Lorillard  By way of further response, it is alleged that ALF is an intended beneficiary of the MSA by virtue of the funds that have been disbursed to it under the MSA  By way of further response, the MSA is a written document that speaks for itself  By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003  Except as expressly admitted herein, the allegations contained in paragraph 29 of the Amended Complaint are denied

30    With respect to the allegations contained in paragraph 30 of the Amended Complaint, the MSA is a written document that speaks for itself  Except as expressly admitted herein, the allegations contained in paragraph 30 of the Amended Complaint are denied.

31    With respect to the allegations contained in paragraph 31 of the Amended Complaint, the MSA is a written document that speaks for itself  Except as expressly admitted herein, the allegations contained in paragraph 31 of the Amended Complaint are denied

32    With respect to the allegations contained in the first sentence of paragraph 32 of the Amended Complaint, it is admitted that ALF was created pursuant to the MSA and that ALF's mission and permissible functions, as well as certain limitations on ALF's conduct and

activities and on its use of MSA monies, are governed by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing With respect to the allegations contained in the second sentence of paragraph 32 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied   With respect to the allegations contained in the third sentence of paragraph 32 of the Amended Complaint, it is alleged that ALF's mission and permissible functions, as well as certain limitations on ALF's conduct and activities and on its use of MSA monies, are governed by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing   Except as expressly admitted herein, the allegations contained in paragraph 32 of the Amended Complaint are denied

33     With respect to the allegations contained in the first and second sentences of paragraph 33 of the Amended Complaint, the MSA is a written document that speaks for itself By way of further response, it is alleged that ALF—through its initial board of directors— adopted ALF's Bylaws   Except as expressly admitted herein, the allegations contained in paragraph 33 of the Amended Complaint are denied

34     The allegations contained in paragraph 34 of the Amended Complaint are denied By way of further response, it is alleged that ALF—through its initial board of directors— adopted ALF's Bylaws   Except as expressly admitted herein, the allegations contained in paragraph 34 of the Amended Complaint are denied

35     With respect to the allegations contained in paragraph 35 of the Amended Complaint, the MSA is a written document that speaks for itself   Except as expressly admitted herein, the allegations contained in paragraph 35 of the Amended Complaint are denied

11

A191

36    With respect to the allegations contained in the first and second sentences contained in paragraph 36 of the Amended Complaint, the MSA is a written document that speaks for itself  With respect to the allegations contained in third, fourth, and fifth sentences of paragraph 36 of the Amended Complaint, it is alleged that ALF's mission and permissible functions, as well as certain limitations on ALF's conduct and activities and on its use of MSA monies, are governed by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing  By way of further response, it is specifically denied that ALF may use Section VI(b) monies for public education or advertising or in a way that violates Section VI(h), including its prohibition against "personal attacks" and "vilification"  Except as expressly admitted herein, the allegations contained in paragraph 36 of the Amended Complaint are denied

37    With respect to the allegations contained in the first sentence of paragraph 37 of the Amended Complaint, the MSA is a written document that speaks for itself  By way of further response it is alleged that ALF's mission and permissible functions, as well as certain limitations on ALF's conduct and activities and on its use of MSA monies, are governed by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing  The allegations of the second sentence of paragraph 37 of the Amended Complaint are denied.  Except as expressly admitted herein, the allegations contained in paragraph 37 of the Amended Complaint are denied

38    With respect to the allegations contained in paragraph 38 of the Amended Complaint, it is admitted that ALF incorporated certain provisions of the MSA into its Bylaws  By way of further response, ALF's Bylaws is a written document that speaks for itself  By way of further response, it is specifically denied that ALF may use Section VI(b) monies for public

12

A192

education or advertising or in a way that violates Section VI(h), including its prohibition against "personal attacks" and "vilification" Except as expressly admitted herein, the allegations contained in paragraph 38 of the Amended Complaint are denied

39    With respect to the allegations contained in paragraph 39 of the Amended Complaint, it is admitted that ALF's Certificate of Incorporation incorporates certain provisions of the MSA By way of further response, ALF's Certificate of Incorporation is a written document that speaks for itself Except as expressly admitted herein, the allegations contained in paragraph 39 of the Amended Complaint are denied

40    With respect to the allegations contained in paragraph 40 of the Amended Complaint, such allegations state a legal conclusion as to which no response is required by Lorillard

41    Denied. By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003

42    With respect to the allegations contained in paragraph 42 of the Amended Complaint, it is admitted that ALF's mission and permissible functions, as well as certain limitations on ALF's conduct and activities and on its use of MSA monies, are governed by the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing Except as expressly admitted herein, the allegations contained in paragraph 42 of the Amended Complaint are denied

43    With respect to the allegations contained in the first sentence of paragraph 43 of the Amended Complaint, it is admitted upon information and belief that ALF has used funds disbursed to it under the MSA—funds totaling hundreds of millions of dollars paid by the tobacco companies, including Lorillard—to develop, produce, and disseminate its "truth"

13

A193

campaign  By way of further response, it is alleged that the scope of and limitations upon ALF's conduct and activities and its use of MSA monies, including its "truth" campaign, are set forth in the MSA, a written document that speaks for itself, including but not limited to the implied covenant of good faith and fair dealing  With respect to the allegations contained in the second sentence of paragraph 43 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied  Except as expressly admitted herein, the allegations contained in paragraph 43 of the Amended Complaint are denied.

44    Denied

45    With respect to the allegations contained in paragraph 45 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied  Except as expressly admitted herein, the allegations contained in paragraph 45 of the Amended Complaint are denied

46    The allegations contained in the first and third sentences in paragraph 46 of the Amended Complaint are denied  With respect to the allegations contained in the second sentence in paragraph 46 of the Amended Complaint regarding the focus of certain ALF advertisements, it is admitted that certain ALF advertisements focus on the tobacco industry, rather than on tobacco products; the remainder of said sentence is denied  Except as expressly admitted herein, the allegations contained in paragraph 46 of the Amended Complaint are denied.

47    With respect to the allegations contained in paragraph 47 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied  Except as expressly admitted herein, the allegations contained in paragraph 47 of the Amended Complaint are denied

14

48    With respect to the allegations contained in paragraph 48 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied    Except as expressly admitted herein, the allegations contained in paragraph 48 of the Amended Complaint are denied

49    With respect to the allegations contained in paragraph 49 of the Amended Complaint, Lorillard lacks sufficient information to admit or deny such allegations, and they are accordingly denied    Except as expressly admitted herein, the allegations contained in paragraph 49 of the Amended Complaint are denied

50    Denied

51    With respect to the allegations contained in the first and second sentences of paragraph 51 of the Amended Complaint, it is admitted that on January 18, 2002, Lorillard sent a thirty-day notice letter to ALF's counsel, among others, pursuant to Section VII(c)(2) of the MSA, which letter is a written document that speaks for itself    With respect to the allegations contained in the third sentence of paragraph 51 of the Amended Complaint, it is admitted that Lorillard did not withdraw or change its position as expressed in its letter of January 18, 2002, prior to ALF's filing of its original Complaint    Except as expressly admitted herein, the allegations contained in paragraph 51 of the Amended Complaint are denied.

