IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE AMERICAN LEGACY FOUNDATION, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | ) Civ. No. 07-248-SLR <br> ) |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, | ) <br> ) <br> ) <br> ) |
| Defendant. | ) <br> ) |

Laura Davis Jones, Esquire, and Timothy P. Cairns, Esquire of Pachulski, Stang, Ziehl & Jones, LLP, Wilmington, Delaware.  Counsel for Plaintiff.

Chad Michael Shandler, Esquire, and Todd Anthony Coomes, Esquire of Richard, Layton & Finger, PA, Wilmington, Delaware.  Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: July  9  , 2009
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

This is an insurance coverage action brought by plaintiff The American Legacy Foundation ("ALF" or "plaintiff") for damages resulting from alleged breaches of contract by National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union" or "defendant") and Travelers Indemnity Insurance Company of America ("Travelers"). (D.I. 1) Plaintiff filed its complaint on May 4, 2007. (D.I. 1) ALF voluntarily dismissed its claims against Travelers on February 8, 2008. (D.I. 24) Currently before the court are cross motions for summary judgment. (D.I. 77; 79) The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a). Venue is proper in this court pursuant to 28 U.S.C. § 1391(a). For the reasons set forth below, defendant's motion (D.I. 79) is granted and plaintiff's motion (D.I. 77) is denied.

## II. BACKGROUND

### A. The Parties and Relevant Policies

Plaintiff is a non-profit Delaware corporation with its principal place of business in the District of Columbia. (D.I. 1 at ¶ 2) Defendant is a Pennsylvania corporation with its principal place of business in the State of New York. Defendant is also a licensed insurer in the State of Delaware and conducts business within Delaware. (D.I. 72 at ¶ 6) Plaintiff was insured by defendant under two "commercial umbrella liability polic[ies]" (the "National Union Umbrella Policies") and a "not-for-profit individual and organization insurance policy" (the "I&O Policy"[1]).

---

[1]The parties refer to this policy as the "D&O policy"; the court adopts an acronym more consistent with the policy title.

**B. Plaintiff's Litigation with Lorillard**

In the 1990s, tobacco companies faced lawsuits from a multitude of states concerning the health effects and associated costs of tobacco products.  (*Id.* at ¶ 8)  On November 23, 1998, forty-six states, including Delaware, reached an agreement with several tobacco companies, including Lorillard Tobacco Company ("Lorillard").  *See American Legacy Foundation v. Lorillard Tobacco Co.* (*"Lorillard I"*), Civ. No. 19406, 2002 WL 927383, at *1 (Del. Ch. Apr. 29, 2002) (unpublished).  This agreement became known as the Master Settlement Agreement ("MSA").  *Id*.  As part of the MSA, plaintiff was established to educate American youth about "the addictiveness, health effects, and social costs related to the use of tobacco products."  *Id*. (quoting the MSA and § 12.2 of Article XII of plaintiff's bylaws).  Plaintiff was funded through the creation of a National Public Education Fund ("NPEF").  The settling states allocated over $1 billion to the NPEF under the MSA.  (D.I. 1 at ¶ 10)

Plaintiff's bylaws, at section 12.2, provide that money allocated to plaintiff through the NPEF to fund the youth education campaign "shall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or government agency, whether individually or collectively."[2]  *Id.*

---

[2]Plaintiff also incorporated other items of the MSA into its bylaws.  Article XIII of plaintiff's bylaws prohibits any amendment to the bylaws or to plaintiff's Certificate of Incorporation that would render either document inconsistent with the terms of the MSA.  In addition, section 5.7 of plaintiff's bylaws expressly recognizes the binding nature of the MSA.  Section VI(e) of the MSA required plaintiff to affiliate itself formally with an educational or medical institution.  Section 5.7 of plaintiff's bylaws satisfies this requirement, providing that 'the programs of [plaintiff] may be affiliated with one or more educational institutions selected by the Board of Directors from time to time as required by the [MSA] attached hereto as Exhibit A.'"  *American Legacy Foundation v. Lorillard Tobacco Co.*, Civ. No. 19406, 831 A.2d 335, 340-41 (Del. Ch. Jan. 30, 2003) ("*Lorillard*

Section VI(h) of the MSA, titled "Foundation Activities," states, in relevant part, as

follows:

> The Foundation shall not engage in, nor shall any of the Foundation's money be used to engage in, any political activities of lobbying, including, but not limited to, support of or opposition to candidates, ballot initiatives, referenda or other similar activities. The National Public Education Fund shall be used only for public education and advertising regarding the addictiveness, health effects, and social costs related to the use of tobacco products and shall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, whether individually or collectively.[3]

Plaintiff's primary advertising campaign is entitled "the truth®."  Plaintiff claims

that a "key component" of its mission is to "build a world where young people reject

tobacco and anyone can quit."  (D.I. 80 at ¶ 3)  Plaintiff describes "the truth®"

campaign's broadcast spots as "blunt, hard-edged, fast-paced, and sometimes

humorous, designed to capture and hold the attention of the target teen audience."

(*Id.*)

In 2001, plaintiff launched a radio ad entitled "Dog Walker."  In the ad, an actor

hired by the producers of the ad and claiming to be a dog walker, calls two Lorillard

employees who were unaware they were speaking with an actor.  *See Lorillard I*, 2002

WL 927383 at *1.  The actor tries to sell dog urine he has collected to "you tobacco

people" because "dog pee is full of urea and that's one of the chemicals in cigarettes."

---

*II*").

[3]It is unclear whether the MSA is of record; the parties do not dispute the relevant language.

(D.I. 83, ex. N at A759)[4]  Lorillard believed this ad contained "false and misleading"

information and ran afoul of Massachusetts law, which prohibits the taping of a

telephone conversation without consent.  *See Lorillard I*, 2002 WL 927383 at *2.

Lorillard sent a letter to plaintiff in July of 2001 threatening legal action and also

threatening to file a complaint with the Federal Communication Commission ("FCC") on

the basis that its employees had no knowledge that the call was being recorded.  *Id*.

Lorillard and plaintiff thereafter exchanged several letters regarding the content of the

ad.

On November 13, 2001, an attorney representing Lorillard sent a letter to plaintiff

containing a draft complaint alleging slander per se, slander per quod, libel per se,

secondary libel, libel per quod, and unfair or deceptive acts or practices under North

Carolina law.  (D.I. 85, ex. H at N293)  The letter indicated that Lorillard was willing to

settle the matter informally if plaintiff retracted the ad, acknowledged that claims in the

ad stating or suggesting Lorillard added urea or a derivative of dog urine to its cigarette

products were false, and agreed to cease recording and transcribing parts of calls to

employees at Lorillard.  (*Id*.)  Lorillard's letter did not seek any monetary compensation.