52    The allegations contained in the first sentence of paragraph 52 of the Amended Complaint are denied    The allegations contained in the second sentence of paragraph 52 of the Amended Complaint are admitted    With respect to the allegations contained in the third sentence of paragraph 52 of the Amended Complaint, the North Carolina Complaint is a written document that speaks for itself    Except as expressly admitted herein, the allegations contained in paragraph 52 of the Amended Complaint are denied

15

53      Lorillard repeats, realleges, and incorporates herein by reference its responses to paragraphs 1 through 52 of the Amended Complaint

54      With respect to the allegations contained in paragraph 54 of the Amended Complaint, it is admitted that ALF purports to seek a declaration that Lorillard has no basis to assert, in any court, any claim or suit against ALF seeking to enforce any term of the MSA or seeking to establish any violation of the MSA. By way of further response, it is alleged that such position lacks merit, is unsupported by the law and the facts, and is contrary to multiple public and internal statements by ALF and multiple ALF documents, exchanged both internally at ALF and otherwise, acknowledging that ALF is required to comply with the MSA and is subject to suit for failing to comply with the MSA  By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003    Except as expressly admitted herein, the allegations contained in paragraph 54 of the Amended Complaint are denied

55      With respect to the allegations contained in the first sentence of paragraph 55 of the Amended Complaint, it is admitted that Lorillard has pursued and intends to pursue enforcement action against ALF under the MSA  With respect to the allegations contained in the second sentence of paragraph 55 of the Amended Complaint, it is admitted that ALF has taken the position that Lorillard has no basis for pursing enforcement action against ALF under the MSA  By way of further response, it is alleged that such position lacks merit, is unsupported by the law and the facts, and is contrary to multiple public and internal statements by ALF and multiple documents, exchanged both internally at ALF and otherwise, acknowledging that ALF is required to comply with the MSA and is subject to suit for failing to comply with the MSA  By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003  With respect to the allegations contained in the third sentence of paragraph 55 of the Amended

16

A196

Complaint, it is admitted that there is an actual controversy between the parties, for which declaratory relief pursuant to 10 Del. C. § 6501 is appropriate   Except as expressly admitted herein, the allegations contained in paragraph 55 of the Amended Complaint are denied

56    Denied

57    Lorillard repeats, realleges, and incorporates herein by reference its responses to paragraphs 1 through 57 of the Amended Complaint

58    With respect to the allegations contained in paragraph 58 of the Amended Complaint, it is admitted that ALF purports to seek a declaration that Lorillard has no standing or basis to assert, in any court, any claim or suit against ALF seeking to enforce ALF's Bylaws or seeking to establish any violation of ALF's Bylaws   By way of further response, Lorillard denies that ALF is entitled to such declaratory relief   By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003   Except as expressly admitted herein, the allegations contained in paragraph 58 of the Amended Complaint are denied

59    With respect to the allegations contained in paragraph 59 of the Amended Complaint, it is admitted that there is an actual controversy between the parties, for which declaratory relief pursuant to 10 Del. C. § 6501 is appropriate   By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003   Except as expressly admitted herein, the allegations contained in paragraph 59 of the Amended Complaint are denied

60    Denied

61    Lorillard repeats, realleges, and incorporates herein by reference its responses to paragraphs 1 through 60 of the Amended Complaint

17

A197

62    With respect to the allegations contained in paragraph 62 of the Amended Complaint, it is admitted that ALF purports to seek an injunction barring Lorillard from asserting, in any court, any claim or suit against ALF seeking to enforce any term of the MSA or ALF's Bylaws, or seeking to establish any violation of the MSA or ALF's Bylaws  By way of further response, Lorillard denies that ALF is entitled to such injunctive relief  By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003   Except as expressly admitted herein, the allegations contained in paragraph 62 of the Amended Complaint are denied

63    Denied

64.    Lorillard repeats, realleges, and incorporates herein by reference its responses to paragraphs 1 through 63 of the Amended Complaint.

65.    With respect to the allegations contained in paragraph 65 of the Amended Complaint, it is admitted that ALF purports to seek an alternative declaration as stated therein that (1) ALF's "truth" campaign does not and has not contravened the provisions of Section VI(h) of the MSA and in ALF's Bylaws requiring ALF's public education and advertising to address the addictiveness, health effects, and social costs relating to the use of tobacco product but not to constitute personal attacks or vilification  By way of further response, Lorillard denies that ALF is entitled to such declaratory relief.  Except as expressly admitted herein, the allegations contained in paragraph 65 of the Amended Complaint are denied

66    With respect to the allegations contained in the first sentence of paragraph 66 of the Amended Complaint, it is admitted that Lorillard has pursued and intends to pursue enforcement action against ALF under the MSA.  With respect to the allegations contained in the second sentence of paragraph 66 of the Amended Complaint, it is admitted that there is an actual

controversy between the parties for which declaratory relief pursuant to 10 <u>Del. C.</u> § 6501 is appropriate, including whether certain of ALF's conduct and activities violate, and have violated, the limitations on ALF's conduct and activity and on its use of MSA monies set forth in the MSA and in ALF's Bylaws  By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003

      67    Denied

## SECOND DEFENSE

With respect to Claims I, II, and III of ALF's Amended Complaint, ALF fails to state a claim upon which relief can be granted  By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003

## THIRD DEFENSE

With respect to Claims I, II, and III of ALF's Amended Complaint, ALF's claims against Lorillard are barred by the doctrine of estoppel  By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003

## FOURTH DEFENSE

With respect to Claims I, II, and III of ALF's Amended Complaint, ALF seeks equitable relief, but has acted inequitably and with unclean hands and, accordingly, ALF's unclean hands bar it from recovering the relief it seeks in this action  By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003

## FIFTH DEFENSE

With respect to Claims I, II, and III of ALF's Amended Complaint, ALF's claims against Lorillard are barred by the doctrine of waiver  By way of further response, Lorillard refers to the Opinion of the Court dated January 31, 2003

RLF1-2813061-1

A199

## SIXTH DEFENSE

With respect to Claim IV of ALF's Amended Complaint, the implied covenant of good faith and fair dealing in the MSA prevents ALF from using any of the funds disbursed to ALF under the MSA for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively, and especially the tobacco industry, any tobacco company, or any tobacco company personnel

## SEVENTH DEFENSE

With respect to Claim IV of ALF's Amended Complaint, the implied covenant of good faith and fair dealing in the MSA prevents ALF from taking any action to avoid its obligation to refrain from using any of the funds disbursed to ALF under the MSA for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively, and especially the tobacco industry, any tobacco company, or any tobacco company personnel

## EIGHTH DEFENSE and COUNTERCLAIMS

Lorillard, complaining of ALF by way of counterclaims filed pursuant to Rule 13 of the Delaware Chancery Court Rules, alleges as follows:

## SUMMARY OF CLAIMS

1    In 1998, defendant-counterclaimant Lorillard Tobacco Company ("Lorillard") signed a Master Settlement Agreement ("MSA") with other tobacco companies and forty-six states  In the MSA, Lorillard and the other tobacco company signatories agreed, among other things, to assist in funding a non-profit entity that would operate a public education and advertising program concerning the health effects of tobacco use

20

A200

2       To date, plaintiff-counterdefendant American Legacy Foundation ("ALF") has purported to qualify and be eligible to receive such funding as the non-profit entity described in the MSA. ALF has in fact operated a public education and advertising program, defined as the "National Public Education Fund" ("NPEF") in the MSA, that is paid for by the funding ALF has received pursuant to the MSA.

3       ALF's public education and advertising program is specifically authorized and circumscribed by the MSA as follows:

> The National Public Education Fund shall be used only for public education and advertising regarding the addictiveness, health effects, and social costs related to the use of tobacco products and shall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively. The Foundation shall work to ensure that its activities are carried out in a culturally and linguistically appropriate manner.