No claims under the MSA were presented in the draft complaint, however, Lorillard

indicated in its letter that, if the matter were not settled, other claims may be pursued

"including claims for breach of the [MSA's] 'vilification' provision."  (*Id.*)

Lorillard did not file suit immediately after its November letter to plaintiff.  Instead,

---

[4]In *Lorillard I,* the court relied on an affidavit stating that urea is "one of the
chemicals you guys put in cigarettes."  2002 WL 927383 at *1 & n.3.  The court cites in
this case the transcript of the "dog walker" ad provided in connection with the parties'
summary judgment briefing.

Lorillard sent a letter to plaintiff on January 18, 2002 entitled "Notice of Intent to Initiate Enforcement Proceeding under [the] MSA."[5]  (D.I. 80, ex. B at A10)  Lorillard indicated that it believed plaintiff had improperly used funds from the NPEF and had failed to "meet its obligation under the MSA."  (*Id.*)  According to Lorillard, "it has become abundantly clear that [plaintiff's] 'truth campaign' is not about conveying the truth about tobacco products to the American public, so much as vilifying and personally attacking tobacco companies and their employees."  (*Id.*)  Lorillard stated that, against the backdrop of its failed overtures to plaintiff in the fall and winter of 2001, it "believes it is now left with no alternative but to pursue enforcement under Section VII© of the MSA." (*Id.*)  No draft complaint or other details were provided.

On February 13, 2002, plaintiff filed an action in Delaware Chancery Court seeking a declaratory judgment that Lorillard lacked standing to file any claim against plaintiff to enforce the MSA, to which plaintiff is not a signatory, or to establish a violation of plaintiff's bylaws (the "Delaware Action").[6]  (D.I. 80, ex. C at A30 ¶¶ 53-60) Two days after the expiration of the thirty-day period prescribed by the MSA, Lorillard filed its breach of contract suit against plaintiff in North Carolina.  *Lorillard I*, 2002 WL 927383 at *3; *Lorillard Tobacco Co. v. American Legacy Foundation*, Civ. No. 02-02170

---

[5]Section VII(c)(2) of the MSA requires that any participating manufacturer has to provide thirty days notice of its intent to initiate proceedings to enforce the MSA.

[6]Lorillard did not brings claims of libel, slander or defamation in the North Carolina action, instead, Lorillard's only accusation was that plaintiff made false or misleading statements in connection with a press conference plaintiff held following Lorillard's January 18, 2002 letter.  The North Carolina Action was stayed pending resolution of plaintiff's declaratory judgment claims against Lorillard in Delaware.

(Wake Co. Super. Ct. Feb. 19, 2002) (the "North Carolina Action") (D.I. 80, ex. D).  As

described by the Chancery Court,

> [t]hat complaint allege[d] both that [plaintiff] is in breach of the anti-vilification
> provisions of the MSA [ ] through [its] adoption in plaintiff's bylaws, and that
> harassing and vulgar e-mails from [plaintiff] to Lorillard's employees violate North
> Carolina's Cyberstalking Act.  Lorillard [sought] relief for [plaintiff's] alleged
> breach of the MSA [ ] through a Declaratory Order defining [plaintiff's] obligations
> under the MSA [ ] and an award of $1. It also [sought] damages in the amount of
> $1 for [plaintiff's] alleged breach of the duty and covenant of good faith and fair
> dealing.  Finally, Lorillard [sought] preliminary and permanent injunctions
> requiring [plaintiff] to comply with its alleged obligations under the MSA,
> prohibiting it from sending and assisting others to send harassing e-mails to
> Lorillard employees, and defining [plaintiff's] obligations under the MSA.

*Lorillard I*, 2002 WL 927383 at *3.

Lorillard filed a motion to stay or dismiss the Delaware Action in favor of the

North Carolina action, which motion was denied in April 2002.  *Id.* at *5.  In September

2002, Lorillard filed its answer in the Delaware Action along with seven counterclaims,

containing similar allegations to those it had made in the North Carolina Action.[7]  (D.I.

80, ex. E at A75-88)  Specifically, the seven counterclaims were for:  (1) breach of the

MSA; (2) breach of the duty and covenant of good faith and fair dealing; (3) breach of

contract; (4) violations of plaintiff's bylaws and certificate of incorporation; (5) claim for

declaratory judgment that plaintiff is not eligible to operate the NPEF and receive

disbursements under the MSA; (6) declaratory judgment that the settling states can

pursue enforcement of the MSA and plaintiff's bylaws against plaintiff; and (7) trespass

to chattel.  (D.I. 80, ex. E at A75-88)

---

[7]Plaintiff states that the facts as alleged in the Delaware and North Carolina
Actions are "in material respects the same."  (D.I. 78 at 6, n.4)

Plaintiff filed a motion for summary judgment at the outset of the Delaware Action asserting that Lorillard lacked standing to enforce the MSA.  A cross-motion was filed. On January 31, 2003, the Delaware Chancery Court granted Lorillard's motion and denied plaintiff's summary judgment motion on the basis that Lorillard had standing to enforce the MSA against plaintiff.  *Lorillard II*, 831 A.2d at 351.  Specifically, the Chancery Court found that the "MSA contemplates ALF's adoption, and [ ] ALF in fact adopted it, thus becoming bound by its provisions and amenable to suit for its breach."[8] *Id.*

The Delaware Action proceeded on Lorillard's counterclaims.  A total of 20 ads, including the "dog walker" ad, were selected by the parties and subject to discovery relevant to the determination of whether plaintiff violated Section VI(h) of the MSA.  *See American Legacy Foundation v. Lorillard Tobacco Co.* ("*Lorillard III*"), Civ. No. 19406, 886 A.2d 1, *11 (Del. Ch. Aug. 22, 2005).  On cross-motions for summary judgment, the Chancery Court held (on August 22, 2005) that none of the challenged ads violated the anti-vilification clause of the MSA.[9]  *Id.* at *33.  The Delaware Supreme Court affirmed on July 17, 2006.  *See Lorillard Tobacco Co. v. American Legacy Foundation*, 903 A.2d 728 (Del. 2006).

---

[8]The Chancery Court did not decide, therefore, whether Lorillard also has standing to bring an action based on plaintiff's breach of its bylaws.

[9]The Chancery Court also found that plaintiff was responsible for emails generated by the public on its "thetruth.com" website (to tobacco company executives), and that these emails violated the "personal attack" prohibition of Section VI(h) of the MSA; the violation was deemed "de minimis," however, and no damages were awarded.  *Lorillard III*, 886 A.2d at 44.