MSA, § VI(h). As the Court held in the Opinion of the Court dated January 31, 2003, Section VI(h), together with the other provisions of the MSA relating to ALF, are binding upon ALF and may be enforced by Lorillard.

4.      Notwithstanding these important restrictions on its conduct and activities, since its creation ALF has published and broadcast a number of advertisements that do not address the "addictiveness, health effects, or social costs" of tobacco use. In addition, many of ALF's advertisements have included personal attacks on, and vilification of, Lorillard, its employees, and tobacco companies collectively. Such advertisements and attacks constitute breaches of the MSA by ALF. ALF's radio and television advertisements that violate the MSA are listed in Exhibit A.

5       In addition to its improper advertisements, ALF has engaged in personal attacks on Lorillard's employees by sending (and/or assisting others in sending) numerous unsolicited

21

and harassing e-mails  Examples of such e-mails are attached as Exhibit B hereto  Such e-mails frequently contained vulgar, threatening, and obscene language, and such e-mails evidence the malice that ALF bears toward Lorillard  These e-mails constitute breaches of the MSA by ALF

6    Moreover, after certain tobacco companies, certain attorneys general, television networks, and others expressed the view to ALF that some of ALF's initial advertisements violated the MSA, ALF and its attorneys pursued a scheme designed to evade the restrictions placed on ALF's conduct and activities by Section VI of the MSA.  ALF adopted a practice under which any advertisement or activity deemed by its attorneys to present at least a moderate risk of violating the MSA was designated by ALF to be funded by monies received by ALF pursuant to Section VI(b) of the MSA (the "Base Foundation Payments"), monies ALF wrongly believes may be spent on personal attacks and vilification  Notwithstanding ALF's efforts, it cannot avoid the limitations placed on its conduct and activities as a factual or legal matter and, further, the scheme implemented by ALF itself constitutes a breach of the MSA by ALF, including without limitation a breach of the implied covenant of good faith and fair dealing

7    By these counterclaims, Lorillard is seeking, among other relief, a determination that ALF, by engaging in the conduct alleged herein, has repeatedly and materially breached the MSA and an order requiring ALF to comply with its obligations under the MSA

## PARTIES

8    Lorillard is a corporation organized and existing under the laws of the State of Delaware and has its principal office and place of business in Greensboro, North Carolina

9    ALF is a non-profit corporation organized and existing under the laws of the State of Delaware and has its principal office and place of business in Washington, D C

## EXECUTION OF THE MASTER SETTLEMENT AGREEMENT
## AND THE CREATION OF ALF

10    As a result of litigation pending in multiple fora, four tobacco companies—Lorillard, Philip Morris Incorporated ("Philip Morris"), Brown & Williamson Tobacco Corporation ("B&W"), and R J Reynolds Tobacco Company ("RJR")—on the one hand and some forty-six states—including Delaware—participated in negotiations designed to reach a resolution of the parties' disputes. The various attorneys general of these states negotiated on the states' behalf

11    The parties successfully reached a settlement, and they memorialized the terms in a landmark agreement known as the MSA  The document was executed in November 1998 by the four tobacco companies, including Lorillard, and the attorneys general of the forty-six states signatories  The state signatories to the MSA hereinafter shall be referred to collectively as the "Settling States," and the tobacco company signatories hereinafter shall be referred to collectively as the "Participating Manufacturers "

12    The MSA imposes significant obligations upon the Participating Manufacturers  Among other things, the Participating Manufacturers agreed to fund a non-profit entity charged with the mission of educating the public as to the nature and effect of tobacco products and their use

13    Section VI of the MSA carefully describes this non-profit entity's mission, and it lists the entity's permissible functions.  This section also describes in a general manner the structure of the organization and the composition of its board of directors, as well as certain other organizational requirements the entity must meet once formed

14    Section VI of the MSA also sets forth in detail the funding obligations imposed upon the Participating Manufacturers with respect to this non-profit entity    Pursuant to

23

Section VI(b), beginning on March 31, 1999, and extending for a period of nine years thereafter, the Participating Manufacturers agreed to pay collectively $25,000,000 per year to fund the non-profit entity   These Base Foundation Payments are disbursed under the MSA and Escrow Agreement to the non-profit entity described in Section VI

15    To date, Lorillard has made each of the Base Foundation Payments called for by the MSA, as have the other Participating Manufacturers   Lorillard's proportionate share of the Base Foundation Payments made to date exceeds $10,000,000

16    Pursuant to Section VI(c), the Participating Manufacturers agreed to make five substantial payments to fund and for the benefit of the National Public Education Fund ("NPEF"), the public education and advertising program administered by the non-profit entity   The MSA called for these payments to be made on the following dates and in the following amounts: $250,000,000 paid collectively by the Participating Manufacturers on March 31, 1999, and $300,000,000 paid collectively each of the next four years thereafter   These payments are known as "National Public Education Fund Payments" or "NPEF Payments"   The NPEF Payments are disbursed under the MSA and Escrow Agreement to the non-profit entity described in Section VI

17    To date, Lorillard has made each of the NPEF Payments called for by the MSA, as have the other Participating Manufacturers   Lorillard's proportionate share of the NPEF Payments made to date exceeds $100,000,000.

18.    Section VI limits in significant ways the manner in which the non-profit entity may use the monies it receives under the MSA   One critical limitation is contained in Section VI(h), which provides that:

> The National Public Education Fund shall be used only for public education and advertising regarding the addictiveness, health effects, and social costs related to

24

> the use of tobacco products and shall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively

Master Settlement Agreement, § VI(h)  Lorillard and, upon information and belief, the other Participating Manufacturers would not have agreed to make the Base Foundation Payments or the NPEF Payments, would not have agreed to the formation and funding of the non-profit entity under the MSA and to its operation of the NPEF, and would not have executed the MSA itself had the MSA permitted Lorillard's and the Participating Manufacturers' payments to be used for personal attacks on, or vilification of, tobacco companies or their employees, individually or collectively

19      Pursuant to Section VI(c)(4) of the MSA, the NPEF may be funded only by NPEF Payments and by contributions made to the non-profit entity and specifically designated for the NPEF  Thus, when spent as part of the public education and advertising program called for by the MSA, NPEF Payments may not be used to personally attack or vilify  Lorillard contends that Base Foundation Payments may not be used at all to fund the public education and advertising program  To the extent that Base Foundation Payments are nevertheless able to be used for advertising, however, Section VI(h) and the implied covenant of good faith and fair dealing still require that the advertising concern the addictiveness, health effects, and social costs of the use of tobacco product and not constitute personal attacks or vilification

20      Section VI of the MSA therefore imposes significant obligations on the non-profit entity that are owed to the Participating Manufacturers, including Lorillard, with respect to the NPEF administered and operated by the non-profit entity and the MSA monies disbursed to the non-profit entity, namely that (1) the NPEF will be administered and operated by a non-profit entity qualified and eligible to do so; (2) Base Foundation Payments and NPEF Payments will be

disbursed to a non-profit entity qualified and eligible to receive such disbursements; and (3) the NPEF, and any MSA monies used to fund it, will in fact be used by this non-profit entity in a manner consistent with Section VI and any other pertinent provisions of the MSA    These promises and contractual obligations are consistent with the promises and contractual obligations owed to Lorillard and the Participating Manufacturers concerning the mission and permissible functions of the non-profit entity