7

The complaint in the case at bar was filed May 4, 2007.  Plaintiff claims that, during the over four years of litigation with Lorillard in North Carolina and Delaware, it spent approximately $17 million in its defense.  (D.I. 1 at ¶ 25)

### C.  Plaintiff's Insurance Policies

During the time plaintiff was airing the ads at issue in the state court litigation, plaintiff held several policies of insurance:  (1) three "Commercial General Liability Polic[ies]" from Travelers, effective consecutively for policy periods between July 22, 1999 and July 22, 2002 (the "Travelers Primary Policies");[10] (2) umbrella policies issued by Travelers for that same period (the "Travelers Umbrella Policies");[11] (3) a "Commercial General Liability Policy,"[12] issued by Scottsdale Insurance Company ("Scottsdale") for the policy period of May 4, 2000 to May 4, 2001 (the "Scottsdale Policy"); (4) the National Union I&O Policy,[13] providing coverage for the policy period from August 26, 2001 through August 26, 2002; and (5) the National Union Umbrella Policies,[14] which provided coverage for consecutive annual policy periods from April 24,

---

[10]Nos. W-680-479H825-3-TIA-99, W-680-479H825-3-TIA-00, and W-680-479H825-3-TIA-01.  (D.I. 81, ex. M)

[11]Travelers' policy no. ISF-CUP-479 H 8462-IND-1 covered the policy period of July 22, 2001 to July 22, 2002.  (D.I. 83, ex. P at A777)  The details regarding the subsequent renewal(s) are unclear.

[12]No. CLS684101.  (D.I. 83, ex. Q)

[13]The I&O Policy named plaintiff as the insured for policy no. 873-99-71.  (D.I. 85, ex. E)  The policy of record indicates that it is a renewal of a policy no. 473-29-11; the parties do not address this or other prior I&O Policies in their papers.  (*Id.*)

[14]Policy nos. BE 7402566 and BE 8716521, respectively.  (D.I. 85, ex. F & G) The named insured on the National Union Umbrella Policies is "Health and Education Liability Program, Inc." ("HELP"); endorsements to the policies reflect that plaintiff

8

2001 through April 24, 2003.  The coverages of the policies at issue in the present motion are as follows.

### 1.  Travelers Primary Policies

The Travelers Primary Policies provided coverage for "personal injury," "advertising injury," and "web site injury."  (D.I. 83, ex. M at A687[15])  Coverage applied to "personal injury" "caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for [the insureds]."  (*Id.*)  Coverage for "advertising injury" included injury "caused by an offense committed in the course of advertising your goods, products or services."  (*Id.*)  Coverage for "web site injury" included injury "caused by an offense committed in the course of the visual or audio presentation of material on '[the insureds'] web site' or in the numerical expression of computer code used to enable '[the insureds'] web site'."  (*Id.*)  All three types of injury were specifically defined as including "[o]ral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services," as well as "[o]ral, written or electronic publication of material that violates a person's right to privacy."  (*Id.* at A688-89)

---

subscribed to the HELP between April 24, 2001 and April 24, 2003 and was, therefore, an "insured" under the policies.  (*Id.*, Ex. F at NAT261)

[15]Insofar as the parties do not call out any differences between the Travelers Primary Policies, the court cites the record for the policy effective July 2001 through 2002.

Amongst the exclusions in the Travelers Primary Policies was any "advertising injury" arising out of a breach of contract[16] or out of "[a]n offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting." (*Id.* at A688)  Finally, a "trade association exclusion" provided that the insurance did not apply to "bodily injury," "property injury," "personal injury" or advertising injury" arising out of "any service by [the insureds] or on [the insureds'] behalf in connection with . . . [t]he rendering or failure to render any service in connection with the preparation, approval, furnishing, printing, publishing of any education or instructional programs, designs, specification, manuals, instructions or any other materials." (*Id.* at A718)

### 2.  The Travelers Umbrella Policies

The Travelers' Umbrella Policies provided that Travelers was responsible for "sums in excess of the amount payable under the terms of any personal, advertising and web site injury liability insurance included in the 'underlying insurance,' that the insured becomes legally obligated to pay as damages because of [such injuries] . . . provided that the personal, advertising and web site injury liability insurance applies or would apply except for the exhaustion of its [limits]." (D.I. 83, ex. P at A779-80[17])

### 3.  The National Union Umbrella Policies

Travelers was identified as an "underlying insurance provider" in plaintiff's application for umbrella insurance with National Union, dated March 21, 2001. (D.I. 83,

---

[16]A "breach of contract" exclusion was also placed on coverage for web site injury.  (D.I. 81, ex. M at A688)

[17]There is no indication that the terms of the policy changed between renewals. Because the parties have not cited to the actual policies, the court cites Travelers' coverage letter (dated April 25, 2002) for the relevant policy language.

ex. O at A772 ("Currently insured through Travelers for all but Directors and Officers pol[icy].")  The National Union Umbrella Policies provided two types of coverage. Coverage A covered damages and claims in excess of the limits of "scheduled underlying insurance" but in no case for "broader coverage than that provided by scheduled underlying insurance."  (D.I. 85, ex. F at NAT204[18])  No specific "underlying insurance" company or policy number is provided.  Coverage B covered damages and claims that were not covered by "scheduled underlying insurance" but were covered within the scope of the bodily injury, property damage, personal injury of advertising injury coverage provided in Coverage B.  (*Id.*)  The policies defined "personal injury" as "injury arising out of your business, other than bodily injury or advertising injury, caused by one or more of the following offenses. . . (4) [o]ral, written or electronic publication of material that slanders or libels a person or organization, or disparages a person's or organization's goods, products, or services."  (*Id.* at NAT210)  An "advertising injury" was an "injury, other than bodily or personal injury, arising solely out of your advertisement[[19]] as a result of one or more of the following offenses:  (1) [s]lander or libel of a person or organization, or disparagement of a person's or organization's goods, products, or services in your advertisement. . . ."  (*Id.* at NAT207)  Defendant assumed a duty to defend its insureds in suits under Coverage A (when scheduled

---

[18]The court cites the August 2000 to 2001 policy; the terms are identical in the 2001 to 2002 renewal.  (D.I. 85, ex. G)

[19]"[A] paid broadcast, publication or telecast to the general public or specific market segments about your goods, products, or **services for the purpose of attracting customers or supporters**."  (D.I. 85, ex. F at NAT207) (emphasis added)

underlying insurance has been exhausted by payment of "loss"[20]) and Coverage B (when damages sought would not be covered by scheduled underlying insurance).  (*Id.* at NAT205)