21    These promises and contractual obligations concerning the NPEF, the Base Foundation Payments and NPEF Payments, the permissible uses of, and restrictions upon, the NPEF, Base Foundation Payments, and NPEF Payments, and the Section VI non-profit entity generally each constitute material terms of the MSA    Had these terms not been present in the MSA, Lorillard and, upon information and belief, the other Participating Manufacturers would not have agreed to make the Base Foundation Payments or the NPEF Payments, would not have agreed to the formation and funding of the non-profit entity under the MSA and to its operation of the NPEF, and would not have executed the MSA itself

22    Pursuant to the MSA, on or about March 3, 1999, the National Association of Attorneys General ("NAAG") incorporated a non-profit entity in the State of Delaware    The original name of the entity—the plaintiff and counter-defendant in this action—was the "MSA National Foundation," a name that was changed to "American Legacy Foundation" ("ALF") on or about August 2, 1999

23    The MSA requires that the non-profit entity described in Section VI incorporate into its organizational documents those terms of the MSA relating to the entity    Consistent with this requirement, the entity's permissible functions—listed in Section VI(f) of the MSA—are contained in ALF's Certificate of Incorporation    The MSA's requirements concerning the

26

composition of the entity's board of directors are contained in the Bylaws adopted by ALF's initial board of directors   Section 5 7 of ALF's Bylaws meets the affiliation requirement set forth in Section VI(e) of the MSA, and this provision expressly provides that ALF is bound by and subject to the terms of the MSA   The restrictions contained in Section VI(h) of the MSA are set forth in Section 12 2 of ALF's Bylaws, as are the rules set forth in Section VI(g) of the MSA regarding grants made by the non-profit entity from the NPEF   Finally, Article XIII of ALF's Bylaws provides that neither its Bylaws nor its Certificate of Incorporation may be amended so as to create an inconsistency with any provision of the MSA concerning the non-profit entity described in Section VI of the MSA   The entire MSA is attached to ALF's Bylaws as an exhibit

24    Upon information and belief, ALF adopted these Bylaws in an attempt to qualify under Section VI of the MSA to administer and operate the NPEF and in an attempt to become eligible to receive disbursements under Sections VI(b), VI(c), and IX(e) of the MSA and under the Escrow Agreement   Upon information and belief, ALF adopted these Bylaws for the benefit of the Participating Manufacturers, including Lorillard

25    Upon information and belief, after ALF was incorporated and adopted its Bylaws, the Settling States and NAAG considered ALF to be qualified under Section VI of the MSA to administer and operate the NPEF and to be eligible receive disbursements under Sections VI(b), VI(c), and IX(e) of the MSA, and they considered ALF to be the non-profit entity described in Section VI   Upon information and belief, after ALF was incorporated and adopted its Bylaws, the Setting States and NAAG allowed ALF to administer and operate the NPEF, and they allowed ALF to receive disbursements under Sections VI(b) and VI(c) of the MSA and under the Escrow Agreement

26    The Escrow Agent has disbursed to ALF each of the Base Foundation Payments made by Lorillard and the Participating Manufacturers to date  As of July 21, 2004, ALF has received $150,039,584 in Base Foundation Payments, and ALF continues to receive Base Foundation Payments

27    The Escrow Agent has disbursed to ALF each of the NPEF Payments made by Lorillard and the Participating Manufacturers to date  As of July 21, 2004, ALF has received $1,346,029,840 in NPEF Payments, and no additional NPEF Payments are due under the MSA  No payments have been disbursed to ALF pursuant to Section IX(e) of the MSA

28    Other than the approximately $50,000,000 in funds ALF has received pursuant to the Smokeless Tobacco Master Settlement Agreement, which contains restrictions identical to those contained in Section VI(h) of the MSA, ALF has no significant assets or sources of revenue other than the Base Foundation Payments and NPEF Payments it has received and the income it has earned on portions of NPEF Payments that have been invested

29    ALF has purported to administer and operate the NPEF to date, and ALF continues to do so

30    By administering and operating the NPEF, and by accepting disbursements of Base Foundation Payments and NPEF Payments under the MSA, ALF has reaped significant, intended benefits under the MSA, and it has done so with knowledge of the terms of the MSA

## ALF'S VIOLATIONS OF THE MSA

**A.    ALF Publishes and Broadcasts Advertisements that Constitute Personal Attacks and/or Vilification in Violation of Section VI(h) of the MSA**

31    Once formed, in early 2000 ALF launched the public education and advertising program called for by the MSA   This program is comprised of several distinct advertising campaigns, including ALF's primary and most prominent advertising campaign, known as

28

A208

"truth" The "truth" campaign includes an internet website maintained by ALF called "THETRUTH com"

32    ALF's "truth" advertising campaign—including its internet website called "THETRUTH com"—is funded by NPEF Payments and Base Foundation Payments

33    Lorillard does not object to those ALF advertisements that are authorized by and consistent with the MSA  Exhibit A lists radio and television advertisements for which Lorillard has no objection  These advertisements properly address "the addictiveness, health effects, and social costs related to the use of tobacco products" and do not personally attack or vilify any person or group

34    Unfortunately, shortly after its creation ALF began to run other advertisements—on television, on radio, in print publications, and on the internet—that are not authorized by or consistent with the MSA  These advertisements do not address "the addictiveness, health effects, and social costs related to the use of tobacco products" and/or constitute personal attacks on, or vilification of, Lorillard, its employees, or tobacco companies collectively  As a result, such advertisements, and the activities related to such advertisements, represent misuse of the NPEF, misuse of NPEF Payments and Base Foundation Payments, and breaches of the MSA by ALF

35    On multiple occasions, in publications or broadcasts reaching millions of members of the public, ALF has personally attacked and vilified Lorillard, its employees, and tobacco companies collectively  For example, ALF has broadcast advertisements that:

a    attack tobacco companies collectively, as well as employees of such companies;

b    state or strongly imply that Lorillard and other tobacco companies deliberately target their sales efforts at minors; (for example, in a press release on THETRUTH com, ALF stated "Lorillard has successfully marketed its addictive product to minority youth"),

29

c    accuse tobacco companies of shredding documents, thereby implying the intentional and improper destruction of evidence;

d    accuse tobacco companies of lying to the public, including one advertisement in which an employee of a tobacco company is asked to take a lie-detector test;

e.   end with a statement that ALF is attempting to "expose the tobacco industry's deceptions to the light of day"; and

f.   strongly imply that Lorillard adds dog urine to its cigarettes ("Dog Walker")

36    Examples of ALF's improper advertisements are listed in Exhibit A  All such advertisements (whether they fail to address "the addictiveness, health effects, and social costs related to the use of tobacco products" or constitute personal attacks and/or vilification) represent misuse of the NPEF, misuse of NPEF Payments and Base Foundation Payments, and breaches of the MSA by ALF

37    ALF purposefully and intentionally developed, produced, and disseminated advertisements that violated the MSA because ALF and its advertising contractors set out to convey what ALF describes as an "industry manipulation" theme with its public education and advertising program  In order to convey this theme, ALF and its advertising contractors tested advertisements with focus groups that demonstrated that persons viewed tobacco companies and their employees less favorably after being exposed to ALF's advertising  In particular, the reports from these focus groups informed ALF before its advertisements were published or broadcast that many of those advertisements caused viewers to see tobacco companies and their employees as, among other things, evil, greedy, deceitful, dishonest, and manipulative  Such advertisements amount to personal attacks on, and/or vilification of, Lorillard, its employees, and tobacco companies collectively and thus violate the MSA