### 4.  The I&O Policy

Coverage C of the I&O Policy provided coverage for "claims" arising out of "wrongful acts" by plaintiff.[21]  (*Id.*, ex. E)  Coverage C and the Policy's "defense provisions" require National Union to "advance defense costs"[22] of a "claim first made against the organization during the policy period or the discovery period (if applicable) and reported to the insurer pursuant to the terms of this policy for any actual or alleged wrongful act of the organization."  (D.I. 85, ex. E at LF2668)  As it is pertinent to this matter, a claim was defined as "(1) a written demand for monetary relief; or (2) a civil, criminal, regulatory or administrative proceeding for monetary or non-monetary relief which is commenced by:  (I) service of a complaint or similar pleading. . . ."  (*Id.* at LF2669)  A "wrongful act," as it related to the organization, included "any breach of duty, neglect, error, misstatement, misleading statement, omission or act by or on behalf of the organization," specifically including "libel, slander, defamation or publication or utterance in violation of an individual's right to privacy."  (*Id.* at LF2673)  Exclusion (k) of the I&O Policy provides that

---

[20]"Those sums actually paid as judgments and settlements and, under Coverage A if provided by scheduled underlying insurance, expenses incurred to defend any suit or investigate any claim."  (D.I. 81, ex. K at A264)

[21]Separate coverages were provided for individuals (employees) and organizational indemnification from acts of such employees.

[22]Subject to the $15 million limit of the policy.

[t]he Insurer shall not be liable to make any payment for loss in connection with a claim made against an insured . . . (k) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of an insured under any express contract or agreement; provided, however, that this exclusion shall not apply to liability which would have attached in the absence of such express contract or agreement.

(*Id.* at LF2674)

### 5.  The Scottsdale Policy

The Scottsdale Policy was a "commercial general liability" coverage policy under which plaintiff was insured for "bodily injury" and "property damage" as defined therein. (D.I. 83, ex. Q)  Coverage was provided for "personal and advertising injury," or injury arising out of "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organizations' goods, products, and services," so long as the underlying act was not done with the knowledge that such injury would result.  (*Id.* at A790, 797)  The Scottsdale Policy also contains a duty to defend plaintiff. (*Id.* at A786)

Plaintiff's application for the Scottsdale Policy states:

The new venture this insured is entering involving an intern program has been declined by the current carrier.  It is an intern program whereby a chaperone, a permanent salaried employee of [plaintiff] will be assigned two 14-17 year old students to work at [plaintiff].  These students will be chosen from high schools across the country and will be the responsibility of [plaintiff] for 24 hours a day from the time they arrive until they leave.  A thorough background check will be made on all chaperones and carefully screened.

(*Id.* at A817-18)  The Scottsdale Policy does not state that its coverage is limited to injuries arising out of the intern program.

### D.  Plaintiff's Attempts to Invoke Insurers' Duties to Defend

13

Plaintiff obtained its insurance policies through the brokerage firm of Armfield Harrison & Thomas ("AHT").  Following receipt of Lorillard's November 13, 2001 letter and draft complaint threatening suit for libel and slander, Wilmer, Cutler & Pickering ("WCP"), a law firm representing plaintiff in the litigation with Lorillard, contacted AHT and requested that AHT immediately notify all applicable insurance policy holders and demand defense and indemnity on behalf of plaintiff.  (D.I. 98, ex. T at B3)  Once again, following Lorillard's January 18, 2002 letter threatening suit, WCP requested AHT to notify applicable insurance policy holders.[23]  (*Id.*, ex. U at B5)  After Lorillard filed suit against plaintiff in North Carolina, a third letter requesting that applicable policy holders be notified was sent from WCP to AHT on February 25, 2002.  (*Id.*, ex. V)

On April 16, 2002, AIG Technical Services Inc., the claims administrator for defendant, sent out a letter acknowledging receipt of three separate correspondences regarding the North Carolina Action and other potential claims deriving from Lorillard's letters.[24]  (*Id.*, ex. X)  By letter dated April 25, 2002, Travelers informed WCP that

---

[23]In this second request letter to plaintiff's insurance broker, plaintiff's counsel described the January 18, 2002 letter as "a new claim asserted (and lawsuit threatened)" and as "what appears to be a different legal proceeding" than that threatened in November.  (D.I. 98, ex. U at B5)

[24]Within this letter, it is requested that plaintiff produce coverage position letters regarding this matter from other insurance providers with whom plaintiff may have policies.  In part the letter states:

> We understand that this matter may also have been tendered to certain other insurance carriers.  If you have received any acknowledgment or coverage position letters from these carriers, please forward them to us at your earliest convenience.  Also, if you have the name, address, and telephone number for the claim handlers at these other carriers, please provide this information.

coverage under the Travelers Primary Policies for the North Carolina Action had been denied.[25]  (D.I. 86, ex. V)  Travelers, despite having received notice of the Delaware Action, never issued a coverage position letter with respect to the Delaware Action, as the claims specialist assigned to the matter was promoted and presumably the claim was not properly reassigned.  (D.I. 86, ex. R at 49-56)

A coverage position letter was issued on behalf of defendant with respect to the I&O Policy on December 6, 2002.  (D.I. 80, ex. F)  Defendant declined coverage on the following bases:  (1) Lorillard's letters did not constitute a "claim" under the policy because no monetary relief was demanded; (2) plaintiff's declaratory judgment action (the Delaware Action) is not pursuit of a "defense" under the policy,[26] and the North Carolina Action had been stayed; and (3) several exclusions, such as that for contractual liability, appeared to apply.  (*Id.*)  A second letter denying coverage under the I&O Policy was issued on August 13, 2003.  (D.I. 86, ex. T)  In this letter, defendant acknowledged the counterclaims in the Delaware Action, considering those counterclaims and the affirmative claims in the North Carolina Action as "one interrelated claim."  (*Id.*)

On April 10, 2003, a coverage position letter was issued on behalf of defendant regarding the National Union Umbrella Policies.  (*Id.*, ex. U)  Defendant indicated that it

_____

(D.I. 98, ex. X at B10)

[25]The record indicates that this coverage position letter was forwarded to defendant on July 30, 2003.