30

A210

**B.    ALF Attempts to Evade Section VI(h)'s Restrictions by Manipulating Its Finances**

38      Among the first of the advertisements ALF developed violate Section VI(h) of the MSA  These advertisements, including advertisements known as "Body Bags," "Lie Detector," "Hypnosis," and "Shredder" (the "Youth Voice Ads"), were developed for broadcast in early 2000  When ALF attempted to have these advertisements approved for production by television networks, several networks expressed concern to ALF that these advertisements violated the MSA   In addition, when tobacco companies learned of these advertisements, they too complained that the advertisements constituted personal attacks and/or vilification   Finally, members of ALF's own board of directors and certain attorneys general expressed similar concerns to ALF  In fact, as the Youth Voice Ads were being finalized for production, ALF's own attorneys warned that the messages they expressed presented moderate or high risk of violating Section VI(h) of the MSA   Notwithstanding the concern expressed from multiple parties as to the propriety of the Youth Voice Ads under the MSA, ALF ultimately broadcast each of these advertisements, either on television or on the internet

39      In the wake of the controversy surrounding the Youth Voice Ads, ALF and its attorneys developed a strategy in an attempt to avoid the Section VI(h) restrictions  Adopting the mistaken view that Base Foundation Payments can be used to pay for advertising and that Base Foundation Payments may be used to personally attack and vilify Lorillard, its employees, and tobacco companies collectively, ALF began in March 2000 designating what ALF describes as "base fund activities" as being paid for by Base Foundation Payments   Such "base fund activities" included ALF's THETRUTH com website and any advertisement deemed by ALF's attorneys as exposing ALF to a moderate to high risk of liability for breaching the MSA   ALF also began allocating certain indirect expenses associated with its public education and

31

advertising program between NPEF Payments and Base Foundation Payments, including the fees paid to advertising contractors, general and administrative expenses, and salaries  This scheme and related actions violate the covenant of good faith and fair dealing in the MSA

40      Notwithstanding the scheme it devised, ALF has not funded its "base fund activities" exclusively with Base Foundation Payments  This follows for a number of reasons, including without limitation (a) the relationship between ALF and its contractors (b) the fact that ALF commingles NPEF Payments and Base Foundation Payments; (c) the presence of indirect costs associated with ALF's public education and advertising program, some of which are difficult, if not impossible, to allocate accurately between "base fund activities" and non-"base fund activities", (d) the fact that each discrete "base fund activity" described by ALF cannot be isolated or separated from a larger advertising campaign, and each of ALF's advertising campaigns are funded in part by NPEF Payments; and (e) ALF has simply failed as a factual matter to adhere to its purported distinction between "base fund activities" and non-"base fund activities "  Further, the percentages ALF uses to allocate certain indirect expenses among NPEF Payments and Base Foundation Payments upon information and belief are incorrect and unsupported by any factual basis  For these reasons, all of ALF's purported "base fund activities" and all of ALF's advertisements and related activities have been funded, at least in part, by NPEF Payments

41      Moreover, ALF's use of Base Foundation Payments to fund advertising and other aspects of ALF's public education and advertising program itself constitutes a breach of Section VI of the MSA  Further, any personal attack or vilification published or broadcast as part of ALF's public education and advertising program violates the MSA specifically and through the covenant of good faith and fair dealing, whether or not ALF contends that such

32

personal attacks or vilification were paid for by Base Foundation Payments  Finally, upon information and belief ALF has improperly spent NPEF Payments so as to make available additional Base Foundation Payments for advertising, which also constitutes a breach of Section VI of the MSA

C.  **ALF Facilitates and Assists the Sending of Multiple Harassing E-mails to Lorillard Employees**

42   In addition to the malicious attitude toward Lorillard, its employees, and tobacco companies collectively displayed in ALF's advertisements, ALF has engaged in a pattern of sending, facilitating, and/or assisting others in sending thousands of unsolicited and harassing e-mails to Lorillard  ALF sent, facilitated, and/or assisted others in the dissemination of the harassing e-mails by including features at its THETRUTH com website known as "mad libs" or "pissed-off libs" and "talk to them" or "letters to big tobacco " These features allowed visitors to ALF's website to compose original messages or to fill in blanks contained in form messages, and then to send the messages to tobacco company executives, whose e-mail addresses were provided by ALF

43   These e-mails, some of which are attached as Exhibit B, frequently contain vulgar, threatening, and obscene language, including the use of such words and phrases as "whores," "fags," "morons," "you monkeys at Lorillard Tobacco Company," "bullshit," "pathetic bitch asses," and "hookers " These multiple unsolicited and harassing e-mails sent to Lorillard interfered with Lorillard's e-mail system and computer network, and they disrupted Lorillard's employees and such employees' use of their computers

44   In 2001, Lorillard was forced to install a filter on its computers to attempt to block ALF's vulgar e-mails  However, some of the harassing e-mails from THETRUTH com website were nevertheless received by Lorillard thereafter

45      Such e-mails, and the activities related to such e-mails, were intended by ALF to harass and annoy (and, upon information and belief, intimidate) Lorillard and its employees Upon information and belief, such e-mails were also intended to interfere with Lorillard's e-mail system and/or computer network and to disrupt Lorillard's employees and such employees' use of their computers

46      ALF knew that visitors to ALF's website would send and were sending vulgar, profane, and threatening e-mail messages to tobacco company employees with the "mad libs" or "pissed-off libs" and the "talk to them" or "letters to big tobacco" features of ALF's website, yet ALF continued to maintain those features on its website until after this litigation began ALF also had knowledge that tobacco companies were attempting to block the receipt of ALF's harassing e-mails, yet ALF continued to maintain those features on its website until after this litigation began and, upon information and belief, sought to evade the tobacco companies' attempts to block such e-mails  Finally, ALF knew that visitors would inundate and were inundating tobacco company employees with thousands of such e-mail messages, yet ALF continued to maintain those features on its website until after this litigation began

47      These unsolicited and harassing e-mails, including without limitation the vulgar, threatening, and obscene content of such e-mail messages, constitute personal attacks on and vilification of Lorillard and its employees, which is expressly prohibited by the MSA  ALF's THETRUTH com website is a component of its public education and advertising program and is funded by NPEF Payments and Base Foundation Payments  Thus, the features of ALF's THETRUTH com website that facilitated the sending of such e-mails, the e-mail messages themselves and their content, and the activities related to such e-mails, all constitute misuse of

34

the NPEF, misuse of NPEF Payments and Base Foundation Payments, and breaches of the MSA by ALF

## ATTEMPTS BY LORILLARD TO RESOLVE DISPUTE

48      After Dog Walker was broadcast, Lorillard contacted ALF and expressed its view that ALF's conduct constituted a material breach of the MSA  Lorillard requested that ALF issue a retraction of the advertisement and agree to comply with the MSA  ALF refused to comply with these requests

49.     After these initial informal settlement discussions were unproductive, Lorillard sent ALF a formal thirty-day notice letter, as required by Section VII(c) of the MSA  Lorillard's hope was that the parties would re-kindle their discussions and resolve this matter amicably Instead, ALF's President, Cheryl Healton, responded by issuing a press release containing malicious statements about Lorillard  Lorillard does not seek, and has never sought, to stop ALF's "truth" advertising campaign  Lorillard's goals are for ALF to stop misusing the funds entrusted to it and for ALF otherwise to comply with its legal, contractual, and ethical obligations