[26]At the time this coverage position letter was issued, defendant had not received or had not processed receipt of any correspondence indicating that Lorillard had filed counterclaims against plaintiff in the Delaware Action.  (D.I. 80, ex. F at A95)

had no current obligations with respect to Coverages A or B because it had "no

information regarding the scheduled underlying insurance." (*Id.*)  Plaintiff, through AHT

and its counsel, provided defendant with several status updates regarding both the

Delaware and North Carolina Actions between 2003 and 2006.  (D.I. 86, exs. W, X)

On February 7, 2007, after all litigation with Lorillard had concluded (with the

Delaware Supreme Court's affirmance in July 2006), plaintiff notified Scottsdale of the

Delaware Action.  (*Id.*, ex. Z)  Without addressing the scope of the coverage provided

by its policy, Scottsdale denied coverage on the grounds that plaintiff had failed to

provide timely notice of the counterclaims filed against it in the Delaware Action.  (*Id.*,

ex. AA at 7)

## III.  STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56©.  The moving party bears

the burden of proving that no genuine issue of material fact exists.  *See Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).  "Facts that

could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from

which a rational person could conclude that the position of the person with the burden

of proof on the disputed issue is correct."  *Horowitz v. Fed. Kemper Life Assurance Co.*,

57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).  If the moving party has

demonstrated an absence of material fact, the nonmoving party then "must come

16

forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV.  DISCUSSION

### A.  Legal Standard[27]

"The proper construction of any contract, including an insurance contract, is a question of law." *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). Interpretation of an insurance policy is properly subject to disposition on summary judgment where the terms of the policy and coverage

---

[27]As noted by the Chancery Court in *Lorillard III*, the parties have apparently never argued about which state's law applies to the MSA. *Lorillard III*, 886 A.2d at *9 n.5. The parties do not address the issue in connection with the motions at bar. Plaintiff is a Delaware entity operating in the District of Colombia. Like the Chancery Court, this court will apply the law of Delaware to the MSA, and notes that District of Colombia law would produce the same result. *See Williams v. Stone*, 109 F.3d 890, 893 (3d Cir. 1997) ("[W]here the laws of two jurisdictions would produce the same result on the particular issue[s] presented, there is a 'false conflict' and the court should avoid the choice of law question.").

are not ambiguous.  *Alstrin v. St. Paul Mercury Ins. Co.*, 179 F. Supp. 2d 376, 388 (D. Del. 2002); *Travelers Indemn. Co. of Illinois v. United Food & Commercial Workers Intern'l Union*, 770 A.2d 978, 985 (D.C. 2001).  When no ambiguity exists within an insurance contract, the court shall interpret the plain meaning of the terms to which the parties have agreed.  *Hallowell v. State Farm Mutual Auto Ins. Co.,* 443 A.2d 925, 926 (Del. 1982); *Travelers Indemn. Co. of Illinois*, 770 A.2d at 986.  A contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible to different interpretations or may have two or more different meanings.  *Hallowell*, 443 A.2d at 926; *Kass v. William Norwitz Co.*, 509 F. Supp. 618, 623-24 (D.D.C. 1980).  Where ambiguity exists, the court should construe the language of the contract in favor of coverage and against the insurance company which has drafted it.  *New Castle County Del. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 174 F.3d 338,344 (3d Cir. 1999) ("due to the insurer's dominant position, when an ambiguity is found in insurance policy language, we must construe the language against the insurer as a matter of Delaware law").  A contract, however, is not rendered ambiguous merely because the parties do not agree upon its proper construction.  *Hallowell,* 443 A.2d at 926; *Travelers Indemn. Co. of Illinois*, 770 A.2d at 986.  Ambiguity also does not exist where the court can determine the meaning of a contract "without any other guide than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends.  *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. 1983) (quoting *Burbridge v. Howard Univ.*, 305 A.2d 245, 247 (D.C. 1973)).  The true test in construing a contract is to determine what a reasonable person in the position of the parties would have thought the

language of the policy meant.  *Steigler*, 384 A.2d at 401; *Travelers Indemn. Co. of Illinois*, 770 A.2d at 986.

Where a dispute over coverage arises, the insured bears the initial burden of proving that the claim is covered by the insurance policy.  *New Castle County v. Hartford Accident and Indemn. Co.*, 933 F.2d 1162, 1181 (3d Cir. 1991); *Group Hospitalization, Inc. v. Foley*, 255 A.2d 499, 501 (D.C. 1969).  If this burden is met, the burden then shifts to the insurer to prove that the claims fall under an applicable policy exclusion.  *State Farm Fire and Cas. Co. v. Hackendorn*, 605 A.2d 3, 7 (Del. Super. 1991); *Washington Sports and Entm't, Inc. v. Untied Costal Ins. Co.*, 7 F. Supp. 2d 1, 7 (D.D.C. 1998).

The duty to defend is broader than the duty to indemnify.  *See Steadfast Ins. Co. v. EON Labs Mfg, Inc.*, Civ. No. 98-01-058, 1998 WL 961791, *1 (Del. Super. Sept. 18, 1998).[28]  Delaware courts "typically look[ ] to the allegations of the complaint to decide whether the third party's action against the insured states a claim covered by the policy, thereby triggering the duty to defend."[29]  *American Ins. Group v. Risk Enterprise Mgmt., Ltd.,* 761 A.2d 826, 829 (Del. Supr. 2000) (citation omitted).

---

[28]*See also Essex Ins. Co. v. Night & Day Mgmt., LLC*, 536 F. Supp. 2d 53, 57 (D.D.C. 2008).

[29]Similarly, in the District of Colombia, "an insurer's duty to defend is determined by comparing the complaint . . . with the policy.  If the facts alleged in the complaint . . . would give rise to liability under the policy if proven, the insurer must defend the insured."  *See Stevens v. United General Title Ins. Co.*, 801 A.2d 61, 66 n.4 (D.C. 2002) (citations omitted).  As explained by the *Stevens* court, the majority of jurisdictions follow this "eight corners rule" (a comparison of the "four corners" of the complaint with the "four corners" of the policy).  *Id.*

> The test is whether the underlying complaint, read as a whole, alleges a risk
> within the coverage of the policy.  Determining whether an insurer is bound to
> defend an action against its insured requires adherence to the following
> principles:  (1) where there is some doubt as to whether the complaint against
> the insured alleges a risk insured against, that doubt should be resolved in favor
> of the insured; (2) any ambiguity in the pleadings should be resolved against the
> carrier; and (3) if even **one count or theory** alleged in the complaint lies within
> the policy coverage, the duty to defend arises.