## FIRST CLAIM FOR RELIEF
### Breach of Master Settlement Agreement

50      The allegations of Paragraphs 1 through 49 are repeated, realleged, and incorporated herein by reference

51.     ALF was created under the terms of the MSA

52      ALF incorporated the MSA into its Bylaws

53      Pursuant to the terms of the MSA, Lorillard has paid tens of millions of dollars for ALF's benefit   ALF has accepted those funds under the terms of the MSA and with full knowledge of the MSA

35

A215

54    The MSA constitutes a pre-incorporation agreement    Specifically:

    a    the MSA sets forth certain obligations of, and restrictions on, ALF;

    b    the MSA was signed by the various Settling States (as defined in the MSA) and their respective attorneys general;

    c    the Settling States and NAAG promoted and incorporated ALF;

    d    ALF has accepted millions of dollars in benefits under the MSA; and

    e    ALF accepted the benefits with full knowledge of the terms of the MSA

By its conduct, ALF has adopted and ratified the MSA, and is bound to comply with the terms thereof    At no time has ALF attempted to repudiate the benefits received by it under the MSA

55    In addition, ALF has expressly and/or implicitly adopted and assumed the obligations set forth in the MSA concerning the NPEF and its permissible uses, the NPEF Payments and Base Foundation Payments ALF receives and all restrictions on the use of such monies, and the non-profit entity described in Section VI of the MSA    This adoption and assumption is evidenced by the fact that ALF, its board of directors, and its attorneys have repeatedly acknowledged, both publicly and internally, that ALF is bound by the terms of the MSA and that ALF is subject to suit from the Participating Manufacturers for breaching the terms of the MSA

56.    ALF's Bylaws acknowledge that ALF must comply with the MSA    For example, §5 7 provides.

> Affiliation    The programs of the Foundation may be affiliated with one or more educational or medical institutions selected by the Board of Directors from time to time <u>as required by the Master Settlement Agreement attached hereto as Exhibit A</u> ("Master Settlement Agreement")

(emphasis added )

57    Thus, as the Court held in the Opinion of the Court dated January 31, 2003, Section VI(h), together with the other provisions of the MSA relating to ALF or the monies ALF receives pursuant to the MSA, are binding upon ALF and may be enforced by Lorillard

58    As described above, ALF has committed multiple material breaches of the MSA, including but not limited to Sections VI(f) and (h), by engaging in activities and conduct prohibited by the MSA and by misusing the monies disbursed and entrusted to it   Specifically, ALF breached the MSA in at least the following ways:

a    administering and operating a public education and advertising program that includes advertisements and other activities that fail to address "the addictiveness, health effects, and social costs related to the use of tobacco products;"

b    administering and operating a public education and advertising program that includes advertisements and other activities that constitute personal attacks on, and/or vilification of, Lorillard, its employees, and tobacco companies collectively;

c    using NPEF Payments to develop, produce, and/or disseminate advertisements that fail to address "the addictiveness, health effects, and social costs related to the use of tobacco products," including certain advertisements identified in Exhibit A,

d    using NPEF Payments to develop, produce, and/or disseminate advertisements that constitute personal attacks on, and/or vilification of, Lorillard, its employees, and tobacco companies collectively, including certain advertisements identified in Exhibit A;

e    using Base Foundation Payments to develop, produce, and/or disseminate advertisements that fail to address "the addictiveness, health effects, and social costs related to the use of tobacco products," including certain advertisements identified in Exhibit A;

   f  using Base Foundation Payments to develop, produce, and/or disseminate advertisements that constitute personal attacks on, and/or vilification of, Lorillard, its employees, and tobacco companies collectively, including certain advertisements identified in Exhibit A;

   g  using NPEF Payments to maintain a website that facilitated and assisted the sending of thousands of unsolicited and harassing e-mail messages to Lorillard employees, which e-mails, and the features of ALF's THETRUTH com website that facilitated the sending of such e-mails, constitute personal attacks on, and/or vilification of, Lorillard and its employees;

   h  using Base Foundation Payments to maintain a website that facilitated and assisted the sending of thousands of unsolicited and harassing e-mail messages to Lorillard employees, which e-mails, and the features of ALF's THETRUTH com website that facilitated the sending of such e-mails, constitute personal attacks on, and/or vilification of, Lorillard and its employees;

   i  using NPEF Payments for matters other than the functions described in Sections VI(f), VI(g), and VI(h) of the MSA; and

   j  using Base Foundation Payments for advertising

  59  Pursuant to Section VII(c) of the MSA, this Court has the authority to enforce the terms of the MSA  In addition, this Court has the authority to issue a Declaratory Order (as defined in the MSA)

  60  Lorillard requests that the Court enter a finding that ALF has repeatedly breached the MSA and enter an order requiring ALF to comply with the MSA

  61  ALF's breaches of the MSA and harassing conduct are likely to recur in the future unless ALF is ordered to cease doing so and to specifically perform its duties and obligations under the MSA, and such breaches and harassing conduct are not compensable by money

RLF1-2813061-1

A218

damages   Accordingly, Lorillard requests preliminary and permanent injunctive relief requiring ALF to cease sending (and assisting others in sending) unsolicited e-mails to Lorillard and/or its employees and to comply with the requirements of the MSA, including the operation of a public education and advertising program that is consistent with Section VI(h) of the MSA and the expenditure of monies disbursed to ALF under the MSA in a manner consistent with Section VI of the MSA, and Lorillard requests an order requiring ALF to specifically perform its duties and obligations under the MSA

62      Lorillard requests as further relief for ALF's breaches of the MSA that the Court enter an order requiring ALF to refund and return to the Escrow Agent all NPEF Payments and Base Foundation Payments made by the Participating Manufacturers, including Lorillard   In the alternative, Lorillard requests that the Court order an accounting of ALF's use of the NPEF Payments and Base Foundation Payments disbursed to it under Section VI of the MSA and under the Escrow Agreement and, based on the results of such accounting, enter an order requiring ALF to refund and return to the Escrow Agent all NPEF Payments and Base Foundation Payments made by the Participating Manufacturers, including Lorillard, that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement

63      To the extent the Court finds ambiguity in any term or terms of the MSA, Lorillard requests a Declaratory Order under Section VII(c)(1) and (c)(5) of the MSA defining ALF's obligations under the MSA and/or construing such ambiguous term or terms

## SECOND CLAIM FOR RELIEF
### Breach of the Duty and Covenant of Good Faith and Fair Dealing

64.    The allegations of Paragraphs 1 through 63 are repeated, realleged, and incorporated herein by reference

65.    Implied in the MSA is a duty and covenant of good faith and fair dealing

66    ALF knew, acknowledged, and admitted that it is bound by and must comply with the terms of the MSA, including without limitation the prohibitions against personal attacks and vilification contained in Section VI(h) of the MSA  Despite the presence of these limitations on ALF's conduct and activities, ALF undertook to avoid those limitations by manipulating its finances  As alleged herein, ALF sought to designate those advertisements and activities that exposed ALF to significant risk of liability under the MSA as being funded exclusively by Base Foundation Payments, which ALF wrongfully views as not being subject to the MSA's prohibition against personal attacks and vilification

67    ALF's purposeful and intentional effort to evade Section VI(h)'s restrictions and to develop, produce, and disseminate advertisements and engage in activities that violate those restrictions amounts to a breach of ALF's duty and covenant of good faith and fair dealing under the MSA

68    Accordingly, Lorillard requests that the Court enter a finding that ALF has repeatedly breached the MSA, including without limitation the covenant of good faith and fair dealing, and enter an order requiring ALF to comply with the MSA, including without limitation the covenant of good faith and fair dealing

69    ALF's breaches of the MSA and harassing conduct are likely to recur in the future unless ALF is ordered to cease doing so and to specifically perform its duties and obligations under the MSA (including without limitation the covenant of good faith and fair dealing), and

40

such breaches and harassing conduct are not compensable by money damages  Accordingly, Lorillard requests preliminary and permanent injunctive relief requiring ALF to cease sending (and assisting others in sending) unsolicited e-mails to Lorillard and/or its employees and to comply with the requirements of the MSA (including without limitation the covenant of good faith and fair dealing), including the operation of a public education and advertising program that is consistent with Section VI(h) of the MSA and the expenditure of monies disbursed to ALF under the MSA in a manner consistent with Section VI of the MSA, and Lorillard requests an order requiring ALF to specifically perform its duties and obligations under the MSA, including without limitation the covenant of good faith and fair dealing.