*Pacific Ins. Co. v. Liberty Mut. Ins. Co.*, 956 A.2d 1246, 1255 (Del. 2008) (emphasis

added).[30]

### B.  Count III:  The I&O Policy

#### 1.  Coverage

The court first examines whether the I&O Policy covered Lorillard's claims.  As

noted previously, the I&O Policy defines a "wrongful act" as "any breach of duty,

neglect, error, misstatement, misleading statement, omission or act by or on behalf of

the organization."  (*Id.* at LF2672)  "[L]ibel, slander, defamation or publication or

utterance in violation of an individual's right to privacy" are specifically included within

this definition.  (*Id.* at LF2673)

As noted previously, Lorillard's counterclaims in the Delaware Action were for:

(1) breach of the MSA; (2) breach of the duty and covenant of good faith and fair

dealing; (3) breach of contract; (4) violations of plaintiff's bylaws and certificate of

incorporation; (5) claim for declaratory judgment that plaintiff is not eligible to operate

---

[30]*Compare Am. Cont'l Ins. Co. v. Pooya*, 666 A.2d 1193, 1197 (D.C. 1995) ("It is
appropriate to examine the complaint for **all plausible claims** encompassed within the
complaint and to ascertain whether the allegations of the complaint state a cause of
action within the policy coverage and give fair notice to the insurer that the insured is
being sued upon an occurrence which gives rise to a duty to defend under the terms of
the policy.") (emphasis added).

the NPEF and receive disbursements under the MSA; (6) declaratory judgment that the settling states can pursue enforcement of the MSA and plaintiff's bylaws against plaintiff; and (7) trespass to chattel.[31]  (D.I. 80, ex. E at A75-88)  As originally filed, the counterclaims provided that plaintiff's public statements that Lorillard was "trying to stop the truth® campaign" with its litigation were "false statements. . . consistent with ALF's pattern of attacks upon, and vilification of, Lorillard."  (D.I. 80, ex. E at A66 ¶ 7)  The counterclaims were later amended and these statements were removed.  (D.I. 101 at 5, n.2)

Plaintiff asserts that Lorillard's counterclaims "sound in tort" and alleged "wrongful acts" as unambiguously defined by the I&O Policy.  (D.I. 97 at 29) Specifically:  (1) "Lorillard alleged a variety of acts, including the airing of the various challenged truth® spots and 'personal attacks' on and 'vilification' of Lorillard"; (2) Lorillard's allegations that plaintiff breached duties of the MSA, plaintiff's bylaws and certificate of incorporation are "tantamount to allegations of defamation, slander, and libel"; and (3) notwithstanding, the I&O Policy "explicitly contemplates providing coverage for breaches of contract" because certain breaches of "implied contract[s]" (such as in the employment context) are included within the definition of "wrongful act." (*Id.* at 26-29)

_____

[31]It is undisputed that Lorillard's trespass to chattel allegations were dismissed by the Chancery Court for want of prosecution "and did not account for any significant amount of the defense costs" incurred by plaintiff.  (D.I. 97 at 36-37)  Plaintiff, therefore, does not seek a determination that the assertion of this tort claim invoked defendant's duty to defend.

Defendant argues that the I&O Policy does not cover the counterclaims claims Lorillard prosecuted in the Delaware Action because: (1) with the exception of trespass to chattel, a count relating to facilitating the sending of email to defendants by consumers, the counterclaims sought to impose "exclusively contractual liability" under the MSA, plaintiff's bylaws, and plaintiff's certificate of incorporation, falling outside of the definition of "wrongful act"; (2) notwithstanding, exclusion (k) of the I&O Policy excludes loss arising out of contractual liability; and (3) the "escape clause" of exclusion (k) is inapplicable. (D.I. 82 at 11-21)

"Wrongful act" is broadly defined by the I&O Policy as "**any** breach of duty . . . on behalf of the organization." (D.I. 80, ex. E at LF2672) (emphasis added) However, exclusion (k) specifically limits this clause by providing that the insurer is not liable for losses relating to claims "alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of an insured under any express contract or agreement; provided, however, that this exclusion shall not apply to liability which would have attached in the absence of such express contract or agreement." (*Id.* at LF2674)

In determining whether these conditions exist, the court has reviewed the claims put forward by Lorillard in both the North Carolina and Delaware Actions, as well as the rulings by the Chancery Court and the Delaware Supreme Court. While Lorillard initially expressed an intent to file claims of libel and slander, Lorillard ultimately changed its strategy and opted to pursue strictly contractual claims. *Lorillard III*, 886 A.2d at *9. Within the Delaware Action, in a "procedural maneuver," Lorillard specifically decided

22

not to contest the truthfulness of plaintiff's ads.[32]  *Id.* at *28.  Lorillard and plaintiff

agreed, therefore, "that the matter presented [was] a straightforward contractual issue

that turns on the legal interpretation of the words of the settlement agreement,"

specifically, section VI(h) of the MSA.  *Id.* at *8.  Although an inquiry into plaintiff's

underlying conduct was a necessary prerequisite to determining breach of that section

– a lengthy exercise undertaken by the Chancery Court in *Lorillard III* – that (tortious)

conduct was never the subject of a direct counterclaim by Lorillard.  On appeal, the

Delaware Supreme Court addressed the dispute between the parties as a contractual

matter.  *Lorillard IV*, 903 A.2d at 731 ("The primary question on appeal is whether any

of ALF's advertisements in their 'truth®' campaign violated the contractual language of

the MSA prohibiting 'vilification' or 'personal attacks.'").

        Exclusion (k) is applicable if the MSA was an "express contract or agreement."

Plaintiff was not a signatory to the MSA, as plaintiff had not been created at the time

the MSA was drafted and signed.  (D.I. 97 at 18-19; D.I. 82 at 3)  However, a party may

adopt and be bound to a contract to which it was not originally a signatory.  *Lorillard III*,

831 A.2d at 344 (citing *Mehul's Inv. Corp. v. ABC Advisors, Inc.*, 130 F. Supp. 2d 700,

707-08 (D. Md. 2001)).  For a party to adopt an already existing contract, the existing

contract must permit the third party to adopt it.  *Id.* (citing *White v. Nat'l Football

League*, 92 F. Supp. 2d 918, 920 (D. Minn. 2000).

_____

        [32]It was Lorillard's argument that the ads themselves, regardless of the falsity of
them, violated the terms of the MSA and that the ads did not need to be false or libelist
to personally attack or vilify Lorillard.  *Lorillard III*, 886 A.2d at *10-11.  The only
instance of falsity alleged by Lorillard came in connection with a press conference
plaintiff held after Lorillard had threatened suit.  This allegation had little, if any,
relationship to the claims made by, or the avenues of relief sought by, Lorillard.