70    Lorillard requests as further relief for ALF's breaches of the MSA (including without limitation the covenant of good faith and fair dealing) that the Court enter an order requiring ALF to refund and return to the Escrow Agent all NPEF Payments and Base Foundation Payments made by the Participating Manufacturers, including Lorillard  In the alternative, Lorillard requests that the Court order an accounting of ALF's use of the NPEF Payments and Base Foundation Payments disbursed to it under Section VI of the MSA and under the Escrow Agreement and, based on the results of such accounting, enter an order requiring ALF to refund and return to the Escrow Agent all NPEF Payments and Base Foundation Payments made by the Participating Manufacturers, including Lorillard, that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement.

**THIRD CLAIM FOR RELIEF**
**Violation of Bylaws and Certificate of Incorporation**

71    The allegations of Paragraphs 1 through 70 are repeated, realleged, and incorporated herein by reference

RLFI-2813061-1

A221

72    Upon information and belief, NAAG incorporated those certain provisions of ALF's Certificate of Incorporation concerning the non-profit entity described in Section VI of the MSA in an attempt to qualify ALF under Section VI of the MSA to administer and operate the NPEF and to allow ALF to become eligible to receive disbursements under Sections VI and IX(e) of the MSA and under the Escrow Agreement   Upon information and belief, NAAG incorporated these provisions into ALF's Certificate of Incorporation for the benefit of the Participating Manufacturers, including Lorillard

73    Upon information and belief, ALF adopted those Bylaws concerning the NPEF and its permissible uses, the NPEF Payments and Base Foundation Payments ALF receives and all restrictions on the use of such monies, and the non-profit entity described in Section VI of the MSA, as well as those Bylaws otherwise relating to the MSA, in an attempt to qualify under Section VI to administer and operate the NPEF and to become eligible to receive disbursements under Sections VI(b), VI(c), and IX(e) of the MSA and under the Escrow Agreement   Upon information and belief, ALF adopted these Bylaws for the benefit of the Participating Manufacturers, including Lorillard

74    Lorillard enjoys standing to enforce such Bylaws and Certificate of Incorporation provisions because upon information and belief these provisions were intended to confer direct contractual rights upon Lorillard and/or because upon information and belief Lorillard is an intended third-party beneficiary of such provisions

75    In the alternative, Lorillard enjoys standing to enforce such Bylaws and Certificate of Incorporation provisions because of the special interest Lorillard has in the enforcement of such provisions and/or because the Attorney General of the State of Delaware has failed to enforce such provisions herself

42

A222

76    As described above, ALF has committed multiple material violations of such Bylaws and Certificate of Incorporation provisions by misusing the NPEF and by misusing the NPEF Payments and the Base Foundation Payments disbursed to it under the MSA. Specifically and without limitation, ALF's public education and advertising program has included, and the NPEF Payments and Base Foundation Payments disbursed to ALF have been used for, advertisements and activities that do not address the addictiveness, health consequences, or social costs of the use of tobacco products and/or that constitute personal attacks on, or vilification of, Lorillard, its employees, and tobacco companies collectively. In addition, the unsolicited and harassing e-mails described above constitute personal attack on, and vilification of, Lorillard and its employees and further violate the MSA. Finally, ALF has also used NPEF Payments and Base Foundation Payments in manners prohibited by the MSA.

77    ALF's misconduct and misuse of MSA funds disbursed and entrusted to it, which misconduct and misuse violates ALF's Bylaws and Certificate of Incorporation provisions concerning the NPEF and its permissible uses, the NPEF Payments and Base Foundation Payments ALF receives and all restrictions on the use of such monies, and the non-profit entity described in Section VI of the MSA, as well as those provisions otherwise relating to the MSA, are likely to recur in the future unless ALF is ordered to cease doing so and are not compensable by money damages. Accordingly, Lorillard requests preliminary and permanent injunctive relief requiring ALF to cease its violation of such provisions.

78    Lorillard requests as further relief for ALF's violation of its Bylaws and Certificate of Incorporation that the Court enter an order requiring ALF to refund and return to the Escrow Agent all NPEF Payments and Base Foundation Payments made by the Participating Manufacturers, including Lorillard. In the alternative, Lorillard requests that the Court order an

43

accounting of ALF's use of the NPEF Payments and Base Foundation Payments disbursed to it under Section VI of the MSA and under the Escrow Agreement and, based on the results of such accounting, enter an order requiring ALF to refund and return to the Escrow Agent all NPEF Payments and Base Foundation Payments made by the Participating Manufacturers, including Lorillard, that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement

**FOURTH CLAIM FOR RELIEF**
**Claim for Declaratory Judgment Regarding MSA**

79    The allegations of Paragraphs 1 through 78 are repeated, realleged, and incorporated herein by reference

80    Lorillard seeks a declaration that ALF—on account of its conduct, its activities, the content of the NPEF, its use of NPEF Payments and Base Foundation Payments, and otherwise, as alleged herein—does not qualify and is not eligible to administer and operate the NPEF under Sections VI and IX(e) of the MSA and does not qualify and is not eligible to receive disbursements under Sections VI(b), VI(c), and IX(e) of the MSA and under the Escrow Agreement   Lorillard requests that the Court issue a declaration to this effect and also declare that ALF no longer may administer and operate the NPEF under Sections VI and IX(e) of the MSA and no longer may receive disbursements under Sections VI(b), VI(c), and IX(e) of the MSA and under the Escrow Agreement

81    Lorillard also seeks a declaration that ALF—on account of its conduct, its activities, the content of the NPEF, its use of NPEF Payments and Base Foundation Payments, and otherwise, as alleged herein—has been disqualified and ineligible to administer and operate the NPEF under Section VI of the MSA and has been disqualified and ineligible to receive disbursements under Section VI(b), VI(c), and IX(e) of the MSA and under the Escrow

44

Agreement Lorillard requests that the Court issue a declaration to this effect and also declare

that ALF must refund and return to the Escrow Agent all NPEF Payments and Base Foundation

Payments disbursed to ALF while ALF was disqualified and ineligible to administer and operate

the NPEF and/or disqualified and ineligible to receive such disbursements

82    ALF has demonstrated through its conduct, its activities, the content of the NPEF,

its use of NPEF Payments and Base Foundation Payments, and otherwise, as alleged herein, that

it does not meet (and has not met) the definition of the non-profit entity described in Sections VI

and IX(e) of the MSA and that it does not qualify and is not eligible (and has been disqualified

and ineligible) to administer and operate the NPEF under Sections VI and IX(e) of the MSA or

to receive disbursements under Sections VI(b), VI(c), and IX(e) of the MSA and under the