The Chancery Court concluded that "the MSA should be viewed, as a matter of law, as expressly contemplating ALF's adoption." *Id.* at 346.  In reaching this conclusion, the Chancery Court cited the fact that the MSA "provides for ALF's creation and funding, it requires ALF's board to be comprised of a predetermined group of people, and it places significant restrictions on ALF's activities." *Id.* at 345.  Plaintiff was obligated by the MSA to adopt the language of the MSA into its bylaws and certificate of incorporation.  *Id.*  But for the MSA, plaintiff would not have been created.  Ultimately, the Chancery Court found that "ALF's bylaw provisions and public statements of ALF's officers and directors, both to the effect that ALF is bound by or must comply with the MSA, reflect ALF's **explicit** intent and consent to be bound by the MSA."  *Id.* at 349 (emphasis added); *see also id.* at 351 ("ALF's promoters entered into the MSA on ALF's behalf and for its benefit, and after its formation ALF expressly adopted the M.S.A. through corporate acts and explicit statements.").  The court concurs with the judgment of the Chancery Court in finding that plaintiff had an explicit relationship to the MSA.[33]

The court also notes that plaintiff's bylaws and certificate of incorporation are contracts under settled law.  *See, e.g.*, *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114, 120 (Del. 2006) ("[C]ertificates of incorporation are contracts, subject to the general rules of contract and statutory construction") (citation omitted); *Jana Master*

---

[33]In the alternative, as a result of plaintiff's actions, statements, and the benefits it received as a direct result of the MSA, the MSA can be held to be an implied in fact contract as it relates to plaintiff.  An implied in fact contract has the legal equivalency of an express contract.  *See In re Phillips Petroleum Sec. Litig.*, 697 F. Supp. 1344, 1356 (D. Del. 1988) (reversed on other grounds); *Chase Manhattan Bank v. Iridium Africa Corp.*, 239 F. Supp. 2d 402, 408-09 (D. Del. 2002).

*Fund, Ltd. V. CNET Networks, Inc.*, 954 A.2d 335, 338 (Del. Ch. 2008) (bylaws are contracts).[34]  Lorillard's claims made against plaintiff to enforce its own bylaws and certificate of incorporation also fall under exclusion (k) of the I&O Policy.

Having found exclusion (k) applicable, the court briefly addresses the "escape clause," which provides that the "exclusion shall not apply to liability which would have attached in the absence of such express contract or agreement." (D.I. 80, ex. E at LF2672)  The court disagrees with plaintiff's assertion that Lorillard's claims, if not based in contract, would have been considered libel or slander claims.[35]  Plaintiff points to a phrase in defendant's "summary of claims" that plaintiff made "false statements. . . consistent with ALF's pattern of attacks upon, and vilification of, Lorillard."  (D.I. 80, ex. E at A66 ¶ 7)  This statement is general background and, absent more, is insufficient to form a factual basis upon which claims of libel and slander could reasonably be based. Additionally, this statement was later removed through amendment.[36]  (D.I. 101 at 5, n.2)  Ultimately, Lorillard had ample opportunity to assert a claim for libel, slander, or

_____

[34]The law of the District of Colombia is consistent with that of Delaware on these points.  *See, e.g., Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005).

[35]Lorillard's November 13, 2001 letter and draft complaint threatening suit for libel and slander is insufficient to invoke the potential for "liability" under the escape clause.

[36]The date is unclear; presumably, the amendments to pleadings occurred early in the litigation, thereby removing any possible suspicion that Lorillard would pursue libel and slander claims.  Plaintiff states that the cited language was not amended out of the North Carolina Action; that action, however, was stayed pending resolution of the Delaware Action.

defamation and opted not to pursue those avenues of litigation. The court declines to find that such claims would have existed but for the contractual claims against plaintiff.

### 2. Conclusion

In conclusion, Lorillard sought relief for breaches of the MSA, plaintiff's bylaws, and plaintiff's certificate of incorporation – not the conduct underlying such a breach. Although the definition of "wrongful act" appears broad enough to encompass allegations of tortious conduct underlying a breach of contract claim, such conduct was never asserted by Lorillard in a legal proceeding, and exclusion (k) of the I&O Policy specifically excludes coverage for the contractual claims asserted by Lorillard. Put another way, no count or theory alleged by Lorillard invoked defendant's duty to

defend.[37] *Pacific Ins. Co.*, 956 A.2d at 1255.  Summary judgment is granted for

defendant on the I&O Policy ("Count III").

### C.  The National Union Umbrella Policies

To determine whether Lorillard's claims fall under Coverage A or Coverage B of

the National Union Umbrella Policies, it must first be determined whether the claims

were covered by any "scheduled underlying insurance."  If "scheduled underlying

insurance" covered the claims and was exhausted, Coverage A applies.  If the claims

fell outside of the "scheduled underlying insurance" policies, then a determination as to

whether Coverage B applies must be made.

---

[37]Having found no liability on the part of defendant, the court need not determine whether public policy would prohibit the enforcement of the I&O Policy.  The court notes that defendant cites two cases (from outside this jurisdiction) in which the courts found that primary organizational insurance policies should not cover contractual liability for public policy reasons, namely, to disallow insureds to deliberately back out of obligations and pass along the cost to their insurance carriers.  (D.I. 82 at 12, citing *American Cas. Co. of Reading, PA v. Hotel & Restaurant Employees & Bartenders Intern'l Union Welfare Fund*, 942 P.2d 172, 176-77 (Nev. 1997) and *August Entm't, Inc. v. Philadelphia Indemn. Ins. Co.*, 52 Cal. Rptr. 3d 908, 911-20 (Cal. App. 2d Dist. 2007))  The court has been unable to find an instance where the public policy positions advanced in these cases have been adopted by a Delaware court (or in the District of Columbia).  Absent a clear indication that the Delaware legislature seeks to void contractual liability arising under organizational insurance contracts, the court declines to adopt defendant's argument in this regard. *See Whalen v. On-Deck, Inc.*, 514 A.2d 1072, 1074 (Del. 1986) (stating that the Court would "not partially void what might otherwise be a valid insurance contract as contrary to public policy in the absence of clear indicia that such a [public] policy actually exists").  Moreover, at least one federal court has distinguished the holding of *American Cas. Co. of Reading* on the basis that that case involved a default on a contract where the insured was obligated to pay for services received.  *See Napoli, Kaiser, & Bern, LLP v. Westport Ins. Corp.*, 295 F. Supp. 2d 335, 342 (S.D.N.Y 2003).  This case involved no agreement by plaintiff to pay for a service, and the onerous implications of insured parties knowingly passing contract costs onto insurance companies would not potentially arise here.

Coverage B applies only to damages for liability due to bodily injury, property damage, personal injury or advertising injury caused by an "occurrence" which was not covered by scheduled underlying insurance.  (D.I. 85, ex. F at NAT204)  An "occurrence" is defined as "an offense arising out of your business that causes personal injury or advertising injury"; "[a]ll damages that arise from the same or related injurious material or act shall be deemed to arise out of one occurrence[.]"  (*Id.* at NAT209)  The parties debate whether any of the following three policies constitutes "scheduled underlying insurance":  the Travelers Primary Policies and the Scottsdale Policy.