Escrow Agreement However, ALF has suggested that it does qualify and is eligible (and has

been qualified and eligible) to administer and operate the NPEF under Sections VI and IX(e) of

the MSA and to receive disbursements under Sections VI(b), VI(c), and IX(e) of the MSA and

under the Escrow Agreement Thus, this claim presents an actual controversy, for which

declaratory relief is appropriate under 10 Del. C. § 6501 and Section VII(c) of the MSA

### FIFTH CLAIM FOR RELIEF
#### Trespass to Chattel

83    The allegations of Paragraphs 1 through 82 are repeated, realleged, and

incorporated herein by reference                    ,

84    As described above, ALF intentionally intermeddled with Lorillard's e-mail

system and computer network by sending, facilitating, and/or assisting others in sending,

thousands of unsolicited and harassing e-mails to Lorillard and Lorillard's employees These

unsolicited and harassing e-mails interfered with Lorillard's e-mail system and computer

network, and they disrupted Lorillard's employees and such employees' use of their computers Lorillard was forced to install a filter on its computers to attempt to block such e-mails

85     ALF sent, facilitated, and/or assisted others in the sending of the harassing e-mails by including features at its THETRUTH com website known as "mad libs" or "pissed off libs" and "talk to them" or "talk to big tobacco "

86     ALF's conduct relating to the sending of such unsolicited and harassing e-mails to Lorillard and Lorillard's employees as alleged herein amounts to a trespass to Lorillard's chattel, that is, a trespass to Lorillard's e-mail system and computer network

87     As a result of ALF's trespass, Lorillard is entitled to recover from ALF Lorillard's direct and special damages, including the cost of installing the e-mail filter

88     ALF's trespass is likely to recur in the future unless ALF is ordered to cease doing so   Accordingly, Lorillard requests preliminary and permanent injunctive relief requiring ALF to cease sending, facilitating, and/or assisting others in sending unsolicited e-mails to Lorillard and/or Lorillard's employees

WHEREFORE Defendant-Counterclaimant Lorillard prays that the Court:

1     Enter judgment in favor of Lorillard and against ALF on ALF's claims against Lorillard and dismiss ALF's complaint against Lorillard in its entirety with prejudice;

2     Enter judgment in favor of Lorillard and against ALF on claims I-V of Lorillard's Counterclaims and grant Lorillard the relief requested in its Counterclaims;

3     Grant Lorillard its direct and special damages, including the cost of installing the e-mail filter, on claim V;

4     Issue a declaration that (1) ALF does not qualify and is not eligible to administer and operate the NPEF under Sections VI and IX(e) of the MSA and does not qualify and is not

46

eligible to receive disbursements under Sections VI(b), VI(c), and IX(e) of the MSA and under the Escrow Agreement; (2) ALF no longer may administer and operate the NPEF under Sections VI and IX(e) of the MSA and no longer may receive disbursements under Sections VI(b), VI(c), and IX(e) of the MSA and under the Escrow Agreement; (3) ALF has been disqualified and ineligible to administer and operate the NPEF under Section VI of the MSA and has been disqualified and ineligible to receive disbursements under Section VI(b), VI(c), of the MSA and under the Escrow Agreement; and (4) ALF must refund and return to the Escrow Agent all NPEF Payments and Base Foundation Payments disbursed to ALF while ALF was disqualified and ineligible to administer and operate the NPEF and/or to receive such disbursements;

5    Enter a finding that ALF has repeatedly breached the MSA and enter an order requiring ALF to comply with the MSA, including without limitation the requirements that ALF operate a public education and advertising program that is consistent with Section VI(h) of the MSA and that ALF expend monies disbursed to ALF under the MSA in a manner consistent with Section VI of the MSA;

6    Enter preliminary and permanent injunctions requiring that ALF comply with its obligations under the MSA, including the content of the NPEF, the proper use of NPEF Payments and Base Foundation Payments, and the prohibitions against personal attacks and vilification, and enter an order requiring ALF to specifically perform its duties and obligations under the MSA, including without limitation the requirements that ALF operate a public education and advertising program that is consistent with Section VI(h) of the MSA and that ALF expend monies disbursed to ALF under the MSA in a manner consistent with Section VI of the MSA;

47

A227

7       Enter preliminary and permanent injunctions requiring that ALF comply with its Certificate of Incorporation and Bylaws;

8       Enter preliminary and permanent injunctions prohibiting ALF from sending, facilitating, and/or assisting others in sending unsolicited e-mails to Lorillard;

9       Enter preliminary and permanent injunctions and/or an order requiring ALF to refund and return to the Escrow Agent all NPEF Payments and Base Foundation Payments made by the Participating Manufacturers, including Lorillard    In the alternative, enter an order requiring an accounting of ALF's use of the NPEF Payments and Base Foundation Payments disbursed to it under Section VI of the MSA and under the Escrow Agreement and, based on the results of such accounting, requiring ALF to refund and return to the Escrow Agent all NPEF Payments and Base Foundation Payments made by the Participating Manufacturers, including Lorillard, that were misspent, misused, and otherwise improperly disbursed to ALF under Section VI of the MSA and under the Escrow Agreement;

10      To the extent necessary and appropriate, enter a Declaratory Order defining ALF's obligations under the MSA or otherwise construing any ambiguous term or terms in the MSA;

11      Tax the costs of this action, including attorneys' fees, against ALF; and

12      Grant to Lorillard such other and further relief as the Court deems just and proper

_Stephen E. Herrmann (#691)_
Robert W. Whetzel (#2288)
Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
Attorneys for Lorillard Tobacco Company

_Of Counsel:_
Jim W. Phillips, Jr.
Robert J. King III
Charles E. Coble
Brooks, Pierce, McLendon, Humphrey &
 Leonard, L.L.P.
2000 Renaissance Plaza
Greensboro, North Carolina 27401
(336) 373-8850

49

A229

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| THE AMERICAN LEGACY FOUNDATION | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO:  07-248 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL UNION FIRE INSURANCE COMPANY | ) | |
| OF PITTSBURGH, PENNSYLVANIA, et. al. | ) | |
| | ) | |
| Defendants | ) | |

## AFFIDAVIT OF SERVICE

Louise L. Tuschak, being duly sworn according to law, deposes and says that she

is employed by the law firm of Pachulski Stang Ziehl & Jones LLP, and that on the _12th_ day of

March, 2008 she caused a copy of the following document to be served upon the attached service

list in the manner indicated:

**APPENDIX TO THE FOUNDATION'S BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT (VOLUME I OF III)**

_Louise L. Tuschak_
Louise L. Tuschak

Sworn to and subscribed before
me this _12th_ day March, 2008

_Mary Corcoran_
Notary Public
My Commission Expires: _11/4/09_

MARY E. CORCORAN
NOTARY PUBLIC
STATE OF DELAWARE
My commission expires Nov. 4, 2009

03691-001\DOCS_DE:130511.10

American Legacy Foundation
Service List
Document No. 130442
02 – Hand Delivery
01 –First Class


**Hand Delivery**
Richards Layton & Finger, P.A.
John A. Parkins, Jr.
Chad M. Shandler
Todd A. Coomes
One Rodney Square, P.O. Box 551
Wilmington, DE  19899

**Hand Delivery**
Fox Rothschild, LLP
Neal J. Levitsky, Esquire
919 N. Market Street, Suite 1300
Wilmington, DE  198014

**First Class Mail**
Kramon & Graham, P.A.
Lee H. Ogburn, Esquire
One South Street, Suite 2600
Baltimore, MD  21202-3201