### 1.  "Scheduled underlying insurance"

### a.  The Travelers Primary Policies

The Travelers Primary Policies provided coverage for "personal injury," "advertising injury," and "web site injury."  (D.I. 83, ex. M at A687)  The parties disagree on whether Lorillard's counterclaims in the Delaware Action qualify as "personal injury" or "advertising injury."  As noted previously, "personal injury" is defined as conduct that "slanders, libels [or] disparages" an entity; the court has held that Lorillard's claims did not sound in tort.  Additionally, the definition of "personal injury" in the Travelers Primary Policy excluded offenses arising out of advertising; "advertising injury" is characterized as "an offense committed in the course of advertising your goods, products or services." (*Id.*)  As discussed *infra*, the court finds that plaintiff does provide a "service," however, this determination is ultimately inconsequential insofar as the Travelers Primary Policies specifically exclude coverage for "advertising injury" resulting from "breach of contract." (*Id.* at A688)  As discussed previously, the court has construed Lorillard's allegations as

28

contractual claims; therefore, the Travelers Primary Policies were not "scheduled underlying insurance."

### b.  The Scottsdale Policy

Plaintiff argues that the Scottsdale policy cannot be "scheduled underlying insurance" because:  (1) it intended the policy to cover only its intern program; and (2) there is only an eight-day coverage overlap between the Umbrella Policies (April 24, 2001 to April 24, 2002) and the Scottsdale Policy (May 4, 2000 to May 4, 2001).  (D.I. 78 at 20-21)  As an initial matter, plaintiff itself recognizes the basic tenet of insurance policy construction that it is the plain language of the policy that controls.  Plaintiff is not an unsophisticated party and, regardless of its intent in obtaining the contract of insurance, was capable of recognizing that the Scottsdale Policy it procured was not, by its terms, limited to plaintiff's intern program.

The fact that the policies have only an eight-day overlap in coverage is more compelling.  A "Schedule of Underlying Insurance" is referenced by the Umbrella Policies but there is no dispute between the parties that the National Union Umbrella Policies do not name a primary insurer, policy number, or policy period for primary insurance.  Defendant, like plaintiff, is a sophisticated party.  In view of the court's general obligation to construe any ambiguities against the insurer, *New Castle County Del.*, 174 F.3d at 344, and the mere eight-day overlap in coverage, the court finds that the Scottsdale Policy was not "scheduled underlying insurance."[38]  The fact that

---

[38]Even had the court determined otherwise, however, a Coverage B determination would be necessitated by the fact that coverage would only apply for eight days.

defendant, in prior pleadings, characterized Travelers (and not Scottsdale) as plaintiff's "primary carrier" is also indicative of the soundness of this determination.  (D.I. 37 at ¶ 14)

### 2.  Coverage B applicability

Having determined that no "scheduled underlying insurance" covered the conduct alleged, the court must analyze whether Coverage B of the National Union Umbrella Policies is applicable.  An "advertising injury" as per Coverage B of the Umbrella Policies arises "solely out of your advertisement as a result of . . . slander or libel of a person or organization, or disparagement of a person's or organizations' goods, products or services in your advertisement[.]"  (*Id.* at NAT207)  This definition, like that for "personal injury," contemplates injury caused by the torts of slander, libel, or disparagement.  Exclusion (O) of the Umbrella Policies further provides, *inter alia*, that Coverage B insurance does **not** apply to "advertising injury" that "aris[es] out of a breach of contract, except an implied contract to use another's advertising idea" or is "committed by an [i]nsured whose business is advertising, broadcasting, publishing or telecasting."  (D.I. 85, ex. F at NAT218)

If plaintiff's truth® campaign is not an "advertisement," plaintiff cannot have suffered an "advertising injury" for which there may be coverage, *i.e.*, Coverage B cannot apply.  If the truth® campaign constitutes an "advertisement,"[39] the record

---

[39]The parties' arguments in this regard focus on whether plaintiff's truth® campaign was an "advertisement," or a "paid broadcast . . . about your goods, products or services for the purpose of attracting customers or supporters."  (D.I. 85, ex. F at NAT207)  More specifically, the parties debate whether plaintiff provides a "service" as contemplated by the policies.  On this point, it is the court's view that plaintiff provides a "service" (plaintiff's reason for existence is to educate the public about the ills of

demonstrates that Lorillard did not assert claims sounding in tort, *i.e.*, any advertising injury allegedly sustained by Lorillard (as asserted in the Delaware and North Carolina Actions) was **not** slander or libel or disparagement.  The above conclusions are buttressed by the exclusionary language found in Coverage B, to wit, that coverage is not provided for an insured whose business is "advertising, broadcasting, publishing or telecasting" or whose alleged "advertising injury" arises out of a breach of contract (exclusion (O)).

### 3. Conclusion

In view of the foregoing, the court finds that Lorillard did not allege an "advertising injury" as defined in the National Union Umbrella Policies; defendant was not obligated, therefore, to defend plaintiff against Lorillard's claims.[40]  Summary

---

smoking) in order to attract "supporters" (smoking converts, supporters of "the truth®" campaign, thetruth.com website participants, and/or donors) as those terms are used in the policies.  This view is consistent with the standard definition of "service" as cited by defendant (D.I. 78 at 22), implicit in the depictions of similar not-for-profit ads as "public service announcements."  Plaintiff has not pointed to case law that precludes such "educational spots" as "the truth®" ads as being classified as an "advertisement" as defined by the National Union Umbrella Policies.

[40]In view of this holding, the court need not ultimately reach defendant's argument that plaintiff never took the required steps to inform defendant of its purported duty to defend.  (D.I. 82 at 26)  The court notes, however, that defendant does not deny receiving a forwarded copy of correspondence from plaintiff's counsel (dated February 26, 2003) requesting that plaintiff's broker notify all insurers of Lorillard's counterclaims in the Delaware Action, nor does it deny having received six status reports regarding the litigation between July 30, 2003 and March 10, 2006.  Defendant's argument that more than notice of a lawsuit is required to be provided to an umbrella policy insurer ("affirmative steps to notify the umbrella insurer that it desires [its] assistance"), as compared to any other insurer, strains credibility in view of the fact that defendant had actual and prompt notice of Lorillard's claims.  Put most simply, plaintiff undoubtably did not keep defendant abreast of the litigation for no reason.

judgment is granted in favor of defendant with respect to the National Union Umbrella Policies.

## V.  CONCLUSION

For the reasons stated above, defendant's motion for summary judgment (D.I. 79) is granted and plaintiff's motion for summary judgment (D.I. 77) is denied.  An appropriate order shall issue.